**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>*Plaintiff*,<br><br>-*versus*-<br><br>**UBS SECURITIES LLC, UBS AG, MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC., and UBS REAL ESTATE SECURITIES, INC.,**<br><br>*Defendants*. | Civil Action No.: |

## COMPLAINT OF THE UNITED STATES OF AMERICA

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

BONNI J. PERLIN
MICHAEL J. CASTIGLIONE
RICHARD K. HAYES
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

BYUNG J. PAK
United States Attorney
Northern District of Georgia

ARMEN ADZHEMYAN
AUSTIN M. HALL
Assistant United States Attorneys
Northern District of Georgia
Richard B. Russell Federal Building
75 Ted Turner Dr., SW, Suite 600
Atlanta, Georgia 30303
(404) 581-6000

TABLE OF CONTENTS

**Summary of Claims** ......................................................................................................... 1

**The Parties** .................................................................................................................... 10

**Jurisdiction and Venue** ................................................................................................. 11

**Background** .................................................................................................................... 12

    I.   Mortgage Loan Origination and Securitization During the Relevant Period ................... 12

        A.  Mortgage Loan Origination .................................................................................. 12

        B.  The "Originate-To-Distribute" Business Model ...................................................... 14

        C.  Deteriorating Underwriting Practices During the Relevant Period ........................... 15

    II.  UBS' Securitization of Residential Mortgage Loans ....................................................... 18

        A.  UBS Principal Deals ............................................................................................. 18

            1.  UBS' Role in Principal Deals: Sponsor, Depositor, and Underwriter ................. 18

            2.  Loan Acquisition For Principal Deals .............................................................. 21

                a.  Bulk Purchases ...................................................................................... 21

                b.  Correspondent Channel, Mini-Bulk, and Wholesale Channel Acquired
                    Loans ..................................................................................................... 24

        B.  Third-Party Deals ................................................................................................ 24

        C.  The Structure and Credit Ratings of RMBS ......................................................... 26

        D.  Profitability of Principal and Third-Party Deals .................................................... 28

    III. UBS' RMBS Team .................................................................................................. 29

**UBS' Fraudulent Conduct** ............................................................................................ 30

    I.   UBS Made Numerous Misrepresentations and Misleading Statements about the
        Subject Deals and the Securitized Loans to Induce Investors to Purchase Certificates ... 30

        A.  Misrepresentations and Misleading Disclosures in the Offering Documents ............. 30

            1.  Misrepresentations about Compliance with Underwriting Guidelines and with
                Applicable Law and Regulations .................................................................. 32

            2.  Misrepresentations about Loan Characteristics ............................................... 36

        B.  Misrepresentations and Misleading Statements in Investor and Rating Agency
            Presentations ................................................................................................... 38

    II.  UBS Knew from the Credit and Compliance Due Diligence It Conducted that Its
        Representations as to Loan Quality Were False. .......................................................... 41

        A.  UBS' Credit and Compliance Due Diligence Process ............................................. 41

        B.  UBS Knew that There Was a High Probability that a Significant Number of the
            Unreviewed Loans Were Defective. ................................................................... 45

1.  UBS Knew from the High Credit and Compliance Reject Rates that There Was a High Probability that the Unreviewed Portions of the Pools Had Significant Numbers of Defective Loans. .............................................. 45

2.  In the Face of High Reject Rates, UBS Intentionally Manipulated Due Diligence Results to Avoid Identifying the Defective Loans It Knew Existed in the Unreviewed Loan Pools ........................................................... 47

3.  UBS Manipulated Its Due Diligence Processes to Avoid Identifying Additional Defective Loans. ................................................................... 50

C.  UBS Knew that a Significant Number of Securitized Loans in Its Home Finance Deals Violated Its Representations to Investors ........................................ 52

D.  UBS Securitized a Significant Number of Defective Loans in An Effort to Appease Originators Despite Knowing of Poor Underwriting Practices .................. 56

III. UBS Knew that Its Representations that Were Dependent on the Validity of the Originators' Property Valuations Were Highly Likely to Be False. ............................... 59

A.  UBS' Valuation Due Diligence Process .................................................. 61

1.  Valuation Due Diligence for MARM and MABS Deals ..................................... 64

2.  Valuation Due Diligence for Third-Party Deals ........................................ 66

3.  Valuation Due Diligence Tolerance Levels ............................................. 67

B.  UBS Routinely Securitized Loans with "Out of Tolerance" Valuation Due Diligence Results. ...................................................................... 68

C.  UBS Routinely Securitized "Flip Flag" and Loans That Had Not Been Subjected to Any Valuation Diligence in Violation of Its Representations to Investors and Rating Agencies about the Scope of Its Valuation Due Diligence ............................ 72

IV. UBS Knowingly Misrepresented or Omitted Other Material Loan Characteristics Affecting the Risk of the Underlying Mortgages in the Subject Deals. .......................... 76

A.  UBS Routinely Made Misleading Disclosures Pertaining to Borrower Equity Through Its Omission of Information Regarding Known Secondary Financing in Its Alt-A Deals. .......................................................................... 76

B.  UBS Routinely Misrepresented Countrywide's Underwriting Guidelines and Omitted Material Information Regarding DTI Ratios for Deals Securitizing Countrywide Loans. .................................................................... 79

C.  UBS Routinely Misrepresented FICO Scores for Seasoned Loans. ......................... 81

V.  UBS' Fraudulent Conduct Affected Federally-Insured Financial Institutions and Victimized Other Financial Institutions. ...................................................... 84

**Deal-Specific Facts ....................................................................... 87**

I.  MABS Deals ........................................................................... 87

A.  New Century Deals .................................................................. 87

1.  MABS 2006-NC1 ................................................................... 87

2.  MABS 2006-NC2 ................................................................... 89

3.  MABS 2006-NC3 .................................................................................. 91

B.  WMC Deals .................................................................................................. 95

1.  MABS 2006-WMC1 .......................................................................... 95

2.  MABS 2006-WMC2 .......................................................................... 95

3.  MABS 2006-WMC3 .......................................................................... 97

4.  MABS 2006-WMC4 .......................................................................... 98

5.  MABS 2007-WMC1 .......................................................................... 99

C.  Fremont Deals ............................................................................................ 101

1.  MABS 2006-FRE1 ........................................................................... 101

2.  MABS 2006-FRE2 ........................................................................... 102

D.  HE Deals .................................................................................................... 104

1.  MABS 2006-HE1 ............................................................................. 104

2.  MABS 2006-HE2 ............................................................................. 106

3.  MABS 2006-HE4 ............................................................................. 109

4.  MABS 2006-HE5 ............................................................................. 111

5.  MABS 2007-HE1 ............................................................................. 114

E.  Rent-a-Shelf: TBW 2006-6 ....................................................................... 115

II.  MARM Deals ....................................................................................................... 118

A.  Countrywide Deals..................................................................................... 118

1.  MARM 2006-OA2 ........................................................................... 118

2.  MARM 2007-2 ................................................................................. 121

3.  MARM 2007-3 ................................................................................. 125

a.  Credit and Compliance Due Diligence .................................. 125

b.  Valuation Due Diligence........................................................ 134

c.  Seasoned Loans ..................................................................... 134

B.  American Home Deals ................................................................................ 138

1.  MARM 2006-OA1 ........................................................................... 138

2.  MARM 2007-1 ................................................................................. 141

C.  Home Finance Deals .................................................................................. 146

1.  MARM 2007-HF1 ............................................................................ 146

2.  MARM 2007-HF2 ............................................................................ 150

III. Third-Party Deals ................................................................................................ 152

A.  Countrywide Deals..................................................................................... 152

1.  CWHL 2006-OA5............................................................................. 152

2. CWALT 2006-12CB ........................................................................... 154

3. CWALT 2006-OA3 ............................................................................ 156

4. CWALT 2006-OA7 ............................................................................ 158

5. CWALT 2006-OA8 ............................................................................ 160

6. CWALT 2006-23CB ........................................................................... 161

7. CWALT 2006-OA10 .......................................................................... 164

8. CWALT 2006-43CB ........................................................................... 166

9. CWALT 2007-OA2 ............................................................................ 168

10. CWALT 2007-24 ................................................................................ 172

B. American Home Deals ................................................................................ 175

1. AHMIT 2006-2 .................................................................................... 175

2. AHMA 2006-2 ..................................................................................... 179

C. RFC Deals ................................................................................................... 181

1. RALI 2006-QO7 .................................................................................. 181

2. RALI 2006-QS15 ................................................................................ 184

D. IndyMac Deals ............................................................................................ 186

1. INABS 2006-D .................................................................................... 186

2. INABS 2007-A .................................................................................... 189

E. Fremont Deal: FHLT 2006-B ..................................................................... 191

**Claims for Relief** ............................................................................................**194**

CLAIM I: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD ... 194

CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD . 196

CLAIM III: FIRREA CIVIL MONEY PENALTIES PREDICATED ON BANK FRAUD 198

CLAIM IV: FIRREA CIVIL MONEY PENALTIES PREDICATED ON
FRAUDULENT BENEFIT FROM A TRANSACTION WITH A COVERED
FINANCIAL INSTITUTION ............................................................................ 199

CLAIM V: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FALSE
STATEMENTS MADE TO INFLUENCE THE ACTIONS OF A COVERED
FINANCIAL INSTITUTION ............................................................................ 200

**Demand for Jury Trial** ....................................................................................**202**

**TABLE OF APPENDICES**

| Table Number | Description |
|---|---|
| 1 | List of Subject Deals |
| 2a | Misrepresentations and Misleading Statements in Prospectus Supplements for Subject Deals |
| 2b | Misrepresentations and Misleading Statements in Presentations to Investors and Rating Agencies |
| 3a | Principal Subject Deals: Credit & Compliance Due Diligence EV3 Rates |
| 3b | Third-Party and Rent-a-Shelf Subject Deals: Credit & Compliance Due Diligence EV3 Rates |
| 4a | Principal Subject Deals: Adjusted EV3 Rates Taking Into Account Waived Loans and Ungraded Loans in Samples Due to Missing Loan Files or Unavailability for Review |
| 4b | Third-Party and Rent-a-Shelf Subject Deals: Adjusted EV3 Rates Taking Into Account Waived Loans and Ungraded Loans in Samples Due to Missing Loan Files or Unavailability for Review |
| 5 | Valuation Diligence: Securitized "Out of Tolerance," "Flip Flag," and "No Diligence" Loans |
| 6 | Alt-A Subject Deals with Undisclosed Secondary Financing |
| 7 | Securitized Countrywide Loans with Debt-to-Income (DTI) Ratios Exceeding Underwriting Guidelines Disclosed in Prospectus Supplements |
| 8 | Subject Deals with Inaccurately Reported FICO Scores |

Plaintiff the United States of America alleges and complains against Defendants UBS Securities LLC, UBS AG, Mortgage Asset Securitization Transactions, Inc., and UBS Real Estate Securities, Inc. (collectively, "UBS" or "Defendants") as follows:

### SUMMARY OF CLAIMS

1.      Between January 1, 2005, and December 31, 2007 (the "Relevant Period"), UBS sold tens of billions of dollars of residential mortgage-backed securities ("RMBS"), in which it knowingly and repeatedly made false and fraudulent statements to investors about the characteristics of the loans backing those trusts.  This action relates to 40 of those RMBS ("the Subject Deals"), identified on the annexed Table 1, which UBS sponsored, issued, underwrote, managed, or offered during the Relevant Period.

2.      UBS securitized over $41 billion of mortgage loans in the Subject Deals, which proved to be catastrophic failures.  UBS repeatedly and intentionally misled investors, depriving them of the critical information capable of influencing their decisions to invest in the Subject Deals, and knowingly putting the investors at risk of harm.  Investors in those deals lost many billions of dollars, with substantially more in losses projected during the remaining life of the deals.

3.      In publicly-filed Offering Documents (defined in ¶ 70 *infra*), UBS knowingly and intentionally misrepresented key characteristics of the loans it securitized in the Subject Deals in order to conceal the fact that these loans were much riskier and much more likely to default than UBS represented to investors.  As anticipated by the risk profiles of the loans, which UBS concealed from investors, the loans backing the Subject Deals defaulted at exceptionally high rates.

4.      During the Relevant Period and even prior to the Relevant Period, UBS knew that the origination practices and standards of the lenders issuing mortgages (companies such as

Countrywide Home Loans, Inc. ("Countrywide"), Fremont Investment & Loan ("Fremont"), New Century Mortgage Corporation ("New Century"), WMC Mortgage Corp. ("WMC"), American Home Mortgage Corp. ("American Home"), and IndyMac Bank, F.S.B. ("IndyMac")) were severely deteriorating, yet continued to issue RMBS backed by loans issued by those (and other equally shoddy) originators.  Because of these poor origination practices, significant numbers of the loans UBS securitized in its RMBS were made to borrowers with little or no ability to repay, or based on property values that could not justify the loan amounts.

5.       In internal communications, UBS employees made their views on these originators' practices clear.  In one instance, a UBS trader concluded (a month before selling certificates backed by WMC loans to investors) that WMC loans were "quite possibly better than little beside leprosy spores."  Indeed, as early as 2004, a UBS due diligence manager had circulated internally "the top FIVE reasons to avoid purchasing Countrywide loans."   Additionally, by 2007, the head of mortgage trading at UBS had referred to a pool of Countrywide loans UBS was diligencing and ultimately purchased for one of the Subject Deals as "a bag of sh[*]t."  Similarly, just before UBS began underwriting Fremont loans to securitize in another Subject Deal, a UBS trader commented, "[T]hose guys are slimy."

6.       UBS knew that large percentages of these loans: (1) did not meet the originators' underwriting guidelines and did not have documented compensating factors to otherwise justify the loan; (2) were not originated in compliance with all applicable laws and regulations; and (3) were issued based on inaccurate, inflated or fraudulent appraisals of the properties underlying the loans.

7.       UBS represented to investors, through Offering Documents and other communications, that the loans in each deal had been underwritten generally in accordance with

underwriting guidelines or otherwise had documented compensating factors justifying an exception to the guidelines; that all the loans in the deal complied with all applicable laws and regulations; and that the values of the underlying properties supported the loan amounts.

8.      UBS knew these representations were false.  UBS was well aware from the due diligence it conducted on loans underlying every one of the Subject Deals that a significant percentage of the loans in each deal violated the above-described representations.

9.      UBS hired third-party vendors to conduct due diligence on the pools of mortgage loans that were to be securitized in each Subject Deal to determine whether the loans adhered to underwriting guidelines and applicable laws and regulations (known as "credit and compliance" diligence), and whether the appraised values for the underlying properties were reasonable (known as "valuation" diligence).

10.     While UBS made representations to investors about *all* of the loans in each deal, in conducting credit and compliance diligence in each deal, UBS generally reviewed a subset of the loans, referred to as "samples."  Often these samples were 5% or 10% of the entire loan pool, and occasionally even less.  UBS' practice was to review a sample that was partially drawn at random and partially drawn through what it called "adverse" selection[1].

11.     UBS knew that its samples were "benchmarks" for the remaining loans in the pool, meaning that defects observed in the samples were indicative of similar defects in the unreviewed portions of the pools, and referred internally to its sampling methodology as providing "representative sample[s]."

---

[1]  "Adverse" selection refers to a process whereby loans were identified using criteria that purported to identify loans with characteristics that could signal heightened risk.  As further discussed below, because of the manner in which adverse criteria was utilized by UBS, these criteria did not capture all, or even most, of the loans potentially violating representations to investors.

12.     UBS' credit and compliance due diligence vendors informed UBS that significant percentages of the loans they reviewed in their samples for the Subject Deals did not comply with underwriting guidelines and had no documented compensating factors or did not comply with all applicable laws and regulations.  These "defective"[2] loans were referred to as "kicks" or "rejects" and the percentage of defective loans in the sample was referred to as the "reject" or "kickout" rate.

13.     UBS knew, from the high percentages of defective loans identified in the due diligence results, especially given its use of random sampling, that significant numbers of loans that did not comply with underwriting guidelines or with the law were also highly likely to exist in the unreviewed[3] portion (usually 75% to 95%) of the loan pools.

14.     Indeed, UBS had an internal policy dictating additional review in the face of high percentages of rejects in a sample in order to gain "comfort" with the rest of the pool.  Yet, despite regularly observing high reject rates in the samples, UBS looked at additional loan files only sometimes, instead reviewing only the originators' loan tapes – spreadsheets containing the loans' purported collateral characteristics – for the unreviewed portion of the loan pools.  On the occasions that UBS did look at additional loans outside the sample, the results of those reviews invariably confirmed that the unreviewed portions also contained significant percentages of loans that did not meet the representations being made to investors.

15.     Moreover, when faced with poor due diligence results, UBS regularly manipulated its credit and compliance due diligence results to artificially reduce the reject rates in order to avoid

---

[2]   References to "defective" loans herein refer to loans whose characteristics were in contradiction to the representations being made to investors or otherwise should not have been securitized.
[3]   The term "unreviewed" herein refers to loans securitized by UBS that were not subjected to loan-by-loan review in credit, compliance, or valuation due diligence.

additional review.  UBS did this by, among other methods, instructing vendors to "waive in" defective loans with no explanation, and inventing a malleable and arbitrary category of "soft" defective loans, which were excluded from UBS' reject rate calculations despite the fact that they were kicked from the pool along with so-called "hard" defective loans.  When manipulation alone was insufficient to squeeze due diligence results into compliance with UBS' policies, UBS simply loosened the policies as needed to close the deal.  When even that was not enough, UBS turned a blind eye to poor due diligence results or fabricated baseless excuses for them.

16.     In the 21 Subject Deals for which UBS actually conducted any valuation diligence, UBS hired separate valuation due diligence vendors to conduct valuation diligence and review the loan pools to assess whether the originators' appraisals on the properties were reasonable.

17.     These valuation due diligence vendors informed UBS that the property values of thousands of loans it was securitizing in the Subject Deals were "out of tolerance" at their last stage of valuation due diligence, meaning that there was a high probability that the loans had materially inflated property valuations.

18.     In the face of these poor due diligence results, UBS took no steps to excise loans from the unreviewed portions of the loan pools that would contradict its representations to investors.  Nor did UBS change its representations to accurately reflect the loan characteristics of the entirety of the loan pools based on what it knew from due diligence.  Instead, UBS sold RMBS certificates backed by these loans to investors knowing that the investors were not getting what they paid for.

19.     UBS accepted poor due diligence results in order to maintain its relationships with its most important clients: originators such as Countrywide, Fremont, New Century, WMC,

American Home and IndyMac.  Without access to loans from these and other originators, UBS would have been shut out of the RMBS business.

20.     Loan originators did not want their loans kicked from deals by UBS and took steps to limit the scope of due diligence to ensure that UBS bought or securitized as many loans as possible.  Rejections of their loans in due diligence were costly to originators.  If a securitizing bank, such as UBS, refused to buy or securitize a loan because of due diligence findings, the originator would likely be forced to sell the rejected loan in the "scratch and dent" market[4] at a steep discount – an unprofitable and unpalatable option for originators.

21.     Originators frequently pressured UBS to accept poor diligence results and defective loans under the threat of ending their business relationships.  UBS acceded to that pressure from originators time and time again.  Appeasing loan originators was a paramount consideration at UBS during the Relevant Period.  As a UBS trader noted, in reference to one particular originator, "if they're really that unhappy, they just won't sell us the loans tomorrow; and . . . I really don't want to get to the point where they hate us."  UBS' head of Asset Backed Securities similarly commented on the possibility of more stringent due diligence: "we run the risk of alienating everyone that sells loans to us."

22.     One example of UBS bowing to originator pressure and knowingly securitizing loans that did not meet representations occurred in one of the Subject Deals called AHMIT 2006-2.  In the course of creating that deal, UBS' own lawyers informed it and the originator, American Home, that disclosures were needed to warn investors of the extremely poor due diligence results.  Given that such disclosure would have been highly irregular for a non-"scratch & dent" deal,

---

[4] The "scratch & dent" market was typically reserved for mortgage loans that had not been originated in accordance with underwriting guidelines or that had experienced missed payments.  Loans sold in this market were often sold at a steep discount.

American Home quickly made clear in an email to UBS "this language is not going to happen." Thirty-five minutes after American Home emailed UBS, and without taking any additional steps to excise loans violative of the representations or to modify those representations to address the problem, UBS signed off on the transaction, knowing that the Offering Documents were false and misleading.

23.     While UBS boasted about the purported effectiveness and comprehensiveness of its due diligence process in presentations to its investors, UBS' due diligence was essentially window dressing.  UBS primarily conducted due diligence to give the appearance to investors and rating agencies that UBS had a process in place to ensure that the loans in its deals complied with the representations it made to investors, rather than to ensure that was actually the case.  Despite the deficiencies in UBS' due diligence process, however, UBS' due diligence still informed it of significant numbers of defective loans securitized in the Subject Deals.  By UBS' former employees' own admissions, UBS knew at the time it performed due diligence that it was not eliminating loans with characteristics that contradicted UBS' representations to investors about the loans in the Subject Deals.  Or, as a UBS trader concluded in a 2006 instant message conversation, "our crack due diligence effort is a joke."

24.     Internally, UBS employees openly discussed the poor quality and expected poor performance of its deals.  Among other examples, in reference to the Subject Deal called MABS 2006-WMC3, a UBS employee acknowledged concern about "how [the loan pool] ended up this bad" and bluntly stated that if people "thought wmc 2 performance was bad wait until this one goes out."  After a Subject Deal called MARM 2007-3 suffered large losses in its first month, a UBS trader sarcastically noted: "MARM 07-3 has HUGE delinquencies in Month 1 (big surprise!)."  With regard to a pool of New Century loans eventually securitized in Subject Deal

MABS 2006-NC3, a due diligence manager noted to others at UBS, "This deal is horrific!!!."  A UBS structurer referred internally to Subject Deal INABS 2007-A as "that piece of c__p" prior to certificates being sold.

25.     UBS, to further give the appearance that it had a legitimate process that ensured loans complied with representations, made presentations to investors and rating agencies including Standard & Poor's Financial Services LLC, and Moody's Investors Service, Inc., detailing its purported diligence processes.  These presentations were meant to persuade investors and rating agencies that UBS had an effective and sufficient diligence process to validate its representations to investors.  As detailed below, these presentations were riddled with misrepresentations and misleading statements.

26.     Beyond UBS' misrepresentations regarding adherence to guidelines, adherence to the law, and loans being supported by property values, UBS also routinely and intentionally misrepresented or omitted a litany of other key loan characteristics to obscure the true risk profile of each deal.  As detailed below, these misrepresentations and omissions included the following:

(i)     UBS routinely misrepresented Countrywide's underwriting guidelines with respect to permitted debt-to-income ratios and omitted information related to those misrepresentations;

(ii)    UBS routinely made misleading disclosures regarding known secondary financing; and

(iii)   UBS routinely misrepresented FICO scores for seasoned loans.[5]

27.     UBS' conduct during the Relevant Period served to maintain its business relationships with originators, ensure that its deals closed, and yield handsome profits for its RMBS business.

---

[5] A "seasoned" loan is generally one that is six months or more past its origination date.

28.     UBS sold its RMBS based on misrepresentations, while at the same time it also sought to minimize its own economic exposure by offloading all risk from the Subject Deals onto others.  An internal UBS memorandum outlined this strategy: "It is the business' intent to fully distribute all risk in the MASTR program deals within a short period; i.e., the business does not keep 'hold' positions."  In response to the poor performance on one particular deal, a UBS trader stated this strategy more bluntly in an instant message conversation, stating that the losses were "someone else's problem."

29.     The conduct of UBS' RMBS personnel during the Relevant Period reflected a business culture that tolerated and, in some instances, even encouraged misrepresentations.  In June of 2006, a structurer complained directly to the leadership of the RMBS business about his serious concerns with the business culture including that he was "really concerned [about the] 'lack of right and wrong — aka ethics' — ie. [sic] Lying is ok."

30.     UBS sold certificates in the Subject Deals to a wide range of investors that included, among other entities: financial institutions (many of which were federally-insured), government-sponsored entities (such as Fannie Mae and Freddie Mac), federal home loan banks, credit unions, pension plans, and university endowments.   Many of these investors suffered devastating losses.

31.     The United States now brings this action pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 498, tit. IX, § 951, *codified as amended at* 12 U.S.C. § 1833a, to recover civil penalties and other appropriate relief from UBS on account of its fraudulent and illegal conduct, including its intentional misrepresentations to investors and material omissions about the Subject Deals.

32.     The United States seeks from UBS the maximum civil penalties available under FIRREA, and other appropriate relief, for engaging in one or more schemes constituting: (a) mail

fraud affecting federally-insured financial institutions; (b) wire fraud affecting federally-insured financial institutions; (c) fraud on or attempted fraud on financial institutions; (d) fraud in obtaining or attempting to obtain money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, financial institutions, by false or fraudulent pretenses, representations, or promises; (e) fraud in benefiting from transactions with financial institutions; and (f) the making of false statements to influence the action of certain financial institutions. *See* 12 U.S.C. § 1833a; 18 U.S.C. §§ 1005, 1014, 1341, 1343, and 1344.

## THE PARTIES

33.     Plaintiff is the United States of America, a body politic and sovereign.  It brings this action in its own right pursuant to FIRREA, 12 U.S.C. § 1833a.

34.     Defendant UBS Securities LLC ("UBS Securities") is a Delaware limited liability company with its headquarters and principal place of business at 1285 Avenue of the Americas in New York, New York.  UBS Securities is wholly-owned, directly, in part, and indirectly, in part, by UBS Americas Holding LLC, which is a wholly-owned subsidiary of Defendant UBS AG.  UBS Securities is a registered securities broker-dealer with the United States Securities Exchange Commission ("SEC").  It served as the lead or managing co-lead underwriter for each Subject Deal.

35.     Defendant UBS AG ("AG") is a Switzerland-based multinational banking, investment banking, and financial services company, with a United States headquarters at 1285 Avenue of the Americas in New York, New York.  On information and belief, AG operates in all 50 States, as well as in the District of Columbia.  AG had a direct role in many of the Subject Deals, serving as "Swap Provider," "Cap Provider," "Corridor Contract Counterparty" or "Yield

Maintenance Agreement Provider."  AG also directly originated loans, later securitized in two of the Subject Deals, through the trade name "UBS Home Finance."

36.     Defendant Mortgage Asset Securitization Transactions, Inc. ("MASTR") is a Delaware corporation with its principal place of business located at 1285 Avenue of the Americas in New York, New York.  MASTR is a wholly-owned subsidiary of UBS Americas, Inc.  MASTR was the depositor and registrant for all of the Subject Deals whose names begin with "MARM," or "MABS."  It was responsible for registering certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

37.     Defendant UBS Real Estate Securities, Inc. ("UBSRES") is a Delaware corporation with its principal place of business located at 1285 Avenue of the Americas in New York, New York.  UBSRES is a wholly-owned subsidiary of UBS Americas, Inc.  UBSRES, as sponsor, was responsible for acquiring, holding, and transferring the loans securitized in these Subject Deals.

### JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1833a(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

39.     Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Significant numbers of loans underlying the Subject Deals were secured by homes and other properties located in this District.  UBS marketed and sold RMBS backed by materially defective loans to investors in this District, who incurred significant losses on their investments.

40.     Venue also lies in this District under 28 U.S.C. § 1395 in that this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and all Defendants are found

in this District.  The Defendants are all found in this District because they reside in this District under 28 U.S.C. § 1391(c)(2),(3), and (d), and are subject to personal jurisdiction in this District.

41.     The Defendants are all subject to personal jurisdiction in this District.  Defendants UBS Securities, MASTR, and UBSRES maintain (or maintained during the Relevant Period) their principal place of business in the State of New York.  Together with UBS AG and its respective subsidiaries and corporate affiliates, these entities regularly perform (or performed during the Relevant Period) a substantial amount of business within the State of New York, and provide(d) banking and investment banking services to persons and entities in the State of New York, including, during the Relevant Period, the marketing and sale of RMBS.  Substantially all of the events, actions, representations, and omissions alleged herein relating to the Subject Deals occurred in New York.

## BACKGROUND

## I.     Mortgage Loan Origination and Securitization During the Relevant Period

### A.     Mortgage Loan Origination

42.     RMBS are securities backed by residential mortgage loans.  A mortgage loan is a loan made to the owner of real property secured by the value of that real property.

43.     When a current or prospective homeowner wants to borrow money to purchase or refinance a home, he or she typically seeks a loan from a mortgage lender, also known as an "originator."  In exchange for the money to buy or refinance the home, the borrower promises to repay the original amount lent (the "principal"), plus interest at either a fixed or adjustable rate. This promise is documented in a promissory note.  The originator obtains a lien against the home, on which it can foreclose if the borrower defaults on his or her obligation to repay.

44.     To determine whether a borrower has the wherewithal to repay the loan on the terms set forth in the note, and also whether the value of the particular property supports the loan amount,

an originator performs a process called "loan underwriting."  The originator applies loan underwriting standards or "guidelines" to determine whether a particular borrower is qualified to receive a mortgage for a property on the terms offered.

45.     Loan underwriting guidelines typically require an underwriter to consider a variety of key facts about the borrower, including: the borrower's overall debt level, annual income, debt-to-income ("DTI") ratio, amount of cash reserves or disposable savings, employment history and prospects for future employment, credit history, and credit score (a measure of a borrower's credit risk, also called a "FICO score").  Factors considered that concern the property itself are: whether the property was owner-occupied or investor-owned, the nature of the property (e.g., single family home, multi-family home), and the ratio of the loan amount to the property value, also known as the loan-to-value ("LTV") ratio.  Often, other liens on the property are also considered, in what is referred to as the combined loan-to-value ("CLTV") ratio.

46.     To determine whether the borrower is likely to repay the loan, the mortgage lender considers whether the loan fully complies with the loan underwriting guidelines.  If it does not strictly comply with the guidelines, the mortgage lender considers whether there are sufficient "compensating factors" that nevertheless justify the extension of credit to the borrower. "Compensating factors" must relate to, and materially offset, the particular deviations from the underwriting guidelines that apply to the loan.  For example, if a borrower has a slightly higher than acceptable DTI, a compensating factor may exist if the borrower has significant cash reserves to make up for the smaller income.

47.     In addition, the originator must assess the adequacy of the value of the collateral securing the loan.  An appraisal of the property enables the originator to consider how much

collateral the lender will be able to recover if the borrower defaults and the property is foreclosed upon or sold.

48.     The LTV and CLTV ratios are, in part, used by lenders to gauge the risk of default by a prospective borrower.  As the LTV or CLTV ratio increases, the amount of equity that the borrower has in the home decreases along with the borrower's willingness to repay the loan.  A delinquent borrower with little to no equity in a property may have little incentive to work with a lender to bring the loan current to avoid foreclosure, and instead may be more willing to walk away from the mortgage debt, particularly where home values are declining or where a borrower faces an unexpected financial hardship (such as loss of a job, divorce or an unexpected medical emergency).  Where the CLTV ratio exceeds 100%, the risk that a borrower will walk away from his or her mortgage becomes especially strong, as the borrower is "underwater" and has no (or negative) equity in his or her home.

49.     The originator must also ensure that the loan complies with all applicable laws and regulations.  There are many provisions of federal and state law designed to prevent predatory lending and other improper lending practices.  For example, the federal Truth in Lending Act ("TILA") requires that lenders provide borrowers with an accurate disclosure of the loan's annual percentage rate ("APR"), term of the loan and total costs to the borrower, and that the disclosure be made in a conspicuous manner and provided to the consumer prior to signing the loan documents.  Similarly, during the Relevant Period, and until October 3, 2015, the HUD-1 closing statement was a required document that set forth, in part, a complete list of charges for which the borrower was responsible, as well as the total amount of money required to be paid by the borrower at closing in order to finalize the real estate transaction or mortgage loan refinance.

### B.     The "Originate-To-Distribute" Business Model

50.     Historically, when an originator made a mortgage loan to a borrower, it held the loan on its own books for the duration of the loan.  Originators profited over time as they collected monthly principal and interest payments directly from borrowers.

51.     When originators held the loans, they also retained the risk if a borrower defaulted on the loan.  Because the originator was exposed to the risk, it had a financial incentive to ensure that the loan was properly underwritten, meaning that the borrower had the financial ability to repay the loan and that the underlying property had sufficient value to enable the originator to recover its principal if the borrower defaulted.

52.     In the 1990s and 2000s, however, originators increasingly turned to "securitizing" mortgages.  The originators would sell large pools of mortgages to investment banks to be structured into RMBS.  These investment banks would, in turn, sell RMBS certificates, or in common parlance, "mortgage bonds," to various investors, rarely holding any significant portion of the purchased loans or resulting securities on their own books for the long-term.

53.     By selling their mortgages, the originators obtained the proceeds from the sale of the mortgages up front, offloading the risk of borrower default, and obtaining new capital to originate additional mortgages.  Similarly, by selling their securities, investment banks likewise offloaded the risk of borrower default and generated new capital to purchase additional pools of mortgage loans to structure and issue as securities.  By continuously creating new capital in this way, the originators and investment banks were able to repeat this process over and over again.  Thus, both the originators' and investment banks' profitability largely turned on the volume of loans they could originate or securitize.  This focus on volume ultimately led to the deterioration of loan underwriting standards.

C.     **Deteriorating Underwriting Practices During the Relevant Period**

54.     Under the originate-to-distribute business model, the risk exposure related to borrower default shifted from the originators, and subsequently the investment banks, and passed along to the investors in the RMBS certificates.

55.     As a result, the originators' incentive to ensure that loans were properly underwritten and that borrowers had the long-term ability to repay their loans was replaced by a desire to originate as many loans as they could in the shortest time possible.  Underwriting guidelines, which previously protected originators' long-term interest, subsequently became barriers to the high-volume loan underwriting necessary to sustain the new business model.  Just as originators' profits turned on their ability to originate more loans, investment banks' profits turned on their ability to acquire more loans to securitize.

56.     UBS' RMBS business utilized several channels of loan acquisition to fuel its securitization program.  UBS' primary method of acquisition was through "bulk" purchases of loans, which were single-pool purchases by UBS with a total value of more than $20 million.  Purchases of loan pools that were worth less than $20 million cumulatively were referred to as "mini-bulk" purchases.   UBS also purchased individual loans, referred to as "conduit," "correspondent," "loan-by-loan" or "LBL" purchases.  In addition, in 2006 UBS began originating loans through its affiliate UBS Home Finance ("Home Finance").

57.     Investment banks, including UBS, typically performed some amount of due diligence prior to purchasing, or securitizing, large pools of loans.  The purpose of this due diligence was ostensibly to ensure that the loans being purchased were (1) originated in accordance with underwriting guidelines or with compensating factors; (2) originated in compliance with all applicable laws and regulations; and (3) supported by adequate collateral.

58.     Due diligence took time to complete, required additional cost expenditures, and typically resulted in investment banks identifying a number of loans from the pool for rejection for failing (1) to be originated in accordance with underwriting guidelines or with compensating factors; (2) to comply with all applicable laws and regulations; or (3) to have collateral values that adequately supported the loan amount.

59.     Originators did not want their loans kicked from deals.  If an investment bank, such as UBS, rejected a loan during due diligence, the originator potentially would be forced to find another buyer (and possibly have to disclose that another bank had rejected the loan), sell the rejected loan in the "scratch & dent" market at a deep discount or keep the rejected loan on its own balance sheet and bear the risk of loss on the loan.

60.     As a result, originators pressured investment banks to limit both the amount of due diligence performed and the number of loans rejected.  Originators exercised this pressure through a carrot-and-stick approach.  Originators gave more business and better terms to investment banks with less stringent due diligence requirements.  Conversely, originators gave worse terms and limited or outright refused to sell loans to investment banks that did not agree to originator-imposed limitations on due diligence.

61.     UBS' primary focus was "maintaining relationships" with originators, which UBS considered to be its clients.  For example, when a trader at UBS was asked for his "Top 5 clients" in 2006, he responded, "In terms of money making counterparties it would have to be the originators, ie we made 20mm by buying whole loans from fremont. So I would add New Century and WMC to the list."

62. Because of this dynamic, UBS routinely acceded to originators' demands to limit due diligence, knowing full well that the quality of the loans being originated, and the processes being used by originators to underwrite them, were deteriorating.

## II. UBS' Securitization of Residential Mortgage Loans

63. Investment banks such as UBS played a central role in arranging the securitization of mortgage loans and in making, or verifying and adopting, key representations to investors about the securities and the mortgage loans being securitized.

64. UBS securitized residential mortgage loans in two main ways: "principal" or "shelf" deals, and "third-party" or "agented" deals. [6]

### A. UBS Principal Deals

#### 1. UBS' Role in Principal Deals: Sponsor, Depositor, and Underwriter

65. During the Relevant Period, UBS purchased residential mortgage loans for the purpose of securitizing those loans in RMBS in "principal" transactions using its own SEC registered shelves. A "shelf registration" is an SEC regulated procedure by which a corporation files a registration statement with the SEC in order to offer and sell multiple issuances of the same security over a period of time.

66. In principal Subject Deals, UBS acquired subprime and Alt-A loans for the purpose of securitizing them. UBS structured and securitized these loan pools on its own registered shelves

---

[6] At times, UBS also utilized a third method of securitization, known as "rent-a-shelf." In a rent-a-shelf deal, UBS would allow an originator to securitize loans off a UBS shelf without UBS actually purchasing the loans or taking on the risk of holding whole loans on its books.

using a variety of affiliates, including entities known as "sponsors"[7] and "depositors."[8]  UBS then issued,[9] underwrote,[10] and sold RMBS certificates to investors through affiliated entities. Investors expected to receive principal and interest payments based on the cash flows from the underlying loans.

