UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>UBS SECURITIES LLC, UBS AG,<br>MORTGAGE ASSET SECURITIZATION<br>TRANSACTIONS, INC., and UBS REAL<br>ESTATE SECURITIES, INC.,<br><br>                    Defendants. | Case No. 18-cv-6369 |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS THE COMPLAINT**

Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
Amanda F. Davidoff (*davidoffa@sullcrom.com*)
Justin J. DeCamp (*decampj@sullcrom.com*)
Jacob M. Croke (*crokej@sullcrom.com*)
Hilary M. Williams (*williamsh@sullcrom.com*)
Harry F. Murphy (*murphyh@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for UBS Securities LLC, UBS AG,
Mortgage Asset Securitization Transactions,
Inc., and UBS Real Estate Securities, Inc.*

February 6, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................. 1

ALLEGATIONS OF THE COMPLAINT .......................................................... 1

    A.    The Defendants ............................................................................... 9

    B.    The Growth of the Market for Non-Traditional Home Mortgage Loans ............ 10

    C.    The Mortgage Securitization Process .................................................. 12

    D.    The 40 RMBS ................................................................................ 14

    E.    UBS Structured the 40 RMBS Using Credit Enhancements To Protect Against Investor Losses ................................................................. 15

    F.    UBS Conducted Extensive Due Diligence on Loans Backing the 40 RMBS ...................................................................... 16

        1.    UBS Hired Independent Due Diligence Firms To Perform "Credit and Compliance" Due Diligence To Confirm the Accuracy of Representations in the Offering Documents ............................................ 16

        2.    For Principal RMBS, UBS Also Performed "Valuation Due Diligence" .............................................................................. 19

    G.    UBS Provided Extensive Disclosures and Warnings Regarding the Risks of the Non-Traditional Mortgages Backing the 40 RMBS ................................ 20

    H.    As the Housing Market Deteriorated, UBS Enhanced Its Risk Warnings .......... 22

    I.    UBS Invested in the 40 RMBS and Lost Billions of Dollars Alongside Its Investors When the Housing Market Crashed ..................................... 23

    J.    Plaintiff's Investigation and Claims Under FIRREA ......................................... 24

LEGAL STANDARD ....................................................................................... 27

ARGUMENT ................................................................................................... 28

I.    THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS ACTED WITH SCIENTER IN MAKING THE ALLEGED MISREPRESENTATIONS ................................................................. 28

    A.    The Complaint Does Not Identify Any UBS Employees Responsible for the Alleged Misrepresentations Who Acted With Scienter ................................ 29

    B.    The Complaint's Allegations of Motive Fail as a Matter of Law, and Plaintiff Fails To Plead Opportunity Altogether .................................... 34

        1.    The Complaint Alleges No Cognizable Motive ...................................... 34

        2.    The Complaint Does Not Allege That UBS Had Any Opportunity To Commit Fraud ................................................................. 37

C.     The Complaint Fails To Plead Correspondingly Stronger Circumstantial Allegations of "Deliberate Illegal Behavior" ..................................... 38

    1.     The Facts Alleged, and Documents Incorporated, in the Complaint Refute Any Inference of Scienter ........................................... 38

    2.     The Complaint Does Not Plead That UBS Engaged in Deliberate Illegal Behavior by Formulaically Reciting Due Diligence Results and Quoting From Cherry-Picked Emails ................................. 42

        a.     Plaintiff's Alleged "EV3 Rates" Do Not Distinguish Between Allegedly "Defective" and "Non-Defective" Loans ........................... 44

        b.     EV3 Rates Apply Only to Sampled Loans—Not Entire RMBS ......................................................... 46

        c.     Plaintiff's Allegations Based on Valuation Due Diligence Fail To Show That UBS Knew Any Valuations Were Inflated ............................................... 49

        d.     Plaintiff's Out-of-Context Quotes From Cherry-Picked Emails Do Not Support a Strong Inference of Fraudulent Intent as to Any of the 40 RMBS ................................. 50

D.     Plaintiff Fails To Allege That UBS Contemplated Harm to RMBS Investors as a Result of Its Alleged Scheme ........................................ 51

II.     THE COMPLAINT DOES NOT PLEAD THE PREDICATE OFFENSES OF BANK FRAUD, FRAUDULENT BANK TRANSACTIONS, AND FALSE STATEMENTS TO BANKS ..................................................... 53

A.     The Complaint Does Not Plead the Predicate Offense of Bank Fraud (18 U.S.C. § 1344) ............................................................... 54

B.     The Complaint Does Not Plead the Predicate Offense of Participating in Fraudulent Bank Transactions (18 U.S.C. § 1005) ............................... 56

C.     The Complaint Does Not Plead the Predicate Offense of Making False Statements to Banks (18 U.S.C. § 1014) ........................................... 59

III.     THE COMPLAINT DOES NOT PLEAD PERSONAL JURISDICTION OVER UBS AG OR FACTS SUFFICIENT TO STATE ANY CLAIM AGAINST UBS AG ................................................................... 61

CONCLUSION ....................................................................... 63

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re Advanced Battery Techs., Inc.*,
    781 F.3d 638 (2d Cir. 2015)...................................................................................52

*Alnwick* v. *European Micro Holdings, Inc.*,
    281 F. Supp. 2d 629 (E.D.N.Y. 2003) ...................................................................63

*Altayyar* v. *Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................41

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)........................................................................................27, 55

*Atlantic Gypsum Co.* v. *Lloyds Intern Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990) .......................................................................36

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...............................................................................................55

*Bristol-Meyers Squibb Co.* v. *Superior Ct. of Cal.*,
    137 S. Ct. 1773 (2017)...........................................................................................61

*Brotherhood of R.R. Trainmen* v. *Baltimore & O.R. Co.*,
    331 U.S. 519 (1947)...............................................................................................60

*Burger King Corp.* v. *Rudzewicz*,
    471 U.S. 462 (1985).........................................................................................61, 62

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)...............................................................................4, 36

*Crandon* v. *United States*,
    494 U.S. 158 (1990)...............................................................................................58

*D'Alessio* v. *New York Stock Exch., Inc.*,
    258 F.3d 93 (2d Cir. 2001).....................................................................................25

*Daimler AG* v. *Bauman*,
    571 U.S. 117 (2014)...............................................................................................61

*Dep't of Revenue of Oregon* v. *ACF Indus., Inc.*,
    510 U.S. 332 (1994)...............................................................................................58

*Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC N. Am. Holdings, Inc.*,
  2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ........................................46

*Fadem* v. *Ford Motor Co.*,
  352 F. Supp. 2d 501 (S.D.N.Y. 2005)...................................................39

*Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017)...................................................................3

*Fogel* v. *Wall-Mart de Mexico SAB de CV*,
  2017 WL 751155 (S.D.N.Y. Feb. 27, 2017).........................................31

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)......................................39

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
  2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013).........................................9

*Glassman* v. *Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996).................................................................28

*Glazer Capital Mgmt., L.P.* v. *Magistri*,
  549 F.3d 736 (9th Cir. 2008) ..............................................................33

*Gould* v. *Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012)................................................5, 28, 38, 42

*GSC Partners CDO Fund* v. *Washington*,
  368 F.3d 228 (3d Cir. 2004)................................................................36

*Gustafson* v. *Alloyd Co., Inc.*,
  513 U.S. 561 (1995)............................................................................60

*Helicopteros Nacionales de Columbia, S.A.* v. *Hall*,
  466 U.S. 408 (1984)............................................................................63

*Jovel* v. *i-Health, Inc.*,
  2013 WL 5437065 (E.D.N.Y. Sept. 27, 2013) ...................27, 30, 31, 56

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)................................................................35

*Kleinman* v. *Elan Corp., PLC*,
  706 F.3d 145 (2d Cir. 2013)..................................................................9

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
  478 F. App'x 679 (2d Cir. 2012) ........................................................34

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)......................................................................7, 28, 52

*Loughrin* v. *United States*,
   573 U.S. 351 (2014).................................................................................8, 54, 55

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ........................................................................32, 33

*Mariah Re Ltd.* v. *Am. Family Mut. Ins. Co.*,
   52 F. Supp. 3d 601 (S.D.N.Y. 2014)...................................................................48

*MassMutual Life Ins. Co.* v. *DB Structured Prods., Inc.*,
   110 F. Supp. 3d 288 (D. Mass. 2015) .............................................................45, 48

*Matana* v. *Merkin*,
   2014 WL 426857 (S.D.N.Y. Feb. 4, 2014)...........................................................53

*MLSMK Inv. Co.* v. *JP Morgan Chase & Co.*,
   737 F. Supp. 2d 137 (S.D.N.Y. 2010)..................................................................34

*In re MRU Holdings Secs. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011)..................................................................35

*Nat'l Credit Union Admin. Bd.* v. *UBS Sec., LLC*,
   2017 WL 411338 (D. Kan. Jan. 31, 2017).............................................................45

*Nelson* v. *Publishers Circulation Fulfillment, Inc.*,
   2012 WL 760335 (S.D.N.Y. Mar. 7, 2012) ...........................................................39

*O'Brien* v. *Nat'l Prop. Analysts Partners*,
   936 F.2d 674 (2d Cir. 1991)...............................................................................28

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) .............................................................................33

*Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)...............................................................................27

*Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund* v. *Conseco Inc.*,
   2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ...................................................31, 32

*Powers* v. *British Vita, PLC*,
   57 F.3d 176 (2d Cir. 1995)......................................................................... *passim*

*Prus* v. *Holder*,
   660 F.3d 144 (2d Cir. 2011)...............................................................................59

*In re PXRE Grp., Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................41

*Schonfeld* v. *Hilliard*,
    218 F.3d 164 (2d Cir. 2000)..............................................................................49

*Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*,
    729 F. App'x 55 (2d Cir. 2018) ........................................................................32

*Shaw* v. *United States*,
    137 S. Ct. 462 (2016)......................................................................................55

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..........................................................35, 36, 37, 39

*Spiteri* v. *Russo*,
    2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013) ......................................................27

*Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................................................33

*SPV Opus Ltd.* v. *UBS AG*,
    882 F.3d 333 (2d Cir. 2018)........................................................................61, 62

*Starr Int'l Co.* v. *Fed. Reserve Bank of New York*,
    906 F. Supp. 2d 202 (S.D.N.Y. 2012)..................................................................9

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)..............................................................................52

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)................................................................. *passim*

*Thomas* v. *Ashcroft*,
    470 F.3d 491 (2d Cir. 2006)..............................................................................61

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)......................................4, 36, 37, 53

*Union Cent. Life Ins. Co.* v. *Credit Suisse Secs. (USA), LLC*,
    2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013) ................................................34, 35

*United States* v. *Autuori*,
    212 F.3d 105 (2d Cir. 2000)..............................................................................27

*United States* v. *Barclays Capital Inc.*,
    No. 16-cv-7057 (E.D.N.Y. 2016) ................................................................18, 29

*United States* v. *Barel*,
    939 F.2d 26 (3d Cir. 1991) ................................................................ 57, 59

*United States* v. *Boren*,
    278 F.3d 911 (9th Cir. 2002) ................................................................ 59

*United States* v. *Bouchard*,
    828 F.3d 116 (2d Cir. 2016) .......................................................... 7, 27, 55

*United States* v. *Devoll*,
    39 F.3d 575 (5th Cir. 1994) ................................................................ 60

*United States* v. *Edick*,
    432 F.2d 350 (4th Cir. 1970) ................................................................ 57

*United States* v. *Edwards*,
    566 F. Supp. 1219 (D. Conn. 1983) ...................................................... 57, 58

*United States* v. *Guadagna*,
    183 F.3d 122 (2d Cir. 1999) ................................................................ 52

*United States* v. *Krilich*,
    159 F.3d 1020 (7th Cir. 1998) .............................................................. 59

*United States* v. *Krown*,
    675 F.2d 46 (2d Cir. 1982) ............................................................ 59, 60

*United States* v. *Ortiz*,
    906 F. Supp. 140 (E.D.N.Y. 1995) ...................................................... 57, 58

*United States* v. *Philip Morris USA, Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ...................................................... 5, 30, 33

*United States* v. *Rigas*,
    490 F.3d 208 (2d Cir. 2007) ................................................................ 55

*United States* v. *Rubin/Chambers, Dunhill Ins. Servs.*,
    798 F. Supp. 2d 517 (S.D.N.Y. 2011) .............................................. 8, 58, 59

*United States* v. *Smith*,
    29 F.3d 914 (4th Cir. 1994) ................................................................ 59

*United States* v. *Starr*,
    816 F.2d 94 (2d Cir. 1987) ................................................................ 52

*United States* v. *Stavroulakis*,
    952 F.2d 686 (2d Cir. 1992) ................................................................ 54

*United States* v. *Van Brocklin*,
  115 F.3d 587 (8th Cir. 1997) .................................................................................58

*United States* v. *Wade*,
  266 F.3d 574 (6th Cir. 2001) .................................................................................59

*United States* v. *Wells Fargo Bank, N.A.*,
  972 F. Supp. 2d 593 (S.D.N.Y. 2013).....................................................................58

*Utah* v. *Evans*,
  536 U.S. 452 (2002)..................................................................................................47

*Vining* v. *Oppenheimer Holdings Inc.*,
  2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010).........................................................35

*Vladimir* v. *Deloitte & Touche LLP*,
  1997 WL 151330 (S.D.N.Y. Mar. 31, 1997) ..........................................................28

*Walden* v. *Fiore*,
  571 U.S. 277 (2014)..................................................................................................61

*Waldman* v. *Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016).....................................................................................62

*Williams* v. *United States*,
  458 U.S. 279 (1982).......................................................................................8, 59, 60

## Statutes and Rules

12 U.S.C. § 1833a ................................................................................... *passim*

18 U.S.C. §§ 1005, 1014, 1341, 1343, 1344.............................................. *passim*

40 Stat. 972, § 5209,
  65 Cong. Sess. II, Ch. 177 (1918) ...........................................................................57

62 Stat. 750, § 1005,
  80th Cong. Sess. II, Ch. 645 (1948).........................................................................57

Fed. R. Civ. P. 9(b), 12(b)(2), 12(b)(6), 26.............................................. *passim*

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
  Public Law No. 101-73, 103 Stat. 183 (1989) ........................................................58

Title XIII of the Housing and Community Dev. Act of 1992,
  Public Law 102-550, 106 Stat. 3672, 3970 H.R. 5334 (October 28, 1992) ............11

**Other Authorities**

Asset-Backed Securities, Securities Act and Exchange Act Release Nos. 33-8518, 34-50905,
    70 Fed. Reg. 1506 (Jan. 7, 2005) .............................................................................................10

Dep't of Housing and Urban Dev., HUD's Housing Goals,
    69 Fed. Reg. 63,580 (Nov. 2, 2004)................................................................................11, 12

H.R. Rep. No. 91-1457 (1970)........................................................................................................61

H.R. Rep. No. 101-54 (1989)..........................................................................................................24

S. Rep. No. 88-1078 (1964)............................................................................................................61

Pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, UBS Securities LLC, UBS AG, Mortgage Asset Securitization Transactions, Inc., and UBS Real Estate Securities, Inc., (collectively, "Defendants" or "UBS") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint with prejudice.[1]

## PRELIMINARY STATEMENT

This is not the typical fraud complaint. To state a claim under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, Plaintiff must plead that one or more employees of Defendants engaged in predicate crimes of fraud against banks and the banking system. But no law enforcement agency—including the Criminal Division of the Department of Justice ("DOJ")—has ever charged any of Defendants or their employees with a crime related to residential mortgage-backed securities ("RMBS"). In fact, no law enforcement agency has ever brought even a civil claim over RMBS against any of Defendants' employees, *including in this action*. In its 202-page Complaint, Plaintiff does *not* identify any of Defendants' employees, even one, who had the requisite fraudulent intent, even though DOJ policy prioritizes "[h]olding individuals who perpetrate wrongdoing accountable."[2]

Instead of pleading that any UBS employee intentionally committed fraud, Plaintiff has sued four separate UBS entities, which Plaintiff impermissibly lumps together as "UBS."

---

[1] The Complaint does not allege that any Defendant should be held liable for the actions of any other Defendant (*i.e.*, there are no veil-piercing allegations). For purposes of this Motion only, Defendants adopt the Complaint's convention of referring to the four Defendant entities collectively as "UBS," except where necessary to Defendants' arguments.

