# Exhibit 1

PROSPECTUS SUPPLEMENT DATED February 15, 2006
(To Prospectus dated June 2, 2005)



**$869,864,000 (Approximate)**

**MASTR Asset Backed Securities Trust 2006-NC1**
**(Issuing Entity)**

**Mortgage Asset Securitization Transactions, Inc.**
**(Depositor)**

**UBS Real Estate Securities Inc.**
**(Sponsor)**

**Wells Fargo Bank, N.A.**
**(Master Servicer, Servicer and Trust Administrator)**

**Mortgage Pass Through Certificates, Series 2006-NC1**

The MASTR Asset Backed Securities Trust 2006-NC1 is issuing nineteen classes of certificates, but is offering only twelve classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed-end, fixed-rate and adjustable-rate mortgage loans secured by first and second mortgages or deeds of trust on residential one- to four-family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions," excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "Description of the Certificates—Interest Rate Swap Agreement, the Swap Provider and the Swap Account."

---

**You should consider carefully the risk factors beginning on page S-17 in this prospectus supplement and page 8 in the prospectus.**

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity.  No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

---

**Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete.  Any representation to the contrary is a criminal offense.**

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc.  UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about February 24, 2006.

The proceeds to the depositor are expected to be approximately $867,689,340 before deducting expenses.  See "Underwriting" in this prospectus supplement.  UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.



# TABLE OF CONTENTS

## PROSPECTUS SUPPLEMENT

Page

SUMMARY .......................................................................................................................... S-6
RISK FACTORS ................................................................................................................... S-17
FORWARD LOOKING STATEMENTS ............................................................................. S-27
AFFILIATIONS AND RELATED TRANSACTIONS ........................................................ S-28
DEFINED TERMS ............................................................................................................... S-28
USE OF PROCEEDS ........................................................................................................... S-28
DESCRIPTION OF THE MORTGAGE LOANS.................................................................. S-28
STATIC POOL INFORMATION ......................................................................................... S-42
THE ORIGINATOR.............................................................................................................. S-42
THE MASTER SERVICER AND THE TRUST ADMINISTRATOR .................................. S-47
THE SERVICER .................................................................................................................... S-48
THE TRUSTEE ..................................................................................................................... S-50
THE SPONSOR ..................................................................................................................... S-50
THE DEPOSITOR ................................................................................................................. S-51
THE ISSUING ENTITY ....................................................................................................... S-52
DESCRIPTION OF THE CERTIFICATES .......................................................................... S-52
PREPAYMENT AND YIELD CONSIDERATIONS............................................................. S-68
THE POOLING AND SERVICING AGREEMENT ............................................................. S-84
FEDERAL INCOME TAX CONSEQUENCES .................................................................... S-91
ERISA CONSIDERATIONS ................................................................................................ S-94
LEGAL INVESTMENT........................................................................................................ S-96
USE OF PROCEEDS ............................................................................................................ S-96
UNDERWRITING ................................................................................................................. S-96
RATINGS............................................................................................................................... S-96
LEGAL MATTERS ............................................................................................................... S-97
GLOSSARY OF TERMS ...................................................................................................... S-98
ANNEX I................................................................................................................................ I-1
ANNEX II .............................................................................................................................. II-1
ANNEX III ............................................................................................................................. III-1

See "Certain Legal Aspects of Residential Loans—Anti-Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders" in the prospectus.

**The Certificates Are Obligations of the Trust Only**

The Class A Certificates and the Mezzanine Certificates will not represent an interest in or obligation of the depositor, the originator, the sponsor, the servicer, the master servicer, the trust administrator, the trustee or any of their respective affiliates. None of the Class A Certificates, the Mezzanine Certificates or the underlying mortgage loans will be guaranteed or insured by any governmental agency or instrumentality, or by the depositor, the originator, the sponsor, the servicer, the master servicer, the trust administrator, the trustee or any of their respective affiliates. Proceeds of the assets included in the trust and proceeds from the Net WAC Rate Carryover Reserve Account will be the sole source of distributions on the Class A Certificates and the Mezzanine Certificates, and there will be no recourse to the depositor, the originator, the sponsor, the servicer, the master servicer, the trust administrator, the trustee or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all distributions provided to the Class A Certificates and the Mezzanine Certificates.

**The Interest Rate Swap Agreement and the Swap Provider**

Any amounts received from the Swap Provider under the Interest Rate Swap Agreement will be applied as described in this prospectus supplement to pay interest shortfalls and basis risk shortfalls, maintain the required level of overcollateralization and cover losses. However, no amounts will be payable by the Swap Provider unless the floating amount owed by the Swap Provider on a distribution date exceeds the fixed amount owed to the Swap Provider on such distribution date. This will not occur except in periods when one-month LIBOR (as determined pursuant to the Interest Rate Swap Agreement) generally exceeds (i) in the case of the first 43 Distribution Dates, 4.672% or (ii) in the case of the 44th and 45th Distribution Date, 4.820%. No assurance can be made that any amounts will be received under the Interest Rate Swap Agreement, or that any such amounts that are received will be sufficient to maintain the required level of overcollateralization or to cover interest shortfalls, basis risk shortfalls and losses on the mortgage loans. Any net payment payable to the Swap Provider under the terms of the Interest Rate Swap Agreement will reduce amounts available for distribution to certificateholders, and may reduce the pass-through rates of the certificates. If the rate of prepayments on the mortgage loans is faster than anticipated, the schedule on which payments due under the Interest Rate Swap Agreement are calculated may exceed the aggregate principal balance of the mortgage loans, thereby increasing the relative proportion of interest collections on the mortgage loans that must be applied to make net payments to the Swap Provider. The combination of a rapid rate of prepayment and low one-month LIBOR could adversely affect the yields on the Class A Certificates and Mezzanine Certificates. In addition, any Swap Termination Payment payable to the Swap Provider (other than a Swap Termination Payment resulting from a Swap Provider Trigger Event) in the event of early termination of the Interest Rate Swap Agreement will reduce amounts available for distribution to certificateholders.

