**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

*Plaintiff,*

-*versus*-

**UBS SECURITIES, LLC,** *et al.***,**

*Defendants*.

**Civil Action No. 18-CV-6369 (MKB/PK)**

**(Brodie, J.)**
**(Kuo, M.J.)**

**MEMORANDUM OF LAW**
**OF PLAINTIFF THE UNITED STATES OF AMERICA**
**IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

BONNI J. PERLIN
MICHAEL J. CASTIGLIONE
RICHARD K. HAYES
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
(718) 254-7000

BYUNG J. PAK
United States Attorney
Northern District of Georgia

ARMEN ADZHEMYAN
AUSTIN M. HALL
Assistant United States Attorneys
Northern District of Georgia
Richard B. Russell Federal Building
75 Ted Turner Dr. SW, Suite 600
Atlanta, GA 30303-3309
(404) 581-6000

May 8, 2019

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..........................................................................................................1

THE COMPLAINT ......................................................................................................8

FIRREA AND ITS PREDICATES ............................................................................9

I.  Elements of Claims for Civil Penalties Under FIRREA ..............................9

II.  Elements of Mail and Wire Fraud Predicates .............................................9

III.  Fraudulent Intent in Mail and Wire Fraud Cases .....................................10

APPLICABLE PLEADING STANDARDS .............................................................12

I.  Legal Standard under Fed. R. Civ. P. 12(b)(6) ........................................12

II.  Pleading Fraud under Fed. R. Civ. P. 9(b) ...............................................13

ARGUMENT .............................................................................................................15

I.  THE COMPLAINT SUFFICIENTLY PLEADS FRAUDULENT INTENT .............16

A.  The Complaint Alleges Motive and the Opportunity to Defraud .........................17

B.  The Complaint Alleges Facts That Show Conscious Misbehavior or Recklessness ......................................................................23

II.  DEFENDANTS' ARGUMENT ON CORPORATE SCIENTER IS MERITLESS ............................................................................................28

A.  Defendants Rely on the Wrong Pleading Standard.................................29

B.  The Complaint Alleges a Culpable State of Mind .................................32

III.  DEFENDANTS' OTHER ARGUMENTS ON SCIENTER ARE EQUALLY MERITLESS AS A MATTER OF LAW ................................................38

A.  Defendants' Argument That Kicking Out Some Loans Negates Fraudulent Intent ....................................................................38

B.  Defendants' Argument on Lack of Concealment ..................................39

C.  Defendants' Argument that Customary Credit Enhancements Negate Fraudulent Intent ....................................................................40

D.  Defendants' Argument That Generalized Risk Disclosures and Disclaimers Negate Fraudulent Intent ................................................40

E.  Defendants' Argument That EV3 Loans Were Not Defective ..............42

F.  Defendants' Argument That Due Diligence Results in Samples Did Not Inform UBS' Assessment of the Rest of the Loan Pools...............45

G.  Defendants' Arguments on Valuation Diligence ..................................48

H.  Defendants' "Cherry-Picked Emails" Argument Demonstrates Why Their Motion Must Fail.........................................................50

I.      Defendants' Arguments on Contemplated Harm....................................................51

IV.    THE COMPLAINT SUFFICIENTLY PLEADS BANK FRAUD AND
       PREDICATE OFFENSES UNDER 18 U.S.C. §§ 1005 and 1014..............................52

       A.     The Complaint Sufficiently Pleads Bank Fraud .......................................52

       B.     The Complaint Sufficiently Pleads Predicate Offenses Under 18
              U.S.C. § 1005.............................................................................................54

       C.     The Complaint Sufficiently Pleads Predicate Offenses Under 18
              U.S.C. § 1014.............................................................................................57

V.     UBS AG IS PROPERLY SUED....................................................................................61

**CONCLUSION** .........................................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

### <u>Federal Cases</u>

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................................................. 20

*Acito v. IMCERA Grp., Inc.,*
47 F.3d 47 (2d. Cir. 1995) ................................................................................... 13

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................. 12

*ATSI Commc'n., Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) .................................................................................. 12

*AUSA Life Ins. Co. v. Ernst & Young,*
206 F.3d 202 (2d Cir. 2000) ................................................................................ 11

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................. 12

*Breard v. Sachnoff & Weaver, Ltd.,*
941 F.2d 142 (2d Cir. 1991) ................................................................................ 13

*Bridge v. Phoenix Bond & Indem. Co.,*
553 U.S. 639 (2008) ............................................................................................. 41

*City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.,*
844 F. Supp. 2d 498 (S.D.N.Y. 2012) .................................................................. 15

*Cohen v. S.A.C. Trading Corp.,*
711 F.3d 353 (2d Cir. 2013) .................................................................. 16, 17, 36, 38

*Commodity Futures Trading Comm'n v. Complete Devs., LLC,*
No. 4:10-CV-2287, 2014 WL 794181 (N.D. Ohio Feb. 26, 2014) ........................... 5

*Connecticut Nat'l Bank v. Fluor Corp.,*
808 F.2d 957 (2d Cir.1987) .................................................................................. 13

*Daimler AG v. Bauman,*
571 U.S. 117 (2014) ............................................................................................. 63

*Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc.,*
No. 12-CV-4025, 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) .......................... 45

*Dexia SA/NV v. Bear, Stearns & Co.,*
929 F. Supp. 2d 231 (S.D.N.Y. 2013) .................................................................. 19

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
722 F.3d 81 (2d Cir. 2013) .................................................................................. 64

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
551 F. Supp. 2d 210 (S.D.N.Y. 2008) .................................................................. 41

*Elliot v. United States*,
    332 F.3d 753 (4th Cir. 2003) ................................................................................... 60

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
    902 F. Supp. 2d 476 (S.D.N.Y. 2012) .................................................................... 41

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015) .................................................................... 43

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    68 F. Supp. 3d 439 (S.D.N.Y. 2014) ...................................................................... 46

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) .............................................................................. 46, 47

*Gabriele v. American Home Mortg. Servicing, Inc.*,
    503 F. App'x 89 (2d Cir. 2012) .............................................................................. 23

*Glidepath Holding B.V. v. Spherion Corp.*,
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) .............................................................. 17, 23

*Global-Tech Appliances, Inc. v. SEB, S.A.*,
    563 U.S. 754 (2011) ....................................................................................... 10, 50

*Gottlieb v. Schaffer*,
    141 F. Supp. 7 (S.D.N.Y. 1956) ............................................................................ 42

*Greene v. Gerber Prod. Co.*,
    262 F. Supp. 3d 38 (E.D.N.Y. 2017) ........................................................... 4, 13, 29

*Hughes v. Ester C Co.*,
    930 F. Supp. 2d 439 (E.D.N.Y. 2013) .................................................................... 23

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................... 32

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................... 41

*In re JWP Inc. Sec. Litig.*,
    928 F. Supp. 1239 (S.D.N.Y. 1996) ......................................................................... 5

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................... 31

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................... 32

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................................... 41

*In re Reserve Fund Sec. & Derivative Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010) .............................................................. 15, 23

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................... 31

*IUE AFL-CIO Pension Fund v. Herrmann*,
   9 F.3d 1049, 1057 (2d Cir. 1993) ......................................................................... 13

*Kravetz v. Brukenfeld*,
   591 F. Supp. 1383 (S.D.N.Y.1984).......................................................................... 13

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
   478 F. App'x 679 (2d Cir. 2012).............................................................................. 18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161, 170 (2d Cir. 2013) ............................................................................ 61

*Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).............................................................. 14, 36, 38, 44

*Loughrin v. United States*,
   573 U.S. 351 (2014) ................................................................................................ 53

*Makor Issues & Rights, Ltd. v. Tellabs, Inc*.,
   513 F.3d 702 (7th Cir. 2008) .................................................................................. 31

*Martin v. Designatronics Inc.*,
   No. 2:17-CV-4907, 2019 WL 482202 (E.D.N.Y. Feb. 7, 2019)............................. 63

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc*.,
   110 F. Supp. 3d 288 (D. Mass. 2015) ............................................................ 44, 47

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc*.,
   576 F.3d 172 (4th Cir. 2009)................................................................................... 31

*N.Y. Cent. & Hudson River R.R. v. United States*,
   212 U.S. 481 (1909)................................................................................................. 28

*National Credit Union Admin. Bd.. v. UBS Sec., LLC*,
   No. 12-2591-JWL, 2017 WL 411338 (D. Kan. Jan. 31, 2017)............................... 44

*Neder v. United States*,
   527 U.S. 1 (1999) ................................................................................... 7, 10, 41

*New York State Catholic Health Plan v. Academy O & P Assocs.*,
   312 F.R.D. 278 (E.D.N.Y. 2015) ........................................................................... 10

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................ 14, 17, 25, 26, 28

*O'Malley v. New York City Transit Auth.*,
   896 F.2d 704 (2d Cir.1990)..................................................................................... 10

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d. Cir 1990) ........................................................................... 13, 14

*Pa. Dep't of Corrections v. Yeskey*,
   524 U.S. 206 (1998) ................................................................................................ 60

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................................. 32

*Powers v. British Vita, P.L.C.*,
   57 F.3d 176 (2d Cir. 1995) ....................................................................... 4, 13, 29

*Reno v. Koray*,
   515 U.S. 50 (1995) ................................................................................................ 56

*Sanchez v. ASA Coll., Inc.*,
   No. 14-CV-5006, 2015 WL 3540836 (S.D.N.Y. June 5, 2015) ............................ 15

*Schmuck v. United States*,
   489 U.S. 705 (1989) .............................................................................................. 10

*Sec. & Exch. Comm'n v. Dunn*,
   587 F. Supp. 2d 486 (S.D.N.Y.2008) .................................................................... 15

*Sec. & Exch. Comm'n v. Pentagon Capital Mgmt. PLC*,
   612 F. Supp. 2d 241 (S.D.N.Y.2009) .................................................................... 15

*Shaw v. United States*,
   137 S. Ct. 462 (2016) ............................................................................................ 53

*Shemian v. Research In Motion Ltd.*,
   No. 11-CIV-4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ........................ 32

*Shields v. Citytrust Bancorp., Inc.*,
   25 F.3d 1124 (2d Cir. 1994) .................................................................................. 13

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ................................................................... 62

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) .................................................................................. 63

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir.1999) ..................................................................................... 13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) .................................................................................. 31

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................................................ 60

*Uebler v. Boss Media AG*,
   432 F. Supp. 2d 301, 305 (E.D.N.Y. 2006) .......................................................... 63

*United States ex rel. O'Donnell v. Countrywide*,
   33 F. Supp. 3d 494 (S.D.N.Y. 2014) ................................................................. 1, 56

*United States v. Autuori*,
   212 F.3d 105 (2d. Cir. 2000) ................................................................................. 10

*United States v. Bank of Am. Corp.*,
   No. 3:13-CV-00446, 2014 WL2777397 (W.D.N.C. June 19, 2014) ...................... 60

*United States v. Bank of N.Y. Mellon*,
 941 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................................ 2, 11, 12, 16, 29, 30

*United States v. Barel*,
 939 F.2d 26 (3d Cir. 1991) ........................................................................ 55

*United States v. Binday*,
 804 F.3d 558 (2d Cir. 2015) ..................................... 5, 10, 11, 22, 25, 26, 52

*United States v. Bonnette*,
 781 F.2d 357 (4th Cir. 1986) ..................................................................... 59

*United States v. Boren*,
 278 F.3d 911 (9th Cir. 2002) ..................................................................... 59

*United States v. Bouchard*,
 828 F.3d 116 (2d Cir. 2016) ...................................................................... 53

*United States v. Campos*,
 No. 16-CR-0395, 2017 WL 4402579 (S.D.N.Y. Oct. 3, 2017) ............................. 51

*United States v. Carlo*,
 507 F.3d 799 (2d Cir. 2007) ............................................................... 5, 10, 49

*United States v. Chandler*,
 98 F.3d 711 (2d Cir 1996) ......................................................................... 11

*United States v. Christensen*,
 344 F. Supp. 2d 1294 (D. Utah 2004) ........................................................ 55

*United States v. Countrywide Fin. Corp.*,
 961 F. Supp. 2d 598 (S.D.N.Y. 2013) ......................................................... 28

*United States v. DeVillier*,
 No. CA 16-012-BAJ-RLB, 2016 WL 2621968 (M.D. La. May 5, 2016) ............. 55, 57

*United States v. Devoll*,
 39 F.3d 575, 580 (5th Cir. 1994) ................................................................ 59

*United States v. Edwards*,
 566 F. Supp. 1219 (D. Conn. 1983) ............................................................ 55

*United States v. Fattah*,
 914 F.3d 112 (3d Cir. 2019) ...................................................................... 59

*United States v. Ferguson*,
 676 F.3d 260 (2d Cir. 2011) ................................................................. 28, 50

*United States v. Ghilarducci*,
 480 F.3d 542 (7th Cir. 2007) ..................................................................... 42

*United States v. Gordon*,
 987 F.2d 902 (2d Cir.1993) ....................................................................... 32

*United States v. Guadagna*,
 183 F.3d 122 (2d Cir. 1999) ............................................................. 11, 24, 25

*United States v. Huron Consulting Grp., Inc.*,
No. 09-CV-1800, 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011)................................. 30

*United States v. Johnson*,
No. 2:11-CR-501-DN-PMW, 2015 WL 8967525 (D. Utah Dec. 15, 2015)..................... 55, 56

*United States v. JPMorgan Chase Bank, N.A., et al.*,
No. 13-CV-0220 (S.D.N.Y.) ...................................................... 3

*United States v. Karro*,
257 F.3d 112 (2d Cir. 2001)..................................................... 11

*United States v. Krilich*,
159 F.3d 1020 (7th Cir. 1998)........................................ 58, 59, 60, 61

*United States v. Krown*,
675 F.2d 46 (2d Cir. 1982)...................................................... 59

*United States v. Laljie*,
184 F.3d 180 (2d Cir. 1999)................................................. 52, 54

*United States v. McGraw Hill Cos., Inc., et al.*,
No. 13-CV-0779 (C.D. Cal.) .................................................. 3, 54

*United States v. Ortiz*,
906 F. Supp. 140 (E.D.N.Y. 1995) ............................................. 55

*United States v. Philip Morris USA, Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ............................................ 30, 31

*United States v. Pinto*,
646 F.2d 833 (3d Cir. 1981)..................................................... 59

*United States v. Quicken Loans Inc.*,
No. 15-CV-0613 (D.D.C.).......................................................... 3

*United States v. Reifler*,
446 F.3d 65 (2d Cir. 2006)...................................................... 11

*United States v. Residential Funding Corp.*,
No. 17-CV-7192 (S.D.N.Y.) ....................................................... 3

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007).................................................... 52

*United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998)..................................................... 12

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,
798 F. Supp. 2d 517 (S.D.N.Y. 2011)............................................ 56

*United States v. Sabatino*,
485 F.2d 540 (2d Cir. 1973).................................................... 57

*United States v. Schlussel*,
No. 08-CR-0694, 2008 WL 5329969 (S.D.N.Y. Dec. 15, 2008)......................... 42

*United States v. Van Brocklin*,
   115 F.3d 587 (8th Cir. 1997)...........................................................55

*United States v. Wade*,
   266 F.3d 574 (6th Cir. 2001)......................................................59, 61

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999)...........................................................11

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017)..............................................................42

*United States v. Wells Fargo Bank, N.A.*,
   972 F. Supp. 2d 593 (S.D.N.Y. 2013)....................2, 30, 37, 55, 56, 57

*United States v. Wells*,
   519 U.S. 482 (1997).................................................................57, 58

*United States v. Wells*,
   63 F.3d 745 (8th Cir. 1995)...........................................................58

*United States v. William Savran & Assocs., Inc.*,
   755 F. Supp. 1165 (E.D.N.Y. 1991) ..................................................5

*VTech Holdings, Ltd. v. PricewaterhouseCoopers LLP*,
   348 F. Supp. 2d 255 (S.D.N.Y. 2004) .............................................12

*Williams v. United States*,
   458 U.S. 279 (1982).................................................................59, 60

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011).............................................................41

## Federal Rules and Statutes

1 U.S.C. § 1 .....................................................................................55

12 U.S.C. § 1833a ......................................................................1, 2, 9

15 U.S.C. § 78(u)–4 ......................................................................4, 14

15 U.S.C. § 78(u)–4(b)(2)(A) ...........................................................14

18 U.S.C. § 1005 .....................................................................2, 9, 54

18 U.S.C. § 1014 ................................................................2, 9, 57, 58

18 U.S.C. § 1341 ...............................................................................9

18 U.S.C. § 1343 ...............................................................................9

18 U.S.C. § 1344 .........................................................................9, 52

18 U.S.C. § 20 ...................................................................................9

40 Stat. 972, § 5209, 65th Cong. Sess. II, Ch. 177 (1918) ...............56

62 Stat. 750, § 1005, 80th Cong. Sess. II, Ch. 645 (1948) ...............56

Fed. R. Civ. P. 12(b)(6).....................................................................12

Fed. R. Civ. P. 8(a) ................................................................................................................... 13

Fed. R. Civ. P. 9(b) ...................................................................................................... 4, 13, 29, 54

**State Statutes**

N.Y. C.P.L.R. § 302(a) ............................................................................................................... 62

## INTRODUCTION

In 2006 and 2007, defendants UBS Securities LLC, UBS AG, Mortgage Asset Securitization Transactions, Inc., and UBS Real Estate Securities, Inc., (collectively, "Defendants" or "UBS"), marketed and sold billions of dollars in residential mortgage-backed securities ("RMBS") to investors.  At issue in this action brought by the United States are 40 of these RMBS (the "Subject Deals").   As detailed in the United States' Complaint, Defendants knew that significant numbers of the loans backing the 40 Subject Deals did not comply with loan underwriting guidelines that were designed to assess borrower ability to repay, and that the loans suffered from other deficiencies.[1]  Defendants knew of these facts because they had conducted "due diligence" reviews of the loans before they sold certificates in the Subject Deals to a broad array of investors, including federally-insured financial institutions ("FIFIs").  *See* Compl. ¶¶ 8, 30, 295-96.  Although Defendants knew of these facts, they did not disclose them to investors. Instead, Defendants knowingly made false statements in offering documents about the true characteristics of the loans — information that was critical to informed decision-making by investors.  *See, e.g.*, Compl. ¶¶ 115-19.  In all, Defendants' fraud permeated the Subject Deals and resulted in many billions of dollars of investor losses.  Compl. ¶ 2.  The United States seeks a penalty commensurate with this conduct.[2]

---

[1] "UBS represented to investors, through Offering Documents and other communications, that the loans in each deal had been underwritten generally in accordance with underwriting guidelines or otherwise had documented compensating factors justifying an exception to the guidelines; that all the loans in the deal complied with all applicable laws and regulations; and that the values of the underlying properties supported the loan amounts." Compl. ¶ 7; *see also id.* ¶ 115-148, tbl.2a.

