**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                    Plaintiff,

     v.

UBS SECURITIES LLC, UBS AG,
MORTGAGE ASSET SECURITIZATION
TRANSACTIONS, INC., and UBS REAL
ESTATE SECURITIES, INC.,

                    Defendants.

Case No. 18-cv-6369

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
Amanda F. Davidoff (*davidoffa@sullcrom.com*)
Justin J. DeCamp (*decampj@sullcrom.com*)
Jacob M. Croke (*crokej@sullcrom.com*)
Hilary M. Williams (*williamsh@sullcrom.com*)
Harry F. Murphy (*murphyh@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for UBS Securities LLC, UBS AG,*
*Mortgage Asset Securitization Transactions,*
*Inc., and UBS Real Estate Securities, Inc.*

June 21, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..................................................................................................................6

I.    THE OPPOSITION CONFIRMS THAT THE COMPLAINT DOES NOT PLEAD THE REQUIRED "STRONG INFERENCE" OF SCIENTER.....................6

    A.    Plaintiff Misstates the Law Governing Its Pleading Obligations............................6

    B.    Plaintiff Cannot Salvage Its Complaint by Pleading "Collective Scienter" ...........9

        1.    The Opposition Confirms That *Dynex* Controls Here ................................9

        2.    The Complaint Fails To Meet the *Dynex* Standard..................................10

        3.    Neither *Bank of New York Mellon* Nor *Wells Fargo* Saves Plaintiff's Inadequate Scienter Allegations ..............................................12

    C.    Plaintiff Has Not Adequately Pled Motive or Opportunity To Commit Fraud ........................................................................................14

    D.    Plaintiff's Fraud-by-Formula Theory Does Not Support a Strong Inference of Scienter When Compared to Alternative, Non-Culpable Inferences................17

        1.    Plaintiff Offers No Coherent Explanation for Numerous Facts Alleged in the Complaint Contradicting UBS's Purported "Knowledge" That Loans in the 40 RMBS Were "Defective".................18

        2.    Plaintiff's Formulaic Recitation of Due Diligence Results Does Not Support a Strong Inference of Scienter................................................21

        3.    The Cited Emails Do Not Support a Strong Inference of Scienter ...........25

        4.    Plaintiff Cannot Save Its Complaint by Accusing Unspecified UBS Employees of "Withholding Key Information" About Loan Quality........26

II.    THE COMPLAINT FAILS TO PLEAD BANK FRAUD, FRAUDULENT BANK TRANSACTIONS, OR FALSE STATEMENTS TO BANKS ......................28

    A.    RMBS Sales Are Far Afield From § 1344's Core Concern ...................................29

    B.    Plaintiff's § 1005 Argument Flouts Settled Canons of Statutory Construction ...........................................................................30

    C.    Plaintiff's Argument To Expand the Reach of § 1014 Is Erroneous.....................32

III.    PLAINTIFF HAS NOT PLED JURISDICTION OR A CLAIM AGAINST UBS AG......................................................................................................33

CONCLUSION .............................................................................................................35

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re Advanced Battery Technologies, Inc.*,
   781 F.3d 638 (2d Cir. 2015)....................................................................................................28

*Alnwick* v. *European Micro Holdings, Inc.*,
   281 F. Supp. 2d 629 (E.D.N.Y. 2003) ...................................................................................34

*In re Aluminum Warehousing Antitrust Litigation*,
   90 F. Supp. 3d 219 (S.D.N.Y. 2015).......................................................................................35

*Amalgamated Bank of New York* v. *Marsh*,
   823 F. Supp. 209 (S.D.N.Y. 1993) ........................................................................................17

*Chill* v. *General Electric Co.*,
   101 F.3d 263 (2d Cir. 1996).............................................................................................2, 16

*Connecticut National Bank* v. *Fluor Corp.*,
   808 F.2d 957 (2d Cir. 1987)....................................................................................................7

*Contant* v. *Bank of America Corp.*,
   2019 WL 2174233 (S.D.N.Y. May 17, 2019) ........................................................................35

*Dexia SA/NV* v. *Bear, Stearns & Co.*,
   929 F. Supp. 2d 231 (S.D.N.Y. 2013)...............................................................................14, 15

*Dexia SA/NV* v. *Bear, Stearns & Co.*,
   945 F. Supp. 2d 426 (S.D.N.Y. 2013)...................................................................................14

*Dhir* v. *Carlyle Group Employee Co.*,
   2017 WL 4402566 (S.D.N.Y. Sept. 29, 2017).......................................................................21

*Elliott* v. *United States*,
   332 F.3d 753 (4th Cir. 2003) ..................................................................................................33

*Footbridge Ltd*. v. *Countrywide Home Loans, Inc.*,
   2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)..................................................................20, 21

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
   2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) .......................................................................34

*Gagnon* v. *Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019).......................................................................................9

*Goonewardena* v. *Forster & Garbus LLP*,
  2019 WL 121677 (E.D.N.Y. Jan. 7, 2019) ...............................................7

*Greene* v. *Gerber Products Co.*,
  262 F. Supp. 3d 38 (E.D.N.Y. 2017) ........................................................7

*IKB International S.A.* v. *Bank of America Corp.*,
  2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014) .........................................12

*IKB International S.A.* v. *Bank of America Corp.*,
  584 F. App'x 26 (2d Cir. 2014) ........................................................12, 14

*Jeune* v. *Crew*,
  2017 WL 4357382 (E.D.N.Y. Sept. 29, 2017) .......................................35

*Leocal* v. *Ashcroft*,
  543 U.S. 1 (2004)....................................................................................32

*Leung* v. *Law*,
  387 F. Supp. 2d 105 (E.D.N.Y. 2005) ....................................................20

*Loreley Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*,
  797 F.3d 160 (2d Cir. 2015)....................................................1, 7, 8, 17

*Loughrin* v. *United States*,
  573 U.S. 351 (2014)................................................................................29

*In re Marsh & McLennan Cos. Securities Litigation*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................4, 27

*Martin* v. *Designatronics Inc.*,
  2019 WL 482202 (E.D.N.Y. Feb. 7, 2019)............................................34

*Matana* v. *Merkin*,
  2014 WL 426857 (S.D.N.Y. Feb. 4, 2014).............................................28

*McNally* v. *United States*,
  483 U.S. 350 (1987)................................................................................32

*Mohasco Corp.* v. *Silver*,
  447 U.S. 807 (1980)................................................................................31

*In re MRU Holdings Securities Litigation*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011)....................................................15

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*,
  261 F.R.D. 13 (S.D.N.Y. 2009) ..............................................................11

*In re Mylan N.V. Securities Litigation*,
 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...............................................................13, 14

*National Credit Union Administration* v. *First National Bank & Trust Co.*,
 522 U.S. 479 (1998).................................................................................................................31

*National Credit Union Administration* v. *UBS Securities, LLC*,
 2017 WL 513970 (D. Kan. Feb. 8, 2017) .................................................................................24

*Naughton* v. *Local 804 Union*,
 2019 WL 1003054 (E.D.N.Y. Mar. 1, 2019) ...........................................................................30

*Novak* v. *Kasaks*,
 216 F.3d. 3d 300 (2d Cir. 2000)..................................................................................................7

*O'Brien* v. *National Property Analysts Partners*,
 936 F.2d 674 (2d Cir. 1991)........................................................................................................7

*Police & Fire Retirement System of Detroit* v. *SafeNet, Inc.*,
 645 F. Supp. 2d 210 (S.D.N.Y. 2009)......................................................................................11

*Powell* v. *Monarch Recovery Management, Inc.*,
 2016 WL 8711210 (E.D.N.Y. Jan. 22, 2016) ..........................................................................35

*Powers* v. *British Vita, P.L.C.*,
 57 F.3d 176 (2d Cir. 1995)............................................................................................2, 7, 16

*Prudential Insurance Company of America* v. *Bank of America, Nat'l Ass'n*,
 14 F. Supp. 3d 591 (D.N.J. 2014) ............................................................................................12

*In re Radian Securities Litigation*,
 612 F. Supp. 2d 594 (E.D. Pa. 2009) .......................................................................................26

*Renner* v. *Chase Manhattan Bank, N.A.*,
 85 F. App'x 782 (2d Cir. 2004) ................................................................................................30

*In re Reserve Fund Securities & Derivative Litigation*,
 732 F. Supp. 2d 310 (S.D.N.Y. 2010)........................................................................................8

*Rockaway Beverage, Inc.* v. *Wells Fargo & Co.*,
 2019 WL 1433076 (E.D.N.Y. Mar. 29, 2019).........................................................................21

*Sable* v. *Southmark/Envicon Capital Corp.*,
 819 F. Supp. 324 (S.D.N.Y. 1993) ..........................................................................................17

*Schonfeld* v. *Hilliard*,
 218 F.3d 164 (2d Cir. 2000).....................................................................................................25

*SEC* v. *Dunn*,
   587 F. Supp. 2d 486 (S.D.N.Y. 2008)......................................................................8

*SEC* v. *Im*,
   2018 WL 840094 (S.D.N.Y. Feb. 12, 2018)...........................................................8

*SEC* v. *Pentagon Capital Management PLC*,
   612 F. Supp. 2d 241 (S.D.N.Y. 2009)......................................................................8

*SEC* v. *Rio Tinto PLC*,
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ...................................................9, 10

*SEC* v. *Takeyasu*,
   2018 WL 2849777 (S.D.N.Y. June 11, 2018) ........................................................8

*Shaw* v. *United States*,
   137 S. Ct. 462 (2016)............................................................................................29

*SPV Osus Ltd.* v. *UBS AG*,
   882 F.3d 333 (2d Cir. 2018)..................................................................................33

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008).......................................................................... *passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................... *passim*

*In re UBS AG Securities Litigation*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..................................................3, 19

*Union Central Life Insurance Co.* v. *Credit Suisse Securities (USA), LLC*,
   2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013) ...................................................2, 15

*United States* v. *Bank of America Corp.*,
   2014 WL 2777397 (W.D.N.C. June 19, 2014) .....................................................33

*United States* v. *Bank of America Corp.*,
   2014 WL 2777372 (W.D.N.C. Mar. 27, 2014).......................................................33

*United States* v. *Bank of New York Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013)..............................................................12, 13

*United States* v. *Binday*,
   804 F.3d 558 (2d Cir. 2015)..................................................................................27

*United States* v. *Bouchard*,
   828 F.3d 116 (2d Cir. 2016)..............................................................................6, 29

*United States* v. *Chandler*,
  98 F.3d 711 (2d Cir. 1996).................................................................27

*United States* v. *Edwards*,
  566 F. Supp. 1219 (D. Conn. 1983)...................................................31

*United States* v. *Karro*,
  257 F.3d 112 (2d Cir. 2001)...............................................................27