67.     UBS had several shelves from which it issued RMBS.  All of the principal Subject Deals were issued off of either the MASTR Asset-Backed Securities ("MABS") shelf or the MASTR Adjustable-Rate Mortgage ("MARM") shelf.  UBS securitized subprime loans on the MABS shelf and Alt-A loans, made up largely of adjustable rate loans, on the MARM shelf.

68.     The sponsor (UBSRES) and underwriter (UBS Securities), together selected the other members of the transaction team.  They hired, among other parties, a "custodian" to maintain possession of the mortgage loan files; a "servicer"[11] to administer the relationship with the borrowers, to collect payments on the loans and to foreclose on the mortgages or employ other forms of loss mitigation in the event of default; a "trustee" to act on behalf of the investors; and other entities to handle other functions associated with the security.

---

[7] Generally speaking, the pool or pools of loans to be securitized in a principal deal were aggregated by an entity known as a "sponsor," which was responsible for acquiring, holding, and transferring (to the "depositor") the loans to be securitized in the RMBS.  The sponsor for each UBS principal deal was defendant UBSRES. The sponsor then sold the aggregated loans to the depositor.

[8] The depositor purchased the loans from the sponsor in order to deposit the loans into a special purpose entity created by the depositor that is sometimes called the "issuer" or "issuing trust" and whose name typically contained the name of the security.  In each of the principal Subject Deals, UBS utilized defendant MASTR as the depositor.

[9] After receiving the mortgages from the depositor, the issuing trust then held the pool of mortgages during the remaining duration of the RMBS' existence.

[10] UBS Securities was the sole underwriter in all of the principal Subject Deals, and sole, lead or co-lead underwriter in all of the third-party Subject Deals.

[11] "Servicers" were responsible for interacting directly with the borrowers on the underlying loans, collecting the monthly mortgage payments (including principal and interest payments), and remitting the funds to the issuing trust or trust administrator for distribution to the RMBS investors, in accordance with the terms of the PSA.  Servicers were also responsible for managing and responding to any delinquencies or defaults on the underlying mortgage payments, such as by negotiating forbearances and loan modifications with the borrowers or alternatively pursuing collection efforts including through mortgage foreclosures.

69.     The underwriter (here, UBS Securities) was responsible for coordinating and supervising all the transaction team members, structuring the deal, conducting the requisite due diligence, preparing or coordinating the preparation of Offering Documents (defined in ¶ 70 *infra*), ensuring that the Offering Documents and other materials truthfully disclosed to investors all material information, and marketing and selling the RMBS certificates to investors.

70.     The "Offering Documents" included: (1) the prospectus supplement ("ProSupp"), which provided granular detail on the purported characteristics of the loans in a particular RMBS; (2) the Mortgage Loan Purchase Agreement ("MLPA") or similar agreements, which described the basic characteristics alleged to be true of each of the loans being sold; (3) the Pooling and Servicing Agreement ("PSA"), which arranged for a trustee and a servicer to collect and distribute loan payments; (4) mortgage loan schedules, which detailed certain characteristics of each loan; and (5) marketing materials, including term sheets, free writing prospectuses ("FWP"), draft prospectuses, slideshow presentations, and loan data, all used to market and sell the certificates to investors.

71.     Before issuing any RMBS, a depositor (here, MASTR) filed with the SEC a base prospectus and a shelf registration statement.  The base prospectus described the characteristics of later issuing trusts that the depositor proposed to establish.  For example, a base prospectus might have informed the SEC that the depositor planned to engage in future offerings of residential mortgage loans that complied with origination standards and that complied with law.

72.     With respect to each specific issuing trust, the depositor then filed with the SEC a ProSupp that applied only to that particular trust.  The depositor also filed with the SEC, as part of a Form 8-K, various other documents, such as the PSA (typically).

73.     Between the filing of the base prospectus and the ProSupp, the depositor generally filed, and disseminated to investors, FWPs and/or term sheets, which served as preliminary supplements to the base prospectus.  The FWP contained statistical information about the characteristics of the loans being securitized and representations as to the loans' origination standards and compliance with law.

74.     The contents of the Offering Documents were dictated, in large measure, by the then-existing version of SEC Regulation AB, 17 C.F.R. § 229.1111 (March 8, 2005), which confirmed the general obligation of RMBS underwriters to disclose all material facts relating to the issuance.  Recognizing that "the characteristics and quality of the asset pool…is often what is most important to investors," (70 Fed. Reg. 1508 (Jan. 7, 2005)) Regulation AB required a description of "the material characteristics of the asset pool." 17 C.F.R. § 229.1111(b).  Regulation AB also required a "description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden," and the disclosure of other material statistics regarding the underlying loans (e.g., LTV ratios, credit scores, occupancy types, etc.).  17 C.F.R. § 229.1111(a)(3), (b).

75.     UBSRES (sponsor), MASTR (depositor), and UBS Securities (underwriter) were each staffed by essentially the same group of UBS employees.  The UBS employees who carried out the securitization steps on behalf of these entities made no distinction in their roles for each entity, and typically considered themselves to simply be employees of "UBS."

### 2.  Loan Acquisition For Principal Deals

#### a.  Bulk Purchases

76.     During the Relevant Period, UBS purchased the majority of loans for securitization in principal deals in bulk pools sold by large mortgage loan originators.  In the subprime space,

UBS' largest bulk client originators included Fremont, New Century, and WMC.  In the Alt-A space, UBS' largest bulk client originators included Countrywide, American Home, and IndyMac.

77.     Generally, the process through which UBS acquired loans via bulk purchases began with UBS bidding against other investment banks for a pool of whole loans offered for sale at auction by an originator.  UBS typically had at most only a few days from the date of the offer within which to bid.

78.     With its bid solicitation, the originator generally provided UBS and other investment banks with a "loan tape" that contained representations about the "collateral attributes" of each loan in the pool, including, among other things, loan balance and term, interest rate, mortgage product type (e.g., fixed interest rate or adjustable rate), borrower FICO score, DTI, LTV and CLTV ratios.

79.     In deciding whether and how much to bid on an offered pool, UBS, through its collateral analysts, would "crack the tape" (i.e., map originator-specific data fields and formats into standardized UBS data fields and formats) and prepare "stratifications," or summary data regarding the pool.  UBS collateral analysts, as well as the UBS due diligence and trading teams, then closely analyzed the "cracked" loan tape and stratified data.

80.     The trading desks determined whether and at what price to bid on an offered pool. In addition to setting the bid price, the trading desk sometimes made a bid subject to certain "bid stipulations" or "bid stips," which were terms and conditions for the purchase.  Bid stips typically detailed, among other things, the scope of and timetable for due diligence, any minimum credit parameters required by UBS, the circumstances under which the originator would repurchase loans, and servicing rights.

81.     UBS routinely, as part of the bid stips, agreed to limit the percentage of loans that UBS could examine as part of due diligence prior to the closing of the purchase.  UBS frequently agreed to examine as little as 25% of the loan pools in subprime deals and 10% of the loan pools in Alt-A deals.  In some cases, UBS agreed to even smaller due diligence samples in order for the originator to even consider UBS' bid.

82.     After an originator conditionally accepted UBS' bid, UBS' collateral analysts screened each pool for loans that did not conform to UBS' credit policies or bid stipulations.  Through this process, loans were either flagged or removed from the pool.  Separate from this preliminary screening of the loan pool, UBS subsequently conducted due diligence.  UBS' due diligence process for bulk purchases consisted of a credit, compliance, and valuation review.

83.     UBS informed investors and rating agencies that, among other things, their due diligence process was: (1) implemented by companies with expertise in assessing loan quality; (2) designed to assess multiple loan characteristics relevant to the quality of the loans; (3) designed to confirm the value of the underlying collateral; (4) constantly updated to improve the system based upon prior results; and (5) applied to a sufficiently large sample to give UBS "comfort" as to the characteristics of the unreviewed portions of the pools.  UBS investors were led to believe that due diligence was intended to clean the pool of loans that did not comply with guidelines.

84.     UBS engaged third-party vendors to conduct credit and compliance due diligence on loan samples, including The Clayton Group, Inc. ("Clayton"), The Bohan Group, Inc. ("Bohan"), American Mortgage Consultants, Inc. ("AMC"), Mortgage Data Management Corporation ("MDMC") and Opus Capital Markets Consultants, LLC ("Opus").

85.     UBS also engaged third-party vendors to conduct valuation due diligence on loan pools, including CoreLogic Systems, Inc. (C&S Marketing) ("C&S"), Fidelity Hansen Quality ("Hanqual"), and Collateral Risk Solutions ("CRS").

86.     These third-party vendors provided regular updates to UBS, including by emailing reports or summaries, or posting reports to secure databases and websites that UBS could access.

87.     The internal due diligence groups at UBS, working in conjunction with the relevant trading desks, then decided which loans to purchase and which loans to reject from the pool.  After due diligence was completed, UBS compiled a final list of loans to purchase.

88.     The loan pools that UBS purchased were then held on the balance sheet for the trading desk responsible for the purchase until the loans were securitized or otherwise sold.

### b.     Correspondent Channel, Mini-Bulk, and Wholesale Channel Acquired Loans

89.     UBS also purchased loans from smaller originators, known as correspondent lenders, on a loan-by-loan basis ("the correspondent channel"), and also on a mini-bulk basis (purchases of pools worth less than $20 million).  Additionally, UBS originated loans itself through a "wholesale lending channel" operated by UBS Home Finance.

### B.     Third-Party Deals

90.     In third-party or "agented" deals, UBS did not purchase the underlying loans pools, but instead underwrote the RMBS for other issuers.

91.     When acting as underwriter in third-party deals, similar to principal deals, UBS, whether as lead or co-lead underwriter, was responsible for coordinating and supervising all the transaction team members; structuring the deal; conducting the requisite due diligence; preparing or coordinating the preparation of Offering Documents; ensuring that the Offering Documents and

other materials truthfully disclosed to investors all material information; and marketing and selling the RMBS certificates to investors.

92.     In the third-party Subject Deals, UBS entered into "underwriting agreements" with originators to underwrite securitizations backed by the originators' loans, either as the sole underwriter or as part of a syndicate consisting of other investment banks.  On some occasions, UBS bid for these assignments against other investment banks in a process similar to whole loan pool purchases, while on other deals, loan originators solicited UBS to underwrite a specific securitization.

93.     As in principal deals, the originators provided UBS with loan tapes containing collateral characteristics for each loan in the pool, such as loan balance, term, interest rate information, mortgage product type, borrower's FICO score, DTI, and LTV and CLTV ratios, as well as access to the underlying loan files.

94.     The underwriting agreements typically contained stipulations concerning due diligence, including limitations on the percentage (or number) of loans that the underwriter could examine as part of due diligence before the closing of the deal.  The underwriting agreements sometimes also required UBS to buy a certain portion of the bonds issued in the securitization.

95.     UBS' responsibilities as underwriter in third-party deals included, among other things, ensuring that the representations the originators made about the characteristics of the loan pool were accurate.  To that end, UBS conducted loan-level due diligence on third-party deals.

96.     As with its principal deals, UBS hired third-party due diligence vendors to conduct credit and compliance due diligence for third-party deals, but on a smaller sample of loans, which was typically 5%.

97.     Unlike the due diligence performed for principal deals, on third-party deals, UBS generally did not hire a valuation due diligence vendor to conduct valuation due diligence.

98.     UBS did conduct limited valuation due diligence on a few third-party deals. However, this value review was even more limited than for principal deals and was often conducted only on a small sample of loans from the pool.

99.     As with principal deals, UBS' third-party due diligence vendors provided regular updates to UBS, including by emailing reports or summaries, or posting reports to secure databases and websites that UBS could access.

100.    At the completion of due diligence for third-party deals, UBS "tied out" the deal with the originators to identify the loans that would be included in the securitization and the loans that would not.

## C.     The Structure and Credit Ratings of RMBS

101.    RMBS certificates are interests in the cash flows from loan pools.  The certificates pay amounts based on the principal and interest payments made by the underlying borrowers.  If a borrower does not pay his or her mortgage (or if losses are incurred in foreclosing upon the mortgage), that default (or those losses) will reduce the available cash flow to pay the RMBS investors.  The characteristics and creditworthiness of the underlying loans are thus paramount to the RMBS investors, who will see a reduction in their income stream, or in the principal balance of their certificates, when defaults and losses exceed the credit enhancements attendant to their certificates.

102.    When structuring RMBS transactions, investment banks, including UBS, grouped the RMBS certificates into different tranches, or classes, organized in a hierarchical capital structure, or "waterfall," in which the highest-rated tranches were entitled to earlier payment from loan pool cash flows and had the most cushion against losses but the lowest rate of return, while

the subordinate tranches were paid later, and bore progressively higher rates of return, but had less protection from losses.

103.    UBS would then arrange for the tranches to be rated by one or more of the nationally-recognized rating agencies.  Standard & Poor's Financial Services LLC ("S&P"), Moody's Investors Service, Inc. ("Moody's"), and Fitch Ratings, Inc. ("Fitch") were the credit rating agencies that typically assigned credit ratings to RMBS, and the agencies that assigned credit ratings to the Subject Deals.

104.    A rating agency's rating on an RMBS tranche was an opinion offered to investors on the quality of the collateral backing the cash flow and on the level of risk associated with the timely payment of principal and interest on a security over the life of the bond.  It was based on information provided to the rating agency by the investment bank underwriting the deal.  Ratings for each tranche were based on a number of factors, including the reported characteristics of the underlying loans (particularly the likelihood of loss due to mortgage default), and the level and type of credit enhancements structured into the deal.

105.    Credit enhancements in RMBS absorb initial losses stemming from defaults in the underlying mortgages.  Common credit enhancement mechanisms include subordination (a hierarchy of cash flows among tranches), overcollateralization (the inclusion of a larger principal dollar amount of mortgages in the pool than the par value of the security), excess spread (the difference between the weighted average coupon received on the underlying mortgages and the weighted average coupon paid on the RMBS certificates), triggers (provisions aimed at capturing more credit enhancement in the event of collateral deterioration), monoline insurance (third-party insurance to cover losses from mortgage defaults), and cross-collateralization (a pooling

mechanism to reduce the risk of cash flow interruption to senior tranches due to disproportionate loan defaults).

106.     While these various forms of credit enhancement created a financial buffer that investors demanded because it insulated them from some amount of collateral losses, credit enhancements were costly for investment banks and ultimately cut into their bottom lines.  UBS wanted rating agencies to require as little credit enhancement as possible because the less credit enhancement required, the more valuable the pool of loans would be to UBS.

**D.     Profitability of Principal and Third-Party Deals**

107.     UBS earned significant income from its RMBS deals in numerous ways.

108.     In principal deals, UBS made money in three ways; first by retaining the interest payments (often called "carried interest") that the underlying borrowers paid on their mortgages during the short period of time (typically just a few months) between acquisition and securitization of whole loan pools.  Second, UBS made money by constructing the RMBS such that the value UBS received by selling RMBS exceeded the value it paid for the underlying assets backing those bonds.  Third, UBS often sold servicing rights in its deals to a mortgage servicer.

109.     In third-party deals, UBS primarily profited through underwriting, trading and syndicate fees paid by the originator.

110.     In addition to selling the RMBS certificates, UBS also sought to sell the "residual" interests in the Subject Deals, which were interests in each deal that UBS sometimes held after selling off the certificates.  Owners of the residual interests were generally entitled to capture the excess cash flow generated by the mortgage pool.  UBS' "business model" during the Relevant Period, as described by its former employees, was not only to sell the certificates to investors but also to divest itself of any residual interests.  UBS made substantial efforts to market residual interests to investors and was largely successful at divesting its residual "book."  Throughout the

Relevant Period, UBS never intended to remain invested in any of the Subject Deals and always sought to off-load all associated risk onto others.

## III.   **UBS' RMBS Team**

111.    During the Relevant Period, UBS' RMBS group was divided into the Asset-Backed Securitization Desk ("ABS"), which focused on subprime loans, and the Mortgage Backed Securities Group ("MBS"), which focused on Alt-A and other non-subprime loans.  Throughout most of the Relevant Period, both ABS and MBS, and each of their subgroups and trading desks, reported to the head of mortgage trading.  The head of mortgage trading reported to the head of RMBS in the United States.

112.    The ABS Trading Desk was responsible for bidding on and purchasing subprime whole loan pools as well as structuring and selling RMBS issued off of the MABS shelf.  The ABS Trading Desk was divided into two main functions: trading and structuring.  The traders on the ABS Trading Desk were responsible for pricing whole loan pools and negotiating the bid stipulations of those purchases with the client originators.  The traders also had the final say in deciding which loans went into subprime deals.  The structurers on the ABS Trading Desk were largely responsible for taking the pools of mortgages purchased by the traders and structuring the cash flows from the mortgages into the different RMBS tranches.

113.    Similar to the ABS Trading Desk, both the ARMs Desk and the Fixed Rate Desk were divided into two main functions: trading and structuring.  The traders on the ARMs Desk and the Fixed Rate Desk were responsible for pricing whole loan pools and negotiating the bid stipulations of those purchases with the client originators. The traders also had the final say in deciding which loans went into Alt-A deals.  The structurers on the ARMs Desk and the Fixed Rate Desk were largely responsible for taking the pools of mortgages purchased by the traders and structuring the cash flows from the mortgages into the different RMBS tranches.

114.   Across UBS' RMBS business, transaction managers on each of the Subject Deals handled overall coordination of the various groups involved in creating RMBS and were responsible for obtaining internal approvals from those groups prior to securitization.   This included overseeing and coordinating due diligence as well as overseeing the preparation, review, and verification of Offering Documents.   Transaction managers were apprised of loan-level due diligence results, which were widely distributed among the various groups involved in RMBS transactions.   Moreover, the due diligence team participated with other groups in regular transaction management meetings where issues relating to the deals being worked on were discussed.   UBS' RMBS securitization process, overseen by transaction managers, facilitated and disseminated loan-level due diligence results throughout the UBS working group for each Subject Deal such that the individuals responsible for verifying Offering Documents were made aware of due diligence results and issues.   The working groups for each of the Subject Deals included, among other individuals, transaction managers, due diligence managers, traders, in-house and outside counsel.

### UBS' FRAUDULENT CONDUCT

**I.**   **UBS Made Numerous Misrepresentations and Misleading Statements about the Subject Deals and the Securitized Loans to Induce Investors to Purchase Certificates**

115.   In securitizing loan pools and selling RMBS certificates to investors, UBS made a number of misrepresentations about the Subject Deals and, more specifically, about the securitized loans.  UBS made these misrepresentations to satisfy industry and investor expectations about the certificates and the securitized loans comprising UBS' RMBS, and thus were made to induce investors to purchase the RMBS certificates.

**A.**   **Misrepresentations and Misleading Disclosures in the Offering Documents**

116.    UBS made numerous misrepresentations and misleading disclosures about the material characteristics and credit quality of the loans underlying the securitization in each of the Subject Deals' Offering Documents.  Annexed as Table 2a is a compendium of misrepresentations and misleading disclosures that UBS made in the ProSupp for each Subject Deal.

117.    Among other things, UBS repeatedly misrepresented in the Offering Documents for the Subject Deals that:

- Loans in the securitized pools were originated generally in accordance with the disclosed loan originator's underwriting guidelines and that exceptions to those underwriting guidelines may have been made on a case-by-case basis when the borrower demonstrated sufficient "compensating factors"; and

- Each loan had been originated in compliance with federal, state and local laws and regulations.

118.    The Offering Documents also contained what UBS represented were detailed descriptions of the originators' underwriting guidelines and tables purporting to disclose the characteristics of the loans in each RMBS, such as the number of loans with LTV or CLTV ratios within specific ranges, and the number of borrowers with FICO scores within specific ranges.  In many of the Subject Deals (as further discussed in UBS' Fraudulent Conduct, Section IV, *infra*), these descriptions and tables frequently contained inaccurate or misleading information.

119.    The representations about the loans in the Offering Documents were made and communicated as essential steps in the securitization process.  Because investors in RMBS could not conduct their own due diligence on the thousands of loans that were typically involved in an RMBS securitization – in part because they did not have access to the individual loan files UBS possessed –UBS knew that the representations provided in the Offering Documents for the Subject Deals were important to investors.

1. **Misrepresentations about Compliance with Underwriting Guidelines and with Applicable Law and Regulations**

120.   The Offering Documents for each Subject Deal purported to describe the underwriting guidelines pursuant to which the loans in the deal were originated and stated that the primary purpose of the loan underwriting guidelines was to evaluate (1) the borrowers' ability and willingness to repay the loans on the specified terms and (2) the adequacy of the properties as collateral for the loans.

121.   The following excerpts from Table 2a are examples of such representations set forth in UBS' ProSupps for the Subject Deals:

- "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (CWALT 2006-23CB ProSupp at S-55);

- "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." (MABS 2006-FRE2 ProSupp at S-67);

- "EquiFirst's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." (MABS 2006-HE5 ProSupp at S-47);

- "The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan." (MABS 2006-NC2 ProSupp at S-63);

- "The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults." (MABS 2006-WMC4 ProSupp at S-66); and

- "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." (MARM 2007-1 ProSupp at S-58).

122.    The Offering Documents for the Subject Deals then falsely stated that "all" or "each" of the securitized loans were originated in accordance with the disclosed guidelines.  In some deals, these misrepresentations were qualified with the statement that, "all" the loans were "generally" originated in accordance with the guidelines, indicating that certain immaterial exceptions might exist.

123.    The following excerpts from Table 2a are examples of the misrepresentations set forth in UBS' ProSupps for the Subject Deals:

- "The mortgage loans have been purchased or originated, underwritten and documented in accordance with . . . the non-conforming or Alt-A underwriting guidelines established by the Originator." (AHMIT 2006-2 ProSupp at S-56);

- "All of the Mortgage Loans will have been originated or acquired by Countrywide Home Loans and Countrywide Bank in accordance with their respective credit, appraisal and underwriting processes." (CWALT 2006-OA10 ProSupp at S-87);

- "The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originator in accordance with its underwriting standards as described under 'The Originator—Underwriting Standards of the Originator' in this prospectus supplement." (MABS 2006-FRE2 ProSupp at S-32);

- "Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originators or acquired by the originators in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originators in accordance with its underwriting standards." (MABS 2006-HE5 ProSupp at S-28);

- "All of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein (the 'New Century Underwriting Guidelines')." (MABS 2006-NC3 ProSupp at S-64);

- "The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the '**Underwriting Guidelines**') or (ii) purchased by WMC after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines." (MABS 2006-WMC3 ProSupp at S-66); and

- "The Loans have been purchased by the sponsor from an Originator which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section '— General,' or the following sections pertaining to Countrywide Home Loans and IndyMac Bank, F.S.B. and their related Loans." (MARM 2006-OA2 ProSupp at S-42).

124.    These statements about underwriting guidelines and compliance therewith were of critical importance to investors.  A loan pool consisting of loans not originated according to guidelines, and lacking compensating factors, has a much different risk profile than a pool of properly-originated loans.  The failure to originate a loan under the applicable guidelines creates a higher risk of delinquency and default by the borrower.  It also creates a risk that losses upon default or liquidation will be higher.  Deviations from underwriting guidelines thus result in a greater economic risk to an investor, because each loan default negatively impacts the flow of payments to the certificate holders.

125.    For these reasons, investors frequently asked UBS about the underwriting guidelines, including at times asking about the process for ensuring the compliance of the loans with underwriting guidelines.

126.    The ProSupps also falsely stated that the loans included in the loan pools that did not "strictly qualify" with underwriting guidelines were made because the originator found them to have sufficient "compensating factors."  The following excerpts from Table 2a are examples of such misrepresentations about compensating factors UBS made in the ProSupps for the Subject Deals:

- "The Originator realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages 'common sense' underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to the Originator's underwriting guidelines are allowed

if sufficient compensating factors exist to offset any additional risk due to the exception." (AHMIT 2006-2 ProSupp at S-58);

- "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (CWALT 2007-OA2 ProSupp at S-38);

- "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions." (MABS 2006-FRE2 ProSupp at S-67);

- "On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions. . . . As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed  if the application reflects compensating factors . . . ." (MABS 2006-HE5 ProSupp at S-42 to S-46);

- "On a case-by-case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio (referred to hereinafter as 'Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions." (MABS 2007-WMC1 ProSupp at S-42-43); and

- "Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer." (MARM 2006-OA2 ProSupp at S-50).

127.    UBS' representations about compensating factors were material to investors.  As

noted above, when a loan does not comply with the guidelines, it presents higher risks to investors.

Investors in the Subject Deals relied on the fact that UBS was not securitizing such non-compliant loans unless they had legitimate compensating factors that would offset the defect and warrant an exception to the guidelines.

128.    The Offering Documents also falsely stated that every loan in each Subject Deal had been originated in compliance with all applicable laws and regulations, including those designed to prevent predatory lending and other improper lending practices and to ensure truth-in-lending.  These representations were also material to investors.

129.    A loan pool containing loans that were not originated in accordance with all applicable laws and regulations has a much different risk profile than a pool of properly-originated loans.  The failure to originate a loan consistent with all applicable laws and regulations creates a higher risk of loss by, among other things, limiting the ability of the lender and other assignees of the loan to collect all or part of the unpaid balance of the loan and, in addition, could subject the lender and other assignees of the loan to other legal consequences.  A loan not originated in compliance with law may also result in a borrower rescinding the loan against the lender or other assignees of the loan.  Such defects cannot be offset by compensating factors.

130.    Loans included in a securitization that do not comply with applicable law thus result in a greater economic risk to an investor because losses stemming from non-compliant loans negatively impact the flow of payments to the certificate holders.

### 2.  Misrepresentations about Loan Characteristics

131.    UBS' RMBS Offering Documents included statements about the material characteristics and credit quality of the loans underlying the securitizations.  For example, the Offering Documents for each of the Subject Deals included a description of the originator's underwriting guidelines that were purportedly used to underwrite any group of loans making up at least 10 percent of the deal.  The Offering Documents also routinely contained data regarding

specific characteristics of the underlying loans that was presented about the pool as a whole on a weighted average basis or in tables that stratified the loans into different bands for different metrics (e.g., LTV ratios, DTI ratios, or FICO scores).   In nearly every Subject Deal, the Offering Documents misrepresented or provided misleading disclosures regarding the material characteristics of the securitized loans.

132.   In the Offering Documents for the Subject Deals, UBS also routinely provided investors with misleading LTV and CLTV ratios for the securitized loans that were calculated using the originators' property valuations—many of which UBS knew were highly likely to be inflated.  *See* UBS' Fraudulent Conduct, Section III.  Further, as described more fully in Section IV.A. of UBS' Fraudulent Conduct, UBS also made misleading disclosures pertaining to borrower equity through its failure to disclose crucial information regarding secondary financing and CLTV ratios in the Offering Documents for many of the Alt-A Subject Deals.

133.   Even small increases in the LTV or CLTV ratios significantly affected the likelihood of timely repayment of the loans or, the sufficiency of the underlying collateral to satisfy the loans in foreclosure and, accordingly, were material to investors.  Thus, UBS' practice of knowingly misrepresenting property values coupled with its concealment of the presence of secondary financing posed material risks of loss to RMBS investors.

134.   As further described in Section IV.B. of UBS' Fraudulent Conduct, UBS misrepresented the DTI restrictions contained within the underwriting guidelines used to originate the Countrywide loans in 12 of the Subject Deals.  In most of these deals, UBS also omitted from the Offering Documents crucial information pertaining to the underlying borrowers' DTI ratios.  As such, UBS' failure to accurately describe Countrywide's DTI guidelines deprived investors of material information necessary to evaluate the risk of the associated certificates.

135.    Additionally, UBS misrepresented the FICO scores for seasoned loans in the Offering Documents in a significant number of the Subject Deals.  *See infra* UBS Fraudulent Conduct, Section IV.C.

136.    All of UBS' misrepresentations and misleading disclosures were important to investors.  Underwriting guidelines, LTV ratios, CLTV ratios, DTI ratios, and FICO scores were all indicators of a borrower's creditworthiness—both in terms of a borrower's willingness and ability to repay the loan.  The LTV and CLTV ratios were also material to investors because they were two of the most important predictors of loss severity in the event of a default.

137.    UBS employees involved in the securitization or sale of RMBS knew that all of these characteristics were material to investors and that investors relied on the integrity of the information that UBS provided in the Offering Documents to appropriately assess whether to invest in the Subject Deals.

138.    UBS also knew that investors in the Subject Deals did not have access to the underlying loan files (nor would it have been practical for investors to conduct their own due diligence) and that investors relied on UBS to perform due diligence on those loan files as part of the securitization process in order to verify the accuracy of the information disclosed in the Offering Documents.

**B.    Misrepresentations and Misleading Statements in Investor and Rating Agency Presentations**

139.    During the Relevant Period, UBS made many presentations to investors and to rating agencies about the MABS and MARM shelves.  UBS, through these presentations, assured both investors and rating agencies that UBS had sufficient due diligence and other quality control processes in place relating to its RMBS.  These presentations were given in a wide variety of

settings, including meetings with rating agencies, "roadshows" with potential investors, and at industry conferences.

140.     In these investor and rating agency presentations, UBS made numerous material misrepresentations and misleading statements about the process it used to securitize the loans, and specifically about its due diligence and surveillance processes.   A summary of these misrepresentations and misleading statements is set forth in the annexed Table 2b.

141.     In connection with MABS and MARM Subject Deals, Defendants routinely made the following misrepresentations in investor and rating agency presentations:

- "[UBS] [a]ctively monitor[s] seller performance, execution rates and origination practices."

- [UBS] [m]andate[s] review of seller due diligence monthly by ABS/MBS Group Head, Legal, Credit Risk Management and Deal Surveillance."

- "[UBS] [d]eliver[s] consistently by maintaining independent due diligence and trading functions."

142.     In reality, UBS knew that it was not doing anything close to "monthly" reviews to monitor seller due diligence.  UBS also knew that its traders consistently exerted influence over the due diligence process throughout the Relevant Period.

143.     Additionally, UBS falsely stated in presentations that it used "past pool performance and historical data" to "identif[y] loans with the highest potential risk" to "target[] them within the due diligence process."  UBS also falsely stated that "[b]ased upon due diligence results and market trends, adverse selection criteria of due diligence samples is continuously reviewed and adjusted" and that UBS' due diligence managers created "feedback loops across the organization," in part, to "hard-code adverse criteria . . . to protect UBS and its investors by reducing bias in selection."

144.    In reality, UBS' use of adverse criteria to select a sample for a particular deal was *ad hoc* with each due diligence manager deciding which adverse criteria to use on a case-by-case basis without consideration of any "past performance and historical data," "hard-cod[ing] [of] adverse criteria," or any other analysis based on due diligence results or market trends.

145.    UBS also falsely stated that it "often" increased credit and compliance samples "as a result of [a] [d]ue [d]iligence review," "in order to gain a comfort level with pool portions that [we]re not reviewed for due diligence."  UBS indicated that such increases in sample sizes were "implemented on a case-by-case basis" "to mitigate fraud, anti-predatory lending legislation, or credit trends within a pool."  In reality, UBS did not "often" increase credit and compliance samples and, on the infrequent occasions when it did so, the process did not yield results that would lead to increased "comfort level" with the unreviewed loans.  Rather, credit/compliance sample size increases, when they occurred, confirmed that the unreviewed portions of the loan pools also contained significant percentages of loans that did not meet the representations UBS made to investors.

146.    UBS also made numerous misrepresentations in presentations about its valuation due diligence processes, as described further below.  *See infra* UBS' Fraudulent Conduct, Section III.  Most notably, UBS consistently misrepresented that "100% of the loans" in a pool were subject to some form of valuation due diligence for UBS' shelf deals.  UBS stated that it did this by applying a multi-step valuation due diligence process based on "Smart Filters," automated valuation models ("AVMs"), desk reviews, and broker price opinions ("BPOs").  In reality, UBS securitized thousands of loans without performing any valuation due diligence at all, as further described below.

147.    UBS also repeatedly made false statements about the surveillance processes it used to identify delinquent loans in its already-securitized deals for possible recourse.  In numerous presentations, UBS stated that loans that were 60 days delinquent were "subject to both a fraud and compliance re-underwrite to ensure the loan in question [was] not a breach of rep and warrant." In reality, UBS did not even have a surveillance department prior to late 2006, and during the Relevant Period UBS only reviewed a limited number of delinquencies that it prioritized, not all 60 day delinquent loans as UBS told investors.

148.    UBS made these false statements to persuade investors and rating agencies that it had taken effective, diligent steps to validate its representations about loan-level characteristics, and ultimately to induce investors to purchase certificates in these deals.

## II.    **UBS Knew from the Credit and Compliance Due Diligence It Conducted that Its Representations as to Loan Quality Were False.**

149.    UBS' responsibilities as underwriter in the Subject Deals included ensuring that all of the disclosures made to investors in marketing the certificates were accurate.  However, at the time it made its representations, UBS knew that the quality and creditworthiness of the loan pools it was securitizing were materially worse than what it was representing to investors.  UBS knew its representations were false because, among other reasons, its credit and compliance due diligence review revealed that a large percentage of the reviewed loans violated its representations to investors.

150.    By misrepresenting key characteristics of the loans that it securitized, UBS concealed from investors the true risk of loss of its RMBS.  In doing so, UBS fraudulently deprived investors of their right to make an informed decision about whether they should invest in the Subject Deals.

### A.    **UBS' Credit and Compliance Due Diligence Process**

151.    During the Relevant Period, UBS hired a variety of vendors, such as Clayton, Bohan, MDMC, and Opus, to conduct what it referred to as "credit and compliance" due diligence on the loan pools securitized in UBS principal and third-party deals.  UBS' credit and compliance due diligence providers were located in states other than New York, including (i) Clayton, located in Shelton, Connecticut, (ii) Bohan, located in San Francisco, California, (iii) AMC, located in Libertyville, Illinois, (iv) MDMC, located in Sussex, Wisconsin, and (v) Opus, located in Chicago, Illinois.

152.    The credit and compliance due diligence vendors employed teams of underwriters to review loan files and to assess the quality and creditworthiness of the loans in the selection, including whether the loans were originated in accordance with underwriting guidelines or with compensating factors and whether the loans were originated in compliance with all applicable laws and regulations.

153.    The ostensible purpose of the credit and compliance due diligence process was to check the accuracy of the representations about the loan characteristics made to investors, and to ensure that the loans in each deal complied with those representations.   As early as 2004, UBS recognized that due diligence "gives us the ability to make reps and warrants on our securities, which need to get approved by legal and credit based off our diligence results . . . ."

154.    UBS generally conducted credit and compliance due diligence by selecting a sample of loans from the initial loan pool.  UBS' representations as to the characteristics and risks of the underlying loans in Offering Documents, however, were not limited to the loans it actually reviewed in credit and compliance due diligence but also pertained to the unreviewed loans outside of the credit and compliance sample in each deal.

155.     When UBS conducted credit and compliance due diligence on a pool of loans, it generally implemented a two-pronged method for selecting its samples for review.  Under the first prong, UBS selected a sample using what it called "adverse selection" whereby UBS purported to review loans with adverse credit characteristics that could signal heightened risk—such as high loan balances, low credit scores, high DTI ratios, investment properties, and high LTV or CLTV ratios.  Under the second prong, UBS selected loans randomly for review—meaning, it randomly selected a subset of loans with no up-front criteria serving as a basis for that selection.

156.     UBS written policies characterized its partially adverse, partially random sample as a "representative sample" of the entire loan pool.   In written testimony submitted in June 2008 to the United States Senate Committee on Banking, Housing and Urban Affairs, UBS described the due diligence samples it had selected for its RMBS transactions as "benchmark[s] for the remainder of the pool," for due diligence which "was performed with the aim of providing information in the offering document to meet legal disclosure requirements."  Per UBS' written testimony, due diligence vendors "reviewed a statistically significant sample of the mortgage loans from the portfolio to ensure that the assets were originated in accordance with applicable law, that the credit quality of the borrower conformed to the related loan underwriting guidelines, and that the value of the underlying real property supported the outstanding balance on the mortgage loans. Based on these results, loans that did not meet these criteria were removed from the pool and others may have been substituted."  Thus, UBS knew that any issues or defects it observed in the diligence samples were indicative of similar issues and defects in the unreviewed portion of the loan pools.

157.     UBS' credit and compliance due diligence vendors would review (or "re-underwrite") each loan file in each sample prior to assigning grades to the loans.  Their review was a fact-finding exercise to determine whether a loan was originated in accordance with underwriting

guidelines or with compensating factors, and whether the loan complied with all applicable laws and regulations.

158.    The credit and compliance due diligence vendors presented their results to UBS in pool-specific reports and loan-level spreadsheets.  These documents showed the "event level" grade assigned to each loan in the sample (as described below) and any associated or explanatory comments.  These comments were often quite detailed, and were accessible to and reviewed by UBS employees both inside and outside of UBS' due diligence groups.

159.    A loan was supposed to be graded event level 1 (or "EV1") if it was deemed to have been originated in accordance with underwriting guidelines and complied with all applicable laws and regulations.

160.    A loan was supposed to be graded event level 2 (or "EV2") if it was deemed not to have been originated strictly according to underwriting guidelines but the originator had approved the loan pursuant to documented relevant compensating factors that warranted an exception to the guidelines.