[2] Justice Manual, 4-3.100 – Pursuit of Claims Against Individuals, *available at* https://www.justice.gov/jm/jm-4-3000-compromising-and-closing; *see* Justice Manual, 9-28.210 – Focus on Individual Wrongdoers, *available at* https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations ("[b]ecause a corporation can only act through individuals," the "[p]rosecution of a corporation is not a substitute for the prosecution of criminally culpable individuals within" a corporation).

Plaintiff claims that these entities engaged in a complex fraud scheme in connection with 40 separate RMBS offerings (the "40 RMBS") issued in 2006 and 2007—12 to 13 years ago. In Plaintiff's telling, these four entities deliberately packaged $41 billion of residential mortgage loans that "UBS knew" were "defective" into the 40 RMBS. (Compl. ¶¶ 2, 12 n. 2, 13.) Plaintiff alleges that UBS "anticipated" that these loans would "default at exceptionally high rates," but still put those loans into the 40 RMBS, which UBS then sold to some of the world's most sophisticated investors or kept for its own account. (Compl. ¶¶ 3, 296.)

Plaintiff has had many years to find culpable UBS employees. Prior to filing its Complaint, Plaintiff spent more than four years investigating UBS's RMBS business under FIRREA. Plaintiff subpoenaed more than 90 million pages of documents from UBS, including all emails, regardless of subject matter, from dozens of UBS employees over a four-year period, and Plaintiff took sworn testimony from 22 witnesses who worked in UBS's RMBS business during 2006 and 2007. From this massive record, Plaintiff has culled a few colorful comments in a handful of emails, none of which suggest that any UBS employee, or anyone else, believed that UBS's representations about the 40 RMBS were false. To the contrary, the Complaint makes clear that Plaintiff's lengthy investigation yielded no evidence that any employee of any of the four corporate Defendants intended to defraud the sophisticated investors in any of the 40 RMBS.

Unable to plead fraud by any UBS employee, the Complaint impermissibly tries to plead "collective scienter" for all four Defendants. To do so, Plaintiff relies on the percentages of loans graded "EV3"—the supposed rate of "defective" loans in the RMBS—by independent due diligence firms hired by UBS to review samples of the mortgage loans backing each of the 40 RMBS. But Plaintiff's critiques of UBS's due diligence amount to nothing more than a flawed attempt to plead "fraud-by-formula," *i.e.*, Plaintiff simply recites due diligence results and

concludes that UBS committed fraud.  In doing so, Plaintiff seeks to repurpose for use in this FIRREA action—which requires the pleading of intentional criminal acts—a formulaic theory of negligence based on EV3 rates developed by civil plaintiffs suing, not for fraud, but under the *strict liability* provisions of the Securities Act of 1933 and various state securities laws.  *See*, *e.g.*, *Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017).[3]  But this FIRREA action is not a negligence, much less a strict liability, case.  Here, Plaintiff must plead—with the specificity required for a fraud claim—that one or more employees of Defendants intentionally committed fraud.  Plaintiff has not come close to meeting its pleading burden.

Beyond failing to identify even one culpable UBS employee, Plaintiff posits an inherently implausible theory that UBS knowingly purchased and securitized "defective" home mortgages, exposing itself to the risk of substantial losses on retained RMBS certificates and ultimately the destruction of its RMBS business.  Indeed, during the historic 2007-2008 U.S. housing market crash, UBS and its shareholders lost more money on mortgage-related securities than almost any other bank—*$45 billion* in total, including in the 40 RMBS—and UBS's RMBS business was shut down.  By Plaintiff's logic, UBS *intentionally*—and irrationally—created this existential crisis for itself and its shareholders.

This is not the first time that a plaintiff has attempted to plead such an implausible fraud theory against UBS, nor is it the first time courts in this Circuit have assessed such a theory on a motion to dismiss.  Following UBS's massive mortgage-related losses, UBS's share price plummeted from $65.15 to $18.90 (71%)—a $115 billion decline in UBS's market capitalization.

---

[3]      In those cases, plaintiffs had to prove only a material misrepresentation (*not*, as here, fraudulent intent), in response to which defendants could assert a "due diligence" defense—*i.e.*, that they had conducted a reasonable review of the loans backing the RMBS, which Plaintiffs could overcome by showing that defendants' due diligence was *negligent*.

In May 2009, seizing on this enormous stock drop, plaintiffs filed a 548-page complaint against UBS in one of the largest-ever securities fraud class actions.  Like Plaintiff here, those plaintiffs alleged that UBS "knew" in 2006 and 2007 that "the quality of subprime and Alt-A mortgages was deteriorating at an unprecedented pace," resulting in the overvaluation of UBS's $100 billion mortgage-backed portfolio.  (Am. Compl. ¶ 58, *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (S.D.N.Y. May 8, 2009), ECF No. 102.)  In support of their claims, those plaintiffs cited numerous internal UBS documents and purported confidential witnesses.  (*See*, *e.g.*, *id.* at ¶¶ 58, 87, 89.)  But in September 2012, Judge Sullivan dismissed that complaint with prejudice, rejecting plaintiffs' theory that UBS knowingly bought overvalued securities backed by defective mortgages as defying "economic reason" and "common sense."  *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *12 (S.D.N.Y. Sept. 28, 2012).  In May 2014, the Second Circuit affirmed.  *City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014) (Cabranes, Hall, Chin, JJ.).

As detailed below, the Complaint here should meet the same fate.

***1.   The Complaint does not plead facts giving rise to the required "strong inference" that any UBS entity or employee acted with fraudulent intent in making alleged misrepresentations to investors.***  To plead fraudulent intent against a corporate defendant, Plaintiff must allege facts "creat[ing] a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Here, the Complaint does not identify, as it must to survive this motion:  (1) any UBS employees who received the due diligence results underlying Plaintiff's claims; (2) what those employees understood the due diligence results to mean; (3) any employees responsible for making the purported misrepresentations to investors;

(4) whether any of those employees intended economic harm to any investors; or (5) which of the four Defendants employed any such individuals.  In sum, the Complaint fails to adequately allege scienter because it does not identify any employees who "made, ordered, or approved the statement," or allege that those employees acted with scienter.  *United States* v. *Philip Morris USA, Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009).

As the Second Circuit has held, Plaintiff must plead facts to support the required "strong inference" of fraudulent intent through allegations of "motive for committing fraud and a clear opportunity for doing so," *Powers* v. *British Vita, PLC*, 57 F.3d 176, 184 (2d Cir. 1995), or through circumstantial allegations of "deliberate illegal behavior," *Gould* v. *Winstar Commc'ns, Inc.,* 692 F.3d 148, 158 (2d Cir. 2012).  Plaintiff offers two motives—UBS's desire to make "handsome profits" and to maintain business relationships—that, as a matter of Second Circuit law, are too generalized to raise the required strong inference.  (Compl. ¶ 27.)  In fact, the Complaint's allegations show that Defendants had a strong motive *not* to commit the alleged fraud: Thus, just as in the 548-page securities class action complaint dismissed by Judge Sullivan and the Second Circuit, Plaintiff here presumes a fraud scheme defying "economic reason" and "common sense," where UBS deliberately shot itself in the foot by securitizing "defective loans," while at the same time investing in those and other RMBS (including the riskiest "residual" pieces of many of the 40 RMBS) and *agreeing to buy back* any loans that did not meet UBS's representations.

Without any coherent motive or opportunity for the alleged fraud, Plaintiff tries to plead deliberate illegal conduct by impermissibly relying on fraud-by-formula.  The "deal-specific" sections of the Complaint make nearly the same conclusory allegations for each RMBS offering.  (*See* Compl. ¶¶ 306-791.)  Specifically, the Complaint mechanically (i) recites "EV3" rates for samples of loans backing the 40 RMBS; (ii) presumes that every EV3 loan was

"defective"; and (iii) concludes that the EV3 rates "indicat[ed]" or "signaled" to UBS that the remaining loans in the pool were defective.  (*E.g.*, Compl. ¶¶ 309, 312.)  Then, Plaintiff simply concludes for each of the 40 RMBS that "UBS"—without ever identifying any UBS employee—"knew" that a "significant number of loans" backing each of the 40 RMBS were "defective." (*E.g.*, Compl. ¶ 316.)

But Plaintiff's formula fails because the Complaint alleges that:  (1) loans graded EV3 were *not* uniformly "defective" and included loans with only missing documents or other curable "defects"; (2) many of the loans reviewed in due diligence were "adversely selected" and thus likely to have significantly higher "EV3" rates than the remainder of the loan pool; *and* (3) UBS *kicked out* all loans with final grades of EV3.  (*See* Compl. ¶¶ 80, 156, 161, tbls. 3a, 3b.)  The Complaint thus overstates whatever "signals" unnamed UBS employees purportedly could have received from due diligence results.

The Complaint's other allegations further contradict Plaintiff's theory that UBS intended to deceive and harm the sophisticated investors in the 40 RMBS, including UBS itself.  For example, the Complaint concedes that during due diligence UBS reviewed more than 48,000 loans—*including 100% of the loans* in 11 of the loan pools backing the 40 RMBS—and kicked out more than 6,500 of those loans (nearly 14%), even though doing so was "costly," "unprofitable," and "unpalatable" for the loan originators whom UBS allegedly was trying to "[a]ppeas[e]."  (Compl. ¶¶ 20, 21, 59, 174, 398, 400, 406-407, 426, tbls. 3a, 3b.)  And the disclosures that Plaintiff claims were designed to defraud investors actually *warned* that the loans backing the 40 RMBS were made using underwriting guidelines that made "delinquencies and liquidation proceedings . . . more likely," that mortgage originators were permitted to make

"exceptions" to those underwriting guidelines (Ex. 1 at S-27, S-46[4]), that a "decline in real estate values or in economic conditions generally could increase the rates of delinquencies, foreclosures and losses," and that investors could suffer significant losses (Ex. 2 at S-20).

In the face of the Complaint's contradictory allegations, UBS's $45 billion in mortgage-related losses, and the lack of any coherent motive for the alleged fraud, the far more "cogent" and "compelling" inference is that UBS—like regulators, most market analysts, and many other sophisticated investors—was blindsided by the historic collapse of U.S. home prices and resulting losses in the 40 RMBS. *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 177-178 (2d Cir. 2015). At most, the Complaint alleges that UBS should have done better due diligence—not, as required to bring this FIRREA action, that UBS intentionally violated criminal fraud statutes.

**2.  *Plaintiff cannot base its FIRREA claims on bank fraud (18 U.S.C. § 1344) and other provisions criminalizing false statements to banks (18 U.S.C. §§ 1005 and 1014) because those claims are not directly related to the banking system.*** In addition to failing to allege scienter, Plaintiff's claims predicated on bank fraud (18 U.S.C. § 1344), 18 U.S.C. § 1005, and 18 U.S.C. § 1014 should be dismissed because those statutes do not apply to sales of publicly offered securities, such as the 40 RMBS. The Second Circuit has instructed that Section 1344 "should not be read to 'federaliz[e] frauds that are only tangentially related to the banking system,'" as Plaintiff seeks to do here by alleging that the bank fraud statute applies to sales of securities to the public. *United States* v. *Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (quoting

---

[4]     Citations to "Ex. _" refer to the accompanying declaration of Robert J. Giuffra, Jr., dated February 6, 2019. Each prospectus supplement cited in this brief is a prospectus supplement for one of the 40 RMBS, filed with the Securities and Exchange Commission ("SEC"). All emails cited in this brief are incorporated by reference into the Complaint, as described in the Declaration of Robert J. Giuffra, Jr., dated February 6, 2019.

*Loughrin* v. *United States*, 573 U.S. 351, 362 (2014)).  Similarly, Section 1005, which prohibits participation in fraudulent bank transactions, "applies only to bank insiders," not to sellers of RMBS or other securities.  *United States* v. *Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 524 (S.D.N.Y. 2011).  Finally, Section 1014 applies only to false statements in connection with traditional customer-facing banking activities, not sales of RMBS.  *See Williams* v. *United States*, 458 U.S. 279, 288-90 (1982) (Section 1014 applies "narrow[ly]" to "representations made in connection with conventional loan or related transactions").

3. ***The Complaint does not plead personal jurisdiction or any claim against UBS AG.***  As to UBS AG, a Swiss company that the Second Circuit has held is not subject to general jurisdiction in New York, the Complaint alleges only that UBS AG:  (i) entered into certain financing agreements (none of which is alleged to be fraudulent) in connection with some of the 40 RMBS; and (ii) through its Tampa Branch *in Florida* (not New York, as required to establish personal jurisdiction in this State), originated some mortgages that were securitized in two of the 40 RMBS.  (Compl. ¶ 35.)  The Complaint does not allege that UBS AG was involved in structuring, marketing, or selling any of the 40 RMBS.  Accordingly, the Complaint states no claim against, and no basis for jurisdiction over, UBS AG.

\*     \*     \*

Because Plaintiff already has extensively investigated UBS concerning the 40 RMBS and has failed to state a claim, there is no reason to believe any amendment would cure the defects in the Complaint.  Accordingly, UBS respectfully requests that this Court dismiss the Complaint with prejudice.

## ALLEGATIONS OF THE COMPLAINT[5]

### A.     The Defendants

Plaintiff brings this action against four separate corporate entities, which Plaintiff collectively refers to as "UBS":

- ***UBS Securities LLC ("UBS Securities").***  UBS Securities is a New York-based securities broker-dealer.  (Compl. ¶ 34.)  As lead underwriter for the 40 RMBS, UBS Securities sold the RMBS certificates to investors.  (Compl. ¶ 34.)

- ***UBS AG.***  UBS AG is a Switzerland-based financial services firm.  (Compl. ¶ 35.)  The Complaint does not allege that UBS AG was involved in structuring, marketing, or selling the 40 RMBS.  UBS AG's Tampa Branch, based in Florida, originated some of the loans that were included in just two of the 40 RMBS.  (Compl. ¶¶ 563-564, 581-582.)

- ***Mortgage Asset Securitization Transactions, Inc. ("MASTR").***  MASTR is a New York-based limited-purpose entity whose sole business was securitizing mortgages.  (Ex. 1 at S-51.)  MASTR filed offering documents with the SEC for certain of the 40 RMBS offerings.  (Compl. ¶ 36.)

- ***UBS Real Estate Securities, Inc. ("UBS RESI").***  UBS RESI is a New York-based corporation whose primary business was purchasing from originators and securitizing

---

[5]     In addition to the Complaint and documents incorporated by reference therein (which include all offering documents for the 40 RMBS), this section is based on facts of which the Court may take judicial notice, including documents filed with the SEC, documents published in the Federal Register, and publicly available materials describing the mortgage market, which are necessary historical context for the Complaint's allegations.  *See Kleinman* v. *Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013) (judicial notice of "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) (judicial notice of "contents of the Federal Register and Code of Federal Regulations," "agency letters, policy and guidance documents, websites, and other agency data made available to the public"); *Starr Int'l Co.* v. *Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202, 205 n.1 (S.D.N.Y. 2012) (judicial notice of "events constituting the financial crisis that occurred in fall 2008" for context, "because the Court may take judicial notice of indisputable historical events").

home mortgages into RMBS, including certain of the 40 RMBS offerings.  (Compl. ¶¶ 37, 66, 88.)

**B.    The Growth of the Market for Non-Traditional Home Mortgage Loans**

RMBS were "securities backed by residential mortgage loans."  (Compl. ¶ 42.) Lenders, also known as "originators," provided mortgages to borrowers to buy homes or to refinance existing residential mortgages.  (Compl. ¶ 43.)  Borrowers promised to repay the original mortgage amount (the "principal") plus interest.  (Compl. ¶ 43.)  Originators used "underwriting guidelines" to determine whether borrowers qualified for mortgages.  (Compl. ¶ 46.)

For most of the 20th century, originators, typically banks and savings-and-loans, held the mortgages they originated and collected principal and interest payments from borrowers. (Compl. ¶ 50.)   In 1970, the U.S. Government (through the Government National Mortgage Association ("Ginnie Mae")) and government-sponsored entities (Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "GSEs")) began to purchase mortgages from originators and issue RMBS backed by those mortgages.[6]  In the 1980s, private entities followed suit.[7]  These purchases provided capital to originators to make additional loans, allowing more people to buy homes.  (Compl. ¶¶ 54-55.)