Upon early termination of the Interest Rate Swap Agreement, the trust or the Swap Provider may be liable to make a Swap Termination Payment to the other party (regardless of which party caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the trust is required to make a Swap Termination Payment, that payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, generally prior to distributions to certificateholders. This feature may result in losses on the certificates. Due to the priority of the applications of the available funds, the Mezzanine Certificates will bear the effects of any shortfalls resulting from a Net Swap Payment or Swap Termination Payment by the trust before such effects are borne by the Class A Certificates and one or more classes of Mezzanine Certificates may suffer a loss as a result of such payment. Investors should note that the level of one-month LIBOR as of February 13, 2006 is approximately 4.570% which means the trust will make a Net Swap Payment to the Swap Provider unless and until one-month LIBOR equals approximately (i) in the case of the first 43 Distribution Dates, 4.672% or (ii) in the case of the 44th and 45th Distribution Date, 4.820%.

To the extent that distributions on the Class A Certificates and Mezzanine Certificates depend in part on payments to be received by the trust under the Interest Rate Swap Agreement, the ability of the trust administrator to make such distributions on such certificates will be subject to the credit risk of the Swap Provider to the Interest Rate Swap Agreement. The credit ratings of the Swap Provider as of the date of this prospectus supplement are

lower than the ratings assigned to the Class A Certificates.  See "Description of the Offered Certificates—The Swap Provider" in this prospectus supplement.

**Lack of Liquidity**

The underwriter intends to make a secondary market in the offered certificates, but has no obligation to do so.  There is no assurance that such a secondary market will develop or, if it develops, that it will continue.  Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield.  The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future.  Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit, or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**Rights of Beneficial Owners May Be Limited by Book Entry System**

Ownership of the offered certificates will be registered electronically with the Depository Trust Company.  The lack of physical certificates could:

- result in distribution delays on the offered certificates because the trust administrator will be sending distributions on the certificates to the Depository Trust Company instead of directly to you;

- make it difficult to pledge the offered certificates if physical certificates are required by the party demanding the pledge; and

- hinder the ability to resell the offered certificates because some investors may be unwilling to buy certificates that are not in physical form.  See "Description of the Certificates—Book-Entry Certificates" in this prospectus supplement.

**Rights of the NIMS Insurer**

Pursuant to the terms of the pooling and servicing agreement, unless there exists a NIMS Insurer Default, such NIMS Insurer will be entitled to exercise, among others, the following rights of the holders of the Class A Certificates and Mezzanine Certificates, without the consent of such holders, and the holders of the Class A Certificates and Mezzanine Certificates may exercise such rights only with the prior written consent of such NIMS Insurer: (i) the right to provide notices of servicer defaults or master servicer defaults and the right to direct the termination of the rights and obligations of the servicer or the master servicer under the pooling and servicing agreement in the event of a default by the servicer or the master servicer; (ii) the right to remove the trustee or the trust administrator or any co-trustee or custodian pursuant to the pooling and servicing agreement; and (iii) the right to direct the trust administrator to make investigations and take actions pursuant to the pooling and servicing agreement.  In addition, unless a NIMS Insurer Default exists, such NIMS Insurer's consent will be required prior to, among other things, (i) the removal or replacement of the servicer, the master servicer, any successor servicer or successor master servicer, the trust administrator or the trustee, (ii) the appointment or termination of any subservicer or co-trustee or (iii) any amendment to the pooling and servicing agreement.

Investors in the offered certificates should note that:

- any insurance policy issued by the NIMS Insurer, if any, will not cover, and will not benefit in any manner whatsoever, the offered certificates;

- the rights to be granted to the NIMS Insurer, if any, are extensive;

- the interests of the NIMS Insurer, if any, may be inconsistent with, and adverse to the interests of the holders of the offered certificates and the NIMS Insurer, if any, has no obligation or duty to consider the

interests of the offered certificates in connection with the exercise or nonexercise of such NIMS Insurer's rights;

- such NIMS Insurer's exercise of the rights and consents set forth above may negatively affect the offered certificates and the existence of such NIMS Insurer's rights, whether or not exercised, may adversely affect the liquidity of the offered certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

- there may be more than one series of notes insured by the NIMS Insurer and the NIMS Insurer will have the rights set forth herein so long as any such series of notes remain outstanding.

**Nature of the Mortgage Loans**

The mortgage loans in the trust were originated in accordance with the originator's underwriting guidelines described herein without regard to whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac. As a result, delinquencies and liquidation proceedings are more likely with these mortgage loans than with mortgage loans that are originated in a more traditional manner. As a result of the use of such underwriting standards, in the event the mortgage loans do become delinquent or subject to liquidation, you may face delays in receiving payment and losses if the credit enhancements are insufficient to cover the delays and losses.

**Reduction or Withdrawal of Ratings**

Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.

**Suitability of the Offered Certificates as Investments**

The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly distributions or distribution on any specific date. The offered certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

## FORWARD LOOKING STATEMENTS

In this prospectus supplement and the accompanying prospectus, we use certain forward looking statements. These forward looking statements are found in the material, including each of the tables, set forth under "Risk Factors" and "Prepayment and Yield Considerations" in this prospectus supplement. Forward looking statements are also found elsewhere in this prospectus supplement and the prospectus and include words like "expects," "intends," "anticipates," "estimates" and other similar words. These statements are intended to convey our projections or expectations as of the date of this prospectus supplement. These statements are inherently subject to a variety of risks and uncertainties. Actual results could differ materially from those we anticipate due to changes in, among other things:

(1) economic conditions and industry competition;

(2) political and/or social conditions; and

(3) the law and government regulatory initiatives.