[2] FIRREA authorizes the Court, in its discretion, to impose a civil penalty up to the amount of the "gain" or "loss" experienced by any "person" in connection with a violation of the statute's predicate offenses. 12 U.S.C. § 1833a(b)(3)(A); *see also United States ex rel. O'Donnell v. Countrywide*, 33 F. Supp. 3d 494, 498 (S.D.N.Y. 2014), *rev'd on other grounds*, 822 F.3d 650 (2d Cir. 2016) (analyzing FIRREA penalty provisions).

The meticulously detailed Complaint, which comprises 302 pages, including nearly 100 pages of tables setting forth deal-specific data, provides ample bases for the United States' claims for civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, based on the predicate offenses of mail, wire, and bank fraud, as well as violations of 18 U.S.C. §§ 1005 and 1014.

Defendants challenge the sufficiency of the Complaint, with emphasis on the United States' claims predicated on mail and wire fraud violations, arguing that the Complaint "does not identify any of Defendants' employees . . . who had the requisite fraudulent intent." Def. Br. at 1. From this, Defendants not only conclude that the Complaint is deficient, but contend that the United States cannot "find" culpable employees because there is purportedly "no evidence" and therefore this is a "collective scienter" case. Def. Br. at 2-3. In making these arguments, Defendants confuse the burden of proof at trial with the sufficiency of allegations at the pleading stage. Although the United States fully expects to prevail at trial, there is no requirement that the Complaint identify specific corporate employees or other agents in order to state claims against Defendants.[3] Nor, as Defendants intimate, is there a requirement that the United States bring claims against these individuals.[4] Def. Br. at 1-5, 29-34. In any event, the Complaint contains numerous allegations

---

[3] Defendants understandably ignore FIRREA case precedent on this point. *See United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 470 (S.D.N.Y. 2013) (refusing to dismiss FIRREA claim against a corporate defendant, holding that "the allegations set forth above hardly involve 'piecing together scraps of innocent knowledge held by various corporate officials' in the way that has given courts pause about theories of collective knowledge to allege corporate *scienter*. Rather, the [complaint] alleges a pattern of misrepresentations by Bank employees who, the [complaint] plausibly alleges, knew that their representations were false. These give rise to a strong inference that these Bank employees intended to deceive customers . . . .") (citations omitted); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 618 & 620 n.18 (S.D.N.Y. 2013) (refusing to dismiss FIRREA claim against a corporate defendant holding that the "contention that the Government must identify the particular employee responsible for submitting or certifying each loan is also incorrect.").

[4] There is literally no law supporting Defendants' suggestion that the United States must sue Defendants' employees as a prerequisite to bringing this action. The United States' determination to bring claims against a particular defendant is a matter of prosecutorial discretion, and the United States has elected

concerning specific persons, and categories of persons, working within specific UBS business groups, identified by description or title, who acted with a culpable state of mind in packaging and selling the 40 Subject Deals.  *See infra* Argument, Section II.  These extensive factual allegations, which must be accepted as true at this point in the action, with all inferences drawn in favor of the United States, demonstrate that Defendants acted with fraudulent intent.  While Defendants would like to recast this case as a negligence action in which they are faulted for not doing better due diligence on the billions of dollars of loans they securitized in the Subject Deals, Def. Br. at 7, it is decidedly a case based upon Defendants' knowing misrepresentations.

Defendants perversely attack the Complaint's allegations as "fraud-by-formula."  *See* Def. Br. at 5-6.  These allegations are not formulaic at all, but rather tell the story of Defendants' fraud. These allegations include citations to specific, loan-level due diligence information that Defendants learned contradicts key representations they made to investors for each Subject Deal. The allegations explain, invoking documents and testimony, how those due diligence results were obtained and what the results meant to Defendants, including how they informed Defendants that the representations they made to investors were false.  The allegations further explain that Defendants signed off on poor due diligence results in an effort to appease loan originators and get deals done, and how Defendants tried to manipulate the due diligence results and process, including by "waiving" in defective loans right into deals.  The Complaint also charges that Defendants knowingly misrepresented or made omissions as to a litany of other key loan characteristics affecting the risk of loans securitized in the Subject Deals.

---

to state claims against corporate defendants, without asserting claims against employees of those defendants, in a number of other cases.  *See, e.g., United States v. Residential Funding Corp.*, No. 17-CV-7192 (S.D.N.Y. 2017); *United States v. JPMorgan Chase Bank, N.A., et al.*,  No. 13-CV-0220 (S.D.N.Y. 2014); *United States v. Quicken Loans Inc.*, No. 15-CV-00613 (D.D.C. 2016); *United States v. McGraw Hill Cos., Inc., et al.*, No. 13-CV-0779 (C.D. Cal. 2015).

Given the sheer breadth of the deal specific allegations, and the overwhelming support they provide for the United States' claims, it is easy to see why the Defendants would attempt to marginalize them.  These attempts should be rejected.  Defendants' assertions that they selected some loans during due diligence through adverse selection, or that some of the loans that they identified as defective during due diligence were in fact not defective, or that Defendants did not securitize certain defective loans, Def. Br. at 5-6, are nothing but arguments for trial.

Although the Complaint meets any fraud pleading standard, it is worth noting that Defendants propose that the Court apply the *wrong* standard.  The Complaint's fraud allegations must, and do, comport with Rule 9(b) of the Federal Rules of Civil Procedure.  Under Rule 9(b), a defendant's state of mind may be pleaded generally, requiring only "*some minimal factual basis* for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent."[5] Defendants assert that a different standard — established by the Private Securities Litigation Reform Act ("PSLRA") — applies here.  *See* 15 U.S.C. § 78(u)–4.  The PSLRA standard, meant by the very terms of the statute to apply to actions brought by private litigants, does not apply in this government enforcement action.  That said, the Complaint nonetheless meets the PSLRA's requirement that scienter be pleaded with particularity.

Defendants assert that they did not intend for others to lose money.  Def. Br. at 3, 5-7, 51-52.  Even if, as Defendants argue, they did not intend for investors to lose money, they may be held liable.  The United States need only allege, as it has here, that Defendants knowingly withheld

---

[5] *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) (emphasis added); *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 73 (E.D.N.Y. 2017) (Brodie, J.) (reciting "minimal factual basis" standard).

Page 4

from investors the facts necessary for the investors to make informed economic decisions about their investments in the Subject Deals.[6]

Defendants ask the Court to disregard the presumed truth of the United States' well-pleaded allegations and instead adopt their own factual narrative, which attempts to exculpate Defendants from any wrongdoing and portray them as victims. For example, Defendants argue that they were "blindsided" by an historic housing collapse and, in some unspecified way, UBS AG sustained $45 billion in "mortgage-related" losses, including in the Subject Deals. Def. Br. at 3, 7. Defendants support this claim with SEC disclosures that reveal no discernible nexus between the $45 billion in losses and the Subject Deals. Instead, the losses appear to have been incurred across a broad swath of businesses within the UBS corporate family. In any event, Defendants' claim is absurd on its face. The fact that a defendant who has allegedly committed fraud may have lost money in the commission of that fraud does not mean that the defendant did not act with the requisite fraudulent intent.[7]

Moreover, although they imply otherwise, Def. Br. at 5-7, 23-24, 36-37, Defendants cannot credibly say that they intended to bear any actual risk of loss in the Subject Deals. As alleged in the Complaint, even if Defendants at some point owned certificates in the Subject Deals, their "business model" was to offload all risk onto others. *See* Compl. ¶¶ 28, 110. This is why

---

[6] *United States v. Binday*, 804 F.3d 558, 578-79 (2d Cir. 2015); *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007); *see also, United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1181 (E.D.N.Y. 1991) ("a showing of evil motive on the part of the defendant is not necessary, and such intent may be inferred through circumstantial evidence.") (citations omitted).

[7] *See, e.g., In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1262-63 (S.D.N.Y. 1996) (noting although defendants "lost money in the company's collapse," they still "had an obvious economic incentive in concealing from the noteholders the truth . . . ."); *Commodity Futures Trading Comm'n v. Complete Devs., LLC*, No. 4:10-CV-2287, 2014 WL 794181, at *16 (N.D. Ohio Feb. 26, 2014) ("A defendant's own losses in a fraudulent investment program do not automatically negate scienter").

investors lost billions of dollars in the Subject Deals.  In Defendants' own words, "the business does not keep 'hold' positions" in its own deals.  Compl. ¶ 28.

In a further effort to avoid the allegations in *this* case, Defendants argue that the Complaint should be dismissed for the same reasons that a court dismissed a private class action lawsuit against UBS that had nothing to do with the misconduct alleged in the Complaint.  Def. Br. at 3-4 (citing *In re UBS AG Sec. Litig.*, No. 07-Civ.-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)). *In re UBS AG*, a PSLRA action, involved allegations that UBS defrauded its own shareholders by, among other things, materially overvaluing its holdings of mortgage-related assets.  2012 WL 4471265, at *2-4. The lynchpin in that case was UBS' alignment of interests with its shareholders.  By contrast, the Complaint alleges that Defendants defrauded RMBS investors by materially misrepresenting the characteristics and quality of the loans backing the Subject Deals in order to get those investors to buy RMBS from them.  Thus, there is no alignment of interests between Defendants and investors buying the Subject Deals.  As alleged in the Complaint, Defendants' financial interests were in fact opposed to the interests of investors in the Subject Deals.  *See* Compl. ¶ 110 ("UBS' 'business model' during the Relevant Period, as described by its former employees, was not only to sell the certificates to investors but also to divest itself of any residual interests. . . . UBS never intended to remain invested in any of the Subject Deals and always sought to off-load all associated risk onto others.").

Defendants assert this case is not "typical." The United States agrees.  The fraudulent conduct at issue was massive in scope, brazen, and caused enormous harm to the investors in a way that was certainly not typical.  Defendants' brief unfortunately makes clear that, to this day, they espouse a "buyer beware" philosophy in selling securities to investors whereby Defendants can avoid the consequences of making knowing misrepresentations by including generalized risk

disclosures about what "may" or "might" happen in the future and including small-print disclaimers. Def. Br. at 20-23, 41. And then, when investors suffer huge losses, Defendants can simply say their victims were sophisticated and should have figured out that they were being misled.[8] This Court should reject Defendants' buyer-beware argument, as well as their other fraud-nullification arguments, all of which run counter to the facts alleged in the Complaint and controlling law.

Defendants also challenge the United States' claims predicated on violations of 18 U.S.C. § 1344 (bank fraud) and 18 U.S.C. §§ 1005 and 1014. Defendants argue that the United States' claims concerning these predicate offenses "do not apply" to the conduct at issue. *Id.* As detailed below, the plain text and case law interpreting each of these statutes support the application of these statutes here. *See infra* Argument, Section IV. Defendants also challenge the Court's jurisdiction as to claims against defendant UBS AG. Def. Br. at 7-8. As elaborated below, UBS AG was directly and extensively involved in the packaging and sale of the Subject Deals. In fact, UBS AG was an originator of loans securitized in Subject Deals through its trade name, UBS Home Finance, whose management "based in New York, NY." *See* Compl. ¶¶ 35, 56, 189-97; *infra* Argument, Section V.

---

[8] The purported "sophistication" of investors in the Subject Deals is decidedly a question of fact not ripe for resolution at this stage in the case. Moreover, it is not a valid defense to mail or wire fraud that the victims were too smart or sophisticated to be taken in. There is no element of reliance in the mail and wire fraud statutes. *See Neder v. United States*, 527 U.S. 1, 24-25 (1999) (noting that, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted").

## THE COMPLAINT

The Complaint (ECF No. 1) contains detailed allegations and annexed tables asserting that Defendants perpetrated a massive fraud as to the 40 RMBS identified in the pleading as the Subject Deals. As alleged in the Complaint, Defendants engaged in fraudulent conduct as to the 40 Subject Deals by knowingly making false representations and material omissions about key characteristics of the securitized mortgage loans. Compl. ¶¶ 115-305. Defendants presented information about these key characteristics in publicly-filed offering documents and in presentations to investors. Compl. ¶¶ 115-48 and tbls.2a–2b. Defendants knew that the representations they made to investors and rating agencies about the loans securitized in the Subject Deals were false. Compl. ¶¶ 139-48. Evidence of Defendants' knowledge is substantial:

1.     UBS knew from the credit and compliance due diligence it conducted that its representations as to loan characteristics and quality were materially inaccurate. Compl. ¶¶ 149-210. UBS conducted credit and compliance due diligence on portions of the loan pools it securitized, ostensibly to validate the representations and warranties it was making to investors about the characteristics of the loans in the underlying pools, and specifically about the credit and compliance risks of those loans. Compl. ¶¶ 149-62. From its due diligence results, however, UBS learned that the representations it was making were false and UBS intentionally manipulated its due diligence to avoid identifying additional defective loans. Compl. ¶¶ 149-82.

2.     UBS repeatedly misrepresented to investors the value of the mortgaged properties underlying the Subject Deals to investors. Compl. ¶¶ 211-65. UBS told investors that appraisals accompanying the mortgage originations had sufficient collateral value to protect investors against losses in the event of default. Compl. ¶¶ 211-16. UBS conducted valuation due diligence to test the reasonableness of the property values underlying the loans securitized in 21 of the Subject Deals. From this due diligence, UBS learned that, contrary to its representations, many of the mortgaged properties were highly likely to have had overstated property values. Compl. ¶¶ 242-54. UBS knowingly securitized these loans. Compl. ¶¶ 217-54 and tbl.5.

3.     UBS also made presentations to investors and rating agencies detailing the purported robustness of its due diligence processes. These presentations were riddled with misrepresentations and misleading statements. *See, e.g.,* Compl., tbl.2b. For example, UBS represented that it did not securitize loans without conducting valuation due diligence but securitized thousands of loans that had no valuation review. Compl. ¶¶ 258-65 and tbl.5. UBS repeatedly characterized its due diligence processes as significantly more robust than they actually were. Compl. ¶¶ 139-48, 217-54.

**FIRREA AND ITS PREDICATES**

**I.    Elements of Claims for Civil Penalties Under FIRREA**

FIRREA authorizes the United States to seek civil penalties for fraudulent conduct.  12 U.S.C. § 1833a.  These penalties are available against any person or entity shown by a civil preponderance of the evidence standard to have violated one or more of several predicate criminal statutes.  12 U.S.C. § 1833a(f).  Among the violations for which FIRREA civil penalties may be sought are: (1) mail and wire fraud, 18 U.S.C. §§ 1341 and 1343 (*see* 12 U.S.C. § 1833a(c)(2) and Claims I and II); (2) bank fraud, 18 U.S.C. § 1344 (*see* 12 U.S.C. § 1833a(c)(1) and Claim III); (3) fraudulently benefiting from a transaction with a financial institution ("FI"), 18 U.S.C. § 1005 (*see* 12 U.S.C. § 1833a(c)(1) and Claim IV); and (4) making false statements to influence the action of certain FIs, 18 U.S.C. § 1014 (*see* 12 U.S.C. § 1833a(c)(1) and Claim V).  Under FIRREA, mail and wire fraud violations give rise to civil penalties only if the conduct affects federally-insured financial institutions.  12 U.S.C. § 1833a(c)(2).  Violations of sections 1005, 1014, and 1344 apply to conduct directed at FIFIs as well as a broader universe of FIs, including federal home loan banks and branches of certain foreign banks.  *See* 18 U.S.C. §§ 20, 1005, 1014, 1344, and 12 U.S.C. § 1833a(c)(1).[9]

**II.    Elements of Mail and Wire Fraud Predicates**

The elements of mail and wire fraud are (1) a scheme to defraud, (2) the making of a false statement (or the omission of information) in execution of the scheme, (3) materiality of the

---

[9] If the Government can prove that a defendant "violate[d] any provision of law" listed among FIRREA's predicate offenses, then the statute provides that the defendant "shall be subject to a civil penalty in an amount assessed by the court;" this penalty ordinarily "shall not exceed $1,000,000," unless "any person derives pecuniary gain from the violation" or unless "the violation results in pecuniary loss to a person other than the violator," in which case the maximum penalty is "the amount of such gain or loss." 12 U.S.C. §§ 1833a(a), (b)(1), (b)(3)(A).

falsehood or omission, (4) an intent to defraud, and (5) use of the mail or wires that is at least incidental to an essential part of the scheme. *See Neder*, 527 U.S. at 20-21; *Schmuck v. United States*, 489 U.S. 705, 710-11, 721 (1989); *Binday*, 804 F.3d at 569; *United States v. Autuori*, 212 F.3d 105, 115, 118 (2d. Cir. 2000).[10]   The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, "are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose." *Autuori*, 212 F.3d at 105, 118.   "[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* at 188.