*United States* v. *Krown*,
  675 F.2d 46 (2d Cir. 1982).................................................................32

*United States* v. *Laljie*,
  184 F.3d 180 (2d Cir. 1999)...............................................................29

*United States* v. *Ortiz*,
  906 F. Supp. 140 (E.D.N.Y. 1995) ...............................................30, 31

*United States* v. *Philip Morris USA, Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) .........................................................10

*United States* v. *Rossomando*,
  144 F.3d 197 (2d Cir. 1998)...............................................................28

*United States* v. *Rubin/Chambers, Dunhill Insurance Services*,
  798 F. Supp. 2d 517 (S.D.N.Y. 2011)............................................31, 32

*United States* v. *Thompson/Center Arms Co.*,
  504 U.S. 505 (1992)...........................................................................32

*United States* v. *Walker*,
  191 F.3d 326 (2d Cir. 1999)..........................................................27, 28

*United States* v. *Wells*,
  519 U.S. 482 (1997)...........................................................................33

*United States* v. *Wells Fargo Bank, N.A.*,
  972 F. Supp. 2d 593 (S.D.N.Y. 2013).......................................12, 13, 32

*Vining* v. *Oppenheimer Holdings Inc.*,
  2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010)......................................18

*VNB Realty, Inc.* v. *Bank of America Corp.*,
  2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013).......................................4

*Waldman* v. *Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)............................................................................6, 33, 35

*Williams* v. *United States*,
    458 U.S. 279 (1982)..........................................................................................32

**Statutes and Rules**

18 U.S.C. § 1005.............................................................................................5, 28, 30, 31

18 U.S.C. § 1014.............................................................................................5, 28, 32, 33

18 U.S.C. § 1344.............................................................................................5, 28, 29, 30

Fed. R. Civ. P. 9(b) ................................................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiff's Opposition confirms that Plaintiff has not met its burden of pleading fraudulent intent under Federal Rule of Civil Procedure 9(b).  Under the governing standard, Plaintiff must plead a "strong inference" that Defendants' employees acted with fraudulent intent—one that is "cogent and at least as compelling as any opposing inference." *Loreley Fin*. *(Jersey) No*. *3 Ltd*. v. *Wells Fargo Sec*., *LLC*, 797 F.3d 160, 176-77 (2d Cir. 2015) (applying *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007), in common law fraud action). But, after a four-year investigation, Plaintiff cannot identify a human being acting on behalf of any of Defendants who it claims intended to defraud investors in any of the 40 residential mortgage-backed securities (the "40 RMBS") offerings.  Instead, Plaintiff's Complaint, and its Opposition, seek refuge in generalized assertions about "UBS's" alleged fraudulent intent—as though it were possible for corporations to intend something without proof of their employees' intent. The Complaint thus supports not a "strong inference" of fraud, but a strong inference that no fraud occurred.

Unable to surmount the Second Circuit's pleading standard, Plaintiff tries to lower the bar, claiming that it need provide only some "minimal factual basis" to plead scienter.  (Opp. at 4.)  This is incorrect under controlling precedent, and nothing in the Opposition rebuts the more compelling inference that, at most, this is a negligence claim masquerading as a fraud claim. The Complaint should be dismissed for the following reasons:

*1.   Plaintiff cannot identify any of Defendants' employees who acted with scienter.*  Under Rule 9(b), fraud cannot be pled simply by targeting "categories of persons" and "business groups" across the four different corporate defendants.  (Opp. at 3, 32-33.)  Plaintiff's argument is so broad and generalized that it implausibly labels as fraudsters virtually everyone who worked on the 40 RMBS offerings.  (Opp. at 34, 39, 42.)  This does not suffice; pleading

corporate scienter requires a strong inference that *particular employees* of *particular Defendants* (i) were "responsible for the statements made to investors," (ii) acted with fraudulent intent in making those statements, and (iii) held sufficiently senior positions such that their scienter can be imputed to Defendants. *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195-97 (2d Cir. 2008). Plaintiff meets none of these requirements because, unlike in other FIRREA actions, it has not identified any employee of any Defendant who acted wrongfully.

        **2.   Non-culpable inferences are more "cogent" and "compelling" than the inferences Plaintiff urges in its Opposition.** Plaintiff's scienter theory is not cogent, much less compelling. Indeed, Plaintiff fails to point to any rational motive pled in the Complaint for Defendants to commit this alleged fraud. In this Circuit, courts have rejected as insufficient the generic motives that Plaintiff cites—*i.e.*, to "induce investors to invest in their RMBS" and to "maintain . . . relationships with originators." (Opp. at 18-19); *see Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("allegations of a company's motive to 'maintain good relations with suppliers'" insufficient to allege motive); *Union Cent. Life Ins. Co.* v. *Credit Suisse Sec. (USA), LLC*, 2013 WL 1342529, at *6 (S.D.N.Y. Mar. 29, 2013) ("generalized motives to sell . . . [RMBS] [c]ertificates" insufficient to allege motive). Nor does Plaintiff explain how Defendants had any opportunity to carry out a "brazen" fraud, over two years, involving dozens of employees of various UBS entities, independent due diligence firms, and internal and external lawyers on each of the 40 RMBS offerings. *See Powers* v. *British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995) ("elaborate plot that is alleged to have unfolded in this case" weighs against scienter).

        Moreover, Plaintiff *does not dispute* that "alternative, innocuous explanations" can be drawn from the Complaint, but wrongly dismisses those more plausible explanations as

"arguments for trial." (Opp. at 44.) Under *Tellabs*, these "alternative" inferences must be evaluated now, and they show that Plaintiff has not pled the required "strong circumstantial evidence of conscious misbehavior or recklessness." (Opp. at 16.) Plaintiff does not even try to reconcile its flawed scienter theory with the undisputed fact that UBS lost $45 billion on U.S. mortgage-related assets. It cannot explain why UBS made these large investments—including, as shown in documents incorporated in the Complaint, *in the 40 RMBS*—at the very same time UBS "knew" that the loans backing those RMBS were "defective" and would "default[] at exceptionally high rates." (Compl. ¶¶ 3, 13-14.) As then-District Judge Sullivan recognized, this scienter theory defies "economic reason" and "common sense." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *12 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014). Plaintiff misleadingly tries to sidestep Judge Sullivan's decision and the Second Circuit's affirmance by claiming that the "lynchpin" in that case "was UBS'[s] alignment of interests with its shareholders." (Opp. at 6.) But, as Plaintiff acknowledges, that case "involved allegations that UBS *defrauded its own shareholders*." (Opp. at 6 (emphasis added).) It is implausible that UBS would act irrationally and against its own economic interest by investing aggressively in the very securities at the heart of its alleged fraud. Plaintiff has no answer to this.

Plaintiff similarly cannot explain why, as the Complaint alleges, UBS conducted extensive due diligence on the pools of loans at issue, in some cases reviewing every single loan. (*See*, *e.g.*, Compl. ¶¶ 84, 151-54.) Plaintiff contends that this due diligence was merely "window dressing," but contradicts itself by admitting that UBS kicked out *thousands* of loans against the wishes of mortgage originators that UBS allegedly sought to "appease." (Compl. ¶¶ 23, 199.) Plaintiff also claims that UBS performed due diligence to "give the appearance to investors and

rating agencies that UBS had a process in place" to ensure its representations were accurate (Opp. at 38), but Plaintiff acknowledges that *only the originators*—not investors or rating agencies—received due diligence results (*see* Opp. at 26-26).  Plaintiff cannot plausibly plead that UBS performed due diligence to create an "appearance" that was never shared with the entities that the diligence was supposedly designed to deceive.  (Compl. ¶ 23.)

In the headwind of these admissions, which render Plaintiff's scienter theory implausible, the Opposition rests on "nearly 100 pages of tables setting forth deal-specific data" appended to the Complaint and contends that the volume of "data" somehow creates a compelling inference of conscious misbehavior.  (Opp. at 2.)  But Plaintiff cannot point to any authority to support its "fraud-by-formula" method of pleading scienter, because it impermissibly relies on a playbook used by plaintiffs in RMBS actions under the Securities Act of 1933, which does not require scienter, but only an alleged material misrepresentation.  *See VNB Realty, Inc*. v. *Bank of Am. Corp*., 2013 WL 5179197, at *8 n.7 (S.D.N.Y. Sept. 16, 2013) (dismissing fraud complaint with allegations "copied nearly verbatim from [§ 11 complaint against same defendant], with one telling exception: [plaintiff] removed [the] allegation that [defendant] had been 'negligent' and added a reference to 'fraudulent practices'").

In any event, Plaintiff's "formula" fails to show that any due diligence results provided any of Defendants' employees with "specific contradictory information" that was "incompatible" with the challenged "standard representations"—as required to plead "conscious misbehavior or recklessness."  *In re Marsh & McLennan Cos*. *Sec*. *Litig*., 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006).  Instead, Plaintiff urges this Court to accept its speculation, disguised as an "inference," that Defendants' unnamed employees "knew" these representations were false

because they had access to due diligence results.  But this proposition relies on a daisy chain of flawed assumptions, including that:

(i)   any loan graded EV3 by an independent due diligence firm was necessarily "defective" (*see*, *e.g.*, Compl. ¶ 309)—even though the Complaint and Opposition make clear that many of those loans were graded EV3 for *reasons unrelated to any "defect"* (*see* Opp. at 42, 44);

(ii)  the "EV3 rate" of loans reviewed in due diligence samples should be extrapolated to the unreviewed loans backing the 40 RMBS—even though Plaintiff admits that UBS *removed all loans determined to be EV3* at the end of the due diligence process, and that the samples were *not representative* of the loans actually included in the RMBS (Compl. ¶ 10 & n.1); and

(iii) unnamed UBS employees *knew* that some (unspecified) threshold of EV3-graded loans in due diligence samples necessarily rendered false its "standard representations" in the RMBS offering documents about "general" compliance with underwriting guidelines (Opp. at 1, 34)—even though there is no such allegation in the Complaint.

The Complaint's allegations, taken as true, do not withstand scrutiny under *Tellabs*, and Plaintiff's citations to out-of-context emails, cherry-picked from more than 90 million pages of documents produced during Plaintiff's investigation, cannot save a non-existent inference of scienter.  Indeed, Plaintiff does not even allege that the employees who authored the emails had any responsibility for the alleged misrepresentations.  (Opp. at 34-36.)