161.    A loan was supposed to be graded event level 3 (or "EV3") if it had not been originated according to underwriting guidelines and did not have documented compensating factors that warranted an exception to the guidelines, or if it did not comply with all applicable laws and regulations.  UBS referred to loans graded EV3 in the due diligence process as "kicks," "kickouts," or "rejects."  A loan was also supposed to be graded EV3 if there was an absence of key documents (or the entire loan file) preventing an assessment of the loan's compliance with underwriting guidelines and applicable laws and regulations.  Thus, no loans graded EV3 should have been securitized in the Subject Deals.

162.    Through its due diligence, UBS learned that significant numbers of loans across the Subject Deals were EV3s because they did not comply with underwriting guidelines and did not have documented compensating factors, and did not comply with laws or regulations.  Despite this knowledge, UBS consistently represented to investors that the loans in each Subject Deal either had been underwritten according to the originator's underwriting guidelines or approved by the originator on a case-by-case basis based on documented relevant compensating factors that warranted an exception to the guidelines.  UBS also consistently represented to investors that the loans in each Subject Deal complied with all applicable laws and regulations.

**B.    UBS Knew that There Was a High Probability that a Significant Number of the Unreviewed Loans Were Defective.**

163.    Through its due diligence process, UBS knew that, contrary to its representations to investors, there was a high probability that a significant number of the unreviewed loans were defective.

**1.    UBS Knew from the High Credit and Compliance Reject Rates that There Was a High Probability that the Unreviewed Portions of the Pools Had Significant Numbers of Defective Loans.**

164.    Across the Subject Deals, UBS' credit and compliance due diligence vendors graded large numbers of loans EV3 in diligence samples at the conclusion of due diligence, meaning they could not be included in the security consistent with UBS' representations to investors that the loans generally met guidelines.  Annexed as Tables 3a and 3b are the final EV3 rates for pools ultimately securitized in 37 of the Subject Deals.

165.    Notably, while very high, these final EV3 rates are extremely conservative because they were based only on the loans graded EV3 at the end of the credit and compliance due diligence process.  As discussed further below, UBS used various methods to manipulate EV3 rates lower than they should have been.  When properly adjusted for waived loans and loans in the credit and

compliance due diligence samples which were not graded because they had missing loan files or were otherwise unavailable to review, UBS' manipulation of the EV3 rates yields even higher rates, as shown in Tables 4a and 4b, including 5 deals with EV3 rates exceeding 30% and 11 deals with EV3 rates between 20% and 30%.

166.    When UBS identified high percentages of EV3 loans or rejects in its credit and compliance due diligence samples, it knew that there was a high probability that the unreviewed portion of the loan pools also contained a significant number of defective loans.

167.    UBS' due diligence policies and procedures demonstrate that UBS recognized the correlation between the characteristics of loans within its credit and compliance due diligence samples and the characteristics of loans outside of the samples (i.e., unreviewed loans) because these policies required UBS to look at additional loans when its diligence vendors reported high reject rates in samples.   An internal policy manual entitled "UBS Investment Bank Contract Finance Policies and Procedures," memorialized this UBS policy:  "[r]esults that are unfavorable will require additional review so as to ensure the diligence sample adequately captures the risk of the pool."   UBS' written policies further stated, "Upon review of the initial due diligence results, the transaction managers reserve the right to increase the sample size to ensure the remaining loans do not exhibit similarly negative attributes."   UBS policy required even more sampling when the credit and compliance due diligence results for additional samples beyond the initial sample failed to improve:  "If the rejection rate is equal to or greater than the rejection rate in the initial sample, UBS will perform additional due diligence."

168.    In addition, UBS represented in its MABS and MARM shelf presentations that UBS "often" increased credit and compliance samples "[a]s a result of initial Due Diligence review . . .

in order for UBS to gain a comfort level with pool portions that [we]re not reviewed for due diligence."

169.    Moreover, as noted above, UBS acknowledged in written testimony submitted to the Senate Committee on Banking, Housing and Urban Affairs in June 2008 that its due diligence samples were used as "benchmark[s] for the remainder of the pool," and that due diligence "was performed with the aim of providing information in the offering document to meet legal disclosure requirements."  Similarly, the main subprime trader at UBS testified in an interview that if he saw problematic loans in a due diligence sample, he would be "concerned that there may be similar issues in the rest of that same loan pool," which is "why we had at UBS contingencies [in] place for increasing the due diligence sample in the event of finding those sorts of problems in the initial sample."[12]

**2.    In the Face of High Reject Rates, UBS Intentionally Manipulated Due Diligence Results to Avoid Identifying the Defective Loans It Knew Existed in the Unreviewed Loan Pools**

170.    Rather than take the steps necessary to ensure that its representations to investors were accurate, UBS instead continuously concocted ways to manipulate high reject rates to avoid having to perform additional credit and compliance due diligence consistent with its internal policies.    While UBS sometimes increased credit and compliance samples in the face of high reject rates, when it did so, it generally identified more defective loans to kick from the pools,

---

[12] This same trader also, in an internal email, acknowledged the need for additional due diligence to ensure that the unreviewed loans met UBS' representations to investors given the high reject rates from a credit and compliance due diligence sample.  In reference to a 25% credit and compliance due diligence sample of a New Century loan pool later securitized in MABS 2006-NC3, the trader stated "[m]y position at this point is we need to kick the sample up to at least 50% on the whole pool.  Right now, we're at something like a 60% kickout rate.  This goes way beyond a 'relationship' question.  In my opinion, I don't think we can in good faith fund this pool and pass it off to investors as though everything is kosher."

indicating that even further review was warranted.  UBS never intended to increase diligence sufficiently to ensure that its representations to investors were accurate.

171.    To try to keep reject rates low enough to avoid additional diligence, UBS employees aggressively waived in EV3-graded loans as EV2 or EV1 loans without justification. In other words, in a number of the Subject Deals, UBS baselessly overrode the credit and compliance due diligence vendors' documented findings and knowingly securitized hundreds of defective loans in order to limit reject rates to maintain its relationships with originators and to ensure a continuous flow of loans.[13]  Moreover, UBS employees often changed these grades without even reviewing the loan files.  UBS' due diligence providers used special notations to track and document the loans where the event level grade was contrary to their recommendation. They often used notes such as "EV2 Per Client," "OK per Client," or "issue waived by client" to indicate that UBS was instructing them to override EV3 loans without valid reasons.  There was no evidence that UBS provided any documented or adequate justification to the vendors for changing event level grades and ignoring underwriting defects in these circumstances.

172.    One vendor, Clayton, internally used a designation "EV2W" (the W stood for "waiver") to indicate that a client overrode their EV3 grade without justification.  However, in mid-2006, UBS instructed Clayton to stop using the "W" designation in grading loans because UBS' CONFINE database used by UBS, in part, to upload and analyze loan tapes and due diligence results, purportedly could not accept letters in the spreadsheet column assigning a due diligence grade, although it was capable of capturing the vendors' notes in a notes column.  As such, loans waived by UBS were not captured in the documentation grading each loan or in CONFINE except

---

[13]   When a credit and compliance due diligence vendor graded a loan EV1, UBS employees seldom, if ever, questioned that "passing" grade.

when the vendors documented explanations for the waivers in a notes column, which was not consistently done.

173.    UBS would also sometimes exclude from its EV3 count loans selected for review if the loan files were missing or unavailable.    Annexed as Tables 4a and 4b are tables calculating "adjusted EV3 rates" taking into account both waived loans and missing or "unavailable" loan files.  When these loans are included in the EV3 counts, the EV3 rates are even higher.

174.    UBS' manipulation of EV3 rates did not end there.  UBS also manipulated reject rates by excluding significant numbers of EV3s from its calculation by categorizing them as "soft" rejects.  UBS arbitrarily changed what would count as a "soft" reject in order to decrease its reject rates.  For example, sometimes a missing HUD-1 form[14] was "soft" and sometimes "hard," but regardless of the terminology used, UBS kicked the loan from the pool and did not purchase or securitize it.  However, by only counting the "hard" rejects towards its reject rate, UBS was able to artificially lower the reject rate to make it appear to be closer to being within UBS policy in order to justify the purchase of the pool without conducting additional review (i.e., conducting more diligence on loans in the pool).

175.    The "hard" and "soft" categorizations for rejects allowed UBS due diligence managers broad discretion to manipulate reject rates.  For example, with respect to missing HUD-1 forms and missing Truth-in-Lending statements, the head of due diligence for Mortgage Finance admitted, "we may have gone both ways a couple of times" as to whether they were hard or soft

---

[14]   A HUD-1 Settlement Statement was a standard form required to be completed in connection with the settlement of certain real estate transactions involving mortgage loans under the Real Estate Settlement Procedures Act ("RESPA") and United States Department of Housing and Urban Development ("HUD") regulations.  The HUD-1 was used to itemize all charges and credits to the borrower and seller.

kicks.  As another due diligence manager acknowledged, "To one person a missing [HUD-1 Form] could be construed as hard.  To some, it may be soft.  It is what it is."

176.    In instances when UBS could not manipulate the reject rate low enough, UBS posited excuses to justify the large percentages.  For example, UBS blamed high reject rates on short time frames for credit and compliance due diligence.  However, as UBS well knew, it experienced high reject rates in all of the Subject Deals regardless of the amount of time spent on due diligence.

177.    For example, in CWALT 2006-23CB, UBS approved a 17.5% reject rate from a due diligence sample of less than 5% of the loans in the deal based on the 18 days allowed for due diligence.  Despite the reject rate being "outside of what we normally see" and "over what our highest deal has been in the past," UBS approved the deal under the pretext of being "comfortable with the fact that the majority of these issues [would] clear as the files [were] made more complete over the next several weeks."  There is no evidence that Countrywide ever attempted to clear any of the outstanding issues in this deal or any UBS underwritten third-party Countrywide deal post-closing.

### 3.  UBS Manipulated Its Due Diligence Processes to Avoid Identifying Additional Defective Loans.

178.    In addition to manipulating EV3 rates on specific deals, UBS also manipulated its entire due diligence process to avoid identifying additional defective loans.  UBS altered the scope of its credit and compliance due diligence process to accommodate originators who demanded as little diligence as possible on their loan pools.

179.    UBS knew, for multiple reasons, that it was securitizing defective loans.  To begin with, UBS routinely loosened its adverse selection parameters to keep its samples within the size restrictions dictated by originators.  Because these sample sizes were often as small as 10%

for principal deals and 5% for third-party deals, UBS did not review all of the loans it selected using its adverse criteria.  That is, at the beginning of the due diligence process, UBS would apply a number of "adverse" criteria to the initial loan tape provided by the originator to devise the adversely selected portion of the credit and compliance due diligence sample.  Because the number of loans identified through that process would invariably exceed the limits on sample size, UBS personnel would then repeatedly narrow its parameters of those adverse selection criteria until the number of loans selected fell within the sample size.  In order to comply with sample size limitations dictated by originators, UBS deliberately skipped the review of numerous loans it had identified as adverse.

180.    In addition to skipping "adverse" loans, UBS did nothing to ensure that the "adverse" criteria it used were tailored to identify defective loans.  UBS' adverse criteria used on a particular deal were entirely *ad hoc* determinations with each due diligence manager deciding which adverse criteria to use on a case-by-case basis without reference to any analysis.  UBS engaged in this practice despite assuring investors that "[b]ased upon due diligence results and market trends, adverse selection criteria of due diligence samples [was] continuously reviewed and adjusted . . . to protect UBS and its investors . . . ."  UBS also falsely represented that it used "past pool performance and historical data" to "identif[y] loans with the highest potential risk" to "target[] them within the due diligence process."[15]

181.    With respect to third-party deals, UBS also knew it was securitizing defective loans based on the compromised manner in which it conducted diligence for those deals.  For third-

---

[15]   UBS' adverse criteria were not specifically designed to precisely identify loans for the sample that would likely violate representations to investors.  Rather, UBS used these criteria instead to select loans with characteristics that would trigger higher credit enhancements in the deal structure for its own benefit.  Credit enhancements were mechanisms built into the structure of an RMBS deal to improve the overall credit profile, and were important to rating agencies in structuring a deal.  Greater levels of enhancements decreased the deal's profitability for UBS.

party deals, UBS underwrote certificates backed by the loans for a client originator.  UBS did not

purchase or acquire an ownership interest in the loans.  Because UBS did not "own" the loans, it

viewed third-party deals as presenting less risk to UBS.  Consequently, UBS conducted even less

stringent due diligence on these deals, securitizing loans that would have been graded EV3 if UBS

were purchasing the pool, and selling the resulting RMBS to investors.  The head of Alt-A due

diligence explained this approach to a credit and compliance due diligence vendor in 2005:  "[a]lso

please keep in mind that these deals are 3rd party underwrites of Countrywide securities so we can

show more leniency than if we were actually purchasing the loans."  When a vendor graded a loan

EV3 for a third party deal, UBS was more aggressive in waiving this defective loan into the deal.

Voluminous UBS internal emails demonstrate that UBS was using a looser standard for third-party

deals.

182.    Additionally, in third-party deals, UBS often accepted initial loan tapes from

originators that only contained data for a portion of the loan pool, either because the full tape was

not yet available or because the originator might later increase the size of the deal.  UBS drew its

samples in those deals from the initial incomplete loan tapes, but failed to draw any samples at all

from subsequent loans tapes for the balance of the deals.  Despite finding high reject rates in due

diligence samples, UBS took no steps to diligence loans from the remainder of the pools, despite

the near-certainty that the undiligenced portions would contain defective loans.

C.    UBS Knew that a Significant Number of Securitized Loans in Its Home Finance
Deals Violated Its Representations to Investors

183.    In addition to the loans that UBS purchased and securitized from originators, UBS

also securitized loans that it had originated itself through UBS Home Finance ("Home Finance")

in two Subject Deals, MARM 2007-HF1 and MARM 2007-HF2 (the "Home Finance Deals").

184.    UBS knew that a significant number of the loans originated by Home Finance and securitized in the Home Finance Deals violated its representations to investors, including that the loans in these deals were originated in accordance with Home Finance underwriting criteria or otherwise had compensating factors that justified an exception, and that they were originated in compliance with all applicable laws and regulations.

185.    Specifically, UBS knew that: (1) its underwriting process, managed by its third-party fulfillment vendor, LenderLive, and meant to ensure that all Home Finance originated loans were of sufficient quality, "was ineffective" and "failed the sniff test" such that UBS had "lost confidence" in LenderLive; (2) its post-closing "Quality Control" due diligence audit identified a significant number of securitized loans as having credit or compliance "critical" exceptions (meaning that such loans violated representations to investors), but UBS securitized many of these loans anyway; and (3) a significant number of securitized loans were rejects from prior whole loan sales because they had failed credit, compliance, or valuation due diligence conducted by its third-party purchaser clients.

186.    The underwriting and origination process for Home Finance was managed by LenderLive.  As UBS represented to investors in presentations about Home Finance, "100%" of all of the loans UBS originated through Home Finance were purportedly reviewed for credit and compliance issues in a post-closing due diligence audit as part of UBS' "Quality Control" process. UBS hired a third-party vendor, JCIII & Associates ("JCIII"), to review all Home Finance originated loans post-closing for "adherence to guidelines, compliance, data integrity and completeness and propriety of all documents."  The vendor then created "Quality Control reports," which were distributed to "senior management for oversight purposes."

187.    The post-closing Quality Control reports conducted by JCIII for UBS identified all loans graded "acceptable" (complied with Home Finance underwriting criteria), "non-critical" or "critical" exceptions.   "Non-critical" exceptions were "approved exceptions to the guidelines." "Critical" exceptions were loans that did not comply with Home Finance underwriting guidelines and did not have approved exceptions to the guidelines, or were not originated in compliance with all applicable laws and regulations.  Thus, "critical" exception loans were loans that, if included in a securitization, would violate UBS' representations to investors.

188.    In October 2006, in a presentation to LenderLive, UBS identified serious problems with the underwriting process at Home Finance.  UBS informed LenderLive that LenderLive's process for ensuring underwriting quality was "ineffective."   In internal notes to the presentation, UBS stated that its underwriting vendor "failed 'the sniff test'" and loan underwriting "[f]ulfillment is not functioning smoothly" such that UBS had "lost confidence" and "trust" in LenderLive.  UBS nonetheless continued using LenderLive as its underwriting vendor to originate loans in the Relevant Period prior to securitizing a subset of those loans in the Home Finance Deals.

189.    Further, the post-closing "Quality Control" reports from JCIII revealed that astonishingly high numbers of loans were "critical" exceptions and thus violated representations to investors in the Home Finance Deals.  In an internal review by UBS of post-closing Quality Control reports for the fourth quarter of 2006 and first quarter of 2007, UBS found that critical exceptions ranged "from as high as 80% to as low as 40%."

190.    UBS nonetheless securitized a significant number of loans graded as "critical" exceptions or otherwise identified as defective loans in the Quality Control process in Home

Finance Deals.[16]  Specifically, in MARM 2007-HF1, UBS securitized 240 loans graded as "critical" exceptions and two loans graded EV3 in the Quality Control process, which was 13.69% of the entire deal.  Similarly, in MARM 2007-HF2, UBS securitized 110 such loans comprising 6.23% of the deal.

191.    UBS also securitized a significant number of Home Finance originated loans in MARM 2007-HF2, which appear to have never received a Quality Control review despite UBS representing to investors that "100%" of the loans were reviewed in its post-closing audit.

192.    Beyond loans that UBS had itself identified as having "critical" exceptions, UBS also knew that the representations it made to investors about the quality of loans in the Home Finance Deals were false because numerous loans securitized in the Home Finance Deals were rejects from prior whole loan sales where they had failed credit, compliance, or valuation due diligence.

193.    In addition to securitizing loans in principal deals, Home Finance also sold loans directly to third parties that were originated by UBS Home Finance or purchased through a loan-by-loan correspondent channel.  Execution of these transactions typically went poorly for UBS because the purchasers conducted due diligence on these loan pools and rejected a significant number of loans for credit, compliance, or valuation reasons.  The head of Home Finance specifically referred to one of these trades as a "sh*t show."

194.    After loans were rejected in due diligence by UBS' whole loan purchaser clients, there is no evidence that UBS ever conducted additional due diligence on the rejected loans.

---

[16] Clayton was a vendor utilized by UBS to conduct Quality Control audits prior to the time UBS began using JCIII. Clayton used several different grading systems for Quality Control reviews including an EV grading system similar to the grading system used for due diligence.

195.    UBS was effectively stuck with a significant number of loans that were "rejects" that it could not off-load in whole loan sales.  UBS' exit strategy for many of these loans was to securitize them and sell them to unwitting investors in the Home Finance Deals.

196.    UBS included significant numbers of loans in the Home Finance Deals that it knew, based on prior due diligence conducted by its purchaser clients, violated the representations it made to investors.  Specifically, UBS securitized 220 such loans in MARM 2007-HF1 (12.4% of the deal) and 16 such loans in MARM 2007-HF2 (0.91% of the deal).

197.    UBS never disclosed to investors in the Home Finance Deals any of the problems it knew existed in the underwriting practices at Home Finance.  Nor did UBS disclose that it was securitizing loans that its own Quality Control process identified as having "critical" exceptions, or that it was recycling loans rejected by its whole loan purchaser clients because of credit, compliance, or valuation issues.

**D.    UBS Securitized a Significant Number of Defective Loans in An Effort to Appease Originators Despite Knowing of Poor Underwriting Practices.**

198.    Throughout the Relevant Period, UBS knowingly securitized loans it knew violated or were highly likely to have violated representations to investors from the mortgage loan pools on which it conducted credit and compliance due diligence for the Subject Deals so that it could maintain its relationships with originators.

199.    UBS' access to the mortgage loans and underwriting business that originators supplied was essential to its RMBS business.   In order to continue to have access to whole loans and new underwriting engagements, UBS needed to appease originators so that they would continue to do work with UBS.  As one UBS trader put it in describing EquiFirst Corporation, an originator with which UBS did repeat business, "if they're really that unhappy, they just won't sell us the loans tomorrow; and . . . I really don't want to get to the point where they hate us."  Similarly,

the head of ABS noted that if UBS pushed for more stringent diligence, "we run the risk of alienating everyone that sells loans to us."

200.    Loan originators routinely sought to minimize "kickout" or "reject rates"[17] and maximize "pull-through rates".[18]  UBS received pushback from all of its originator clients about rejects.

201.    In order to maintain its relationships with originators, UBS frequently gave in to originator pressure and compromised its credit and compliance due diligence process to limit the number of loans UBS rejected.  By doing so, UBS securitized loans it knew had characteristics that contradicted its representations to investors.

202.    UBS was well aware of significant problems with the operations of its originator clients.  Despite this knowledge, UBS purchased or underwrote thousands of loans from these originators in the Subject Deals, and represented to investors and rating agencies that it only dealt with "reputable, established originators."

203.    In 2004, a due diligence manager emailed her colleague "the top FIVE reasons to avoid purchasing Countrywide loans." The reasons included due diligence reject rates that were "worse than average" (15-25%), loan "[f]iles [that were] rarely available on time" for due diligence which "compromis[ed] the integrity of the process," and significant numbers of loan tapes provided with missing data including DTI ratios.   Another UBS employee said of Countywide: "When you do business with them, you dance with the devil and sell your soul . . . ."

---

[17]  The terms kickout rate or reject rate as used by UBS was the number of loans removed from a loan pool during due diligence, divided by the number of loans in the credit/compliance due diligence sample reviewed by UBS.

[18]  The pull-through rate as used by UBS during the Relevant Period was the number of loans that were purchased and securitized after due diligence, divided by the number of loans in the pool offered by the originator.  For example, if 15 loans were rejected from a pool of 100 loans for due diligence reasons, the pull through rate would have been 85%.

204.    UBS was similarly aware of serious problems at American Home, WMC, New Century, Fremont, and IndyMac.

205.    By September 2005, UBS' head of due diligence for Mortgage Finance acknowledged that American Home had "extremely weak past performance from a diligence perspective," and stated that with respect to American Home's loans he "would only be comfortable at 50% due diligence . . . ."   In 2006, he continued to view American Home as a problem ("I know they suk").  Others at UBS expressed similar concerns, including a trader on the ARMs Desk who in 2006 described American Home as "the worst with due diligence . . . their files are really sloppy and often incomplete."   Despite these concerns, UBS continued to buy and underwrite American Home loans throughout the Relevant Period and never performed anywhere close to 50% credit and compliance due diligence.

206.    By 2006, UBS was extremely concerned about the quality and expected performance of loans originated by WMC, yet it continued to purchase and securitize these loans. For instance, prior to securitizing WMC loans in MABS 2006-WMC3, UBS' head of ABS (i.e., subprime) due diligence acknowledged concern about "how [the loan pool] ended up this bad." He continued, if people "thought wmc 2 performance was bad wait until this one goes out."   The following year, a trader on the ABS Trading Desk summed up his opinion of WMC loans (approximately a month prior to selling certificates backed by those same loans in MABS 2007-WMC1) as "quite possibly better than little beside leprosy spores."

207.    By 2006, UBS also knew that New Century's loans had gone from bad to worse. After receiving initial diligence results on a pool of New Century Loans from a diligence manager who commented, "This deal is horrific!!!," a trader on the ABS Trading Desk responded that "New

Century has never been one of the 'cleanest' counterparties we buy loans from, but the initial results are 'significantly' worse than our previous experiences with them."

208.    UBS also recognized a decline in Fremont's underwriting practices.  In May 2006, prior to securitizing Fremont loans in MABS 2006-FRE2, the head of ABS due diligence started looking into Fremont's rising EPD rates noting that "we are beginning to see more an[d] more creativity on the origination side" and "higher than normal FPD's[19] [sic] and EPD's [sic] percentages."

209.    UBS had such a low opinion of Fremont loans that by mid-2006, UBS stopped buying Fremont loans altogether.  Despite UBS' aversion to purchasing Fremont's collateral, UBS continued to securitize the loans it had already purchased and to act as an underwriter to Fremont for FHLT 2006-B.   In September 2006, a trader on the ABS Trading Desk summed up his view of Fremont loans:  "their collateral is cr*p."

210.    UBS also knew that the quality of IndyMac was abysmal.  As early as 2004, a trader on the ARMs desk stated, "I have made my reservations about this firm quite clear. . . . i told [another UBS employee] i would do whatever is best for the biz, but i clearly am against buying their paper."

## III.    UBS Knew that Its Representations that Were Dependent on the Validity of the Originators' Property Valuations Were Highly Likely to Be False.

211.    When a borrower applies for a mortgage loan, the originator conducts or procures an appraisal of the mortgaged property, which generally becomes part of the loan file.  In order for UBS to make a number of representations in the Offering Documents, it needed to reasonably evaluate the originators' valuation of the underlying properties.

---

[19] An FPD is a "first payment default," which occurs when a borrower fails to make the first payment due on a mortgage.

212.     First, the Offering Documents stated that a central purpose of the underwriting guidelines was to ensure that the property value supported the loan amount.  Accordingly, LTV and CLTV ratios—which were to be calculated using the lesser of the originator's assessment of the property value or the actual sale price—played a significant role in underwriting guidelines. As such, substantiating the property value was essential to assuring that the loan had been originated in accordance with guidelines and that the property value supported the loan amount.

213.     Second, since the originator's value or the sale price was to be used to calculate the LTV and CLTV ratios that were often provided to investors in stratification tables in ProSupps (and sometimes also in loan tapes), an assessment of the validity of this property value was also necessary to ensure that the disclosed ratios were accurate and not misleading.

214.     LTV and CLTV ratios were used to gauge the risk of default by a prospective borrower.  As the LTV or CLTV ratio increases, the amount of equity that the borrower has in the home decreases along with the borrowers' willingness to repay the loan.  When a CLTV exceeds 100% and a borrower is considered to be "underwater," the borrower is more likely to walk away from the property and cease paying the mortgage.  Thus, to give comfort to investors that UBS' disclosed LTV and CLTV ratios were accurate, UBS' investor presentations contained detailed information describing UBS' purported valuation due diligence process as outlined below.

215.     When acquiring loan pools for the purpose of securitizing them in MARM and MABS deals, UBS conducted valuation due diligence to test the reasonableness of the appraisal values on the properties backing each loan and told investors it did this for "100%" of the loans in investor presentations.  UBS also conducted valuation due diligence on samples of loans for its third-party subprime deals.

216.   UBS' valuation due diligence revealed that the property values of thousands of loans it was securitizing were overstated.  Nevertheless, UBS knowingly securitized these loans, and misrepresented to investors in ProSupps the property values used to calculate LTV or CLTV ratios, and that the property values supported the loan amounts.

**A.     UBS' Valuation Due Diligence Process**

217.   UBS conducted valuation due diligence by reviewing the property value an originator used to underwrite a loan, and typically, the underlying appraisal used to generate that property value.  In the words of a trader on the ABS Trading Desk, the purpose of valuation due diligence was to have an "educated" "second set of eyes" make a determination about whether the value placed on the underlying property by the originator "seemed reasonable."

218.   Numerous former UBS employees and a valuation due diligence vendor confirmed similarly:

- Head of ABS: The purpose of valuation due diligence was to "get a sense of whether the originator is doing a good job of estimating the value of a property . . . ."
- Head of Mortgage Finance: "My understanding of valuation due diligence is validating or getting a level of comfort with respect to the appraised value of a loan . . . . [The purpose of valuation due diligence is] to get comfortable with the valuation of the mortgaged property. . . . it just has to do with affirming that the appraisal that the loan was originated with makes sense."
- Due Diligence Manager: "The valuation due diligence was to ensure that the value on the original appraisal is – substantiates the actual value that was utilized to close the loan. . . . You want to ensure that the value is supportive, because you are obviously using that as collateral for the loan, so you want to make sure that that asset is – is substantiated."
- Valuation Due Diligence Vendor: "They hired us to make sure that the valuations were reasonable and accurate."

219.   To make this assessment, UBS employed third-party valuation due diligence vendors to conduct a multi-step process to assess whether the value placed on the underlying property by the originator was reasonable.  At each stage of the process, UBS used various tools

to compare the property valuations determined through due diligence against the value in the original appraisal. If the difference between these values fell within an acceptable "tolerance" level (generally between 10-20% negative variance), UBS would securitize the loan without further review. However, if the variance was "out of tolerance," meaning the variance was outside the acceptable tolerance level, the loan file was supposed to continue through additional stages of diligence until UBS made a final decision whether to kick or keep the loan.

220.    In presentations to investors, UBS explained its purported multi-step due diligence process in great detail. UBS described each step in the process and told investors that its processes for MARM and MABS deals were applied to "100%" of the loans. UBS also described the tolerance levels used to determine whether each loan would be required to continue through the additional stages of diligence.

221.    These valuation due diligence vendors were located in states other than New York including: (1) C&S, located in Sacramento, CA; (2) Hanqual, located in San Diego, CA;  and (3) CRS, located in San Diego, CA.

222.    UBS knew that valuation due diligence should have been afforded particular importance given UBS' awareness of pervasive appraisal fraud in the industry during the Relevant Period. Reflecting on valuation due diligence results relating to Home Finance in October 2006, the Mortgage Finance head of due diligence wrote, "Within this report and in particular the CRS comments lies solid evidence that there are a great deal of value issues out there." In the same email exchange, the Mortgage Finance head of due diligence forwarded to a number of traders and due diligence personnel an article that reflected on both the incentives behind appraisal fraud and its prevalence, citing a 2003 National Appraisal Survey: "55% of the appraisers reported that they had been pressured to **overstate property values**. 25 percent of appraisers reported that they had

experienced such pressure in at least half of the appraisals they were commissioned to perform."
(emphasis in original).

223.    As early as the second or third quarter of 2006, traders at UBS also began to have
concerns with appraisal fraud. As a trader on the ABS Trading Desk testified, "Appraisal fraud
was something that was – was something that I knew existed and it concerned me, sure."

224.    UBS was also aware that originators were employing tactics that it didn't "feel too
comfortable about at face value" to inflate the values of the properties supporting their mortgage
loans.  For example, in October 2006, Countrywide proposed using "Landsafe Reviewer," a
program that would allow Countrywide to "present decreased LTVs by using (what amounts to)
an AVM to justify an increased value (by as much as 10%!) over an appraisal!"  With respect to
Countrywide, even the head of mortgage trading at UBS knew that Defendants needed "to be
careful with CW super jumbos because of outdated or inaccurate appraisals."

225.    UBS was also aware of appraisal fraud schemes employed by borrowers.  For
example, in February 2007, the head of the ABS Trading Desk wrote one of his traders about a
fraud scheme he had learned about: "was talking to a realtor and he had a story about the bull sh1t
that goes on down here . . . homes aren't selling at or near their appraised values so homeowners
are giving guys cash back, and it's not just 25k . . . he heard of a guy getting 500k back on a 2mm
dollar purchase.  Why not just lower the $ price you ask??? How about max out your ltv with a
silent second and pay 2-3 months then just walk away . . . assume you put 10% down and make
payment of 9k you walk away with 270+k cash . . . not bad for 3 mos of work."

226.    Despite its knowledge of the importance of valuation due diligence, the inflated
appraisals provided by originators, and the fraudulent behavior of borrowers, UBS implemented a

valuation due diligence process, as described herein, that it knew was highly likely to result in securitizing loans that violated its representations to investors.

### 1. Valuation Due Diligence for MARM and MABS Deals

227. For MARM deals, UBS instructed its valuation due diligence vendors to apply "Smart Filters" to the entire loan pool. "Smart Filters" were supposed to screen loans based on a number of factors. For loans identified as low risk by the filter, valuation due diligence ended. For loans identified as high risk by the "Smart Filters," valuation due diligence continued. UBS did not use "Smart Filters" for MABS deals.

228. The next step in the process was to run an automated valuation model ("AVM") on each of the properties. An AVM is a service provided by a vendor that generates real estate property valuations using mathematical modelling. Most AVMs calculate a property's value at a specific point in time by analyzing sale prices of comparable properties. The valuation due diligence vendors then compared the AVM value to the originator's property value. As noted above, UBS utilized tolerance levels – meaning UBS' accepted range of deviation (in percentage) from the property value in the loan file to the value determined by the due diligence vendors – to determine whether a loan should proceed to the next stage of valuation due diligence.[20] If the downward variance between the AVM value and the originator's property value was "within tolerance," UBS typically proceeded to purchase the loan without any further valuation due diligence. If, however, the variance was "out of tolerance," the loan should have proceeded to the next stage of valuation due diligence, which was usually a desk review.

---

[20] In MARM deals (containing mostly Alt-A loans), UBS' tolerance level was generally 15% negative variance, and in MABS deals (containing mostly subprime loans), UBS' tolerance levels ranged from 10-20% negative variance depending on the LTV indicated in the loan file.

229.     Additionally, the AVM results contained "flip flag" designations for loan files, which indicated that the property may have been repeatedly resold, or "flipped," to inflate the stated value of the property.  UBS represented in its shelf presentations that all loan files in MABS deals with an "indication of flipping [would be] automatically selected" for the next stage of valuation due diligence.  Furthermore, UBS represented that in MARM deals, "[f]lip flags from AVM providers" would be obtained for all loans and UBS would "ensure against flip activity."

230.     The "desk review" was the next step after an AVM.  It entailed a licensed appraiser reviewing the loan file, which contained the property appraisal, the AVM results, and other resources pulled by the valuation due diligence vendor, to determine a fair market value for the property and to identify other risks such as fraud associated with the origination of the loan.  The valuation due diligence vendors then compared the desk review value against the originator's property value.  If the valuation due diligence vendor found the variance between the desk review value and the originator's property value to be "within tolerance," UBS typically proceeded to purchase the loan without any further valuation due diligence.

231.     If the variance between the desk review value and the originator's property value was "out of tolerance," the loan was supposed to proceed to the next stage of valuation due diligence, which usually involved obtaining a second opinion of value through a broker price opinion ("BPO").  In a BPO, a real estate broker familiar with the geographic area in which the property was located would conduct a review of the property and render an opinion as to its fair market value.  The valuation due diligence vendor then compared the BPO value against the originator's property value.  If the variance between the BPO value and the originator's property value was "within tolerance," UBS typically proceeded to purchase the loan.

232.    If, however, the variance between the BPO value and the originator's property value was "out of tolerance," the loan should have proceeded to the next stage of valuation due diligence, which was usually a rebuttal and tie-out call with the originator to reach a final "reconciled value" for the property.  If the variance between the final reconciled value and the originator's property value was "within tolerance," UBS typically proceeded to purchase the loan. If the variance between the final diligence value and the originator's property value was "out of tolerance," the valuation due diligence vendor recommended that the loan be dropped from the purchase.

233.    At the end of this process, the valuation due diligence vendor typically provided a final diligence value for each loan selected for further due diligence beyond the AVM.  According to the vendors, this final diligence value was the "best, most logical value that [the valuation due diligence vendor] could assign to the property."

234.    UBS used this reconciliation analysis to identify loans with associated properties that lacked sufficient value to support them.  These under-supported loans should have been rejected by UBS.

### 2. Valuation Due Diligence for Third-Party Deals

235.    UBS generally performed valuation due diligence on its subprime third-party deals, but unlike its shelf deals, UBS performed this diligence only on a sample of loans.

236.    UBS generally did not conduct valuation due diligence on loans in its Alt A third-party securitizations except for a limited cursory review of the appraisals for the loans selected for credit and compliance due diligence.  However, in two of UBS' Alt-A third-party securitizations that were initially intended to be whole loan purchases, UBS ordered AVMs to be done on the entire pool.  Nevertheless, when these deals transitioned to third-party securitizations, UBS ceased further valuation due diligence.

### 3. Valuation Due Diligence Tolerance Levels

237.    While the valuation due diligence vendors set up the process for reviewing loans, UBS ultimately dictated which loans would be considered "within tolerance."

238.    The tolerance levels recognized that, within a certain range, appraisers' opinions about the value of a particular property could reasonably differ.  Additionally, the tolerance levels were not intended to measure a property's potential appreciation or depreciation during the generally short period of time between when the loan was originated and diligence was performed. Instead, the tolerance levels were meant to differentiate between variances in value based on reasonable differences of opinion, and variances stemming from fraud.

239.    A trader on the ABS Trading Desk similarly testified that, since most of the loans UBS purchased were less than six months old, "you were only going to see a given amount of deterioration of the underlying value of the collateral. . . . So, yes, the value would have gone down, but it's not like homes were decreasing at a 20 percent annualized rate or a 30 percent annualized rate. . . . You would hopefully catch the appraisal fraud by seeing a much larger variance . . . ."  He further explained, a "larger variance would cause one . . . to be more suspicious [of appraisal fraud]."

240.    For loans intended for securitization off the MARM shelf, UBS generally dictated that any loan with a negative variance[21] greater than 15% should be considered "out of tolerance." Prior to April 2006, UBS generally employed the same tolerance levels for MABS deals.

---

[21] A negative variance occurred when the value obtained during the due diligence process was lower than the originator's property value.  For example, a property with an originator's appraisal value of $100,000 and an AVM value of $85,000 would produce a negative variance of 15%.

241.    In or about April 2006, UBS implemented a new policy for tolerance levels for its MABS deals.  Under the new policy, at the AVM stage, a loan's LTV or CLTV ratio[22]—as provided by the originator—determined the tolerance, as shown below.

**SUBPRIME AVM NEGATIVE VARIANCE TOLERANCES**

| LTV/CLTV | AVM Negative Variance Tolerance |
|---|---|
| LTV/CLTV ≤ 70% | 20% |
| LTV/CLTV > 70% and < 90% | 15% |
| LTV/CLTV ≥ 90% | 10% |

After the AVM stage, UBS continued to use a negative variance tolerance of 15%, regardless of a loan's LTV or CLTV ratio.