Traditionally, originators' underwriting guidelines permitted only "prime" mortgage loans "made to borrowers with good credit, who fully documented their income and ma[de] traditional down payments."[8]  Starting in 1992, the U.S. Government began encouraging

---

[6]    *See* Asset-Backed Securities, Securities Act and Exchange Act Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1506, 1510 n.45 (Jan. 7, 2005).

[7]    *See* Dep't of Housing and Urban Dev., *The Secondary Market in Residential Mortgages* (1982), at 8, 16-17, *available at* https://www.huduser.gov/Publications/pdf/HUD-11648.pdf.

[8]    Gene Amromin & Anna L. Paulson, Federal Reserve Bank of Chicago, *Default Rates on Prime and Subprime Mortgages:  Differences and Similarities* (Sept. 2010), at 1, *available*

the use of "non-traditional" underwriting guidelines to promote homeownership.   Congress directed the Department of Housing and Urban Development ("HUD") "to establish an annual goal for the purchase by" the GSEs of "mortgages on housing for low- and moderate-income families," and to study "the implications of implementing underwriting standards that" allowed down payments "of 5 percent or less" and "approve[d] borrowers who have a credit history of delinquencies."[9]   These new "more flexible underwriting standards" were intended to help borrowers who traditionally would not have qualified for mortgages to purchase homes.[10]

As a result of government policies, two types of non-traditional mortgages developed:  "subprime" and "Alt-A."  "Subprime" mortgages were loans to borrowers with "weakened credit histories," including "payment delinquencies" and "possibly more severe problems such as charge-offs, judgments, and bankruptcies," who sometimes "display[ed] reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria."[11]  "Alt-A" mortgages were loans to borrowers with "limited or low documentation" of income or assets, "unstable income sources," and "higher loan-to-value-ratios."[12]  The GSEs promoted subprime and Alt-A mortgages by purchasing them and by issuing and purchasing RMBS backed by them,

---

*at* https://www.chicagofed.org/publications/profitwise-news-and-views/2010/pnv-september2010.

[9]   Title XIII of the Housing and Community Dev. Act of 1992, Public Law 102-550, 106 Stat. 3672, 3956, 3970, H.R. 5334, enacted October 28, 1992.

[10]   Dep't of Housing and Urban Dev., HUD's Housing Goals, 69 Fed. Reg. 63,580, 63,741 (Nov. 2, 2004) (hereinafter "HUD's Housing Goals").

[11]   *Expanded Guidance for Subprime Lending Programs* (Jan. 31, 2001), *available at* https://www.fdic.gov/news/news/press/2001/pr0901a.html.

[12]   SEC, Staff Report:  Enhancing Disclosure in the Mortgage-Backed Securities Markets (Jan. 2003), *available at* https://www.sec.gov/news/studies/mortgagebacked.htm.

in part to meet HUD's Housing Goals.[13]  As access to subprime and Alt-A mortgages increased, so did home prices, which rose every year from 1992 to 2006.[14]  By the mid-2000s, the U.S. Government's promotion of homeownership had led to record levels of homeownership.[15]

### C.      The Mortgage Securitization Process

The process through which home mortgages were securitized into RMBS—a key part of the U.S. Government's strategy for increasing homeownership—is shown in Figure 1.



(*See* Ex. 3 at S-9.)

---

[13]      HUD's Housing Goals at 63,670-71 (describing GSEs' purchase and securitization of billions of dollars of subprime and Alt-A mortgages and RMBS backed by such mortgages).

[14]      *See*   S&P/Case-Shiller   U.S.   National   Home   Price   Index,   *available at* https://fred.stlouisfed.org/series/CSUSHPINSA?utm_source=series_page&utm_medium=related_content&utm_term=related_resources&utm_campaign=categories.

[15]      HUD's Housing Goals at 63,585 ("Thus, the 1990s and the early [2000s] have seen the development of a strong affordable lending market.  Homeownership statistics show similar trends. After declining during the 1980s, the homeownership rate has increased every year since 1994, reaching a record mark of 69.2 percent in the second quarter of 2004.").

An RMBS "sponsor," typically a bank or mortgage lender, obtained mortgages either by originating them or purchasing them from originators. (*See* Compl. ¶ 66 n.7.) To create an RMBS, the sponsor would then sell the loans to a "depositor" (often an affiliate of the sponsor), which would in turn transfer the loans to a trust. (*See* Compl. ¶ 66.) The sponsor and depositor would enter into a Pooling and Servicing Agreement ("PSA") with a "trustee" responsible for managing the RMBS trust.[16] (Compl. ¶ 70.) In the PSA, which was filed publicly with the SEC, the sponsor would make contractual representations to the trust, often including that the loans were "underwritten in accordance with the underwriting guidelines" of the originator with "exceptions thereto exercised in a reasonable manner." (*See*, *e.g.*, Ex. 3 at S-87-90.) In the event of a breach of a representation, the sponsor typically would be required to "cure" the breach by "substituting" a non-breaching loan or "repurchas[ing]" the breaching loan from the trust. (Ex. 4, § 2.03 and Schedule II.) The trustee was responsible for enforcing the PSA, including the sponsor's obligation to cure such breaches. (*Id.* § 2.03 ("The Trustee shall enforce the obligations of the Transferor . . . to correct or cure any such breach of a representation or warranty . . . ."); Compl. ¶ 68.)

The trust would issue certificates entitling the holder to monthly principal and interest payments based on the payments made by borrowers on the mortgages backing the RMBS. (Ex. 3 at S-9.) An "underwriter" would develop a structure for the RMBS and determine the characteristics of the certificates, including the monthly payments on each certificate. (Compl. ¶ 69.) The depositor would file with the SEC a detailed "prospectus supplement" setting out the

---

[16]     The PSA typically also included one or more other parties, such as a "servicer," which would "administer the relationship with the borrowers," including collecting monthly mortgage payments, and a loan "custodian," which would "maintain possession of the mortgage loan files." (Compl. ¶ 68.)

terms of the certificates and associated risks.  (Compl. ¶ 71.)  The underwriters were required to purchase the certificates from the trust (through the depositor) and would sell them to investors.  (Compl. ¶ 69; Ex. 3 at S-9.)

### D. The 40 RMBS

Plaintiff's claims here concern 40 RMBS issued in 2006 and 2007.  UBS Securities was underwriter for all 40 RMBS.  Eighteen of these RMBS were backed by subprime mortgages.  (Compl. tbl. 1.)  The remaining 22 were backed by Alt-A mortgages.  (Compl. tbl. 1.)  UBS's RMBS business was "divided into" two separate groups, the Asset-Backed Securitization Desk ("ABS Desk"), "which focused on subprime loans," and the Mortgage Backed Securities Group ("MBS Group"), "which focused on Alt-A and other non-subprime loans."  (Compl. ¶ 111.)

Twenty-three of the 40 RMBS were "Principal RMBS," meaning that UBS entities served as sponsor and depositor.[17]  (Compl. tbl. 1.)  The remaining 17 RMBS were "Third-Party RMBS," meaning that entities affiliated with the loan originator (and not UBS) served as sponsor and depositor.[18]  (Compl. tbl. 1.)  Third-party lenders originated all of the loans backing 38 of the 40 RMBS; UBS AG's Tampa Branch, based in Florida, originated some of the loans backing the remaining two RMBS.  (Compl. ¶¶ 563-589; *see also* Compl. tbl. 1 (identifying originators for each of the 40 RMBS).)

---

[17] Fifteen of these 23 Principal RMBS were backed by subprime mortgages, and the remaining eight were backed by Alt-A mortgages.  (Compl. tbl. 1.)  UBS RESI served as sponsor for these 23 RMBS, and MASTR served as depositor.  (Compl. ¶ 66 nn.7-8.)

[18] Three of these 17 Third-Party RMBS were backed by subprime mortgages, and the remaining 14 were backed by Alt-A mortgages.  (Compl. tbl. 1.)

### E.      UBS Structured the 40 RMBS Using Credit Enhancements To Protect Against Investor Losses.

Although the mortgages backing the 40 RMBS were riskier than traditional "prime" mortgages, UBS structured the RMBS to protect investors against the risk that some borrowers would default.  All mortgages mitigate risk by giving the lender "a lien against the home, on which [the bank] can foreclose if the borrower defaults on his or her obligation to repay." (Compl. ¶ 43.)  Pooling thousands of mortgages into RMBS further mitigated risk through diversification, because each borrower represented only a small fraction of the monthly cash flow used to pay investors.  In addition to these basic risk-reducing features, UBS included a number of "credit enhancements" in the 40 RMBS to "create[] a financial buffer that . . . insulated [investors in the RMBS] from some amount of collateral losses" (Compl. ¶ 106), including:

- *Subordination.*  UBS structured the certificates for all 40 RMBS in "tranches" with differing payment priorities.   "Senior" tranches were paid first, but received lower interest payments than "junior" tranches, which were "subordinated" to the senior tranches. (Compl. ¶ 102.) Investors in senior certificates "had the most cushion against losses."  (Compl. ¶ 102.)  The lowest tranche was called the "residual," and was the first to absorb any shortfall in the cash flows available to the trust.  (Compl. ¶ 110.)

- *Overcollateralization and Excess Spread.*  UBS structured the 40 RMBS to be "overcollateralized," meaning that the principal balance for the mortgage loans generating cash flows *into* the RMBS trust was greater than the principal balance due to be paid to investors *out of* the RMBS trust.[19]  (Compl. ¶ 105.)  The 40 RMBS also had an "excess spread" feature, meaning that the underlying mortgages would yield monthly interest payments in excess of the amount needed to make interest payments

---

[19]      *See*, *e.g.*, Ex. 3 at S-13 (explaining that the mortgage loan principal balance would exceed the RMBS certificate principal balance by at least 3.35%, essentially offsetting up to 3.35% of losses on the underlying mortgages).

to investors.  (Compl. ¶ 105.)  Together, these features were "available to absorb realized losses on the mortgage loans."  (Ex. 3 at S-13.)

These and other structural features of the RMBS ensured that investors would only "see a reduction in their income stream, or in the principal balance of their certificates, *when defaults and losses exceed[ed] the credit enhancements attendant to their certificates*."  (Compl. ¶ 101.)

### F. UBS Conducted Extensive Due Diligence on Loans Backing the 40 RMBS.

#### 1. UBS Hired Independent Due Diligence Firms To Perform "Credit and Compliance" Due Diligence To Confirm the Accuracy of Representations in the Offering Documents.

In addition to building in structural enhancements for investors, UBS performed "credit and compliance due diligence" in order "to check the accuracy of the representations about the loan characteristics made to investors, and to ensure that the loans in each deal complied with those representations."[20]  (Compl. ¶¶ 84, 153.)  UBS hired independent due diligence firms to review the origination files for the loans and determine whether the loans complied with the applicable underwriting guidelines and law.  (Compl. ¶ 152.)  For some loan pools, UBS directed these due diligence firms to review a sample of loans and, for others, UBS instructed them to review every loan.  (Compl. ¶ 10.)  To determine a review sample, UBS selected some loans at random and other loans using "adverse" criteria, which identified "characteristics that could signal heightened risk."  (Compl. ¶ 10 & n.1.)

Due diligence firms "provided regular updates to UBS, including by emailing reports or summaries, or posting reports to secure databases and websites that UBS could access."

---

[20]     When purchasing loans for Principal RMBS, UBS RESI also imposed "bid stipulations," or "bid stips," which gave UBS the right to reject loans that did not meet UBS's own "minimum credit parameters," separate from the originators' underwriting guidelines.  (Compl. ¶¶ 80-82, 424.)  UBS RESI refused to purchase hundreds of loans "solely because they violated UBS's bid stipulations."  (Compl. ¶ 424.)

(Compl. ¶ 86.)  The reports tracked the due diligence firms' review of the origination files, using three "event levels," or categories, labeled "EV1," "EV2," and "EV3":

- "EV1" identified loans "deemed to have been originated in accordance with underwriting guidelines and [to have] complied with all applicable laws and regulations."  (Compl. ¶ 159.)

- "EV2" identified loans "deemed not to have been originated strictly according to underwriting guidelines," but that, in the opinion of the due diligence firm, had "compensating factors that warranted an exception to the guidelines."  (Compl. ¶ 160.)

- "EV3" identified loans that:

  1. required additional review because the origination files were missing documents (or were missing altogether), which "prevent[ed] an assessment of the loan's compliance with underwriting guidelines and applicable laws and regulations" (Compl. ¶ 161);

  2. did not meet one of UBS's bid stipulations (*i.e.*, conditions above and beyond compliance with underwriting guidelines) (Compl. ¶ 82); or

  3. in the opinion of the due diligence firm, did not comply with guidelines and lacked sufficient compensating factors to warrant an exception, or did not comply with applicable laws or regulations (Compl. ¶ 161).

Contrary to Plaintiff's fraud-by-formula theory, an EV3 grade did not automatically reflect UBS's or a due diligence firm's finding that the loan was "defective," and the Complaint does not allege that any employee of UBS or of a due diligence firm understood the EV3 designation to mean "defective" or ever used that term to describe loans graded EV3.[21]  Instead, the Complaint cites emails showing that loans graded EV3 often had only documentation issues

---

[21]    Plaintiff defines "defective" loans as "loans whose characteristics were in contradiction to the representations being made to investors or otherwise should not have been securitized," but never explains how a loan could "otherwise" be defective.  (Compl. ¶ 12 n.2.)

that were "typically quite curable" (Ex. 4 at UBS_EDNY_008853383), and that UBS's employees understood that the EV3 designation was often used to identify issues that could be—and routinely were—resolved before securitization.[22]

Before deciding whether to purchase or securitize loans, UBS personnel reviewed the independent due diligence firms' reports, which included "quite detailed" comments from the due diligence firms and extensive loan information, and made final judgments about the loans' compliance with originators' guidelines and whether, in UBS's opinion, compensating factors sufficiently offset any deviation from guidelines. (Compl. ¶ 158.) UBS did not purchase or include in the 40 RMBS loans that received final grades of EV3, regardless of whether the EV3 grade was the result of non-compliance with underwriting guidelines or another issue, such as missing documents. (Compl. ¶¶ 174-176, 200 n.17, 479, 720.)[23] Instead, UBS "kicked" these loans out of the 40 RMBS, even though "[l]oan originators did not want their loans kicked from deals by UBS." (Compl. ¶ 20.) Notwithstanding UBS's practice of kicking out *all* loans with final grades of EV3, the Complaint alleges that "UBS knew that a significant number of loans" backing each RMBS were "defective." (*See*, *e.g.*, Compl. ¶ 316.) The Complaint bases this allegation on the number of loans graded EV3 by the due diligence firms and "kicked" by UBS (without alleging how many supposedly "defective" loans were included in any of the 40 RMBS). (Compl. ¶¶ 162-

---

[22]    For example, in a June 21, 2006 internal email regarding CWALT 2006-23CB, a UBS employee explained that the "majority" of EV3 loans that UBS would decline to purchase (*i.e.*, "kicks") had been graded EV3 due to "missing documents," and that "[o]ften these missing docs can clear[] up." (Ex. 7 at UBS_EDNY_088860057.) Where the documentation issues were not "cleared up," UBS removed the loans from the RMBS. (Ex. 8 at UBS_EDNY_078664246 (showing that 31 out of 41 EV3s loans were removed because of "missing doc[uments] only").

[23]    Notably, in Plaintiff's lawsuit against Barclays, filed in 2016, Plaintiff alleged that Barclays "securitized thousands of loans" with final grades of EV3. (*See* Am. Compl. ¶¶ 162-163, *United States* v. *Barclays Capital Inc.*, No. 16-cv-7057 (E.D.N.Y. May 11, 2017), ECF No. 48.) Plaintiff has not made, and cannot make, the same allegation against UBS.

169.)  UBS's supposed motive for this alleged fraud was "to maintain its relationships with . . . originators" and to obtain "handsome profits for its RMBS business."  (Compl. ¶¶ 19, 27.)