We will not update or revise any forward looking statement to reflect changes in our expectations or changes in the conditions or circumstances on which these statements were originally based.

## AFFILIATIONS AND RELATED TRANSACTIONS

UBS Securities LLC is an affiliate of Mortgage Asset Securitization Transactions, Inc. and UBS Real Estate Securities Inc.  Each of Mortgage Asset Securitization Transactions, Inc. and UBS Real Estate Securities Inc. is a wholly owned subsidiary of UBS Americas Inc.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the sponsor, the depositor and the trust and (b) any of the servicer, the master servicer, the trust administrator, the trustee or the originator.

The underwriter has provided warehouse financing to the sponsor that may be secured by some or all of the Mortgage Loans.  The underwriter will release any and all of its liens on or security interests in the Mortgage Loans on or prior to the closing date.

## DEFINED TERMS

We define and use capitalized terms in this prospectus supplement and the prospectus to assist you in understanding the terms of the offered certificates and this offering.  We define the capitalized terms we use in this prospectus supplement under the caption "Glossary of Terms" in this prospectus supplement.  We define capitalized terms we use in the accompanying prospectus under the caption "Glossary of Terms" in the prospectus.

## USE OF PROCEEDS

The sponsor will sell the mortgage loans to the depositor, and the depositor will convey the mortgage loans to the trust in exchange for and concurrently with the delivery of the certificates.  Net proceeds, after deduction of expenses payable by the depositor, equal to approximately $867,689,340**,** from the sale of the offered certificates and the Class M-9, Class M-10, Class M-11, Class CE and Class P Certificates will be applied by the depositor to the purchase of the mortgage loans from the sponsor.  These net proceeds will represent the purchase price to be paid by the depositor to the sponsor for the mortgage loans.  The sponsor will have acquired the mortgage loans from the originator prior to the sale of the mortgage loans to the depositor.

## DESCRIPTION OF THE MORTGAGE LOANS

**General**

The information set forth in the following paragraphs is based on servicing records and representations about the Mortgage Loans that were made by NC Capital at the time it sold the Mortgage Loans.

The statistical information presented in this prospectus supplement relates to the Mortgage Loans and related Mortgaged Properties as of the Cut-off Date, as adjusted for scheduled principal payments due on or before the Cut-off Date whether or not received.  Prior to the issuance of the certificates, Mortgage Loans may be removed from the trust fund as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time.  A limited number of other Mortgage Loans may be included in the trust fund prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans as described in this prospectus supplement.  The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans will be representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans may vary.  Any statistic presented on a weighted average basis or any statistic based the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8-K within four days following the Closing Date.

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut-off Date Principal Balance.

The trust will consist of a pool of residential mortgage loans consisting of 4,815 Mortgage Loans having a Cut-off Date Principal Balance of approximately $915,168,720.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units and individual condominium units.  Approximately 97.48% of the Mortgage Loans are secured by first Mortgages and approximately 2.52% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers.  A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The depositor will purchase the Mortgage Loans from the sponsor pursuant to the Mortgage Loan Purchase Agreement.  Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders.  See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans.  The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement, NC Capital will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans.  Subject to certain limitations, NC Capital will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan.  The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller.   Neither the originator nor NC Capital will have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due-on-sale" provisions included therein which provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate.  Approximately 79.93% of the Mortgage Loans are Adjustable-Rate Mortgage Loans and approximately 20.07% of the Mortgage Loans are Fixed-Rate Mortgage Loans.

Each Fixed-Rate Mortgage Loan has a Mortgage Rate that is fixed for the life of such Mortgage Loan.

Each Adjustable-Rate Mortgage Loan accrues interest at a Mortgage Rate that is adjustable following an initial period of two years or three years following origination.  Generally, the Adjustable-Rate Mortgage Loans provide for semi-annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each Adjustment Date applicable thereto; provided, that the first adjustment for the Adjustable-Rate Mortgage Loans will occur after an initial period of two years in the case of approximately 83.68% of the Adjustable-Rate Mortgage Loans and three years in the case of approximately 16.32% of the Adjustable-Rate Mortgage Loans.  On each Adjustment Date for each Adjustable-Rate Mortgage Loan, the Mortgage Rate thereon will be adjusted to equal the sum, rounded to the nearest or next highest multiple of 0.125%, of Six-Month LIBOR and the Gross Margin.  The Mortgage Rate on any Adjustable-Rate Mortgage Loan will not decrease or  increase by more than a stated percentage (up to a maximum of no more than 1.500% per annum, as

employees and 24 months for self-employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria.  All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment.  Verification of the source of funds, if any, required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

In evaluating the credit quality of borrowers, the originator utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