### III.   Fraudulent Intent in Mail and Wire Fraud Cases

The United States may establish intent to defraud by showing actual knowledge, conscious avoidance of the truth, or reckless indifference to the truth. *See United States v. Carlo*, 507 F.3d at 802 (intentional fraud includes both actual knowledge as well as conscious avoidance of the truth where a defendant "was aware of a high probability that [the statements] were false, but consciously avoided confirming that suspicion."); *Global-Tech Appliances, Inc. v. SEB, S.A.*, 563 U.S. 754, 766 (2011); *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir.1990) ("A showing of intentional fraud . . . or 'reckless indifference to the truth' is necessary to satisfy 'the requisite knowledge and criminal intent' element of mail fraud.") (citations omitted); *New York State Catholic Health Plan v. Academy O & P Assocs.*, 312 F.R.D. 278, 297 (E.D.N.Y. 2015) (a showing of "intentional fraud" or "reckless indifference to the truth" may satisfy the intent element of mail fraud).

---

[10] There is no element of reliance in either statute as the Supreme Court has ruled that the common law requirements of justifiable reliance and damages "plainly have no place in the federal fraud statutes." *Neder*, 527 U.S. at 24–25 (noting that, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.").

In the Second Circuit, "intent to defraud for purposes of the mail and wire fraud statutes comprises two principal parts: (1) intent to deceive and (2) contemplation of actual harm to the victim." *Id.* at 464. Intent to deceive can be proven indirectly, through evidence of a defendant's actions: "[D]irect proof of defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence, including by showing that the defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). "[W]here a necessary consequence of the scheme, if it were successful, would be injury to others, 'fraudulent intent may be inferred from the scheme itself.'" *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (quoting *Guadagna*, 183 F.3d at 130).[11]

Defendants' motion incorrectly suggests that, to show fraudulent intent, the United States is required to show that Defendants intended for others to lose money. Def. Br. at 51-52. To show fraudulent intent, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss — it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579. This Circuit has recognized that intent to harm can be shown if the victim pays the defendant for the product deceptively sold. *United States v. Walker*, 191 F.3d 326, 335-36 (2d Cir. 1999). Even exposing the victim to a potential loss is enough. *United States v. Karro*, 257 F.3d 112, 117-18 (2d Cir. 2001); *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir 1996). Intent to harm is also shown where the defendant deprives the victim of the ability to make a sound business decision. For example, intent to harm a bank is shown if the defendant "deliberately supplies false information to obtain a bank loan," the effect

---

[11] "We have presumed . . . that the requisite intent exists '[w]hen it is clear that a scheme, viewed broadly, is necessarily going to injure.'" *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220-21 (2d Cir. 2000) (quoting *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999)). "Such a presumption is appropriate in circumstances such as these, where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm." *Id.* at 221.

of which is "to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant." *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998). The harm thus can be "to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Id.* at n.5. Where "the false representations are directed to the quality, adequacy, or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 465 (citation omitted).

<u>**APPLICABLE PLEADING STANDARDS**</u>

**I.      Legal Standard under Fed. R. Civ. P. 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545; *VTech Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004) (issue "is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims."). Under Rule 12(b)(6), courts must accept a complaint's factual allegations as true and draw all inferences in plaintiff's favor. *See ATSI Commc'n., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.   Pleading Fraud under Fed. R. Civ. P. 9(b)

The United States' claims are governed by the pleading requirement of Rule 9(b).[12]  Rule 9(b) requires "particularity" only as to "the circumstances constituting fraud or mistake" with the caveat that "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally."  The controlling standard in this Circuit is that a plaintiff may "allege fraudulent intent generally" under Rule 9(b), as long as there is "'*some minimal factual basis* for conclusory allegations of scienter that give rise to a strong inference' of fraudulent intent."  *Powers*, 57 F.3d at 184  (emphasis added, citations omitted); *Greene*, 262 F. Supp. 3d at 73 (reciting "minimal factual basis" standard) (Brodie, J.).   Because only a "minimal factual basis" is required, the Second Circuit has recognized that "great specificity [is] not required with respect to . . . allegations of . . . scienter."[13]  *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) (alterations in original) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985)).  Moreover, scienter can be inferred circumstantially from other allegations in the Complaint.  *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84-86 (2d Cir. 1999).

Rule 9(b) is meant "(1) to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based . . . (2) to safeguard defendant's reputation and goodwill from improvident charges of wrongdoing. . . and (3) to inhibit the institution of strike suits."  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993) (internal quotation marks,

---

[12] Fed. R. Civ. P. 8(a) also applies to this case and Rule 9(b) must still be read in light of the liberal pleading requirement of Rule 8, which only requires a "short and plain statement" of the claim.  *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir 1990).  Plaintiffs are not required to plead with detailed evidence.  *Kravetz v. Brukenfeld*, 591 F. Supp. 1383, 1386 (S.D.N.Y.1984).

[13] With respect to a "condition of mind" such as scienter, the second sentence of Rule 9(b) represented a "relaxation of [the] specificity requirement" contained in the first sentence of the rule.  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d. Cir. 1995); *accord Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Thus "allegations of scienter . . . 'are not subjected to the more exacting consideration applied to the other components of fraud.'"  *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 143 (2d Cir. 1991) (quoting *Ouaknine*, 897 F.2d at 81).

citations and alterations omitted). Rule 9(b) "does not require factual pleadings that demonstrate the *probability* of wrongdoing. . . . At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). Thus, to satisfy Rule 9(b), a complaint need only "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* at 171. In assessing Rule 9(b)'s pleading standards, the facts alleged are viewed "in their totality, not in isolation." *Id.* Moreover, "reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of the representation where, as here, defendants are . . . affiliates participating in the offer of securities." *Ouaknine*, 897 F.2d at 80. Here, the Complaint identifies each individual misstatement at issue in Tables 2a and 2b, leaving no uncertainty as to which specific misstatements Defendants are accused of. The Complaint also details why each misstatement identified is false or misleading. *See* Compl. ¶¶ 115-791, tbls.3-8.

Defendants imply that the applicable pleading standard for state of mind is the PSLRA. 15 U.S.C. § 78(u)–4. The PSLRA contains heightened pleading requirements for securities class action complaints, beyond what is required in the Federal Rules,[14] including a requirement that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). However, the pleading standards of the PSLRA are not applicable to this FIRREA case. Courts in this Circuit have specifically

---

[14] The Second Circuit has recognized that the PSLRA's "additional requirement that plaintiffs state facts [alleging scienter] 'with particularity' represents a heightening of the standard." *Novak v. Kasaks*, 216 F.3d 300, 310-11 (2d Cir. 2000) (quoting *In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 534 (3d Cir. 1999); *id.* at 311 (acknowledging that "the addition of the words 'with particularity'" represented a change in "the basic pleading standard for scienter in this circuit").

rejected attempts to apply the PSLRA to civil enforcement actions brought by the government relating to securities offerings.[15]

Throughout their motion, Defendants rely almost exclusively on cases applying the PSLRA's more stringent scienter standard that does not apply to this case. This attempt to apply the PSLRA to mail and wire fraud claims should be rejected here as it has otherwise been:

> Relying on cases applying the [PSLRA] Defendants contend that Plaintiffs cannot rely on an unnamed employee's knowledge to establish scienter. The PSLRA, however, requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." By contrast, Rule 9(b) requires only a "minimal factual basis" for scienter, and allows a plaintiff to aver intent generally. Accordingly, there is no merit to Defendants' contention.

*Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006, 2015 WL 3540836, at *10 n.4 (S.D.N.Y. June 5, 2015) (internal citations omitted). It makes no sense to apply the PSLRA here. The PSLRA was designed to restrict securities actions brought by private plaintiffs "to curtail the champertous vice of 'lawyer-driven' securities litigation." *City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 844 F. Supp. 2d 498, 500 (S.D.N.Y. 2012). FIRREA, in contrast, was intended to broaden the Government's law enforcement authority to pursue fraud.

<u>**ARGUMENT**</u>

Contrary to Defendants' arguments, the Complaint sufficiently pleads fraudulent intent, and claims based upon predicate offenses of bank fraud (18 U.S.C. § 1344), 18 U.S.C. § 1005 and 18 U.S.C. § 1014. The Complaint also establishes that UBS AG is subject to jurisdiction of this Court.

---

[15] *See, e.g., Sec. & Exch. Comm'n v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y.2008) ("I decline Defendants' invitation to extend the PSLRA 'strong inference' formulation beyond the limits of the PSLRA. Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language."); *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 318 (S.D.N.Y.2010) ("The PSLRA applies only to private actions, not to actions filed by the Commission."); *Sec. & Exch. Comm'n v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263–64 (S.D.N.Y.2009) ("By the terms of the PSLRA, its heightened pleading standard does not apply to actions brought by the SEC.").

## I.     THE COMPLAINT SUFFICIENTLY PLEADS FRAUDULENT INTENT

Defendants' principal attack on the Complaint is that it fails to plead sufficiently that Defendants acted with fraudulent intent.  Def. Br. at 28-51.  Defendants' argument is premised on the wrong pleading standard, and misconstrues the meaning of "fraudulent intent" and how it can be proved at trial.  That said, there can be no doubt that the Complaint sufficiently pleads fraudulent intent.  As detailed below, the Complaint pleads extensive facts showing (a) Defendants had both motive and opportunity to defraud their investors, (b) Defendants had actual knowledge that their statements to investors were materially false or misleading from numerous sources, including their own due diligence reports, (c) Defendants intended their misrepresentations to induce their investors to enter into transactions without the relevant facts necessary to make informed economic decisions, by knowingly withholding key information as to the quality of the underlying loans, and (d) Defendants acted with the specific intent to harm by failing to rectify problems in their securitization program in the face of mounting evidence the securitized loan pools were plagued with defects.

Any one of these showings alone is enough to plead a strong inference of fraudulent intent. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (to plead fraudulent intent, a plaintiff need only plead "those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, *or* a reckless disregard for the truth.") (internal quotation marks omitted) (emphasis added) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001); *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 464 (explaining, in FIRREA case, that "pleadings can allege the requisite strong inference by '(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" (quoting *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)); *Glidepath Holding B.V. v.*

Page 16

*Spherion Corp.*, 590 F. Supp. 2d 435, 456 n.8 (S.D.N.Y. 2007) ("Plaintiffs need not plead both 'motive and opportunity' *and* 'conscious misbehavior or recklessness' to prove scienter. One is sufficient.") (emphasis in original).

Contrary to Defendants' suggestions, the Complaint alleges significant direct evidence of Defendants' state of mind. Numerous documents show UBS officials were willing to securitize defective loans notwithstanding the representations to investors. For instance, the Complaint details: evidence reflecting a willingness to securitize defective loans to appease originator clients (Compl. ¶¶ 19-22, 199–201, 417–19, 725-29); evidence showing UBS knowingly passing onto investors the risks from the undisclosed defective loans (Compl. ¶¶ 23-24, 121-130, 202-10, 242-43, and tbls.3-4); emails between Defendants and their originator clients working to artificially keep kickout rates down (Compl. ¶¶ 339, 363, 436-39, 490, 646); evidence demonstrating a willingness to "waive in" defective loans into deals without any justification or review of loan files and the use of other methods to manipulate the due diligence process (Compl. ¶¶ 15, 23, 170-82); evidence showing misrepresentations that loans in certain deals were subjected to "100%" due diligence when it in fact that was not the case (Compl. ¶¶ 258-65); and evidence indicating knowledge of defects in loans originated by UBS Home Finance and the subsequent securitization of those loans. (Compl. ¶¶ 183-97).

### A.   The Complaint Alleges Motive and the Opportunity to Defraud

Defendants argue that the United States has failed to plead a strong inference based on "motive and opportunity."[16] Defendants assert that the Complaint fails to plead motive because it

---

[16] Defendants acknowledge that motive and opportunity is but one of many ways to plead a strong inference of fraudulent intent. Def. Br. at 34 (citing *Powers*, 57 F.3d at 184); *see also Cohen*, 711 F.3d at 359; *Novak*, 216 F.3d at 307-09.

pleads only a "generalized desire to achieve profits."  Def. Br. at 34 (citing *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012) (summary order)).[17]

In reality, the Complaint goes far beyond alleging "a general profit motive common to all corporations," *Landesbank*, 478 F. App'x at 681.  Instead, the Complaint illustrates, in detail, that Defendants' motive to misrepresent characteristics of the loans backing their securitizations, as well as their due diligence processes, was to receive higher credit ratings and to induce investors to invest in their RMBS, while reducing the level of credit enhancement built into each deal's structure.  *See, e.g.*, Compl. ¶¶ 23 ("UBS primarily conducted due diligence to give the appearance to investors and rating agencies that UBS had a process in place to ensure that the loans in its deals complied with the representations it made to investors"), 25 ("UBS, to further give the appearance that it had a legitimate process that ensured loans complied with representations, made presentations to investors and rating agencies . . . These presentations were meant to persuade investors and rating agencies that UBS had an effective and sufficient diligence process to validate its representations to investors. . . . [T]hese presentations were riddled with misrepresentations and misleading statements."), 83 ("UBS investors were led to believe that due diligence was intended to clean the pool of loans that did not comply with guidelines."), 106 ("UBS wanted rating agencies to require as little credit enhancement as possible because the less credit enhancement required, the more valuable the pool of loans would be to UBS.").

---

[17] The case cited by Defendants in support of this point, *Landesbank*, actually undermines their argument that the United States fails to plead a strong inference.  In *Landesbank*, the Second Circuit held that the plaintiff failed to plead a strong inference by not specifically identifying due diligence reports for the securitization at issue that it alleged showed the defendant bank knew that "the quality of the mortgages underlying the collateral for the Davis Square notes did not justify the notes' triple-A ratings."  478 F. App'x. at 681-82.  Here, in contrast, for each and every Subject Deal, the Complaint specifically identifies due diligence results *for that deal* showing high rates of defective loans.  *See* Compl. ¶¶ 306 *et seq.* (Deal-Specific Facts), tbls.3-4.  Thus, the United States has pleaded a strong inference of fraudulent intent on that basis alone.  The United States has also pleaded a strong inference on several other bases, including, as discussed in this section, by pleading motive and opportunity.

Page 18

The Complaint further pleads motive through its allegations that UBS knowingly securitized defective loans in the Subject Deals because it was motivated "to maintain its relationships with originators and to ensure a continuous flow of loans."  Compl. ¶¶ 171, 198-210 (discussing UBS succumbing to originator pressure and securitizing defective loans to appease originators), 199 (UBS trader discussing an originator of loans securitized in several of the Subject Deals: "if they're really that unhappy, they just won't sell us the loans tomorrow; and . . . I really don't want to get to the point where they hate us.").   In short, as alleged with particularity throughout the Complaint, UBS securitized loans that violated representations to investors because it knew that loan kickouts were costly to originators and believed that originators would stop selling it loans if UBS conducted more stringent due diligence.  *Id.* ¶¶ 199 ("the head of ABS noted that if UBS pushed for more stringent diligence, 'we run the risk of alienating everyone that sells loans to us.'"), 20 ("Loan originators did not want their loans kicked from deals by UBS and took steps to limit the scope of due diligence to ensure that UBS bought or securitized as many loans as possible. Rejections of their loans in due diligence were costly to originators. . .").

Courts have recognized that similar allegations of motive are sufficient to raise a strong inference of fraudulent intent.  In *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, a case involving allegations of fraud against sponsors, depositors, and underwriters in the offerings of RMBS, the court found that allegations that defendants provided false information to credit rating agencies about the loans to receive inflated ratings were sufficient.  929 F. Supp. 2d 231, 241-42 (S.D.N.Y. 2013).  Such allegations "suggest an improper motive beyond a general business motive for profits, as the defendants' alleged improper conduct suggests that they had a motive to maintain the appearance that the . . . assets were safe and highly rated."  *Id.* (internal quotations and citations omitted)*; Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 179-

80 (S.D.N.Y. 2009) ("plausible inference" of fraudulent intent shown by bank's motive and opportunity to maintain the appearance that assets were safe and highly rated).

Defendants' other "motive and opportunity" arguments are similarly unavailing. Defendants argue that the Complaint's allegations should be rejected as "economically irrational," because UBS (1) agreed to repurchase loans that did not meet its contractual representations on some deals, and (2) invested alongside investors in the 40 RMBS.  But these argument are factually inaccurate and highly misleading. Def. Br. at 35-37.

With regard to their repurchase argument, Defendants conveniently leave out that these so-called repurchase obligations were *fully indemnified* by the originators from which they purchased the loans they were securitizing.  Thus, Defendants did not bear the risk for repurchase.  The deals were structured so that the "repurchase" risk was borne by the originators and not UBS.  This is a matter of public record, as UBS has publicly disclosed these indemnifications to inform its shareholders that it does not bear this risk and has actually commenced legal proceedings to enforce the indemnities they failed to mention here.  *See* UBS AG Form 6-K, at 28 (Feb. 2, 2016) ("In most instances in which we would be required to repurchase loans due to misrepresentations, we would be able to assert demands against third-party loan originators who provided representations when selling the related loans to UBS"); Perlin Decl., Ex. 1 (UBS Proofs of Claim, filed in Case Nos. 12-12019 and 12-2032 (Bankr. S.D.N.Y.)) (seeking to enforce indemnities in three Subject Deals and representing to the court that "[u]nder the applicable Purchase Agreements, UBS is entitled to indemnification for fees, costs, damages, or judgments for any claims or actions arising from the Current Repurchase Demands.").  UBS' most recent annual report also informs its shareholders that a repurchase lawsuit has been settled and a "signification

Page 20

portion" of the settlement "will be borne by other parties that indemnified UBS."  *See* UBS AG 2018 Annual Report, at 408.

Defendants' argument that they purposefully "invested" in the 40 Subject Deals goes beyond the well-pled allegations in the Complaint and, in any event, is not factually correct.  As alleged in the Complaint, citing evidence, Defendants never harbored an intent to take "hold" positions in their own deals that would have put UBS in the same risk position as those buying its RMBS.  Rather, the intent was to sell every part of the transaction and push all risk onto others:

> In addition to selling the RMBS certificates, UBS also sought to sell the "residual" interests in the Subject Deals, which were interests in each deal that UBS sometimes held after selling off the certificates.  Owners of the residual interests were generally entitled to capture the excess cash flow generated by the mortgage pool.  UBS' "business model" during the Relevant Period, as described by its former employees, was not only to sell the certificates to investors but also to divest itself of any residual interests.