> ***3.   Plaintiff cannot base its FIRREA claims on allegations of bank fraud, fraudulent bank transactions, or false statements to banks, and this Court lacks jurisdiction over UBS AG.***  Plaintiff cannot ground its FIRREA claims about public securities offerings on the bank fraud statute, 18 U.S.C. § 1344, or other provisions criminalizing false statements to banks, *id*. §§ 1005, 1014.  Courts have rejected attempts to stretch those statutes to cover activities outside

of core banking functions (such as lending), because the statutes "should not be read to federaliz[e] frauds that are only tangentially related to the banking system." *United States* v. *Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (addressing 18 U.S.C. § 1344). Nothing in the Opposition justifies Plaintiff's unprecedented use of these statutes. And Plaintiff fails to tie UBS AG to the specific "episode[s]-in-suit" in New York, as required to plead personal jurisdiction. *Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016).

## ARGUMENT

### I.  THE OPPOSITION CONFIRMS THAT THE COMPLAINT DOES NOT PLEAD THE REQUIRED "STRONG INFERENCE" OF SCIENTER.

#### A.  Plaintiff Misstates the Law Governing Its Pleading Obligations.

The parties agree that Rule 9(b) applies here, and thus the Complaint must allege facts sufficient to "give rise to a strong inference of fraudulent intent." (Opp. at 4, 13; *see* Defs.' Mem. at 28.) As shown in Defendants' moving brief, under binding Second Circuit precedent, an inference is "strong" only if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." (Defs.' Mem. at 28 (quoting *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 177-78).) Plaintiff apparently disagrees. Although never explicitly arguing that the "cogent and at least as compelling" standard does not apply, Plaintiff asserts that: (i) only a "minimal factual basis" is required to plead scienter; (ii) Defendants "propose that the Court apply the wrong standard"—the standard of the Private Securities Litigation Reform Act ("PSLRA"); and (iii) Defendants' proposed standard does not apply because this is a "government enforcement action." (Opp. at 4.) Plaintiff is wrong on all three points.

*First*, Plaintiff is wrong that the Complaint can survive dismissal if it pleads "*only* 'some *minimal* factual basis for conclusory allegations of scienter.'" (Opp. at 4 (emphasis added) (quoting *Powers*, 57 F.3d at 184); *see* Opp. at 13, 15, 29.) As both the Second Circuit and this

Court have recognized, "while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.' An *ample* factual basis must be supplied" to plead a strong inference of fraudulent intent. *O'Brien* v. *Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (emphasis added); *Goonewardena* v. *Forster & Garbus LLP*, 2019 WL 121677, at *7 (E.D.N.Y. Jan. 7, 2019) (Brodie, J.) (same).[1]

> *Second*, Plaintiff suggests, but never outright argues, that the "cogent and at least as compelling" standard does not apply here because it was first articulated by the Supreme Court in *Tellabs*, a PSLRA case. This suggestion is mistaken. Before the PSLRA, the Second Circuit's law governing "the Rule 9(b) inquiry" was the country's "most stringent," requiring plaintiffs to "specifically plead those facts which they assert give rise to a *strong inference* that the defendants had the requisite state of mind," and Congress "adopt[ed] the Second Circuit's 'strong inference' standard" in passing the PSLRA. *Tellabs*, 551 U.S. at 319-22. The PSLRA "did not change the basic pleading standard for scienter in this circuit." *Novak* v. *Kasaks*, 216 F.3d. 3d 300, 311 (2d Cir. 2000). Not surprisingly, therefore, the Second Circuit made clear in *Loreley*, which was *not* a PSLRA case, that Rule 9(b) itself requires plaintiffs to plead facts giving rise to a strong inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 797 F.3d at 177-78. This "comparative evaluation" weighs "the

---

[1]     The three decisions Plaintiff cites for its "minimal factual basis" standard (Opp. at 13) merely observed that at least some "minimal factual basis" would be *necessary*—rather than sufficient—to raise a strong inference of scienter. *See Greene* v. *Gerber Prods. Co.*, 262 F. Supp. 3d 38, 73 (E.D.N.Y. 2017) (Brodie, J.) (Rule 9(b) requires plaintiffs to provide "*at least* a minimal factual basis for their conclusory allegations of scienter" that "give[s] rise to a strong inference of fraudulent intent" (emphasis added)); *Conn. Nat'l Bank* v. *Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) (same; *dismissing* fraud claim because complaint was "barren of any factual basis for [plaintiff's] conclusory allegations of scienter"); *Powers*, 57 F.3d at 184 (plaintiff must allege facts "that give rise to a strong inference" of fraudulent intent).

inferences urged by the plaintiff" against "competing inferences" that can be drawn from (i) the Complaint, (ii) "documents incorporated into the complaint by reference," and (iii) "matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 314, 322.

        *Third*, Plaintiff claims that *Tellabs* does not apply to "civil enforcement actions brought by the government relating to securities offerings." (Opp. at 15.) In doing so, Plaintiff relies exclusively on district court decisions predating *Loreley*, where the Second Circuit expressly applied *Tellabs*'s "comparative inquiry" standard to a common law fraud claim, 797 F.3d at 176 n.9, 176-77. (Opp. at 15 & n.15.)[2] Moreover, Rule 9(b)'s "strong inference" standard—including the comparative analysis required by *Tellabs*—applies to *all* civil suits alleging fraud, and there are no distinctions between the PSLRA and Rule 9(b) standards that are relevant here. *See*, *e.g.*, *SEC* v. *Takeyasu*, 2018 WL 2849777, at *16, 20 (S.D.N.Y. June 11, 2018) (applying *Tellabs* comparative inference standard to SEC suit); *SEC* v. *Im*, 2018 WL 840094, at *4 (S.D.N.Y. Feb. 12, 2018) (same). Tellingly, Plaintiff itself acknowledged in another action **under FIRREA** that the strong inference standard requires a "comparative" analysis. (*See United States* v. *Bank of New York Mellon*, No. 11 Civ. 6969 (S.D.N.Y. Oct. 12, 2012), ECF No. 47 at 42 ("Whether an inference is strong '*is comparative*,' and courts evaluate the facts alleged along with any reasonable inferences favoring plaintiffs and *compare them to plausible, nonculpable explanations* . . . .") (emphasis added).)

---

[2]    *See SEC* v. *Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("The Court of Appeals has yet to decide *Tellabs*'s effect on the requirements for pleading scienter in actions governed by Rule 9(b) but not governed by the PSLRA."); *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2010) (same, quoting *Dunn*); *SEC* v. *Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263-64 (S.D.N.Y. 2009) (recognizing that the "area of law" was still "muddled" and opting to follow *Dunn*).

Because the "strong inference" standard applies under both the PSLRA and Rule 9(b), Plaintiff is wrong in dismissing as irrelevant PSLRA cases applying that standard. These precedents—including *Tellabs* (which requires the "comparative evaluation" of scienter theories described above); *Dynex* (which prohibits the "collective scienter" theory undergirding the Complaint); and *UBS AG* (which rejected a materially identical theory of UBS's scienter in connection with its investments in RMBS and other mortgage-backed securities as defying "economic reason" and "common sense")—require dismissal of Plaintiff's Complaint.

## B.     Plaintiff Cannot Salvage Its Complaint by Pleading "Collective Scienter."

Because each of the Defendants is a corporation, the Complaint must allege that "someone whose intent could be imputed to the corporation[s] acted with the requisite scienter" as to each of the 40 RMBS.  *Dynex*, 531 F.3d at 195-96.  Fatally, notwithstanding its four-year pre-suit investigation, Plaintiff identifies no such allegations.[3]

### 1.     The Opposition Confirms That *Dynex* Controls Here.

Plaintiff incorrectly belittles *Dynex* as just another "PSLRA case[]."  (Opp. at 29.) But the *Dynex* holding applies to *all* corporate fraud claims, including those asserted by regulators. *See SEC* v. *Rio Tinto PLC*, 2019 WL 1244933, at *14 (S.D.N.Y. Mar. 18, 2019) (dismissing SEC

---

[3]     Plaintiff contends that "[i]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  (Opp. at 31 (quoting *Dynex*, 531 F.3d at 195-96).)  But the Second Circuit has explained that pleading scienter for an individual defendant is the "most straightforward way" to plead it against a corporation, and that pleading corporate scienter without also pleading scienter as to a specific employee of the corporation whose intent could be properly imputed to the corporation is limited only to "dramatic" circumstances where, for example, a company publicly stated that it had sold one million SUVs when it had, in fact, sold none.  531 F.3d at 195-96.  (*See* Defs.' Mem. at 29, 32.)  Plaintiff does not claim (nor could it) that the allegedly false "standard representations" (Opp. at 34, 39, 42) about underwriting guidelines here are comparable to the hypothetical discussed in *Dynex*.  *See Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 776 (S.D.N.Y. 2019) (granting motion to dismiss securities fraud complaint for lack of scienter because alleged "misstatement [was not] in the same league" as the *Dynex* hypothetical).

fraud claims under *Dynex* because "[w]ith no agent of Rio Tinto alleged to have the requisite scienter, Rio Tinto did not have it either").  Where, as here, a fraud claim rests on alleged misrepresentations in "securities offerings" (Opp. at 15), the only employees whose intent can be imputed to corporate defendants are those "responsible for the statements made to investors," *Dynex*, 531 F.3d at 197.  The Second Circuit held in *Dynex* that plaintiff did not plead fraud, even where "Dynex employees were systematically flouting its underwriting guidelines [and] giving [investors] false information about the cause of the bonds' poor performance," because the complaint did not plead that those "*responsible for the statements made to investors*" knew the statements were false.  *Id*. (emphasis added); (*see also* Opp. at 31 (citing *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 545 (S.D.N.Y. 2011) (scienter requires individual who "actively participated in making, reviewing and/or authorizing the statements"), *aff'd*, 838 F.3d 223 (2d Cir. 2016))).  The Complaint disregards this principle.  It does not even *identify* any employee of any Defendant responsible for the alleged misrepresentations, much less make allegations giving rise to a "strong inference" that, when the employees made those statements, they "knew" they were false.[4]  (Defs.' Mem. at 29-34.)