**B.    UBS Routinely Securitized Loans with "Out of Tolerance" Valuation Due Diligence Results.**

242.    With regard to MARM and MABS deals, UBS' valuation diligence vendors informed it that significant numbers of loans were "out of tolerance" at the time UBS elected to terminate valuation due diligence, meaning that there was a high probability that these loans had materially inflated property values.  Instead of removing these loans from the deals or moving them to the next stage of diligence required by UBS' policies, UBS securitized these loans knowing that they were "out of tolerance."

243.    This practice of securitizing "out of tolerance" loans directly contradicted UBS' assurances to investors in investor presentations that it did not securitize "out of tolerance loans," and that "out of tolerance" loans would proceed to the next stage of diligence.

---

[22] UBS' shelf presentations indicated that a loan's CLTV would be used for first liens and their associated second liens if both loans were within the pool.

244.     Moreover, this rendered UBS' representations concerning value in Offering Documents false in at least two ways.  First, UBS falsely represented to investors – by referencing the originators' guidelines – that the associated property values were adequate to support the amount of the mortgage loans.  Second, UBS disclosed LTV (loan-to-value) and CLTV (combined loan-to-value) ratios for the Subject Deals based upon the originators' property values.  However, UBS knew from what it learned through valuation due diligence that the LTV and CLTV ratios were highly likely to have been significantly higher than it disclosed in Offering Documents, and that many of the mortgages were not supported by the values of the underlying properties.

245.     With regard to subprime third-party deals where valuation due diligence was limited to a sample, UBS identified a significant number of loans with inflated or "out of tolerance" values, indicating that loans outside the sample had similar issues, yet did not expand the sample to identify similarly defective loans.  Moreover, UBS often stretched its tolerance levels to allow for more loans to be accepted in third party deals than would be tolerated in principal deals.  As a result, UBS' representations in Offering Documents about the loan values, including LTV disclosures and statements that the properties supported the loans, were false.[23]

246.     UBS' motivation for securitizing these "out of tolerance" loans, like its motivation for securitizing credit and compliance rejects, was grounded in UBS' understanding, as acknowledged by the head of the Asset-Backed Securitization Desk (subprime RMBS) in an October 2006 email, that applying its valuation due diligence process as represented to investors would result in increased numbers of kicked loans and would create "an issue with the relationship

---

[23]  Some of the Subject Deals transitioned from whole loan purchases intended for securitization on UBS' shelf to Alt-A third-party securitizations on the originator's shelf.  In those instances, while the underlying representations remained unchanged, UBS ignored AVM results altogether.  As a result, UBS securitized hundreds of loans with AVM valuations that were outside of UBS' tolerance levels without conducting any further valuation due diligence on those loans.

with the seller" that "[ran] the risk of alienating everyone that [sold] loans to [UBS]."  As a result, UBS looked for ways to reduce the number of loans advanced to each subsequent stage of the valuation due diligence process, and routinely disregarded "out of tolerance" valuations identified by its vendors.

247.   For example, in MARM 2007-1, the vendor recommended—based on UBS' tolerances —that 935 loans from an American Home pool be sent for further due diligence based on their AVM results.  Because UBS had agreed to a 17% due diligence sample as part of its bid, American Home demanded that UBS drastically reduce the number of loans UBS selected for further valuation due diligence to comply with this percentage.

248.   Thus, despite its vendor's assessment, UBS ordered additional valuation due diligence for only 213 of the 935 loans in contravention of UBS' representations in shelf presentations.  Of the 722 loans that were not subjected to further valuation due diligence, UBS securitized 516 loans with negative variances greater than 15% (10.4% of the deal by loan count), including hundreds of loans with negative variances that far exceeded the 15% tolerance.  251 of the securitized loans had negative variances greater than 25%, 67 loans had negative variances greater than 50%, and 11 loans had negative variances greater than 75%.

249.   In MARM 2007-2, the vendor recommended—based on UBS' tolerances—that 340 loans from a Countrywide pool be subjected to further due diligence based on their AVM results.  Ultimately, UBS "chop[ped]" that number down to 286 loans.  Of the 54 loans that were not subjected to any additional valuation due diligence, UBS securitized 51 of them with negative variances greater than 15% (3.76% of the deal by loan count), including 16 loans that had negative variances greater than 20%, and 6  loans which had negative variances greater than 25%.

250.    Similarly, in TBW 2006-6, a rent-a-shelf deal securitizing loans originated by Taylor Bean Whitaker, the vendor recommended—based on UBS' tolerances—that 737 loans be subjected to additional due diligence based on their AVM results.  Ultimately, UBS "pared" that number down to 578 loans.  Of the 159 loans that did not receive any further review, UBS securitized 141 loans with negative variances greater than 15% (5.5% of the deal by loan count), including 47 loans that had negative variances greater than 20%, and 10 loans that had negative variances greater than 30%.

251.    In some deals, UBS simply changed its tolerance levels to accommodate more loans.  For example, in INABS 2006-D (a subprime third-party deal for which UBS only conducted valuation due diligence on a sample of loans), at the final stage of valuation due diligence, without providing any explanation, UBS decided to increase its negative variance tolerance levels to 25%, seemingly for the sole purpose of accepting more loans.

252.    UBS also ignored the AVM results it received in two Alt-A Subject Deals that transitioned from whole loan purchases to Alt-A third-party securitizations, securitizing hundreds of loans with AVM valuations that exceeded UBS' tolerances without conducting any further valuation due diligence on those loans.

253.    In RALI 2006-QO7, UBS ordered AVMs for 407 loans because UBS initially intended to purchase this pool as whole loans.  The AVM results showed that 74 loans had negative variances greater than 15%, including 39 loans that had negative variances greater than 25%, and 10 loans that had negative variances greater than 50%.  Based on the AVM results, UBS selected 104 loans to proceed to the next stage of valuation due diligence.  However, once this deal was converted into a third-party securitization, UBS cancelled the next stage of valuation due diligence

and securitized 86 of the 104 loans (with a total principal balance of $28,283,405) without any further review.

254.    Similarly, in CWALT 2007-OA2, UBS ordered AVMs for 1,562 loans because UBS initially intended to purchase this pool as whole loans to be securitized in a principal deal. The AVM results showed that 250 loans had negative variances greater than 15%, including 117 loans that had negative variances greater than 25%, and 21 loans that had negative variances greater than 50%.   After receiving the AVM results, UBS converted the whole loan purchase into a third-party deal.  In spite of the variances observed in the AVM results, the UBS due diligence manager working on the deal informed the valuation due diligence vendor that UBS would not need any further valuation due diligence because UBS was "not going to buy these loans." UBS ultimately securitized 239 of the 250 loans (with a total principal balance of $94,012,362) in CWALT 2007-OA2.

### C.    UBS Routinely Securitized "Flip Flag" and Loans That Had Not Been Subjected to Any Valuation Diligence in Violation of Its Representations to Investors and Rating Agencies about the Scope of Its Valuation Due Diligence

255.    As noted above, in addition to the representations in the Offering Documents, UBS touted its valuation due diligence processes in MABS and MARM shelf presentations made to investors and rating agencies.  These presentations provided descriptions of the multi-step process that UBS employed, and the specific tolerance levels UBS purportedly used to determine loans that would be considered "out of tolerance."

### 1.  Flip Flags

256.    In MABS presentations, UBS represented that loans with "indication of flipping [were] automatically selected" for the next stage of valuation due diligence, and MARM representations stated that UBS would "ensure against flip activity."   Contrary to these representations and UBS' own policy, UBS regularly securitized loans with "flip flag"

designations indicating that the property may have been repeatedly "flipped" with no additional review or consideration, in violation of UBS' policies and representations to investors. As the Mortgage Finance head of due diligence acknowledged in an October 2006 email to an internal auditor at UBS, a "flip flag" was a "potential indicator" that a property was being repeatedly resold to "inflate values and create potentially false value profits."

257.   Flipping, of course, was a critical problem as one UBS valuation due diligence vendor explained:

> We've seen properties that were purchased for three thousand dollars that were flipped for a hundred thousand dollars. They were really worth three thousand dollars, but they were bogus, fraudulent appraisals that were using flip sales and part of a scam. In that type of situation, the property is really worth five thousand [sic] and [even] if you only have a thirty thousand loan, that becomes a high–risk situation.

**2. No Diligence Loans**

258.   UBS' shelf presentations also falsely represented to investors and rating agencies that "100% of the loans" in a pool were subjected to some form of valuation due diligence. Yet, UBS securitized thousands of loans without subjecting them to any valuation due diligence at all (hereinafter referred to as "no diligence" loans).

259.   UBS securitized no diligence loans in a number of ways. In some instances, UBS performed no valuation due diligence on loans that were added to a deal late in the process – typically through an upsize. Rather than delay the deal so that proper valuation due diligence could be conducted to verify the originator's property valuations, UBS securitized these loans without performing any valuation due diligence in violation of its own policies and representations to investors.

260.   For example, in MARM 2006-OA1, an American Home pool of loans that contributed to the deal was upsized after valuation due diligence had already begun on the pool,

adding 1,037 loans to the pool.  Because of pressure to complete the securitization on time, UBS performed no credit, compliance or valuation due diligence on the 1,022 loans from the upsize that were securitized in this deal.  This was explicitly approved by UBS on an "exception basis," indicating the decision was inconsistent with UBS policy.   Similarly, UBS did not conduct any valuation due diligence on 23 other loans securitized in this deal that were added as an upsize to a different loan pool.

261.    UBS knew that it should have conducted valuation diligence on the upsized pool. In October 2006, several months after the deal closed, MARM 2006-OA1 was the subject of an internal audit conducted on the RMBS business unit at UBS.  As part of that audit, the auditors requested AVM results for the upsize to the American Home pool.  Instead of admitting to the auditors that no valuation due diligence had been conducted on the loans in the upsize, the Mortgage Finance head of due diligence instructed the valuation due diligence vendor for the deal to retroactively perform AVMs on those loans.  He then presented the AVM results to the auditors as though they had been obtained in March 2006, when diligence for the deal had been performed.  Of note, the retro-AVM results indicated that 113 of the 1,022 securitized loans from the upsize had negative variances greater than 15%, including 36 loans that had negative variances greater than 25%, and four loans that had negative variances greater than 50%.

262.    Similarly, in MARM 2007-2, a deal that was upsized the same day that UBS began its valuation due diligence, UBS used a partially allocated initial loan tape to perform valuation due diligence.  UBS performed no valuation due diligence on 409 loans securitized in the deal that had been added with the upsize (30.18% of the deal by loan count).

263.    Likewise, in MABS 2006-WMC4, 200 "50 year loans" were added to the deal after the valuation due diligence process began.  While some of these loans were selected for credit and

compliance due diligence, no valuation due diligence was ever conducted on the 200 "50 year loans" that were securitized in the deal.

264.    UBS also effectively securitized no diligence loans when it securitized hundreds of loans that came back as "no hits" during the AVM process.  The "no hit" designation indicated the properties had insufficient comparable properties to generate AVM values.  Instead of advancing these loans on to the next stage of the valuation due diligence process, UBS conducted no other valuation due diligence on these loans, which was tantamount to performing no valuation due diligence at all.  This directly violated UBS' own policies and representations to investors.  UBS' shelf presentations assured investors that "All 'No Hits' are selected automatically" for the next stage of diligence or that "All loans that have a 'No Hit' . . . will also be adversely selected."

A third way UBS effectively securitized no diligence loans concerned UBS' MARM shelf, when UBS employed purported "Smart Filters" to eliminate loans from further valuation due diligence based solely on the LTV ratio provided by the originator.  Under these filters, any loan with a sufficiently low LTV – as indicated by the originator – was accepted by UBS without conducting any valuation due diligence because UBS treated the loan as low risk despite not having verified the originator's valuation of the underlying property.  This use of purported "Smart Filters" in this fashion was equivalent to conducting no value diligence at all for the loans eliminated from review by these LTV filters.  This approach of filtering loans using the originator's LTV did nothing to assess the validity or reasonableness of the originator's underlying property valuation, or whether the property valuation was fraudulent.  Assessing whether a particular property valuation was fraudulent was crucial because, as confirmed by one of UBS' valuation vendors, a fraudulent appraisal was indicative of a fraudulent loan: "From a pure appraisal perspective, a bad appraisal

is a bad appraisal [regardless of the originator's stated LTV ratio]. Bad appraisals are tied to bad loans."

265.    As set forth on the annexed Table 5, UBS securitized thousands of loans that either were out of tolerance, had flip flag designations, or were no diligence loans.  These loans represented material portions of the loan pools on many of the Subject Deals.  Loan counts in Table 5 are adjusted to avoid double-counting loans that have multiple violations.

## IV.    UBS Knowingly Misrepresented or Omitted Other Material Loan Characteristics Affecting the Risk of the Underlying Mortgages in the Subject Deals.

266.    UBS knew, based on information concealed from investors, that numerous representations in many of the Subject Deals pertaining to borrower equity, the parameters for DTI in Countrywide's underwriting guidelines, and credit scores were false or misleading.

### A.    UBS Routinely Made Misleading Disclosures Pertaining to Borrower Equity Through Its Omission of Information Regarding Known Secondary Financing in Its Alt-A Deals.

267.    UBS made misleading disclosures pertaining to borrower equity in 10 Subject Deals containing Alt-A loans through its failure to disclose known information regarding secondary financing.[24]  In the affected Subject Deals, the ProSupps routinely disclosed LTV ratios, but not CLTV ratios, and disclosed only that it was a mere possibility that the subject borrowers had obtained secondary financing.[25]

268.    This created a misleading picture of borrower equity because UBS knew that it was not just a possibility that the subject borrowers had obtained secondary financing, but a certainty, in that significant percentages of the borrowers in these deals had, *in fact*, taken out second

---

[24] UBS failed to disclose known information regarding secondary financing and CLTV ratios in the following Subject Deals: CWALT 2006-12-CB, CWALT 2006-23CB, CWALT 2006-OA3, CWHL 2006-OA5, CWALT 2006-OA7, CWALT 2006-OA8, CWALT 2006-OA10, RALI 2006-QO7, MARM 2007-1 and MARM 2007-3.

[25] The failure to disclose known CLTV ratios contravened UBS' representations in every MARM prospectus that "each prospectus supplement . . . will contain information . . . with respect to the residential loans . . . the combined Loan-to-Value ratios at origination."  *See e.g.* MARM 2006-OA2 Prospectus at 27.

mortgages against the underlying properties that served as collateral for the securities. These second liens that were not included in the securities along with the corresponding first liens were known as "silent" or "simultaneous" seconds.

269.    Both LTV and CLTV ratios are measures of a borrower's equity in the mortgaged property. The LTV ratio is calculated by dividing the subject loan amount by the value of the underlying property. The CLTV ratio is calculated by dividing the total amount of all outstanding loans taken out against the underlying property by the value of the property. For example, if a borrower takes out an $800,000 loan to purchase a $1,000,000 property, the LTV ratio is 80%. If the same borrower also takes out a second loan against the property for $200,000 to make the down payment, the CLTV ratio is 100%.

270.    UBS research analysts identified the significant risks associated with "silent seconds" in the non-agency mortgage market early on. In an article published on December 14, 2004, in UBS' weekly mortgage strategy publication, "The Mortgage Strategist," UBS noted the emergence of second liens being "taken out simultaneously with the 1st mortgage" and "often stand[ing] side-by-side with prime or Alt-A 1st mortgages." The article also observed that the presence of second mortgages or "silent seconds" was a "general indicator[] of homebuyers' [sic] stretching incomes to purchase a home," that it was "important that non-Agency investors recognize the concentration of silent seconds, and evaluate their credit quality and collateral performance accordingly," and that CLTV ratios were the "correct measure of borrower leverage!"

271.    In the affected Subject Deals, UBS routinely disclosed LTV ratios, but disclosed only the *possibility* that some borrowers might have obtained secondary financing, when it was a certainty. For example, in CWALT 2006-23CB, the ProSupp provided a stratification table that displayed the "Original Loan-to-Value Ratios" with a footnote that indicated the LTV ratios did

"not take into account any secondary financing on the mortgage loans . . . that *may exist* at the time of origination." (emphasis added)  The stratification table showed that 103 out of the 4,737 loans, or approximately 2% of the loans in the deal, had LTV ratios between 90 and 100 percent. Elsewhere, the ProSupp stated that "Countrywide Home Loans *may provide secondary financing* to a mortgagor contemporaneously with the origination of a mortgage loan . . . ." (emphasis added) There were no other disclosures pertaining to secondary financing or CLTV ratios in the ProSupp or FWPs.

272.   This stratification table, along with the footnote and other references to the possibility of secondary financing, were half-truths and misleading representations of the leverage of the borrowers in this deal. In reality, UBS knew that 1,909 loans, or approximately 40% of the deal, had silent second liens associated with them.  Had the ProSupp disclosed CLTV ratios—the "correct" measure for borrower leverage—it would have shown that 1,673 loans out of the 4,737 loans, or approximately 35% of the loans in the deal, had CLTV ratios between 90% and 100%.

273.   Across the affected Subject Deals, the percentages of loans with secondary financing ranged from 11% to over 40% and the omission of this information from the disclosures in the Offering Documents made the borrowers' equity in the underlying properties appear significantly higher than it was.  As shown in the annexed Table 6, UBS knew that material percentages of loans in each of the affected Subject Deals had second liens associated with them.

274.   UBS' actions in these deals were intentional.  UBS agreed with Countrywide to withhold this information from investors who specifically requested it.  For example, in May 2006, a potential investor requested CLTV ratios for loans in the CWALT 2006-OA8 deal.  A UBS collateral analyst did not provide this information because "CW does not disclose CLTV info." Similarly, in early January 2007, a collateral analyst apologized to a trader after mistakenly

including CLTV on an investor tape, saying, "My bad keeping the cltv on the tape . . . I took them out of all the strats and I thought I had done the same for the exports too."

275.    Contrary to what was disclosed in Alt-A deals, UBS regularly disclosed the existence of secondary financing in the ProSupps for subprime deals done on UBS' MABS shelf, which generally securitized similar percentages of loans with secondary financing.  Typically, the MABS ProSupps alerted investors to the risks associated with silent second liens and the presence of such loans in those deals.  For example, in MABS 2006-WMC3, the ProSupp disclosed the percentage of loans in the deal that were subject to a second lien along with the weighted average LTV ratio and the weighted average CLTV ratio for those loans.  The ProSupp also warned that with respect to these loans, "foreclosure frequency may be increased relative to mortgage loans that were originated without a silent second lien since mortgagors have less equity in the mortgaged property."

**B.    UBS Routinely Misrepresented Countrywide's Underwriting Guidelines and Omitted Material Information Regarding DTI Ratios for Deals Securitizing Countrywide Loans.**

276.    In deals where UBS securitized large numbers of loans originated by Countrywide, the ProSupps contained a summary description of Countrywide's purported underwriting guidelines used to originate the loans.  Those summaries included Countrywide's purported debt-to-income ratio limitations under its "Standard Underwriting Guidelines" and its more lenient "Expanded Underwriting Guidelines."  The guidelines contained two figures – "front-end" and "back-end" DTI limits.  A "front-end" DTI ratio calculated debt based only on a borrower's monthly housing expenses.  A "back-end" DTI ratio included total monthly debt.

277.    UBS represented in the ProSupps for these deals that under Countrywide's Standard Underwriting Guidelines, Countrywide permitted front-end DTI ratios of up to 33% and back-end DTI ratios of up to 38%.  Under the Expanded Underwriting Guidelines, the ProSupps

indicated that Countrywide generally permitted front-end DTI ratios of up to 36% and back-end DTI ratios of up to 40%. However, for loans with LTVs above 80%, the maximum permitted DTI ratios were the same as the Standard Guidelines: 33% and 38%, respectively.

278.    In 12 of the Subject Deals, UBS' representations concerning the DTI limits in Countrywide's various program guidelines purportedly used to originate the securitized loans bore no resemblance to the actual guidelines used by Countrywide for originating the loans underlying these RMBS, and UBS knew this. The actual guidelines used by Countrywide to originate the securitized loans permitted DTI ratios that far exceeded the tolerances articulated in the ProSupps, including back-end DTI ratios for at least the vast majority of these loans of up to either 50% or 55%. Consequently, many of the securitized Countrywide loans had DTI ratios that exceeded the limits disclosed in the ProSupps.

279.    Table 7, annexed hereto, tabulates the number of Countrywide loans contained within each Subject Deal disclosing Countrywide's guidelines that exceeded the DTI limitations articulated in the deal's ProSupp. As can be seen in Table 7, large numbers of loans in these deals had front-end and back-end DTI ratios that exceeded the guidelines disclosed in the ProSupps. Most notably, in all of these deals, between 30% and 55% of the loans in each deal exceeded the back-end DTI limit.

280.    UBS was fully aware that Countrywide used different DTI guidelines than those disclosed in the ProSupps. The guidelines that Countrywide provided to UBS to perform its due diligence, which were not disclosed to investors, permitted DTI ratios that vastly exceeded the limits represented in the ProSupps.

281.    Further, for these deals, UBS' practice was *not* to disclose DTI ratios to investors, even when investors specifically asked. UBS refused to provide this information as a result of a

directive from Countrywide, thereby withholding from investors material information that approximately half the loans in these deals exceeded the DTI limitations articulated by the guidelines disclosed in the ProSupps.

**C.    UBS Routinely Misrepresented FICO Scores for Seasoned Loans.**

282.    In seven of the Subject Deals, UBS misrepresented the FICO scores of borrowers whose loans backed the RMBS.  In ProSupps for both principal and third-party deals, UBS represented the FICO scores or "expected" FICO scores disclosed in the ProSupp to be "as of the Cut-Off Date" of the security.  The cut-off date for a securitization was the date, referenced in the ProSupp, on which the collateral attributes were determined.  This was typically the first day of the month in which the security closed.

283.    Despite representing that the FICO scores included in ProSupps were "as of the Cut-Off Date," UBS generally disclosed borrowers' FICO scores from the loan tape, which were not obtained as of the Cut-Off Date, but rather at the time of origination.  However, at the request of ratings agencies, UBS often obtained updated FICO scores for the loans in the deal that were at least six months "seasoned," generally meaning at least six months old.  The ratings agencies requested these updated scores because they knew, like UBS, that borrowers' FICO scores could – and often did – change during the period between origination and the cut-off date – so-called "FICO drift."

284.    UBS knew that even slight changes in FICO scores for the borrowers of the loans securitized in a deal could affect a rating agency's analysis of the deal.  For example, in MABS 2006-HE1, S&P insisted that UBS obtain updated FICO scores even when there were only 15 seasoned loans slated for the deal (just 0.4% of the deal by loan count) because they were "seasoned loans with relatively low FICOs and some loans ha[d] high LTVs and rates" that could affect loss coverage levels and the deal's structure.

285.    UBS was often reluctant to obtain and share updated FICO scores for seasoned loans with rating agencies because employees at UBS believed the FICO scores "[could] only get worse" and because UBS knew that updated scores that evidenced FICO drift could have a substantial impact on so-called "loss coverage ratios" or "levels."  These were calculations by the rating agencies governing how much credit enhancement was required for each deal.  Credit enhancements were mechanisms built into the structure of an RMBS deal to improve the overall credit profile, and were important to rating agencies in structuring a deal.  The more enhancements that were needed, however, the greater the cost to the issuer of RMBS.

286.    In MARM 2007-3, UBS went so far as to conceal from S&P the fact that UBS had obtained updated FICO scores for the seasoned loans slated for the deal until it was sure the updated credit scores would not unduly impact loss coverage levels.   In this deal, UBS had obtained updated FICO scores for the seasoned loans to be securitized in MARM 2007-3 five days before they were requested by S&P.  UBS was alarmed by the updated FICO scores, which included 37 loans with borrowers whose FICO scores had dropped significantly to below 600, a crucial floor in the Alt-A space.   The drops were so significant that when UBS first learned of them, it considered conducting a full representation and warrant review, believing that it would likely find a breach of a representation or warranty that would justify putting the loans back to the originators.[26]

287.    When S&P requested updated FICO scores, which UBS had already obtained five days prior, a UBS collateral analyst falsely stated to S&P in an email that UBS "did not have time

---

[26] Ultimately, UBS decided to forgo any further review of these loans because the loan files would "need to be requested from the servicer, pulled from storage, and delivered to the due diligence vendor performing the rep and warrant review" which could "take over a week" and because there was no "guaranty [the originator] [would] repurchase the loan either."

to refico this pool due to the short turn around time." The analyst was not acting on his own: a structurer on the ARMs Desk had instructed the collateral analyst not to provide the updated FICO scores to S&P.[27]

288.     In another example highlighting the importance of updated FICO scores for seasoned borrowers, in MARM 2007-HF1, S&P requested updated FICO scores for all seasoned collateral in the deal.  Based on the loans slated for the deal, UBS anticipated that it would need to obtain updated FICO scores for eight to nine percent of the deal.  A structurer working on the deal questioned whether UBS should do this: "[I]'ve asked around and a large camp seem to think that re-FICO on most loans came [sic] back w/ lower FICOs."  UBS ultimately decided to obtain the updated FICO scores, but wanted to "discuss before we distribute to anyone."  While in the end the updated FICO scores were provided to S&P, there is no evidence that UBS shared the updated FICO scores with Moody's, which also rated this deal, or with investors.

289.     As a result of the rating agency requirement, UBS obtained updated FICO scores for seasoned loans in these seven deals in the weeks prior to securitization, giving it a much better assessment of the FICO scores as of the cut-off date for those loans.  Through this process, UBS identified borrowers whose FICO scores had dropped significantly and materially since origination.  UBS never disclosed this updated information to investors, and instead continued to report the FICO scores that had been obtained at the time of origination in the ProSupps, knowingly misrepresenting them as FICO scores or the expected FICO scores "as of the Cut-Off Date."

290.     Annexed as Table 8 is a summary of the deals in which FICO scores for seasoned loans that had experienced downward FICO drift were inaccurately reported in the ProSupp as being the FICO scores, or the expected FICO scores, "as of the Cut-Off Date."   UBS

[27]It was not until later that evening, after the ARMs Desk structurer had reviewed the estimated loss coverage levels with the updated FICO scores,that he allowed them to be sent to S&P.

misrepresented to investors the FICO scores of borrowers of mortgage loans totaling tens of millions of dollars that were securitized in the relevant Subject Deals.

## V.   UBS' Fraudulent Conduct Affected Federally-Insured Financial Institutions and Victimized Other Financial Institutions.

291.   As to each Subject Deal, UBS' fraudulent conduct affected one or more federally-insured financial institutions ("FIFIs").

292.   As to each Subject Deal, UBS intended to defraud or victimize one or more financial institutions ("FIs"), including by targeting money and property owned by, or in the custody or control of, such institutions by means of false or fraudulent pretenses, representations, or promises.

293.   First, a substantial percentage of the loans UBS securitized or underwrote in the Subject Deals were originated by, and purchased directly or indirectly from, FIFIs acting as originators, such as Fremont and IndyMac.  UBS' fraudulent conduct and securitization machine primed the pump for these loans, creating demand for loans that were more and more risky and deficient, ultimately contributing to a housing bubble that, when it burst, led to one of the most severe financial crises in this nation's history, as well as the bankruptcy or distress of many of the FIFIs that originated the loans.

294.   UBS' fraud also affected FIFIs and victimized FIs in other significant ways.  In UBS' initial offerings on all of the Subject Deals, UBS actively marketed RMBS certificates to FIFIs and other FIs (including entities known by UBS to be affiliates or subsidiaries of FIFIs). UBS' employees had regular contact with these institutions through interstate telephone calls and wire communications to try to persuade them to buy UBS' RMBS.  UBS assigned internal sales representatives to cover FIFIs and other FIs.

295.    Numerous FIFIs and other FIs bought certificates in the Subject Deals based on UBS' representations about the loans.  In purchasing the RMBS certificates from UBS, FIFIs and other FIs provided UBS with funds they owned, or that were in their custody and control, in exchange for RMBS certificates.  One or more FIFIs purchased certificates in each of the Subject Deals.

296.    The FIFIs and FIs that purchased RMBS in the Subject Deals included, among many other institutions, The Bank of New York Mellon, The Northern Trust Company, Federal Home Loan Bank of San Francisco, Bank Hapoalim, U.S. Central Federal Credit Union, Bank of Tokyo Mitsubishi, Merrill Lynch Bank, Western Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, Federal Home Loan Bank of Seattle, Members United Corporate Federal Credit Union, Federal Home Loan Bank of Boston, State Street Bank, Lasalle Bank National Association and Suntrust Bank.

297.    Many of the above-mentioned FIFIs and FIs were based in states other than New York.  In inducing these investors to invest in the Subject Deals, UBS' employees located in New York communicated with the investors located in these other states over email, by phone, or by other means.

298.    UBS' employees involved in the Subject Deals knew that, for each Subject Deal, initial purchasers included many FIFIs and other FIs.  They also knew that many investors in the Subject Deals bought RMBS using funds held in custodial accounts at FIFIs or other FIs.

299.    UBS knew the false representations they made about the securitized loans and about UBS' due diligence processes subjected FIFIs and other FIs to materially increased risk of loss as to each Subject Deal.

300.     In perpetrating their fraud while securitizing the Subject Deals, UBS imposed risks

on other transaction participants that were FIFIs.  Specifically, for the vast majority of the Subject

Deals, FIFIs were among: (1) the trustee or trust administrator; (2) the servicer; or (3) the custodian

of the loan files.  In these roles, the FIFIs receive(d) compensation for their role in the transaction

or process(ed) payments and accounts affected by UBS' fraud.

301.     The trustees and trust administrators were exposed to loss or risks of loss as a direct

result of UBS' fraudulent conduct.  For certain of the Subject Deals, the FIFI trustee has been sued

by investors on account of UBS' systemic misrepresentations as to the underlying loan pools. (*See*

*National Credit Union Administration Board v. U.S. Bank National Association* 14-CV-9928

(S.D.N.Y.)).  This has exposed the trustees to risks of loss and reputational harm.  The trustees

have also expended resources in defending against these suits. Further, trustees have also expended

resources filing suit against UBS and loan originators to enforce contractual re-purchase rights.

*See MASTR Adjustable Rate Mortgages Trust 2006–OA2 et al. v. UBS Real Estate Sec. Inc. ,* No.

12-CV-7322 (S.D.N.Y.)

302.     As a result of UBS' fraudulent conduct, the servicers were also affected and

subjected to increased costs and increased risk of loss.  The servicers' costs and profits were tied,

in part, to the outstanding balances of the loans they serviced, the amount of monthly payments

they processed and forwarded to the trusts, the late fees and penalties they collected on the

underlying loans, or the amounts they spent or recovered in pursuing loans in default, all of which

were affected by the fraudulent conduct.

303.     Despite knowing at the time of securitization of widespread breaches of the

representations in the MLPAs and PSAs for the loans securitized in each of the Subject Deals,

UBS did not provide notice to the trustees or servicers of the breaches, as required under the terms

of many of the PSAs.  This lack of notice affected the trustees and servicers, including those that were FIFIs, by depriving them of the opportunity to take timely action to protect their interests and by exposing them to potential liability and other costs.

304.    As a consequence of UBS' fraudulent conduct, the custodians of the loan files for the Subject Deals were also affected and subjected to increased costs and increased risk of loss. The custodians' costs and profits were tied, in part, to the number and outstanding balances of the loans they serviced, which were affected by UBS' fraudulent conduct.

305.    UBS' false representations about the loans it securitized in the Subject Deals were widely disseminated and had foundational effects on a broad range and number of financial instruments held, generated by, or serviced by FIFIs.

<u>DEAL-SPECIFIC FACTS</u>

306.    The following sections of this Complaint set forth UBS' fraudulent conduct with respect to each of the Subject Deals.

**I.   MABS Deals**

The following MABS Deals securitized subprime loans.

**A.    New Century Deals**

**1.   MABS 2006-NC1**

307.    MABS 2006 NC1 closed on February 24, 2006.  As stated in the ProSupp, the deal consisted of 4,815 loans with an aggregate principal balance of $915,168,720.  All of the loans were originated by New Century and were purchased by UBS in November 2005 as part of one pool of 5447 loans.

308.    UBS selected a sample of 1,361 loans (24.99% of the pool by loan count) from which to perform its credit and compliance due diligence.  Additionally, to satisfy a trade stipulation with a residual buyer, UBS directed its credit and compliance due diligence vendor,

Clayton, to perform a compliance only review of an additional 816 "cherry pick[ed]" loans. Clayton specifically instructed its employees not to conduct any credit due diligence on these loans: "I do not want to see ANY credit comments on these compliance only loans either, and yes people have done this."   In total, UBS conducted some combination of credit and compliance due diligence on a sample of 2,177 loans (39.97% of the pool by loan count).

309.     From the sample of 2,177 loans, Clayton graded 368 loans EV3 in its final due diligence reports (16.90% of the due diligence sample by loan count)—indicating that these loans were defective.  Those 368 EV3 loans included 290 loans that were reviewed for both credit and compliance (21.31% of the credit and compliance reviewed loans by loan count) and 78 loans that underwent only a compliance review (9.56% of the compliance only reviewed loans by loan count).

310.     The 368 EV3 loans did not include at least 34 additional loans graded EV3 that, during due diligence, UBS directed Clayton to change to EV2.  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  Clayton identified these loans as "client over ride," "waived per UBS," or with other similar indications in its final due diligence reports (1.56% of the total 2,177 loan sample by loan count).  These 34 overturned loans taken together with the 368 loans that received a final grade of EV3 amounted to a total of 402 loans that Clayton identified as defective (18.47% of the total 2,177 loan sample by loan count).

311.     On February 15, 2006, less than two weeks before MABS 2006-NC1 closed, a UBS credit analyst circulated a summary of the due diligence results that acknowledged the rejects in this deal were "unusually high," but excused them as the natural consequence of UBS' review

of more loans through the additional compliance only review that was dictated by the residual purchaser.

312.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

313.    Despite its representations to investors that the loans met guidelines and complied with law, UBS securitized 36 loans in this deal that Clayton had identified as defective, including four loans that received a final grade of EV3, and 32 loans that were that had been waived in as EV2s by UBS.

314.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized 95 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (1.97% of the deal by loan count with an aggregate principal balance of $12,431,725.95).  UBS also securitized 361 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (7.50% of the deal by loan count with an aggregate principal balance of $34,845,257.00).

315.    Throughout the course of structuring the deal, UBS continued to learn that more loans were defective, but elected to securitize them anyway.  For example, on the eve of closing, UBS learned that four loans in the deal were already in foreclosure, but securitized them anyway.

316.    UBS knew that a significant number of loans securitized in MABS 2006-NC1 were defective.

### 2.  MABS 2006-NC2

317.    MABS 2006-NC2 closed on September 28, 2006.  As stated in the ProSupp, the deal consisted of 4,696 loans with an aggregate principal balance of $862,616,745.  All of the loans were originated by New Century and were purchased by UBS in June 2006 as part of one pool of 5467 loans.

318.    UBS selected samples totaling 1,450 loans (26.52% of the pool by loan count) from which to perform its credit and compliance due diligence.  UBS performed both a credit and compliance review of 1,367 of the sample loans (25.00% of the pool by loan count).  Additionally, in response to due diligence results that identified high cost Cook County loans in the sample, on June 14, 2006, UBS directed Clayton, UBS' due diligence vendor, to perform a compliance only review of 83 loans.

319.    From the 1,450 sample loans, Clayton graded 286 loans EV3 in its final due diligence reports (19.72% of the due diligence sample by loan count)—indicating that these loans were defective.  Of the 1,367 loans that were reviewed for both credit and compliance, Clayton graded 275 loans EV3 in its final due diligence reports (20.12% of the credit and compliance reviewed loans by loan count).  Of the 83 loans that were reviewed only for compliance, Clayton graded 11 loans EV3 in its final due diligence reports (13.25% of the compliance only reviewed loans by loan count).

320.    Additionally, during due diligence, UBS directed Clayton to change the grades of at least 91 loans from EV3 to EV2, which Clayton marked as "issue waived by client" or with other similar markings in its final due diligence reports (6.28% of the total 1,450 loan sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  These 91 overturned loans taken together with the 286 loans that

received a final grade of EV3 amounted to a total of 377 loans that Clayton identified as defective (26.00% of the total 1,450 loan sample by loan count).

321.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

322.    UBS securitized 75 loans in this deal of the 91 loans that had been waived in by UBS as EV2s (1.60% of the deal by loan count with an aggregate principal balance of $16,896,763).

323.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized 13 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.28% of the deal by loan count with an aggregate principal balance of $2,737,329.28).  UBS also securitized 197 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (4.20% of the deal by loan count with an aggregate principal balance of $19,715,729.53).

324.    UBS knew that a significant number of loans securitized in MABS 2006-NC2 were defective.

### 3.    MABS 2006-NC3

325.    MABS 2006-NC3 closed on December 28, 2006.  As stated in the ProSupp, the deal consisted of 5,489 loans with an aggregate principal balance of $1,031,689,338.  All of the loans were originated by New Century and were purchased by UBS in September 2006 as part of one pool 9491 loans.

326. UBS initially drew a credit and compliance due diligence sample of 2,429 loans (25.59% of the pool by loan count). During its initial credit and compliance due diligence review, Clayton, UBS' due diligence vendor, identified a number of "high cost and anti-predatory lending issues" as well as loans with "'stated income." In response, UBS selected an additional 1933 loans for review. UBS directed Clayton to perform credit and compliance due diligence on 245 stated income loans and a compliance only review on 1,688 loans that UBS suspected might be affected by the "high cost and anti-predatory lending issues Clayton ha[d] come across during the underwrite."