The great majority (more than 85%) of loans reviewed during due diligence for the 40 RMBS were graded EV1 or EV2.  (Compl. tbls. 3a, 3b.)  The Complaint acknowledges that due diligence "took time" and required significant "cost expenditures," but alleges that UBS "manipulate[d]" EV3 rates "to give the appearance to investors and ratings agencies"—who are not alleged to have received the EV3 rates or due diligence grades of the loans—"that UBS had a process in place to ensure that the loans in its deals complied with the representations it made to investors."  (Compl. ¶¶ 23, 165.)  In total, during due diligence, UBS reviewed more than 48,000 loans and refused to securitize more than 6,500 loans.  (Compl. ¶23, tbls. 3a, 3b (sum of "Loans from Pool Reviewed" for each RMBS and sum of "Loans Reviewed with Final EV3 Grades" for each RMBS).)  UBS excluded these 6,500-plus loans from the 40 RMBS, even though doing so was "costly," "unprofitable," and "unpalatable" to the originators of the loans, and "[a]ppeasing" these originators was allegedly "a paramount consideration at UBS."  (Compl. ¶¶ 20-21.)

## 2.    For Principal RMBS, UBS Also Performed "Valuation Due Diligence."

"[Q]ualified independent appraisers licensed in their respective states" assessed the values of the residential properties underlying each mortgage loan in the 40 RMBS.  (*See*, *e.g.*, Ex. 9 at S-68.)  For mortgages used to purchase a home (as opposed to refinances of existing mortgages), the property values also were validated by the purchase price, which was negotiated in an arm's-length transaction between the buyer and seller of the home.  (*See*, *e.g.*, Ex. 10 at S-65.)

For the 23 Principal RMBS (those where UBS was the sponsor and depositor), UBS conducted valuation due diligence as a check on the values of the properties securing the underlying mortgages.  (Compl. ¶ 219.)  UBS retained an independent valuation firm to compare

the purchase price or appraised property value to estimates generated by automated valuation models ("AVMs").[24]   (Compl. ¶ 228.)   If the AVM estimate was meaningfully lower than the appraised value (typically by 15% or more), UBS performed a "desk review" by retaining a licensed appraiser to review the original appraisal report to determine if there was an explanation for the discrepancy.  (Compl. ¶¶ 228, 230.)  If the appraisal report explained the discrepancy, UBS accepted the appraised valuation.  (Compl. ¶ 230.)  If the report did not explain the discrepancy, UBS obtained a broker price opinion ("BPO"), provided by a local real estate broker based on knowledge of the local market and personal, direct observation of the property from the street. (Compl. ¶ 231.)  If the difference between the appraisal and BPO value remained outside of UBS's tolerance threshold, UBS would discuss the loan with the originator and the diligence firm and decide whether the underlying property was adequate as collateral for the loan, or whether the loan should be "kicked."  (Compl. ¶¶ 232-234.)

**G.    UBS Provided Extensive Disclosures and Warnings Regarding the Risks of the Non-Traditional Mortgages Backing the 40 RMBS.**

Following due diligence, UBS and its counsel prepared offering documents for each of the 40 RMBS, including prospectus supplements, which included extensive and detailed risk warnings.[25]  Among other things, UBS disclosed that the subprime and Alt-A mortgages backing the RMBS were originated using guidelines that permitted:

---

[24]    An AVM is a computer model that estimates the value of a home based on records of similar property transactions in similar geographical locations.  (Compl. ¶ 228.)

[25]    Separate from the offering documents, UBS occasionally made presentations to certain investors and credit rating agencies about its RMBS business generally.  (Compl. ¶ 139.)  These generalized marketing materials, none of which concerned any of the 40 RMBS specifically, contained disclaimers that they were "published *solely for informational purposes* and [were] not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments" and that "*no representation or warranty, either express or implied, [was] provided* in relation to the accuracy, completeness or reliability of the information" in the presentations.

- non-traditional payment options, such as "interest only" loans, where borrowers were required "to make monthly payments *only of accrued interest* for [a specified period] following origination" (*see*, *e.g.*, Ex. 12 at S-21 (emphasis added));

- "negative amortization" loans, where "the scheduled monthly payment made by the borrower will not be sufficient to pay the amount of interest accruing on the mortgage loan," thereby increasing the principal owed on the loan over time (*see*, *e.g.*, Ex. 13 at S-23-24); or

- loan-to-value ratios[26] up to 100%, meaning that borrowers could borrow the full purchase price of the home with no down payment (*see*, *e.g.*, Ex. 10 at S-69).

The offering documents warned investors that because originators used non-traditional underwriting guidelines to originate the loans, "*delinquencies and liquidation proceedings are more likely with these loans* than with loans that are originated in a more traditional manner." (Ex. 14 at S-28 (emphasis added).)

UBS also disclosed that the mortgages backing the 40 RMBS had been underwritten "generally in accordance with" these non-traditional underwriting guidelines, or "otherwise had documented compensating factors justifying an exception to the guidelines." (Compl. ¶ 7.) UBS explained that loan underwriters would determine whether a particular borrower should be given a loan on a "case-by-case basis," and that underwriters could grant exceptions "based upon compensating factors," such as "substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address." (Compl. ¶ 126.) UBS further disclosed that originators exercised their own judgment—both in determining whether a loan met underwriting guidelines and whether a loan merited an exception to guidelines.

---

(Ex. 11 at Slide 1 (emphasis added); Appendix A (listing disclaimers for each of the presentations cited in the Complaint).)

[26]   This ratio represents the principal balance of the loan amount divided by the lower of the sales price or appraised value of the mortgaged property.  (*See*, *e.g.*, Ex. 10 at S-65.)

(*See*, *e.g.*, Ex. 9 at S-67 ("underwriting programs" are "an aid to, not a substitute for, the underwriter's judgment").)

UBS also included in the offering documents extensive data about the mortgages backing the 40 RMBS, including: borrower credit scores; loan-to-value ratios; mortgage interest rates; lien status (*e.g.*, first or second); documentation level (*e.g.*, stated or verified income); property type (*e.g.*, single- or multi-family); loan purpose (*e.g.*, purchase or refinance); occupancy status (*e.g.*, primary residence or rental property); and geographic distribution. (*See*, *e.g.*, Ex. 13 at S-39-85.) Except for selectively alleging that UBS disclosed inaccurate information regarding certain specific loan characteristics, such as borrower equity, debt, and credit scores for 21 of the RMBS, the Complaint does not question the accuracy of the vast majority of the detailed loan data UBS disclosed to investors. (Compl. ¶ 26; tbls. 6-8.)

Finally, UBS warned investors in no uncertain terms about the risk that the value of the properties securing the loans could be insufficient to cover losses if borrowers defaulted. Specifically, the offering documents stated: "[a] decline in real estate values or in economic conditions generally could increase the rates of delinquencies, foreclosures and losses on the loans to a level that is significantly higher than those experienced currently." (Ex. 2 at S-20.)

## H. As the Housing Market Deteriorated, UBS Enhanced Its Risk Warnings.

In 2007, as the housing market deteriorated, UBS increased its risk disclosures to RMBS investors. For all six of the 40 RMBS issued after February 2007, UBS included a full-page warning under the heading: "*Recent Developments in the Residential Mortgage Market May Adversely Affect the Yields of the Offered Certificates.*" (*See*, *e.g.*, Ex. 14 at S-29 (emphasis added).) UBS specifically cautioned investors that:

- "the residential mortgage market in the United States *has experienced a variety of difficulties and changed economic conditions that may adversely affect the yield on*

*your certificates*.  Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector" (Ex. 14 at S-29 (emphasis added));

- "in recent months *housing prices and appraisal values in many states have declined* or stopped appreciating, after extended periods of significant appreciation. . . . *A continued decline or an extended flattening of housing values may result in additional increases in delinquencies and losses on residential mortgage loans*" (Ex. 15 at S-25 (emphasis added)); and

- "numerous" subprime mortgage originators "have recently experienced serious financial difficulties and, in some cases, bankruptcy," and "[t]hose difficulties have resulted in part from declining markets for mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase . . . for *material breaches of representations and warranties made on the mortgage loans, such as fraud claims*" (Ex. 16 at S-15-16 (emphasis added)).

**I.**   **UBS Invested in the 40 RMBS and Lost Billions of Dollars Alongside Its Investors When the Housing Market Crashed.**

Although Plaintiff alleges in conclusory fashion that UBS's exit plan for its "fraud" was to "offload[] all risk" from the RMBS, as underwriter, UBS bore the risk that it could not sell all of the certificates, particularly if "defective" loans in earlier allegedly fraudulent RMBS began to perform poorly.  (Compl. ¶ 28.)  UBS also invested its own money in the 40 RMBS despite supposedly knowing that the loans backing those RMBS would default at "exceptionally high rates."  (Compl. ¶ 3; *see* Ex. 17 at 6 ("UBS typically retained a residual interest in its primary [RMBS] issuances and would also invest in various parts of the capital structure of third party securitizations.").)[27]

---

[27]    *See* Ex. 18 at UBS_EDNY_086393727 (UBS loan trader stating, "We've done 38 deals off the MABS shelf.  Of those 38 residuals we created, we only sold nine.").

As detailed in UBS's SEC disclosures, which the Court may take judicial notice of (*see* note 4, *supra*), UBS invested $100 billion in U.S. mortgage-related assets.[28]  When the U.S. housing market crashed in 2007 and 2008, mortgage-related assets, including RMBS, lost significant value—a materialization of the very risks UBS had disclosed to investors in the 40 RMBS.  UBS lost over $45 billion on mortgage-related assets.[29]  These losses wiped out all of UBS's investment banking profits for the decade from 1997 through 2006.[30]  Following disclosure of these losses, UBS's stock lost $115 billion in market value, and in October 2008, the Swiss National Bank agreed to purchase $50 billion in "illiquid securities and other positions from UBS's balance sheet" to ensure UBS's continued existence.  (Ex. 25 at 6.)

These massive losses fundamentally disrupted UBS.  UBS's CEO was "forced out by subprime losses" in 2007, and its Chairman resigned in 2008 "after months of criticism from shareholders" over UBS's mortgage-related losses.[31]  UBS's RMBS business was effectively shut down.

### J.    Plaintiff's Investigation and Claims Under FIRREA

In August 2014—*seven years after* the last of the 40 RMBS offerings—Plaintiff launched an investigation into UBS's RMBS business under FIRREA.  *See* 12 U.S.C. § 1833a(g). In 1989, in the wake of the savings-and-loan crisis, Congress passed FIRREA to protect the federal deposit insurance system from the criminal "fraud and insider abuse" that contributed to that crisis. H.R. Rep. No. 101-54, pt. I, at 300 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 96.  As far as

---

[28]    *See* Ex. 19 at 22; Ex. 20 at Slide 30; Ex. 21 at 2; Ex. 22 at Slide 4; Ex. 23 at 19-23, 81; Ex. 24 at Slide 29.

[29]    *See* Appendix B (summary of UBS's mortgage-related losses in 2007 and 2008).

[30]    *See* Appendix C (summary of UBS's investment banking profits from 1997 through 2006).

[31]    Nelson D. Schwartz & Julia Werdigier, *UBS to Write Down Another $19 Billion*, N.Y. Times (Apr. 2, 2008), https://www.nytimes.com/2008/04/02/business/worldbusiness/02ubs.html.

Defendants are aware, DOJ's investigations into UBS and other banks concerning their RMBS businesses were the first FIRREA investigations that focused on sales of SEC-registered, publicly offered securities.  Before the 2007 to 2008 financial crisis, DOJ never once brought a claim alleging that FIRREA applies to fraud in those types of offerings, which already are subject to the comprehensive regulatory framework of the federal securities laws that Congress initially established more than 80 years ago.[32]

During Plaintiff's investigation, which lasted for more than four years, UBS voluntarily produced over 90 million pages of documents and made 22 witnesses available for sworn testimony.  The Complaint does not allege that any of those witnesses—or any other identified UBS employees—was responsible for UBS's alleged "fraud."

After its lengthy investigation, Plaintiff filed its 202-page Complaint against Defendants, seeking civil penalties under FIRREA for alleged violations of five predicate criminal statutes:  (i) mail fraud (18 U.S.C. § 1341) affecting a federally insured financial institution; (ii) wire fraud (18 U.S.C. § 1343) affecting a federally insured financial institution; (iii) bank fraud (18 U.S.C. § 1344); (iv) participating in fraudulent bank transactions (18 U.S.C. § 1005); and (v) making false statements to banks in loan and credit applications (18 U.S.C. § 1014).  The principal allegation in the Complaint is that that UBS "repeatedly and intentionally misled investors" by misrepresenting in RMBS offering documents:  (i) that the underlying mortgage loans were originated "generally in accordance" with the mortgage lender's underwriting guidelines and "in compliance with federal, state and local laws and regulations" (for all 40 RMBS); and (ii) certain specific loan characteristics, such as borrower equity, debt, and credit

---

[32]     *See D'Alessio* v. *New York Stock Exch., Inc.*, 258 F.3d 93, 103 (2d Cir. 2001) (recognizing the "comprehensive scheme of statutes and regulations designed to police the securities industry").

scores (for 21 of the RMBS).  (Compl. ¶¶ 2, 117-138; tbls. 6-8.)  The Complaint also alleges that UBS misrepresented in presentations to certain investors or rating agencies the nature of UBS's due diligence review and UBS's process for monitoring the performance of the RMBS after the certificates were sold.  (Compl. ¶¶ 139-148.)

Without any documents or testimony showing that any UBS employee believed that any of the alleged misrepresentations was false, the Complaint generically recites the results of UBS's due diligence for each of the 40 RMBS in a formulaic attempt to plead "fraud," borrowing a technique used by plaintiffs in civil actions under the strict liability provisions of the Securities Act of 1933 and state securities laws to plead that defendants' due diligence was *negligent*.

The Complaint's one-page, perfunctory allegations regarding MABS 2006-WMC2 illustrate Plaintiff's fraud-by-formula method of pleading.  (*See* Compl. ¶¶ 342-346.)  Although MABS 2006-WMC2 was backed by more than 4,000 home mortgages (with more than $750 million aggregate principal balance), the Complaint's only factual allegation regarding credit and compliance due diligence for this offering is that the due diligence firm graded EV3 "9.78% of the due diligence sample."  (Compl. ¶ 343.)  The Complaint does not explain why these loans were graded EV3, but nevertheless asserts that this EV3 rate (of less than 10%) "signaled that similarly defective loans existed in the non-reviewed portion of the pool."  (Compl. ¶ 343.)  On the basis of this "signal[ing]"—the sort of allegations normally found in strict liability or negligence, but not fraud, cases—the Complaint alleges, in conclusory fashion, as it does for the other 39 RMBS, that "UBS knew that a significant number of loans securitized in MABS 2006-WMC2 were defective."  (Compl. ¶ 346.)  The Complaint does not identify any employees who were responsible for the MABS 2006-WMC2 offering documents, whether those employees

received the due diligence results the Complaint cites, or what they understood those due diligence results to mean.   The same is true for Plaintiff's "Deal-Specific Allegations" for *each* of the 40 RMBS offerings.

## LEGAL STANDARD

To survive dismissal under Rule 12(b)(6), Plaintiff must plead facts that "state a claim that is plausible on its face." *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 208 (2d Cir. 2014).  "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).   "Where an allegation in the complaint conflicts with other allegations, or where the plaintiff's own pleadings are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss." *Spiteri* v. *Russo*, 2013 WL 4806960, at *8 (E.D.N.Y. Sept. 7, 2013) (Brodie, J.), *aff'd sub nom.*, *Spiteri* v. *Camacho*, 622 F. App'x 9 (2d Cir. 2015).

Each predicate crime asserted in the Complaint requires Plaintiff to allege fraudulent intent.  *See United States* v. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (mail and wire fraud require "fraudulent intent"); *Bouchard*, 828 F.3d at 125-26 (same for bank fraud); 18 U.S.C. § 1005 (requiring "intent to defraud"); 18 U.S.C. § 1014 (requiring "knowingly" false statement). As a result, the Complaint must satisfy Rule 9(b) and "specify the who, what, where, when and why of the alleged fraud; specifying which statements were fraudulent and why, who made the statements to whom, and when and where the statements were made." *Jovel* v. *i-Health, Inc.*, 2013 WL 5437065, at *11 (E.D.N.Y. Sept. 27, 2013) (Gleeson, J.); *see Spiteri*, 2013 WL 4806960, at *48 ("[A]llegations of mail and wire fraud . . . must be pled with particularity.").  In addition,

to "safeguard a defendant's reputation from improvident charges of wrongdoing," Rule 9(b) requires Plaintiff to allege facts that "give[] rise to a 'strong inference' of fraudulent intent." *O'Brien* v. *Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).