*"AA" Risk.*  Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%.  The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan.  An existing mortgage loan must be less than 60 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan.  A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550).  No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 90% is permitted for a mortgage loan on a non-owner occupied single family or two unit property, an owner occupied high-rise condominium or a three to four family residential property.   The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and non-owner occupied three to four family residential properties or high-rise condominiums is 85%.  The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80%.  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"A+" Risk.*  Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Two or more tradelines (one of which with 24 months history and no late payments), are required for loan-to-value ratios above 90%.  A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 60 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan.  A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% (or 90% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted

for a mortgage loan on a non-owner occupied property single family or two unit property, and an owner occupied high-rise condominium or a three to four family residential property.  The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and a non-owner occupied three to four family residential property or high-rise condo is 85% (or 80% for mortgage loans originated under the stated income documentation program).  The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80% (or 75% for mortgage loans originated under the stated income documentation program).  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"A-" Risk.*   Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  A maximum of three 30 day late payments within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 60 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan.  A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550).  No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property, and an owner occupied high-rise condominium or three to four family residential property.  The maximum loan-to-value ratio for owner occupied rural, remote, or unique properties, and non-owner occupied three to four family residential properties or high rise condominiums is 85% (or 80% for mortgage loans originated under the stated income documentation program).  The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 80% (or 70% for mortgage loans originated under the stated income documentation program).  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and 100%, for a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"B" Risk.*   Under the "B" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Unlimited 30 day late payments and a maximum of one 60 day late payment within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 90 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with a FICO score less than or equal to 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 may have occurred as long as such bankruptcy has been discharged at least one day prior to funding of the loan.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (such loan may not exceed an 80% loan-to-value ratio for borrowers with a FICO score of less than 550).  No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding 18 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 85% (or 75% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property, and an owner occupied high-rise condominium or a three to four family residential property.  The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and a non-owner occupied three to four family property or high-rise condo is 80% (or 70% for mortgage loans originated under the stated income documentation program).   The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 75% (or 65% for mortgage loans originated under the stated income documentation program).  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and for a purchase money loan.  The maximum debt service-to-income ratio is usually 50%, unless the loan-to-value ratio is reduced.

*"C" Risk.*   Under the "C" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Unlimited 30 day and 60 day late payments and a maximum of one 90 day late payment within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 120 days late at the time of funding of the loan.  All bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds.  No notice of default filings may have occurred during the preceding 12 months.  The mortgaged property must be in at least average condition.  In most cases, a maximum loan-to-value ratio of 80% (or 75% for mortgage loans originated under the stated income documentation program) for a mortgage loan on an owner occupied single family or two unit property is permitted.  A maximum loan-to-value ratio of 75% is permitted for a mortgage loan on a non-owner occupied single family or 2 unit property (refinance only), or an owner occupied high-rise condominium or a three to four family residential property (or 70% for mortgage loans originated under the stated income documentation program).  The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and non-owner occupied three to four family residential properties or high-rise condos is 65 70% (or 65% for mortgages originated under the stated income documentation program).  The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property (refinance only) is 65% (or 60% for mortgage loans originated under the stated income documentation program).  The maximum combined loan-to-value ratio, including any related subordinate lien, is 85% for a refinance loan and for a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"C-" Risk.*   Under the "C-" risk category, an applicant must have a FICO score of 500, or greater.  Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 150 days late at the time of funding of the loan.  There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 70% (55% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 65% is permitted for a mortgage loan on a non-owner occupied property single family or two unit property (refinance only), and an owner occupied high-rise condominium or a three to four family residential property (50% for a mortgage loan on a non-owner occupied property, an owner occupied high-rise condominium or a three to four family residential property originated under the stated income documentation program).  Rural, remote or unique properties are not allowed.  The maximum combined loan-to-value ratio, including any related subordinate lien, is 80% for a refinance loan and 80% for a purchase money loan.  The maximum debt service-to-income ratio is usually 55%.

*Special Programs.*  New Century originates loans which it calls "special programs" to enable borrowers with higher FICO scores and good mortgage histories the ability to obtain larger loan amounts or higher loan-to-value ratios.   Special programs extend loan-to-value ratios to a maximum of 100%, and combined 80/20 (first/second) loan combinations to 100% combined loan-to-value ratios and loan amounts to $1,000,000 with higher minimum FICO scores and paid-as-agreed minimum tradeline requirements.   No bankruptcy filing may have occurred during the preceding two years for borrowers with FICO scores less than 580, under the full income documentation program, or 620, under the limited income and stated income documentation programs (Chapter 13 bankruptcies may not be paid off with loan proceeds) for combined 80%/20% (first/second) loan combinations.   For first mortgage loans having 100% loan-to-value ratios, no bankruptcy filing may have occurred during the preceding two years.  No notice of default filings may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.   The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan.  The maximum debt service-to-income ratio is usually 50%.

*Exceptions.*  As described above, the foregoing categories and criteria are guidelines only.  On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc.  An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.  An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more.  Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy

only the criteria of a less favorable risk category.  It is expected that a substantial portion of the mortgage loans will represent these kinds of exceptions.

## THE MASTER SERVICER AND THE TRUST ADMINISTRATOR

The information set forth in the following paragraphs has been provided by the master servicer.

Wells Fargo Bank, National Association ("Wells Fargo Bank") will act as master servicer and trust administrator under the Pooling and Servicing Agreement.  Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company.   A diversified financial services company with approximately $397 billion in assets, 24 million customers and 143,000 employees, Wells Fargo & Company is among the leading U.S. bank holding companies, providing banking, insurance, trust, mortgage and consumer finance services throughout the United States and internationally.  Wells Fargo Bank provides retail and commercial banking services and corporate trust, custody, securities lending, securities transfer, cash management, investment management and other financial and fiduciary services.   The depositor, the sponsor and the servicer may maintain banking and other commercial relationships with Wells Fargo Bank and its affiliates.  Wells Fargo Bank's principal corporate trust offices are located at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951 and its office for certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

Wells Fargo Bank will act as master servicer pursuant to the Pooling and Servicing Agreement.  The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicer under the terms of the Pooling and Servicing Agreement.  In particular, the master servicer will independently calculate monthly loan balances based on servicer data, compare the results of such calculation to servicer loan-level reports and reconcile any discrepancies with the servicer.  The master servicer will also review the servicing of defaulted mortgage loans for compliance with the terms of the Pooling and Servicing Agreement.  In addition, upon the occurrence of certain servicer events of default under the terms of the Pooling and Servicing Agreement, the master servicer may be required to enforce certain remedies on behalf of the trust and at the direction of the trustee against the defaulting servicer.  In particular, upon the failure of the servicer to make a required Advance on a Mortgage Loan, the master servicer will be required to terminate the defaulting servicer and to make such Advance to the extent that the master servicer determines such Advance is recoverable from subsequent payments or recoveries on the related Mortgage Loan.  As of November 30, 2005, Wells Fargo Bank was acting as master servicer for approximately 940 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $428,268,679,337.