Compl. ¶ 110.  As this allegation makes clear, this strategy included the intent to sell all so-called "residual" interests in the Subject Deals that UBS sometimes owned after closing.  *See also id.* ¶¶ 308, 311, 382-84.  The Complaint also cites an internal memorandum further elaborating on UBS' strategy to shift all risk in the Subject Deals onto others:

> UBS sold its RMBS based on misrepresentations, while at the same time it also sought to minimize its own economic exposure by offloading all risk from the Subject Deals onto others.  An internal UBS memorandum outlined this strategy: "It is the business' intent to fully distribute all risk in the MASTR program deals within a short period; i.e., the business does not keep 'hold' positions."  In response to the poor performance on one particular deal, a UBS trader stated this strategy more bluntly in an instant message conversation, stating that the losses were "someone else's problem."

*Id*. ¶ 28.  Putting aside that these allegations are based on documentary evidence and testimony, they must be accepted as true for the purpose of this motion.

Defendants' economic irrationality argument is irrelevant to the claims asserted.  Even if UBS had agreed to repurchase out of its own purse, and actually did repurchase all defective loans upon a breach finding (not the case), and even if it had harbored an intent to "invest" in the Subject

Deals (also not the case), it nonetheless could have been motivated to misrepresent material characteristics of the securitization to investors to receive higher prices for its sale of the securities and to reduce the size of the credit enhancement, as the Complaint alleges with particularity. Compl. ¶¶ 23, 25, 83, 106.

The standard for scienter in a mail or wire fraud claim is not that a defendant seek for a transaction to fail, but that the defendant "intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579. Thus, Defendants' economic irrationality argument is wholly irrelevant. At best, it is a trial argument that does not vitiate any of the factual allegations giving rise to a strong inference of fraudulent intent at the pleading stage.

Finally, and more incredibly, Defendants argue that they could not have had the "opportunity" to commit the fraud alleged here. Def. Br. at 37-38. But as alleged in the Complaint, Defendants (a) acquired (in the case of principal deals) the underlying mortgage loans, (b) conducted due diligence, (c) structured the deals, (d) made the representations and warranties for the deals, and (e) underwrote, issued, and/or sold the deals. Compl. ¶¶ 65-75. In the course of these activities, UBS had ample opportunities to learn information about the loans and make misrepresentations about the securitizations.

Defendants' "opportunity" argument seems to be that UBS had no opportunity to defraud because in-house and outside counsel were involved in the Subject Deals. *See* Def. Br. at 37 ("Plaintiff's allegations of fraud are grounded in UBS' due diligence practices, yet Plaintiff alleges instances of oversight by in-house or outside counsel and their review of due diligence results no less than 15 times in the brief."). First, this argument fails because this is a motion to dismiss and Defendants' argument is clearly a trial argument. Second, the argument assumes that in-house or

Page 22

outside counsel overseeing the deals were not complicit in the misrepresentations; they were fully informed of the due diligence results and other findings about the securitized loans; and that they appropriately advised Defendants on how to proceed with the transactions in the face of such information, including whether the representations in the transaction were true.  There is no factual predicate for such assumptions.  An unsubstantiated advice of counsel assertion in a motion to dismiss brief is simply insufficient to show that Defendants lacked "opportunity" in view of the allegations here.[18]

In sum, the detailed factual allegations describing Defendants' motives — including direct quotes by UBS employees revelatory of their state of mind — are more than sufficient to plead a strong inference on the basis of motive and opportunity alone.

### B.     The Complaint Alleges Facts That Show Conscious Misbehavior or Recklessness

The Complaint also pleads facts raising an inference of "conscious misbehavior or recklessness."  *Gabriele v. American Home Mortg. Servicing, Inc.*, 503 F. App'x 89, 97 (2d Cir. 2012); *Glidepath*, 590 F. Supp. 2d at 456 n.8.  Defendants' conscious misbehavior and recklessness alone warrants an inference of fraudulent intent.  *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 473 (E.D.N.Y. 2013) (adequately alleged scienter where the defendants were aware of lacking supporting scientific evidence for their claims).

***Defendants Had Actual Knowledge of the Falsity of Their Representations:*** Intent to defraud is strongly inferred when Defendants' public statements are contrary to specific facts known to them.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y.

---

[18] *See In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d at 321 n.8  (concluding that defendants' argument that "they sought input and approval from all relevant sources, including the SEC itself" may not support a motion to dismiss because "consultation with counsel is one factor, or possible evidence, that might be taken into account in evaluating whether those accused of fraud acted in good faith." (internal marks and citations omitted)).

2006); *Guadagna*, 183 F.3d at 129 ("Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false."). The Complaint sets forth extensive and detailed allegations demonstrating that Defendants had actual knowledge that their statements to investors were false, or that they were aware of a high probability that the statements were false but consciously avoided confirming that suspicion. As set forth in the pleading, this knowledge came from many sources, including Defendants' own due diligence results. These allegations alone give rise to a "strong inference" of fraudulent intent.

Defendants repeatedly made misrepresentations to investors as to the credit quality and other characteristics of the loans backing their securitizations. Compl. ¶¶ 121-30 and tbl.2a. Defendants made these representations to assure investors the loans were creditworthy and to meet industry and investor expectations about the risks of the investments. *Id.* ¶ 115.

The Complaint alleges Defendants (through due diligence managers, transaction managers, and traders) knew from these due diligence results that the unreviewed loans contained high percentages of materially defective and misrepresented loans. Compl. ¶¶ 163-82, 114. Indeed, Defendants' own documents and testimony reveal their knowledge that high due diligence defect rates showed that the non-reviewed portions of the loan pools also contained defective loans. *Id.* ¶¶ 156, 165-69.

Defendants' valuation reviews revealed to Defendants that significant percentages of loans did not meet the representations Defendants were making about the adequacy of the property values securing the mortgage debt. Compl. ¶¶ 216, 242-54. As with their credit and compliance due diligence process, Defendants knowingly securitized thousands of these misrepresented loans, and also failed to review large numbers of loans in valuation due diligence, despite making

representations that they were reviewing "100%" of the loans. *Id*. ¶¶ 220, 224-26, 242, 265. As summarized in Table 5, the Complaint alleges that, across the Subject Deals, Defendants securitized a significant number of loans with inflated appraisals. The Complaint also alleges that Defendants had direct evidence that other key loan characteristics were false, including known secondary financing (*id.* ¶¶ 267–75), debt-to-income ratios (*id.* ¶¶ 276– 81), and FICO scores for seasoned loans (*id.* ¶¶ 282-90). In sum, the Complaint alleges overwhelming direct evidence of Defendants' knowledge from a variety of sources of information contradicting their representations. These allegations alone raise a strong inference of fraudulent intent. *Novak*, 216 F.3d at 308-09, 311 (the strong inference requirement is satisfied where a complaint alleges that Defendants "knew facts or had access to information suggesting that their public statements were not accurate."); *Guadagna*, 183 F.3d at 129 (intent to defraud "may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false.").

***Defendants Knowingly Withheld Key Information from Investors:*** The Complaint also details that Defendants intended that their misrepresentations induce investors to enter into transactions without the relevant facts necessary to make informed economic decisions, by knowingly withholding key information from investors and rating agencies as to the quality of the securities they were selling. *See Binday*, 804 F.3d at 579. The following are only some examples of UBS withholding information from investors:

- Defendants did not disclose that their due diligence results indicated that representations in offering materials were false. Compl. ¶¶ 7-8, 18, 115-38, 149-69.
- Defendants never informed investors that EV3 loans were securitized in the Subject Deals or that they had instructed their vendors to change EV3 loans to EV2 loans, which Defendants then securitized. *Id.* ¶¶ 171-77, and tbls.4a, 4b.
- Defendants did not disclose to investors in the UBS Home Finance deals, MARM 2007-HF1 and MARM 2007-HF2, that: (1) there were problems with the underwriting process that "was

Page 25

ineffective" and "failed the sniff test" such that UBS had "lost confidence" and "trust"; (2) UBS securitized loans that its own post-origination Quality Control process identified as having "critical" exceptions; and (3) the deals securitized a significant number of recycled loans that UBS' client loan purchasers had kicked out of prior whole loan deals due to material defects and no additional due diligence was conducted on these rejected loans. *Id.* ¶¶ 183-97.

- Defendants did not disclose to investors their decisions not to review loans meeting their own adverse selection criteria. *Id.* ¶¶ 145-46, 166-69, 220, 237-45, 256-65.

- Defendants did not disclose their baseless decisions to excuse high reject rates in due diligence on "short time frames" for due diligence. *Id.* ¶¶ 176-77.

- Defendants did not disclose the exclusion of so-called "soft" rejects from EV3 rates. *Id.* ¶¶ 174-75.

- Defendants did not disclose even less stringent due diligence standards on third-party deals. *Id.* ¶ 181.

- Defendants did not disclose that they often drew samples for third-party deals from incomplete loan tapes. *Id.* ¶ 182.

- Defendants made misleading representations to investors or rating agencies pertaining to the presence of secondary financing associated with a significant number of loans in certain Subject Deals containing Alt-A loans and withheld this information from investors who specifically requested it. *Id.* ¶¶ 267-74, 527, 561, 596, 609, 619, 629, 639, 652, 665, 755, and tbl.6.

- Defendants routinely misrepresented to investors or rating agencies the debt-to-income restrictions contained within the Countrywide guidelines used to originate the Countrywide loans in 12 of the Subject Deals. UBS was fully aware that the actual DTI guidelines used by Countrywide differed from the guideline representations disclosed in the ProSupps for these Subject Deals. Further, under a directive from Countrywide, UBS' practice was not to disclose DTI ratios to investors, even when investors specifically asked. *Id.* ¶¶ 276-81, 459, 527, 596, 609, 629, 639, 652, 665, 678, 696, 708, and tbl.7.

- In presentations to investors and rating agencies, Defendants falsely represented that "100% of the loans" in a pool were subjected to some form of valuation due diligence. Defendants did not disclose that UBS securitized thousands of loans in its MARM and MABS deals without subjecting the loans to any valuation diligence at all. *Id.* ¶¶ 258-65, and tbl.5.

- Defendants did not disclose to investors poor due diligence results in AHMIT 2006-2 even when warned by UBS lawyers that disclosures were needed. American Home did not want to disclose the results and, instead of taking steps to excise the loans that violated the representations or modifying the representations, UBS signed off on the transaction knowing that the Offering Documents were false and misleading. *Id.* ¶¶ 724-30.

These allegations alone, which Defendants wholly ignore, raise a strong inference of fraudulent

intent. *Binday*, 804 F.3d at 579; *Novak*, 216 F.3d at 308-09.

***Defendants Failed to Rectify Problems in their Securitization Program:*** The Complaint also alleges extensive facts showing Defendants acted with the specific intent to harm the property interests of their victims by failing to rectify problems in their securitization program in the face of mounting evidence the securitized loan pools were plagued with defects.  For example:

- Defendants securitized loans or loan pools they described at various times as a "bag of sh[*]t" (Compl. ¶ 488), "cr*p" (*id.* ¶ 209, 384, 790), "quite possibly better than little beside leprosy spores" (*id.* ¶¶ 206, 368), "that piece of c__p" (*id.* ¶ 782), from originators that UBS had negative opinions of such as "I know they suk" (*id.* ¶ 205), "[w]hen you do business with them, you dance with the devil and sell your soul . . ." (*id.* ¶ 203), and "those guys are slimy" (*id.* ¶ 5).  Defendants made no effort to tighten their due diligence process in the face of this knowledge, but instead manipulated their due diligence processes to accommodate these originators. *Id.* ¶¶ 178-182.

- Prior to issuing Subject Deals containing Fremont loans, Defendants were aware of serious problems with Fremont originations and the decline in Fremont's underwriting practices, including that the loans were defaulting and going into delinquency at astronomical rates due to "more an[d] more creativity on the origination side."  Despite this knowledge, Defendants did not change their due diligence practices with regard to Fremont loans.  Instead, they continued to securitize Fremont loans. *Id.* ¶¶ 208-09, 379-85, 790.

- Despite representations in presentations to investors, Defendants did not actively monitor seller performance, execution rates, and origination practices; were not conducting monthly reviews of seller due diligence practices; and only reviewed a limited number of delinquent loans that it prioritized, not all 60-day delinquent loans as Defendants told investors.  Defendants did not even have a surveillance department prior to late 2006. *Id.* ¶¶ 141-48, and tbl.2b.

- Defendants openly discussed the poor quality and expected performance of its deals and were not surprised when Subject Deals suffered large losses in the first month such as MARM 2007-3, which had "HUGE delinquencies in Month 1 (big surprise!)." *Id.* ¶ 529.

- Before securitizing WMC loans, Defendants was aware of significant problems with WMC loans, including concern from UBS' head of ABS due diligence about "how [the loan pool] ended up this bad."  Despite this knowledge regarding the quality and expected performance of loans originated by WMC, Defendants did not abandon the WMC loans or tighten their due diligence, but instead securitized the loans. *Id.* ¶¶ 347-52, 361-70.

- Defendants acknowledged that American Home had "extremely weak past performance from a diligence perspective," and UBS' head of due diligence stated that with respect to American Home's loans he "would only be comfortable at 50% due diligence . . . ."  Others at UBS expressed similar concerns, including a trader on the ARMs Desk who in 2006 described American Home as "the worst with due diligence . . . their files are really sloppy and often incomplete."  Despite these concerns, Defendants continued to buy and underwrite American Home loans throughout the Relevant Period and never performed anywhere close to 50% credit and compliance due diligence. *Id.* ¶ 205.

- Despite knowing that guidelines were "being pushed" in connection with MARM 2007-2, Defendants proceeded on this deal with a minimal 10% diligence sample. *Id.* ¶ 466.

- Defendants learned in the course of structuring MABS 2006-NC1 that loans in the deal were defective, including learning, on the eve of closing, that four loans in the deal were already in foreclosure but elected to securitize them anyway. *Id.* ¶ 315.

These allegations amply support a "strong inference" of fraudulent intent. *See Novak*, 216 F.3d at 308-09; *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 608 (S.D.N.Y. 2013) ("circumstantial evidence" that the defendant concealed information from the purchasers of misrepresented loans and that the defendant did nothing to rectify problems in the loan approval program in the face of mounting evidence that the program was producing defective loans "amply" supported an inference of intent to defraud); *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance.").

## II.   DEFENDANTS' ARGUMENT ON CORPORATE SCIENTER IS MERITLESS

Defendants argue that the Complaint fails to plead intent because "it does not identify any UBS employees responsible for the alleged misrepresentations who acted with scienter." Def. Br. at 29. This argument fails for two reasons. First, it misstates the law by erroneously relying exclusively on PSRLA cases applying a heightened pleading standard for state of mind, and completely ignoring relevant FIRREA and mail and wire fraud cases specifically rejecting the precise argument Defendants invoke. Second, even under the PSLRA standard, the Complaint alleges that specific individuals carried out Defendants' fraudulent conduct with a culpable state of mind.[19]

---

[19] As an initial matter, a fraudulent scheme perpetrated by UBS employees, in the scope of their employment, is a fraudulent scheme perpetrated by UBS itself. *See, e.g.*, *N.Y. Cent. & Hudson River R.R. v. United States,* 212 U.S. 481, 495 (1909) (holding a corporation "can only act through its agents and officers" but can be "held punishable by fine because of the knowledge and intent of its agents to whom it

### A.      Defendants Rely on the Wrong Pleading Standard

Defendants' argument is erroneously premised on PSLRA cases which rest on a different and heightened pleading standard as to scienter.  *See supra* Applicable Pleading Standards.  While the PSLRA requires *particularity* as to state of mind, Rule 9(b) requires "particularity" only as to the "the circumstances constituting fraud" with the caveat that "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally."  Accordingly, the standard in this Circuit for 9(b) cases is only that there is "'*some minimal factual basis* for conclusory allegations of scienter that give rise to a strong inference' of fraudulent intent."  *Powers,* 57 F.3d at 184 (internal marks and citations omitted); *Greene*, 262 F. Supp. 3d at 38 (Brodie, J.) (applying the "minimal factual basis" standard).

There is no pleading requirement that a specific individual be identified to state a FIRREA claim against a corporate defendant.   In fact, two FIRREA cases from this Circuit, which Defendants ignore, have rejected precisely the argument Defendants now make.  In *United States v. Bank of N.Y. Mellon*, the defendant contended "that alleging corporate scienter requires alleging that a particular employee had the requisite intent" and that the complaint failed to do so.  941 F. Supp. 2d at 470.  The court rejected this argument holding that the "numerous allegations of conscious misbehavior and recklessness" in the complaint were sufficient because "the allegations set forth above hardly involve piecing together scraps of innocent knowledge held by various corporate officials in the way that has given courts pause about theories of collective knowledge to allege corporate scienter.  Rather, the SAC alleges a pattern of misrepresentations by Bank employees who, the SAC plausibly alleges, knew that their representations were false.  These give

---

has [e]ntrusted authority to act in the subject-matter … and whose knowledge and purposes may well be attributed to the corporation for which the agents act").

rise to a strong inference that these Bank employees intended to deceive customers . . . ."  *Id.* (quotations and citations omitted).

Similarly, in *United States v. Wells Fargo*, the court held that, the "contention that the Government must identify the particular employee responsible for submitting or certifying each loan is also incorrect."  972 F. Supp. 2d at 618*; United States v. Huron Consulting Grp., Inc.*, No. 09-CV-1800, 2011 WL 253259, at *2-3 & n.3 (S.D.N.Y. Jan. 24, 2011) (denying motion to dismiss where the complaint alleged, *inter alia*, that the false statements were "authored by Huron Corporation").  The same reasoning applies here.