## 2.   The Complaint Fails To Meet the *Dynex* Standard.

Plaintiff claims that "there is no requirement at the pleading stage to identify a specific individual," suggesting that its decision not to do so here was an exercise of "prosecutorial

---

[4]     Plaintiff cannot evade *United States* v. *Philip Morris USA, Inc*. by merely claiming it "lacks any relevance."  (Opp. at 30.)  The D.C. Circuit there explained that "to determine whether a corporation made a false or misleading statement with specific intent to defraud, [a court must] look to the state of mind of the individual corporate officers and employees who made, ordered, or approved the statement."  566 F.3d 1095, 1118 (D.C. Cir. 2009); (*see* Defs.' Mem. at 30).  And Plaintiff *itself* relied on that *same quotation* in opposing the motion to dismiss Plaintiff's recent FIRREA action against Barclays.  (*See United States* v. *Barclays Capital, Inc.*, No. 16 Civ. 7057 (E.D.N.Y. Oct. 10, 2017), ECF No. 91 at  37.)

discretion." (Opp. at 2 n.4, 31.) Plaintiff misses the point. It is not simply that Plaintiff did not *sue* any individual defendants here, although that would have been the "most straightforward way" of pleading scienter. *Dynex*, 531 F.3d at 195. The Complaint's fundamental defect is that it does not *plead scienter* for *any* specific human being employed by any Defendant. Instead, Plaintiff falls back on general descriptions of entire "business units that were responsible for securitizing loans into RMBS" and the tasks those units undertook in that process. (Opp. at 33-34.) But Plaintiff cannot "use" the "collective knowledge of [a corporate defendant's] 'family' to support the inference that the Defendants had actual knowledge of . . . fraudulent activity" as a means "to shore up a claim of essentially fraudulent conduct when it is unable to allege that any specific employee(s) had the requisite knowledge." *Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 24 n.11 (S.D.N.Y. 2009); (*see* Defs.' Mem. at 32-34 (summarizing cases)).

Similarly, Plaintiff's reference to individuals merely "by position and title" (Opp. at 37) does not save its Complaint: "Plaintiffs cannot successfully plead scienter based only on allegations related to the [defendants'] title and job responsibilities." *Police & Fire Ret. Sys. of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 235 (S.D.N.Y. 2009). That is particularly true here because Plaintiff has referenced by "title and job responsibilities" virtually everyone at UBS who worked on the 40 RMBS offerings—and, remarkably, even people outside UBS. (*See* Opp. at 34.)

To take one example of the Complaint's failure to plead scienter, Plaintiff claims that the supposedly false "standard representation[]" (Opp. at 34) on page S-64 of the MABS 2006-WMC2 prospectus supplement—that the loans in that RMBS were "originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp." (Compl. tbl. 2a at 30)—was made with scienter, because a report by the outside due diligence vendor graded

"EV3" 9.78% of the loans in a sample (Compl. ¶ 343), even though *none of those EV3-graded loans* were ultimately put into in that RMBS.  The Complaint does not allege which UBS employee was responsible for the "standard representation" or whether that employee reviewed the report and, if so, believed that an EV3 grade for 10% of loans adversely selected for inclusion in a due diligence sample rendered the "standard representation" false.[5]  (*See* Defs.' Mem. at 26-27.) Plaintiff's attempt to plead scienter for the remaining 39 RMBS is equally deficient.  (Compl. ¶¶ 307-41, 347-791.)

Plaintiff argues that UBS "transaction managers" "responsible for" executing Pooling and Servicing Agreements ("PSAs") for three of the 40 RMBS "were each personally aware of the due diligence results indicating the representations were false." (Opp. at 36-37.)  But the Complaint does not allege any misrepresentations in the PSAs (*see* Compl. tbls. 2a-b) or plead this scienter theory.  (*See* Compl. ¶¶ 114, 167 (discussing transaction managers but nowhere alleging that they knew of any misrepresentations in PSAs).)  Nor could it—the PSAs were contracts among RMBS sponsors, depositors, and trustees, not offering documents to investors. *See Prudential Ins*. *Co. of Am*. v. *Bank of Am*., *N.A*., 14 F. Supp. 3d 591, 601 (D.N.J. 2014) (rejecting fraud claim because "the Complaint points to [alleged misrepresentations] in the Pooling and Servicing Agreements . . . not in the Offering Materials").

### 3. Neither *Bank of New York Mellon* Nor *Wells Fargo* Saves Plaintiff's Inadequate Scienter Allegations.

Plaintiff tries to evade *Dynex* by citing *United States* v. *Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013), and *United States* v. *Wells Fargo Bank, N.A*., 972 F. Supp.

---

[5]      To survive a motion to dismiss based on due diligence reports, Plaintiff must specify (*inter alia*) "which company officers reviewed them." *IKB Int'l S.A*. v. *Bank of Am*., 2014 WL 1377801, at *16 (S.D.N.Y. Mar. 31, 2014) (quoting *In re Scholastic Corp*. *Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001)), *aff'd*, 584 F. App'x 26 (2d Cir. 2014).

2d 593 (S.D.N.Y. 2013).  (Opp. at 29-30.)  But in *Bank of New York Mellon*, Plaintiff (i) named as a defendant David Nichols, a bank executive who was personally responsible for "crafting" and disseminating the key challenged statement, and (ii) quoted an email to Nichols from another bank executive specifically contradicting that statement.  941 F. Supp. 2d at 467, 472-73.  The court referenced Nichols by name more than *70 times* in its decision, and *dismissed* Plaintiff's claim predicated on misrepresentations *not* linked to Nichols.  *See id*. at 478-80.

In *Wells Fargo*, Plaintiff alleged that bank employees were motivated to commit fraud because the bank "impermissibly paid [them] a bonus based on the number of loans they approved," and thus that they improperly certified ineligible loans as eligible for FHA insurance. 972 F. Supp. 2d at 602.  The court held that Plaintiff adequately alleged scienter because it "ha[d], effectively, provided Wells Fargo with the names of the employees responsible for the alleged false claims" by providing the loan number of each allegedly fraudulently submitted loan.  *Id*. at 618 n.16.  Plaintiff here has not identified any individuals who were allegedly responsible for the challenged statements *and* knew them to be false.

\*      \*      \*

In short, the Complaint must be dismissed because Plaintiff does not (i) identify even one employee of any of Defendants who was "responsible for" the alleged misrepresentations in the offering materials, let alone (ii) plead facts giving rise to a strong inference that, in making the alleged misrepresentations, that person acted with scienter.  Under settled law, Plaintiff cannot lump together all of the employees across four separate corporate entities and assert that they collectively were part of a criminal fraud.[6]  *See*, *e.g.*, *In re Mylan N.V. Sec. Litig.*, 2018

---

[6]     The Complaint also fails by seeking to impute scienter to all of "UBS," the generic catch-all term Plaintiff uses to refer to four distinct corporate entities.  (*See*, *e.g.*, Compl. ¶¶ 132, 142, 149.)

WL 1595985, at *17 & n.12 (S.D.N.Y. Mar. 28, 2018) (declining to infer "corporate scienter" from allegations that "identify only amorphous Mylan 'employees' and 'executives'").

    **C.    Plaintiff Has Not Adequately Pled Motive or Opportunity To Commit Fraud.**

        Beyond failing to distinguish among the four corporate Defendants or identify any employee of any Defendant who acted with scienter, the Complaint does not plead scienter even as to the generic "UBS." Plaintiff concedes that to "allege the requisite strong inference," the Complaint must plead specific facts either (i) showing "that defendants had both motive and opportunity to commit fraud," or (ii) "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." (Opp. at 16.) Plaintiff has done neither.

        As to motive, Plaintiff doubles down on its theory that it is enough to allege that Defendants' motive to commit fraud was "[1] to receive higher credit ratings and [2] to induce investors to invest in their RMBS, while [3] reducing the level of credit enhancement built into each deal's structure." (Opp. at 18.) Plaintiff cites *Dexia SA/NV* v. *Bear, Stearns & Co.* to claim that UBS "had a motive to maintain the appearance that the . . . assets were safe and highly rated." (Opp. at 19 (quoting 929 F. Supp. 2d 231, 241-42 (S.D.N.Y. 2013).) But the *Dexia* decision is "null and void," as the court later ruled that it lacked jurisdiction. *See Dexia SA/NV* v. *Bear, Stearns & Co.*, 945 F. Supp. 2d 426, 430 (S.D.N.Y. 2013). Regardless, *Dexia* is inapposite here, because the court found that plaintiffs' specific allegations "suggest[ed] an improper motive beyond a general business motive for profits," 929 F. Supp. 2d at 241-42, including allegations that defendants "exert[ed] *improper pressure* on the agencies to give high credit ratings," *id*. at 241

---

The Second Circuit has rejected this conclusory approach of merely pleading "each corporate Defendant and its role in the securitization process across the 40 Subject Deals." (Opp. at 32); *see IKB Int'l S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26, 28-29 (2d Cir. 2014) (plaintiffs' "general allegations regarding undifferentiated [corporate] entities and their role in the mortgage-backed securities market are insufficient to meet their pleading burden under Rule 9(b)").

(emphasis added), by (i) "routinely threaten[ing] to take their business to a different" agency, and (ii) "blacklist[ing] individual [agency] analysts who refused to provide favorable credit ratings," Am. Compl. ¶ 242, *Dexia SA/NV* v. *Bear, Stearns & Co.*, No. 12 Civ. 4761 (S.D.N.Y. June 18, 2012), ECF No. 1-2.

There are no such allegations here.  The Complaint merely alleges that Defendants misrepresented their due diligence process to rating agencies "ultimately to induce investors to purchase certificates in these deals."  (Compl. ¶ 148; *see* Compl. ¶¶ 139-47.)[7]  But this is no different from alleging that UBS was motivated to sell more RMBS certificates and, as courts have held, such "generalized motives to sell . . . [RMBS] [c]ertificates, make profits, and collect fees" are insufficient to plead scienter.  *Union Cent. Life Ins. Co.*, 2013 WL 1342529, at *6.  Plaintiff's related claim that Defendants committed fraud to "reduc[e] the level of credit enhancement built into each deal's structure" because "the less credit enhancement required, the more valuable the pool of loans would be to UBS," simply asserts that Defendants, like all for-profit corporations, sought to reduce costs to increase profits.  (Opp. at 18 (quoting Compl. ¶ 106).)  Similarly, the "desire to avoid loss to the corporation" is also a "universal, generalized motive[]" that is insufficient as a matter of law.  *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011).  Equally weak is Plaintiff's theory that Defendants were motivated to commit fraud "to maintain [their] relationships with originators."  (Opp. at 19.)  The Opposition recycles the Complaint's allegations, but does not cite any authority showing that "maintaining" a customer

---

[7]    Even the allegations of "one instance" of a "blatant lie" relating to only "one particular deal" do not withstand scrutiny.  (Opp. at 40.)  Plaintiff alleges that, on a single occasion, UBS "conceal[ed] . . . the fact that UBS had obtained updated" credit scores for certain loans (Compl. ¶ 286), but admits that UBS in fact *provided the rating agency with the "concealed" information the very same day that it was requested* (Compl. ¶ 287 n.27).  That single non-event hardly provides a "motive" for fraud.

relationship provides a cognizable motive for criminal fraud, because there is none.  (*See* Opp. at 19.)  The Second Circuit has recognized that "allegations of a company's motive to 'maintain good relations with suppliers, retailers and lenders'" are insufficient as a matter of law to plead scienter "because 'they pertain to virtually any company.'"  *Chill*, 101 F.3d at 268.