327. Ultimately, Clayton assigned credit and compliance grades to 4,360 loans (45.94% of the pool by loan count). However, 1,025 of those loans did not actually undergo any credit or compliance review. At least 276 of these loans were not reviewed because the associated loan files were missing. In total, only 2,552 loans were reviewed for both credit and compliance (26.89% of the pool by loan count), and 783 loans (8.25% of the pool by loan count) received a compliance only review.

328. From the 4,360 sample loans, Clayton graded 672 loans EV3 in its final due diligence reports (15.41% of the total 4,360 loan due diligence sample by loan count)—indicating that these loans were defective. Of the 2,552 loans that were reviewed for both credit and compliance, Clayton graded 537 loans EV3 in its final due diligence reports (21.04% of the credit and compliance reviewed loans by loan count). Of the 783 loans that were reviewed only for compliance, Clayton graded 42 loans EV3 in its final due diligence reports (5.36% of the compliance only reviewed loans by loan count). Of the 1,025 loans that received grades, but were not reviewed, 93 loans received a final grade of EV3 (9.07% of the graded but unreviewed loans). From the subset of 276 unreviewed but graded loans that were missing loan files, Clayton graded

only 84 loans EV3 (28.99% of the missing loan files).  UBS due diligence personnel subsequently admitted through testimony that all loans missing loan files should have been graded EV3.

329.    Notably, Clayton graded 932 loans EV1 (21.38% of the total 4,360 loan sample by loan count)—artificially depressing the EV3 rate for this pool—despite never having reviewed the associated loan files including 195 loans whose loans files were missing entirely.  UBS also directed Clayton to change the grades of at least 345 loans graded EV3 to EV2, which Clayton marked as "waived by client," "waived in BULK per client," or with other similar markings in its final due diligence reports (7.91% of the total 4,360 loan sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides. Taken together, the 672 loans that received a final grade of EV3, the 345 loans that received an initial grade of EV3 but had been waived in as EV2s by UBS, and the 195 loans that received a final grade of EV1 despite missing loan files, Clayton identified 1,212 loans as defective (27.80% of the total 4,360 loan sample by loan count).

330.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

331.    UBS securitized 133 loans in this deal that Clayton had identified as defective (2.42% of the deal by loan count) including two loans that received a final grade of EV3 with an aggregate principal balance of $246,251, and 131 loans overturned by UBS from EV3 to EV2 with an aggregate principal balance of $33,771,692.  Additionally, of the 195 loans graded EV1 with associated missing loan files, UBS securitized 85 (an additional 1.55% by loan count) with an aggregate principal balance of $15,524,135.76.

332.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized five loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value.  UBS also securitized 351 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (6.39% of the deal by loan count with an aggregate principal balance of $37,118,593.41).

333.    On October 19, 2006, just weeks after UBS purchased the pool of New Century loans that contributed to this deal, but months before this deal closed, a trader on the ABS Trading Desk emailed several UBS salespeople concerning this pool of loans, stating, "[o]ur last settlement with New Century (September) was terrible (pull-thru of ~84%) and the feedback from due diligence was remarkably bad.  A ton of suspected fraud, high cost loans, and a somewhat systemic occurrence of unreasonable incomes on stated doc loans."

334.    In a December 7, 2006 email, three weeks before the deal closed, the same trader on the ABS Trading Desk further expressed his concerns about New Century loans, commenting on the poor performance of earlier New Century deals: "New Century performance, this isn't surprising . . . . They really do have some stinkers this year. . . . The break seems to be between September 05 production (ace 06-nc1, msac 06-nc1) and October 05 production (msc 06-nc2, mabs 06-nc1, etc.) . . . *They needed to find 100bps of additional coupon and they clearly went to 'new' borrowers to do it.*" (emphasis added)

335.    In addition to the issues discussed above, UBS made material misrepresentations in the Prosupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

336.    UBS knew that a significant number of loans securitized in MABS 2006-NC3 were defective.

**B.    WMC Deals**

**1.  MABS 2006-WMC1**

337.    MABS 2006-WMC1 closed on March 29, 2006.  As stated in the ProSupp, the deal consisted of 4,065 loans with an aggregate principal balance of $785,615,588.  All of the loans were originated by WMC and were purchased by UBS in December 2005 as part of one pool of 4,924 loans.

338.    UBS selected a sample of 1,231 loans (25.00% of the pool by loan count) from which to perform its credit and compliance due diligence.  From this sample, Bohan, UBS' due diligence vendor, graded 157 loans EV3 in its final due diligence reports (12.75% of the due diligence sample by loan count)—indicating that these loans were defective.

339.    In early January 2006, the head of due diligence for ABS TM acknowledged that the 12.75% reject rate was high, but blamed it on "the short settlement caused by the holidays in December," despite the fact that the deal did not close until March.  In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, and the ample time UBS had to conduct further diligence, UBS performed no additional credit and compliance due diligence on the loans in the deal.

340.    Additionally, UBS securitized 197 loans in this deal marked with flip flags during the AVM stage of valuation due diligence without conducting any further due diligence beyond the AVM (4.85% of the deal by loan count with an aggregate principal balance of $20,025,883.10).

341.    UBS knew that a significant number of loans securitized in MABS 2006-WMC1 were defective.

**2.  MABS 2006-WMC2**

342.    MABS 2006-WMC2 closed on June 29, 2006.  As stated in the ProSupp, the deal consisted of 4,027 loans with an aggregate principal balance of $766,150,152.  All of the loans were originated by WMC and nearly all were purchased by UBS in March 2006 as part of one pool of 4,784 loans.  An additional 15 EPD loans from UBS' December 2005 purchase of WMC loans were also included in this deal as described in ¶ 337 *supra*.

343.    UBS performed credit and compliance due diligence on a sample of 1,483 loans (31.00% of the pool by loan count) from the March 2006 purchase.[28] From this sample, Bohan graded 145 loans EV3 in its final due diligence reports (9.78% of the due diligence sample by loan count)—indicating that these loans were defective.

344.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

345.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized 68 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (1.69% of the deal by loan count with an aggregate principal balance of $12,063,030.88).  UBS also securitized 205 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (5.09% of the deal by loan count with an aggregate principal balance of $17,121,589.50).

346.    UBS knew that a significant number of loans securitized in MABS 2006-WMC2 were defective.

---

[28] UBS also performed due diligence on the December 2005 loan pool that was securitized in this deal, but the vast majority of loans in the deal came from the March 2006 loan pool.

### 3. MABS 2006-WMC3

347.    MABS 2006-WMC3 closed on September 28, 2006.  As stated in the ProSupp, the deal consisted of 4,847 loans with an aggregate principal balance of $917,433,840.  All of the loans were originated by WMC and nearly all were purchased by UBS in June 2006 as part of one pool 5,514 loans.  An additional 39 reperforming EPD loans from UBS' March 2006 purchase of WMC loans were also included in this deal as described in ¶ 342 *supra*.

348.    UBS performed credit and compliance due diligence on a sample of 1,379 loans (25.01% of the pool by loan count) from the June 2006 purchase.[29]  From this sample, Bohan, UBS' due diligence vendor, graded 196 loans EV3 in its final due diligence reports (14.21% of the due diligence sample by loan count)—indicating that these loans were defective.

349.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

350.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized 384 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (7.92% of the deal by loan count with an aggregate principal balance of $66,246,374.17).  UBS also securitized 353 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (7.28% of the deal by loan count with an aggregate principal balance of $35,027,352.86).

---

[29] UBS also performed due diligence on the March 2006 loan pool that was securitized in this deal, but the vast majority of loans in the deal came from the June 2006 loan pool.

351.    On September 5, 2006, a trader on the ABS Trading Desk emailed an ABS transaction manager and others at UBS statistics about the loans in MABS 2006-WMC3 to be used in the sales memo, noting: "Not sure yet what the 'Key Points' are (as our deal is kinda awful) . . . maybe we go without 'Key Points' altogether."

352.    UBS knew that a significant number of loans securitized in MABS 2006-WMC3 were defective.

### 4.  MABS 2006-WMC4

353.    MABS 2006-WMC4 closed on November 30, 2006.  As stated in the ProSupp, the deal consisted of 4,896 loans with an aggregate principal balance of $949,927,193.  All of the loans in this deal were originated by WMC and were purchased by UBS in July 2006 and August 2006 as part of two pools of 2646 loans and 2793 loans, respectively.  The loans purchased in July 2006 contributed 2,500 loans (51.06% of the deal by loan count) and the August 2006 purchase contributed 2,396 loans (48.94% of the deal by loan count).

354.    From the July 2006 pool, UBS performed credit and compliance due diligence on a sample of 725 loans (27.40% of the pool by loan count).  From this sample, Bohan graded 119 loans EV3 in its final due diligence reports (16.41% of the due diligence sample by loan count)—indicating that these loans were defective.

355.    From the August 2006 pool, UBS performed credit and compliance due diligence on a sample of 735 loans (26.32% of the loans in the pool).  From this sample, Bohan graded 134 loans EV3 in its final due diligence reports (18.23% of the due diligence sample by loan count)—indicating that these loans were defective.

356.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

357.     When UBS received the initial tape for the August 2006 pool, it realized that WMC had included dozens of loans that UBS had recently rejected from the July 2006 pool.  On August 25, 2006, the head of due diligence for ABS TM emailed an ABS TM transaction manager a list of 31 loans in the August 2006 pool that he recalled UBS had rejected from the July 2006 pool. The ABS TM transaction manager confirmed this and provided a spreadsheet of the loans and the reasons they had been previously rejected, 14 of which had been removed by third party vendors for credit or compliance reasons, or both.  Despite recognizing that WMC had recycled rejected loans into the August 2006 pool, UBS performed credit and compliance due diligence on only 22 of the 31 recycled loans.

358.     UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored.  UBS securitized 104 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (2.12% of the deal by loan count with an aggregate principal balance of $27,013,118.71).  UBS also securitized 36 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (0.74% of the deal by loan count with an aggregate principal balance of $4,621,923.01).

359.     Additionally, UBS failed to conduct any valuation due diligence on 200 loans securitized in this deal (4.08% of the deal by loan count with an aggregate principal balance of $61,238,769.44) as described more fully in ¶ 263 *supra*.

360.     UBS knew that a significant number of loans securitized in MABS 2006-WMC4 were defective.

### 5.  MABS 2007-WMC1

361.    MABS 2007-WMC1 closed on February 27, 2007.  As stated in the ProSupp, the deal consisted of 4,993 loans with an aggregate principal balance of $987,027,011.  All of the loans were originated by WMC and nearly all were purchased by UBS in November 2006 as part of one pool of 5,857 loans.

362.    UBS performed credit and compliance due diligence on a sample of 1,464 loans (25.00% of the pool by loan count) from the November 2006 purchase.[30]  From this sample, Bohan, UBS' due diligence vendor, graded 236 loans EV3 in its final due diligence reports (16.12% of the due diligence sample by loan count)—indicating that these loans were defective.

363.    Throughout due diligence on the November 2006 pool, there was tremendous pressure on UBS to reach what WMC considered an acceptable pull-through rate.  For example, just days before UBS finalized the pool of loans for purchase, as relayed by the head of ABS TM, a WMC representative told the head of due diligence for ABS TM that "his bonus was riding on the pull thru rate for this trade."

364.    During due diligence, UBS directed Bohan to change the grades of at least 59 loans graded EV3 to EV2, which Bohan marked as "EV2 per client" or "EV2 OK per client" in its final due diligence reports (4.03% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to Bohan that warranted these overrides.  These 59 loans taken together with the 236 loans that received a final grade of EV3 amounted to a total of 295 loans that Bohan identified as defective (20.15% of the sample by loan count).

365.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

---

[30] UBS also performed due diligence other WMC loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the November 2006 loan pool.

366.    UBS securitized 44 of the 59 loans that received an initial grade of EV3 but that had been waived in as EV2s by UBS.

367.    UBS valuation due diligence results also revealed significant issues with the collateral for these loans.  UBS securitized 17 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.34% of the deal by loan count with an aggregate principal balance of $4,108,839.42).  UBS also securitized one loan marked with a flip flag during the AVM stage without conducting any further valuation due diligence beyond the AVM.

368.    Notably, in the months prior to securitization, UBS was already well aware of the extremely poor quality of WMC's loans.  As a trader on the ABS Trading Desk later testified, "Sometime in 2006 we – I recall my – observing a noticeable deterioration in the performance of [WMC's] loans where instead of performing at or better than expectations they began to perform below expectations, and as time went on, increasingly below expectations to the point in early 2007 where the performance of their loans, as I recall, was cause for – for serious concern."  In late January 2007, the same trader commented in an email to ABS TM transaction managers that "wmc loans are quite possibly better than little beside leprosy spores."

369.    In addition to the issues discussed above, UBS made material misrepresentations in the ProSupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

370.    UBS knew that a significant number of loans securitized in MABS 2007-WMC1 were defective.

**C.    Fremont Deals**

**1.    MABS 2006-FRE1**

371.    MABS 2006-FRE1 closed on February 24, 2006.  As stated in the ProSupp, the deal consisted of 1,925 loans with an aggregate principal balance of $475,764,898.  All of the loans were originated by Fremont and were purchased by UBS in November 2005 with a December 2005 tail-fund as part of one pool of 5,320 loans.[31]

372.    UBS performed credit and compliance due diligence on a sample of 1,474 loans (27.71% of the pool by loan count).  From this sample, Bohan, UBS' due diligence vendor, graded 228 loans EV3 in its final due diligence reports (15.47% of the due diligence sample by loan count)—indicating that these loans were defective.

373.    In spite of these reject rates, which signaled that similarly defective loans existed in the unreviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

374.    UBS valuation due diligence results also revealed significant issues with the collateral for these loans. UBS securitized 28 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (1.45% of the deal by loan count with an aggregate principal balance of $6,514,882.42).  UBS also securitized 142 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (7.38% of the deal by loan count with an aggregate principal balance of $16,762,747.20).

375.    UBS knew that a significant number of loans securitized in MABS 2006-FRE1 were defective.

    **2.  MABS 2006-FRE2**

---

[31] This same pool of Fremont loans also contributed loans to MABS 2006-HE1 (*see* ¶ 386 *infra*).

376.     MABS 2006-FRE2 closed on May 30, 2006.  As stated in the ProSupp, the deal consisted of 4,277 loans with an aggregate principal balance of $874,791,986.  All of the loans were originated by Fremont and nearly all were purchased by UBS in February 2006 as part of one pool of 5,072 loans.

377.     UBS performed credit and compliance due diligence on a sample of 1,283 loans (25.30% of the pool by loan count).[32]  From this sample, Clayton, UBS' due diligence vendor, graded 128 loans EV3 in its final due diligence reports (9.98% of the due diligence sample by loan count)—indicating that these loans were defective.

378.     During due diligence, UBS directed Clayton to change the grades of at least another 36 loans graded EV3 to EV2, which Clayton marked as "issue waived by client" in its final due diligence reports (2.81% of the credit and compliance sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  These 36 overturned loans taken together with the 128 loans that received a final grade of EV3 amounted to a total of 164 loans that Clayton identified as defective (12.78% of the sample by loan count).

379.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

380.     UBS securitized 34 of the 36 loans that Clayton had identified as defective and graded EV3, but had been waived in by UBS as EV2.

381.     UBS valuation due diligence results also revealed significant issues with the collateral for the loans.  UBS valuation due diligence results raised significant red flags that UBS

---

[32] UBS also performed due diligence on another Fremont loan pool that was securitized in this deal, but the vast majority of loans in the deal came from the February 2006 loan pool.

*United States* v. *UBS*
Complaint
Page 103

ignored.  UBS securitized 20 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.47% of the deal by loan count with an aggregate principal balance of $5,058,189.05).  UBS also securitized 198 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (4.63% of the deal by loan count with an aggregate principal balance of $22,746,630.53).

382.   Beyond these due diligence results, internal UBS emails indicate that UBS was aware of, and did not want to retain, the risk of loss associated with these Fremont loans.  In an email sent by a trader on the ABS Trading Desk just weeks before UBS purchased this pool of Fremont loans, he discussed the sale of the residual for the planned MABS 2006-FRE2 securitization: "I really feel strongly that I'd like to see us sell this one. . . .  Maybe I'm crazy, but the thought of taking $8mm off the table on this pig really makes me smile."

383.   Ultimately, UBS sold the residual interest and profited from this deal.  In another email sent by the same trader the month before MABS 2006-FRE2 closed, he commented, "Through a strange confluence of events, I expect the upcoming Fremont deal is going to end up being quite good from a P&L perspective."

384.   In September 2006, the trader emailed a former colleague giving his opinion about Fremont, "we don't own the residual.  [S]omeone else's problem . . .  don't think the problem is Wells [the servicer].  Think it is Fremont. . . their collateral is cr*p."

385.   UBS knew that a significant number of loans securitized in MABS 2006-FRE2 were defective.

## D.    HE Deals

### 1.  MABS 2006-HE1

386.     MABS 2006-HE1 closed on February 27, 2006.  As stated in the ProSupp, the deal consisted of 3,652 loans with an aggregate principal balance of $660,232,251.  MABS 2006-HE1 was a multi-originator deal: 2,740 loans were originated by Fremont (75.03% of the deal by loan count); 832 loans were originated by Novelle Financial Services, Inc. ("Novelle") (22.78% of the deal by loan count); and 80 loans were originated by various other originators (2.19% of the deal by loan count).  The Fremont loans were purchased by UBS in November 2005 with a December 2005 tail-fund as part of one pool 5,320 loans.[33]

387.     UBS performed credit and compliance due diligence on a sample of 1,474 Fremont loans (27.71% of the pool by loan count). [34]  From this sample, Bohan, UBS' due diligence vendor, graded 228 loans EV3 in its final due diligence reports (15.47% of the due diligence sample by loan count)—indicating that these loans were defective.

388.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the Fremont loans in the deal.

389.     UBS valuation due diligence results across the pools included in this deal also revealed significant issues with the collateral for the loans.  UBS securitized 60 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (1.64% of the deal by loan count with an aggregate principal balance of $8,665,057.58).  UBS also securitized 177 loans marked with flip

---

[33] This same pool of Fremont loans also contributed loans to MABS 2006-FRE1 (*see* ¶ 371 *supra*).
[34] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the Fremont loan pool.

flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (4.85% of the deal by loan count with an aggregate principal balance of $13,669,776.23).

390.     In addition to the issues discussed above, UBS made material misrepresentations in the ProSupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

391.     UBS knew that a significant number of loans securitized in MABS 2006-HE1 were defective.

### 2.   MABS 2006-HE2

392.     MABS 2006-HE2 closed on June 29, 2006.  As stated in the ProSupp, the deal consisted of 3,105 loans with an aggregate principal balance of $590,026,907.  MABS 2006-HE2 was a multi-originator deal: 1,491 loans were originated by New Century (48.02% of the deal by loan count); 1,132 loans were originated by People's Choice Home Loan ("People's Choice") (36.46% of the deal by loan count); 271 loans were originated by Mandalay Mortgage ("Mandalay") (8.73% of the deal by loan count); and the remaining 211 loans were originated by various other originators (6.80% of the deal by loan count).  The New Century loans in this deal were purchased by UBS in April 2006 with a May 2006 tail-fund as part of one pool of 2,916 loans.

393.     UBS performed credit and compliance due diligence on a sample of 765 loans from the New Century pool (26.23% of the pool by loan count).  From this sample, Clayton, UBS' due diligence vendor, graded 260 loans EV3 in its final due diligence reports (33.99% of the due diligence sample by loan count)—indicating that these loans were defective.

394.     UBS identified 13 loans from this sample with missing loan files or files that were otherwise unavailable for review.  Clayton graded only three of these loans EV3.  Clayton did not grade the remaining 10 loans and excluded them from the sample, thereby artificially lowering the

reject rate.  If these 10 loans had been graded EV3—as they should have been—the reject rate for the credit and compliance sample by loan count would have been 34.84%.

395.    During due diligence, UBS directed Clayton to change the grades of at least another 13 loans from EV3 to EV2, which Clayton marked as "issue waived by client" and graded EV2W in its final due diligence reports.  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  These 13 loans taken together with the 260 loans Clayton graded EV3 in its final due diligence reports and the 10 loans Clayton did not grade in its final due diligence reports even though they were missing loan files amounted to a total of 283 loans that Clayton identified as defective (36.52% of the credit and compliance sample by loan count).

396.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the New Century loans in the deal.

397.    UBS securitized five loans of the 13 New Century loans that Clayton had identified as defective in its final due diligence reports and graded EV2W after being waived in by UBS (0.16% of the deal by loan count with an aggregate principal balance of $648,298).

398.    The People's Choice loans in this deal were purchased by UBS in March 2006 with an April 2006 tail-fund in one pool of 1,391 loans.  UBS performed credit and compliance due diligence on 100% of the People's Choice pool.

399.    During due diligence, UBS directed Clayton to overturn at least 52 People's Choice loans from EV3 to EV2, which Clayton marked as "issue waived by client" or "waived in bulk per client" and graded EV2W in its final due diligence reports.  UBS securitized 45 of these 52

People's Choice loans (1.45% of the deal by loan count with an aggregate principal balance of $8,865,475).

400.    The Mandalay loans in this deal were purchased by UBS in April 2006 in one pool of 291 loans.  UBS performed credit and compliance due diligence on 100% of the Mandalay pool.[35]

401.    Mandalay originated a product known as "Zoom."  According to Mandalay's underwriting guidelines, these loans were "an enhancement to the Core Traditional products that [would] allow borrowers to qualify without regard to previous housing history, bankruptcy discharge term, or asset verification."

402.    In an email sent in May 2006, in response to the ABS head of due diligence's request that an ABS trader "carve out the 'zoom' loans", the trader asked "[a]re we sure Mandalay 'zoom' loans are worse than every other subprime product currently being offered?"  According to the trader, Zoom loans were "the only product offered by anyone that [UBS] explicitly [did] not bid."  The ABS head of due diligence responded:

> Just to give you some of the risk there's no VOR/VOM required while they allow those who have it no more than 1x90 on their mtg history for the past 12 mths.  The source and seasoning of funds is important to have to help us evaluate the dti properly and this is not required.  If we have an 80 LTV/CLTV with the subject purchase and the borrower claims they have the 20% in cash, we don't know if that came from his savings or a private party with terms to pay it back.  With a 55 dti max there's no room for additional debts for the average borrower before they go over 60 . . . .  There's no BK seasoning except for the 1 day out of bk before closing.  They allow a full doc 580 fico to go 100% LTV on these parameters. . . .  I see that this is a reverse too and I don't want to ruin it or hurt the relationship but we should at best limit the amount of these loans and or carve out some of the riskier zooms.

403.    Despite UBS' concerns about the risk of Zoom loans, UBS purchased and securitized nearly all of the Zoom loans included in the Mandalay pool.  Within the 291 loan pool

---

[35] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the New Century, People's Choice, and Mandalay loan pools.

of Mandalay loans, 48 were identified on Bohan's final due diligence report as "Zoom" loans (16.49% of the pool by loan count). Of these 48 loans, only two were graded EV3 in Bohan's final due diligence report. Of the remaining 46 loans, UBS securitized 44 of them (1.42% of the deal by loan count with an aggregate principal balance of $6,342,628). Notably, because the Mandalay loans represented less than 10% of the deal, there is no mention of the Mandalay "Zoom" product in the ProSupp.

404.    UBS valuation due diligence results across the pools included in this deal also revealed significant issues with the collateral for the loans. UBS securitized 12 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value. UBS also securitized 190 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (6.12% of the deal by loan count with an aggregate principal balance of $20,249,902.11).

405.    UBS knew that a significant number of loans securitized in MABS 2006-HE2 were defective.

### 3. MABS 2006-HE4

406.    MABS 2006-HE4 closed on November 30, 2006. As stated in the ProSupp, the deal consisted of 3,251 loans with an aggregate principal balance of $600,639,792. MABS 2006-HE4 was a multi-originator deal: 765 loans were originated by First NLC Financial Services, LLC ("FNLC") (23.53% of the deal by loan count); 645 loans were originated by Decision One Mortgage Company ("Decision One") (19.84% of the deal by loan count); 644 loans were originated by Meritage Mortgage Corporation ("Meritage") (19.81% of the deal by loan count); 448 loans were originated by EquiFirst Corporation ("EquiFirst") (13.78% of the deal by loan

count); 273 loans were originated by OwnIt Mortgage Solutions ("OwnIt") (8.40% of the deal by loan count); 254 loans were originated by LIME Financial Services Ltd. ("Lime") (7.81% of the deal by loan count); and 222 loans were originated by First Street Financial, Inc. ("FSF") (6.83% of the deal by loans count). All of the loans in the deal came from pools of loans purchased by UBS in August through October of 2006 from FNLC (1,049 loans), Decision One (737 loans), Meritage (724 loans), EquiFirst (3,552 loans), OwnIt (279 loans), Lime (282 loans), and FSF (240 loans).

407.    UBS performed credit and compliance due diligence on nearly 100% of the loans from all of the pools that contributed to MABS 2006-HE4.

408.    UBS used the fact that it conducted nearly 100% due diligence on these pools to market the certificates.

409.    During due diligence, UBS directed Clayton and Bohan, its due diligence vendors for the pools that contributed to this deal, to overturn 41 loans from EV3 to EV2, which Clayton and Bohan marked as "issue waived by client," "ok per client" or with other similar markings in their final due diligence reports.  There was no evidence that UBS identified any compensating factors to Clayton and Bohan that warranted these overrides.  In this deal, UBS securitized 33 loans Clayton or Bohan identified as defective in these pools with indicators that the loans had been waived in by UBS (0.98% of the deal by loan count with an aggregate principal balance of $6,741,824.89).

410.    UBS valuation due diligence results across the pools included in this deal also revealed significant issues with the collateral for the loans.  UBS securitized 87 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for

assessing the reliability of the originator's property value (2.68% of the deal by loan count with an aggregate principal balance of $18,652,907.63). UBS also securitized 242 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (7.44% of the deal by loan count with an aggregate principal balance of $28,274,506.75).

411.   UBS knew that a significant number of loans securitized in MABS 2006-HE4 were defective.

### 4.  MABS 2006-HE5

412.   MABS 2006-HE5 closed on Dec. 28, 2006. As stated in the ProSupp, the deal consisted of 5,111 loans with an aggregate principal balance of $ 903,750,691. MABS 2006-HE5 was a multi-originator deal: 2,420 loans were originated by EquiFirst (47.35% of the deal by loan count); 2,489 loans were originated by New Century (48.70% of the deal by loan count); 107 loans were originated by Decision One (2.09% of the deal by loan count); and 95 loans were originated by FNLC (1.86% of the deal by loan count). All of the loans securitized in the deal came from pools of loans purchased by UBS in August, September, and October of 2006 from EquiFirst (3,552 loans), New Century (9,491 loans), Decision One (128 loans), and FNLC (1,049 loans).

413.    The New Century pool that contributed to MABS 2006-HE5 was the same New Century pool of loans that contributed to MABS 2006-NC3. As described above, Clayton graded 672 New Century loans EV3 (15.41% of the sample). Clayton also graded 932 loans EV1 (21.38% of the sample) without reviewing them, including 195 loans with missing loan files, and changed the grades of at least 345 loans graded EV3 to EV2 at UBS' direction. There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides. For a more thorough discussion of the due diligence conducted on this pool of New Century loans, *see* discussion in ¶¶ 325 through 329 *supra*.

414.    UBS securitized 168 loans in this deal from the New Century pool that Clayton had identified as defective (3.29% of the deal by loan count).  Of these 168 loans, UBS securitized four loans Clayton graded EV3 in its final due diligence reports with an aggregate principal balance of $1,264,991 and 164 loans Clayton graded EV2 in its final due diligence reports that had been waived in by UBS with an aggregate principal balance of $38,088,091.  UBS also securitized 97 loans that Clayton graded EV1 even though they were missing loan files (1.90% of deal by loan count with an aggregate principal balance of $19,779,047).

415.    UBS performed approximately 100% due diligence on the remaining loan pools that contributed to this deal.  The final due diligence reports for these pools reflected that UBS directed Clayton and Bohan, its due diligence vendors for these pools, to change the grades of at least 13 loans from EV3, to EV2 or EV1, which Clayton and Bohan marked as "issue waived by client," "ok per client," "client approved as EV2," or with other similar markings in their final due diligence reports.  There was no evidence that UBS identified any compensating factors to Clayton and Bohan that warranted these overrides.  UBS securitized six of these 13 loans.

416.    Additionally, emails between the ABS due diligence managers and an ABS trader show that UBS likely waived significantly more EquiFirst loans than reflected in the final diligence reports.

417.    On September 20, 2006, an ABS trader sent an email to the Head of ABS TM discussing the poor quality of the EquiFirst loans in the September 2006 pool: "Wow! This is way worse than advertised.  At 22% kickout, I absolutely expect Equifirst walks from the trade (and likely never shows us loans again). We're going to need to get creative to figure out which pieces of the remainder we can fund. . . . Equifirst walking from this trade will cost us probably $1.25mm

. . . . Obviously we can't fund loans we \*\*can't\*\* buy, but I'm hopeful there's a population of loans we \*\*could\*\* buy (...as long as we held our noses tight enough)."

418.    The Head of ABS TM responded "[s]o is there a magic number at which Equifirst would still sell the loans" to UBS.

419.    As the trader on the ABS Trading Desk described in an email sent to other UBS personnel working on the deal on September 27, 2006, "in my +3 years at UBS I've never seen our group be so deferential to a seller...put so much time and effort into a trade and subsequent settlement where honestly we had no responsibility to do so....Keep in mind, our 8.2% kicks \*\*includes\*\* EPDs they tried to stick us with and high cost loans we found during due diligence...two buckets that typically register 0.00% on pools we buy from other guys."

420.    UBS valuation due diligence results across the pools included in this deal also revealed significant issues with the collateral for the loans.  UBS securitized 25 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value.  UBS also securitized 370 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (7.24% of the deal by loan count with an aggregate principal balance of $40,445,601.20).

421.    In addition to the issues discussed above, UBS made material misrepresentations in the ProSupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

422.    UBS knew that a significant number of loans securitized in MABS 2006-HE5 were defective.

### 5. MABS 2007-HE1

423.     MABS 2007-HE1 closed on May 30, 2007.  As stated in the ProSupp, the deal consisted of 4,526 loans with an aggregate principal balance of $858,577,553.  MABS 2007-HE1 was a multi-originator deal: 3,834 loans were originated by EquiFirst (84.71% of the deal by loan count); 536 loans were originated by Lime (11.84% of the deal by loan count); and 156 loans were originated by FSF (3.45% of the deal by loan count).  Nearly all of the EquiFirst loans in this deal were purchased in February 2007 as part of one pool of 5,957 loans.

424.     UBS performed credit and compliance due diligence on a sample of 3,753 loans from the February EquiFirst pool (63.00% of the pool by loan count).  From this sample, Bohan, UBS' due diligence vendor, graded 1,438 loans EV3 in its final due diligence reports (38.32% of the due diligence sample by loan count).  Of the 1,438 EV3 loans, 746 were kicked solely because they violated UBS' bid stipulations.  692 of the EV3 graded loans (18.44% of the sample by loan count) were kicked for credit or compliance reasons indicating that these loans were defective.

425.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the February EquiFirst pool.

426.     UBS purchased all of the Lime loans in this deal in February and March 2007 as part of two pools.  UBS performed approximately 100% due diligence on both of these Lime pools.[36]  During due diligence, UBS instructed Clayton, UBS' due diligence vendor, to change the grades of 19 loans that had been graded EV3 for credit and compliance reasons to EV2, which Clayton marked as "issue waived by client" in their final due diligence reports.  There was no

---

[36] UBS also performed due diligence on another loan pool that was securitized in this deal, but the vast majority of loans in the deal came from the EquiFirst and Lime loan pools.

evidence that UBS identified any compensating factors to Clayton that warranted these overrides. UBS securitized 12 of the 19 overturned Lime loans.

427.    UBS also discovered in mid-February and early March that there were a significant number of purported "Owner Occupied" loans intended for securitization in MABS 2007-HE1 that it suspected were fraudulent because the borrowers had loans on three or more properties.

428.    In early May 2007, an ABS trader acknowledged that UBS had "no luck what-so-ever" putting these loans back to originators and that UBS' "counterparties [had] not made good on their obligations under the various contracts under which [UBS] purchased loans" for all of the MABS deals and that "in some cases, [UBS was] no longer dealing with solvent counterparties."

429.    UBS ultimately securitized 29 purported "Owner Occupied" loans in MABS 2007-HE1 where the borrowers had loans on three or four properties (0.64% of the deal by loan count with an aggregate principal balance of $7,315,606.90).

430.    Consistent with UBS' other deals, in MABS 2007-HE1, UBS reported the Occupancy Status of the properties underlying the deal "as represented by the mortgagor at the time of origination." UBS did not disclose to investors that it suspected that at least 29 borrowers had fraudulently misrepresented their occupancy status at origination.

431.    In addition to the issues discussed above, UBS made material misrepresentations in the ProSupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

432.    UBS knew that a significant number of loans securitized in MABS 2007-HE1 were defective.

### E.    Rent-a-Shelf: TBW 2006-6

433.    TBW 2006-6 closed on December 21, 2006. As stated in the ProSupp, the deal consisted of 2,565 loans with an aggregate principal balance of $571,696,142. All of the loans

were originated by Taylor, Bean & Whitaker Mortgage Corp. ("TBW").  As a rent-a-shelf deal, UBS purchased these loans on the day of closing and immediately deposited them into the TBW 2006-6 trust.  While the trust bore a name associated with TBW, the deal was issued off of UBS' MASTR shelf that TBW "rented" for this securitization with MASTR as the depositor and UBSRES as transferor.

434.   UBS performed credit and compliance due diligence on a sample of 688 loans (26.82% of the deal by loan count).  From this sample, Bohan, UBS' due diligence vendor, graded 58 loans EV3 in its final due diligence reports (8.43% of the due diligence sample by loan count)— indicating that these loans were defective.

435.   During due diligence, UBS directed Bohan to change the grades of at least eight additional loans from EV3 to EV2, which Bohan marked as "EV2 per client" in its final due diligence report (1.01% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to Bohan that warranted these overrides.  These eight loans taken together with the 58 loans that Bohan graded EV3 in its final diligence reports amounted to a total of 66 loans that Bohan identified as defective (9.59% of the credit and compliance sample by loan count).  UBS securitized all eight of the overturned loans.

436.   Before due diligence for the deal began, a transaction manager on the ABS Banking Desk emailed a TBW representative, informing him that they needed "to make sure [the due diligence] goes very smoothly and there is a small rejection rate."

437.   In the week before credit and compliance due diligence was completed, a TBW representative asked the transaction manager on the ABS Banking Desk: "Have you given any thought to what level of DD kicks is tolerable? I think you DD'd 700 loans. Is 10% (70 loans) tolerable? Or 15%? I know it will vary depending upon the type of kick.  Just trying to get a feel."

The transaction manager responded, "probably under 10% closer to the 5% range if possible, again a case by case basis, this being that it is off our shelf so there is a lot of sensitivity. . . . Unfortunately my hands are tied on a lot of this because of the legal focus on the due diligence results.  But certainly we can talk about whatever loans you like and try to come to a happy medium."

438.    On December 12, 2006, a Mortgage Finance due diligence manager wrote in an email to two members of the ABS Banking Desk: "There are currently 88 declines. This leaves us with a kick out ratio of 12.8%. We are still in the process of clearing loans. My gut tells me we should be able to get below 10% later this afternoon."

439.    In a December 14, 2006 e-mail signing off on the due diligence results, the same due diligence manager confirmed that UBS got the kick rate down to 7.55%, but that this was not "an acceptable tolerance level."   The diligence manager excused the high reject rate with the following rationale: "Please keep in mind, if Taylor, Bean and Whitaker was provided a few more days, then this decline ratio would be within an acceptable tolerance level. The diligence would be within tolerance because the majority of the issues that remain are missing documentation."

440.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

441.    UBS valuation due diligence results also revealed significant issues with the collateral for the loans.  UBS securitized 141 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (5.50% of the deal by loan count with an aggregate principal balance of $34,007,662.04).  UBS also securitized 32 loans marked with flip flags during the AVM stage

without conducting any further valuation due diligence beyond the AVM (1.25% of the deal by loan count with an aggregate principal balance of $8,642,124.32).

442.     Additionally, UBS failed to conduct any further valuation due diligence on 370 loans that received "no hit" results during the AVM stage and were securitized in this deal (14.42% of the deal by loan count with an aggregate principal balance of $96,560,366.05) as described more fully in ¶ 264 *supra*.

443.     UBS knew that a significant number of loans securitized in TBW 2006-6 were defective.

## II.     MARM Deals

The following MARM deals securitized Alt-A loans.

### A.     Countrywide Deals

#### 1.     MARM 2006-OA2

444.     MARM 2006-OA2 closed on November 15, 2006.  As stated in the ProSupp, the deal consisted of 5,660 loans with an aggregate principal balance of $2,013,321,248.  MARM 2006-OA2 was a multi-originator deal: 2,611 loans were originated by Countrywide (46.13% of the deal by loan count); 2,248 loans were originated by IndyMac (39.72% of the deal by loan count); 506 loan were originated by MortgageIT ("MIT") (8.94% of the deal by loan count); and the remaining 295 loans were originated by various other originators or purchased through the conduit and underwritten to UBS' guidelines (5.21% of the deal by loan count).  The Countrywide loans in this deal were purchased by UBS in three pools purchased in August 2006, September 2006, and October 2006, totaling 2,769 loans.