Because Plaintiff conducted a four-year pre-suit investigation, this Court should "look more closely at the factual allegations to see if they support the legal conclusions pled." *Glassman* v. *Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996); *see Vladimir* v. *Deloitte & Touche LLP*, 1997 WL 151330, at *2 (S.D.N.Y. Mar. 31, 1997) (same, quoting *Glassman*).

## ARGUMENT

## I.  THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS ACTED WITH SCIENTER IN MAKING THE ALLEGED MISREPRESENTATIONS.

As a threshold matter, the Complaint should be dismissed for failing to identify any individual employees of Defendants who intentionally made misrepresentations to RMBS investors.  *See Dynex*, 531 F.3d at 195.  Even if Plaintiff had identified such individual employees (and it has not), Plaintiff still fails to plead facts supporting the required "strong inference" that any of those employees intended to defraud RMBS investors.  As the Second Circuit has held, an inference is "strong" only if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 177-178.  To plead this required strong inference, Plaintiff may allege "motive for committing fraud and a clear opportunity for doing so."  *Powers*, 57 F.3d at 184.  Absent sufficient allegations of motive and opportunity, Plaintiff may allege "circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Id.* (internal quotation marks omitted).  To raise a strong inference of fraudulent intent through such stronger circumstantial allegations, Plaintiff must allege "*deliberate illegal behavior*."  *Gould*, 692 F.3d at 158 (emphasis added).

As shown below, Plaintiff has failed to meet its burden of pleading facts establishing a strong inference of scienter. *First*, the Complaint contains no facts sufficient to infer corporate scienter, such as the fraudulent intent of an employee that can be imputed to any of Defendants. *Second*, Plaintiff's generic allegations of motive fail as a matter of law and allegations of opportunity are equally missing from the Complaint. *Third*, Plaintiff fails to plead "deliberate illegal behavior," particularly in the face of the Complaint's many contradictory allegations refuting any strong inference of scienter. *Fourth*, the Complaint is not saved by Plaintiff's flawed formulaic allegations based on EV3 rates or snippets of out-of-context emails.

A.    **The Complaint Does Not Identify Any UBS Employees Responsible for the Alleged Misrepresentations Who Acted With Scienter.**

To plead scienter against a corporation, a plaintiff must allege facts supporting "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195 (reversing district court's denial of corporate defendants' motion to dismiss securities fraud claims). The "most straightforward way to raise [a strong inference of scienter] for a corporate defendant will be to plead it for an individual defendant." *Id.* Presumably for that reason, in its FIRREA action against Barclays in this District concerning sales of RMBS issued in 2006 and 2007, Plaintiff named two senior Barclays employees as defendants and made extensive allegations about their specific conduct. (*See* Am. Compl., *United States* v. *Barclays Capital Inc.*, No. 16-cv-7057 (E.D.N.Y. May 11, 2017), ECF No. 48.) Here, despite accusing "UBS" of engaging in a fraud scheme as to 40 RMBS and listing scores of allegedly false statements in the Tables appended to the Complaint, Plaintiff has named no individual defendants.

Instead, Plaintiff has named as defendants four distinct UBS entities and impermissibly alleges in the broadest possible terms that "UBS" defrauded investors in the

40 RMBS.  (*See*, *e.g.*, Compl. ¶¶ 116, 140.)  Because a corporation's intent is based solely on the intent of its employees acting on its behalf, Plaintiff cannot adequately plead that any Defendant—much less *all four*—acted with intent to defraud without identifying the individual employee(s) who did so on each Defendant's behalf.  *See Philip Morris*, 566 F.3d at 1118 (in assessing corporate scienter in the context of RICO claims predicated on mail and wire fraud, "to determine whether a corporation made a false or misleading statement with specific intent to defraud, [courts] look to the state of mind of the individual corporate officers and employees *who made, ordered, or approved the statement*") (emphasis added).

Even after a four-year investigation, Plaintiff does not identify for any of the 40 RMBS offerings:

- a single employee of any of the four Defendants who received and reviewed the due diligence reports for the loans backing the 40 RMBS;

- any employee(s) who knew, on the basis of those due diligence reports, that the alleged misrepresentations were false;

- the employee(s) responsible for making the purported misrepresentations, and whether any of those employees were aware of the information in the due diligence reports;

- whether the employee(s) responsible for the alleged misrepresentations intended to defraud investors and to cause them economic harm; or

- which of the four Defendants employed any such individuals.[33]

Plaintiff thus fails to plead the particularized facts needed to meet Rule 9(b)'s requirement that Plaintiff identify which of Defendants' employees acted with fraudulent intent.  *See Jovel*, 2013

---

[33]     The Complaint does say that the "UBS employees who carried out the securitization steps on behalf of these entities made no distinction in their roles for each entity." (Compl. ¶ 75.) But it provides no clue as to who these people are, or what in particular they supposedly did wrong. This is not a particularized allegation sufficient to plead corporate scienter under Rule 9(b).

WL 5437065, at *11 ("Rule 9(b) generally requires that a plaintiff specify the who, what, where, when and why of the alleged fraud.").

The bulk of Plaintiff's allegations relate to "UBS's" purported understanding of due diligence reports evaluating home loans' compliance with underwriting guidelines. Plaintiff generally alleges that these due diligence reports "were accessible to and reviewed by UBS employees both inside and outside of UBS'[s] due diligence groups" (Compl. ¶ 158), but this vague allegation—which literally encompasses every employee of any Defendant—cannot support the required strong inference necessary to impute criminal intent to defraud to any particular Defendant. Similarly, the Complaint uses the phrase "UBS knew" more than 70 times, and includes the same generic recitation 40 separate times—once for each of the 40 RMBS offerings—that "UBS knew that a significant number of loans securitized in [the 40 RMBS] were defective." (*See*, *e.g.*, Compl. ¶ 336.) But Plaintiff fails to identify any employee whose "knowledge" of the supposedly "defective" loans creates "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."[34]  *Dynex*, 531 F.3d at 195; *see Fogel* v. *Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *17 (S.D.N.Y. Feb. 27, 2017) (granting corporate defendant's motion to dismiss because plaintiff "failed to plead scienter with adequate specificity with regard to [individual defendant], [another individual named in complaint]—and, by extension, [corporate defendant]"), *aff'd sub nom. Fogel* v. *Vega*, 2018 WL 6753799 (2d Cir. Dec. 26, 2018); *Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund* v.

---

[34]     Moreover, the Complaint alleges that UBS's RMBS business was "divided into" two separate groups, the ABS Desk, focused on subprime loans, and the MBS Group, focused on Alt-A loans. (Compl. ¶ 111.) The intent of an employee responsible for subprime RMBS therefore cannot be imputed to any Defendant for statements made regarding Alt-A RMBS and vice versa. To state a FIRREA claim as to all 40 RMBS, Plaintiff must, at a minimum, plead scienter as to specified individual employees in *each of* the ABS Desk *and* the MBS Group.

*Conseco Inc.*, 2011 WL 1198712, at *24 (S.D.N.Y. Mar. 30, 2011) (dismissing securities fraud claims where complaint was "devoid of any particularized allegation connecting the individual defendants to information suggesting unlawful activity within the company").

Nor can Plaintiff save its Complaint by relying on a theory of "collective scienter." In *Dynex*, the Second Circuit held that "[t]o prove liability against a corporation . . . a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." 513 F.3d at 195. The court acknowledged that there are circumstances where "it is possible" at the pleading stage to allege scienter against a corporate defendant without naming culpable individuals, for example where a misrepresentation is "so dramatic . . . [that it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," such as if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero." *Id.* at 195-196 (quoting *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)) (internal quotations omitted). Plaintiff's formulaic allegations that unnamed individuals learned from due diligence reports that loans that Defendants specifically *excluded* from the 40 RMBS did not comply with originators' underwriting guidelines or applicable laws or regulations are not "so dramatic" that the unnamed corporate officials making or approving the supposed misrepresentations necessarily would have known that the alleged misrepresentations were false.[35]

---

[35]     The Second Circuit has never applied this exception. *See Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 58 n.1 (2d Cir. 2018) ("Our decision in [*Dynex*] recognized that '[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.' We have not since elaborated on when this is the case.").

Courts in other circuits also have rejected pleadings relying on allegations of "collective scienter."  In *Southland Securities Corp* v. *INSpire Insurance Solutions, Inc.*, the Fifth Circuit affirmed the dismissal of fraud claims against corporate defendants for failure to plead scienter and held that in assessing corporate scienter allegations, it was "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  365 F.3d 353, 366 (5th Cir. 2004).  Other courts have followed the Fifth Circuit in rejecting or limiting the "collective scienter" theory in affirming dismissals of fraud claims against corporate defendants.[36]

This is not a case where the Court should excuse Plaintiff's failure to plead scienter with the required specificity because of the early stage of the proceedings.  Plaintiff used its broad subpoena power under FIRREA to conduct four years of unfettered discovery.  In crafting the Complaint, Plaintiff had the benefit of more than 90 million pages of documents, including all emails, regardless of subject matter, from dozens of UBS employees for a four-year period, and sworn testimony from 22 employees who worked in UBS's RMBS business, in addition to any

---

[36]     *See Tellabs Inc.*, 513 F.3d at 707 ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily a deliberate act, could be the result of a series of acts none of which was both done with scienter and imputable to the company."); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 483 (6th Cir. 2014) (allegations regarding Chief Operating Officer's knowledge were "out of bounds under our conception of collective scienter because there are no allegations that [COO] played any role in formulating" the allegedly false statements); *Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (declining to apply a "collective scienter theory" where "so long as *any* employee at [the company] had knowledge of the violation of *any* law, scienter could be imputed to the company as a whole") (emphasis in original); *see also Philip Morris*, 566 F.3d at 1122 ("Like Defendants and other courts, we are dubious of the legal soundness of the 'collective intent' theory.").

information Plaintiff obtained from third parties.  Despite that, Plaintiff does not even come close to alleging facts creating the required "strong inference" that any individual—even one—whose intent could be imputed to any Defendant acted with the requisite scienter as to any of the 40 RMBS, much less as to all 40 RMBS.  The Court should dismiss the Complaint on this basis alone.

**B.      The Complaint's Allegations of Motive Fail as a Matter of Law, and Plaintiff Fails To Plead Opportunity Altogether.**

Beyond not identifying a single employee responsible for the alleged misrepresentations whose scienter can be imputed to any Defendant, Plaintiff fails to plead facts supporting the required strong inference that any of the Defendants intended to defraud RMBS investors.[37]  One way to plead this strong inference is to allege "motive for committing fraud and a clear opportunity for doing so."  *Powers*, 57 F.3d at 184.  Plaintiff has failed to do so.

**1.      The Complaint Alleges No Cognizable Motive.**

Plaintiff's allegation that UBS sought "handsome profits for its RMBS business" (Compl. ¶ 27) is not a "concrete benefit[]" sufficient to allege motive.  *MLSMK Invs. Co.* v. *JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 143 (S.D.N.Y. 2010) (dismissing civil RICO case predicated on wire fraud), *aff'd in part*, 431 F. App'x 17 (2d Cir.), *and aff'd*, 651 F.3d 268 (2d Cir. 2011).  As the Second Circuit and other courts have held, a generalized desire to achieve profits is "common to all corporations . . . [and] does not suffice" to plead "any particular motive" as a matter of law.  *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012); *see Union Cent. Life Ins. Co.* v. *Credit Suisse Sec. (USA), LLC*, 2013 WL 1342529, at *5-6 (S.D.N.Y. Mar. 29, 2013) (dismissing fraud claims where RMBS investors alleged

---

[37]      Because the Complaint's allegations of intent fail to differentiate between the four distinct corporate Defendants, Defendants' arguments in response also are necessarily undifferentiated.

defendant bank "had a motive to continue securitizing defective loans to make significant profits" and not any "concrete and personal benefit to the [] defendants resulting from the fraud" (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (alteration in original))).  Plaintiff's allegation that UBS perpetrated a fraud "to maintain its relationships with" originators is equally inadequate.  (Compl. ¶ 19.)  A "generalized motive[] such as the desire . . . to preserve a business relationship" is insufficient "to allege a motive."[38]  *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011); *see Vining* v. *Oppenheimer Holdings Inc.*, 2010 WL 3825722, at *7 (S.D.N.Y. Sept. 29, 2010) (dismissing securities fraud claims, holding that "[defendant]'s profit motive in perpetuating the [market for auction-rate securities] in order to maintain relationships with auction dealers . . . is 'a generalized motive, . . . not sufficiently concrete for purposes of inferring scienter'") (quoting *Kalnit*, 264 F.3d at 139)).

The Complaint's allegations of motive fail for the additional reason that Plaintiff's scienter theory is economically irrational.  *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, [courts] assume that the defendant is acting in his or her informed economic self-interest.").  Plaintiff posits that UBS set out to commit economic suicide by buying overpriced "defective" mortgages over the course of several years, packaging those loans into RMBS doomed to fail, and selling the RMBS to investors (and investing in the RMBS itself), while at the same time expressly agreeing to repurchase loans that did not meet its contractual representations.  Basic rules of economics and common sense make clear that such an irrational scheme will not lead to "handsome profits," but instead guarantees that the business will implode.  Courts routinely dismiss cases where, as here,

---

[38]    Plaintiff also contradictorily alleges that UBS severed relationships where it believed the quality of the originators' loans had declined.  (*See* Compl. ¶ 209 ("UBS had such a low opinion of Fremont loans that by mid-2006, UBS stopped buying Fremont loans altogether.").)

allegations of "motive" suggest no economic advantage to the defendant, but only "a short respite from an inevitable day of reckoning." *Id.*; *see Atl. Gypsum Co.* v. *Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (dismissing RICO claim predicated on mail and wire fraud against "established banking institutions" where "on plaintiffs' view of the facts, defendants advanced money to the venture with the intention of driving it into the ground" which "defie[d] economic reason").

The fact that UBS invested *alongside* investors in the 40 RMBS fatally undercuts Plaintiff's assertion that UBS "anticipated" that mortgages backing the 40 RMBS would "default[] at exceptionally high rates." (Compl. ¶ 3.)  Documents incorporated by reference in the Complaint show that "UBS *typically retained a residual interest* in its primary [RMBS] issuances and would *also invest in various parts of the capital structure of third party securitizations*."  (Ex. 17 at 6 (emphasis added); *see* Ex. 18 at UBS_EDNY_086393727 (UBS loan trader stating, "We've done 38 deals off the [subprime] shelf.  Of those 38 residuals we created, we only sold nine.").)  UBS would not have invested in any of its RMBS—never mind the riskiest "residual" portion—if "UBS knew that a significant number of loans" in the 40 RMBS were "defective."  (*E.g.*, Compl. ¶ 324.) *See GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 244 (3d Cir. 2004) (dismissing securities claim for failure to plead scienter where "[t]here is simply nothing to suggest that [the defendant] was on a suicide mission").

As Judge Sullivan held—and the Second Circuit unanimously affirmed—"the mere fact that UBS made investments in mortgage-related securities . . . undercuts [p]laintiff's ability to plead a 'strong inference' of scienter."  *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *12, *aff'd*, 752 F.3d 173.  Plaintiff's theory here, that UBS knowingly purchased overvalued mortgages and invested in overvalued RMBS backed by "defective" loans, is essentially identical to the theory

from *In re UBS*, where plaintiffs alleged that UBS acted against its economic self-interest by "accumulat[ing] additional billions of dollars in overvalued mortgage-related securities" when UBS allegedly "knew" its "mortgage-related securities portfolio was overvalued." *Id.* Such a theory is "economically irrational," "implausible," and defies both "economic reason" and "common sense." *Id.* at *12-13.

  **2.**   **The Complaint Does Not Allege That UBS Had Any Opportunity To Commit Fraud.**

  Even if Plaintiff had pled a coherent motive, Plaintiff does not allege that UBS had the opportunity to perpetrate a years-long fraud of this scope and complexity. "Clear opportunity" to commit fraud "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. Setting aside Plaintiff's failure to allege *any* concrete benefit to UBS, the "means" allegedly chosen by UBS for its fraud were highly complex securitizations involving dozens of individuals and multiple independent entities, with oversight by outside and in-house counsel. As the Second Circuit explained in *Powers*, "[w]hen courts speak of 'clear opportunity' to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case." 57 F.3d at 185 (dismissing RICO claims predicated on mail and wire fraud for failure to plead opportunity).