Under the terms of the Pooling and Servicing Agreement, Wells Fargo Bank also is responsible for trust administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports.  As trust administrator, Wells Fargo Bank is responsible for the preparation of all REMIC tax returns on behalf of the trust REMICs and the preparation of monthly reports on Form 10-D and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the trust.  Wells Fargo Bank has been engaged in the business of securities administration since June 30, 1995.  As of November 30, 2005, Wells Fargo Bank was acting as securities administrator with respect to more than $700,000,000,000 of outstanding residential mortgage-backed securities.

Under the Pooling and Servicing Agreement, the trust administrator's material duties will be (i) to authenticate and deliver the certificates; (ii) to maintain a certificate registrar; (iii) to calculate and make the required distributions to certificateholders on each Distribution Date; (iv) to prepare and make available to certificateholders the monthly distribution reports and any other reports required to be delivered by the trust administrator; (v) send a notice to holders of a class of certificates when the remaining Certificate Principal Balance of such class of certificates is to be paid on a specified Distribution Date; (vi) to perform certain tax administration services for the trust and (vii) to communicate with investors and rating agencies with respect to the certificates.  In performing the obligations set forth in clauses (iii) and (iv) above, the trust administrator will be able to rely on the monthly loan information provided to it by the servicer, and will perform all obligations set forth above solely to the extent described in the Pooling and Servicing Agreement.

Wells Fargo Bank serves or has served within the past two years as loan file custodian for various mortgage loans owned by the depositor or an affiliate of the depositor and anticipates that one or more of those mortgage loans may be included in the Trust.  The terms of the custodial agreement under which those services are provided by

Wells Fargo Bank are customary for the mortgage-backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage loan files.

Wells Fargo Bank serves or has served within the past two years as warehouse master servicer for various mortgage loans owned by the depositor or an affiliate of the depositor and anticipates that one or more of those mortgage loans may be included in the Trust. The terms of the warehouse master servicing agreement under which those services are provided by Wells Fargo Bank are customary for the mortgage-backed securitization industry.

For a description of the limitations on the liability of the master servicer, see "Description of the Securities—Certain Matters Regarding the Master Servicer, the Depositor and the Trustee" in the prospectus.

## THE SERVICER

*Servicing Experience and Procedures of Wells Fargo Bank*

*Servicing Experience.* Wells Fargo Bank, N.A. ("Wells Fargo Bank") is an indirect, wholly-owned subsidiary of Wells Fargo & Company. Wells Fargo Bank is a national banking association and is engaged in a wide range of activities typical of a national bank. Wells Fargo Bank, including its predecessors, has many years of experience in servicing residential mortgage loans, commercial mortgage loans, auto loans, home equity loans, credit card receivables and student loans. Wells Fargo Bank, including its predecessors, has been servicing residential mortgage loans since 1974 and has been servicing subprime residential mortgage loans since 1996. These servicing activities, which include collections, loss mitigation, default reporting, bankruptcy, foreclosure and REO Property management, are handled at various Wells Fargo Bank locations including Frederick, Maryland, Fort Mill, South Carolina and other mortgage loan servicing centers.

Wells Fargo Bank's servicing portfolio of residential mortgage loans (which includes Fixed Rate First Lien Subprime Loans, Adjustable Rate First Lien Subprime Loans and Second Lien Subprime Loans as well as other types of residential mortgage loans serviced by Wells Fargo Bank) has grown from approximately $450 billion as of the end of 2000 to approximately $745.5 billion as of the end of 2004. The table below sets forth for each of the periods indicated the number and aggregate original principal balance of mortgage loans serviced by Wells Fargo Bank (other than any mortgage loans serviced for Fannie Mae, Freddie Mac and Federal Home Loan Banks; mortgage loans insured or guaranteed by the Government National Mortgage Association, Federal Housing Administration or Department of Veterans Affairs; or mortgage loans with respect to which Wells Fargo Bank has acquired the servicing rights, acts as subservicer, or acts as special servicer) for First Lien Subprime Loans and Second Lien Subprime Loans:

| | As of December 31, 2002 | | As of December 31, 2003 | | As of December 31, 2004 | |
|---|---|---|---|---|---|---|
| Asset Type | No. of Loans | Aggregate Original Principal Balance of Loans | No. of Loans | Aggregate Original Principal Balance of Loans | No. of Loans | Aggregate Original Principal Balance of Loans |
| First Lien Subprime Loans | 46,437 | $5,951,628,366 | 91,490 | $12,527,192,204 | 136,813 | $19,729,895,239 |
| Second Lien Subprime Loans | * | * | * | * | * | * |

* Wells Fargo Bank does not have a material servicing portfolio of Second Lien Subprime Loans for the periods indicated.