Defendant cannot cite a single case dismissing a FIRREA action or any other civil enforcement action filed by the United States on this basis.  The only non-PSLRA decision Defendants cite at all is *United States v. Philip Morris USA, Inc*., 566 F.3d 1095 (D.C. Cir. 2009), which involved civil RICO mail and wire fraud claims.  This decision, however, involved an appeal of a *judgment after trial*, not a motion to dismiss an initial pleading, and therefore lacks any relevance to this motion.  Defendants are confusing proof at trial with the sufficiency of pleadings.  Moreover, in *Philip Morris* the D.C. Circuit *upheld after trial* a mail and wire fraud judgment in the face of the same argument that the judgment was "without finding that any employee harbored specific intent to defraud."  *Id.* at 1122.  Specifically, the court held:

> Specific intent to defraud may be inferred where, as here, there is a pattern of corporate research revealing a particular proposition, for example, that smoking is addictive; an ensuing pattern of memoranda within the corporation acknowledging that smoking is addictive, even though the memoranda may or may not have gone directly to the executive who makes the contrary statement; and the corporate CEO or other official of high corporate status then makes a public statement stating that smoking is not addictive, contrary to the knowledge within the corporation.  Based on this sort of evidence and the inferences reasonably drawn from it, a fact-finder could permissibly infer that the speaker harbored specific intent to defraud at the time he or she made the false or misleading statement.  Moreover, such pervasive knowledge throughout the organizations demonstrates that Defendants' executives at least acted with the reckless disregard for the truth or falsity of their statements.  As the district court correctly held, such reckless

disregard suffices to demonstrate the requisite intent.  The law then imputes this specific intent to the corporation.

*Id.* at 1121 (citation omitted).  It is difficult to see how this case supports Defendants' argument given the widespread knowledge within UBS' RMBS business of due diligence results and UBS' knowledge of poor underwriting practices at the originators that sold loans to UBS.

Even in the PSLRA context, there is no requirement at the pleading stage to identify a specific individual.  Under the PSRLA, a complaint suffices if it "alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind . . . even if the complaint does not name the corporate agent as an individual defendant or otherwise identify the agent."  *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc*., 576 F.3d 172, 189 (4th Cir. 2009); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) ("[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."); *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 513 F.3d 702, 710 (7th Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."); *In re MBIA, Inc., Sec. Litig*., 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010) (finding corporate scienter for misrepresentations where individual scienter was absent).  Thus, even in the PSLRA context, Defendants get the law wrong.  Further, in the PSLRA context, the individual acting with scienter need not also be the person "making" the misrepresentation.  Any person "who played a meaningful role in drafting or reviewing the [fraudulent statement]" may possess the requisite scienter.  *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 545 (S.D.N.Y. 2011).[20]  These cases acknowledge the corporate reality that regardless of which

---

[20] *See also Makor*, 513 F.3d at 708 (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)) ("To establish corporate liability for a violation of Rule 10b-5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make or issue the

corporate officer "makes" a corporate statement, it is highly likely that one or more additional employees played a role in drafting or providing information for the statement in question.[21]

### B.     The Complaint Alleges a Culpable State of Mind

The Complaint contains voluminous allegations that specific individuals at UBS working on RMBS acted with a culpable state of mind.   The Complaint alleges a pattern of misrepresentations by UBS employees who, the Complaint plausibly alleges, knew that their representations were false.   This is especially true given that all reasonable inferences are to be construed in the Government's favor and that the law gives equal weight to direct and circumstantial evidence.   *See United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993) (observing that intent may be shown through circumstantial evidence of consciousness of guilt).

First, the Complaint specifically describes each corporate Defendant and its role in the securitization process across the 40 Subject Deals, and further alleges that individuals working for these entities carried out the fraudulent conduct:

- Defendant UBS Securities LLC "served as the lead or managing co-lead underwriter for each Subject Deal."  Compl. ¶ 34.

---

statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein or the like) . . . .'")); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) (holding that an individual whose knowledge is imputed to the corporation need not also make the material misstatement); *In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("[T]he individual making an alleged misstatement and the one with scienter do not have to be one and the same.")

[21] In PSLRA cases, courts within this Circuit have also suggested that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).  Although recent cases have called into question whether the "core operations" inference is sufficient under the PSRLA, standing alone, to create a strong inference of intent, when paired with allegations regarding the wide dissemination within the company of information contradicting the representations (here UBS' due diligence results), a strong inference may be established.  *See, e.g.*, *Shemian v. Research In Motion Ltd.*, No. 11-CIV-4068, 2013 WL 1285779, at *17-18 (S.D.N.Y. Mar. 29, 2013) (stating that the core operations inference "may be considered 'as part of [a court's] holistic assessment of the scienter allegations.'").

- Defendant Mortgage Asset Securitization Transactions, Inc. ("MASTR") acted as the "depositor and registrant for all of the Subject Deals whose names begin with 'MARM,' or 'MABS.'" *Id*. ¶ 36.  MASTR "was responsible for registering certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934." *Id.*

- Defendant UBS Real Estate Securities, as the sponsor for the Subject Deals, "was responsible for acquiring, holding, and transferring the loans securitized in these Subject Deals." *Id.* ¶ 37.

- "UBSRES (sponsor), MASTR (depositor), and UBS Securities (underwriter) were each staffed by essentially the same group of UBS employees. The UBS employees who carried out the securitization steps on behalf of these entities made no distinction in their roles for each entity, and typically considered themselves to simply be employees of 'UBS.'" *Id.* ¶ 75.

- Defendant UBS AG "had a direct role in many of the Subject Deals, serving as 'Swap Provider,' 'Cap Provider,' 'Corridor Contract Counterparty' or 'Yield Maintenance Agreement Provider.'  AG also directly originated loans, later securitized in two of the Subject Deals through the trade name 'UBS Home Finance.'"  Compl. ¶ 35.  In those two Subject Deals, MARM 2007-HF1 and MARM 2007- HF2, a significant number of loans originated by Home Finance were not originated in accordance with Home Finance underwriting criteria or were not originated in compliance with all applicable laws and regulations.  *Id.* ¶ 184.

- The Complaint contains specific allegations as to the actions of the head of the Home Finance business and another director at Home Finance.  *See id.* ¶¶ 193, 569, 578-80, 587.

Second, the Complaint alleges the precise business units that were responsible for securitizing loans into RMBS and more specifically, describes the personnel within these units and how due diligence results were widely communicated across the deal teams, including to the individuals verifying the offering documents.

- The Complaint describes the "UBS RMBS Team" being "divided into the Asset-Backed Securitization Desk ('ABS') which focused on subprime loans and the Mortgage Backed Securities Group ('MBS'), which focused on Alt-A and other non-subprime loans.  Throughout most of the Relevant Period, both ABS and MBS, and each of their subgroups and trading desks, reported to the head of mortgage trading.  The head of mortgage trading reported to the head of RMBS in the United States."  Compl. ¶ 111.

- The Complaint describes the responsibilities and staffing of the ABS and MBS groups.  *Id.* ¶ 112-113.

- For each of the Subject Deals, the Complaint describes the securitization process and personnel referenced by job description or title: "Across UBS' RMBS business, transaction managers on each of the Subject Deals handled overall coordination of the various groups involved in creating RMBS and were responsible for obtaining internal approvals from those groups prior

to securitization. This included overseeing and coordinating due diligence as well as overseeing the preparation, review, and verification of Offering Documents. Transaction managers were apprised of loan-level due diligence results, which were widely distributed among the various groups involved in RMBS transactions. Moreover, the due diligence team participated with other groups in regular transaction management meetings where issues relating to the deals being worked on were discussed. UBS' RMBS securitization process, overseen by transaction managers, facilitated and disseminated loan-level due diligence results throughout the UBS working group for each Subject Deal such that the individuals responsible for verifying Offering Documents were made aware of due diligence results and issues. The working groups for each of the Subject Deals included, among other individuals, transaction managers, due diligence managers, traders, in-house and outside counsel." *Id.* ¶ 114.

- The Complaint contains additional detail as the roles and knowledge of traders and due diligence group: "The internal due diligence groups at UBS, working in conjunction with the relevant trading desks, then decided which loans to purchase and which loans to reject from the pool. After due diligence was completed, UBS compiled a final list of loans to purchase. *Id.* ¶ 87. The trading desk responsible for the purchase would hold the loan pools purchased on their balance sheet until the loans were either securitized or otherwise sold. *Id.* ¶ 88.

- The Complaint also alleges that due diligence results "were often quite detailed, and were accessible to and reviewed by UBS employees both inside and outside of UBS' due diligence groups." *Id.* ¶ 158. The Complaint also states that traders "consistently exerted influence over the due diligence process throughout the Relevant Period." *Id.* ¶ 142.

Third, the Complaint alleges that the standard representations made to investors in all of these deals (*e.g.*, the loans complied with underwriting guidelines or had compensating factors) were well-known across the RMBS groups at UBS. The Complaint alleges that persons responsible for such activities as conducting due diligence, waiving in loans, or failing to review more loans before securitizing them in the face of high EV3 rates knew the representations that UBS was making to investors and that due diligence was aimed at ensuring these representations were accurate. *See* Compl. ¶¶ 69-73, 91, 95, 114, 149, 153, 156, 169, 437, 478, 486, 492.

Fourth, the Complaint cites a number of *specific communications* demonstrating the fraudulent intent of specific individuals working on securitizing RMBS who are referenced, by title or position. For example:

- "UBS trader concluded (a month before selling certificates backed by WMC loans to investors) that WMC loans were 'quite possibly better than little beside leprosy spores.'" Compl. ¶ 5.
- "Additionally, by 2007, the head of mortgage trading at UBS had referred to a pool of Countrywide loans UBS was reviewing and ultimately purchased for one of the Subject Deals as 'a bag of sh[*]t.'" *Id.* ¶ 5.
- "UBS trader concluded in a 2006 instant message conversation, 'our crack due diligence effort is a joke.'" *Id.* ¶ 23.
- "UBS trader sarcastically noted: 'MARM 07-3 has HUGE delinquencies in Month 1 (big surprise!).'" *Id.* ¶ 24.
- "[D]ue diligence manager noted to others at UBS, 'This deal is horrific!!!.'" *Id.* ¶ 24.
- "UBS structurer referred internally to Subject Deal INABS 2007-A as 'that piece of c__p' prior to certificates being sold." *Id.* ¶ 24.
- "UBS trader stated . . . that the losses were 'someone else's problem.'" *Id.* ¶ 28.
- "[A] structurer complained directly to the leadership of the RMBS business about his serious concerns with the business culture including that he was 'really concerned [about the] "lack of right and wrong — aka ethics" — ie. [sic] Lying is ok.'" *Id.* ¶ 29.
- A UBS "trader stated '[m]y position at this point is we need to kick the sample up to at least 50% on the whole pool. Right now, we're at something like a 60% kickout rate. This goes way beyond a "relationship" question. In my opinion, I don't think we can in good faith fund this pool and pass it off to investors as though everything is kosher.'" *Id.* ¶ 169 n.12.
- "Another UBS employee said of Countywide: 'When you do business with them, you dance with the devil and sell your soul . . . .'" *Id.* ¶ 203.
- "UBS' head of due diligence for Mortgage Finance acknowledged that American Home had 'extremely weak past performance from a diligence perspective,' and stated that with respect to American Home's loans he 'would only be comfortable at 50% due diligence . . . .' In 2006, he continued to view American Home as a problem ('I know they suk')." *Id.* ¶ 205.
- "[A] trader on the ARMs Desk who in 2006 described American Home as 'the worst with due diligence . . . their files are really sloppy and often incomplete.'" *Id.* ¶ 205.
- "[A] trader on the ABS Trading Desk summed up his view of Fremont loans: 'their collateral is cr*p.'" *Id.* ¶ 209.
- "[A] trader on the ABS Trading Desk further expressed his concerns about New Century loans, commenting on the poor performance of earlier New Century deals: 'New Century performance, this isn't surprising . . . . They really do have some stinkers this year. . . .'" *Id.* ¶ 334.
- "[A] trader on the ABS Trading Desk emailed an ABS transaction manager and others at UBS statistics about the loans in MABS 2006-WMC3 to be used in the sales memo, noting: 'Not sure yet what the "Key Points" are (as our deal is kinda awful) . . . maybe we go without "Key Points" altogether.'" *Id.* ¶ 351.
- "[A] trader emailed a former colleague giving his opinion about Fremont, 'we don't own the residual. [S]omeone else's problem . . . don't think the problem is Wells [the servicer]. Think it is Fremont. . . their collateral is cr*p.'" *Id.* ¶ 384.
- "Mortgage Finance collateral analyst referred to a purchase of loans later securitized as 'an unmitigated train wreck.'" *Id.* ¶ 547.

- "[A] director at Home Finance wrote two employees in his group regarding loan sales: 'The credit market is getting worse every day. Things are getting really scary. I want to sell as many loans as possible asap. I'd like to […] Show out package with ARMs with CLTVs >95 and FICOs <680 and mix with fixed package. We'll have to see how much this hurts our deal, but we don't want these loans in our deal.'" These loans were then securitized. *Id.* ¶ 569.
- "[H]ead of Home Finance wrote to the head of mortgage trading and a colleague within Home Finance, wondering whether they should cancel the MARM 2007-HF2 deal: 'We need to decide on whether to pull the deal or own bonds today.' In spite of the known performance issues with MARM 2007-HF1, UBS went forward with MARM 2007-HF2." *Id.* ¶ 587.
- Mortgage Finance transaction manager wrote, in reference to a pool of loans later securitized, "Sounds like we got a really ugly pool with loans that [Countrywide's] trying to unload." *Id.* ¶ 700.
- Deal manager within Mortgage Finance emailed a representative from American Home regarding a pool of loans later securitized: "I am worried because the rejection rate is over 50% and the industry average is between 2-4%. Am home does not have a lot of time to get the numbers down . . . At rates this high, we can't really kick out those loans that do not work because we are also underwriting the deal (not same as whole loan trade). Its [sic] pretty serious . . . especially since its [sic] quarter end and the trades have to happen." *Id.* ¶ 714.
- Head of due diligence for Mortgage Finance wrote in an email to representatives from American Home regarding a pool of loans later securitized, "There is a very large concern at this time regarding the underwriting of this issue for American Home. The reject rate is extremely high at over 50%. The pool is due to tie out this week (tomorrow I believe) and I need to know from your group that these items are being handled and will clear." *Id.* ¶ 733.
- "[S]tructurer on the ABS Trading Desk asked, specifically referencing INABS 2007-A: 'do u know what rating that piece of c__p is?' The same structurer further commented on the loss coverage levels for this deal later in February, 'The 600 mil LCs were already cr_p. With 1.1 bil LCs looking worst [sic], this is not doable.' Further, another structurer on the ABS Trading Desk commented on another IndyMac pool of loans out for bid just two months after INABS 2007-A closed, 'IndyMac pool performs like crap so although the pool doenst [sic] look horrible in strats, it may be worth looking at.'" *Id.* ¶ 782.

Defendants now recast these communications as innocent, but such efforts are not appropriate at the pleadings stage. *Loreley*, 797 F.3d at 176 (holding that "the district court erred by requiring Plaintiffs to show that their reading [of emails alleged in the complaint] was superior to the court's own benign reading, thereby imposing a *de facto* probability requirement at the pleadings stage."); *Cohen*, 711 F.3d at 360 (holding that *Iqbal* "requires assertions of facts supporting a *plausible* inference of fraud — not of facts which can have no conceivable other explanation").

Nor do Defendants lack fair notice as to the individuals working on the Subject Deals. Documents referenced in the Complaint contain the specific names of these individuals. Specific

Page 36

individuals signed the deal transaction documents such as the Pooling and Servicing Agreement ("PSA") (*see* Compl. ¶¶ 70, 72) filed with the SEC, personally endorsing the veracity of the representations made in those documents on behalf of the business, even though they, as the Complaint alleges, were each personally aware of the due diligence results indicating the representations were false. *See, e.g.*, PSA for MABS 2006-HE1 PSA, at 203 (Feb. 1, 2006) (Transaction Manager signing for MASTR); PSA for MARM 2006-OA1 PSA (Mar. 1, 2006) (Transaction Manager signing for both MASTR and UBS Real Estate Securities); PSA for MARM 2006-OA2 PSA (Oct. 1, 2006) (Transaction Manager signing for both MASTR and UBS Real Estate Securities). Indeed, many of the misrepresentations cited in Table 2a, were incorporated and reprinted into prospectus supplements from these PSAs. *See, e.g.*, Compl., tbl.2a at 39 (compiling misrepresentations in MARM 2006-OA 2 including "Pursuant to the Pooling and Servicing Agreement, the transferor will make, among others, the following representations and warranties. . ."). The investor presentations referenced in Table 2b also specifically outline the structure and names of the individuals responsible for the securitization process at UBS, complete with mini-biographies. *See, e.g.*, Perlin Decl, Ex. 2 (UBS MASTR Trust Series Discussion Materials-MASTR, November 2006) at 30, 32. *See Wells Fargo*, 972 F. Supp. 2d at 618 n.16 ("The Bank can obviously determine the names of the employees that worked on the ten loans cited as examples of the reckless origination scheme as well.").

In sum, the Complaint contains detailed allegations about each Defendant's role in the fraud, the precise business units responsible for the Subject Deals at issue, the precise misstatements at issue, and particular statements attributed to individuals referenced by position and title evidencing the fraudulent intent of UBS' former RMBS employees. Defendants' baseless

assertion that a Complaint must *name* individuals to survive a motion to dismiss cannot vitiate the detailed factual allegations regarding the individuals responsible for the fraud.

### III.   DEFENDANTS' OTHER ARGUMENTS ON SCIENTER ARE EQUALLY MERITLESS AS A MATTER OF LAW

Defendants' brief ignores the overwhelming body of allegations supporting a strong inference (as well as direct evidence) of intent.  Instead, Defendants concentrate on a narrow set of allegations that they try to contradict with extraneous evidence, make trial arguments as to why certain documents and information quoted in the pleading do not mean what the Complaint alleges they mean, and suggest why they lacked a motive to defraud investors.  Def. Br. at 38-53.  These arguments uniformly lack merit and do not provide a basis to dismiss.  *See Loreley*, 797 F.3d at 176; *Cohen*, 711 F.3d at 360.  Further, some of these arguments are patently misleading.