Plaintiff also confuses the separate requirement of pleading a "*clear* opportunity" to commit fraud with the "opportunit[y] to learn information about the loans."  (Opp. at 22.)  In fact, "[w]hen courts speak of 'clear opportunity' to commit fraud," they require pleadings to show that the alleged fraud *could feasibly be accomplished*, and do not contemplate the sort of "elaborate plot that is alleged to have unfolded in this case."  *Powers*, 57 F.3d at 185.  The Complaint alleges that "UBS engaged" at least *eight* independent "third-party vendors to conduct credit and compliance [and valuation] due diligence" (Compl. ¶¶ 84-85), and acknowledges counsel's involvement in the 40 RMBS no fewer than 15 times (*see*, *e.g.*, Compl. ¶ 437 (quoting UBS employee's email to originator:  "[M]y hands are tied on a lot of this because of the legal focus on the due diligence results.")).  Thus, Plaintiff implausibly alleges that UBS perpetrated a criminal fraud *for years* in plain view of both independent due diligence vendors and counsel.

Rather than grapple with this, Plaintiff reflexively claims that lack of opportunity is a "trial argument" when it plainly is a pleading requirement, and then spins two new, contradictory theories:  that UBS's "in-house or outside counsel" were either "complicit in the misrepresentations" or, conversely, were not "fully informed of the due diligence results."  (Opp. at 22-23.)  But the Complaint contains no such allegations, and the Opposition says nothing about the many *other* third parties allegedly engaged in the "fraud."  Plaintiff's failure to address such pleading inconsistencies shows that it has not met its burden to plead a clear opportunity to commit

-16-

fraud, let alone a theory of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

> **D.**    **Plaintiff's Fraud-by-Formula Theory Does Not Support a Strong Inference of Scienter When Compared to Alternative, Non-Culpable Inferences.**

Having not pled motive or opportunity, Plaintiff claims that it pled "conscious misbehavior" by formulaically alleging that "UBS knew"—based on due diligence on loans *not* included in the RMBS—that loans *actually* included were "defective," and that the "standard representation" about compliance with underwriting guidelines was false.[8]   (Compl. ¶¶ 12-13; Opp. at 23, 34.)   Plaintiff also tries to bolster its due diligence theory by quoting unnamed employees' emails (Opp. at 35-36), but the Complaint does not allege that these employees were responsible for any representations (much less *mis*representations) to investors in the 40 RMBS.

In assessing whether such allegations create a "strong inference" of scienter, *Tellabs* and *Loreley* instruct that this Court must engage in a "comparative evaluation" that weighs "the inferences urged by the plaintiff" against "competing inferences rationally drawn from the facts alleged" in the Complaint, "documents incorporated into the complaint by reference," and "matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 314, 322; *see Loreley*, 797 F.3d at 176-77.  Plaintiff never confronts the opposing inferences raised in Defendants' moving brief.  Instead, Plaintiff criticizes Defendants for doing precisely what *Tellabs* requires:  presenting "alternative, innocuous explanations" (Opp. at 44), and asking this Court to consider whether

---

[8]     The Opposition backs away from the Complaint, asserting that pleading Defendants' "reckless indifference to" or "conscious avoidance of" the truth—as opposed to actual knowledge—is sufficient to plead scienter.  (Opp. at 10.)  But the Complaint rests entirely on UBS's alleged actual knowledge, reciting *more than 70 times* that "UBS knew" its statements were false.  (*See*, *e.g*., Compl. ¶¶ 341, 475.)  Plaintiff must be held to its allegations.  In any event, recklessness in mail and wire fraud cases requires conduct that "ris[es] to the level of intentional behavior."  *Sable* v. *Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 341 (S.D.N.Y. 1993); *accord Amalgamated Bank of New York* v. *Marsh*, 823 F. Supp. 209, 217 (S.D.N.Y. 1993).

Plaintiff's proposed inference of *fraudulent* intent is "at least as compelling as any opposing inference of *nonfraudulent* intent." *Tellabs*, 551 U.S. at 314 (emphasis added). This "comparative evaluation" confirms that the Complaint should be dismissed.

> **1.  Plaintiff Offers No Coherent Explanation for Numerous Facts Alleged in the Complaint Contradicting UBS's Purported "Knowledge" That Loans in the 40 RMBS Were "Defective."**

The Complaint alleges numerous facts that are inconsistent with—and undercut— its core scienter allegation that "UBS knew that a significant number of loans securitized" in each of the 40 RMBS "were defective." (*E.g.*, Compl. ¶ 316.) Plaintiff never explains why any rational actor would have done what the Complaint alleges UBS did. Put another way, "Plaintiff's allegations of scienter appear less cogent" than opposing inferences "when the alleged scheme is viewed as a whole." *Vining* v. *Oppenheimer Holdings Inc.*, 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) (granting motion to dismiss because the "plausible" and "more cogent theory" was that defendant was "merely negligent").

***UBS Invested Alongside Investors in the 40 RMBS and Lost Billions on Mortgage-Related Assets.*** Plaintiff does not contest that (i) UBS invested in the 40 RMBS and lost money on those investments; (ii) UBS lost billions of dollars on mortgage-related assets as a result of the U.S. housing market crash; and (iii) it would have been economically irrational for UBS to invest in RMBS that UBS knew were doomed to fail. (*See* Defs.' Mem. at 23-24, 34-37.) Instead, Plaintiff cherry-picks from one internal UBS memorandum that it claims reflects that unnamed employees' "intent was to sell every part of the transaction and push all risk onto others." (Opp. at 21.) But Plaintiff fails to address documents—incorporated by reference in the Complaint and highlighted in Defendants' moving brief—showing that UBS not only intended to retain positions in its RMBS, but in fact did so. (*See*, *e.g*., Defs.' Mem., Ex. 17 at 6 (testimony of former Group Chief Risk Officer that "UBS *typically retained a residual interest in its primary [RMBS]*

issuances and would also invest in *various parts of the capital structure of third party securitizations*" (emphasis added)); Defs.' Mem., Ex. 18 at UBS_EDNY_086393727 (UBS loan trader's email stating: "We've done 38 deals off the MABS shelf. Of those 38 residuals we created, we've only sold nine," and that trading desk intended to sell part of residual for one RMBS "*not because we don't like the risk*" but "more as price point for the remainder of our portfolio" (emphasis added).))[9]   That UBS invested in the 40 RMBS and nearly *$100 billion* in U.S. mortgage-related assets, which Plaintiff does not dispute, is directly inconsistent with UBS's "knowledge" that the loans in the 40 RMBS would "default[] at exceptionally high rates." (Compl. ¶ 3.)   As then-District Judge Sullivan held, and the Second Circuit affirmed, "the mere fact that UBS made substantial investments in mortgage-related securities . . . undercuts Plaintiff['s] ability to plead a 'strong inference' of scienter." *In re UBS AG*, 2012 WL 4471265, at *12, *aff'd*, 752 F.3d at 187-88.

   ***UBS Performed Costly, Extensive Due Diligence, and Kicked Out Thousands of EV3-Graded Loans.***   The Complaint admits that UBS kicked out thousands of EV3-graded loans, even though "originators did not want their loans kicked from deals" because kick-outs were "costly," "unprofitable," and "unpalatable." (Compl. ¶¶ 20, 59.)   The Opposition merely repeats the contradictory allegation that UBS's extensive due diligence was "window dressing," conducted "to give the appearance to investors and rating agencies that UBS had a process in place to ensure that the loans in its deals complied with the representations it made to investors." (Opp. at 38 (quoting Compl. ¶ 23).)   But Plaintiff does not allege that investors or rating agencies ever received

---

[9]   Other documents show that UBS's own investments in the 40 RMBS contributed to its rigorous approach to due diligence, and that UBS could not "appease originators" because "*as residual holder*, that is a line [UBS] continually need[ed] to toe." (Defs.' Mem., Ex. 28 at UBS_EDNY_063845694 (emphasis added).)

the due diligence results.  To the contrary, Plaintiff repeatedly alleges that UBS "did not disclose" to investors or rating agencies "that their due diligence results indicated that representations in offering materials were false."  (Opp. at 25.)  The only entities that allegedly were informed of the EV3 rates were *the originators* that UBS allegedly sought to "appease" by not kicking out loans. (Compl. ¶¶ 198-200); *see Leung* v. *Law*, 387 F. Supp. 2d 105, 117 (E.D.N.Y. 2005) (Garaufis, J.) (dismissing RICO claim predicated on bank fraud where alleged fraudulent scheme "defie[d] economic reason").[10]  Plaintiff's argument that UBS "manipulate[d] the due diligence process" by regrading EV3 loans to EV2 or EV1 is flawed for the same reason.  (Opp. at 17.)

Plaintiff's assumption that all regrades were improper also is undercut by the Opposition's acknowledgement that EV3 loans could be regraded because "the missing document was found and compliance with guidelines or sufficient compensating factors could be verified." (Opp. at 43.)  Because Plaintiff's allegation that regrades were improper is entirely speculative (*see* Compl. ¶¶ 171-72), the more compelling inference is that Defendants' employees sometimes disagreed with due diligence firms' grades and adjusted them accordingly.

**UBS Agreed To Repurchase Loans That Did Not Comply with Underwriting Guidelines.**  Plaintiff acknowledges that UBS agreed to repurchase non-compliant loans (Opp. at 20), but cannot explain how this is consistent with the allegations that "UBS knew" that a "significant number" of loans in the 40 RMBS did not comply with underwriting guidelines and would "default[] at exceptionally high rates."  (Compl. ¶¶ 3, 324.)  Plaintiff also fails to address authority holding that "defendants' obligation to cure any noncompliant loan" undercuts any inference of scienter.  *Footbridge Ltd*. v. *Countrywide Home Loans, Inc*., 2010 WL 3790810,

---

[10]     Plaintiff ignores that UBS conducted 100% credit and compliance due diligence for 11 pools backing the 40 RMBS.  As explained in Defendants' moving brief, no "fraudster" would undertake the expense and burden of reviewing every single loan in a pool.  (Defs.' Mem. at 39-40.)

at *21 (S.D.N.Y. Sept. 28, 2010).  Instead, Plaintiff claims that UBS's repurchase obligation is irrelevant because UBS was "fully indemnified" and the "repurchase risk was borne by originators."  (Opp. at 20.)  But the Complaint contradicts that assertion.  If UBS knew it was buying "defective" loans that were likely to "default[] at exceptionally high rates" from "shoddy" originators (Compl. ¶¶ 3-4), then UBS also knew that the originators' indemnities were worthless. Indeed, the 2016 disclosure misleadingly cited in the Opposition (at 28) in fact *warned* investors that UBS likely would *not* be indemnified for its repurchase obligations, and that "many . . . third parties [with indemnification obligations] *are insolvent or no longer exist*."  (UBS AG, Report of Foreign Private Issuer (Form 6-K) (Feb. 2, 2016), Fourth Quarter 2015 Fin. Supp. at 28 (emphasis added).)