445.     UBS performed credit and compliance due diligence on 311 loans from the three Countrywide pools (11.23% of the pools by loan count).  From this sample, AMC, UBS' due diligence vendor, graded 48 loans EV3 in its final diligence reports (15.43% of the due diligence

sample by loan count)—indicating that these loans were defective.  During due diligence, UBS directed AMC to change the grades of at least another 13 loans from EV3 to EV2 or EV1, which AMC marked as "ok per UBS," "client override per UBS – change to EV2," "client override per UBS – change to risk level 2," or with other similar markings in its final due diligence reports (4.18% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides.  These 13 loans taken together with the 48 loans AMC graded EV3 amounted to a total of 61 loans that AMC identified as defective (19.61% of the sample by loan count).

446.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the Countrywide loans in the deal.

447.    From this Countrywide sample, UBS securitized 12 loans AMC graded EV2 or EV1 in its final due diligence reports after being overturned by UBS.

448.    All of the IndyMac loans in this deal were purchased by UBS in November 2006 as part of one pool of 2,753 loans.

449.    Initially, UBS selected a sample of 611 loans (22.19% of the pool by loan count) for credit and compliance due diligence.  In an email dated October 23, 2006, describing the due diligence results, the Mortgage Finance due diligence manager working on the deal stated, "Overall, I'd say 60% of the issues are for guidelines while the other 40% are for missing docs." In late October, in response to high reject rates, UBS entered into a side letter with IndyMac.

450.    Under this side letter, UBS proceeded with the scheduled purchase of loans and IndyMac was given more time to clear 56 outstanding rejected loans from UBS' initial credit and compliance sample.  In addition, IndyMac substituted into the pool 225 loans "[d]ue to certain

deficiencies in overall pool characteristics."  As such, UBS was allowed to perform credit and compliance due diligence on these 225 loans.  If any of the loans (either from the 56 outstanding rejects or the 225 substituted loans) remained rejects as of November 8, 2006, IndyMac agreed to repurchase those loans from UBS.

451.    UBS ultimately selected a credit and compliance due diligence sample of 841 loans, but could only review 834 of those loans (30.29% of the pool) because seven of the loan files were purportedly missing or unavailable for review.  MDMC, UBS' due diligence vendor, graded 117 loans EV3 in its final due diligence reports (14.03% of the reviewed loans by loan count)— indicating that these loans were defective.

452.    UBS identified seven loans from this sample with missing loan files or which were otherwise unavailable for review.  MDMC did not grade these loans and excluded them from the sample, thereby artificially lowering the reject rate.  If these loans had been graded EV3—as they should have been—the reject rate for the sample, by loan count, would have been 14.74%.

453.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the IndyMac loans in the deal.

454.    UBS securitized four of the seven loans which had missing loan files or files that were otherwise unavailable for review.

455.    All of the loans originated by MIT in this deal were purchased by UBS in July 2006 as part of one pool of 559 loans.  UBS performed credit and compliance due diligence on a sample of 140 loans from the MIT pool (25.04% of the pool by loan count).[37]  From this sample, AMC,

---

[37] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the Countrywide, IndyMac and MIT loan pools.

UBS' due diligence vendor, graded 12 loans EV3 (8.57% of the sample by loan count)—indicating that these loans were defective.

456.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the MIT loans in the deal.

457.    UBS valuation due diligence results for this deal also revealed significant issues with the collateral for the loans.  UBS securitized 23 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.41% of the deal by loan count with an aggregate principal balance of $9,485,930.27).  UBS also securitized 87 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (1.54% of the deal by loan count with an aggregate principal balance of $17,649,480.21).

458.    Additionally, UBS failed to conduct any valuation due diligence on 1,059 loans securitized in this deal (18.71% of the deal by loan count with an aggregate principal balance of $390,344,031.74).  Of these loans, 1,058 were excluded from the AVM stage based on their LTV ratios and one received a "no hit" result during the AVM stage.

459.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7).

460.    UBS knew that a significant number of loans securitized in MARM 2006-OA2 were defective.

### 2.  MARM 2007-2

461.    MARM 2007-2 closed on February 27, 2007.  As stated in the ProSupp, this deal consisted of 1,355 loans with an aggregate principal balance of $940,082,460.  Nearly all of the loans were originated by Countrywide, 1,339 of which were purchased by UBS in February 2007 as part of one pool of 1,402 loans.  Also included in the deal were two additional loans from earlier Countrywide purchases and 14 loans from various other originators.

462.    UBS initially selected a credit and compliance due diligence sample of 67 loans, but could only review 60 of those loans (4.28% of the pool) because seven of the loan files were purportedly missing or unavailable for review.  From this sample, AMC, UBS' due diligence vendor, graded 11 loans EV3 in its final due diligence reports (18.33% of the reviewed loans by loan count)—indicating that these loans were defective.

463.    UBS identified seven loans from the sample with missing loan files or which were otherwise unavailable for review.  AMC did not grade these loans and excluded them from the sample, thereby artificially lowering the EV3 rate.  If these loans had been graded EV3—as they should have been—the reject rate for the sample, by loan count, would have been 26.87%.

464.    At the start, this deal was meant to proceed as a third-party underwrite for Countrywide under the deal name CWALT 2007-HY1.  In late January 2007, however, UBS decided to purchase the loans and securitize them off of its MARM shelf instead.  Because the loans would now be securitized on UBS' shelf, UBS reconsidered the limited scope and leniency it had applied to its due diligence review when it thought the loans were destined to be Countrywide's problem.

465.    In an email dated January 22, 2007, to the head of Mortgage Finance, the head of due diligence for Mortgage Finance acknowledged, "Side note is [the due diligence manager] has been looking at these DD results with a '3rd' party eye meaning he has given diligence a looser

consideration because we would not own the loans.  He now has to revisit many of the exceptions he may have granted and possibly make some changes.  Hopefully this does not amount to many over turns but CW could be unhappy if we look to exclude some loans we had originally approved."

466.   Further, when the head of due diligence for Mortgage Finance announced that they would increase the credit and compliance due diligence sample size from 5% to 10% because of the conversion of this trade to a whole loan purchase, a trader on the ARMs Desk questioned whether 10% was sufficient given the significant loosening of originators' guidelines:,"[T]hought we did more than 10% for ALTA vs. Prime.  Just seems to me with guidelines being pushed so much we should maybe think about increasing our DD standard. Might be a little late but just a thought."  Despite these concerns, UBS proceeded on this deal with an approximately 10% diligence sample.

467.   UBS selected 134 loans for credit and compliance due diligence.  However, one loan file was missing or otherwise unavailable for review.  AMC, UBS' due diligence vendor, did not grade this loan, which should have been graded EV3.  Instead, AMC excluded the loan from the sample.

468.   UBS performed credit and compliance due diligence for the whole loan purchase of the Countrywide loans on the remaining 133 loans in the sample (9.49% of the pool by loan count).[38]  Of the 133 loans, AMC graded 13 loans EV3 in its final due diligence reports (9.77% of the remaining 133 loans by loan count)—indicating that these loans were defective.

469.   During due diligence, UBS also directed AMC to overturn at least another 4 loans from EV3 to EV2, which AMC marked as "client override per UBS – change to EV2," "ok per

---

[38] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the February 2007 Countrywide loan pool.

UBS," or with other similar markings in its final due diligence reports (3.01% of the reviewed loans by loan count). There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides. These four loans taken together with the 13 loans AMC graded EV3 in its final due diligence reports, and the ungraded loan with the missing loan file amounted to a total of 18 loans that AMC identified as defective (13.43% of the sample by loan count).

470. In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the February 2007 Countrywide loans in the deal.

471. UBS securitized three of the four loans AMC identified as defective in its final due diligence reports that were waived in by UBS and the loan with the missing loan file.

472. UBS valuation due diligence results also revealed significant issues with the collateral for the loans. UBS securitized 51 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (3.76% of the deal by loan count with an aggregate principal balance of $40,189,043.42). UBS also securitized two loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (0.15% of the deal by loan count with an aggregate principal balance of $1,187,936.59).

473. Additionally, UBS failed to conduct any valuation due diligence, in contravention of its own policies and representations, on 594 loans securitized in this deal (43.84% of the deal by loan count with an aggregate principal balance of $429,916,222.40). Of these loans, 409 were

added as an upsize after valuation due diligence began and 185 were excluded from the AVM stage based on their LTV ratios.

474.    By April 3, 2007, at least 24 loans securitized in this deal from the February 2007 Countrywide purchase had become FPDs, indicating that the borrowers had not even made the first payment.

475.    UBS knew that a significant number of loans securitized in MARM 2007-2 were defective.

### 3. MARM 2007-3

476.    MARM 2007-3 closed on May 15, 2007.  As stated in the ProSupp, the deal consisted of 6,478 loans with an aggregate principal balance of $2,582,881,408.  MARM 2007-3 was a multi-originator deal: 3,106 loans were originated by Countrywide (47.95% of the deal by loan count); 2,762 loans were originated by IndyMac (42.64% of the deal by loan count); 370 loans were originated by Chevy Chase Bank, F.S.B. ("Chevy Chase") (5.71% of the deal by loan count); 237 loans were originated by RFC (3.66% of the deal by loan count); and the remaining 3 loans were originated by various other originators (0.05% of the deal by loan count).

### a.    Credit and Compliance Due Diligence

### i.    Countrywide

477.    Nearly all the Countrywide loans in this deal were purchased by UBS in March 2007 as part of three separate pools totaling 3,674 loans.

478.    As of early March 2007, the loans from these three Countrywide pools were slated for securitization as part of a third-party underwrite scheduled to close at the end of the month under the deal name CWALT 2007-OA5.  By mid-March 2007, however, reject rates from the credit and compliance samples were roughly 50%, putting the deal in jeopardy.  As a result, the

head of Mortgage Finance sent an email to the trader on the ARMs Desk working on the deal,

copying the head of mortgage trading:

> I'm concerned this is going to turn into the same CWALT due diligence problem that happened last time. . . . Based on the current reject numbers, which are preliminary, and the responsiveness of Countrywide to cure issues from prior deals, I don't see how we will be able to get the reject % rate low enough for legal to sign-off. I expect the numbers to get better over the next day or so, but we are currently at a 50% kick out rate and a tie out date of Tuesday . . . . Since Countrywide needs to have the loans off of their books by quarter end (no matter what), we seriously need to reconsider taking this trade down as whole loans again.

479.    By March 19, 2007, due diligence results across these three Countrywide pools had

not improved significantly, with the reject rate still hovering around 35%.  On March 20, 2007,

the head of Mortgage Finance sent an email to the UBS team working the deal with an update:

> All - The call just ended with Countrywide. There are approximately 38 loans that Countrywide feels they should be able to clear, BUT will need until end of day tomorrow to reconcile. Assuming all 38 loans clear, we then need to determine if the remaining exception conditions are HARD or SOFT FAILS. If the final numbers get us within our 5%-6% reject rate, we can proceed. If this % moves higher, we will need to discuss the option of purchasing the package as loans, which will then require additional due diligence and have a higher reject % based on our whole loan purchase standards. I understand the concern of the desk to finalize this due diligence today, but Countrywide will not be able to clear the remaining exception items until end of day tomorrow (if at all).  Please let me know if you have any questions, or would like to discuss other options.

480.    By March 21, 2007, Countrywide had only cleared enough loans to bring the reject

rate across these three Countrywide pools down to 17%.   Consequently, UBS decided to move

forward with the trade as a whole loan purchase.   At this time, UBS, including the head of

Mortgage Finance, the head of mortgage trading, and a trader on the ARMs Desk, and Countrywide

entered into negotiations regarding the terms of the whole loan settlement, which included the

negotiation of the due diligence terms of the trade.

481.    The trader on the ARMs Desk for the deal wanted UBS to do 100% due diligence

across these Countrywide pools prior to the deal closing because of concerns that there were "too

many guys going under at this point to take risk." In an email to the head of Mortgage Finance dated March 21, 2007, the trader wrote: "I think we should deny them [Countrywide] post closing dili.... What if we fund 20% kicked loans and then cwide implodes the next day?"

482.     In an internal Countrywide email dated March 22, 2007, a high-level official at Countrywide recounted his discussions concerning this deal with the UBS head of mortgage trading who had described the Countrywide pools as "a bag of sh[*]t."

483.     On March 23, 2007, based on the ARMs Desk trader's recommendation, UBS proposed to perform 100% due diligence on the Countrywide pools. UBS offered that it would purchase on March 29, 2007, "all loans excluding those having exception(s) that UBS determine[d] [could not] be cured (critical compliance, excessive guideline violation, value)." Countrywide would then have an opportunity "to refute or clear any remaining exception(s) on the purchased loan population until April 6th" and "[a]ny loans not cleared by April 6th [would] be repurchased by Countrywide within 5 business days."

484.     While Countrywide appears to have initially agreed with UBS' proposal to do 100% diligence, on March 29, 2007, the day the transaction was scheduled to close, Countrywide reversed its position. The UBS ARMs Desk trader subsequently emailed the Countrywide trader urging him to proceed with their agreement:

> I think you should accept [the head of Mortgage Finance's] original solution as difficult as it may be. I think management here will be even less accommodative than us given the bigger picture issues in the mortgage market (which ain't so good). It was a real stretch to get approval for this arrangement in the first place and now that we've agreed to the terms, it will [sic] even more challenging to change the terms. Moreover, the underlying issue is that the original sample was problematic and our arrangement is the 'reasonable' compromise; the official protocol would be to reject the trade outright for compliance reasons. . . .

485.     In response, the Countrywide trader, stated that "the spirit of [the head of Mortgage Finance's] solution that I agreed to over the phone was a) that UBS would be timely in completing

diligence and, b) that UBS would be flexible in allowing for rebuttals.  You've [UBS] done neither.

. . . We believe that it's time to consider other alternatives as painful as they might be.  Let's put

this to bed tonight.  I suggest we get senior people on the phone right away."

486.   As a result, senior officials got involved.  The head of mortgage trading asked the

head of Mortgage Finance to prepare a written defense of UBS' original proposal to conduct 100%

due diligence across the pools.  The head of Mortgage Finance responded as follows:

> UBS reached out to Countrywide countless times during the March transaction to try and put resolution to the remaining stipulations so that this deal would settle as a security. There were delays and little to no response from Countrywide's resolution team from the beginning. An effort was made by Countrywide toward the end of the deal timeline to clear exceptions, but unfortunately the final results were unacceptable to sign-off on from a legal and due diligence perspective. Since our only option was to settle the transaction as whole loan and securitize the collateral in an April deal, we determined it was necessary to look at 100% of the loans. If we simply upsized the sample and had similar results, we would end up requesting more loans to review and quite possibly having an April deal. A 17% reject rate [for the initial due diligence performed prior to conducting 100% diligence on this deal] is concerning and should not be deemed a market standard. . . . The exception reject rate as of now is approximately 50%.

487.   In the early morning hours of March 30, 2007, a high-level Countrywide official

sent the head of mortgage trading the following message:

> Based on our review, the due diligence findings on the original sample for this trade are not materially out of line with historically acceptable results by UBS . . . .  Considering you did not have the same opinion, we agreed to allow 100% due diligence on this trade, provided it was completed by settlement date and that we were given a reasonable time to refute the findings.  To date, we have received results on an additional 251 loans out of the additional 3,050 loans never due diligenced.  I need the final results of any additional due diligence findings by tomorrow morning.  We will also need to agree on the rebuttal period for those findings.  Any loans in which findings are not reported by tomorrow morning will be considered acceptable loans and not repurchase candidates.  Depending on the size and materiality of those findings we will need to mutually agree on what portion, if any, of the pool we will settle on.  As in all trades, if the findings are significantly large we both reserve the right to cancel this trade.

488.     UBS did not cancel the trade, nor did it insist on 100% due diligence as it thought was necessary given the due diligence results or the fact that it believed these Countrywide pools were a "bag of sh*t."

489.     Instead, UBS more or less acquiesced to Countrywide's terms and entered into a March 30, 2007 side letter with Countrywide regarding these pools.  Under the terms of the side letter, UBS agreed to purchase the Countrywide pools.  UBS limited its due diligence review to 50% of the mortgage loans in the pools.  Countrywide had until April 13, 2007 to cure any due diligence exceptions found within the agreed 50% diligenced portion of the pool and assented to repurchase any loans, with outstanding exceptions as of April 13, 2007.

490.     However, UBS' policy required it to conduct additional due diligence in a deal if the reject rates in its due diligence samples exceeded its tolerances.  Consequently, after entering into the side letter, UBS' "most important goal" became getting the reject rate across these Countrywide sample pools low enough to be able to securitize all of the loans in MARM 2007-3 and avoid triggering UBS' internal policies requiring it to conduct due diligence on the remaining 50% of the pools.

491.     In an email exchange dated April 9, 2007, the head of due diligence for Mortgage Finance wrote to several UBS employees working on the deal, including the head of mortgage trading:

> On Friday . . . they [Countrywide] are to purchase back whatever fails regardless of the final percentage.  Our hopes are that they are able to get under 10% (and have a good division between hard and soft exceptions) so we can include the entire pool in a deal without having to do more diligence.  If they fail at the 10% goal we are going to need to do additional diligence on the loans we own in order to justify placing them in our deal.

The ARMs Desk trader responded, "At the rate they've been going so far, can't we estimate how likely it is that get down to 10%?  Even if they buy back the kicks, that won't help us at all b/c we

won't be able to securitize the portion that they don't buy back.  The most important goal is to be able to securitize these loans by month end."

492.    On April 10, 2007, the head of due diligence for Mortgage Finance confirmed that the "ultimate goal" with respect to due diligence on these trades was "to reach only a 5% hard exception rate which in turn will allow us to get sign off from legal and NOT have to look at performing due diligence on any additional loans in the pool in order to designate a population for the upcoming deal."

493.    On April 12, 2007, the ARMs Desk trader inquired whether Countrywide was "expected to fail tomorrow" in clearing a sufficient number of loans.  The head of due diligence for Mortgage Finance responded,: "There is no fail to the trade at this point, we own the loans now.  What does not cure by end of day tomorrow they [Countrywide] must repurchase.  The biggest issue we are looking to address is clearing enough loans so that we do not have to perform due diligence on the remaining 50% of the loans in order for you to securitize."

494.    In reply, the trader on the ARMs Desk clarified what he meant by fail: "BTW, when I say 'fail', I mean that we do have to perform due diligence on the remaining 50% of the loans in order to securitize.  That would be the tipping point that would drive the deal into economic oblivion."  The head of due diligence for Mortgage Finance assured the trader on the ARMs Desk that his team "and any other resource I can utilize are working to make sure we stay out of economic oblivion."

495.    If UBS had performed due diligence on the remaining 50% of the loans from these pools (just shy of $800 million worth of loans), and reject rates were similar to those already experienced, UBS could have been stuck with anywhere from $80 million (assuming a 10% reject

rate) to $400 million (assuming a 50% reject rate) worth of defective loans that it could not securitize in a MARM deal.

496.    Unsurprisingly, UBS found a way to avoid conducting diligence on the remaining more than 50% of the pools.  UBS ultimately performed credit and compliance due diligence on 1,767 Countrywide loans (48.09% of the pools by loan count).  From this sample of Countrywide loans, AMC and Clayton, UBS' due diligence vendors, graded 161 loans EV3 in their final due diligence reports (9.11% of the due diligence sample by loan count)—indicating that these loans were defective.  UBS internally classified 8.15% of the sample as "hard rejects."

497.    Even though emails repeatedly confirmed that the "hard" reject rate needed to be between 5% and 6% in order to securitize the remaining 50% of the pool without conducting further due diligence, UBS proceeded with the securitization without any further due diligence on the Countrywide loans.

498.    Beyond UBS expanding its tolerance levels, it affirmatively compromised its credit and compliance due diligence review in order to avoid "economic oblivion."  Over the course of due diligence, in addition to the cleared loans discussed above, UBS directed AMC and Clayton to overturn at least 240 loans from EV3 to EV2 or EV1, without documenting any compensating factors or other rationale, which AMC and Clayton subsequently marked as "EV2 per UBS," "change to EV2-UBS approved," "waived to EV2 per client request," "waived in bulk per client," "ok per UBS," or with other similar markings in their final due diligence reports (13.58% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC and Clayton that warranted these overrides.

499.    Fifteen of the loans selected for due diligence were missing loan files or were otherwise unavailable for review.  AMC and Clayton did not grade these loans and excluded them

from the sample, thereby artificially lowering the EV3 rate.  These 15 loans taken together with the 161 loans that AMC and Clayton graded EV3 in their final due diligence reports and the 240 loans that AMC and Clayton graded EV2 or EV1 after being overturned by UBS amounted to a total of 416 loans that AMC and Clayton identified as defective (23.34% of the sample by loan count.)

500.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the Countrywide loans in the deal.

501.    From this Countrywide sample, UBS securitized 187 of the 244 loans that AMC and Clayton graded EV2 or EV1 in their final due diligence reports after being waived in by UBS and three of the 15 loans with missing loan files (2.933% of the deal by loan).

502.    In an email sent on April 24, 2007, before this deal closed, the head of due diligence for Mortgage Finance rehashed what had occurred with respect to the due diligence of these Countrywide loans:

> . . . . Exceptions were fairly high from the start of this trade (in the area of 50% of the pool at one point).  As always these numbers are not satisfactory to UBS when deciding whether to buy or play the role of a third party underwriter . . . . UBS is unsure at this time which if not both of the issues was a driving force in the higher than usual reject numbers. . . .  It was not until the initial deal passed, more loans were looked at AND CW gave a stronger effort at the beginning of the month that allowed USB [sic] to gain an acceptable reject rate under 10% of the loans reviewed.  It should be noted that the UBS target rate of 5% of the loans reviewed was not reached however in an effort to make the deal work UBS provided extra due diligence management to review loans on our end to see where we could allow risk to be purchased, required our DD vendors to provide more support to the project to clear every loan possible and constantly worked with the seller to clear items and hear rebuttals.

In this email, UBS acknowledged that it still did not know "the driving force in the higher than usual reject numbers;" that it never hit its target reject rate of 5%; and that, "in an effort to make the deal work," UBS made a determination about "where [UBS] could allow risk to be purchased."

Yet, when UBS securitized these loans, it never provided investors with any of these facts, depriving investors of information capable of influencing their decisions to invest in this deal.

### ii.    IndyMac Loans

503.    UBS purchased the IndyMac loans in this deal in March 2007 with an April 2007 tail fund as part of one pool of 3,414 loans.  UBS performed credit and compliance due diligence on 841 loans (24.63% of the pool by loan count).

504.    From this sample, AMC, UBS' due diligence vendor, graded 187 loans EV3 in its final due diligence reports (22.24% of the due diligence sample by loan count)—indicating that these loans were defective.

505.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the IndyMac loans in the deal.

### iii.    Chevy Chase Loans

506.    UBS purchased the Chevy Chase loans in this deal in March 2007 as part of one pool of 395 loans.  UBS performed credit and compliance due diligence on 40 loans (10.13% of the pool by loan count).  From this sample, AMC, UBS' due diligence vendor, graded eight loans EV3 in its final due diligence reports (20% of the due diligence sample by loan count)—indicating that these loans were defective.

507.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the Chevy Chase loans in the deal.

### iv.    RFC Loans

508.    UBS purchased the RFC loans in this deal in February 2007 as part of one pool of 278 loans.  UBS performed credit and compliance due diligence on 28 loans (10.07% of the pool

by loan count).[39]  From this sample, AMC, UBS' due diligence vendor, graded four loans EV3 in its final due diligence reports (14.29% of the due diligence sample by loan count)—indicating that these loans were defective.

509.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the RFC loans in the deal.

### b.    Valuation Due Diligence

510.    UBS valuation due diligence results across the pools included in this deal also revealed significant issues with the collateral for the loans.  UBS securitized 214 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (3.30% of the deal by loan count with an aggregate principal balance of $128,127,004.21).  UBS also securitized 51 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (0.79% of the deal by loan count with an aggregate principal balance of $21,892,576.58).

511.    Additionally, UBS failed to conduct any valuation due diligence on 609 loans securitized in this deal (9.40% of the deal by loan count with an aggregate principal balance of $219,445,414.90).  Of these loans, 553 were excluded from the AVM stage based on their LTV ratios and 56 received "no hit" results during the AVM stage.

### c.    Seasoned Loans

---

[39] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the Countrywide, IndyMac, Chevy Chase, and RFC loan pools.

512.     UBS identified large numbers of seasoned loans within the Countrywide and IndyMac loan pools that were securitized in MARM 2007-3.  Generally speaking, a seasoned loan referred to a loan that was at least six months old.

513.      Several employees at UBS suspected that these seasoned loans were rejects from prior pools.  UBS believed that the presence of significant numbers of seasoned loans within pools of more recently originated collateral was suspicious.  UBS generally believed that seasoned loans might have been kicked from prior pools due to any number of credit, compliance, or valuation exceptions.

514.     Moreover, the presence of seasoned loans within a pool raised concerns that the originator was adversely selecting loans for sale to UBS (i.e., disproportionately selecting kicks from prior pools for sale rather than simply selecting loans randomly from the originator's outstanding inventory).

515.     Despite these concerns, from which UBS knew or knew with reasonable certainty, that the seasoned loans in these pools were likely defective, UBS securitized 11 of these loans that had been identified as defective by its due diligence vendor, as described below.

### i.     The Countrywide Pools

516.     On March 16, 2007, UBS identified 105 seasoned loans in the Countrywide pools that contributed to MARM 2007-3, and requested an explanation from Countrywide, including specifically whether these loans were rejects from previous pools.  A Countrywide employee responded that "there may have been collateral/credit documents missing that prevented us for [sic] selling the loans sooner. . . .  Also, if the loans are COFI or LBR production, it has been awhile since we've sold a pool of these payoptions . . . . None of the loans in this pool have been rejected by UBS from previous pool [sic]."  Notably, UBS did not inquire as to whether the loans had been previously rejected by purchasers other than UBS.

517.     UBS employees doubted that these were simply cured loans that had been placed back into Countrywide's general inventory.  The Mortgage Finance deal manager noted in an email to several other UBS employees working on the deal, "While we look at the due diligence results as a whole, I think it is interesting to note that we have an 11% kickout rate on a 'cured' seasoned pool."  In another email to the head of Mortgage Finance, the same deal manager wrote: "We . . . need to raise the issue of the 100 seasoned loans.  The desk does not want them in the pool and they are loans with 'cured' doc exceptions which have 'never been kicked out by UBS.'"

518.     Even the Countrywide trader on the deal acknowledged that the percentage of seasoned loans "seemed so adversely high as to warrant a review of their allocation."

519.     Because of these suspicions, UBS initially attempted, unsuccessfully, to negotiate the removal of all 105 of the Countrywide seasoned loans from the pools.  UBS eventually settled on a price concession for these loans and Countrywide agreed to reduce the seasoned loan population to approximately one percent of the pool.  Ultimately, 25 of the 105 loans UBS identified as seasoned were securitized in MARM 2007-3.  In addition, 11 more securitized loans were seasoned greater than six months as of the cut-off date, bringing the total number of seasoned loans UBS securitized in MARM 2007-3 to 36.

520.     UBS conducted credit and compliance due diligence on all of the seasoned Countrywide loans that were securitized in MARM 2007-3.  UBS' due diligence vendors graded nine seasoned loans as defective EV3s.  UBS, despite its concerns about these nine seasoned loans, nonetheless securitized these loans, after directing its due diligence vendors to regrade them as EV2 or EV1 without identifying any compensating factors or other rationale.  Additionally, UBS securitized two seasoned loans with missing loan files that it should have graded EV3 because they were unavailable to review.

521.   Regardless, the due diligence did not alter UBS' suspicions that these seasoned loans had been rejected from prior pools or that Countrywide had adversely selected these loans for sale to UBS.

522.   UBS was, in fact, correct about the provenance of these loans.   Internal Countrywide emails confirm that the vast majority of these seasoned loans were kicks from prior pools.   As noted by a Countrywide employee, "At least 20 of the loans [were] part of the COFI/Libor trades [for] which [Countrywide hadn't] settled a trade since Dec/Jan.  The other aged loans [were] either previous rejects or loans that were on defi [40] at one point and [had] been cured." Specifically, "[a]bout half of these loans [were] repurchases for either due diligence or EPD issues. Of the remaining loans, a few [had] been kicked out of due diligence trades for various reasons. . . ."

### ii.   The IndyMac Pool

523.   UBS knew that there were a large number of seasoned loans in the IndyMac pool that contributed to the MARM 2007-3 deal.  The IndyMac pool had a total value of approximately $1.1 billion, including 426 loans worth approximately $147 million that had been seasoned more than six months.

524.   Ultimately, UBS securitized 253 seasoned IndyMac loans in MARM 2007-3, 133 of which were not subjected to any credit or compliance diligence.   The reject rate for the diligenced seasoned IndyMac loans was nearly 30%.

### iii.   UBS Traders Obscured Loan Age Disclosures.

---

[40] Countrywide's reference to loans "on defi" was to loans that had been included in either a document, credit, or collateral deficiency side letter as loans that were required to be repurchased by Countrywide if certain document, credit, or collateral issues that made the loans ineligible for purchase were not cured.

525.    Largely as a result of the seasoned Countrywide and IndyMac loans, MARM 2007-3 contained a much higher percentage of seasoned loans than most previous MARM deals.  While UBS had traditionally provided disclosures regarding the seasoning of loans in MARM deals, it noticeably omitted those disclosures from the MARM 2007-3 ProSupp.

526.    The ProSupp for MARM 2007-3 contained a stratification table highlighting the securitized loans' remaining terms to maturity in 60-month buckets.  By excluding origination dates, UBS did not provide investors with any meaningful information in the ProSupp regarding the seasoning of the loans in this deal.[41]

527.    In addition to the issues discussed above, in the MARM 2007-3 Prosupp UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7); made misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6); and made material misrepresentations by not disclosing that the FICO scores for the seasoned loans securitized in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

528.    UBS knew that a significant number of loans securitized in MARM 2007-3 were defective.

529.    Approximately six weeks after the deal closed, the ARMs Desk trader for the deal emailed, "MARM 07-3 ha[d] HUGE delinquencies in Month 1 (big surprise!)."

**B.    American Home Deals**

**1.    MARM 2006-OA1**

530.    MARM 2006-OA1 closed on April 20, 2006.  As stated in the ProSupp, the deal consisted of 3,187 loans with an aggregate principal balance of $1,117,141,591.  Nearly all of the

---

[41] While UBS filed a tentative loan tape that contained loan age information in the FWP for MARM 2007-3, the FWP contained less than two-thirds the number of loans that were eventually securitized in the deal.

loans in this deal were originated by American Home Mortgage Corp. ("American Home") (3,050 loans representing 95.7% of the deal by loan count).  The remaining loans in the deal were originated by General Motors Acceptance Corporation Inc. ("GMAC") (82 loans representing 2.57% of the deal by loan count) and Alliance Bancorp ("Alliance") (55 loans representing 1.73% by loan count).  UBS purchased the American Home loans in this deal in March 2006 as part of one pool of 3175 loans.

531.     UBS performed credit and compliance due diligence on 534 loans (16.82% of the American Home pool by loan count).[42]  UBS drew its entire credit and compliance due diligence sample from the initial loan tape, which contained only 2,138 loans (67.34% of the pool by loan count).  The deal was subsequently upsized, adding 1,037 loans to the pool.  Even before the upsize, UBS' head of due diligence for Mortgage Finance complained to a diligence vendor that American Home was "a real bear . . . and timeframes are always tough with these guys."

532.     UBS performed no credit, compliance, or valuation diligence on the 1,022 loans from the upsize that were securitized in this deal.

533.     From the sample of 534 American Home loans, Clayton, UBS' due diligence vendor, graded 30 loans EV3 in its final due diligence reports (5.62% of the due diligence sample by loan count)—indicating that these loans were defective.

534.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the American Home loans in the deal.

535.     UBS securitized three loans in this deal that Clayton identified as defective in its final due diligence reports, including two loans graded EV3 in Clayton's final due diligence reports

---

[42] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the American Home loan pool.

with an aggregate principal balance of $2,725,492, and one loan Clayton identified as defective that was waived in by UBS with an aggregate principal balance of $371,083.

536.    UBS valuation due diligence results for this deal also revealed significant issues with the collateral for the loans. UBS securitized 15 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.47% of the deal by loan count with an aggregate principal balance of $5,740,955.37).  UBS also securitized nine loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (0.28% of the deal by loan count with an aggregate principal balance of $1,303,382.19).

537.    Additionally, UBS failed to conduct any valuation due diligence on 1,329 loans securitized in this deal (41.70% of the deal by loan count with an aggregate principal balance of $443,927,254.55).  Of these loans, 1,045 were added as an upsize after valuation due diligence began, and 284 were excluded from the AVM stage based on their LTV ratios.

538.    In mid-March 2006, UBS Executive level Portfolio Manager questioned the head of due diligence for Mortgage Finance regarding "value issues in the deal," explaining that his "boys are freaked that we are financing some pooh." The head of due diligence for Mortgage Finance responded that it was just "normal due diligence."

539.    In addition to the issues cited above, UBS identified several instances of loans being made to the same borrower in excess of the number of loans per borrower allowed under American Home's guidelines.  In an email to an ARMs Desk trader and others at UBS, the head of due diligence for Mortgage Finance expressed his willingness to overlook American Home's guidelines: "Looks to me like the [sic] there is a 6 loan limit (2 of which can be investor) for this

product type.  I don't have a big issue going slightly over this [sic] guides and accepting up to 10 properties and all investor as we would do that for any seller."

540.    Ultimately, UBS securitized a total of 31 loans made to four borrowers even though UBS knew that these borrowers had taken out anywhere from eight to 20 loans each, in violation of American Home guidelines (0.97% of the deal by loan count with an aggregate principal balance of $2,321,644).  Perhaps most egregiously, UBS securitized five loans made to a single borrower despite knowing that this borrower had taken out 20 separate loans—more than three times the number allowed under American Home's guidelines.   Unlike in AHMIT 2006-2, which closed in late June 2006, UBS made no additional disclosures in MARM 2006-OA1 notifying investors of the existence of multiple loans in the deal made to the same borrowers.[43]

541.    UBS knew that a significant number of loans securitized in MARM 2006-OA1 were defective.

### 2.   MARM 2007-1

542.    MARM 2007-1 closed on January 16, 2007.  As stated in the ProSupp, the deal consisted of 4,944 loans with an aggregate principal balance of $2,099,439,579.  MARM 2007-1 was a multi-originator deal: 3,732 loans were originated by American Home (75.49% of the deal by loan count); 972 loans were originated by IndyMac (19.66% of the deal by loan count); and the remaining 240 loans were originated by various other originators, purchased through the conduit pursuant to UBS' guidelines, or originated by UBS Home Finance (4.85% of the deal by loan count).  The loans originated by American Home in this deal were purchased by UBS in December 2006 as part of one pool of 3735 loans.

---

[43] Compare MARM 2006-OA1 ProSupp with AHMIT 2006-2 ProSupp.

543.    UBS performed credit and compliance due diligence on a sample of 658 loans from the American Home pool (17.62% of the pool by loan count). From this sample, Clayton, UBS' due diligence vendor, graded 11 loans EV3 in its final due diligence reports (1.67% of the due diligence sample by loan count)—indicating that these loans were defective.

544.    UBS had initially selected 661 loans for credit and compliance due diligence, however, four loan files were missing or otherwise unavailable for review. Despite missing its loan file, Clayton graded one of these loans EV1 instead of EV3. Clayton did not grade the other three loans with missing loan files or that were otherwise unavailable for review. Instead, Clayton excluded them from the sample, thereby artificially lowering the EV3 rate.

545.    During due diligence, UBS also directed Clayton to overturn at least another 11 loans from EV3 to EV2, which Clayton marked as "Per client issue waived," "Issue waived by client," "Issue cleared per client" or with other similar markings (1.67% of the credit and compliance sample by loan count). There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides. These 11 loans taken together with the 11 loans that Clayton graded EV3 in its final due diligence reports, and the four loans with missing loan files that Clayton either graded EV1 or did not grade in its final due diligence reports amounted to a total of 26 American Home loans that Clayton identified as defective (3.93% of the original 661 loan sample by loan count).

546.    UBS securitized 11 of the loans from the American Home pool Clayton identified as defective in its final due diligence reports that were waived in by UBS. UBS also securitized three of the four loans with missing loan files.

547.    In addition to these credit and compliance due diligence issues, there were significant data issues with the loan tape. So much so that on December 12, 2006, less than a week

after UBS purchased this pool of loans, a Mortgage Finance collateral analyst referred to the purchase as "an unmitigated train wreck."

548.    The loans originated by IndyMac in this deal were purchased by UBS from four separate pools totaling 1533 loans: the first was purchased in September 2006 (contributing 193 loans) and the remaining three pools were purchased in October 2006 (contributing 779 loans).

549.    UBS performed credit and compliance due diligence on a sample of 416 loans across the IndyMac pools (27.14% of the pools by loan count). From this sample, MDMC and Clayton, UBS' due diligence vendors, graded 35 loans EV3 in its final due diligence reports (8.41% of the due diligence sample by loan count)—indicating that these loans were defective.

550.    UBS had initially selected 421 loans for credit and compliance due diligence; however, five loan files were missing or otherwise unavailable for review (1.19% of the credit and compliance sample by loan count).  Clayton did not grade these five loans.  Instead, Clayton excluded these loans from the sample, thereby artificially lowering the EV3 rate.