  Here, if anything, the Complaint shows that UBS was in *no* position to carry out the alleged criminal scheme. Plaintiff's allegations of fraud are grounded in UBS's due diligence practices, yet Plaintiff alleges instances of oversight by in-house or outside counsel and their review of due diligence results no less than 15 times in the Complaint.[39] Plaintiff does not allege

---

[39]  *See, e.g.*, Compl. ¶ 437 (quoting UBS transaction manager as saying "my hands are tied on a lot of this *because of the legal focus on the due diligence results*") (emphasis added); Compl. ¶ 153 ("UBS recognized that due diligence 'gives us the ability to make reps and warrants on our securities, *which need to get approved by legal . . . .*'") (emphasis added).

that UBS's counsel, the loan originators, or any of the due diligence firms were complicit in UBS's alleged scheme to defraud, and Plaintiff does not explain how UBS had the "clear opportunity" to perpetrate a years-long fraud in plain view of all of them. Here, as in *Powers*, "a number of circumstances had to arise and a number of players outside of [the defendant corporation] had to cooperate in order for [the] alleged scheme to have come to fruition," and Plaintiff thus fails to allege the required "clear opportunity" to commit fraud. *Id.*

### C.   The Complaint Fails To Plead Correspondingly Stronger Circumstantial Allegations of "Deliberate Illegal Behavior."

Without sufficient allegations of motive and opportunity, Plaintiff may plead a "strong inference" of scienter by alleging "circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 184. Specifically, Plaintiff must allege "*deliberate illegal behavior*, a standard met when it is clear that a scheme, viewed broadly, is *necessarily going to injure*." *Gould*, 692 F.3d at 158 (emphasis added). The Complaint does not meet that standard. *First*, the Complaint's allegations and the documents incorporated therein flatly contradict Plaintiff's scienter theory and affirmatively negate any "strong inference" that UBS intentionally committed a fraud. *Second*, Plaintiff's fraud-by-formula allegations based on due diligence results—infected with incorrect assumptions and basic mathematical errors—bar an inference of deliberate illegal behavior. *Third*, Plaintiff's reliance on cherry-picked, out-of-context emails cannot save its Complaint's flawed pleading of scienter.

### 1.   The Facts Alleged, and Documents Incorporated, in the Complaint Refute Any Inference of Scienter.

***UBS Agreed To Repurchase Loans That Did Not Comply With Underwriting Guidelines***. In addition to investing in U.S. mortgage-related assets, including the 40 RMBS, UBS further aligned itself with the interests of RMBS investors by agreeing, for each of the 23 Principal

RMBS, to repurchase loans that breached UBS's contractual representations, including that the mortgage loans were "originated in compliance" with applicable laws and regulations and, for many of the Principal RMBS, that the loans were "underwritten in accordance with the underwriting guidelines" of the mortgage originators. (Appendix D.) Plaintiff cannot explain why UBS allegedly would load up these RMBS with "defective" loans only to face an "inevitable day of reckoning" when UBS would be required to cure the defects or buy back the loans from the RMBS trusts. *Shields*, 25 F.3d at 1130; *see also Fadem* v. *Ford Motor Co*., 352 F. Supp. 2d 501, 525 (S.D.N.Y. 2005) (granting motion to dismiss securities fraud claims where alleged conduct "is a recipe for economic disaster"). As Judge Castel held in dismissing claims brought by RMBS investors in *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, Plaintiff's allegations do not "lead[] to an inference of scienter that is compelling in light of defendants' obligation to cure any noncompliant loan." 2010 WL 3790810, at *21 (S.D.N.Y. Sept. 28, 2010).

*UBS Kicked Out Thousands of Loans Prior to Securitization.* The expensive and burdensome due diligence practices recounted in the Complaint, which involved reviewing thousands of individual loan files, cannot be squared with Plaintiff's theory of fraud. Indeed, as part of a supposed fraudulent scheme, UBS hired "a variety of" due diligence firms to engage in a "fact-finding exercise" to determine whether loans complied with originators' guidelines and "with all applicable laws and regulations." (Compl. ¶¶ 151, 157.) Through this painstaking process— and notwithstanding that "originators did not want their loans kicked from deals" (Compl. ¶¶ 20, 59)—UBS allegedly reviewed *more than 48,000 loans* in connection with the 40 RMBS and kicked out *more than 6,500 loans—*a total of *nearly 14%.* (Compl. tbls. 3a, 3b.) For 11 pools backing the 40 RMBS, UBS reviewed *100% of the loans*. (Compl. ¶¶ 398, 400, 406-407, 426.) No one engaging in "fraud" would have undertaken this expense and burden, and the notion that

UBS engaged in fraud to "[a]ppeas[e] loan originators" (Compl. ¶ 21) is contradicted by UBS's decision to reject their loans by the thousands—particularly when the Complaint alleges that such rejections were "costly," "unprofitable," and "unpalatable" to originators (Compl. ¶ 20). *See Nelson* v. *Publishers Circulation Fulfillment, Inc.*, 2012 WL 760335, at *4-5 (S.D.N.Y. Mar. 7, 2012) (dismissing RICO claims predicated on mail, wire, and bank fraud where "the alleged scheme to defraud . . . defie[d] logic or economic reason").

**UBS Made No Effort To Conceal the Alleged Fraud From Other Deal Participants**. Plaintiff claims that the due diligence firms UBS hired to review loans "used special notations to track and document the loans where the event level grade *was contrary to their recommendation*" and "often used notes such as 'EV2 Per Client,' 'OK per Client,' or 'issue waived by client' to indicate that *UBS was instructing them to override EV3 loans without valid reasons*." (Compl. ¶ 171 (emphasis added).) In other words, the Complaint alleges not only that UBS was transparent with these independent firms about its supposed fraudulent scheme, but that UBS also directed them to make a written record of their disagreements with UBS's scheme. (*See*, *e.g*., Compl. ¶ 364 ("During due diligence, *UBS directed Bohan to change the grades* of at least 59 loans graded EV3 to EV2, which Bohan marked as 'EV2 per client' or 'EV2 OK per client' in its final due diligence reports . . . .").)

**UBS Structured the 40 RMBS To Provide a Buffer Against Losses.** UBS also built credit enhancements into the structure of the 40 RMBS to protect against losses on the underlying mortgages. (*See supra* Part E.) Plaintiff alleges that UBS designed these features to "absorb initial losses" and "create[] a financial buffer," (Compl. ¶¶ 105-106), such that RMBS investors would only "see a reduction in their income stream, or in the principal balance of their certificates, when defaults and losses exceed the credit enhancements attendant to their

certificates." (Compl. ¶ 101.) Plaintiff thus alleges that UBS was intentionally securitizing "defective" loans to criminally defraud RMBS investors, while simultaneously structuring the RMBS to insulate investors from losses. These contradictory pleadings do not support a strong inference of fraudulent intent.

**_UBS Enhanced Its Risk Warnings and Publicized the Very Risks That UBS Allegedly Sought To Conceal From Investors_**. As the U.S. housing market began to deteriorate, UBS added full-page warnings to RMBS offering documents specifically cautioning investors that, among other things, "numerous" mortgage originators "have recently experienced serious financial difficulties . . . result[ing] in part from declining markets for mortgage loans [and] from claims for repurchases . . . for _material breaches of representations and warranties made on the mortgage loans, such as fraud claims._" (_See_, _e.g._, Ex. 16 at S-15-16 (emphasis added).) Thus, in the midst of a scheme to defraud RMBS investors by allegedly _concealing_ that loans backing the 40 RMBS failed to comply with guidelines, UBS was _broadcasting_ to sophisticated RMBS investors that claims against originators for breaching their own representations about the loans, _including fraud claims_, were on the rise. This conduct is entirely inconsistent with an intent to "conceal the fact that the[] loans were much riskier" as part of a scheme. (Compl. ¶ 3.) _See Altayyar_ v. _Etsy_, _Inc_., 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (Donnelly, J.) (dismissing securities fraud claims where prospectus included cautions about allegedly concealed risk), _aff'd_, 731 F. App'x 35 (2d Cir. 2018); _In re PXRE Grp., Ltd., Sec. Litig._, 600 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009) (Sullivan, J.) (dismissing securities fraud claims where "inference of scienter is further belied by" defendants' "willingness to issue a steady stream of" information and updates concerning the alleged fraud).

*UBS's Presentations to Rating Agencies and Investors Included Important Disclaimers.* In alleging that UBS misled potential investors and rating agencies, the Complaint ignores that the disclaimers in marketing presentations about the nature of UBS's due diligence. (*See* Compl. ¶ 140.) The disclaimers contained in those presentations undercut Plaintiff's theory of fraud. It is implausible that UBS intended to defraud while at the same time advising that "[*n*]*o representation or warranty, either express or implied*, [was] provided in relation to the accuracy, completeness or reliability of the information" in the presentations. (Ex. 11 at Slide 1 (emphasis added); *see* Appendix A.)

### 2. Plaintiff Cannot Plead That UBS Engaged in Deliberate Illegal Behavior by Formulaically Reciting Due Diligence Results and Quoting From Cherry-Picked Emails.

As shown above, Plaintiff has not pled that UBS had any motive or opportunity to engage in a years-long scheme to defraud its customers, and the contradictory allegations in the Complaint negate any "strong inference" of scienter. Tellingly, after a four-year investigation, Plaintiff's circumstantial allegations of "deliberate illegal behavior" rest almost entirely on Plaintiff's recitation of due diligence results. *Gould*, 692 F.3d at 158. Plaintiff engages in the same mechanical pleading strategy for each of the 40 RMBS. The "Deal-Specific Facts" alleged in the Complaint span 107 pages—*less than three pages* for each of the 40 RMBS offerings—and follow the same conclusory formula:

*Credit and Compliance Due Diligence.* As if pleading negligence or a strict liability claim, the "Deal-Specific Facts" for each of the RMBS criticize UBS's credit and compliance due diligence. Almost uniformly, the Complaint begins by describing the number of loans in the credit and compliance due diligence sample. (*E.g.*, Compl. ¶ 308.) Then, the Complaint alleges the number of loans graded EV3 by the due diligence firm and the resulting "EV3 rate" (the number of loans graded EV3 divided by the number of loans in the due diligence

sample).  (*E.g.*, Compl. ¶ 309.)  Next, the Complaint alleges in conclusory fashion that the EV3 rate "indicat[ed] that these loans were defective" and "signaled that similarly defective loans existed in the non-reviewed portion of the pool."  (*E.g.*, Compl. ¶¶ 309, 312.)

For 27 RMBS, the Complaint also alleges that unspecified "UBS" employees "directed" the due diligence firm to change the grades for certain loans from EV3 to EV2 or EV1. (*E.g.*, Compl. ¶ 378.)  The Complaint does not allege, as it must, that the unnamed UBS employees directed those changes improperly, but only that "[t]here was no evidence that UBS identified any compensating factors" to the due diligence firm "that warranted these overrides."  (*E.g.*, Compl. ¶ 378.)  Again, this sort of pleading, which impermissibly puts the burden of proof on the defendant, might be sufficient in pleading a negligence or strict liability claim, but such allegations are woefully insufficient to plead fraud.

*Valuation Due Diligence.*   For 23 RMBS, the Complaint alleges that "UBS valuation due diligence results also revealed significant issues with the collateral for the loans, which UBS ignored."  (*E.g.*, Compl. ¶ 314.)  These "issues" apparently arise from (i) "the difference between the originator's valuation of the property" and due diligence estimates showing that the property value may have "exceeded the tolerances UBS set for assessing the reliability of the originator's property value"; and (ii) the number of loans with "flip flags," which purportedly "indicated that the property may have been repeatedly sold."  (*E.g.*, Compl. ¶¶ 229, 314.)

*Conclusory Allegation of Scienter for Each RMBS.*  No matter how high or low the EV3 rate, or how many or few loans with valuation "issues," the Complaint concludes **for each of the 40 RMBS**, that "UBS knew," without identifying any human being, "that a significant number of loans securitized in [the RMBS] were defective."  (*E.g.*, Compl. ¶ 346.)

In sum, these "Deal-Specific Facts," summarized in Appendix E to this memorandum, are not sufficiently particularized at all.  These allegations are essentially the same for each RMBS and amount to criticisms of UBS's due diligence process—not allegations of fraud.  Moreover, as detailed below, the Complaint itself makes clear that Plaintiff's alleged EV3 rates are inflated and riddled with computational errors.

### a. Plaintiff's Alleged "EV3 Rates" Do Not Distinguish Between Allegedly "Defective" and "Non-Defective" Loans.

Plaintiff's speculation that "UBS knew" that a "significant number" of loans backing each RMBS were "defective" relies on its flawed allegation—formulaically repeated verbatim for each of the 40 RMBS—that due diligence firms grading loans EV3 "indicat[ed] that these loans were defective." (*E.g.*, Compl. ¶ 309.)  But Plaintiff acknowledges that loans could be graded EV3 for reasons unrelated to compliance with originators' guidelines or law—*i.e.*, reasons that would *not* render the loans "defective."  The Complaint alleges, for example, that loans could be graded EV3 "if there was an absence of key documents (or the entire loan file), *preventing an assessment* of the loan's compliance with underwriting guidelines and applicable laws and regulations." (Compl. ¶ 161 (emphasis added).)  Documents incorporated into the Complaint show that many loans were graded EV3 simply because the due diligence firms could not obtain certain documents from the originator in time to complete their review—not because the documents did not exist or because the loans did not comply with underwriting guidelines.[40]  Tellingly, the

---

[40]   *See*, *e.g.*, Ex. 26 at UBS_EDNY_009076762 (due diligence manager explained that although 35 loans of 144 loans were graded EV3 in sample, the results were "not a concern" where grade was due to missing documents and there was "not sufficient time to clear missing docs type issues" prior to close of due diligence); Ex. 6 at UBS_EDNY_008853383 (UBS employee noted that EV3 loans were "typically quite curable"); Ex. 27 at UBS_EDNY_050728197 (UBS employee noted that "close to half" of EV3 issues were "tied to missing documents the seller normally would clear if they had enough time").

Complaint does not allege how many loans were graded EV3 for this reason, making it impossible to know how many purportedly "defective" loans were identified during due diligence.

Plaintiff also acknowledges that loans were graded EV3 and kicked out *not* for noncompliance with underwriting guidelines, but "solely" based on UBS's own "bid stipulations." (Compl. ¶ 424.)  These stipulations were "terms and conditions for the purchase" of the loans set by UBS, and "typically detailed . . . *minimum credit parameters required by UBS*." (Compl. ¶ 80 (emphasis added).)  Plaintiff alleges, for example, that "of the 1,438 EV3 loans" identified on the final due diligence report for one RMBS, "*746 were kicked solely because they violated UBS'[s] bid stipulations*." (Compl. ¶ 424 (emphasis added).)  But Plaintiff cannot plausibly allege that UBS engaged in a fraudulent scheme to securitize loans that deviated from originators' guidelines, while at the same time alleging that UBS in fact enforced standards *stricter* than the originators' guidelines.  As shown in the Complaint, these stricter standards *increased* the number of loans graded EV3 for reasons having nothing to do with compliance with underwriting guidelines or loans being "defective." (Compl. ¶ 424.)

Even in cases brought under the *strict liability* provisions of the Securities Act of 1933 and state blue-sky laws, courts have recognized that EV3 rates do not mean that loans were "defective," or even that due diligence was unreasonable.  For example, in *National Credit Union Administration Board* v. *UBS Securities LLC*, the court denied an RMBS investor's motion for summary judgment on UBS's due diligence defense because the record showed that EV3 grades "include[d] examples in which the loan failed [UBS's] own stricter underwriting guidelines instead of the originator's guidelines . . . ; [or] the loan file was missing documentation, which defect could be cured."  2017 WL 411338, at *9 (D. Kan. Jan. 31, 2017).  Similarly, in *MassMutual Life Insurance Co.* v. *DB Structured Products, Inc.*, the court recognized that loans could be graded

EV3 because they were "missing documentation or had other curable exceptions." 110 F. Supp. 3d 288, 292-293 (D. Mass. 2015) (denying RMBS investor's motion for summary judgment on defendant's due diligence defense).