*Servicing Procedures.* Shortly after the funding of a loan, various types of loan information are loaded into Wells Fargo Bank's automated loan servicing system. Wells Fargo Bank then makes reasonable efforts to collect all payments called for under the mortgage loan documents and will, consistent with the applicable servicing agreement and any pool insurance policy, primary mortgage insurance policy, bankruptcy bond or alternative arrangements, follow such collection procedures as are customary with respect to loans that are comparable to the mortgage loans. Wells Fargo Bank may, in its discretion, (i) waive any assumption fee, late payment or other charge in connection with a mortgage loan and (ii) to the extent not inconsistent with the coverage of such mortgage loan by a pool

insurance policy, primary mortgage insurance policy, bankruptcy bond or alternative arrangements, if applicable, waive, vary or modify any term of any mortgage loan or consent to the postponement of strict compliance with any such term or in any matter grant indulgence to any borrower, subject to the limitations set forth in the applicable servicing agreement.

Wells Fargo Bank's collections policy is designed to identify payment problems sufficiently early to permit Wells Fargo Bank to address such delinquency problems and, when necessary, to act to preserve equity in a pre-foreclosure mortgaged property.  Borrowers are billed on a monthly basis in advance of the due date. If a borrower attempts to use Wells Fargo Bank's Voice Response Unit ("VRU") to obtain loan information on or after a date on which a late charge is due, the VRU automatically transfers the call to the collection area. Collection procedures commence upon identification of a past due account by Wells Fargo Bank's automated servicing system. If timely payment is not received, Wells Fargo Bank's automated loan servicing system automatically places the mortgage loan in the assigned collection queue and collection procedures are generally initiated on the 5th day of delinquency. The account remains in the queue unless and until a payment is received, at which point Wells Fargo Bank's automated loan servicing system automatically removes the mortgage loan from that collection queue.

When a mortgage loan appears in a collection queue, a collector will telephone to remind the borrower that a payment is due. Follow-up telephone contacts with the borrower are attempted until the account is current or other payment arrangements have been made. When contact is made with a delinquent borrower, collectors present such borrower with alternative payment methods, such as Western Union, Phone Pay and Quick Collect, in order to expedite payments.  Standard form letters are utilized when attempts to reach the borrower by telephone fail and/or in some circumstances, to supplement the phone contacts. Company collectors have computer access to telephone numbers, payment histories, loan information and all past collection notes. Wells Fargo Bank supplements the collectors' efforts with advanced technology such as predictive dialers and statistical behavioral software used to determine the optimal times to call a particular customer.  Additionally, collectors may attempt to mitigate losses through the use of behavioral or other models that are designed to assist in identifying workout options in the early stages of delinquency.  For those loans in which collection efforts have been exhausted without success, Wells Fargo Bank determines whether foreclosure proceedings are appropriate.  The course of action elected with respect to a delinquent mortgage loan generally will be guided by a number of factors, including the related borrower's payment history, ability and willingness to pay, the condition and occupancy of the mortgaged property, the amount of borrower equity in the mortgaged property and whether there are any junior liens.

Regulations and practices regarding the liquidation of properties (e.g., foreclosure) and the rights of a borrower in default vary greatly from state to state. As such, all foreclosures are assigned to outside counsel, licensed to practice in the same state as the mortgaged property. Bankruptcies filed by borrowers are similarly assigned to appropriate local counsel.  Communication with foreclosure and bankruptcy attorneys is maintained through the use of a software program, thus reducing the need for phone calls and faxes and simultaneously creating a permanent record of communication.  Attorney timeline performance is managed using quarterly report cards.  The status of foreclosures and bankruptcies is monitored by Wells Fargo Bank through its use of such software system. Bankruptcy filing and release information is received electronically from a third-party notification vendor.

Prior to a foreclosure sale, Wells Fargo Bank performs a market value analysis. This analysis includes: (i) a current valuation of the mortgaged property obtained through a drive-by appraisal or broker's price opinion conducted by an independent appraiser and/or a broker from a network of real estate brokers, complete with a description of the condition of the mortgaged property, as well as other information such as recent price lists of comparable properties, recent closed comparables, estimated marketing time and required or suggested repairs, and an estimate of the sales price; (ii) an evaluation of the amount owed, if any, for real estate taxes; and (iii) estimated carrying costs, brokers' fees, repair costs and other related costs associated with real estate owned properties. Wells Fargo Bank bases the amount it will bid at foreclosure sales on this analysis.  In the case of second lien loans for which Wells Fargo Bank does not also service the related first lien loans for the same lienholder, Wells Fargo Bank performs a net present value analysis to determine whether to refer the second lien loan to foreclosure or to charge it off.

If Wells Fargo Bank acquires title to a property at a foreclosure sale or otherwise, it obtains an estimate of the sale price of the property and then hires one or more real estate brokers to begin marketing the property. If the mortgaged property is not vacant when acquired, local eviction attorneys are hired to commence eviction proceedings and/or negotiations are held with occupants in an attempt to get them to vacate without incurring the

additional time and cost of eviction. Repairs are performed if it is determined that they will increase the net liquidation proceeds, taking into consideration the cost of repairs, the carrying costs during the repair period and the marketability of the property both before and after the repairs.

Wells Fargo Bank's loan servicing software also tracks and maintains tax and homeowners' insurance information and tax and insurance escrow information. Expiration reports are generated periodically listing all policies scheduled to expire. When policies lapse, a letter is automatically generated and issued advising the borrower of such lapse and notifying the borrower that Wells Fargo Bank will obtain lender-placed insurance at the borrower's expense.

**THE TRUSTEE**

U.S. Bank National Association ("U.S. Bank"), a national banking association, will be named trustee under the pooling and servicing agreement. The trustee's offices for notices under the pooling and servicing agreement are located at 60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107, Attention: Structured Finance/MASTR 2006-NC1, and its telephone number is (800) 934-6802.