#### A.   Defendants' Argument That Kicking Out Some Loans Negates Fraudulent Intent

Defendants argue that because UBS kicked out some loans in its due diligence process as defective that it could not have had fraudulent intent. Def. Br. at 39-40.  This argument is meritless. Whether UBS kicked *some* loans is beside the point because kicking *some* loans did not make the representations as to the securitized loans accurate.

Moreover, the Complaint explains that Defendants' aim in kicking some loans from the deals was to give the appearance that there was meaningful diligence ensuring representations to investors were accurate: "UBS' due diligence was essentially window dressing.  UBS primarily conducted due diligence to give the appearance to investors and rating agencies that UBS had a process in place to ensure that the loans in its deals complied with the representations it made to investors, rather than to ensure that was actually the case."  Compl. ¶ 23.  Indeed, UBS, as an underwriter, was required to conduct due diligence.  *See id.* ¶ 69 ("The underwriter (here, UBS

Securities) was responsible for coordinating and supervising all the transaction team members, structuring the deal, conducting the requisite due diligence, preparing or coordinating the preparation of Offering Documents . . . .").

The key issue in this case is what UBS did *after* conducting its due diligence and learning that the loan pools backing its deals did not comply with its standard representations to investors. Instead of taking the additional steps UBS' own policies required to conduct enough due diligence to ensure that the representations were accurate, UBS withheld what they knew from investors and knowingly misrepresented the quality of their RMBS in violation of the predicate statutes.

### B.    Defendants' Argument on Lack of Concealment

Defendants argue that they "made no effort to conceal the alleged fraud from other deal participants" based on UBS instructing due diligence vendors to change EV3 grades on loans and purportedly also "directing them to make a written record" of this.  Def. Br. at 40.  Defendants misread the allegations.  There is no allegation that UBS instructed due diligence vendors *to memorialize* EV3 waivers with notations indicating that there was no justification for the waiver. It was the vendors who, to ensure there was a record of the waiver if ever scrutinized later, added notations indicating that the grade was not theirs.  *See* Compl. ¶ 171 ("UBS' due diligence providers used special notations to track and document the loans where the event level grade was contrary to their recommendation.  They often used notes such as 'EV2 Per Client,' 'OK per Client,' or 'issue waived by client' to indicate that UBS was instructing them to override EV3 loans without valid reasons").  Of note, UBS specifically instructed vendors to stop using the "W" designation indicating they were waving in loans, a result of which many waivers were not memorialized with an "EV2W" designation. *See id.* ¶ 172.

### C.   Defendants' Argument that Customary Credit Enhancements Negate Fraudulent Intent

Defendants assert that because they provided "credit enhancements" to their deals that they therefore could not have had culpable intent.  Def. Br. at 40-41.  This is, again, a highly misleading argument.  The Complaint makes clear that credit enhancements were *essential* and *required* by RMBS investors.  Credit enhancements were not unique to UBS and were industry standard features of RMBS.  *See* Compl. ¶¶ 104-06 ("Ratings for each tranche were based on a number of factors, including . . . the level and type of credit enhancements structured into the deal . . . . While these various forms of credit enhancement created a financial buffer that investors demanded . . . ."), 285 ("Credit enhancements were mechanisms built into the structure of an RMBS deal to improve the overall credit profile, and were important to rating agencies in structuring a deal."). But, as the Complaint alleges, Defendants sought to minimize, at every turn, the amount of such enhancements because they cost UBS money.  *Id.* ¶ 106 ("[C]redit enhancements were costly for investment banks and ultimately cut into their bottom lines. UBS wanted rating agencies to require as little credit enhancement as possible because the less credit enhancement required, the more valuable the pool of loans would be to UBS."); *id.* ¶¶ 285, 180 n.15.  In one instance, UBS told a rating agency a blatant lie in order to try to minimize credit enhancements on one particular deal. *Id.* ¶¶ 286-87 ("When S&P requested updated FICO scores, which UBS had already obtained five days prior, a UBS collateral analyst falsely stated to S&P in an email that UBS 'did not have time to refico this pool due to the short turn around time.'").  Moreover, these minimal credit enhancements did little to protect investors from the billions of dollars in losses they suffered.

### D.   Defendants' Argument That Generalized Risk Disclosures and Disclaimers Negate Fraudulent Intent

Defendants assert that because they included generalized risk disclosures about what "may" happen in the future in their offering documents and small-print disclaimers on their

investor presentations that they therefore could not have had fraudulent intent.  This argument is meritless.  It is well-settled that generalized cautionary language does not protect material misrepresentations or omissions that were knowingly made.  Indeed, what UBS concealed from investors were the risks *UBS already knew existed in the loan pools it was securitizing* based on its due diligence results.  Vague and general warnings about "risks" that "may" happen do not immunize Defendants from fraud.  *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd*., 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability."); *In re Prudential Sec. Inc. Ltd. P'ships Litig*., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (general disclaimers do not provide protection "to someone who warns his hiking companion to walk slowly because there might be a ditch when he knows with near certainty that the Grand Canyon lies one foot away.").[22]

Further, because the federal fraud statutes require no showing of reliance, the small-print "disclaimers" in investor presentations are irrelevant to the issue of liability. The disclaimers Defendants cite – contained in presentations "prepared by UBS AG"[23] – purport to inform the reader that he or she should not rely on the accuracy of the information. Def. Br. at 42.  But unlike securities fraud cases under the PSLRA, reliance is not an element of mail or wire fraud.  *See Neder*, 527 U.S. at 24–25 (noting that, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted"); *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 642 (2008)

---

[22] *See also Fed. Hous. Fin. Agency v. JPMorgan Chase & Co*., 902 F. Supp. 2d 476, 497 (S.D.N.Y. 2012) (general statements regarding riskiness of securitization do not absolve RMBS sponsors and underwriters from liability for false statements that loans in a specific securitization comply with guidelines); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *Wilson v. Merrill Lynch & Co*., 671 F.3d 120, 130 (2d Cir. 2011) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.") (citation omitted).

[23] *See, infra* Argument, Section IV.

(holding that "a showing of reliance" is not required for mail fraud).  Accordingly, the presence of a disclaimer does not defeat liability under the federal fraud statutes.  *See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017); *United States v. Ghilarducci*, 480 F.3d 542, 546-47 (7th Cir. 2007). If it were otherwise, every fraudster could simply put a boilerplate "disclaimer" on every misrepresentation it made and be immunized from liability.[24]

### E.    Defendants' Argument That EV3 Loans Were Not Defective

Defendants argue that the loans graded EV3 in UBS' own due diligence process were not necessarily defective.  However, the Complaint makes clear the EV3 designation, by its terms, and as used by UBS in its due diligence process, meant that the loan designated as such was inappropriate for securitization because it would violate the standard representations to investors. *See* Compl. ¶ 161 ("[N]o loans graded EV3 should have been securitized in the Subject Deals.").

Defendants first argue that because some EV3s were designated as such due to the loan files missing key documents (such as appraisal, proof of income or assets) that such loans were not truly defective and presumably could be securitized consistent with what was represented to investors even if the missing documents were never found.  In making this argument, Defendants ignore the fact that without the key documents for a file, it was impossible for UBS to verify whether the loan violated the standard representations.  This is why loans missing key documents were designated by UBS as EV3 "kicks" or "rejects."   *See* Compl. ¶ 161 ("A loan was also supposed to be graded EV3 if there was an absence of key documents (or the entire loan file) preventing an assessment of the loan's compliance with underwriting guidelines and applicable laws and regulations.").  Moreover, underwriting guidelines contained specific verification and

---

[24] In fact, some fraudsters have tried to do this, unsuccessfully.  *See, e.g.*, *United States v. Schlussel*, No. 08-CR-0694, 2008 WL 5329969, at *1 (S.D.N.Y. Dec. 15, 2008) (holding that disclaimer at issue did not negate intent to defraud); *Gottlieb v. Schaffer*, 141 F. Supp. 7, 17 (S.D.N.Y. 1956) (holding that the advertisements at issue should be examined as a whole, stating that "[n]or do the disclaimers inserted inconspicuously in the sales literature, unsay what is said elsewhere").

documentation requirements such that missing key documents often meant by definition that the loan did not meet underwriting guidelines. *Id.* ¶¶ 164 ("Across the Subject Deals, UBS' credit and compliance due diligence vendors graded large numbers of loans EV3 in diligence samples at the conclusion of due diligence, meaning they could not be included in the security consistent with UBS' representations to investors that the loans generally met guidelines"); 160-61 (referring to the underwriting guidelines requiring *documented* compensating factors); 123 (quoting AHMIT 2006-2 Prospectus Supplement ("ProSupp") representing that "the mortgage loans have been purchased or originated, underwritten and *documented* in accordance with . . . underwriting guidelines established by the Originator.").[25]

While EV3 grades could be changed to EV2 or EV1 if the missing document was found and compliance with guidelines or sufficient compensating factors could be verified, the Complaint also makes clear that the EV3 rates cited were *final EV3* rates where the missing key documents *were never found during diligence* and the EV3 grades could not be changed such that the loans had to be removed from the pool. *See* Compl. ¶ 165 ("[T]hese final EV3 rates . . . were based only on the loans graded EV3 at the end of the credit and compliance due diligence process.").

Loan files that were missing key documents were also red flags for fraud, and securitizing them was "an invitation to fraud." *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 472 (S.D.N.Y. 2015). Defendants now assert that these loans *theoretically could*

---

[25] *See also* ProSupp for CWALT 2006-12CB, at S-38 (Mar. 28, 2006) ("[A]nd if any document in a mortgage file is found to be missing or defective in a material respect and Countrywide Home Loans does not cure the defect within 90 days of notice of the defect from the trustee . . . Countrywide Home Loans will be obligated to repurchase the related mortgage loan from the issuing entity . . . ."); ProSupp for MARM 2006-OA1, at 37 (Apr. 19, 2006) ("Generally, if any document is found to be missing or defective in any material respect, [and] the Unaffiliated Seller cannot cure the omission or defect [of the residential loan documents], the Unaffiliated Seller will be obligated to repurchase the related residential loan from the trustee . . .").

*have been cured* as a reason for discounting the problem.  But, as the Complaint makes clear, loans with missing key documents receiving final grades of EV3 were not cured, and UBS did not do any additional diligence on the loan pools to address these loans but simply buried its head in the sand.

The second argument Defendants make is that because UBS graded some loans EV3 solely because of "bid stipulations" that therefore EV3-graded loans could not have violated UBS' representations.  Defendants again misread the allegations.  As the Compliant makes clear, there was only one instance in the 40 Subject Deals where loans were kicked solely due to bid stipulations, MABS 2007-HE1.  The Complaint explains that the EV3 rate cited (18%) excluded loans kicked solely because of bid stipulations from the calculation to be conservative.  Compl. ¶ 424.

Ultimately, Defendants, again, ignore the notion that, "at the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley*, 797 F.3d at 174.  Defendants may believe they have alternative, innocuous explanations for EV3s rates being not as bad as they appear, but those are arguments for trial. Indeed, Defendants cite several cases which make this point.  Defendants cite dicta in *Massachusetts Mut. Life Ins. Co. v. DB Structured Prods., Inc*., 110 F. Supp. 3d 288, 300 (D. Mass. 2015).  In that case, the court made clear that whether high "kick rates" in adverse samples raise a "red flag" for the rest of the pool is a "jury question," which would make it inappropriate for determination on a Rule 12(b)(6) motion.  *Id.*  Similarly, in denying a summary judgment motion, another court held "that the existence of red flags and whether defendants responded appropriately to any such red flags present questions of fact for the jury."  *National Credit Union Admin. Bd.. v. UBS Sec., LLC*, No. 12-2591-JWL, 2017 WL 411338, at *9 (D. Kan. Jan. 31, 2017).  Those cases

held that the issues Defendants now raise are jury questions and offer no basis to dismiss a complaint at the pleading stage (or even at the summary judgment stage for that matter).[26] Moreover, unlike in those cases, many of the loans here that were supposed to have been "kicked" did make it into the securitizations because UBS "waived" them right into the deals.[27]

### F. Defendants' Argument That Due Diligence Results in Samples Did Not Inform UBS' Assessment of the Rest of the Loan Pools

Defendants argue that reject rates from due diligence samples "could not signal that a significant number of loans in the entire RMBS offering were defective." Def. Br. at 46. This is based upon two arguments. First, Defendants' argument that their use of "adverse selection"[28]

---

[26] Defendants also misleadingly cite a snippet from *Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12-CV-4025, 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) to somehow imply erroneously that a court dismissed a complaint because of the argument they now raise. Def. Br. at 46. That is false. In that case, the plaintiff attempted, in relevant part, to assert a fraud claim based on inaccurate "LTV and owner-occupancy rates" but could not identify any specific due diligence reports for the securitizations that were at issue. *Id.* at *21. Instead, plaintiff relied upon a publicly available "Clayton Report" produced during the congressional Financial Crisis Inquiry Commission (FCIC) that did not contain any information indicating that Clayton had even reviewed "LTV and owner-occupancy" issues or that Clayton "did diligence on any of the loans underlying the securitizations" at issue. *Id.* It was on this basis the court stated that the EV3s from the Clayton report did not support the "LTV and owner-occupancy" claim because there was no "no way of knowing" if the EV3s in the Clayton Report involved these issues or even the loans in the securitizations at issue. *Id.* This is far cry from the instant case where the Complaint specifically identifies the due diligence results for the securitizations at issue and specifically alleges that the EV3 rates in those reports dealt directly with the representations to investors of adherence to underwriting guidelines. *See* Compl. tbls.3a-3b; ¶¶ 164 ("Across the Subject Deals, UBS' credit and compliance due diligence vendors graded large numbers of loans EV3 in diligence samples at the conclusion of due diligence, meaning they could not be included in the security consistent with UBS' representations to investors that the loans generally met guidelines."), 169 ("Moreover . . . UBS acknowledged in written testimony submitted to the Senate Committee on Banking, Housing and Urban Affairs in June 2008 that its due diligence samples were used as 'benchmark[s] for the remainder of the pool,' and that due diligence 'was performed with the aim of providing information in the offering document to meet legal disclosure requirements.'").

[27] *See* Compl. ¶¶ 195-196 ("UBS' exit strategy for many of these ['rejects'] was to securitize them and sell them to unwitting investors in the Home Finance Deals."); 366 (discussing MABS 2007-WMC1 due diligence results, "UBS securitized 44 of the 59 loans that received an initial grade of EV3 but that had been waived in as EV2s by UBS."); 501 (discussing Countrywide loan due diligence in MARM 2007-3: "UBS securitized 187 of the 244 loans that AMC and Clayton graded EV2 or EV1 in their final due diligence reports after being waived in by UBS . . . .").

[28] *See* Compl. ¶ 10 n.1 ("'Adverse' selection refers to a process whereby loans were identified using criteria that purported to identify loans with characteristics that could signal heightened risk. As further

criteria in creating diligence samples means the results meant nothing about the rest of the loan pool.  Second, Defendants perform a dubious and convoluted math exercise for one Subject Deal to purportedly show that EV3 rates should be somewhat lower.  Def. Br. at 46-49.  These arguments are meritless for a number of reasons.

First, Defendants' litigation position is at odds with testimony and documents from its former employees in the RMBS business, who, as alleged in the Complaint, very clearly understood that "[w]hen UBS identified high percentages of EV3 loans or rejects in its credit and compliance due diligence samples, it knew that there was a high probability that the unreviewed portion of the loan pools also contained a significant number of defective loans."  *See* Compl. ¶ 166.  Indeed, the Complaint cites to specific UBS documents and testimony establishing this to be the case.  *Id.* ¶¶ 14, 83, 145, 167, 169, and n.12.  This, of course, makes sense, as there would be no point of looking at samples of loans if they did not inform UBS' assessment of the rest of the loan pool.  Indeed, UBS' own lawyers believed that a 4.69% reject rate in one diligence sample necessitated additional disclosures to investors and the "industry standard" was 2-4%.  *Id.* ¶¶ 714, 723-28.

Defendants argue that because the due diligence samples were drawn partially using "adverse selection," these results could not inform UBS about the characteristics of the rest of the loan pools (contrary to their own former employees' testimony and their own documents cited above).  On this point, the Second Circuit, in an RMBS case, has held that, as a matter of law, high defect rates in entirely "adverse" due diligence selections informed the defendants of serious problems with the pools as a whole.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,

---

discussed below, because of the manner in which adverse criteria was utilized by UBS, these criteria did not capture all, or even most, of the loans potentially violating representations to investors.").

873 F.3d 85, 124-25 (2d Cir. 2017).[29]  As the Second Circuit observed, the criteria defendants in

that case used to determine what was "adverse" was "not tied to the loans' adherence to the

underwriting guidelines."  *Id.* at 132-33.  The same reasoning applies here because the "adverse"

criteria used by UBS were not tied to adherence to underwriting guidelines in any way and, like in

*Nomura*, the due diligence results here informed UBS of serious problems with the pools as a

whole.[30]  It is illogical for Defendants to assert that due diligence samples "contained more loans

with 'defects' than the unsampled remainder of the pool" because adverse criteria was not designed

to find defective loans, as the Complaint alleges and the Second Circuit found in *Nomura*.  Further,

in making this argument, Defendants ignore the fact, that, unlike in *Nomura,* UBS' samples were

partially drawn *at random* in addition to the use of adverse selection criteria, meaning loans were

randomly selected with no up-front criteria serving as a basis for that selection.[31]  Compl. ¶¶ 10,

155, 156.

Second, Defendants perform a convoluted and irrelevant math exercise for one Subject

Deal to purportedly show that EV3 rates should be lower.  Def. Br. at 48.  As an initial matter, the

Complaint makes clear the kickout or reject rates cited were calculated the same way that *UBS*

---

[29] This decision upheld the same finding by the district court. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*., 68 F. Supp. 3d 439, 479 (S.D.N.Y. 2014)(finding high EV3 rates in an adverse sample meaningfully told Nomura of the poor quality of the unreviewed loans: "Any reasonable jury would find that high kick-out rates would shake a reasonably prudent person's confidence in the . . . representation [that the mortgage loans were originated generally in accordance with underwriting guidelines], and thus constitute red flags.").