### 2. Plaintiff's Formulaic Recitation of Due Diligence Results Does Not Support a Strong Inference of Scienter.

At bottom, Plaintiff rests on its claim that "nearly 100 pages of tables setting forth deal-specific data" can raise a strong inference of scienter.  (Opp. at 2.)  But the "strong inference" test cannot be met by counting pages, and the data in the tables do not show what Plaintiff wants them to show.  The Opposition makes clear that the Complaint's "data"-based theory relies on assumptions that are either implausible in their own right or contradicted by the Complaint's other allegations.  The Court "need not" accept "conflicting pleadings that make no sense" or allegations that "are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *Rockaway Beverage, Inc.* v. *Wells Fargo & Co*., 2019 WL 1433076, at *3 (E.D.N.Y. Mar. 29, 2019) (Chen, J.); *see Dhir* v. *Carlyle Grp. Emp. Co*., 2017 WL 4402566, at *8 (S.D.N.Y. Sept. 29, 2017) (dismissing complaint with "internally contradictory evidence of a harebrained, short-sighted conspiracy that defies logic").

**Flawed Assumption 1:  Loans Graded EV3 Were "Defective."**  Plaintiff's theory presumes that any EV3 grade automatically "meant that the loan . . . would violate the standard representations to investors" (Opp. at 42), even though a loan could be designated EV3 *for reasons unrelated to* an underwriting "defect."  For example, Plaintiff recognizes that loans were graded EV3 simply because documents were missing from files provided for due diligence review.  (Opp. at 42-43.)  Plaintiff also concedes that where a document was missing, "*it was impossible for UBS to verify* whether the loan violated the standard representations."  (Opp. at 42 (emphasis added).)[11]  Because the Complaint does not specify *how many* loans were graded EV3 because of missing documents, Plaintiff's formulaic allegations do not support a strong inference of scienter.

Plaintiff also acknowledges that more than 700 loans in one RMBS were graded EV3 "solely due to bid stipulations," *i.e.*, contractual conditions imposed by UBS that were *stricter* than the originators' underwriting guidelines.  (Opp. at 44; *see* Defs.' Mem. at 45.)  To blunt its concession, Plaintiff claims that "there was only one instance" where loans were graded EV3 due to bid stipulations, but no such allegation is in the Complaint.  (Opp. at 44.)  And Plaintiff never explains why UBS would kick out *any* loans based on stricter "bid stipulations" if UBS's goal was to appease originators by "accepting more loans."  (Compl. ¶ 251.)

**Flawed Assumption 2:  "EV3 Rates" Can Be Extrapolated to Loans Included in RMBS.**  Defendants' moving brief showed that Plaintiff's "EV3 rates" for each RMBS did not create the inference advanced by Plaintiff—*i.e.*, that the percentage of EV3s identified in due

---

[11]     Plaintiff also acknowledges that missing documents could be "cured" by locating the documents, but oddly claims that this is no reason to "discount[] the problem."  (Opp. at 44.)  But if, as documents incorporated in the Complaint show, UBS employees believed that missing documents were "typically quite curable," then allegations of missing documents do not support a strong inference of scienter.  (Defs.' Mem., Ex. 6 at UBS_EDNY_008853383; *see also* Defs.' Mem., Ex. 7 at UBS_EDNY_088860057 ("Often these missing docs can clear[] up.").)

diligence samples and *not* included in the RMBS meant that (unnamed) employees "knew" that loans *actually* included in the RMBS would have a similar EV3 rate. (Defs.' Mem. at 46-49.) Defendants gave an example where the "EV3 rate" for one RMBS—based on Plaintiff's own extrapolation theory—would be less than half the "EV3 rate" for the due diligence sample. (Defs.' Mem. at 48.) Rather than responding to this straightforward point, Plaintiff accuses UBS of "perform[ing] a dubious and convoluted math exercise." (Opp. at 46.) But Plaintiff acknowledges the factual predicate of this "math exercise," namely, that UBS removed *all* loans with final EV3 grades *before* securitization. (Opp. at 43 (describing loans with final EV3 grades that "had to be removed from the pool").) Thus, the only thing "dubious" here is Plaintiff's refusal to deal with simple subtraction and division, particularly given that its *entire scienter theory* is based on arithmetic calculations reflected in tables appended to the Complaint. Plaintiff also admits that UBS drew samples using "adverse selection" (Opp. at 45)—*i.e.*, samples that were, by design, *not representative* of the loan pool as a whole (but were riskier), making the "EV3 rate" an even more obviously untenable metric for inferring the "knowledge" of any employee.

Plaintiff's response to UBS's use of adverse selection in sampling and removal of all EV3-graded loans is to repeat its assertion that unspecified "former employees . . . very clearly understood" that allegedly "high percentages" of EV3s meant that "there was a high probability that the unreviewed portion of the loan pools also contained a significant number of defective loans." (Opp. at 46.) Plaintiff has it backwards. Defendants' undisputed points (Defs.' Mem. at 44-47)—all taken from the Complaint—that (i) EV3 did not mean defective (Compl. ¶¶ 80, 161, 424); (ii) no EV3-graded loans were included in any of the 40 RMBS (Compl. ¶¶ 80, 156, 161, tbls. 3a, 3b); and (iii) adverse selection was used in sampling (Compl. ¶ 10 & n.1), all *fatally undercut* any inference that unnamed employees knew the challenged statements were false based

on the EV3 rates cited in the Complaint.  *See Nat'l Credit Union Admin. Bd.* v. *UBS Sec., LLC*, 2017 WL 513970, at *2 (D. Kan. Feb. 8, 2017) (excluding testimony regarding EV3 rates as "pool failure rates cannot be validly extrapolated to unsampled loans because the samples were not randomly drawn and thus the sampled loans may not be sufficiently representative").[12]

> ***Flawed Assumption 3:  Unnamed UBS Employees "Knew" That Some Unspecified EV3 Rate Rendered "Standard Representations" About Compliance With Underwriting Guidelines False.***  Plaintiff speculates that when EV3 rates in adversely selected due diligence samples hit some magic number, unnamed employees "knew" that a representation that loans were "generally" underwritten in accordance with underwriting guidelines was false. But Plaintiff does not commit itself to *any* particular number, while vaguely alleging *more than 40 times* that the "number" of defective loans in each pool (based on Plaintiff's flawed extrapolation exercise) was "significant."  (*See*, *e.g.*, Compl. ¶¶ 336, 422, 576.)  The Opposition asserts that a "reject" rate of 2-4% was "industry standard" and seemingly acceptable, but contends that a "7.72% EV3 rate" was "high enough" to "indicate" that "the pool contained significant numbers of defective loans."  (Opp. at 48.)  Plaintiff effectively claims that somewhere (unspecified) in the 3.72 percentage points separating a 4% and a 7.72% "reject rate," UBS crossed the line from "acceptable" into criminal fraud.  But Plaintiff does not allege that any UBS employee knew of Plaintiff's unidentified "magic number"—one of several missing links essential to Plaintiff's theory.  Moreover, because Plaintiff's "defect" rates for the pool rest on fatally flawed assumptions about loans *excluded* from non-representative loan *samples*, the Complaint provides no basis to

---

[12]      With no authority for the proposition that high "reject" rates in due diligence samples are sufficient to plead fraudulent intent, Plaintiff resorts to citing inapposite cases finding that certain reject rates supported a finding of *negligence*.  (Opp. at 46-47 & 47 n.29 (citing *FHFA* v. *Nomura Holding Am., Inc.*, 68 F. Supp. 3d 439, 479 (S.D.N.Y. 2014) and *FHFA* v. *Nomura Holding Am., Inc.*, 873 F. 3d 85, 129-32 (2d Cir. 2017)).)

infer that any UBS employee "knew," based on due diligence results, that "standard representations" that loans in 40 separate RMBS offerings "generally" complied with guidelines were false.  (Opp. at 34, 48.)

      ***Flawed Assumption 4:  UBS Employees Knew From Valuation Due Diligence That Appraisals Were Inflated.***  Plaintiff contends that UBS's valuation due diligence was "meaningless" or a "sham," because unnamed UBS employees did not *always* kick out loans that exceeded certain "tolerance" thresholds, and that UBS's valuation diligence gave (unnamed) UBS employees "knowledge of inflated appraisal values."  (Opp. at 48-50.)  These are not cogent inferences from the Complaint's allegations.  As explained in Defendants' moving brief, apart from its valuation diligence, UBS often had *two estimates* of a property's value—an appraisal *and a price from an arm's-length sale.*  (*See* Defs.' Mem. at 49.)  The Opposition never explains how any UBS employee could "know" that an arm's-length transaction provided an "incorrect" value based on due diligence.  Nor could it:  "[I]t is well-established that a recent sale price for [a] subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value."  *Schonfeld* v. *Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000).  The more compelling inference is that employees understood that valuation diligence tools, unlike sales prices, are often unreliable.  As for purported "misrepresentations to investors in presentations about how UBS conducted its valuation due diligence process" (Opp. at 48), Plaintiff does not identify any employee responsible for those presentations or why he or she would make the alleged misrepresentations.

      **3.**     **The Cited Emails Do Not Support a Strong Inference of Scienter.**

      The Opposition includes two single-spaced pages of cherry-picked snippets from emails of unnamed UBS employees, supposedly "demonstrating the fraudulent intent of specific individuals working on securitizing RMBS."  (Opp. at 34-36.)  These do not create a "strong inference" that "someone whose intent could be imputed to the corporation[s] acted with the

requisite scienter" as to each of the specific 40 RMBS at issue. *Dynex*, 531 F.3d at 195. For starters, the Complaint does not allege that the emails were written by employees responsible for the supposedly false "standard representations," and the vague assertion that they were "working on securitizing RMBS" is not enough. Moreover, the out-of-context emails do not support a "cogent"—let alone "compelling"—inference that dozens of employees in different business groups committed criminal fraud in connection with 40 separate RMBS offerings over two years. One email, for example, suggests that an employee wanted to perform *more* due diligence—hardly a sign of fraud. (Opp. at 35 (quoting Compl. ¶ 205 (in light of originator's "extremely weak past performance from a diligence perspective," employee "would only be comfortable at 50% due diligence")).) None of the emails express the view that the challenged statements were false. At most, the emails reflect the authors' views on the risk profile of the loans and RMBS performance—both of which were disclosed by UBS and known to the sophisticated RMBS investors. (*See* Defs.' Mem. at 21-23); *see In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 618 (E.D. Pa. 2009) (dismissing fraud claim for lack of scienter where riskiness of "securities backed by subprime loans" was "known . . . by the market at large").