551.    During due diligence, UBS also directed Clayton to overturn at least another eight loans from EV3 or no grade, to EV2, which Clayton marked as "Issue waived by client" (1.90% of the sample by loan count) or with other similar markings.  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  These eight loans taken together with the 35 loans that Clayton and MDMC graded EV3 in their final due diligence reports, and the five loans with missing loan files or which were otherwise unavailable for review that Clayton did not grade in its final due diligence reports amounted to a total of 48 IndyMac loans that Clayton and MDMC identified as defective (11.40% of the initial 421 loan credit and compliance sample by loan count).

552.     UBS securitized all eight loans from the IndyMac pools that Clayton had identified as defective in its final due diligence reports and were waived in by UBS.

553.     The loans originated by RFC in this deal were purchased by UBS as one pool of 193 loans in October 2006 (contributing 170 loans to the deal).

554.     UBS performed credit and compliance due diligence on a sample of 26 loans from the RFC pool (13.47% of the pool by loan count).[44]  From this sample, AMC, UBS' due diligence vendor, graded 10 loans EV3 in its final due diligence reports (38.46% of the due diligence sample by loan count)—indicating that these loans were defective.

555.     UBS had initially selected 29 loans for credit and compliance due diligence, however, three loan files were missing or otherwise unavailable for review.  AMC did not grade these three loans, which should have been graded EV3.  Instead, AMC excluded these loans from the sample.

556.     During due diligence, UBS directed AMC to overturn at least another three loans from EV3 to EV2, which AMC marked as "change to event level 2 per UBS," "ok per UBS," or with other similar markings (11.54% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides.  These three loans taken together with the 10 loans AMC graded EV3 in its final due diligence reports, and the three loans with missing loan files that AMC did not grade in its final due diligence reports amounted to a total of 16 loans that AMC identified as defective (55.17% of the original 29 loan sample by loan count).

---

[44] UBS also performed due diligence on other loan pools that were securitized in this deal, but the vast majority of loans in the deal came from the American Home, IndyMac and RFC loan pools.

557.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

558.    UBS securitized all three loans from the RFC pool that were overturned from EV3 to EV2 by UBS.

559.    UBS valuation due diligence results in this deal also revealed significant issues with the collateral for the loans. UBS securitized 540 loans in this deal where the difference between the originator's valuation of the property and the value determined by UBS at the loan's last stage of valuation due diligence exceeded the tolerances UBS set for assessing the reliability of the originator's property value (10.92% of the deal by loan count with an aggregate principal balance of $215,750,594.37).  UBS also securitized 138 loans marked with flip flags during the AVM stage without conducting any further valuation due diligence beyond the AVM (2.79% of the deal by loan count with an aggregate principal balance of $51,066,931.08).

560.    Additionally, UBS failed to conduct any valuation due diligence on 767 loans securitized in this deal (15.51% of the deal by loan count with an aggregate principal balance of $356,831,859.53).  Of these loans, 618 were excluded from the AVM stage based on their LTV ratios and 149 received "no hit" results during the AVM stage.

561.    In addition to the issues discussed above, in the ProSupp for this deal, UBS made misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6.) Specifically, UBS failed to disclose to investors that 544 loans (11.00% by loan count) securitized in the deal had second liens associated with them.

562.    UBS knew that a significant number of loans securitized in MARM 2007-1 were defective.

### C.    Home Finance Deals

#### 1.    MARM 2007-HF1

563.    MARM 2007-HF1 closed on April 27, 2007.  As stated in the ProSupp, the deal consisted of 1,768 loans with an aggregate principal balance of $649,573,852.  As further stated in the ProSupp, several originators, including Home Finance, contributed to the loans in this deal:

> Approximately 28.61% of the stated principal balance of the loans as of the cut-off date were originated by UBS Home Finance, approximately 14.78% of the stated principal balance of the loans as of the cut-off date were originated by Silver State Financial Services Inc., approximately 10.89% of the stated principal balance of the loans as of the cut-off date were originated by EverBank, approximately 36.86% of the stated principal balance of the loans as of the cut-off date were originated by certain other originators (each of which originated less than 10% of the stated principal balance of the loans as of the cut-off date) in accordance with the underwriting guidelines of UBS Home Finance and approximately 8.86% of the stated principal balance of the loans as of the cut-off date were originated by certain other Originators (each of which originated less than 10% of the stated principal balance of the loans as of the cut-off date) in accordance with such originators' underwriting guidelines.

The ProSupp included a description of the Home Finance underwriting guidelines, and stated that all of the loans in the deal were "purchased by the sponsor from the originators, and were originated generally in accordance with the underwriting criteria . . . pertaining to UBS Home Finance."

564.    As a Home Finance deal, 487 loans included in this deal were originated by Home Finance and underwritten by LenderLive (*see* ¶¶  183 through 186 *supra*).  Of those 487 loans, 483 were subjected to a quality control review.  Of these 483 loans, 479 were graded using the "acceptable," "non-critical," and "critical" grades described in ¶¶ 186 and 187 *supra*.  The remaining four loans that were subjected to a quality control review received the typical EV1, EV2 and EV3 grades characteristic of other credit and compliance reviews.  Together, 242 of the 483 loans subjected to a quality control review received either a "critical" final quality control grade for credit or compliance (240 loans) or an EV3 (two loans) (13.69% of the deal by loan count with an aggregate principal balance of $99,379,345.79)—indicating that these loans were defective.

565.    The remaining 1281 loans securitized in this deal were purchased from originators, either through the correspondent channel or on a mini-bulk basis.   144 of these loans were originated by Decision One (8.14% of the deal by loan count).  The Decision One loans were purchased by UBS in February 2007 as part of one pool of 177 loans.

566.    UBS performed credit and compliance due diligence on a sample of 44 Decision One loans from this pool (24.85% of the pool by loan count).[45]  From this sample, Clayton, UBS' due diligence vendor, graded four loans EV3 in its final due diligence report (9.1% of the due diligence sample by loan count)—indicating that these loans were defective.

567.    During due diligence, UBS directed Clayton to overturn at least another three of the Decision One loans from EV3 to EV2, which Clayton marked as "issue waived by client" or with other similar markings in its final due diligence reports, and UBS securitized these loans. There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.

568.    UBS securitized 220 loans (12.44% of the deal by loan count) in MARM 2007-HF1 that had been previously rejected by its whole sale loan purchaser clients or removed by UBS from whole loan sales because they were defective for credit, compliance or valuation reasons, some of them multiple times.

569.    UBS also securitized a significant number of loans in MARM 2007-HF1 that it had previously identified as loans that should not be securitized.  On February 15, 2007, a director at Home Finance wrote two employees in his group regarding loan sales: "The credit market is getting worse every day.  Things are getting really scary.  I want to sell as many loans as possible asap.  I'd like to [...] Show out package with ARMs with CLTVs >95 and FICOs <680 and mix

---

[45] UBS also performed due diligence on other mini-bulk loan pools that were securitized in this deal, but the vast majority of mini-bulk loans in the deal came from the Decision One mini-bulk loan pool.

with fixed package.  We'll have to see how much this hurts our deal, but we don't want these loans in our deal." Later, one of the two employees sent an excel tape that included 103 loans with these characteristics.  Despite the acknowledgement that these loans should not be in the deal, 53 of them were securitized in MARM 2007-HF1.

570.    Similarly, on March 12, 2007, the head of Mortgage Finance wrote several UBS employees about the growing list of LenderLive kicks: "I just wanted to touch base with you on the number of loans we now have tagged as 'LL Do not Source'. The list is growing quite rapidly (91 loans @ $48MM orig bal) and I was wondering if any of the loans on the list have cured or when resolution will be expected." On March 13, 2007, one of the UBS employees forwarded the e-mail to the Chief Operating Officer at Home Finance with the comment "yikes."  The email identified 91 loans as "LL Do not Source"—70 of these loans were securitized in MARM 2007-HF1.

571.    Collectively, 301 loans securitized in this deal were rejects from whole loan sales, or loans UBS employees indicated should not be securitized based on poor credit characteristics or because they were LenderLive kicks, or both (17.02% of the deal by loan count with an aggregate principal balance of $114,759,957.01).

572.    In MARM 2007-HF1, UBS also securitized 96 seasoned loans (5.43% of the deal by loan count).   Seasoned loans were typically suspicious because of concerns that they had been kicked from prior pools due to any number of credit, compliance, or valuation exceptions.  Of these 96 seasoned loans included in MARM 2007-HF1, 28 had been rejected from UBS' whole loan sales for credit, compliance or valuation reasons, some of them multiple times.

573.    With over five percent of the loans in this deal seasoned more than six months, MARM 2007-HF1 had a significantly higher percentage of seasoned loans than UBS' previous MARM deals throughout 2006 and early 2007.

574.    The stratification table UBS disclosed in the ProSupp for this deal for the remaining terms to maturity of the securitized loans grouped the loans into five-month buckets that obscured the extent of the seasoned loans in the deal.

575.    In addition to the issues discussed above, UBS made material misrepresentations in the ProSupp by not disclosing that the FICO scores for many of the seasoned loans in this deal had declined (*see* ¶¶ 282 through 290 *supra* and Table 8).

576.    UBS knew that a significant number of loans securitized in MARM 2007-HF1 were defective.

577.    MARM 2007-HF1's performance was consistent with UBS' knowledge about the collateral in the deal.  On May 23, 2007, a representative of Wells Fargo informed UBS of delinquencies in the deal.  This information was forwarded by a UBS surveillance employee to the head of Mortgage Finance, sarcastically adding: "Didn't take long for good news on the HF1 deal. . ."  The information from Wells Fargo showed that less than 30 days after closing, 90 loans (5.1% of the deal by loan count) were delinquent.

578.    On May 31, 2007, the head of Home Finance emailed the surveillance employee: "I'm worried that this is a real problem, since the servicing transfer isn't until June 1.  Given this is our first deal, I have to make sure it doesn't totally suck wind."

579.    By July 2007, delinquencies had significantly increased.  On July 18, 2007, the head of Home Finance wrote the head of Mortgage Finance: "In all seriousness, if this deal is 12%

30 days DQ and 8% 90 days; I have to figure we seriously consider unwinding this thing. I don't know how I get any liquidity going forward if our deals are performing this badly."

580.    On July 23, 2007, the surveillance employee emailed the head of Home Finance a list of 198 delinquent loans in MARM 2007-HF1 (11.2% of the deal by loan count).  Of these 198 loans, 47 were loans that had been rejects from whole loan sales; loans UBS employees indicated they did not want to place in a deal, or loans that UBS employees indicated should not be sourced for deals.

### 2. MARM 2007-HF2

581.    MARM 2007-HF2 closed on July 31, 2007.  As stated in the ProSupp, the deal consisted of 1,767 loans with an aggregate principal balance of $615,259,045.  As further stated in the ProSupp, several originators, including Home Finance, contributed to the loans in this deal:

> Approximately 51.11% of the stated principal balance of the loans as of the cut-off date were originated by UBS Home Finance, approximately 46.46% of the stated principal balance of the loans as of the cut-off date were originated by certain other originators (each of which originated less than 10% of the stated principal balance of the loans as of the cut-off date) in accordance with the underwriting guidelines of UBS Home Finance and approximately 2.43% of the stated principal balance of the loans as of the cut-off date were originated by certain other originators (each of which originated less than 10% of the stated principal balance of the loans as of the cut-off date) in accordance with such originators' underwriting guidelines.

The ProSupp included a description of the Home Finance underwriting guidelines, and stated that all of the loans in the deal were "purchased by the sponsor from the originators, and were originated generally in accordance with the underwriting criteria described in the following section pertaining to UBS Home Finance."

582.    As a Home Finance deal, 913 loans included in this deal were originated by Home Finance and were processed on the LenderLive platform (see ¶¶ 183 through 196 supra).  Of these

913 loans, 287 were subjected to a quality control review.[46]  Of those 287 loans, 110 received "critical" final quality control grades for credit or compliance (38.33% of the 287 loans reviewed)—indicating that these loans were defective.

583.    Despite the extremely high incidence of "critical" findings among the 287 loans reviewed, there was no evidence that UBS performed any quality control review on the remaining 626 Home Finance loans processed through the LenderLive platform that were securitized in MARM 2007-HF2.

584.    Further, regardless of the quality control review findings, UBS securitized all 110 loans that received "critical" final quality control grades for credit or compliance (6.23% of the deal by loan count).  UBS also securitized 16 loans in this deal that had been previously rejected from whole loan sales for credit, compliance or valuation reasons.

585.    In MARM 2007-HF2, UBS made a concerted effort to securitize seasoned loans to get them off of its books.  On July 12, 2007, the head of mortgage trading emailed a group of traders and salespeople expressing concern about the number of seasoned loans on UBS' books, "The aged inventory numbers are getting to [sic] high. I understand it is a tough environment but we can't let our liquid products get aged."

586.    UBS securitized 75 seasoned loans in MARM 2007-HF2 (4.24% of the deal by loan count).  UBS was typically suspicious of seasoned loans because of concerns that they had been kicked from prior pools due to any number of credit, compliance, or valuation exceptions.  Of these 75 seasoned loans included in MARM 2007-HF2, 12 loans were previously rejected from whole loan sales, some of them multiple times.

---

[46] UBS also performed due diligence on mini-bulk loan pools that were securitized in this deal, but the vast majority of loans in the deal came from UBS Home Finance.

587. After the poor delinquency numbers that surfaced in July 2007 from MARM 2007-HF1 (*see* ¶¶ 577 through 580 *supra*), the head of Home Finance wrote to the head of mortgage trading and a colleague within Home Finance, wondering whether they should cancel the MARM 2007-HF2 deal: "We need to decide on whether to pull the deal or own bonds today." In spite of the known performance issues with MARM 2007-HF1, UBS went forward with MARM 2007-HF2.

588. Similar to MARM 2007-HF1, and again consistent with UBS' knowledge about the poor collateral that it did not share with investors, MARM 2007-HF2 began performing very poorly soon after closing. On September 21, 2007, a representative of Wells Fargo, the servicer, reported to two UBS surveillance employees and the head of Mortgage Finance that 488 loans in the deal were at least 30 days delinquent (27.62% of the deal by loan count). On September 28, 2007, a UBS surveillance employee acknowledged in an email to the head of Mortgage Finance and to others: "I have to be honest; the preliminary delinquency numbers look terrible."

589. UBS knew that a significant number of loans securitized in MARM 2007-HF2 were defective.

## III. Third-Party Deals

### A. Countrywide Deals

#### 1. CWHL 2006-OA5

590. CWHL 2006-OA5 closed on February 28, 2006. As stated in the ProSupp, the deal consisted of 3,337 Countrywide originated loans with an aggregate principal balance of $1,371,172,048. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWMBS, Inc.

591. UBS performed credit and compliance due diligence on two samples totaling 144 loans from the initial tapes and an upsize (4.3% of the deal by loan count). Before UBS selected

its credit and compliance due diligence samples, Countrywide instructed UBS to "over sample" loans – or select more loans than it would actually subject to due diligence – because Countrywide anticipated that some loan files "may not be available" for review.  UBS acquiesced to this request.

592.    From these samples, MDMC, UBS' due diligence vendor, graded 35 loans EV3 in its final due diligence reports (24.3% of the due diligence samples by loan count)—indicating that these loans were defective.  The head of due diligence for Mortgage Finance excused this extremely high reject rate  based on the "short time frame CW has had to go through with the upsized deal sample and not sufficient time to clear missing docs type issues etc."

593.    Among the loans UBS selected for due diligence, but did not review, were three loans that were missing loan files or were otherwise unavailable for review.  MDMC did not grade these loans and excluded them from the sample, thereby artificially lowering the EV3 rate.  UBS then securitized these loans.   If these loans had been graded EV3—as they should have been— the reject rate for the credit and compliance sample, by loan count, would have been 25.85%.

594.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

595.    Although UBS conducted a limited review of the appraisals within the credit and compliance sample, UBS did not conduct valuation due diligence on the loans in this deal as it did for its shelf deals.

596.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 276 *supra* and Table 6).

597.   UBS knew that a significant number of loans securitized in CWHL 2006-OA5 were defective.

### 2.   CWALT 2006-12CB

598.   CWALT 2006-12CB closed on March 30, 2006.  The deal consisted of 3,070 Countrywide originated loans with an aggregate principal balance of $631,984,541.  Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

599.   UBS performed credit and compliance due diligence on a sample of 149 loans (4.85% of the deal by loan count).  Before UBS selected its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review.  UBS selected 165 loans pursuant to Countrywide's request, but only performed credit and compliance due diligence on 149 loans.

600.   UBS selected its credit and compliance due diligence sample solely from a partially allocated initial loan tape consisting of 1,570 loans (51.14% of the deal by loan count).  Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 1,500 loans (48.86% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 1,500 loans, UBS securitized all of them.

601.   Before UBS selected the due diligence sample, a deal manager asked whether the Mortgage Finance head of due diligence  was comfortable with selecting the sample from such a small portion of the loans slated for the deal.  The head of due diligence responded, "I would prefer more pool to look at.  I am also under a tight time constraint to complete diligence."  The time constraint trumped the preference to review a larger portion of the pool and UBS proceeded with a sample that was drawn from only 51.14% of the deal by loan count.

602.     From this sample, Clayton, UBS' due diligence vendor, graded 20 loans EV3 in its final due diligence reports (13.42% of the due diligence sample by loan count)—indicating that these loans were defective.

603.     During due diligence, UBS also directed Clayton to overturn at least another 19 loans from EV3 to EV2, which Clayton marked as "issue waived by client" or with other similar markings in its final due diligence reports (12.75% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides. These 19 overturned loans taken together with the 20 loans that Clayton graded EV3 amounted to a total of 39 loans that Clayton identified as defective (26.17% of the sample by loan count).

604.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

605.     UBS securitized all 19 loans that Clayton had graded EV3 and changed the grade to EV2 in its final due diligence reports after being waived in by UBS (0.62% of the deal by loan count with an aggregate principal balance of $5,431,597).

606.     When Clayton completed its credit and compliance due diligence review for this deal, UBS threatened not to pay Clayton for its work.  In an internal Clayton email dated March 20, 2006, a Clayton employee recounted UBS' complaints: "[head of diligence for Mortgage Finance] is just now looking at the data we provided for his 2 Countrywide deals [CWALT 2006-12CB and CWALT 2006-OA3] and says that he is not paying for these 2 deals due to lack of quality.  He doesn't feel they were q/ce'd well at all and the underwriting is poor at best.  No comp factors explaining what he has."

607.     UBS complained about the quality of Clayton's work despite the fact that Clayton had warned UBS that it did not have the manpower to adequately handle this deal.  In an internal Clayton email dated March 10, 2006, the same Clayton employee noted, "[the Mortgage Finance head of due diligence] threatened to give the deal to AMC if we did not do it for him when I explained we were having some capacity issues that we were dealing with."

608.     Other than a limited review of appraisals associated with loans within the due diligence sample, UBS conducted no valuation due diligence on the loans in this deal.

609.     In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

610.     UBS knew that a significant number of loans securitized in CWALT 2006-12CB were defective.

### 3.   CWALT 2006-OA3

611.     CWALT 2006-OA3 closed on March 31, 2006.  As stated in the ProSupp, the deal consisted of 2,534 Countrywide loans with an aggregate principal balance of $756,979,520. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

612.     UBS selected its credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, Countrywide's initial delivery tapes consisted of only 1,465 loans (57.81% of the deal by loan count).  UBS performed credit and compliance due diligence on a sample of 74 loans (2.92% of the deal by loan count).  After the credit and compliance due diligence sample was drawn, Countrywide upsized the loan pools that contributed to this deal twice.  Although Countrywide

subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 1,069 loans (42.19% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance diligence on these loans.  Despite not having performed any due diligence on these 1,069 loans, UBS securitized all of them.

613.    From this sample, Clayton, UBS' due diligence vendor, graded 11 loans EV3 in its final due diligence reports (14.86% of the due diligence sample by loan count)—indicating that these loans were defective.

614.    During due diligence, UBS also directed Clayton to overturn at least another seven loans from EV3 to EV2, which Clayton marked as "issue waived by client" or with other similar markings in its final due diligence reports (9.46% of the credit and compliance sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  These seven loans taken together with the 11 loans Clayton graded EV3  in their final diligence reports amounted to a total of 18 loans that Clayton identified as defective (24.32% of the credit and compliance sample by loan count).

615.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

616.    UBS securitized all seven loans that Clayton had identified as defective in its final due diligence reports and were waived in by UBS.

617.    When Clayton completed its credit and compliance due diligence review for this deal, the Mortgage Finance head of due diligence had concerns about the quality of Clayton's underwriting.  In an internal Clayton email dated March 20, 2006, a Clayton employee recounted UBS' complaints: "[head of diligence for Mortgage Finance] is just now looking at the data we

provided for his 2 Countrywide deals [CWALT 2006-12CB and CWALT 2006-OA3] and . . . says that he . . . is not paying for these 2 deals due to lack of quality. He doesn't feel they were q/ce'd well at all and the underwriting is poor at best. No comp factors explaining what he has."

618.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

619.    In addition to the issues discussed above, in the ProSupp for this deal, UBS made material misrepresentations about Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 267 through 281 *supra* and Table 7) and misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

620.    UBS knew that a significant number of loans securitized in CWALT 2006-OA3 were defective.

### 4.   CWALT 2006-OA7

621.    CWALT 2006-OA7 closed on April 28, 2006. As stated in the ProSupp, the deal consisted of 2,825 Countrywide loans with an aggregate principal balance of $1,183,444,985. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

622.    Before UBS pulled its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review. UBS selected 153 loans pursuant to Countrywide's request, but only performed credit and compliance due diligence on 100 loans (3.54% of the deal by loan count).

623.    UBS selected its credit and compliance due diligence sample from only a portion of the loans in the deal. When UBS drew its sample, Countrywide's initial delivery tapes included only 1,188 loans (42.05% of the deal by loan count). Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all

from the 1,637 loans (57.95% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans. Despite not having performed any due diligence on these 1,637 loans, UBS securitized all of them.

624. From the sample, MDMC, UBS' due diligence vendor, graded nine loans EV3 in its final due diligence reports (9% of the due diligence sample by loan count)—indicating that these loans were defective.

625. Among the loans UBS selected for due diligence, but did not review, were 53 loans that were missing loan files or were otherwise unavailable for review. MDMC did not grade these loans and excluded them from the sample, thereby artificially lowering the EV3 rate. UBS then securitized these loans. If these loans were graded EV3—as they should have been—the reject rate for the sample, by loan count, would have been 40.52%.

626. In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

627. UBS securitized 52 of the 53 loans that had missing loan files or files that were otherwise unavailable for review (1.84% of the deal by loan count with an aggregate principal balance of $37,086,393).

628. Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

629. In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

630.    UBS knew that a significant number of loans securitized in CWALT 2006-OA7 were defective.

### 5. CWALT 2006-OA8

631.    CWALT 2006-OA8 closed on May 31, 2006.  As stated in the ProSupp, the deal consisted of 1,497 Countrywide loans with an aggregate principal balance of $609,137,086. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

632.    UBS performed credit and compliance due diligence on a sample of 75 loans (5.01% of the deal by loan count).  Before UBS pulled its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review.  UBS selected 102 loans pursuant to Countrywide's request, but only performed credit and compliance due diligence on 75 loans.

633.    UBS selected its credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its sample, Countrywide's initial delivery tapes consisted of only 1,007 loans (67.27% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.  Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 490 loans (32.73% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 490 loans, UBS securitized all of them.

634.    From this sample, AMC, UBS' due diligence vendor, graded 10 loans EV3 in its final due diligence reports (13.33% of the due diligence sample by loan count)—indicating that these loans were defective.

635.    During due diligence, UBS also directed AMC to overturn at least another four loans from EV3 to EV2 or EV1, which AMC marked as "ok per UBS" or with other similar markings in its final due diligence reports (5.33% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides. These four loans taken together with the 10 loans that AMC had graded EV3 amounted to a total of 14 loans that AMC had identified as defective (18.67% of the sample by loan count).

636.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

637.    UBS securitized the four loans AMC identified as defective in its final due diligence reports that were waived in by UBS.

638.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

639.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

640.    UBS knew that a significant number of loans securitized in CWALT 2006-OA8 were defective.

### 6. CWALT 2006-23CB

641.    CWALT 2006-23CB closed on June 28, 2006.  As stated in the ProSupp, the deal consisted of 4,737 Countrywide loans with an aggregate principal balance of $997,998,621. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

642.   UBS performed credit and compliance due diligence on a sample of 234 loans (4.9% of the deal by loan count).   Before UBS pulled its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review.   UBS selected 235 loans pursuant to Countrywide's request, but performed credit and compliance due diligence on 234 loans.

643.   UBS also selected this credit and compliance due diligence sample from only a portion of the loans in the deal.   When UBS drew its sample, Countrywide's initial delivery tapes consisted of only 2,453 loans (51.78% of the deal by loan count).   UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.   Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 2,284 loans (48.22% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.   Despite not having performed any due diligence on these 2,284 loans, UBS securitized all of them.

644.   From this sample, AMC, UBS' due diligence vendor, graded 41 loans EV3 in its final due diligence reports (17.52% of the due diligence sample by loan count)—indicating that these loans were defective.

645.   Throughout due diligence, UBS had significant difficulties obtaining loan files and missing documents from Countrywide.   A representative from Countrywide told the Mortgage Finance due diligence manager working on the deal to "review the loans with credit issues only; there may be some you could cure 'as is.'"   The Mortgage Finance due diligence manager responded, "Yes, I've already been looking at all credit issues.   I've already cleared a pretty good amount of loans on my end."

646.     In a separate email, a Mortgage Finance transaction manager acknowledged, "We're trying not to kick out the loans to maximize the population and from a compliance perspective get those items cleared . . . ."

647.     During due diligence, UBS instructed AMC to overturn at least 22 loans from EV3 to EV1 or EV2, which AMC marked as "client override[s]," "ok per UBS," or with other similar markings in its final due diligence reports (9.40% of the credit and compliance sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides.  These 22 loans taken together with the 41 loans AMC graded EV3 in its final due diligence reports amounted to a total of 63 loans that AMC identified as defective (26.92% of the sample by loan count).

648.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

649.     On June 23, 2006, the head of due diligence for Mortgage Finance emailed various UBS employees that UBS was comfortable with the 17.5% reject rate even though this was "outside of what we normally see (5% to 10%), and over what our highest deal has been in the past (15%)," and that UBS felt "comfortable that as the majority of missing docs are provided back to cure the files the actual exceptions rates will drop to possibly below 10%."  There was no evidence that any of these missing document exceptions were ever cured.

650.     UBS securitized all 22 loans that AMC had identified as defective in its final due diligence reports and were waived in by UBS.

651.     Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

652.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

653.    UBS knew that a significant number of loans securitized in CWALT 2006-23CB were defective.

### 7.  CWALT 2006-OA10

654.    CWALT 2006-OA10 closed on June 30, 2006.  As stated in the ProSupp, the deal consisted of 6,531 Countrywide loans with an aggregate principal balance of $2,782,512,672. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

655.    Before UBS pulled its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review. UBS selected 235 loans pursuant to Countrywide's request, but only performed credit and compliance due diligence on 215 loans (3.29% of the deal by loan count).

656.    UBS selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, Countrywide's initial delivery tapes consisted of only 3,374 loans (51.66% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.  Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 3,157 loans (48.34% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 3,157 loans, UBS securitized all of them.

657.    From this sample, Clayton, UBS' due diligence vendor, graded 35 loans EV3 in its final due diligence reports (16.28% of the due diligence sample by loan count)—indicating that these loans were defective.

658.    During due diligence, UBS instructed Clayton to overturn at least 26 loans from EV3 to EV2, which Clayton marked as "issue waived by client" in its final due diligence reports (12.09% of the sample by loan count).    There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.

659.    Among the loans UBS selected for due diligence, but did not review, were 20 loans that were missing loan files or were otherwise unavailable for review.  Clayton did not grade these loans and excluded them from the sample, thereby artificially lowering the EV3 rate.

660.    Taking together the 35 loans Clayton graded EV3 in its final due diligence reports, the 26 loans Clayton graded EV2 in its final due diligence reports that were waived in by UBS, and the 20 loans Clayton did not grade in its final due diligence reports despite missing loan files, Clayton identified 81 loans as defective (34.47% of the sample by loan count).

661.    While acknowledging that even the stated 16.28% EV3 reject rate was "higher than normal,"  the head of due diligence for Mortgage Finance excused it because of the "short timeframe," claiming  that Countrywide would normally clear the missing document issues "if they had enough time to do so."

662.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

663.    UBS securitized 24 of the 26 loans that Clayton had identified as defective in its final due diligence reports and were waived in by UBS and all 20 of the loans with missing loan files or files that were otherwise unavailable for review.

664.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

665.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7) and made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

666.    UBS knew that a significant number of loans securitized in CWALT 2006-OA10 were defective.

### 8.  CWALT 2006-43CB

667.    CWALT 2006-43CB closed on December 29, 2006.  As stated in the ProSupp, the deal consisted of 4,211 Countrywide loans with an aggregate principal balance of $884,436,058. Countrywide was the sponsor of this third-party deal, which UBS as co-lead underwriter issued on the registered shelf of CWALT, Inc.

668.    UBS performed credit and compliance due diligence on a sample of 145 loans (3.44% of the deal by loan count).  Before UBS pulled its credit and compliance due diligence sample, Countrywide instructed UBS to oversample loans to account for loan files that "may not be available" for review, telling UBS to select 170 loans for a 163 loan review.  UBS nevertheless selected only 150 loans for its credit and compliance due diligence sample and  performed credit and compliance due diligence on only 145 loans.

669.    UBS also selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample,

Countrywide's initial delivery tapes only contained 1,657 loans (39.35% of the deal by loan count). UBS drew its credit and compliance due diligence sample from the initial, partial delivery tapes. Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 2,554 loans (60.65% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans. Despite not having performed any due diligence on these 2,554 loans, UBS securitized all of them.

670.    When the Mortgage Finance transaction manager working on the deal informed a Countrywide representative that UBS needed at least a 75% allocated tape in order to pull its due diligence sample, the Countrywide representative responded, "Our usual practice is that underwriters select DD sample when the data tape is 50% allocated . . . UBS was senior underwriter on CWALT 2006-23CB and you were able to select DD sample when we were under 50% allocated." UBS acquiesced and selected its due diligence sample solely from the initial tapes.

671.    From this sample, Clayton, UBS' due diligence vendor, graded 25 loans EV3 in its final due diligence reports (17.24% of the due diligence sample by loan count)—indicating that these loans were defective.

672.    During due diligence, UBS instructed Clayton to overturn at least 26 loans from EV3 to EV2, which Clayton marked as "ev2 per UBS," "change to EV2 per UBS," or with other similar markings in its final due diligence reports (17.93% of the sample by loan count). There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.

673.    Among the loans UBS selected for due diligence, but did not perform due diligence on, were four loans that were missing loan files or were otherwise unavailable for review. Clayton

did not grade these loans EV3 and excluded them from the sample, thereby artificially lowering the EV3 rate.

674.    Taking together the loans Clayton graded EV3 in its final due diligence reports, the loans Clayton graded EV2 in its final due diligence reports after being waived in by UBS, and the loans Clayton did not grade in its final due diligence reports even though they were missing loan files, Clayton identified 55 loans as defective (36.91% of the sample by loan count).

675.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.  In this instance, the Mortgage Finance due diligence manager excused the 17.24% reject rate reflected in the final reports to the head of Mortgage Finance, stating, "if we had ample enough time to complete diligence then CWIDE would have had better execution in regards to the dd."

676.    In this deal, UBS securitized 11 of the 26 loans for which UBS had waived the EV3 ratings, and all four loans with missing loan files or files that were otherwise unavailable for review (aggregate principal balance of $4,482,813).

677.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

678.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7).

679.    UBS knew that a significant number of loans securitized in CWALT 2006-43CB were defective.

**9.  CWALT 2007-OA2**

680.    CWALT 2007-OA2 closed on February 15, 2007.  As stated in the ProSupp, the deal consisted of 1,899 Countrywide loans with an aggregate principal balance of $669,524,121. Countrywide was the sponsor of this third-party deal, which UBS as lead underwriter issued on the registered shelf of CWALT, Inc.

681.    UBS performed credit and compliance due diligence on 184 loans (9.69% of the deal by loan count).  UBS "over sampled just in case all files are not delivered" and selected 208 loans for credit and compliance due diligence, but performed credit and compliance due diligence on only 184 loans.

682.    UBS also selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, Countrywide's initial delivery tapes contained only 1,562 loans (82.25% of the deal by loan count). UBS drew its credit and compliance due diligence sample from only the initial delivery tapes. Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 337 loans (17.75% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans. Despite not having performed any due diligence on these 337 loans, UBS securitized all of them.

683.    Initially, UBS selected only 92 loans for credit and compliance due diligence.  As of January 22, 2007, the initial reject rate stood at over 60 percent.  By January 24, 2007, Countrywide had cleared a number of loans, but the reject rate still remained outside of UBS' tolerances, with "14 loans (15% of sample) as uncurable kicks."

684.    In spite of the high reject rate, the head of due diligence for Mortgage Finance initially approved moving forward with the deal without conducting additional diligence.

685.     Despite the head of due diligence for Mortgage Finance's willingness to sign off on these results, UBS' internal counsel insisted that the closing date be postponed to provide UBS time to conduct additional diligence "[b]ecause of the high level of compliance and credit kicks on this deal."

686.     The head of Mortgage Finance distinguished these credit and compliance due diligence results from those on previous Countrywide deals, explaining in an email to the ARMs Desk trader: "In prior reviews, we have had DD kick rates similar to this transaction, but a portion of the issues were relative to certain missing documents that we were able to get comfortable with in a short period of time.  In this instance the conditions were all true credit and compliance exceptions."

687.     Countrywide agreed to allow UBS to sample an additional five percent of the loans for credit and compliance due diligence.

688.     As of February 2, 2007, UBS completed an initial credit and compliance review of an additional 92 loans from the pool with initial reject rates at 50%.  Significantly, at this time, over 80% of the rejected loans had credit issues associated with them related to "MI certs, excessive dti's [sic], scores, questionable income, missing CLUES reports, riders, questionable appraisals," thus demonstrating, again, a variety of "non document-related" credit and compliance issues in the additional sample.

689.     That same day, the head of due diligence for Mortgage Finance, reminded the Mortgage Finance due diligence managers working on the deal to "keep in mind, we need total kicks to be <4% on this sub pool."

690.     Ultimately, across the two samples, MDMC, UBS' due diligence vendor, graded 25 loans EV3 in its final due diligence reports (13.59% of the due diligence samples by loan count)—indicating that these loans were defective.

691.     Of the 25 loans MDMC graded EV3 in its final due diligence reports, 10 came from the initial sample and 15 came from the second sample.  Thus, the reject rate for the second sample—at 16.3%—was even higher than the reject rate from the first sample that triggered the additional review.  If anything, this second credit and compliance due diligence sample confirmed that the defects identified in the first sample existed across the entire deal.  Yet, UBS performed no additional credit and compliance due diligence on the unreviewed loans.

692.     Further, during due diligence, UBS instructed MDMC to overturn at least another 24 loans from EV3 to EV2 or EV1, which MDMC marked as "soft failed," "client allows as soft fail," "client waived," or with other similar markings in its final due diligence reports (13.04% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to MDMC that warranted these overrides.  These 24 loans taken together with the 25 loans MDMC graded EV3 in its final diligence reports, and one loan not graded despite its missing loan file, amounted to 50 loans that MDMC identified as defective (27.03% of the sample by loan count).

693.     In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

694.     In CWALT 2007-OA2, UBS securitized 22 of the 24 loans graded as EV3s by MDMC that were then waived in by UBS and the loan that was unavailable for review (collectively, 1.21% of the deal by loan count with an aggregate principal balance of $16,412,876).

695.     As discussed in ¶ 254 *supra*, because this deal started out as a whole loan purchase, UBS initially ordered AVMs, intending to conduct valuation due diligence. However, once the deal became a third-party securitization, UBS immediately ceased its valuation due diligence in spite of the substantial red flags already identified in the AVM results completed up to that point.

696.     In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7).

697.     UBS knew that a significant number of loans securitized in CWALT 2007-OA2 were defective.

### 10. CWALT 2007-24

698.     CWALT 2007-24 closed on August 30, 2007. As stated in the ProSupp, the deal consisted of 893 Countrywide-originated loans with an aggregate principal balance of $548,972,720. Countrywide was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of CWALT, Inc.

699.     UBS performed credit and compliance due diligence on a sample of 45 loans (5.04% of the deal by loan count). UBS selected this credit and compliance due diligence sample from only a portion of the loans in the deal. When UBS drew its credit and compliance due diligence sample, Countrywide's initial delivery tapes consisted of only 475 loans (53.19% of the deal by loan count). UBS drew its credit and compliance due diligence sample from only the initial delivery tapes. Although Countrywide subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 418 loans (46.81% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans. Despite not having performed any due diligence on these 418 loans, UBS securitized all of them.