In a *fraud* case such as this, the plaintiff must plead much more.  The court in *Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC North American Holdings, Inc.*, dismissed fraud claims asserted by an RMBS investor that had attempted to plead scienter based on due diligence results, and emphasized that the pleadings failed to distinguish among the reasons for EV3 grades:  "[a]n 'event-level 3' *might* mean that a loan did not comply with underwriting guidelines, or that it violated state and federal lending regulations, or perhaps failed to satisfy the clients' risk tolerances, but *the Court has no way of knowing.*"  2013 WL 6667601, at *21 (S.D.N.Y. Dec. 17, 2013) (emphasis added).

> **b.** **EV3 Rates Apply Only to Sampled Loans—Not Entire RMBS.**

Plaintiff's speculation that "UBS knew that a significant number of loans" backing each RMBS were "defective" also relies on its allegations—again formulaically repeated verbatim for each of the RMBS—that the EV3 rates "*signaled* that similarly defective loans existed in the non-reviewed portion of the pool."  (*E.g.*, Compl. ¶ 425 (emphasis added).)  But even if the alleged EV3 rates were not improperly inflated by the inclusion of "non-defective" loans (as shown above), those rates still could not "signal" that a "significant number" of loans in the entire RMBS offering were "defective" because, as the Complaint itself alleges, (i) the due diligence sample included loans selected both randomly and "adversely" (which means the samples were not representative of the broader pool); and (ii) UBS removed loans graded EV3 from the loan pools prior to purchasing or securitizing them (which means the calculations of alleged EV3 rates for the 40 RMBS offerings must exclude those loans).

The Complaint alleges that UBS determined samples of loans for review through both "random" and "adverse" sampling.  (*See supra* Part F.1.)  UBS's use of "adverse" sampling, which identified *higher-risk* loans, undercuts Plaintiff's allegation that "defects observed in the samples were indicative of similar defects in the unreviewed portions of the pools." (Compl. ¶ 11.)  Indeed, UBS's use of adverse selection by definition meant that the sample was not representative and instead likely contained *more* loans with "defects" than the unsampled remainder of the pool.[41]  Accordingly, the court in *MassMutual* denied an RMBS investor's motion for summary judgment on defendant's due diligence defense because it recognized that "*elevated kick rates are somewhat to be expected for adverse sampling*, which focuses on potentially high risk credit characteristics." 110 F. Supp. 3d at 300 (emphasis added).

Compounding the errors of its formulaic approach, when calculating the purported EV3 rate for a loan pool, the Complaint divides the number of EV3s in the due diligence sample by the number of loans in the sample.  (*See* Compl. tbls. 3a, 3b.)  This calculation *does not apply* to the loans that were *actually included* in the RMBS, but only to the loans reviewed in due diligence, because UBS removed and did not securitize loans that received final grades of EV3.

---

[41] Plaintiff alleges that UBS "referred internally to its sampling methodology as providing 'representative sample[s]'" (Compl. ¶ 11) and refers to congressional testimony by Joseph Scoby, former Group Chief Risk Officer of UBS Group AG, describing UBS's due diligence samples as "benchmark[s] for the remainder of the pools." (Compl. ¶ 156.)  Plaintiff then alleges, in conclusory fashion, that "UBS knew that any issues or defects it observed in the diligence samples were indicative of similar issues and defects in the unreviewed portion of the loan pools." (Compl. ¶ 156.)  But a "benchmark" is not a representative sample, and Plaintiff cannot plausibly allege a counter-factual world where the random and adverse sampling methodologies described in the Complaint would generate results that are representative of the broader pool.  *Utah* v. *Evans*, 536 U.S. 452, 467 (2002) (describing sampling as methodology "used by statisticians seeking to find *a subset that will resemble a whole* through the use of *artificial, random selection processes*" (emphasis added)).

(Compl. ¶¶ 174-176, 200 n.17, 479, 720.)  Accordingly, the EV3 rates Plaintiff cites do not and cannot show that "UBS knew that a significant number of loans" in its RMBS were "defective."

Plaintiff's calculations for one of the loan pools in MABS 2007-HE1, as set forth in Tables 3a and 3b of the Complaint, illustrate these errors:

- The initial pool of loans UBS considered for purchase comprised 5,957 loans.

- UBS reviewed 3,753 of those loans in due diligence, and 692 loans were graded EV3—which Plaintiff characterizes as an 18.44% EV3 rate.

- If this 18.44% EV3 rate were applied *to the entire loan pool*, that would imply that the pool contained 1,098 EV3 loans (5,957 x 18.44%).

- But 692 of those loans already were identified in the due diligence sample and removed from the pool, implying that only 406 EV3 loans remained in the pool (the extrapolated estimate of 1,098 EV3 loans minus the 692 EV3 loans that were removed).

- Dividing 406 by the 5,256 loans UBS actually purchased (5,957 minus 692, to reflect the loans that were removed) yields an EV3 rate of 7.72%, *less than half of Plaintiff's alleged 18.44% rate*.

This corrected rate does not even account for the impact of adverse sampling or the basic fact that "EV3" does not mean "defective," meaning that the EV3 rates in Tables 3a and 3b of the Complaint are inflated and say nothing about how many purportedly "defective" loans actually were included in the RMBS, and whether it was a "significant number."

The *MassMutual* court followed this basic math in finding that "relatively high 'kick' rates" in due diligence results "do not necessarily demonstrate a red flag, *as any loans that were kicked did not make it into the securitization pools*."  *MassMutual*, 110 F. Supp. 3d at 300 (emphasis added).  Plaintiff cannot properly rely on its distorted "EV3 rate" calculations to allege

criminal fraud.  *See Mariah Re Ltd.* v. *Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 618 (S.D.N.Y. 2014) (Sullivan, J.) (dismissing claim based on "bad math and bad logic").

**c.      Plaintiff's Allegations Based on Valuation Due Diligence Fail To Show That UBS Knew Any Valuations Were Inflated.**

Plaintiff asserts that "UBS knew" as a result of its "valuation" due diligence that "there was a high probability" that certain loans in the Principal RMBS "had materially inflated property values."  (Compl. ¶ 242.)  But the Complaint does not allege facts sufficient to support that allegation.

The property values reflected in the offering documents for the 40 RMBS represented "the lesser of the selling price of the mortgaged property or its appraised value at the time of sale" or, for mortgages to refinance an existing loan, the "appraised value . . . at the time of the refinance."  (Ex. 13 at S-38.)  Nowhere does the Complaint allege that any UBS employees believed that the results of valuation due diligence provided a better estimate of property value than the original appraised value or the actual sale price of the property, negotiated in an arm's-length transaction.  *See Schonfeld* v. *Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("[I]t is well-established that a recent sale price for [a] subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value.").

Instead, the boilerplate allegations in the "Deal-Specific" sections of the Complaint simply state that UBS's valuation due diligence "revealed significant issues with the collateral" for the loans, and then list the number of loans that purportedly "exceeded the tolerances."  (*See, e.g.*, Compl. ¶ 374.)  The mere fact that loans were "out of tolerance" is of no moment without the further allegation that anyone at UBS believed that valuation due diligence estimates were more reliable estimates of property value than appraised values or sale prices.  These missing allegations, combined with the lack of any facts concerning, for example, the degree of any "intolerance" or

-49-

whether the "out of tolerance" loans were for purchase transactions where the value of the property was supported by a sales price, are fatal to Plaintiff's effort to plead that UBS "knew" of a "high probability" that the disclosed valuations were inflated.  (Compl. ¶¶ 242-254.)

> **d.     Plaintiff's Out-of-Context Quotes From Cherry-Picked Emails Do Not Support a Strong Inference of Fraudulent Intent as to Any of the 40 RMBS.**

The emails cited in the Complaint also do not support a strong inference of fraudulent intent.  Plaintiff cherry-picked these emails from a massive record of more than 90 million pages of documents—giving Plaintiff the opportunity to quote any email written by any employee in UBS's RMBS business over a multi-year period.  It is hardly surprising that Plaintiff has come up with a handful of out-of-context quotes, but it has not cited anything that supports a strong (or even weak) inference that fraud was committed in any of the 40 RMBS.  *Not a single email* or piece of testimony quoted in the Complaint indicates that any employee believed that any of the challenged statements were false.  In fact, the only emails that specifically reference any RMBS offering documents are about *only one* of the 40 RMBS (AHMIT 2006-2).  For that RMBS, a UBS transaction manager stated in an email that the "exception rate [for AHMIT 2006-2] is *well within [accepted] tolerance*, and should not warrant any disclosure in the offering documents." (Compl. ¶ 723 (emphasis added).)  The Complaint never explains how this email, which on its face states that the transaction manager believed the offering documents were correct, supports an allegation of fraud.  Moreover, although the Complaint includes quotations of specific emails from unnamed employees, the Complaint never identifies which emails it contends were sent or received by the UBS employees responsible for making the challenged statements, or how those emails indicate that those employees had fraudulent intent.

Beyond this, many of the Complaint's quoted emails are untethered to any of the 40 RMBS.  For example, Plaintiff claims that "UBS" was "aware of appraisal fraud schemes"

based on a February 2007 chat between two employees, in which one relayed a "story" he had heard from an unidentified "realtor" in an unidentified housing market describing a rumored scheme between a borrower and seller that did not have any connection to the 40 RMBS.  (Compl. ¶ 225.)   Other emails omit critical passages that contradict the cherry-picked quotes in the Complaint.  For instance, Plaintiff cites an email supposedly to show, as a motive for fraud, that "UBS needed to appease originators."  (Compl. ¶ 199.)  The author of that email expressed concern that tightening valuation tolerances would "run the risk of alienating everyone that sells loans to us," (Compl. ¶¶ 21, 199; Ex. 28 at UBS_EDNY_063845694), but the Complaint misleadingly omits the very next sentence where the author notes, "I realize, as residual holder, that is a line we continually need to toe"—*i.e.*, that *as an investor* in the RMBS, UBS would want to conduct robust due diligence even if it upset originators.   (Ex. 28 at UBS_EDNY_063845694.)   Similarly, Plaintiff alleges that "UBS knew" that there were defective loans in the unsampled portions of a loan pool, citing an email where a UBS employee acknowledged that a loan pool was "[a] bit higher on the drops."  (Ex. 26 at UBS_EDNY_009076762.)  But the employee explains that the "bit higher" reject rate was due in part to having "not sufficient time to clear missing docs."  (*Id.*) Rather than include loans with issues that were expected to be resolved in time, UBS removed them from the pool.  (*Id.*)

### D.   Plaintiff Fails To Allege That UBS Contemplated Harm to RMBS Investors as a Result of Its Alleged Scheme.

As shown above, Plaintiff fails to allege that Defendants acted with the required strong inference of scienter, and this alone is fatal to all its claims.  Additionally, for the predicate offenses of mail and wire fraud (18 U.S.C. §§ 1341, 1343) and participating in fraudulent bank transactions (18 U.S.C. § 1005), Plaintiff must plead that UBS "contemplated or intended some

harm to the property rights of the victim." *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).  Plaintiff fails to meet its pleading burden.

The Complaint and documents incorporated therein make clear that each of the 40 RMBS was a complex securitization designed to mitigate the economic risk of borrower default and losses on the loans.  The RMBS thus included features such as "subordination," "overcollateralization," and "excess spread."  (Compl. ¶ 105.)  These "credit enhancements" allegedly were included in the RMBS to "absorb initial losses" and "create[] a financial buffer" for RMBS investors.  (Compl. ¶¶ 105-106.)  Conclusory pleadings that UBS "knew" that a "significant number" of loans in the 40 RMBS were "defective"—based on faulty math—provide no way to assess whether UBS contemplated any harm to investors in any of the 40 RMBS. Neither the Court nor Defendants have any way to know whether the "significant number" was actually "significant" at all, or whether the allegedly "defective" loans could ever have "harmed" RMBS investors' interests given the "financial buffer[s]" already built into the RMBS.  *United States* v. *Starr*, 816 F.2d 94, 99 (2d Cir. 1987) (reversing mail and wire fraud conviction and dismissing indictment where "evidence does not identify what harm, if any, [defendants] intended to inflict on their customers").[42]  These vague and conclusory allegations do not even begin to meet the pleading standards of Rule 9(b).

*     *     *

In sum, the Complaint pleads an implausible, convoluted, and internally inconsistent scheme to defraud for which UBS had no motive and from which UBS lost billions

---

[42]     Indeed, Plaintiff nowhere explains how Defendants, through any of their employees,  could ever have contemplated  harm to *all* investors in the 40 RMBS, given that, as alleged, investors in senior tranches were exposed to far less risk from the loans in the RMBS than investors in the junior or residual tranches (such as UBS). *See supra* Part E.

of dollars, including in the 40 RMBS offerings. "[C]onsider[ing] the complaint in its entirety and tak[ing] into account plausible opposing inferences," the inference of scienter is not "cogent and at least as compelling" as the non-fraudulent inferences to be drawn from UBS's conduct. *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 177-78 (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)) (internal quotation marks omitted). At worst, the Complaint recounts conduct that might rise to the level of negligence, but this is a fraud case, and Plaintiff's fraud-by-formula pleading does not pass muster. *See In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) ("even a lack of due diligence will not state a securities fraud claim absent evidence of corresponding fraudulent intent"); *Matana* v. *Merkin*, 2014 WL 426857, at *4 (S.D.N.Y. Feb. 4, 2014) (complaint based on alleged deviations from "industry practice" of due diligence "pleads a lapse, but it does not plead fraud" because defendant "may well have been irresponsible or slipshod . . . but irresponsibility does not equate to fraudulent intent").

When all is said and done, the Complaint does not come close to supporting the required strong inference that UBS perpetrated a complex scheme to defraud sophisticated investors in the 40 RMBS. Plaintiff simply has no way around Judge Sullivan's holding, affirmed by the Second Circuit, that "the mere fact that UBS made substantial investments in mortgage-related securities . . . undercuts [p]laintiffs' ability to plead a 'strong inference' of scienter." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *12. The Complaint should be dismissed.

## II.   THE COMPLAINT DOES NOT PLEAD THE PREDICATE OFFENSES OF BANK FRAUD, FRAUDULENT BANK TRANSACTIONS, AND FALSE STATEMENTS TO BANKS.

Apart from mail and wire fraud, the Complaint also seeks to ground FIRREA liability on three additional predicate offenses:  bank fraud (18 U.S.C. § 1344); fraudulent bank transactions (18 U.S.C. § 1005); and making false statements to banks (18 U.S.C. § 1014). Each of Plaintiff's novel theories of liability is meritless.

A.      **The Complaint Does Not Plead the Predicate Offense of Bank Fraud (18 U.S.C. § 1344).**

Section 1344 criminalizes any scheme (i) "to defraud a financial institution" or (ii) "to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses." 18 U.S.C. § 1344.  This statute did not transform "every fraud, no matter how prosaic" into a federal crime.  *Loughrin*, 573 U.S. at 361.

Rather, Plaintiff must allege either (i) that Defendants engaged in "a pattern or course of conduct *designed to deceive a . . . financial institution* into releasing property, *with the intent to victimize the institution* by exposing it to actual or potential loss," *United States* v. *Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992); or (ii) that Defendants intended to obtain property "owned by, or under the custody or control of, a financial institution" and that "the envisioned result—*i.e.*, the obtaining of bank property—occur[red] by means of false or fraudulent pretenses, representations, or promises," *Loughrin*, 573 U.S. at 354-56.  The Complaint does not state a claim under either theory.

A public securities offering pursuant to supposed misrepresentations is not transformed into federal bank fraud simply because a covered bank decides to buy securities in that offering.  The "goal" of the "scheme" must be to "defraud a bank" or "obtain[] bank property" specifically.  *Id.* at 356, 357, 364 n.6.  The Second Circuit thus has underscored that 18 U.S.C. § 1344 "should not be read to 'federaliz[e] frauds that are only tangentially related to the banking system,' which is § 1344's core concern." *Bouchard*, 828 F.3d at 126.  It is not federal bank fraud where, as here, the only involvement of the "victim" bank is its "engage[ment] in activities far afield of the *core functions of our federal banking system*," *id.*, here as one of many investors in a public securities offering.