U.S. Bank is a national banking association and a wholly-owned subsidiary of U.S. Bancorp, which is currently ranked as the sixth largest bank holding company in the United States with total assets exceeding $207 billion as of September 30, 2005. As of September 30, 2005, U.S. Bancorp served approximately 13.3 million customers, operates 2,396 branch offices in 24 states and had over 51,000 employees. A network of specialized U.S. Bancorp offices across the nation, inside and outside its 24-state footprint, provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, governments and institutions.

U.S. Bank has one of the largest corporate trust businesses in the country with offices in 31 U.S. cities. The pooling and servicing agreement will be administered from U.S. Bank's corporate trust office located at 60 Livingston Avenue, EP-MN-WS3D, St. Paul, MN 55107, Attention: Structured Finance/MASTR 2006-NC1.

U.S. Bank has provided corporate trust services since 1924. As of September 30, 2005, U.S. Bank was acting as trustee with respect to approximately 49,500 issuances of securities with an aggregate outstanding principal balance of over $1.58 trillion. This portfolio includes corporate and municipal bonds, mortgage-backed and asset-backed securities and collateralized debt obligations.

On December 30, 2005, U.S. Bank purchased the corporate trust and structured finance trust services businesses of Wachovia Corporation. Following the closing of the acquisition, the Wachovia affiliate named as fiduciary or agent, as applicable, under each client agreement will continue in that role until U.S. Bank succeeds to that role in accordance with the terms of the governing instrument or agreement and applicable law.

As of December 31, 2005, U.S. Bank (and its affiliate U.S. Bank Trust National Association) was acting as trustee on 343 issuances of subprime mortgage-backed securities with an outstanding aggregate principal balance of approximately $90,186,200,000.

The trustee's responsibilities include (i) accepting delivery of the mortgage loans and (ii) acting as a fiduciary on behalf of the certificateholders pursuant to the pooling and servicing agreement.

**THE SPONSOR**

The information set forth in the following paragraphs has been provided by the sponsor.

**General**

The sponsor is a Delaware corporation that is engaged in a variety of capital markets related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations and origination and acquisition of loans and interests in such loans and the related servicing rights for sale, securitization or portfolio. The sponsor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713-2000.

**Securitization Program**

The sponsor has been engaged in the securitization of a variety of assets since 1983.  During the 2003, 2004 and 2005 fiscal years, the sponsor securitized approximately $26,586,046,432, $23,715,469,420 and $9,044,655,402 of financial assets.

The following table describes size, composition and growth of the sponsor's total portfolio of assets it has securitized as of the dates indicated.

| Loan Type | December 31, 2003 | | December 31, 2004 | | December 31, 2005 | |
|---|---|---|---|---|---|---|
| | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
| Alt-A ARM | 1,831 | $704,818,691.15 | 15,172 | $4,196,433,786.47 | 7,319 | $2,141,793,872.88 |
| Alt-A Fixed | 30,014 | $4,808,312,278.14 | 33,732 | $5,578,131,022.96 | 12,658 | $2,301,424,102.78 |
| Prime ARM | 5,510 | $2,097,734,162.54 | 12,527 | $5,574,915,529.55 | 3,447 | $1,201,231,043.87 |
| Prime Fixed | 29,586 | $14,090,593,768.16 | 10,566 | $4,822,540,192.90 | 2,831 | $1,072,342,586.00 |
| Reperforming | 0 | None | 162 | $24,426,327.00 | 142 | $16,680,656.00 |
| Scratch&Dent | 0 | None | 1,133 | $188,828,039.00 | 2,411 | $337,609,459.00 |
| Seconds | 0 | None | 0 | None | 4,788 | $247,087,151.00 |
| SubPrime | 27,665 | $4,327,714,923.39 | 20,424 | $2,603,908,932.00 | 5,489 | $982,036,702.30 |
| Seasoned | 1,174 | $556,872,608.80 | 1,724 | $726,285,590.60 | 2,444 | $744,449,828.62 |

Through the use of subservicers, the sponsor may contract for the servicing of loans.  The sponsor typically acquires loans from third party originators.  Employees of the sponsor or its affiliates will structure securitization transactions in which  loans are sold to the depositor.  In consideration for the sale of loans, the depositor will cause the issuance of the certificates and enter into an arrangement with the underwriter for the purchase of such certificates.

<h3 style="text-align:center">THE DEPOSITOR</h3>

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc.  The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York.  Its telephone number is (212) 713-2000.

The depositor has been engaged in the securitization of mortgage loans since its incorporation in 1987.  The depositor is generally engaged in the business of acting as a depositor of one or more trust funds that may issue or cause to be issued, sell and deliver bonds or other evidences of indebtedness or certificates of interest that are secured by, or represent an interest in mortgage loans.  The depositor typically acquires mortgage loans and other assets for inclusion in securitizations from the sponsor.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to the issue and sale of one or more series of securities and to act as depositor of trusts that may issue and sell securities.

After the issuance of the certificates, the depositor will have limited or no obligations with respect to the certificates and the trust.  Those obligations may include cure, repurchase or substitution obligations relating to breaches of representations and warranties, if any, that the depositor makes with respect to the Mortgage Loans, to arrange for the Interest Rate Swap Agreement or replacement instruments to be included in the trust, to appoint replacements to certain transaction participants, to prepare and file any required reports under the Securities Exchange Act of 1934, as amended, to provide notices to certain parties under the Pooling and Servicing Agreement or to provide requested information to the various transaction participants.