[30] *See* Compl. ¶¶ 10 n.1 ("[B]ecause of the manner in which adverse criteria was utilized by UBS, these criteria did not capture all, or even most, of the loans potentially violating representations to investors."); 180 n.15 ("UBS' adverse criteria were not specifically designed to precisely identify loans for the sample that would likely violate representations to investors.  Rather, UBS used these criteria instead to select loans with characteristics that would trigger higher credit enhancements in the deal structure for its own benefit."); 724 (due diligence manager explaining adverse criteria were determined with "NO knowledge of any aspect of [originator] guidelines.").

[31] Defendants again cite to the inapposite holding in *Massachusetts Mutual*, where the court found that whether high "kick rates" in adverse samples raise a "red flag" for the rest of the pool is a "jury question."  110 F. Supp. 3d at 300.

*personnel* calculated these rates during the relevant period.  *See* Compl. ¶ 200 n.17.  The EV3 rates

that UBS calculated at the time are what is relevant to UBS and its employees' *state of mind*.  The

fact that ten years later Defendants have come up with a different method of calculating EV3 rates

is not relevant to UBS' state of mind ten years prior.  What did happen during the relevant time

period was that UBS calculated reject rates using the same method as cited in the Complaint and

interpreted those rates as alleged in the Complaint.  Even accepting Defendants' calculations at

face value, and even assuming that somebody at UBS during the relevant time period did the same

calculation at the time, the sole example offered by Defendants in their brief results in a 7.72%

EV3 rate, which would have been high enough to indicate that the rest of the pool contained

significant numbers of defective loans.  *Compare* Def. Br. at 48 *with* Compl. ¶¶ 723-28 (indicating

4.69% reject rate in one deal necessitated additional disclosures), ¶ 714 ("industry standard" reject

rate was 2-4%).

### G.    Defendants' Arguments on Valuation Diligence

Defendants argue that, with respect to Defendants' knowledge of inflated appraisal values

across many of the Subject Deals, the Complaint should be dismissed because it purportedly does

not allege that "any UBS employees believed that the results of valuation due diligence provided

a better estimate of property value than the original appraised value or the actual sale price of the

property."  Def. Br. at 49-50.  Apparently, Defendants are taking the position that their own

valuation diligence process was a meaningless, sham exercise not meant to provide any input into

the question of whether the original property valuation was reasonable.

Defendants completely ignore that, at a minimum, UBS made misrepresentations to

investors in presentations about how UBS conducted its valuation due diligence process.  Compl.

¶¶  146,  242-43  (misrepresentations  regarding  "out  of  tolerance"  loans),  256-57

(misrepresentations about flip flags), 258-65 (misrepresentations that "100% of the loans" were

Page 48

subjected to valuation diligence).  These allegations of misrepresentations to investors about UBS' diligence process independently state a claim against Defendants.

Second, the Complaint makes clear that UBS' valuation due diligence process was designed to assess whether property values assigned to each property (whether from an appraisal or a sales price) backing each loan were reasonable and made sense such that they could be relied upon to support the loans.  Compl. ¶¶ 217-18 ("[T]he purpose of [UBS'] valuation due diligence was to have an 'educated' 'second set of eyes' make a determination about whether the value placed on the underlying property by the originator 'seemed reasonable.'").  This was especially important because UBS was telling investors the property values supported the loans amounts.  *Id*. ¶¶ 212-14, 222-25.  Defendants now ask the Court to accept that UBS' valuation due diligence process was meaningless.  If true, then UBS' valuation due diligence process was a sham and UBS misrepresented its validity to investors.  If the allegations in the Complaint are accepted as true, UBS knew that large numbers of loans had inflated appraisals.  In either case, UBS made misrepresentations to investors concerning the validity of the process or the creditworthiness of the mortgage loans.

The due diligence process employed by UBS yielded results showing that thousands of loans failed this process *by UBS' own terms*, indicating that the values assigned were not reasonable and did not "make[] sense."  *See* Compl. ¶¶ 217-18, tbl.5.  This information, by its very nature, indicated that the original value assigned to each of these loans by originators was not reasonable or reliable and did not make sense.  In the face of these red flags, instead of acting on this information or disclosing it to investors, UBS performed no additional diligence and concealed this information from investors.  Compl. ¶¶ 242-65, tbl.5.  These allegations where UBS ignored these red flags state a claim against Defendants.  *See Carlo*, 507 F.3d at 802 (intent to deceive may

Page 49

also be shown through evidence that a defendant "was aware of a high probability that [the statements] were false, but consciously avoided confirming that suspicion."); *Global-Tech*, 563 U.S. at 766 ("[C]ourts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these [criminal] statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances."); *Ferguson*, 676 F.3d at 278 ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance.").

Defendants argument that the due diligence results did not provide a "better estimate" than the original appraisal misses the point.  The due diligence process, designed by UBS for the very purpose of testing the property value assigned to each loan, revealed that the assigned values for thousands of loans *were not* reasonable and *could not* be relied upon.  UBS ignored these valuation red flags, failed to obtain any "better estimates" in the face of this knowledge, and simply pushed this risk onto investors without telling the truth about what UBS knew about these loans.[32]

### H.    Defendants' "Cherry-Picked Emails" Argument Demonstrates Why Their Motion Must Fail

Defendants argue that the numerous emails cited in the Complaint demonstrating a culpable state of mind as to individuals at UBS during the relevant time period are taken "out of context."  Def. Br. at 50-51.  Defendants then quote a few of these emails and try to draw their own inferences.  Defendants' factual inferences are not appropriate on a motion to dismiss. "Whether [a defendant] acted in good faith is a classic question of fact within the province of the

---

[32] Defendants claim that the Complaint does not specify the "degree of any intolerance" for the loans that failed UBS valuation due diligence process (Def. Br. at 49), despite the fact that the Complaint contains detailed allegations about UBS' tolerance levels and the exact number of loans determined to be out of tolerance.  Compl. ¶¶ 237-41, tbl.5.

jury." *United States v. Campos*, No. 16-CR-0395, 2017 WL 4402579, at \*2 (S.D.N.Y. Oct. 3, 2017).

More broadly, however, it is hard to see how referring to the loans backing UBS' RMBS as "leprosy spores" or a "bag of sh[\*]t" before selling those loans to investors could mean anything other than what it sounds like. Compl ¶¶ 5, 206, 368, 482, 488. It is hard to see how UBS lawyers advising right before a deal closed that an additional disclosure was needed, but then relenting a mere half hour later after the originator applied pressure could mean anything other than what it appears. *Id.* ¶¶ 22, 725-28.[33] It is hard to read the deal narrative on MARM 2007-3 and come away with anything other than the conclusion that UBS was acting in bad faith.[34] There are voluminous other communications (plus the diligence results themselves) indicating knowledge that UBS' representations regarding the quality of the loans backing its deals were false, which are detailed above. *See*, *supra* Argument, Sections I & II.

## I.   Defendants' Arguments on Contemplated Harm

Defendants also argue that the Complaint fails to plead that UBS contemplated harm to any investors. Def. Br. at 51-52. This, as noted above (*see supra* FIRREA and its Predicates, Section III) reflects a fundamental misunderstanding of what constitutes "harm." Again, to show fraudulent intent, "it is not necessary that a defendant intend that his misrepresentation actually

---

[33] *See* Compl. ¶¶ 22, 725-28 ("In the course of creating [AHMIT 2006-2], UBS' own lawyers informed it and the originator, American Home, that disclosures were needed to warn investors of the extremely poor due diligence results. . . . American Home quickly made clear in an email to UBS 'this language is not going to happen.' . . . UBS signed off on the transaction, knowing that the Offering Documents were false and misleading.").

[34] *See* Compl. ¶¶ 476-529 ("[R]eject rates from the credit and compliance samples [for CWALT 2007-OA5] were roughly 50% . . . . UBS did not cancel the trade, nor did it insist on 100% due diligence as it thought was necessary given the due diligence results or the fact that it believed these Countrywide pools were a 'bag of sh\*t.' . . . [T]he head of due diligence for Mortgage Finance confirmed that the 'ultimate goal' with respect to due diligence on these trades was 'to reach only a 5% hard exception rate which in turn will allow us to get sign off from legal and NOT have to look at performing due diligence on any additional loans in the pool in order to designate a population for the upcoming deal.'").

inflict a financial loss — it suffices that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579; *see supra* Argument, Section II.

### IV.   THE COMPLAINT SUFFICIENTLY PLEADS BANK FRAUD AND PREDICATE OFFENSES UNDER 18 U.S.C. §§ 1005 and 1014

In addition to stating FIRREA claims predicated upon mail and wire fraud, the Complaint states claims predicated on  bank fraud (18 U.S.C. § 1344), and 18 U.S.C. §§ 1005 and 1014. Defendants' arguments that the Complaint fails to state claims for these violations are unconvincing.  Def. Br. at 53-60.

#### A.   The Complaint Sufficiently Pleads Bank Fraud

The Complaint alleges violations of FIRREA based on the predicate offense of 18 U.S.C. § 1344.[35]  Unlike mail and wire fraud, here the United States must also prove that "the defendant, through the scheme, intended to victimize the bank by exposing it to loss."  *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).  A claim "under § 1344 is not supportable by evidence merely that some person other than a federally insured financial institution was defrauded in a way that happened to involve banking, without evidence that such an institution was *an intended victim*." *United States v. Laljie*, 184 F.3d 180, 189-90 (2d Cir. 1999) (emphasis added).  Nevertheless, a bank can be the intended victim even if the defendant did not intend to cause the bank financial harm, even if the bank did not ultimately suffer financial loss, even if causing harm to the bank

---

[35] 18 U.S.C. § 1344 provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

was not the primary purpose of the fraud, and even if the object of the fraud is the bank's customer or client rather than the bank itself. *See Shaw v. United States*, 137 S. Ct. 462, 466-69 (2016).[36]

The bank fraud claim here is well-pleaded because the Complaint alleges that UBS actively marketed and misrepresented the Subject Deals to FIFIs and other FIs. Compl. ¶¶ 294-99. Defendants argue that the Complaint fails to plead sufficiently a violation of § 1344 as a predicate offense because it does not allege that the "goal" of the scheme was to defraud a covered bank. Defendants also argue that they cannot be charged with a § 1344 predicate unless the scheme *specifically* targeted FIs and did not also reach other victims that were not FIs. The Supreme Court expressly rejected Defendants' argument in *Shaw*. There, the Court held that the Government is not required to prove the purpose or "goal" of the fraudulent scheme was to harm a bank's property interest. *Shaw*, 137 S. Ct. at 468-69. Instead, the Government need only show knowledge that the fraudulent scheme would deprive a financial institution of its property interest.[37] *Id*. No precedent or statutory text supports Defendants' contention that the bank must be the sole, or even the

---

[36] Claims under § 1344(2) do not require proof that the defendant intended to victimize the bank by exposing it to loss. *See Loughrin v. United States*, 573 U.S. 351, 370 (2014). Rather, such claims require proof that a defendant "'knowingly execute[s], or attempt[s] to execute, a scheme or artifice' with at least two elements. First, the clause requires that the defendant intend 'to obtain any of the moneys … or other property owned by, or under the custody or control of, a financial institution.' . . . And second, the clause requires that the envisioned result—*i.e.,* the obtaining of bank property—occur 'by means of false or fraudulent pretenses, representations, or promises.'" *Id.* at 355-56 (citations omitted).

[37] Defendants' reliance on *Loughrin* is misplaced. *Loughrin* does not require that the goal of the scheme be to defraud a bank or obtain bank property. 573 U.S. at 357. Rather, *Loughrin* held that, under § 1344(2), a defendant is not required to have a specific intent to defraud a bank. *Id*.

Nor do the out of context quotes from *United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016) help Defendants. *Bouchard* dealt with whether a subsidiary of a covered financial institution fell within the statutory definition of a "financial institution" for purposes of the bank fraud statute when their operations were "far afield' from banking. *Id.* at 126-127. Here, the Complaint is alleging that *covered* financial institutions were among the buyers of the Subject Deals. Compl. ¶¶ 294-99.

Page 53

primary, target of the scheme to sustain a § 1344 predicate.[38]  All that is required is that a bank be at least one of the intended victims.  *See Laljie*, 184 F.3d at 189-90.

Defendants also argue that Claim III should be dismissed because the allegations do not satisfy Rule 9(b) with respect to allegations as to an intent to defraud FIs.  Defendants cannot seriously argue that the Complaint fails to plausibly allege that Defendants intended to defraud FIs when they executed their scheme to defraud all investors in the Subject Deals.  FIs were among the entities investing in every Subject Deal, and Defendants knew this.  Compl. ¶¶ 294-99.  Nothing in Rule 9(b) requires the United States to detail every FI that invested in the Subject Deals in a Complaint that alleges violations of FIRREA.

**B.   The Complaint Sufficiently Pleads Predicate Offenses Under 18 U.S.C. § 1005**

Claim IV of the Complaint asserts FIRREA civil penalty claims against UBS under the predicate offense of 18 U.S.C. § 1005.  In particular, the fourth paragraph of § 1005, which was enacted as part of FIRREA in 1989 and can loosely be summarized as "fraudulently benefiting from a transaction with a financial institution," reads as follows:

> Whoever with intent to defraud . . . any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution . . .

18 U.S.C. § 1005.  The Complaint more than sufficiently alleges that UBS intended to defraud financial institutions.  The Complaint describes, plausibly and in detail, how UBS received money and property from the financial institutions that invested in the Subject Deals, either with their own money or with money under their custody and control.  Compl. ¶ 30.  The Complaint alleges in

---

[38] Defendants assert that the United States has never brought a bank fraud claim in relation to a securities offering.  But the United States brought FIRREA bank fraud claims against S&P for its role in RMBS offerings.  *See* Complaint at 117, *McGraw-Hill,* No. 13-CV-0779 (C.D. Cal. 2013) (ECF No. 1).

support of this claim that UBS "with the intent to defraud one or more financial institutions covered by that statute . . . participated and shared in, and received (directly or indirectly) . . . money, profit, property, and benefits through one or more transactions, loans, commissions, contracts, or other acts of such financial institutions." Compl. ¶ 822. These allegations are enough to sustain Claim IV of the Complaint.

Defendants' argument that this claim should be dismissed because only an officer, director, agent, or employee of the victimized bank (what it calls "bank insiders") can violate § 1005 is contrary to the plain language of the statute, and to the weight of the authority interpreting it. At least five cases have explicitly rejected this argument that the fourth paragraph of § 1005 is limited to "bank insiders." *See United States v. Van Brocklin*, 115 F.3d 587, 597 (8th Cir. 1997); *Wells Fargo*, 972 F. Supp. 2d at 626-29 ("This Court agrees with the Government that paragraph four of Section 1005 is not limited to bank insiders."); *United States v. DeVillier*, No. 3:16-CR-00012-BAJ-RLB, 2016 WL 2621968, at *3 (M.D. La. May 5, 2016); *United States v. Johnson*, No. 2:11-CR-501-DN-PMW, 2015 WL 8967525, at *3-4 (D. Utah Dec. 15, 2015); *United States v. Christensen*, 344 F. Supp. 2d 1294, 1296-97 (D. Utah 2004).[39] That reasoning should be followed here.[40]

As recognized in these decisions, the fourth paragraph of § 1005 states "whoever" commits the stated acts shall be guilty of an offense, in contrast to the language of the first paragraph, which

---

[39] Defendants' position is contrary to the interpretive rule in 1 U.S.C. § 1 that "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals[.]"

[40] UBS' citations to *United States v. Barel*, 939 F.2d 26, 39 (3d Cir. 1991), *United States v. Ortiz*, 906 F. Supp. 140, 144-46 & n.2 (E.D.N.Y. 1995), and *United States v. Edwards*, 566 F. Supp. 1219, 1222 (D. Conn. 1983), are irrelevant because they do not relate to the fourth paragraph of § 1005 and are based on legislative history and textual interpretation relevant to the second and third paragraphs of the statute that are inapplicable to the fourth paragraph.

provides "[w]hoever, being an officer, director, agent or employee . . . ."  While the first three paragraphs were originally passed in 1918 and recodified in 1948, the fourth paragraph of § 1005 was added in 1989 as part of FIRREA in the wake of the Savings and Loan Crisis.  *See* 40 Stat. 972, § 5209, 65th Cong. Sess. II, Ch. 177 (1918); 62 Stat. 750, § 1005, 80th Cong. Sess. II, Ch. 645 (1948).  The fourth paragraph of § 1005 was therefore intended to reach a broader set of financial fraud offenders than its sister paragraphs.  Indeed, when Congress added the fourth paragraph to § 1005, it had the opportunity to limit its reach like the other three — but it did not.

Defendants rely heavily on outlier cases, including *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 528 (S.D.N.Y. 2011), in support of their argument that § 1005 should be limited to "bank insiders."  Later cases have found, however, that *Rubin/Chambers* was wrongly decided.  *Wells Fargo*, 972 F. Supp. 2d at 626-29, and *Johnson*, 2015 WL 8967525 at *3-4, expressly disagreed with the decision in *Rubin/Chambers* to deviate from the plain-language of the statute.[41]  These courts found that no deviation was warranted based on legislative history of the first three paragraphs of § 1005, given that the fourth paragraph was added separately as part of FIRREA.[42]  *Wells Fargo* went on to find that "paragraph four plainly does not present the 'rare' or 'exceptional' case in which 'literal application of a statute will produce a result *demonstrably* at odds with the intention of its drafters' or 'thwart the *obvious* purpose of the

---

[41] Even *Rubin/Chambers* acknowledged that from a strictly textural perspective, "it would seem beyond debate" that the fourth paragraph of § 1005 was not limited to bank insiders.  798 F. Supp. 2d at 524.