The common-sense inference is that, in large organizations where hundreds of people are working hard on complex transactions over several years, occasional wisecracks or expressions of frustration are predictable and inevitable. Pulling such remarks out of context is no substitute for a coherent analysis—entirely absent from the Complaint and Opposition—supporting a strong inference that an elaborate scheme to defraud investors was afoot.

### 4. Plaintiff Cannot Save Its Complaint by Accusing Unspecified UBS Employees of "Withholding Key Information" About Loan Quality.

Plaintiff tries to hide the insufficiency of its scienter allegations by claiming that this Court can *infer* scienter based on the theory that unspecified UBS employees "knowingly

withh[e]ld[] key information as to the quality of the underlying loans." (Opp. at 16; *see also* Opp. at 11, 25-26, 51-52.) This is wrong as a matter of law. To plead scienter, Plaintiff must point to, at a minimum, "*specific* contradictory information" in the hands of particular employees of Defendants (whose scienter can be imputed to each Defendant) that is "incompatible" with the challenged statements. *In re Marsh & McLennan*, 501 F. Supp. 2d at 483-84 (summarizing Second Circuit cases) (emphasis added). Alleging that unnamed employees withheld supposedly "key information" about loan quality does not meet that test.[13]

Plaintiff conflates two distinct aspects of its pleading burden. As the Opposition recognizes, Plaintiff must plead *both* an "intent to *deceive*" and "contemplation of *actual harm* to the victim." (Opp. at 11 (emphasis added).) "[I]ntent to deceive" implies that a defendant "knowingly gave false information." *United States* v. *Chandler*, 98 F.3d 711, 714 (2d Cir. 1996). Plaintiff relies on cases where defendants did not dispute that they intended to *deceive*, but claimed that they did not intend to *harm*, their victims. For example, in *United States* v. *Binday*, the defendants "*did not dispute*" that they had made "misrepresentations," but argued only that they "did not intend to inflict . . . any harm." 804 F.3d 558, 568 (2d Cir. 2015) (emphasis added). The Second Circuit rejected that argument because, to satisfy the intent-to-*harm* element of scienter, it was enough that defendants "intended to withhold information relevant to the insurers' economic decision-making." *Id*. at 579-80.[14] That principle has nothing to do with the core issue here:

---

[13]    Much of Plaintiff's "withholding" argument is circular. (Opp. at 25-26.) For example, Plaintiff asks the Court to infer scienter because Defendants "withheld from investors" that "Defendants did not disclose that their due diligence results indicated that representations in offering materials were false." (Opp. at 25.)

[14]    Plaintiff's other Second Circuit precedents (Opp. at 11-12) were also cases where the dispute was whether defendants intended to *harm*, not whether they intended to *deceive*. *See United States* v. *Karro*, 257 F.3d 112, 118 (2d Cir. 2001) ("sufficient intent to inflict harm can be found from the intentional withholding of information"); *United States* v. *Walker*, 191 F.3d 326,

whether the Complaint adequately pleads a strong inference that *anyone* whose scienter can be imputed to Defendants acted with intent *to deceive* through the challenged statements.  (*See* Defs.' Mem. at 29-34.)  The Complaint does not do so.

*    *    *

Given "all of the facts" and the many "competing inferences," Plaintiff's theory that unnamed UBS employees intentionally defrauded investors is not "cogent," let alone "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  Any inference of scienter here is overwhelmed by alternative inferences that, at most, UBS employees may have been negligent in due diligence or in repeating "standard representations."  (Opp. at 34.) But negligence is not enough to plead fraud.  *See In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) ("[E]ven a lack of due diligence will not state a securities fraud claim absent evidence of corresponding fraudulent intent."); *Matana* v. *Merkin*, 2014 WL 426857, at *4 (S.D.N.Y. Feb. 4, 2014) (allegation of deviations from "industry practice" in due diligence "pleads a lapse, but it does not plead fraud" because defendant "may well have been irresponsible or slipshod . . . but irresponsibility does not equate to fraudulent intent").

## II.   THE COMPLAINT FAILS TO PLEAD BANK FRAUD, FRAUDULENT BANK TRANSACTIONS, OR FALSE STATEMENTS TO BANKS.

The Complaint does not plead FIRREA predicate crimes under 18 U.S.C. § 1344 (bank fraud), § 1005 (fraudulent bank transactions), or § 1014 (false statements to banks).

---

330, 335-36 (2d Cir. 1999) (defendant sought reversal of mail fraud conviction solely on ground that he lacked intent to harm because his "clients received [the] results they were seeking"); *United States* v. *Rossomando*, 144 F.3d 197, 198 (2d Cir. 1998) (reversing mail fraud conviction because "jury charge improperly suggested that the government did not have to prove that [the defendant] intended to harm his victim").

### A. RMBS Sales Are Far Afield From § 1344's Core Concern.

The bank fraud statute (18 U.S.C. § 1344) proscribes conduct "with the intent to victimize" financial institutions, and prosecutions under § 1344 have generally been limited to schemes involving banks' "core functions" like lending and other traditional banking activities. (Defs.' Mem. at 54-55 (quoting *United States* v. *Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992)).) Plaintiff cites cases applying § 1344 only to traditional banking activities, and confirms that § 1344 was not intended to, and does not, cover securities fraud claims simply because a bank is among the investors.[15] The purpose of § 1344 "is to protect the federal government's interest as an insurer of financial institutions"—not as a securities regulator. *Laljie*, 184 F.3d at 189; *see Bouchard*, 828 F.3d at 126 (the statute "should not be read to 'federaliz[e] frauds that are only tangentially related to the banking system,' which is § 1344's core concern").[16] Here, the Complaint is not even "tangentially related to the banking system"; it does not adequately plead that Defendants intended to victimize *any* financial institution in selling RMBS to sophisticated investors from around the world. (Defs.' Mem. at 55.)

---

[15]     *See* Opp. at 52, 54 (citing *Shaw* v. *United States*, 137 S. Ct. 462, 466 (2016) (unauthorized transfer of depositor funds); *United States* v. *Laljie*, 184 F.3d 180, 189-90 (2d Cir. 1999) (unauthorized use of checks to misappropriate funds from bank accounts); *United States* v. *Rigas*, 490 F.3d 208, 218 (2d Cir. 2007) (false statements to secure lower interest payments)).

[16]     Plaintiff claims that *Shaw* "rejected Defendants' argument" that § 1344 applies only to traditional banking activities. (Opp. at 53.) Not so. *Shaw* involved a scheme to mislead a bank into transferring a depositor's funds to another bank—a quintessential bank fraud. 137 S. Ct. at 466. Plaintiff also misreads *Loughrin* v. *United States* (Opp. at 53 n.37); the Supreme Court there explained that, under § 1344(2), a plaintiff must show that defendant "inten[ded] to obtain bank property," 573 U.S. 351, 363-64 & 364 n.6 (2014). *Loughrin* cautioned that § 1344(2) is not "a plenary ban on fraud." *Id*. at 362. Plaintiff's attempt to distinguish *Bouchard* fails for the same reason. (Opp. at 53 n.37.) The Second Circuit there relied on *Loughrin* when explaining that § 1344(2) does not apply where the victim's only involvement is "engage[ment] in activities far afield of the core functions of our federal banking system." *Bouchard*, 828 F.3d at 126. That principle is not limited to the facts of *Bouchard*, and Plaintiff never explains how investing in a public securities offering—which is the most the "victims" did here—could be considered a "core function[] of our federal banking system." *Id*.

-29-

Plaintiff tries to excuse its pleading failure with a single sentence: "FIs [financial institutions] were among the entities investing in every Subject Deal, and Defendants knew this." (Opp. at 54 (citing Compl. ¶¶ 294-99).)   But the Complaint's cited paragraphs are entirely conclusory, alleging only that Defendants (i) "intended to defraud or victimize one or more financial institutions," and (ii) "actively marketed RMBS certificates" to certain financial institutions, some of which ultimately "purchased RMBS in the Subject Deals." (Compl. ¶¶ 292, 294, 296.)   These allegations—which simply track § 1344's language—do not satisfy Rule 9(b), which requires a party asserting claims based on "alleged fraudulent statements" to identify with particularity, among other things, "where, when *and to whom* the statements were made." *Renner* v. *Chase Manhattan Bank, N.A.,* 85 F. App'x 782, 783 (2d Cir. 2004) (emphasis added); *accord Naughton* v. *Local 804 Union*, 2019 WL 1003054, at *4 (E.D.N.Y. Mar. 1, 2019) (Brodie, J.) (explaining that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth).

## B.   Plaintiff's § 1005 Argument Flouts Settled Canons of Statutory Construction.

In trying to sustain its interpretation of § 1005, Plaintiff ignores the text of that provision's first paragraph, which states that "[w]hoever, being an *officer, director, agent or employee* of any" covered institution, issues notes without authorization is guilty of a crime. (Defs.' Mem. at 56 (emphasis added).)   The remaining three paragraphs also state that "whoever" commits certain bank-related misconduct shall be guilty of a crime, but do not expressly incorporate the first paragraph's "insider" limitation. (Defs.' Mem. at 56.)   Nevertheless, courts have held that Congress intended that limitation to apply to all of § 1005: "*[T]he statute* only reaches to conduct performed by individuals *acting in their capacity as bank officials* or aiding and abetting such persons." *United States* v. *Ortiz*, 906 F. Supp. 140, 144-46 & 145 n.2 (E.D.N.Y. 1995) (Trager, J.) (emphasis added); (*see* Defs.' Mem. at 56-57 (collecting cases)).

Plaintiff concedes that the term "whoever" is limited to insiders in § 1005's second and third paragraphs, but claims that Congress intended the same word in the fourth paragraph "to reach a broader set of financial fraud offenders than its sister paragraphs." (Opp. at 56 ("[W]hen Congress added the fourth paragraph to § 1005, it had the opportunity to limit its reach *like the other three*.") (emphasis added).) Plaintiff and the non-binding authorities on which it relies are wrong. *First*, Plaintiff ignores Supreme Court precedent that "identical words used in different parts of the same act are intended to have the same meaning." (Defs.' Mem. at 58 (citing *Dep't of Revenue of Oregon* v. *ACF Indus., Inc.*, 510 U.S. 332, 342 (1994); *Prus* v. *Holder*, 660 F.3d 144, 147 (2d Cir. 2011)).) This Court should not interpret the same word to have "two different meanings in the same section." *Mohasco Corp.* v. *Silver*, 447 U.S. 807, 826 (1980) (rejecting "bifurcated construction" of the word "filed" in subsections (c) and (e) of § 706 of the Civil Rights Act of 1964); *Nat'l Credit Union Admin.* v. *First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (rejecting interpretation that violated canon "that similar language contained within the same section of a statute must be accorded a consistent meaning").