700.    The head of due diligence for Mortgage Finance had significant concerns about drawing only a 5% sample from this pool of Countrywide loans.  In an email to several UBS employees working on the deal, including the head of Mortgage Finance, the head of due diligence for Mortgage Finance wrote:

> Just so everyone is aware at 5% due diligence here is the issue we face.  The tape I have is roughly 57% of the deal.  When that is grossed up to assume total deal size of $500mm and probably around 825 loans my sample needs to be in the area of 45 loans.  When sampling in Confine the predatory compliance model consumes 42 of these loans.  The other 3 can be either random or adverse (it does not really matter much).  Bottom line is here is a listing of loans you are potentially missing on this review:
>
> - 17 loans with UPB of $1mm or greater;
> - 27 loans with LTV of 90% or greater
> - 185 loans with CLTV of 90% or higher (this represents 40% of the loans I have for sampling – within this number 92 are in the 95% and higher bucket)
> - 5 loans seasoned 4 months or greater
> - 65 loans with 650 FICO or less
> - 38 loans with DTI of 50% or higher.
>
> I am sure a few of these will fall into the sample from cross over with the mandatory predatory compliance loans.  I just wanted to make everyone aware that this review as it stands does not represent us performing due diligence as we would when looking to sample accurately for risk mitigation.

In response to this email, a Mortgage Finance transaction manager wrote, "Sounds like we got a really ugly pool with loans that CW's trying to unload."

701.    Despite those concerns, the head of due diligence for Mortgage Finance ultimately moved forward with just a 5% sample: "After my conversation with [the trader] I will move forward as best I can with capturing the most adverse loans possible within the 45 loan sample I am choosing."

702.    From this sample, AMC, UBS' due diligence vendor, graded nine loans EV3 in its final due diligence reports (20% of the due diligence sample by loan count)—indicating that these loans were defective.  During due diligence, UBS instructed AMC to overturn at least three loans

from EV3 to EV1, which AMC marked as "cleared . . . per UBS" or with other similar markings in its final due diligence reports (6.66% of the sample by loan count). Taken together, AMC identified 12 loans as defective (26.67% of the sample by loan count).

703.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

704.    UBS securitized the three loans AMC identified as defective but waived in by UBS in its final due diligence reports (0.34% of the deal by loan count with an aggregate principal balance of $2,168,792.64).

705.    Although CWALT 2007-24 was a third-party securitization, UBS conducted a valuation due diligence review on the same 45 loan sample selected for credit and compliance review.

706.    Hansen rejected nine loans (20% of the valuation sample by loan count) because the values of the underlying properties did not support the respective loan amounts.

707.    Despite this high reject rate, UBS performed no valuation due diligence on the other 865 loans securitized in the deal.

708.    In addition to the issues discussed above, in the ProSupp for this deal, UBS misrepresented Countrywide's underwriting guidelines regarding DTI ratios (*see* ¶¶ 276 through 281 *supra* and Table 7).

709.    UBS knew that a significant number of loans securitized in CWALT 2007-24 were defective.

710.    Less than two months after this deal closed, the Fixed Rate Desk trader, who had agreed with or instructed the director of due diligence to cap the sample at 45 loans,  emailed the

head of Mortgage Finance, noting that 3% of the loans had become delinquent in the first month after issuance.

### B.    American Home Deals

#### 1.    AHMIT 2006-2

711.    AHMIT 2006-2 closed on June 30, 2006.  As stated in the ProSupp, the deal consisted of 6,589 American Home originated loans with an aggregate principal balance of $965,174,822.  American Home was the sponsor of this third-party deal, which UBS as lead underwriter issued on the registered shelf of American Home Mortgage Securities LLC.

712.    UBS performed credit and compliance diligence on 295 loans (4.48% of the deal by loan count).  Additionally, in response to underdisclosed finance charges associated with loans sampled for credit and compliance, UBS directed Bohan, UBS' due diligence vendor,  to perform a limited compliance review of 25 additional loans, solely looking for "under disclosures."

713.    From the 295 loan sample reviewed for both credit and compliance, Bohan, UBS' due diligence vendor, graded 59 loans EV3 in its final due diligence reports (20% of the due diligence sample by loan count).

714.    From the outset, the due diligence results for this deal were problematic with reject rates from the credit and compliance due diligence exceeding 50%.  On June 21, 2006, a deal manager within Mortgage Finance emailed a representative from American Home: "I am worried because the rejection rate is over 50% and the industry average is between 2-4%.  Am home does not have a lot of time to get the numbers down . . . At rates this high, we can't really kick out those loans that do not work because we are also underwriting the deal (not same as whole loan trade).  Its [sic] pretty serious . . . especially since its [sic] quarter end and the trades have to happen."

715.    By June 23, 2006, the reject rate had not significantly improved.  The head of due diligence for Mortgage Finance summarized the due diligence results: "Currently both pools are

very much over what we normally see for diligence reject rates (5% to 10%) and even still considerably higher than the highest we have allowed in the past of 15%. . . The reality for both of these deals is that we are hours away from tie out and I do not expect either pool to get to the point where the numbers are satisfactory enough to state that the diligence is acceptable."

716.    Around the same time, UBS became concerned that the high reject rate would affect its ability to make a successful due diligence defense in the event it was ever sued by investors.  A transaction manager on the ABS Banking Desk emailed American Home expressing these concerns: "We need you guys to focus real hard on getting these cleared, we need to have an acceptable % for a due diligence defense if an issue arises with the bonds."

717.    At the same time, UBS employees also understood that canceling this deal would jeopardize UBS' relationship with American Home.  On June 23, 2006, a trader on the ARMs Desk emailed the head of mortgage trading describing this trade-off: "[t]here is a chance that we will not be able to bring the Am Home banking deal (AHMIT06-2) because of due dili issues. . . . Basically, we are either going to walk a thin line and potentially take some underwriting risk or end the relationship."

718.    As stated above, Bohan graded 59 loans EV3 in its final reports, a 20% reject rate from the 295 loan credit and compliance sample.  In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

719.    Instead, UBS manipulated the reject rate to fit within UBS' tolerance levels to justify proceeding with the deal.

720.    For example, the head of due diligence for Mortgage Finance, in an internal email, reported the overall reject rate as only 31 loans out of 256 (12.11%).  To arrive at this lower reject

rate, he excluded 15 exceptions that were due to missing documents and 10 loans that had been removed from the sample by American Home for delinquency issues (along with 49 other delinquent loans from the remainder of the pool).  He further tried to minimize the importance of the reject rate, explaining that 3.13% of the loans in the sample were "hard compliance exceptions" and that only 4.69% of the loans in the sample were rejected due to "guideline exceptions."

721.   In addition, the head of due diligence for Mortgage Finance excluded 30 loans with missing loan files from his calculation.

722.   In addition to not incorporating the missing loan files in its assessment of the reject rate, UBS securitized 24 of 30 loans with missing loan files or that were otherwise unavailable for review in this deal, even though Bohan graded these loans EV3 in its final due diligence reports.

723.   After receiving the due diligence report from the head of due diligence for Mortgage Finance on June 27, 2006, a transaction manager on the ABS Banking Desk commented, "from a business perspective we feel that the 4.69% on the credit guideline exception rate is well within excepted [sic] tolerance, and should not warrant any disclosure in the offering documents." The same transaction manager followed up with the head of mortgage trading later that day, "We need to get in front of [in-house counsel] first thing in the a.m. to talk about the credit %'s and not putting the disclosure in the prosup.  We feel at a below 5% threshold it is not material."

724.   UBS' due diligence managers knew that the high kick rate could not be explained away, even in part, by its sampling methodology, which included adverse selection.   UBS had no knowledge of the American Home guidelines at the outset of the due diligence process.  The due diligence manager who selected the sample admitted as such in an email dated June 27, 2006 to the head of due diligence for Mortgage Finance: "As info – we had absolutely NO knowledge of any aspect of AmHome guidelines when the sample was selected so any correlation of sampled

loan exceptions vs. guidelines is strictly coincidental . . . ."  The head of due diligence for Mortgage Finance simply responded: "I can neither confirm nor deny the presence of military personnel in Vietnam . . . ."

725.    The next day, however, in an email to both UBS and American Home, UBS' outside counsel recommended that the parties add a disclosure to the ProSupp regarding underwriting exceptions: "Please add the following disclosure regarding underwriting guideline exceptions. Ordinarily we would have relied on additional diligence by the underwriters to establish that the percentage of guideline exception kick-outs in the diligence sample was unusually high, but we have been advised that because of the extremely tight timetable for this deal that would be impossible."

726.    The additional disclosure for the AHMIT 2006-2 ProSupp proposed by UBS' outside counsel was as follows:

Risk Factor:

**Underwriting exceptions may increase the risk of defaults and losses on the mortgage loans**

Examination of a [] percent sample of the mortgage loans showed that approximately [] percent had been originated on the basis of significant exceptions, and in some cases two or more such exceptions, to the originator's underwriting guidelines.  These mortgage loans were removed from the mortgage pool. The sample was adversely selected and may therefore not be representative of the mortgage pool as a whole. However, significant or multiple guidelines exceptions may increase the likelihood that the borrower will default and that a loss will be experience on the affected loan. *See "Mortgage Loan Origination -- Underwriting Guidelines" in this free writing prospectus.*

727.    Within an hour of this email, a representative from American Home contacted the transaction manager on the ABS Banking Desk informing him that the language suggested by UBS' outside counsel was "not going to happen" and suggested that UBS work with its outside counsel.

728.    UBS did just that and a little more than a half hour later, UBS' outside counsel withdrew his suggestion, "We have spent some more time on the diligence issues discussed on this

morning's call and have discussed them further with UBS and the other underwriters.  We are now comfortable with the diligence results and accordingly withdraw our request for the additional disclosure that we circulated earlier this morning."  UBS took no additional steps to excise loans violative of the representations or to modify those representations to address the problem. Ultimately, no additional disclosures were made in the ProSupp for this deal.

729.    Other than a limited review of the appraisals within the credit and compliance sample, UBS did not conduct valuation due diligence on the loans in this deal.

730.    UBS knew that a significant number of loans securitized in AHMIT 2006-2 were defective.

## 2.  AHMA 2006-2

731.    AHMA 2006-2 closed on June 30, 2006.  As stated in the ProSupp, the deal consisted of 3,022 American Home originated loans with an aggregate principal balance of $1,206,537,988.  American Home was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of American Home Mortgage Assets LLC.

732.    UBS performed credit and compliance due diligence on a sample of 154 loans (5.1% of the deal by loan count).  UBS selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, American Home's initial delivery tapes contained only 2,668 loans (88.29% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.  Although American Home subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 354 loans (11.71% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 354 loans, UBS securitized all of them.

733.    This deal, like AHMIT 2006-2, which closed the same day, was plagued from the start with extremely high reject rates from the credit and compliance due diligence sample.  On June 19, 2006, the head of due diligence for Mortgage Finance wrote in an email to representatives from American Home, "There is a very large concern at this time regarding the underwriting of this issue for American Home.  The reject rate is extremely high at over 50%.  The pool is due to tie out this week (tomorrow I believe) and I need to know from your group that these items are being handled and will clear."  Because of this high reject rate, UBS employees recognized that the deal might be unsuitable to market.  A deal manager within Mortgage Finance commented internally on these due diligence results: "We just received due diligence results and the reject rate is over 50% - unless a majority of these loans are cleared, we will be unable to go to market."

734.    From this sample, Clayton, UBS' due diligence vendor, graded 19 loans EV3 in its final due diligence reports (12.34% of the due diligence sample by loan count)—indicating that these loans were defective.

735.    During due diligence, UBS directed Clayton to overturn at least another 34 loans from EV3 to EV2, which Clayton marked as "issue waived by client" or "waived in bulk per client" in its final due diligence reports (22.1% of the sample by loan count).  There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.  Taken together, Clayton identified 53 loans as defective (34.4% of the sample by loan count).

736.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

737.    UBS securitized all 34 loans in this deal that Clayton identified in its final due diligence reports as defective and waived in by UBS (1.13% of the deal by loan count with an aggregate principal balance of $33,888,104).

738.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

739.    UBS knew that a significant number of loans securitized in AHMA 2006-2 were defective.

C.    **RFC Deals**

1.    **RALI 2006-QO7**

740.    RALI 2006-QO7 closed on September 29, 2006.  As stated in the ProSupp, the deal consisted of 4,441 loans originated by RFC or its affiliates with an aggregate principal balance of $1,550,191,404.  RFC was the sponsor of this third-party deal, which UBS as sole underwriter issued on the registered shelf of Residential Accredit Loans, Inc.

741.    UBS selected 190 loans for review, but performed credit and compliance due diligence on only a sample of 187 loans (4.21% of the deal by loan count).  UBS selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, RFC's initial delivery tapes consisted of only 3,640 loans (81.96% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.  Although RFC subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 801 loans (18.03% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 801 loans, UBS securitized all of them.

742.    On September 20, 2006, the Mortgage Finance due diligence manager working on the deal signed off on the due diligence results, even though, at the time, the reject rate stood at 17.1% by loan count—with 9.1% of the sample rejected for compliance issues.  At that time, in an email to several senior personnel within RMBS at UBS, including the head of mortgage trading, the head of Mortgage Finance and members of UBS' internal legal team, the due diligence manager noted that this reject rate "would be considered normally to [sic] high of a percentage, however due to the short time frame provided these numbers are within an acceptable range.  We are comfortable with the amount [sic] declines because this counterparty has shown a low number of declines in past deals."

743.    These due diligence results raised concerns at UBS about whether these results would prevent RFC's outside counsel from rendering a 10b-5 opinion.  In an email to UBS' internal counsel and representatives for RFC, a Mortgage Finance deal manager requested a call to discuss the issue, "We are seeing roughly 9% of the sample as having material compliance issues, which is pretty high.  We would like to have [RFC's outside counsel] on the call as well to discuss whether a 10b-5 opinion can be issued . . . ."

744.    Of particular note, in August 2006, RFC emailed UBS a list of 391 loans securitized in RALI 2006-QO5, a deal that closed in late May 2006 that UBS underwrote, with Truth In Lending Act ("TIL") under disclosures.  On September 21, 2006, a Mortgage Finance deal manager asked another Mortgage Finance deal manager, referencing the RALI 2006-QO5 securitization, "Hey did u say half loans [sic] on last RALI deal had TIL issues? Post close?"  The deal manager responded, "Not half but a lot of them."

745.    On September 22, 2006, the Mortgage Finance deal manager working on this deal emailed the head of due diligence for Mortgage Finance, indicating that these 391 loans worried

her when RFC "said on the phone last night that they don't think such results would be found post close – but look at what was found on QO5!!!  So I was concerned about them trying this tactic again."  The head of due diligence for Mortgage Finance responded, "This worries me as well. We can sit here now with concrete info that the issue exists.  Could cause a problem . . . ."

746.    UBS did not review more loans in response to these issues, but instead re-reviewed the loans Opus, UBS' due diligence vendor, had graded EV3 to search for additional loans to clear to lower the reject rate.

747.    On September 25, 2006, Opus sent its final due diligence reports in which it graded 19 loans EV3 (10.16% of the credit and compliance due diligence sample by loan count)— indicating that these loans were defective.

748.    During due diligence, UBS directed Opus to overturn at least another 10 loans from EV3 to EV2 or EV1, which Opus marked as "per [UBS]/UBS client acceptable . . . override," "not cleared . . . client accepted. . . override," "per UBS . . . override," or with other similar markings in its final due diligence reports (5.35% of the credit and compliance sample by loan count).  There was no evidence that UBS identified any compensating factors to Opus that warranted these overrides.

749.    Among the loans UBS selected for due diligence, but on which it did not perform due diligence, were three loans that were unavailable for review.  Opus did not grade these loans EV3 and excluded them from the sample, thereby artificially lowering the EV3 rate.  A representative from RFC informed the Mortgage Finance due diligence manager that "these three files have given us some trouble" and indicated RFC would not be able to provide them in time for the review.  As such, RFC and UBS agreed to remove the three loans from the deal.

750.    Taking together the 19 loans Opus graded EV3 in its final due diligence reports, the 10 loans Opus graded EV2 or EV1 that were waived in by UBS, and the three loans Opus did not grade in its final due diligence reports even though they had missing loan files, Opus identified 32 loans as defective (16.84% of the sample by loan count).

751.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

752.    In this deal, UBS securitized nine of the 10 overturned loans.

753.    UBS ordered AVMs for 407 loans slated for securitization in RALI 2006-QO7 because it initially intended to purchase these loans.  Based on the AVM results, UBS selected 104 loans to proceed to the next stage of valuation due diligence for further review.  However, once this deal was converted into a third-party securitization, UBS ignored the red flags raised by these AVM results, cancelled the next stage of valuation due diligence and securitized 86 of these 104 loans without any further review (*see* ¶¶ 252 and 253 *supra*).

754.    Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

755.    In addition to the issues discussed above, in the ProSupp for this deal, UBS made materially misleading representations pertaining to the borrowers' equity in the underlying properties (*see* ¶¶ 267 through 275 *supra* and Table 6).

756.    UBS knew that a significant number of loans securitized in RALI 2006-QO7 were defective.

### 2.  RALI 2006-QS15

757.    RALI 2006-QS15 closed on October 30, 2006.  As stated in the ProSupp, the deal consisted of 2,182 RFC originated loans with an aggregate principal balance of $538,578,792.

RFC was the sponsor of this third-party deal, which UBS as co-lead underwriter issued on the registered shelf of Residential Accredit Loans, Inc.

758.    UBS performed credit and compliance due diligence on a sample of 70 loans (3.21% of the deal by loan count).  UBS selected this credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, RFC's initial delivery tapes contained only 1,043 loans (47.8% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tapes.  Although RFC subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 1,139 loans (52.2% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 1,139 loans, UBS securitized all of them.

759.    From this sample, AMC, UBS' due diligence vendor, graded 25 loans EV3 in its final due diligence reports (35.71% of the due diligence sample by loan count)—indicating that these loans were defective.  During due diligence, UBS directed AMC to overturn at least another five loans from EV3 to EV2 or EV1, which AMC marked as "UBS to advise – client override per UBS" in its final due diligence reports (7.14 % of the sample by loan count).  There was no evidence that UBS identified any compensating factors to AMC that warranted these overrides. Taken together, Clayton identified 30 loans as defective (42.86% of the credit and compliance sample by loan count).

760.    In this deal, UBS securitized 13 loans AMC identified as defective.  UBS securitized nine loans AMC graded EV3 in its final due diligence reports with an aggregate principal balance of $3,743,145.

761.     UBS also securitized four loans AMC identified as defective that were then waived in by UBS with an aggregate principal balance of $586,813.

762.     Other than a limited review of the appraisals within the credit and compliance sample, UBS conducted no valuation due diligence on the loans in this deal.

763.     UBS knew that a significant number of loans securitized in RALI 2006-QS15 were defective.

### D.     IndyMac Deals

#### 1.     INABS 2006-D

764.     INABS 2006-D closed on September 13, 2006.  As stated in the FWPs, the deal consisted of 4,800 IndyMac originated loans with an aggregate principal balance of $949,997,358. INABS 2006-D included a pre-funding, through which loans would be purchased and added to the trust post-closing.  As of the closing date, 3,954 loans were included in the trust.  An additional 846 loans were later added in October through the pre-funding bringing the total number of loans in this deal to 4,800.  IndyMac MBS, Inc. was the sponsor of this third-party deal, which UBS as co-lead underwriter issued on the registered shelf of IndyMac MBS, Inc.

765.     Even before UBS began due diligence, UBS assumed that there were a number of loans included in this deal that IndyMac wanted to get off its books.  In an email discussing higher than expected loss coverage levels, a transaction manager from the ABS Banking Desk wrote to a representative of IndyMac: "FYI- here is the feedback from SnP analyst, we are working on finding out why the LC [loss coverage] is so much worse.  We can talk about swapping out loans, but ultimately, these are loans that you want to get rid of Im [sic] sure.  All of the 2nds were funded loans, so if dont [sic] include them, you'll still be owning them."  UBS compromised its due diligence processes to help IndyMac securitize as many of these loans as possible.

766.     UBS initially selected a credit and compliance sample of 250 loans (5.21% of the deal by loan count).  In response to high cost loan issues identified on Cook County and Minnesota loans, UBS also performed a *compliance only* review on an additional 96 loans (2% of the deal by loan count).

767.     UBS selected the credit and compliance due diligence sample from only a portion of the loans in the deal.  UBS drew its credit and compliance due diligence sample from IndyMac's initial delivery tapes, which only contained 3,039 loans (63.31% of the deal by loan count).  Although IndyMac subsequently provided UBS with a fully allocated tape, UBS failed to draw any due diligence samples at all from the 1,761 loans (36.69% of the deal by loan count) contained in the balance of the loan pool or to conduct any credit or compliance due diligence on these loans.  Despite not having performed any due diligence on these 1,761 loans, UBS securitized all of them.

768.     From the total sample of 346 loans, Bohan, UBS' due diligence vendor, graded 33 loans EV3 in its final due diligence reports (9.54% of the total 346 loan due diligence sample by loan count)—indicating that these loans were defective.  Of the 250 loans that were reviewed for both credit and compliance, Bohan graded 20 loans EV3 in its final due diligence reports (8% of the credit and compliance sample by loan count).  Of the 96 loans that received compliance only review, Bohan graded 13 loans EV3 (13.54% of the compliance only sample by loan count).

769.     UBS performed valuation due diligence on a sample of 1,083 loans (22.56% of the deal by loan count).  From this sample, UBS' valuation due diligence vendor, CRS, rejected 30 loans (2.77% of the valuation sample by loan count) because the values of the underlying properties did not support the respective loan amounts.  This valuation reject rate, however, did not include 148 loans with flip flags that did not receive any further diligence beyond the AVM (13.67% of the valuation sample by loan count), and 36 loans with values at their last stage of the

valuation due diligence process that exceeded the UBS tolerances (3.32% of the valuation sample by loan count). As such, the valuation reject rate was grossly understated.

770. As the head of due diligence for ABS TM explained to an IndyMac representative, ABS due diligence selected loans to proceed from an AVM to the next stage of the valuation due diligence process only if they were "no hits," "had variances greater than -20%," and "only looked at those loans that were greater than or equal to 95% CLTV."

771. After compromising the entire valuation due diligence process, UBS still securitized 14 loans that CRS had rejected because the values of the underlying properties did not support the respective loan amounts. UBS accepted nine of these loans after "CRS tolerance levels were increased to 25% negative variance." UBS securitized six of the nine loans.

772. Additionally, an IndyMac representative pressured the head of due diligence for ABS to accept another nine loans that CRS had rejected because the value of the underlying properties did not support the respective loan amounts: "[A]re you going to be nice to us on the loans which state 'Appraisal and BPO not provided in a timely manner. Unable to approve.' . . . [W]e did provide the appraisal but it looks like they ran out of time to do their entire review. Just keep in mind that this is a securitization." UBS acquiesced and securitized seven of the nine loans without reviewing the appraisals, along with the companion loan of one of the seven.

773. In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal. UBS did not conduct any credit and compliance or valuation due diligence on the pre-funded loans, which were added to the deal in October.

774. UBS knew that a significant number of loans securitized in INABS 2006-D were defective.

### 2. INABS 2007-A

775.    INABS 2007-A closed on March 13, 2007.  As stated in the FWPs, the deal consisted of 6,518 IndyMac originated loans with an aggregate principal balance of $1,299,661,637.  INABS 2007-A included a pre-funding, through which loans would be purchased and added to the trust post-closing.  As of the closing date, 5,850 loans were included in the trust. An additional 668 loans were added later in March 2007 through the pre-funding bringing the total number of loans in this deal to 6,518.  IndyMac ABS, Inc. was the sponsor of this third-party deal, which UBS as lead underwriter issued on the registered shelf of IndyMac ABS, Inc.

776.    From the outset, IndyMac notified UBS that this pool was of lower quality than UBS was used to seeing, but that UBS should refrain from trying to adjust the pool to improve loss coverage levels from the rating agencies because it wanted to get these loans off of its books. In a January 2007 email, a representative from IndyMac wrote to a transaction manager on the ABS Banking Desk: "Here is a representative tape.  FICO is much lower than what you're used to seeing and you can see the quality dipping a bit. . . .  It does appear that our daily fundings and ratelock mirror these characteristics so we should not try to optimize the pool.  Otherwise we could be stuck holding plenty of lesser quality loans."

777.    UBS performed credit and compliance due diligence on a sample of 250 loans (3.84% of the deal by loan count).  UBS selected the credit and compliance due diligence sample from only a portion of the loans in the deal.  When UBS drew its credit and compliance due diligence sample, IndyMac's initial delivery tapes consisted of only 3,019 loans.  IndyMac further instructed UBS not to select for review any of the 837 "ratelock" loans on the initial tape, reducing the number of loans eligible for due diligence to 2,182 (33.48% of the deal by loan count).  UBS drew its credit and compliance due diligence sample from only the initial delivery tape and did not select any "ratelock" loans.  Although RFC subsequently provided UBS with a fully allocated tape,

UBS failed to draw any additional samples from the loans contained in the balance of the pool. Despite not having performed any due diligence on the loans contained in the balance of the pool or the "ratelock" loans, UBS securitized all 4,336 of these loans (66.52% of the deal by loan count).

778.    When the credit and compliance sample was drawn, the deal was initially intended to have an aggregate principal balance of approximately $850,000,000; however, in February 2007, IndyMac decided to upsize this deal to approximately $1,300,000,000.  Because of the upsize, the transaction manager on the ABS Banking Desk inquired whether additional loans should be selected for credit and compliance due diligence, but no additional loans were ever selected.

779.    From this sample, Bohan, UBS' due diligence vendor, graded 23 loans EV3 in its final due diligence reports (9.20% of the due diligence sample by loan count)—indicating that these loans were defective.   In this deal, UBS securitized six of the 23 loans Bohan graded EV3 in its final due diligence reports.[47]   One of the six securitized EV3 loans was among the 50 loans that an IndyMac representative indicated to UBS "must-be included" in the pre-fund population.

780.    UBS performed valuation due diligence on a sample of 467 loans (7.16% of the deal by loan count).  From this sample, UBS' valuation due diligence vendor, CRS, rejected 18 loans (3.85% of the valuation sample by loan count) because the values of the underlying properties did not support the respective loan amounts.  This valuation reject rate, however, did not include eight loans with values at their last stage of the valuation due diligence process that exceeded the tolerances UBS set for assessing the reliability of the originator's property value (1.71% of the valuation sample by loan count).  As such, the valuation reject rate was grossly understated.

---

[47] These loans were reviewed as part of the initial population, but then were securitized as part of the pre-fund population without any further review.

*United States* v. *UBS*
Complaint
Page 190

781.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.  UBS did not conduct any credit and compliance or valuation due diligence on the pre-funded loans, which were added to the deal in October 2007.

782.    Over the course of securitizing this deal, UBS employees' regularly commented on the poor quality of IndyMac loans.   In February 2007, the structurer on the ABS Trading Desk asked, specifically referencing INABS 2007-A: "do u know what rating that piece of c__p is?" The same structurer further commented on the loss coverage levels for this deal later in February, "The 600 mil LCs were already cr_p.  With 1.1 bil LCs looking worst [sic], this is not doable." Further, another structurer on the ABS Trading Desk commented on another IndyMac pool of loans out for bid just two months after INABS 2007-A closed, "IndyMac pool performs like crap so although the pool doenst [sic] look horrible in strats, it may be worth looking at."

783.    UBS knew that a significant number of loans securitized in INABS 2007-A were defective.

**E.    Fremont Deal: FHLT 2006-B**

784.    FHLT 2006-B closed on August 3, 2006.  As stated in the ProSupp, the deal consisted of 9,226 Fremont-originated loans with an aggregate principal balance of $1,302,568,372.  Fremont was the sponsor of this third-party deal, which UBS as lead underwriter issued on the registered shelf of Fremont Mortgage Securities Corporation.

785.    UBS performed credit and compliance due diligence on a sample of 499 loans (5.46% of the deal by loan count).  From this sample, Clayton, UBS' due diligence vendor, graded 26 loans EV3 in its final due diligence reports (5.21% of the due diligence sample by loan count)— indicating that these loans were defective.

786.    During due diligence, UBS directed Clayton to overturn at least another six loans from EV3 to EV2, which Clayton marked as "issue waived by client" or with other similar markings in its final due diligence reports.   There was no evidence that UBS identified any compensating factors to Clayton that warranted these overrides.   Taken together, Clayton identified 32 loans as defective (6.41% of the credit and compliance sample by loan count).   In this deal, UBS securitized all six loans Clayton identified as defective in its final due diligence reports that were waived in by UBS (aggregate principal balance of $2,015,312).

787.    In this deal, UBS also securitized six loans that UBS had previously rejected from its prior November 2005 or February 2006 whole loan purchases from Fremont (aggregate principal balance of $ 870,372.84).   Of these six loans, five were originally kicked for credit or compliance reasons.

788.    UBS performed valuation due diligence on a sample of 2,219 loans (24.3% of the deal by loan count).   From this sample, UBS' valuation due diligence vendor, CRS, rejected 48 loans (2.16% of the valuation sample by loan count) because the values of the underlying properties did not support the respective loan amounts.   This valuation reject rate, however, did not include 229 loans with flip flags that did not receive any further diligence beyond the AVM (10.32% of the valuation sample by loan count), and 11 loans with values at their last stage of the valuation due diligence process that exceeded the tolerances UBS set for assessing the reliability of the originator's property value (0.50% of the valuation sample by loan count).   As such, the valuation reject rate was grossly understated.

789.    In spite of these reject rates, which signaled that similarly defective loans existed in the non-reviewed portion of the pool, UBS performed no additional credit and compliance due diligence on the loans in the deal.

790.    UBS proceeded with this deal (aware of the poor due diligence results) notwithstanding the fact that, by this time in 2006, UBS had already decided that it would no longer purchase loans from Fremont, because of the originator's poor underwriting practices.  The head of due diligence for ABS TM noted that UBS was "beginning to see more an[d] more creativity on the origination side" and "higher than normal FPD's [sic] and EDP's [sic] percentages" for Fremont loans.  In a September 2006 email, a trader on the ABS Trading Desk referred to Fremont's collateral as "cr*p."

791.    UBS knew that a significant number of loans securitized in FHLT 2006-B were defective.

**CLAIMS FOR RELIEF**

**CLAIM I: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
(12 U.S.C. § 1833a; 18 U.S.C. § 1341)**

792.    The allegations set forth above in paragraphs one through 791 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

793.    In connection with each Subject Deal, all of the Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1341 (mail fraud) affecting one or more FIFIs, for which they are subject to a civil penalty.

794.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, they made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, the Defendants repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

795.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of their victims, they made false and misleading representations and omissions to investors and rating agencies.  When they made these representations and omissions, the Defendants knew that their statements were false, or else they were aware of a high probability that their statements were false and they consciously avoided confirming that suspicion.  The Defendants also knew at that time that a necessary consequence of their fraudulent scheme, if it were successful, would be injury to others, and they consciously intended for this injury to occur.

796.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly used the mails in pursuit of their scheme to defraud when they, *inter alia*, caused to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses, ProSupps, presentations, and additional information regarding the Subject Deals that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors.  UBS also communicated with its credit and compliance due diligence vendors and its valuation due diligence vendors by mail. These communications were at least incidental to an essential part of UBS' scheme to defraud.

797.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly made representations and omissions to investors and rating agencies that were materially false.

798.    The misrepresentations and omissions made by the Defendants on each Subject Deal went to essential aspects of their bargain with RMBS investors, who provided funds to the Defendants in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In each Subject Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

799.    In connection with each Subject Deal, the Defendants' acts of mail fraud affected one or more FIFIs.

800.    In connection with each Subject Deal, the Defendants' acts of mail fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

801.    In connection with each Subject Deal, the Defendants derived pecuniary gain from their acts of mail fraud.

802.    For each violation of 18 U.S.C. § 1341 as to each Subject Deal, the Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD (12 U.S.C. § 1833a; 18 U.S.C. § 1343)

803.    The allegations set forth above in paragraphs one through 791 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

804.    In connection with each Subject Deal, all of the Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1343 (wire fraud) affecting one or more FIFIs, for which they are subject to a civil penalty.

805.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, they made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, the Defendants repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

806.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of their victims, they made false and misleading representations and omissions to investors and rating agencies.  When they made these representations and omissions, the Defendants knew that their statements were false, or else they were aware of a high probability that their statements were false and they consciously

avoided confirming that suspicion.  The Defendants also knew at that time that a necessary consequence of their fraudulent scheme, if it were successful, would be injury to others, and they consciously intended for this injury to occur.

807.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly used the interstate wires in pursuit of their scheme to defraud when they, *inter alia*, (1) executed an interstate wire transfer of funds to the originator selling the loan pools to UBS or the originator securitizing the loans on its own behalf; (2) electronically filed documents with the SEC; (3) electronically transmitted prospectuses, ProSupps, presentations, and additional information regarding the Subject Deals to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among UBS employees to make representations concerning the Subject Deals, or to acquire and exchange knowledge contradicting those representations.  UBS also communicated with its credit and compliance due diligence vendors and its valuation due diligence vendors by interstate wire.  These communications were at least incidental to an essential part of UBS' scheme to defraud.

808.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly made representations and omissions to investors and rating agencies that were materially false.

809.    The misrepresentations and omissions made by the Defendants on each Subject Deal went to essential aspects of their bargain with RMBS investors, who provided funds to the Defendants in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property

as collateral for the debt.  In each Subject Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

810.    In connection with each Subject Deal, the Defendants' acts of wire fraud affected one or more FIFIs.

811.    In connection with each Subject Deal, the Defendants' acts of wire fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

812.    In connection with each Subject Deal, the Defendants derived pecuniary gain from their acts of wire fraud.

813.    For each violation of 18 U.S.C. § 1343 as to each Subject Deal, the Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## CLAIM III: FIRREA CIVIL MONEY PENALTIES PREDICATED ON BANK FRAUD
### (12 U.S.C. § 1833a; 18 U.S.C. § 1344)

814.    The allegations set forth above in paragraphs one through 791 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

815.    In connection with each Subject Deal, all of the Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1344 (bank fraud) for which they are subject to a civil penalty, when they knowingly executed, or attempted to execute, a scheme or artifice (1) to defraud one or more financial institutions, and (2) to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises.

816.    In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly engaged in a deceptive course of conduct by making material

misrepresentations and omissions intended to victimize one or more financial institutions by exposing them to loss.

817.     In connection with each Subject Deal, all of the Defendants, separately or in concert with one another, knowingly executed, or attempted to execute, a scheme or artifice intended to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and other property owned by, and under the custody or control of, one or more financial institutions.

818.     In connection with each Subject Deal, the Defendants' violations of 18 U.S.C. § 1344 actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

819.     In connection with each Subject Deal, the Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1344.

820.     For each violation of 18 U.S.C. § 1344 as to each Subject Deal, the Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

### CLAIM IV: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FRAUDULENT BENEFIT FROM A TRANSACTION WITH A COVERED FINANCIAL INSTITUTION (12 U.S.C. § 1833a; 18 U.S.C. § 1005)

821.     The allegations set forth above in paragraphs one through 791 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

822.     In connection with each Subject Deal, all of the Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1005 for which they are subject to a civil penalty, when, with the intent to defraud one or more financial institutions covered by that statute, they participated and shared in, and received (directly or indirectly) any money, profit,

property, and benefits through one or more transactions, loans, commissions, contracts, or other acts of such financial institutions.

823.    In connection with each Subject Deal, the Defendants' violations of 18 U.S.C. § 1005 actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

824.    In connection with each Subject Deal, the Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1005.

825.    For each violation of 18 U.S.C. § 1005 as to each Subject Deal, the Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## CLAIM V: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FALSE STATEMENTS MADE TO INFLUENCE THE ACTIONS OF A COVERED FINANCIAL INSTITUTION
### (12 U.S.C. § 1833a; 18 U.S.C. § 1014)

826.    The allegations set forth above in paragraphs one through 791 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

827.    In connection with each Subject Deal, all of the Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1014 for which they are subject to a civil penalty, when they knowingly made false statements and reports to one or more financial institutions covered by that statute, for the purpose of influencing the action of such institutions with respect to, (1) the advance of funds by the covered institution to RMBS trusts for the Subject Deals in exchange for RMBS Certificates, and (2) the purchase of RMBS Certificates in the Subject Deals.

828.     In connection with each Subject Deal, the Defendants' violations of 18 U.S.C. § 1014 actually and proximately resulted in pecuniary loss to one or more persons other than the Defendants.

829.     In connection with each Subject Deal, the Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1014.

830.     For each violation of 18 U.S.C. § 1014 as to each Subject Deal, the Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

\* \* \*

831.     The Tables attached as appendices are fully incorporated into this Complaint, and the statements, descriptions, data, and other facts described in those Tables are alleged as if fully set forth in the body of the Complaint.

WHEREFORE, the United States requests judgment against all Defendants for the maximum penalty allowed under FIRREA, 12 U.S.C. § 1833a(b), together with pre-judgment and post-judgment interest, all allowable costs and attorneys' fees, and any other relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

The United States respectfully demands a jury trial for all issues so triable.

Dated:  Brooklyn, New York
       November 8, 2018

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

By:    _Bonni J. Perlin_

BONNI J. PERLIN
MICHAEL J. CASTIGLIONE
RICHARD K. HAYES
Assistant United States Attorneys
Eastern District of New York
(718) 254-7000

BYUNG J. PAK
United States Attorney
Northern District of Georgia
Richard B. Russell Federal Building
75 Ted Turner Dr., SW, Suite 600
Atlanta, Georgia 30303

By:    _Armen Adzhemyan_

ARMEN ADZHEMYAN
AUSTIN M. HALL
Assistant United States Attorneys
Northern District of Georgia
(404) 581-6000

*United States* v. *UBS*
Complaint
Page 202