-54-

Until now, DOJ has limited its claims of bank fraud to schemes involving the "core functions" of a bank, such as accepting deposits, transferring funds, cashing checks, and making loans. *See, e.g.*, *Shaw* v. *United States*, 137 S. Ct. 462 (2016) (making unauthorized transfers from federally-insured account); *Loughrin*, 573 U.S. at 353 (altering or forging checks to obtain federally-insured deposits); *United States* v. *Rigas*, 490 F.3d 208 (2d Cir. 2007) (false statements to secure better interest rate on loan from federally-insured institution). Defendants are not aware of a single case where DOJ has prosecuted any person or entity for bank fraud in connection with an allegedly fraudulent public offering of securities.

Even if Plaintiff otherwise had a viable legal theory (and it does not), the Complaint does not adequately plead that the "goal" of UBS's purported "scheme" was to "defraud a bank" or "obtain[] bank property," *Loughrin*, 573 U.S. at 356, 357, 364 n.6, let alone with respect to each of the 40 RMBS. The Complaint alleges, in conclusory fashion, that "[a]s to each Subject Deal, UBS intended to defraud or victimize one or more financial institutions ('FIs'), including by targeting money and property owned by, or in the custody or control of, such institutions by means of false or fraudulent pretenses, representations, or promises." (Compl. ¶ 292.) But this pure legal conclusion, which merely recites the language of the bank fraud statute, is "not entitled to the assumption of truth" under *Twombly* and *Iqbal*. *Iqbal*, 556 U.S. at 679; *see Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007).

The Complaint's remaining allegations do not "nudge[]" Plaintiff's claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). The Complaint generically alleges that UBS "actively marketed" RMBS certificates to financial institutions (Compl. ¶ 294), and then simply identifies a group of financial institutions and avers that one or more of them "purchased RMBS in the Subject Deals" (Compl. ¶ 296).

Plaintiff similarly alleges that "[o]ne or more FIFIs purchased certificates in each of the Subject Deals" (Compl. ¶ 295), but does not connect any particular financial institution to any of the 40 RMBS (let alone *each* of them). By leaving the Court and UBS to speculate as to the "who, what, where, when, and why" of the purported fraud, these allegations do not meet Rule 9(b)'s specificity requirement. *Jovel*, 2013 WL 5437065, at *11.

### B.   The Complaint Does Not Plead the Predicate Offense of Participating in Fraudulent Bank Transactions (18 U.S.C. § 1005).

Section 1005 ("Bank entries, reports and transactions") is intended to protect financial institutions from *insider* misconduct, and the Complaint does not and cannot allege that any of Defendants was an "insider" at the "victim" banks. The first paragraph of Section 1005 provides that "[w]hoever, *being an officer, director, agent or employee of* any" covered financial institution "issues or puts in circulation any notes" of the institution without authorization is guilty of a crime. 18 U.S.C. § 1005. The remaining three paragraphs state that "whoever" commits certain bank-related misconduct also shall be guilty of a crime. Plaintiff here seemingly seeks to impose liability on UBS under the fourth paragraph of the statute,[43] but Congress clearly envisioned that the bank insider limitation would carry through to all paragraphs in Section 1005. All but one of the courts that have considered the question—including a judge in this District— have held that the second and third paragraphs of Section 1005 are limited to bank insiders. *United States* v. *Ortiz*, 906 F. Supp. 140, 144-46 & n.2 (E.D.N.Y. 1995) (Trager, J.) ("[T]he statute only reaches to conduct performed by individuals acting in their capacity as bank officials or aiding and

---

[43]   The fourth paragraph provides that "[w]hoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution" shall be guilty of a crime. 18 U.S.C. § 1005.

abetting such persons."); *United States* v. *Barel*, 939 F.2d 26, 39 (3d Cir. 1991) ("Congress intended the statute to apply only to bank insiders or their accomplices."); *United States* v. *Edwards*, 566 F. Supp. 1219, 1229 (D. Conn. 1983) (same).[44]

As these courts have explained, the predecessor statute to Section 1005 contained a single paragraph that applied only to "officer[s], director[s], agent[s], or employee[s]" of the protected banks.  40 Stat. 972, § 5209, 65 Cong. Sess. II, Ch. 177 (1918).  When this predecessor statute was recodified as Section 1005 in 1948, the recodified statute was split into the current first three paragraphs of Section 1005.  *See* 62 Stat. 750, § 1005, 80th Cong. Sess. II, Ch. 645 (1948).  The reviser's note accompanying this change states that "*no changes of meaning or substance were made* except that . . . the different punishment provisions were reconciled, and one uniform punishment provision was adopted."  18 U.S.C.A. § 1005, Historical and Statutory Notes.  Thus "[a]lthough not apparent from the terms of § 1005, the legislative history and the pre-1948 bill make clear that the statute only reaches to conduct performed by individuals acting in their capacity as bank officials or aiding and abetting such persons."  *Ortiz*, 906 F. Supp. at 145 (discussing *Edwards*, 566 F. Supp. at 1220-21).

Despite this authority, Plaintiff asks the Court to eliminate the bank insider limitation by reading the word "whoever" in just the fourth paragraph far more expansively than the same word ("whoever") used in the previous three paragraphs.  There is limited authority for Plaintiff's interpretation, *see*, *e.g.*, *United States* v. *Van Brocklin*, 115 F.3d 587, 597 (8th Cir. 1997); *United States* v. *Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 629 (S.D.N.Y. 2013), but

---

[44]     As far as Defendants are aware, there is only one decision holding that the bank insider limitation does not apply to the second and third paragraphs, *see United States* v. *Edick*, 432 F.2d 350, 352-53 (4th Cir. 1970), and this nearly 50-year old decision has never been followed by any other court.

the better-reasoned authority, consistent with the nearly unanimous interpretation of Paragraphs Two and Three and the legislative history, holds that "Paragraph Four applies only to bank insiders." *Rubin*, 798 F. Supp. 2d at 524-28 (dismissing charge that defendants violated the fourth paragraph because the indictment did not allege that defendants were bank insiders). As Judge Marrero explained in dismissing charges against defendants who were not alleged to be bank insiders, Paragraph Four's "current location and predicament must be acknowledged: Paragraph Four follows Paragraphs One, Two and Three, and there is ample support in FIRREA's legislative history to find that Congress was concerned with regulating the conduct of bank insiders." *Id.* at 527.[45]

Moreover, nothing in Section 1005's text or legislative history indicates that Congress meant the term "[w]hoever" to carry a different meaning in the fourth paragraph than in the first three and, indeed, such a construction would violate the settled presumption of consistent usage, which instructs that "identical words used in different parts of the same act are intended to have the same meaning." *Dep't of Revenue of Oregon* v. *ACF Indus., Inc.*, 510 U.S. 332, 342 (1994); *accord Prus* v. *Holder*, 660 F.3d 144, 147 (2d Cir. 2011) (same).[46] Because the Complaint does not allege that UBS was a "bank insider," the Court should dismiss Plaintiff's Section 1005 claim.

---

[45]     The fourth paragraph was added to Section 1005 in 1989 as part of FIRREA. *See* FIRREA, Pub. L. No. 101-73, § 961(d)(3), 103 Stat. 183, 499 (1989).

[46]     Even if "both readings" of Section 1005 were "plausible" (and they are not), the rule of lenity would favor UBS's interpretation. *Williams*, 458 U.S. at 290; *see also Crandon* v. *United States*, 494 U.S. 152, 158 (1990) ("[I]t is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage."); *Rubin*, 798 F. Supp. 2d at 527-28 (applying rule of lenity in light of Section 1005's "inherent linguistic ambiguity"); *Barel*, 939 F.2d at 39 ("[T]his is an appropriate case for applying the ancient maxim that criminal statutes should be narrowly construed.").

**C. The Complaint Does Not Plead the Predicate Offense of Making False Statements to Banks (18 U.S.C. § 1014).**

Section 1014 criminalizes (1) making a "false statement or report"; (2) "for the purpose of influencing in any way the action of" a covered financial institution (such as an FDIC-insured lender); (3) "upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, loan, or insurance agreement or application for insurance or a guarantee . . . ." 18 U.S.C. § 1014. This statute has been used to prosecute crimes such as lying on loan applications or on applications for checking accounts.[47] Notwithstanding this, Plaintiff impermissibly seeks to expand the scope of Section 1014 to cover situations where the only involvement of a covered financial institution is as one of dozens of investors in a public securities offering. (*See* Compl. ¶ 827.) Controlling precedent bars this expansion of the criminal code.

Section 1014 does not punish *all* false statements of any kind to banks. The Supreme Court has limited the reach of Section 1014 to statements "in connection with conventional loan or related transactions." *Williams*, 458 U.S. at 288-89. The Second Circuit likewise has held that the "broad terms" listed in Section 1014—such as "application" or "purchase"—"must be interpreted with reference to the statute as a whole, and can only refer to . . . an advance or loan or other credit transaction listed in the statute." *United States* v. *Krown*, 675 F.2d 46, 50-51 (2d Cir. 1982) (vacating convictions because there is no liability under Section 1014 for "worthless checks"). Despite the "broad terms" the statute uses, their context

---

[47]  *See United States* v. *Boren*, 278 F.3d 911, 912 (9th Cir. 2002) (falsely representing to bank that check had been lost or stolen so bank would issue a stop payment); *United States* v. *Wade*, 266 F.3d 574, 577-79 (6th Cir. 2001) (presenting false identification when applying for checking accounts); *United States* v. *Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (submitting false invoices so bank would release bond funds held in trust); *United States* v. *Smith*, 29 F.3d 914, 915-16 (4th Cir. 1994) (submitting false loan application).

makes clear that the proscriptions are "limit[ed]" to statements made to influence "specifi[c] credit" decisions.  *Id.* at 50.

Other courts similarly have interpreted Section 1014 to reach only "lending activities by financial institutions."  *United States* v. *Devoll*, 39 F.3d 575, 580 (5th Cir. 1994) (rejecting argument that Section 1014 criminalizes false statements made "for the purpose of influencing an institution's actions in *any* way" and holding, instead, that Section 1014 "applies only to actions involving lending transactions").  The alleged misconduct here—misrepresentations in RMBS offering documents to investors generally—is far afield from lies "in connection with conventional loan or related transactions."  *Williams*, 458 U.S. at 288-89.

Plaintiff's proposed expansion of the words "purchase" or "advance" in Section 1014 to cover alleged misrepresentations made in connection with a securities offering that happened to include some financial institutions as investors is inconsistent with the settled rule of construction that "a word is known by the company it keeps."  *Gustafson* v. *Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995).  "Purchase" and "advance" must be read in conjunction with "application," "loan," "insurance agreement," *etc.*—each of which refers to core banking activities—not *proprietary investments* by a bank.  And the title of Section 1014 ("Loan and credit applications generally; renewals and discounts; crop insurance") confirms that the statute reaches only false statements made to banks in connection with core banking activities, like lending.  *See Brotherhood of R.R. Trainmen* v. *Baltimore & O.R. Co.*, 331 U.S. 519, 529 (1947) (the title of a statute may be used to "shed light on some ambiguous word or phrase").  Accordingly, Section 1014 cannot serve as a predicate for Plaintiff's FIRREA claims.[48]

---

[48]     Section 1014's legislative history confirms that it was intended to proscribe false statements in connection with core banking activities—not as a new tool to prosecute securities

III.   **THE COMPLAINT DOES NOT PLEAD PERSONAL JURISDICTION OVER UBS AG OR FACTS SUFFICIENT TO STATE ANY CLAIM AGAINST UBS AG.**

Plaintiff's claims against UBS AG should be dismissed because the Complaint (i) does not make a prima facie showing that UBS AG is subject to general or specific jurisdiction in New York, *Thomas* v. *Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."), and (ii) in any event, does not state a claim against UBS AG.

As the Second Circuit recently affirmed, UBS AG is not subject to general jurisdiction here.  *SPV Opus Ltd.* v. *UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018).  Courts have general jurisdiction over a foreign corporation where the corporation is "essentially at home" in the forum state, which generally means the forum where the corporation is incorporated or has its principal place of business.  *Id.*  There is no general jurisdiction here, because "UBS AG's place of incorporation and principal place of business is in Switzerland."  *Id.*; *see also Daimler AG* v. *Bauman*, 571 U.S. 117, 138-39 (2014); Declaration of John Connors, dated February 6, 2019.

To plead specific jurisdiction, Plaintiff must show that UBS AG "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 475 (1985), meaning that its "suit-related conduct . . . created a substantial connection with the forum State," *Walden* v. *Fiore*, 571 U.S. 277, 284 (2014); *see also Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) ("What is needed [for specific jurisdiction to exist] is a connection between the forum and the specific claims

---

fraud. *See*, *e.g.*, H.R. Rep. No. 91-1457 (1970) (Section 1014 "relat[es] to false statements in loan and credit applications"); S. Rep. No. 88-1078 (1964) (Section 1014 bars "false statements . . . in connection with applications, loans, and the like" and "is designed primarily to apply to borrowers from Federal agencies or federally chartered organizations").

at issue."). "Random, fortuitous, or attenuated contacts" with New York will not suffice. *Burger King*, 471 U.S. at 475. The Complaint falls far short of meeting this standard.

Plaintiff makes just two allegations regarding UBS AG in the entire Complaint.[49] *First*, the Complaint alleges that UBS AG was a counterparty to various side agreements involving certain (not all) of the 40 RMBS offerings. (Compl. ¶ 35.) But these financing agreements did not "g[i]ve rise to the episode-in-suit," *Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (emphasis omitted). In *SPV Osus*, for example, plaintiff sued several UBS entities for "sponsoring" and "providing support for" European feeder funds that foreign investors used to invest money with Bernie Madoff. 882 F.3d at 338. Plaintiff argued that, simply by transferring money from Europe to New York, the UBS entities were subject to specific jurisdiction in New York. *Id.* at 344-45. The Second Circuit rejected that argument, concluding that the UBS entities' contacts with the forum "amount[ed] to a handful of communications and transfers of funds" whose connection with the purported harm was "too tenuous to support the exercise of specific jurisdiction." *Id.* Here, the Complaint's allegations are even weaker than those in *SPV Osus*, because there is no allegation of any significant activity by UBS AG *in New York* relating to the "episode-in-suit."

*Second*, the Complaint alleges that, acting under the trade name "UBS Home Finance," UBS AG originated certain unspecified loans that were sold to another Defendant and ultimately were securitized in two of the 40 RMBS. (Compl. ¶ 35.) But the prospectus supplements for the two RMBS in question state that "UBS Home Finance" was a trade name for "UBS AG, Tampa Branch," which was based **in Florida**, **not** New York. (Ex. 14 at S-34; Ex. 29 at S-32.) UBS AG's contacts with Florida do not establish specific jurisdiction with New York.

---

[49]      Appendix F contains a summary of UBS AG's role (if any) in each of the 40 RMBS.

-62-

*See Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 413 (1984) (specific jurisdiction exists only when the controversy "arises out of a defendant's contacts *with the forum*").

*Finally*, the Complaint does not state any claim against UBS AG on the merits. Neither the Complaint nor any of the documents incorporated therein suggests UBS AG had any role in the purported fraud.  (Compl. ¶¶ 115-148).  Indeed, at no point does the Complaint explain what role, if any, UBS AG allegedly played in preparing the offering documents and presentations that allegedly contained misrepresentations.  Plaintiff merely lumps UBS AG together with the other three Defendants and makes generalized and conclusory allegations about "UBS" (*see*, *e.g.*, Compl. ¶¶ 116, 139, 149), but "[w]here there are multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud."  *Alnwick* v. *European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 639 (E.D.N.Y. 2003) (Spatt, J.).  On this basis alone, the Court should dismiss all claims against UBS AG.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion to dismiss with prejudice.

Respectfully submitted,

Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
Amanda F. Davidoff (*davidoffa@sullcrom.com*)
Justin J. DeCamp (*decampj@sullcrom.com*)
Jacob M. Croke (*crokej@sullcrom.com*)
Hilary M. Williams (*williamsh@sullcrom.com*)
Harry F. Murphy (*murphyh@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for UBS Securities LLC, UBS AG, Mortgage
Asset Securitization Transactions, Inc., and UBS Real
Estate Securities, Inc.*

February 6, 2019