The depositor does not have, nor is it expected in the future to have, any significant assets.  We do not expect that the depositor will have any business operations other than acquiring and pooling residential mortgage loans, mortgage securities and agency securities, offering mortgage-backed or other asset-backed securities, and related activities.

**THE ISSUING ENTITY**

MASTR Asset Backed Securities Trust 2006-NC1, the issuing entity, will be a New York common law trust established pursuant to the Pooling and Servicing Agreement.  The issuing entity will not own any assets other than the Mortgage Loans and the other assets described under "The Pooling and Servicing Agreement—General."  The issuing entity will not have any liabilities other than those incurred in connection with the Pooling and Servicing Agreement and any related agreement.  The issuing entity will not have any directors, officers, or other employees.  No equity contribution will be made to the issuing entity by the sponsor, the depositor or any other party, and the issuing entity will not have any other capital.  The fiscal year end of the issuing entity will be December 31.  The issuing entity will act through the parties to the Pooling and Servicing Agreement.

**DESCRIPTION OF THE CERTIFICATES**

**General**

The certificates will be issued pursuant to the Pooling and Servicing Agreement.  Set forth below are summaries of the specific terms and provisions pursuant to which the offered certificates will be issued.  The following summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Pooling and Servicing Agreement.  When particular provisions or terms used in the Pooling and Servicing Agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

The trust will issue (i) the Class A-1 Certificates, the Class A-2 Certificates, the Class A-3 Certificates and the Class A-4 Certificates, (ii) the Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates, the Class M-9 Certificates, the Class M-10 Certificates and the Class M-11 Certificates, (iii) the Class CE Certificates, (iv) the Class P Certificates, (v) the Class R Certificates and (vi) the Class R-X Certificates. Only the Class A Certificates and the Mezzanine Certificates (other than the Class M-9 Certificates, the Class M-10 Certificates and the Class M-11 Certificates) are offered hereby.

The Class A Certificates and the Mezzanine Certificates will have the Original Certificate Principal Balances specified in the chart entitled "The Series 2006-NC1 Certificates," subject to a permitted variance of plus or minus 5%.  The Class CE Certificates will have an Original Certificate Principal Balance equal to the excess of the aggregate Cut-off Date Principal Balance of the Mortgage Loans over the Original Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates.  The Class P Certificates will have an Original Certificate Principal Balance of $100 and will not bear interest.  The Class P Certificates will be entitled to all prepayment charges received in respect of the Mortgage Loans and such amounts will not be available for distribution to the holders of the Class A Certificates and the Mezzanine Certificates. The Residual Certificates will not have Original Certificate Principal Balances and will not bear interest.

The offered certificates will be issued in book-entry form  as described below.  The offered certificates will be issued in minimum dollar denominations of $25,000 and integral multiples of $1.00 in excess thereof.  The assumed final maturity date for the offered certificates is the Distribution Date in January 2036.

Distributions on the Class A Certificates and the Mezzanine Certificates will be made by the trust administrator on each Distribution Date, to the persons in whose names such certificates are registered at the close of business on the Record Date.

**Fees and Expenses of the Trust**

The following fees and expenses will be paid from amounts received on the Mortgage Loans prior to distributions to certificateholders:

| Fee Payable to: | Frequency of Payment: | Amount of Fee: | How and When Fee Is Payable: |
|---|---|---|---|
| Servicer | Monthly | For each Mortgage Loan, a monthly fee paid to the servicer out of interest collections received from the related Mortgage Loan.  The monthly fee is calculated as one-twelfth of the Servicing Fee Rate on the scheduled Principal Balance of the Mortgage Loan at the beginning of the applicable Due Period. | Withdrawn from amounts on deposit in the collection account, before remittance to the Distribution Account.[1] |
| Credit Risk Manager | Monthly | For each Mortgage Loan, a monthly fee payable to the credit risk manager.  The monthly fee is calculated as one-twelfth of the Credit Risk Manager Fee Rate on the scheduled Principal Balance of the Mortgage Loan at the end of the applicable Due Period. | Paid by the Trust Administrator from amounts on deposit in the Distribution Account, before distributions to Certificateholders. |
| Swap Provider | Monthly | A monthly payment calculated as the positive excess, if any, of (a) one-twelfth of (i) in the case of the first 43 Distribution Dates, 4.672% or (ii) in the case of the 44th and 45th Distribution Date, 4.820%, on the Base Calculation Amount for such Distribution Date multiplied by 250 over (b) one-month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Base Calculation Amount for such Distribution Date multiplied by 250. | Withdrawn from amounts on deposit in the Distribution Account, before distributions to Certificateholders. |

---

[1]   See "The Pooling and Servicing Agreement—Servicing and Other Compensation and Payment of Expenses" in this prospectus supplement for a description of additional compensation that the servicer may receive.

**Book-Entry Certificate**

The offered certificates will be book-entry certificates.  Certificate Owners will hold book-entry certificates through DTC (in the United States), or upon request through Clearstream, or Euroclear (in Europe), if they are participants of such systems, or indirectly through organizations which are participants in such systems.  The book-entry certificates will be issued in one or more certificates which equal the aggregate Certificate Principal Balance of such certificates and will initially be registered in the name of Cede & Co., the nominee of DTC.  Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC.  Citibank will act as depositary for Clearstream and JPMorgan Chase Bank, National Association will act as depositary for Euroclear. Investors may hold such beneficial interests in the book-entry certificates in minimum denominations of $25,000. Except as described below, no Certificate Owner acquiring a book-entry certificate will be entitled to receive a Definitive Certificate.  Unless and until Definitive Certificates are issued, it is anticipated that the only certificateholder of the offered certificates will be Cede & Co., as nominee of DTC.  Certificate Owners will not be