[42] Defendants urge the Court adopt their view of § 1005 under the rule of lenity.  But "[a] statute is not ambiguous for purposes of lenity merely because there is a division of judicial authority over its proper construction." *Reno v. Koray*, 515 U.S. 50, 64-65 (1995) (citations and quotation marks omitted).  The rule only applies if the court "can make 'no more than a guess as to what Congress intended.'  That is not this case.".  *Id.* at 51.  The rule also does not apply because the United States is seeking civil, rather than criminal, penalties.  *See United States ex rel. O'Donnell v. Countrywide*, 33 F. Supp. 3d at 498, *rev'd on other grounds*, 822 F.3d 650 (2d Cir. 2016) (rule of lenity has no application under FIRREA).

statute.'"  972 F. Supp. 2d at 629 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571

(1982)); *see also DeVillier*, 2016 WL 2621968, at *3 (remarking that there is "no justification for

taking liberties with unequivocal statutory language").  This reasoning should be followed here.

### C.   The Complaint Sufficiently Pleads Predicate Offenses Under 18 U.S.C. § 1014

Claim V asserts FIRREA civil penalty claims against UBS predicated on 18 U.S.C. § 1014,

for false statements made to influence the actions of certain financial institutions, including FIFIs

and a variety of other types of entities.[43]  Unlike with mail and wire fraud, § 1014 does not require

a showing of either (a) materiality of the misrepresentations, *United States v. Wells*, 519 U.S. 482,

489-99 (1997), or (b) intent to defraud, *United States v. Sabatino*, 485 F.2d 540, 544-45 (2d Cir.

1973).  It only requires a showing of "intent to influence" a covered institution upon, *inter alia*,

any "advance" or "purchase."  In support of Claim V, the Complaint alleges that UBS "knowingly

made false statements and reports to one or more financial institutions covered by that statute, for

the purpose of influencing the action of such institutions with respect to, (1) the advance of funds

by the covered institutions to RMBS trusts for the Subject Deals in exchange for RMBS

Certificates, and (2) the purchase of RMBS Certificates in the Subject Deals."  Compl. ¶ 827.

Defendants argue that § 1014 only applies to statements made to banks in connection with

"core banking activities" and that the United States impermissibly seeks to expand the scope of §

1014.  Def. Br. at 60.  This argument fails for multiple reasons.  First, the transactions at issue here

---

[43] 18 U.S.C. § 1014 provides:
Whoever knowingly makes any false statement or report, or willfully overvalues any land, property, or security, for the purpose of influencing in any way the action of [covered financial institutions], upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or applications for insurance or a guarantee, or any change or extension of any of the same, by renewal deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

are credit transactions.  Specifically, the RMBS certificates are debt instruments that entitle the holders to interest payments based on the income received by trusts from the mortgage loan collateral, and then repay principal according to the terms of the certificates.  Compl. ¶¶  42, 52-53; *see* Def. Br. at 13 ("The trust would issue certificates entitling the holder to monthly principal and interest payments based upon the payments made by borrowers on the mortgages backing the RMBS.").   Accordingly, Defendants' false statements were made "upon" a form of credit transaction: the issuance of mortgage bonds.  Whether characterized as an "advance" of funds to the RMBS trust by financial institutions (the mortgage bondholders) or a "purchase" of RMBS by financial institutions, such conduct falls within the plain unambiguous terms of § 1014.

Second, Defendants' argument fails because the plain language of the statute contradicts the artificial distinction Defendants try to draw between a financial institution's "lending" and "investment" activities.  *See* 18 U.S.C. § 1014.  It is also contrary to the Supreme Court's ruling in *Wells* that § 1014 is unambiguous and should be interpreted in accordance with its plain terms. *See Wells*, 519 U.S. at 498-99 (refusing to read "materiality" element into § 1014 where the element did not appear in the unambiguous statutory language);[44] *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) (The text of § 1014 is "not ambiguous" and the "Supreme Court reminded us not to add elements to § 1014.").  By its plain terms, § 1014 covers knowing false statements made to covered financial institutions upon "any" of a variety of transactions, including any "purchase" or "advance."  The transactions at issue here fall within the plain terms of § 1014.

---

[44] The transactions at issue in *Wells*, in which the Supreme Court upheld the defendant's conviction under § 1014, involved the sale or rights to receive future income streams from underlying assets.  *United States v. Wells*, 63 F.3d 745, 747 (8th Cir. 1995) (noting that the charged false statements related to the defendant's sale of its rights to receive the future lease payments [from its copier leasing business] to a financial institution . . . for a lump sum payment").

Several Courts of Appeals have rejected arguments — like those made here — that § 1014 should be read narrowly to apply only to statements made in connection with conventional lending transactions.[45]  Defendants rely upon inapposite authority.  For instance, *United States v. Krown*, 675 F.2d 46, 50-51 (2d Cir. 1982), did not involve the meaning of "purchase" and nowhere held that that term "can only refer to an [action] involving an advance or loan or other credit transaction."  Def. Br. at 59.  *Krown* was decided before *Wells* instructed that § 1014 should be interpreted according to its plain terms, and it nowhere held that § 1014 cannot reach transactions involving securities.[46]  It instead held that insufficient evidence was produced in that case to show that the defendants' passing of worthless checks to a supplier constituted false statements upon an "advance," "loan," "application," or "commitment."   In any event, as discussed above, the "purchase" of RMBS here by financial institutions did involve credit transactions.

Likewise, *Williams v. United States*, 458 U.S. 279, 284-85 (1982), which held that a bad check is not a false statement or overvalued security for purposes of § 1014, does not prohibit the application of that section to the transactions here.  Numerous decisions following *Williams* have rejected efforts to limit the scope of § 1014 based on *Williams*' *dicta* that "at no point was it

---

[45] *See e.g.*, *United States v. Fattah*, 914 F.3d 112, 185 (3d Cir. 2019) ("[A] majority of circuits . . . have declined to follow *Devoll*'s suggestion that § 1014 is restricted to lending transactions"); *United States v. Boren*, 278 F.3d 911, 914-15 (9th Cir. 2002) ("The statute's reach is not limited to false statements made with regard to loans, but extends to *any* application, commitment or other specified transaction."); *United States v. Wade*, 266 F.3d 574, 580 (6th Cir. 2001) ("[I]f we were to interpret 18 U.S.C. § 1014 to include only those transaction seeking to create debtor/creditor relationships, it would impermissibly render other terms of the statute superfluous."); *Krilich*, 159 F.3d at 1028 (holding § 1014 not limited to statements made to obtain loans or other extensions of credit); *United States v. Bonnette*, 781 F.2d 357, 365 (4th Cir. 1986); *United States v. Pinto*, 646 F.2d 833, 838 (3d Cir. 1981) ("'Advance,' as used in 18 U.S.C. § 1014, should not be so narrowly construed as to apply solely to funds extended in a loan situation.  The statute refers to both 'advance' and 'loan.'  If 'advance' was only to refer to a loan, the term 'advance' would be rendered meaningless.").

[46] *United States v. Devoll*, 39 F.3d 575, 580 (5th Cir. 1994), which was also cited by UBS in support of its argument, was similarly decided before the Supreme Court instructed that § 1014 should be interpreted according to its plain terms.

Page 59

suggested" in the legislative history "that the statute should be applicable to anything other than representations made in connection with conventional loans or related transactions." *Id.* at 288-89; *see, e.g.*, *Elliot v. United States*, 332 F.3d 753, 763 (4th Cir. 2003) (receipt of funds from forged checks actionable under § 1014 after *Williams*); *Krilich*, 159 F.3d at 1028-29; *see also United States v. Bank of Am. Corp.*, No. 3:13-CV-00446, 2014 WL2777397, at *7 (W.D.N.C. June 19, 2014) (discussing § 1014 claims in connection with "purchases" by bank of RMBS and noting that "as the Fourth Circuit found in *Elliott* and the Seventh Circuit found in *Krilich*, it would appear that Section 1014 does in fact reach the making of false statements to a federally insured banking institution for the purpose of influencing 'in any way' action on 'any . . . purchase,' 18 U.S.C. § 1014, which would include fraud in inducing a bank to purchase securities.").

Defendants' argument that the title of § 1014 limits its reach should be rejected. Although a statute's title can inform an interpretation of its text, it cannot and does not "limit the plain meaning of the text." *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). And as the Seventh Circuit held in *Krilich*, "[t]iebreakers and doubt resolvers such as the Rule of Lenity," as well as legislative history, are "of no assistance, given the Supreme Court's view that [these canons] may not be employed to limit the effect of a broadly worded statute." *Krilich*, 159 F.3d at 1028-29 (citing *Brogan v. United States*, 522 U.S. 398, 406 (1998)).

An interpretation of § 1014 like the one proposed by Defendants would render large swaths of the statutory language superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal citations omitted). The language of the section includes a wide variety of both covered transactions and institutions. 18 U.S.C. § 1014. If the section was intended only to apply to that small universe of transactions

for which Defendants argue, then a vast portion of the statutory text — including most covered institutions and transactions — would be rendered either insignificant or entirely superfluous. *Wade*, 266 F.3d at 580 ("[I]f we were to interpret 18 U.S.C. § 1014 to include only those transactions seeking to create debtor/creditor relationships, it would impermissibly render other terms of the statute superfluous."); *Krilich*, 159 F.3d at 1028.

## V. <u>UBS AG IS PROPERLY SUED</u>

Defendants argue that UBS AG should be dismissed on the grounds that it is not subject to jurisdiction and the Complaint does not state a claim against that entity. Def. Br. at 61-63. This argument is meritless and should be rejected. UBS AG is subject to claims and personal jurisdiction in New York because of its involvement in and extensive contacts with New York relating to the underlying fraud. Specifically, the Complaint contains detailed and specific allegations that (i) UBS AG originated home loans under its trade name UBS Home Finance (Compl. ¶¶ 35, 56, 89); (ii) the head of UBS Home Finance who, as detailed below, was New York-based, repeatedly expressed concerns about the loans it originated (*id.* at ¶¶ 183-197); (iii) UBS Home Finance misrepresented its review of those loans in investor presentations (*id.* at ¶ 186); and (iv) UBS Home Finance and its head were involved in the securitization and sale of its loans in two Subject Deals in New York (*id.* at ¶¶ 41, 563-89). Such allegations and contacts with New York support the claims and exercise of personal jurisdiction under New York's long-arm statute and the Due Process Clause of the Fifth Amendment.[47]

To satisfy N.Y. C.P.L.R. § 302(a), the Complaint must allege that UBS AG transacted business within the state, committed tortious acts (e.g. fraud) in the state, or directed tortious acts

---

[47] *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (noting that while Section 302 and the Due Process Clause are not technically coextensive, no case has found contacts sufficient to satisfy long-arm jurisdiction but not the Due Process Clause).

in the state.  N.Y. C.P.L.R. § 302(a)(1), (2), (3).  Next, the Complaint must allege some articulable

nexus between the forum contacts and the cause of action.  Tellingly, UBS AG does not contest

the detailed allegations regarding UBS Home Finance or its role in at least two Subject Deals.  Def.

Br. at 62.  Rather, UBS AG argues that its "contacts with Florida do not establish specific

jurisdiction with New York."  *Id*.  In support, UBS AG claims that UBS Home Finance was "based

in Florida, not New York."  *Id*.  This claim, however, is directly contradicted by a contemporaneous

UBS Home Finance presentation, referenced in the Complaint because of its misrepresentations to

investors (Compl. ¶ 186), which states that UBS Home Finance's "[c]orporate management and

capital markets trading . . . is based in New York, NY."  Perlin, Decl., Ex. 3 at 4.

    The Complaint also alleges that the New York-based Head of UBS Home Finance

repeatedly expressed concerns about the quality of Home Finance loans and was aware of "quality

control" reports and diligence results showing large numbers of defective loans, which were then

securitized in deals in which the head of UBS Home Finance was directly involved.  *See* Compl.

¶¶ 183-197, 563-589.  In short, the New York-based activities of UBS AG "provided the impetus

for the very wrongdoing" at issue.  *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,

277 F. Supp. 3d 521, 593 (S.D.N.Y. 2017).  Therefore, requiring UBS AG to be subject to suit and

answer for its conduct in New York comports with Section 302 and the Due Process Clause of the

Fifth Amendment.[48]

    For the remaining 38 Subject Deals, UBS AG argues its New York contacts are unrelated

to the cause of action and akin to transferring funds between investors and third-party fraudsters.

Def. Br. at 62 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344-45 (2d Cir. 2018)).  As an initial

---

[48] In light of these suit-related contacts, exercising jurisdiction over UBS AG "clearly comports
with fair play and substantial justice."  *Sonterra*, 277 F. Supp. 3d at 598.

Page 62

matter, because UBS AG is subject to personal jurisdiction for every cause of action based on the activities of UBS Home Finance, the scope of its involvement in the remaining Subject Deals is irrelevant.[49]  In any event, the argument misses the mark.  First, UBS AG was the ultimate parent and sole owner of every other Defendant, and not an isolated party to fraudulent transactions. Compl. ¶¶ 34-36; *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there").[50] The individuals involved in the fraud ignored corporate formalities and "considered themselves to simply be employees of 'UBS.'"  Compl. ¶ 75.  Defendants themselves further blur the line between entities by arguing that overall mortgage-related losses suffered by UBS AG demonstrates a lack of *any* fraudulent intent by its subsidiaries.  Def. Br. at 24; Appendix B (citing UBS AG financial statements).   Whatever the corporate formalities, at a minimum, UBS AG was "consenting" if not furthering the fraudulent "acts of its in-state subsidar[ies] that gave rise to" this FIRREA cause of action.  *Martin v. Designatronics Inc.*, No. 2:17-CV-4907, 2019 WL 482202, at *4 (E.D.N.Y. Feb. 7, 2019).  Thus, UBS AG's reliance on *SPV Osus* is inapposite in light of its intimate relationship to the fraud and the other Defendants.  *Contra SPV Osus*, 882 F.3d at 344 ("the injuries suffered . . . were caused by Madoff").[51]

---

[49] FIRREA authorizes a maximum civil penalty for each Defendant based on investor losses.  If UBS AG means to argue that it — unlike the three other Defendants — should not be subject to the maximum civil penalty based on its role in the 40 Subject Deals, then it may make that argument at the appropriate time.

[50] The test for determining if a subsidiary is an agent of the parent "requires the Court to examine whether the subsidiaries' presence in the New York market is in lieu of the parent and, also, 'whether the parent would have to enter the market directly if the subsidiar[ies were] absent because the market is too important to the parent's welfare.'"  *Uebler v. Boss Media AG*, 432 F. Supp. 2d 301, 305 (E.D.N.Y. 2006). That test is met here because in its Annual Report UBS AG represented that the "Investment Bank operates through branches and subsidiaries of UBS AG.  Securities activities in the US are conducted through UBS Securities LLC, a registered broker-dealer."  *See* UBS AG 2007 Annual Report, at 103.

[51] At a minimum, the Government should be afforded full jurisdictional discovery on the issue of the agency of the wholly-owned subsidiaries.  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81,

Page 63

Second, UBS AG was directly involved in the marketing of RMBS and misrepresenting RMBS to investors. In fact, nearly every false or misleading investor or ratings agency presentation cited in the Complaint contains a statement that it was "prepared by UBS AG, or an affiliate thereof ('UBS')." Compl., tbl.2b; Def. Br. at 20 n.25, Giuffra Decl., Ex. 11 ("This material has been prepared by UBS AG . . .").

Finally, UBS AG's role as a Cap Provider or Swap Provider, among others warrants the exercise of personal jurisdiction because the conduct was in furtherance of the overall fraudulent scheme. Compl. ¶ 35. These agreements were essential to each deal and provided financial infrastructure to issue RMBS with key benefits important to investors.[52] Diagrams in offering documents emphasized the role of Cap and Swap Provider within the intricate web of entities involved in issuing RMBS. Giuffra Decl., Ex. 3 at S-9. Notably, in their motion, Defendants reproduced this diagram with the references to UBS AG's role as the Cap or Swap Provider omitted in an apparent effort to downplay the significance of UBS AG's involvement in the Subject Deals. *Compare* Def. Br. at 12, *with* Giuffra Decl., Ex. 3 at S-9.

In short, UBS AG is subject to the personal jurisdiction of this Court because the Complaint alleges UBS AG's extensive involvement in loan origination, investor misrepresentations, and financial guarantees in furtherance of the overall scheme, all from New York. *See* Compl. ¶¶ 35, 56, 89, 183-197, 563-589, tbl.2b. For the same reason, the Complaint alleges facts against UBS AG upon which relief may be granted.

---

84 (2d Cir. 2013) (stating that the district court has considerable leeway, including discovery on jurisdiction).

[52] Indeed, the offering documents explained that "Certificates also will have the benefit of an interest rate swap agreement." ProSupp for MABS 2006-WMC3, at 1 (Sept. 12, 2006).

## **CONCLUSION**

For all of the foregoing reasons, Defendants' motion to dismiss should be denied.


Dated: Brooklyn, New York
        May 8, 2019

| | |
|---|---|
| RICHARD P. DONOGHUE | BYUNG J. PAK |
| United States Attorney | United States Attorney |
| Eastern District of New York | Northern District of Georgia |
| 271 Cadman Plaza East | Richard B. Russell Federal Building |
| Brooklyn, NY 11201-1820 | 75 Ted Turner Dr. SW, Suite 600 |
| | Atlanta, GA 30303-3309 |
| | |
| /s/ {SUBMITTED ELECTRONICALLY} | /s/ {SUBMITTED ELECTRONICALLY} |
| BONNI J. PERLIN | ARMEN ADZHEMYAN |
| MICHAEL J. CASTIGLIONE | AUSTIN M. HALL |
| RICHARD K. HAYES | Assistant United States Attorneys |
| Assistant United States Attorneys | Northern District of Georgia |
| Eastern District of New York | (404) 581-6000 |
| (718) 254-7000 | |