*Second*, Plaintiff cites nothing in FIRREA's extensive legislative history supporting its assertion that Congress *intended* § 1005's fourth paragraph "to reach a broader set of financial fraud offenders than its sister paragraphs." (Opp. at 56.) Multiple courts have found that § 1005's legislative history shows that Congress intended the insider limitation to apply throughout the section. *E.g.*, *United States* v. *Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 525-27 (S.D.N.Y. 2011); *Ortiz*, 906 F. Supp. at 145; (*see* Defs.' Mem. at 56-57 (describing legislative history)). Moreover, by the time Congress added the fourth paragraph in 1989, courts had almost universally limited the second and third paragraphs to insiders. *See United States* v. *Edwards*, 566 F. Supp. 1220-21 & 1221 n.5 (D. Conn. 1983) (collecting cases); (Defs.' Mem at 57-58

& 57 n.44).  This cuts against any inference that Congress intended to go further when it retained the "whoever" language from the rest of the statute.

*Finally*, the rule of lenity requires application of the insider limitation to the fourth paragraph.  *Rubin*, 798 F. Supp. 2d at 528 (applying rule of lenity to § 1005); *cf. Wells Fargo*, 972 F. Supp. 2d at 626-29 (failing to consider rule of lenity in construing § 1005).  Plaintiff claims the rule does not apply because Plaintiff "seek[s] civil, rather than criminal, penalties."  (Opp. at 56 n.42.)  The Supreme Court has rejected that argument.  *United States* v. *Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (rejecting argument that rule of lenity "is inappropriate because [a court] construe[s] [a] statute . . . in a civil setting, rather than a criminal prosecution"); *accord Leocal* v. *Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  Defendants do not rely on "a division of judicial authority" (Opp. at 56 n.42) to support the rule's application here.  Rather, the rule requires that where "there are two rational readings of a criminal statute, one harsher than the other," courts "are to choose the harsher only when Congress has spoken in clear and definite language."  *McNally* v. *United States*, 483 U.S. 350, 359-60 (1987).  Plaintiff points to no such "clear and definite" language.  *See Williams* v. *United States*, 458 U.S. 279, 290 (1982) (rejecting interpretation that would "render a wide range of conduct violative of federal law" where "legislative history . . . faile[d] to evidence congressional awareness of the statute's claimed scope").

## C.   Plaintiff's Argument To Expand the Reach of § 1014 Is Erroneous.

Plaintiff proposes to convert 18 U.S.C. § 1014 into a sweeping anti-fraud provision, but the Second Circuit has squarely held that § 1014 does not apply to securities offerings; rather, it is "limit[ed]" to "specified credit" decisions, *United States* v. *Krown*, 675 F.2d 46, 50 (2d Cir. 1982), "made in connection with conventional loan or related transactions," *Williams*, 458 U.S. at 289.  Plaintiff cites only out-of-circuit cases in arguing for a broader interpretation (Opp. at 59-60), but even those cases apply § 1014 solely in the context of traditional banking activities,

not securities offerings.  *See*, *e.g.*, *Elliott* v. *United States*, 332 F.3d 753 (4th Cir. 2003) (fraudulent

check endorsement).[17]  Nor did the Supreme Court in *United States* v. *Wells*, 519 U.S. 482 (1997),

abrogate *Krown*, as Plaintiff suggests.  (*See* Opp. at 59.)  *Wells* simply held that materiality is not

an element of § 1014, 519 U.S. at 484, which does not undermine (explicitly or implicitly) *Krown*'s

holding regarding § 1014's reach.

### III.    PLAINTIFF HAS NOT PLED JURISDICTION OR A CLAIM AGAINST UBS AG.

Plaintiff concedes (*see* Opp. at 61-64) that this Court lacks general jurisdiction over

UBS AG.  *See SPV Osus Ltd.* v. *UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018).  And Plaintiff has not

pled specific jurisdiction.  It concedes that, to do so, "the Complaint must allege some articulable

nexus between [UBS AG's] forum contacts and the cause of action."  (Opp. at 62.)  The

Complaint's sporadic allegations regarding UBS AG do not even make out a claim against

UBS AG, let alone tie UBS AG to the specific "episode[s]-in-suit" in New York, as required to

plead jurisdiction here.  *Waldman*, 835 F.3d at 331 (emphasis omitted); (*see* Defs.' Mem. at 62).

For only two of the 40 RMBS offerings, Plaintiff tries to establish specific

jurisdiction in New York by alleging that UBS AG originated an unspecified number of loans

subsequently securitized in those RMBS.  (Opp. at 62.)  Plaintiff alleges that UBS AG originated

those loans under the trade name "UBS Home Finance," but does not contest that the prospectus

---

[17]    The sole decision Plaintiff cites addressing the application of § 1014 to RMBS offerings
specifically *declined to decide* the issue.  (*See* Opp. at 59 (citing *United States* v. *Bank of Am.
Corp.*, 2014 WL 2777397 (W.D.N.C. June 19, 2014)).)  The magistrate judge in that FIRREA
action had recommended dismissal of Plaintiff's claim predicated on § 1014 because that "statute
has been applied consistently in the context of traditional customer related bank activities such as
loans, and not to the purchase of securities."  *United States* v. *Bank of Am. Corp.*, 2014 WL
2777372, at *4 (W.D.N.C. Mar. 27, 2014).  The district court declined to rule on § 1014's scope,
permitting Plaintiff to amend its § 1014 claim.  2014 WL 2777397, at *8.  The case settled before
Plaintiff amended its complaint.  *See* J. Mot. to Dismiss, *United States* v. *Bank of Am. Corp.*,
No. 13 Civ. 446 (W.D.N.C. Aug. 26, 2014), ECF No. 44.

supplements for both RMBS state that "UBS Home Finance" was a trade name for "UBS AG, **Tampa Branch**," based in *Florida*.  (Opp. at 61-62 (emphasis added); *see also* Defs.' Mem. at 62; Defs.' Mem., Ex. 14 at S-34; Defs.' Mem., Ex. 29 at S-32.)  Plaintiff's reference to a June 2007 presentation stating that UBS Home Finance's "Operations Management team" for "mortgage origination" was "located in Tampa, FL" (Perlin Decl., Ex. 3, at 4, 5) simply confirms Plaintiff's failure to articulate a nexus between UBS AG's *New York* contacts and the cause of action here.

Plaintiff's allegations regarding "the remaining 38 Subject Deals" (Opp. at 62) have even less to do with New York.  (*See* Defs.' Mem., App. F (summarizing allegations regarding UBS AG's roles in the 40 RMBS).)  *First*, Plaintiff argues that it can ignore the corporate form and rely on its allegations against the other Defendants to establish specific jurisdiction over UBS AG in New York.  (Opp. at 63.)  The sole case Plaintiff relies on for that proposition, *Martin* v. *Designatronics Inc*., is easily distinguishable; the plaintiff there alleged that three "senior employees" of the defendant parent company—who were identified in the complaint by name—were "involved in the hiring and personnel decisions that directly led to Plaintiff's termination." 2019 WL 482202, at *4-5 (E.D.N.Y. Feb. 7, 2019) (Hurley, J.).  In contrast, Plaintiff here fails to allege that *any* UBS AG employees, much less "senior" ones, were involved in the suit-related conduct.  Having failed to "allege facts specifying [UBS AG's] contribution to the fraud" or facts otherwise sufficient to establish personal jurisdiction over UBS AG, Plaintiff cannot piggyback off of the other Defendants' New York contacts.[18]

*Second*, Plaintiff's reference to boilerplate language in presentations noting that they were "prepared by UBS AG, ***or an affiliate thereof***" (Opp. at 64 (emphasis added)), shows

---

[18]      *See Alnwick* v. *European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 639 (E.D.N.Y. 2003) (Spatt, J.); *accord In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *7 (S.D.N.Y. Mar. 31, 2016) (refusing to impute subsidiary's contacts to parent corporation).

nothing about whether UBS AG played any role in the alleged fraud, *see*, *e.g.*, *Contant* v. *Bank of Am. Co.*, 2019 WL 2174233, at *4 (S.D.N.Y. May 17, 2019) (granting UBS parent company's personal jurisdiction motion to dismiss because complaint impermissibly "lump[ed] together" UBS entities).   *Finally*, Plaintiff's argument that UBS AG is subject to jurisdiction due to its ancillary roles as a "Cap Provider" or "Swap Provider" in some of the 40 RMBS is belied by Plaintiff's failure to explain, or even define, those terms.   (Opp. at 64.)   The Complaint does not allege that either role had anything to do with the alleged misrepresentations at issue here.   This confirms that Plaintiff has failed to allege UBS AG's "in-state activity that *gave rise to the episode-in-suit*."   *Waldman*, 835 F.3d at 331; *accord Powell* v. *Monarch Recovery Mgmt., Inc.*, 2016 WL 8711210, at *7 (E.D.N.Y. Jan. 22, 2016) (Brodie, J.) (granting dismissal because, "[a]side from [one] conclusory assertion, Plaintiff alleges no facts as to the nature of Defendants' purported business within New York").[19]   UBS AG should be dismissed from this action.

### CONCLUSION

Having spent four years investigating UBS before filing its Complaint, Plaintiff apparently recognizes that no amendment would cure its deficient pleading and has not requested leave to amend.   This "Court need not grant unsolicited leave to amend."   *Jeune* v. *Crew*, 2017 WL 4357382, at *18 (E.D.N.Y. Sept. 29, 2017) (Brodie, J.).   Accordingly, UBS's motion to dismiss should be granted, and the Complaint dismissed with prejudice.

---

[19]   The Court also should deny Plaintiff's request for additional discovery to save its agency argument against UBS AG.   (*See* Opp. at 63 n.51.)   Plaintiff has already conducted years of nearly unfettered discovery regarding the 40 RMBS.   If there were any documents supporting personal jurisdiction over UBS AG in this action, Plaintiff would have cited them.   This is "far from a situation in which plaintiffs are required to guess at bases for jurisdiction," because Plaintiff has already "had the benefit of . . . massive discovery."   *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 239 (S.D.N.Y. 2015) (denying jurisdictional discovery).

Respectfully submitted,

Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
Amanda F. Davidoff (*davidoffa@sullcrom.com*)
Justin J. DeCamp (*decampj@sullcrom.com*)
Jacob M. Croke (*crokej@sullcrom.com*)
Hilary M. Williams (*williamsh@sullcrom.com*)
Harry F. Murphy (*murphyh@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for UBS Securities LLC, UBS AG, Mortgage
Asset Securitization Transactions, Inc., and UBS Real
Estate Securities, Inc.*

June 21, 2019