UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,      : 18-cv-06369-MKB-PK
                  Plaintiff,   :
                               :
     - versus -                : U.S. Courthouse
                               : Brooklyn, New York
                               :
                               :
UBS SECURITIES LLC, et al.,    : July 1, 2019
                  Defendants   : 12:02 PM
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**

**For the Plaintiff:**          **Richard K. Hayes, AUSA**
                                **Austin Hall, AUSA**
                                **Armen Adzhemyan, Esq.**
                                DOJ-USAO
                                Northern District of Georgia
                                75 Ted Turner Drive SW
                                Atlanta, GA 30303

                                **Bonni Jessica Perlin, AUSA**
                                **Michael J. Castiglione, AUSA**
                                US Attorney's Office
                                Eastern District of NY
                                271 Cadman Plaza East
                                Brooklyn, NY 11201

**For the Defendants:**         **Justin James DeCamp, Esq.**
                                **Robert J. Giuffra, Jr., Esq.**
                                **Hillary Williams, Esq.**
                                Sullivan & Cromwell, LLP
                                125 Broad Street
                                New York, NY 10004

**Transcription Service:**      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1           THE CLERK:  This Honorable Magistrate Judge

2    Peggy Kuo presiding.

3           Civil Cause for a Motion Hearing, docket number

4    18-cv-6369, USA v. UBS Securities, LLC, et al.

5           Counsel, please state your name for the record,

6    starting with the plaintiffs.

7           MR. HAYES:  Good morning, your Honor.

8           Richard Hayes, Assistant United States Attorney

9    for the United States, and together with me today are

10   colleagues from the Eastern District, as well as the

11   Northern District of Georgia, Mr. Castiglione, Michael

12   Castiglione, is next to me, Ms. Bonni Perlin, Mr. Austin

13   Hall, and Armen Adzhemyan.

14          MR. GIUFFRA:  Good afternoon, your Honor.  I

15   think it's the afternoon, your Honor.

16          Robert Giuffra with Sullivan & Cromwell for the

17   UBS defendants, and with me is my partner, Justin DeCamp,

18   Hillary Williams, and Phil Begler (ph.), who is not

19   admitted but I want to just put him on the record anyway.

20          THE COURT:  All right.  Good afternoon,

21   everyone.

22          So we are having this conference to talk about

23   a dispute with regard to discovery in which the defendant

24   is asking the U.S. government to preserve certain

25   documents.

3

                              Proceedings

1           I will start with the document at 54 where

2    plaintiffs have asked for the reply to be stricken.  So I

3    am just going to explain to the parties what my

4    procedures are.

5           My rules clearly stated that for discovery

6    disputes, there should be a filing of no longer than

7    three pages, which the parties complied with, and that's

8    great.  And normally, I should let you know since this

9    litigation is likely to go on for a while, I will not

10   make a ruling on discovery without speaking to the

11   parties first.  So there's really no reason to file

12   anything in addition because you should be making your

13   best case in those three pages, and if there's any

14   ambiguity or you need to respond, you should be -- I will

15   give you the opportunity to do so orally.

16           I don't want to encourage a situation where the

17   parties are just papering the Court with a lot of

18   filings.  I will read them if you file them but it

19   doesn't do anybody any good to do that.  Okay?

20           So in this case, I will deny the motion to

21   strike because it's the first time this has happened, and

22   I trust that it won't happen again in terms of asking for

23   leave to file something that's attached without asking

24   for leave first, and I will give the plaintiff the

25   opportunity to respond today with whatever arguments you

4

Proceedings

1    want to make.

2            So let me see if I can understand what is

3    happening in this case.  The defendants are asking that

4    there be a certain group or four different groups of

5    relevant documents at the Department of Housing and Urban

6    Development and Treasury to be produced and preserved.

7    They're alleging that the plaintiff has conceded that

8    that's -- it's all one big, happy federal government, and

9    I am understanding from the plaintiff they have not

10   conceded that.  And so that's one of the arguments that

11   we're -- that I will consider today but let me try to

12   understand what's at issue ultimately in making that

13   choice.

14           So, Mr. Giuffra, let me find out from you what

15   difference does it make if this is a Rule 34 request or

16   whether you're making a -- whether you're serving a

17   subpoena to get the documents.

18           MR. GIUFFRA:  Well, your Honor, we think if

19   serve a subpoena, number one, in terms of just

20   enforceability, a party has to respond to a subpoena.

21   Whereas with respect to a nonparty, in the case of the

22   government, it would only be the head of an agency.

23           In addition, there are obligations that go to

24   spoliation.  If you're a party and you have documents and

25   you spoliate them versus a nonparty.

5

Proceedings

1          We can also serve certain types of discovery on

2     a party.  In this particular case, obviously we've gone

3     through the public record to try to find documents but

4     there may be a need to serve interrogatories, for

5     example, about audits that were conducted by HUD into the

6     same loan originators that UBS conducted due diligence

7     of.

8          There are also issues with respect to

9     admissibility in terms of admissions -- excuse me, not

10    admissibility, admissions under 801(d)(2).  Obviously,

11    you know, statements made by a party are treated as

12    admissions.  So is HUD a party is obviously an issue that

13    would be relevant.

14         And so when courts have looked at this issue,

15    and I can talk about it if you would like me to, I think

16    they've taken the position that in a civil case, you

17    know, the other side is calling them the United States of

18    America, not the Northern District of Georgia and the

19    Eastern District United States Attorney's Office.  It's

20    the United States of America.  And --

21         THE COURT:  That's just the naming convention.

22         MR. GIUFFRA:  Yes, but I think but not only is

23    it a naming convention, no but courts have recognized

24    that when you're dealing with nonindependent agencies

25    like the SEC, they're treated as part of the plaintiff in

6

Proceedings

1  a civil case.

2          The other side, when they -- in their

3  opposition papers, referenced a whole series of criminal

4  cases, and cases interpreting the criminal discovery

5  rules.  Those rules have no bearing in a civil case,

6  which is what this is.

7          And when you actually look at the civil cases

8  that the other side cites, you know, we obviously rely

9  upon the AT&T case which is we think the leading case.

10          THE COURT:  But what other cases are there,

11  other than AT&T from 1978?

12          MR. GIUFFRA:  Well, in this circuit, United

13  States v. Amex is a second -- is a case from the Eastern

14  District which cited AT&T favorably and applied the

15  reasoning of AT&T.

16          THE COURT:  But Amex was about the State

17  Attorney General's Office --

18          MR. GIUFFRA:  Correct.

19          THE COURT:  -- versus the State agency

20  controlled by the Governor.

21          MR. GIUFFRA:  But I think the rationale

22  applies.  And then we cited cases like Senkowski, which

23  is from the Southern District of New York, treating

24  departments of an executive branch is considered a single

25  party.

7

Proceedings

1          Then if you just look at the cases that the
2    government cites --
3          THE COURT:  Yeah, I know those are criminal
4    cases but I am looking for --
5          MR. GIUFFRA:  No, but they also cite civil
6    cases.  They cited two civil cases, one which is called
7    Deane, D-E-A-N-E, involving the Health and Human Services
8    Corporation from the Eastern District of Louisiana,
9    citing, in that case, permitted discovery of HHS.
10   Another case called Davis, permitting discovery against -
11   - involving the EPA.
12          And the two civil cases that the government
13   cites which is Texas v. Holder, the party was the
14   Attorney General, not the United States of America, and
15   then they cited an SEC case which is an independent
16   agency, and HUD and Treasury are clearly not independent
17   agencies.
18          So we think the reasoning and rationale of the
19   AT&T case is squarely on point, particularly here, given
20   the nature of what the government is seeking.  This is a
21   case where the government is seeking -- claims billions
22   of dollars in losses on transactions we engaged in.
23          THE COURT:  What I am looking for is any case
24   since AT&T that's on point for your side.  I know you've
25   cited the Amex case.  I've read it.  I've told you why I

8

Proceedings

1  think it's different.  Is there any other case that

2  supports your position?

3          MR. GIUFFRA:  I think I cited a case -- another

4  case would be Talavera v. Shah, that's a case dealing

5  with, you know, statements of USAID employees being

6  admissible as party admissions under Rule 801(d)(2)(D).

7  That's 638 F.3d 303 (2011).

8          THE COURT:  Right, but it doesn't have to do

9  with what you're asking for here, which is a preservation

10 order to an agency.

11         MR. GIUFFRA:  Well, I think it does in that --

12 but I think the AT&T case is directly on point.  It's a

13 similar type case --

14         THE COURT:  But I guess I hear you on that but

15 I am looking for some other court that has -- maybe

16 they're not published decisions but some other court that

17 has looked at AT&T since then and said yes, this

18 absolutely makes me issue a preservation order against an

19 agency other than the United States Attorney's Office or

20 whoever brought, well I guess in this case, let's call it

21 the Justice Department, okay?  So against an agency other

22 than the Justice Department in an enforcement action like

23 this that's civil.

24         So it may be that there aren't any but --

25         MR. GIUFFRA:  I think, your Honor, the Deane

9

Proceedings

1    case that I mentioned --

2             THE COURT:  All right.

3             MR. GIUFFRA:  -- Deane v. Dynasplint Systems,

4    Inc., (2015) W.L. 1638022, Eastern District of Louisiana.

5    That's a false claim, civil case, by the United States

6    against the healthcare provider.  The government sought

7    to produce documents that were in the possession of the

8    Center for Medicare and Medicaid Services, and from HHS.

9             And then the question was well what is the

10   scope of the custody and control of the government.  And

11   does it exceed the Department of Justice because the

12   Department of Justice was acting as the counsel for the

13   government in that case.

14            And the government viewed the term, you know,

15   "you" to include -- I mean, not the government, the

16   judge, granted the party's motion, and said that the

17   government included the Department of Health and Human

18   Services, as well as --

19            THE COURT:  Was that a case where the Justice

20   Department was acting as the lawyer for HHS and the

21   Medicaid/Medicare, or were they bringing --

22            MR. GIUFFRA:  It was like this case, because in

23   a false claims act suit, the Department of Justice brings

24   a civil claim, just like it is bringing you a civil claim

25   under FIRREA in this case.  So there's no difference --

Proceedings

1          THE COURT:  Okay.

2          MR. GIUFFRA:  -- between the procedural posture

3   between the two cases, and it's also important to keep in

4   mind that in case, and I think it is -- we're not seeking

5   documents from the entire U.S. government.  We're seeking

6   documents from HUD and Treasury, and both of those

7   agencies were part of the RMBS task force that was set up

8   by the government to look into the whole question of

9   whether there was, you know, misconduct with respect to

10   RMBS.  And in other settlements, the government in press

11   releases has identified HUD employees as being involved

12   in the investigations.

13          Now I again don't think that, you know, whether

14   HUD is part of the investigation or isn't part of the

15   investigation is the controlling fact.  I think the

16   controlling fact is that this is a civil case, it's not a

17   criminal case, and the idea that we should just put on

18   blinders, and say that, you know, it's only the documents

19   that the United States Attorney's Office's collect

20   because that's the position they've actually taken.

21          THE COURT:  Well, I think it's the Justice

22   Department, right?

23          MR. GIUFFRA:  No, they actually have --

24          THE COURT:  Okay.  Well, I will clarify from

25   them what they --

11

Proceedings

1      MR. GIUFFRA:  And I mean one of the things, and
2  this is not before the Court today but for the last four
3  or five months, we've been asking for documents that the
4  Department of Justice has collected related to RMBS, loan
5  originators that UBS dealt with, documents that related
6  to, you know -- in this case, one of the big issues is
7  that a number of the supposed defrauded investors, bought
8  UBS, RMBS, were themselves sued by the Department of
9  Justice, and at least -- and would have been
10  investigated, as well.
11      So the government is taking the position that
12  well, to the extent that we didn't rely on those
13  documents to file our complaint, we're not going to give
14  you access to them.
15      THE COURT:  We meaning the government?
16      MR. GIUFFRA:  Yes.
17      THE COURT:  Okay.  So they're taking the
18  position in a civil case that their discovery obligations
19  are only -- are limited to the Eastern District of New
20  York, and the Northern District of Georgia, and they're
21  taking the position that well, if they accessed other
22  documents collected by the Justice Department, and they
23  looked at them to do their complaint, they'll give us
24  access to them, but that's not the way discovery works in
25  a civil case.

12

Proceedings

1        Clearly, they're looking for inculpatory

2   documents.  We're looking for exculpatory documents.  And

3   to the extent documents were collected by other parts of

4   the Justice Department relating to UBS, these RMBS

5   transactions, parties that we dealt with, originators

6   that we dealt with, those documents need to be looked at.

7            THE COURT:  Um-hum.

8            MR. GIUFFRA:  So that's not the issue before

9   the Court today.  The issue before the Court today is

10  really the question of whether, you know, documents

11  related to HUD and Treasury should be looked at.  And one

12  of the things that happened in this matter was we had

13  multiple meet and confers.  We thought they had conceded

14  that HUD and Treasury were part of the United States.  We

15  wrote, you know, three letters.

16           THE COURT:  Well, I mean part of the plaintiff.

17           MR. GIUFFRA:  Part of the plaintiff, and they

18  never responded to the letters, but the letters certainly

19  took that position.  They now, you know, in their

20  opposition letter to our motion to compel, took a

21  different position, fine, that that can happen.

22           THE COURT:  Well, I would suggest that the

23  parties communicate better in that instance.  I don't

24  think that especially at this early stage, a failure to

25  respond to a particular point is an admission.  I don't

13

Proceedings

1    think that's a good way to litigate a case.

2          MR. GIUFFRA:  And we wrote three letters.  And

3    they never wrote back, and said that our understanding

4    was wrong.  But I think the bigger point is this dispute

5    has been going on for at least three months.  And when

6    the plaintiff asked us, well, what's the basis for your

7    reasoning that you think that HUD and Treasury has

8    documents, we -- you know, we provided them, and I am

9    happy to give the Court, we have a list -- we have a

10   whole packet of documents that we've gotten from just

11   public materials, that we think are directly relevant to

12   the issues in this litigation.

13          I mean one of the most important issues is that

14   the Federal Housing Administration provide an assurance

15   to Countrywide, and a number of other loan originators,

16   and that insurance was only given pursuant to -- you

17   know, they had to do certain analysis to determine

18   whether originators were proper originators or not.

19          One of the allegations in the complaint is

20   that, you know, UBS falsely told investors that it only

21   dealt with reputable originators.  Well, the originators

22   that UBS was dealing with were the same originators that

23   the plaintiff through HUD was dealing with.  And so I

24   think at a trial, the fact that HUD was insuring, and

25   auditing the same originators that UBS was dealing with

14

Proceedings

1   is highly relevant.

2          In addition, I think this is, you know, I think

3   very important evidence.  HUD was doing audits for

4   purposes of this FHA insurance of, for example,

5   Countrywide.  Countrywide provided the loans for 14 of

6   the 45 -- 40 RMBS transactions that are at issue in this

7   case.  HUD was doing, you know, its audits.  It was

8   looking at loans at bank branches and the like, and they

9   were seeing some defects and problems, missing documents,

10  and they were still concluding that for purposes of HUD,

11  these originators were complying with HUD guidelines.

12          Well -- and in fact, in doing the HUD audits,

13  HUD was looking at loans that they thought were the less

14  good loans. Well, that's exactly what UBS did, yet the

15  plaintiff is accusing UBS of fraud for doing due

16  diligence based on sampling, looking at adversely

17  selected loans, determining that even though there were

18  some poorly -- you know, some loans that were missing

19  documents and other issues, that that wasn't evidence

20  that UBS made a -- knowingly made a false statement to

21  investors when it said that these loans were done in

22  accordance with underwriter guidelines.

23          So, you know, that's just one example. There's

24  -- I could go on, and on, and on to give you examples of

25  why we think the publicly available documents that we

15

Proceedings

1   found that HUD and Treasury have, are directly relevant

2   to the allegations of this complaint.

3          THE COURT:  Okay.  So if you have those

4   publicly available documents, what exactly are you

5   looking for that is not public.

6          MR. GIUFFRA:  Well, obviously that's -- we

7   think that's just the tip of the iceberg, and obviously

8   there must be other documents within HUD that go beyond

9   the documents we found within HUD that relate to these

10  mortgage originators and HUD audits of those mortgage

11  originators in addition.

12         One of the arguments that the plaintiff makes

13  in this case is that somehow UBS is literally responsible

14  for the financial crisis and the government has done

15  analysis of causes of the financial crisis.

16         THE COURT:  Right, and I'm looking at your

17  group category four, treasury analysis of the causes of

18  the financial crisis, so you're -- I guess I am not sure

19  what exactly you're seeking here.

20         MR. GIUFFRA:  What we're saying, your Honor, is

21  we would like to have the opportunity to meet and confer

22  with the government, and discuss the scope of a

23  reasonable, and proportionate document collection, and --

24  will saving and then maybe production, and then

25  production exercise.

16

Proceedings

1          What the government is saying or the plaintiff

2    is saying in this case is they have no obligation to go

3    beyond the Eastern District of New York and the Northern

4    District of Georgia in terms of, you know, producing

5    documents to us.

6          THE COURT:  Okay.  So --

7          MR. GIUFFRA:  And the --

8          THE COURT:  -- all your -- that's why when you

9    just said that, I heard something different.  You're just

10   asking for the opportunity to meet and confer and come up

11   with some document requests.  You're not actually making

12   these requests now.

13         MR. GIUFFRA:  Well, first we want to deal with

14   preservation.  Right now, they're taking the position

15   they don't even have to preserve the documents.

16         THE COURT:  Well, but preservation already

17   requires identification of at least the scope of the

18   preservation.

19         MR. GIUFFRA:  That is --

20         THE COURT:  So what is the scope of the

21   preservation you're seeking?

22         MR. GIUFFRA:  Well, your Honor, we had

23   identified in our May 7th letter, which I think was

24   appended to the materials we gave the Court.  That would

25   be Exhibit 5 to our original motion to compel.

17

Proceedings

1        And in that document, if --

2        THE COURT:  I'm trying to find it now.  I'm

3   looking at your motion to compel, which is document 45.

4        MR. GIUFFRA:  Yes.

5        THE COURT:  And where is the May 7th letter?

6        MR. GIUFFRA:  45-5, it is.

7        THE COURT:  5.  Okay.  So this is the scope of

8   the preservation --

9        MR. GIUFFRA:  And so what we have done in an

10   attempt to try to be -- you know, to try to be as

11   specific and as particularized as possible, I think it's

12   important to remember, the government was able in this

13   case to go out and send subpoenas to whomever they wanted

14   for four years before they brought this case.  This is

15   our first opportunity to gather evidence.

16        And so what we've done is we've particularized

17   from pages 3, all the way to 10, the types of documents

18   that we're interested in.  We even identify in footnote 2

19   in this letter, particular human beings; you know,

20   regional inspector general for audit-Boston, regional

21   inspector general for audit-New York, Philadelphia, and

22   on and on, particular human beings that we have been able

23   to identify who we think are likely to have relevant

24   documents for purposes of this case.

25        THE COURT:  Okay.  So on page 3, you say these

18

Proceedings

1  are only examples.  So is this the scope of what you're

2  seeking to preserve?

3           MR. GIUFFRA:  Obviously, we don't know the full

4  extent of what the government has.  We're doing this sort

5  of in a backwards way.  Normally, you serve a discovery

6  response, and you ask for particular categories of

7  documents, and then there's a process.

8           What we're doing is we've gone above and beyond

9  that.  We've actually, you know, gone through publicly

10  available information, found documents that we think are

11  relevant, and we're saying these are the types of

12  documents that we think are responsive to our broader

13  request, and let's -- and can you number one, preserve

14  them, and number two, produce them.

15          THE COURT:  Okay.  But again, I'm just trying

16  to understand what exactly you're asking for.  If these

17  are only examples, then you're asking them to preserve a

18  lot more than you've enumerated.

19          MR. GIUFFRA:  No, these are what we know of.

20          THE COURT:  Okay.  But --

21          MR. GIUFFRA:  And so this would be a first step

22  in terms of what we think that should be preserved in

23  this case.

24          THE COURT:  Okay.  So you're saying that --

25  when you say only examples, you mean that you'll give

Proceedings

1   further examples at a later date.

2           MR. GIUFFRA:  Or if they produce documents to

3   us, and then we see oh, that they're -- that's a place

4   that you can go.

5           THE COURT:  Right.  But you're not asking them

6   to preserve something that you don't know.

7           MR. GIUFFRA:  No, not at all.

8           THE COURT:  All right.

9           MR. GIUFFRA:  And I think that's important.

10  We've tried to be specific.  So for example, your Honor,

11  on this whole question of, if you look on page 4, we talk

12  about HUD's FHA insurance program.  There's no dispute

13  that HUD insured lenders against losses on mortgages.

14  The lenders that were insured included Countrywide.

15  Countrywide was a large loan originator.  It was an

16  originator that government agencies dealt with, and in

17  order to get that insurance, they had to participate in a

18  certification process that was governed by HUD, and HUD

19  had all these inspectors who were out looking at

20  Countrywide loans.

21          And in our view, at the same time UBS was doing

22  due diligence of Countrywide loans, HUD inspectors were

23  looking at Countrywide loans, and continuing to allow

24  those loans to be subject to --

25          THE COURT:  So if HUD says they're okay, then

20

Proceedings

1  they're okay.

2          MR. GIUFFRA:  Well, I think that's certainly

3  evidence that would be something that in a trial, you

4  would want to present to a jury.  And obviously, you

5  know, this whole question about is an admission, I think

6  it obviously matters that if the plaintiff includes HUD,

7  we would say well HUD did audits of Countrywide, we did

8  audits of Countrywide.  HUD did not see any reason not to

9  continue FHA insurance for Countrywide.

10         THE COURT:  So you're saying those things match

11 up or that this is just additional evidence to bolster

12 your client's position that things are okay?

13         MR. GIUFFRA:  I --

14         THE COURT:  And I am just trying to figure out

15 because the audits could be done in a different way.

16 They could be looking for different things, insurance

17 coverage is maybe --

18         MR. GIUFFRA:  Your Honor?

19         THE COURT:  -- a different standard from

20 liability in this case.

21         MR. GIUFFRA:  Your Honor?

22         THE COURT:  I'm just trying to figure out how

23 you're saying it would match up.

24         MR. GIUFFRA:  Okay.  It certainly goes to

25 scienter, which is, you know --

21

Proceedings

 1          THE COURT:  Your client's scienter?

 2          MR. GIUFFRA:  Yes, I think so, because if they

 3  don't --

 4          THE COURT:  Does your client know about the

 5  audits that FHA did?

 6          MR. GIUFFRA:  But if you had government lawyers

 7  or government investigators or audit-type people, who are

 8  doing due diligence for purposes of FHA insurance in

 9  exactly the same way, or in the similar way to the way

10  UBS was doing due diligence, and the plaintiff is

11  accusing UBS of engaging in fraud, and we're coming to

12  the same conclusions at the same moment in time, I think

13  that's evidence that a jury would want to hear.

14          THE COURT:  But that doesn't go to scienter.

15  Scienter would only be if your client knew about it.  If

16  your client knew about these government audits and relied

17  on it, then maybe there's an argument to be made, in

18  which case your client already knows about it.

19          MR. GIUFFRA:  No, it would --

20          THE COURT:  But if the client didn't know about

21  it, how does it touch on their scienter?

22          MR. GIUFFRA:  It would because if the

23  government was concluding -- they were looking at these

24  while --

25          THE COURT:  They happen to come to the same

22

Proceedings

1  conclusion is not scienter.

2          THE COURT:  But the evidence is obviously not

3  direct but the point is that if the government is doing

4  an audit, looking at specific loans, and seeing that some

5  of those loans, for example, are missing documents or

6  have certain deficiencies but concluding that

7  nevertheless, Countrywide's loans satisfy HUD guidelines,

8  we think that's --

9          THE COURT:  For insurance.

10          MR. GIUFFRA:  For insurance.  We think that's

11  relevance in terms of whether when UBS was doing due

12  diligence of HUD, UBS looking at and finding errors in

13  the loans, understood that, you know, maybe that there

14  wasn't an issue, and the representation that's at issue

15  in the case, which is whether those loans comply with

16  Countrywide's guidelines for originating those loans, was

17  knowingly false.

18          In addition, if --

19          THE COURT:  But again, I'm still not sure how

20  it touches on scienter.  If your client didn't know about

21  what FHA was doing, how could there be any issue of

22  scienter.  They happened to be doing things separately.

23  The way you described it, they're doing things

24  separately.  They just happen to come to the same

25  conclusion, so --

Proceedings

1    MR. GIUFFRA:  Because the government's theory,

2 and I would be happy to hand up our motion to dismiss,

3 they don't name particularly human beings at UBS who they

4 say had fraudulent intent.

5    What they say is --

6    THE COURT:  So only human beings can have

7 fraudulent intent, not a company?

8    MR. GIUFFRA:  Well, in fact, the law is you do

9 need to have a human being that has fraudulent intent,

10 and it's not just something you just sort of amorphously

11 point to a company at large.

12    But what they do is well, they say the due

13 diligence results that UBS obtained showing that there

14 were defects in these loans caused -- not negligence,

15 that you made a mistake, but put UBS on in the view that

16 it knew if it went forward, included some of these others

17 -- included other loans, not even the loans that were

18 looked at, in these RMBS transactions, that that

19 confirmed that UBS or established that UBS had fraudulent

20 intent, which is a pretty high standard.

21    So they're looking at the actual due diligence

22 process and what you did with the results from the due

23 diligence process, in making the argument that they --

24 that how UBS handled the due diligence process, and dealt

25 with loans that had defects, that were not included --

24

Proceedings

1   the defective loans were not included in the overall --

2   were not included in these transactions but they're

3   inferring from that, that UBS should have known that or

4   knew -- because should have known is a negligence

5   standard, knew that the loans that are actually included

6   in the loan pools were defective, and therefore that the

7   representation was made in a knowingly false way.

8          So our point is the fact that HUD was doing

9   audits and in coming to the conclusion that whatever

10  errors it was finding, using a similar methodology and

11  doing sampling, and looking at adverse loans, and

12  concluding that these originators still complied with HUD

13  guidelines is relevant.

14         Because if the plaintiff in a case is doing

15  exactly what the defendant is allegedly doing, and the

16  way the defendant did it was fraudulent, that certainly

17  is something you would want the fact-finder to know.  And

18  the government is saying no -- and again, you have -- the

19  thing about this case is this is the first one of these

20  cases that's actually ever been litigated, which is why

21  you're sort of, you know, dealing with it on a clean

22  slate but, you know, that's --

23         THE COURT:  But the other cases have not gone

24  through discovery?

25         MR. GIUFFRA:  No.

Proceedings

1        THE COURT:  No.  All right.  Okay.

2        MR. GIUFFRA:  Not the similar -- not the FIRREA

3   cases, anyway, but then so your Honor, if you look at

4   what we're talking about -- another argument the

5   government makes --

6        THE COURT:  Okay.

7        MR. GIUFFRA:  -- is that --

8        THE COURT:  So can I just pause there because I

9   would like to give the government an opportunity to

10  speak, and then I will get back to you, all right?

11       MR. GIUFFRA:  Yeah.

12       THE COURT:  So Mr. Hayes, why don't you tell me

13  first, is it your client's position that the discovery is

14  limited to the Northern District of Georgia and the

15  Eastern District of New York, United States Attorney's

16  Offices?

17       MR. HAYES:  Good afternoon, your Honor.  I

18  think I started off with morning, not an auspicious

19  start, and I didn't mean to suggest that your Honor

20  hadn't had a full day up to this point.

21        The short answer to your question is yes, your

22  Honor, and if I may, there are -- Mr. Giuffra has made a

23  number of points, and I would like to address --

24  elaborate on that point, and address some other points.

25        First, Mr. Giuffra cited the Deane case.  I

26

Proceedings

1  don't know whether that's in UBS's unauthorized reply, or

2  whether it's in UBS's initial letter, but it makes no --

3          THE COURT:  I don't see it in the initial

4  letter.

5          MR. HAYES:  It makes no difference, your Honor.

6  It actually is a FOIL and served to set in relief the

7  irrelevancy of the documents that UBS is seeking.  In

8  that case, a United States government program was a

9  victim, as is always the case in a false claims act case.

10         This case is nothing like that case.  The

11 United States is not seeking damages in this case.  And

12 to get specific, it is not seeking any relief on the part

13 of HUD, any relief on the part of the Treasury.

14         In fact, your Honor, there are approximately --

15 UBS securitized approximately 160,000 loans in the forty

16 deals at issue in this case, 100 -- nearly 160,000 loans,

17 not one of which was insured by HUD.  Not a single one of

18 those loans is a government program loan.

19         THE COURT:  Okay.  So it sounds like people are

20 saying different things, and I don't want to get too into

21 the weeds about this.  Mr. Giuffra said that the

22 insurance was of Countrywide, not of the specific loans.

23 And you're saying --

24         MR. HAYES:  That is --

25         THE COURT:  -- that loans had to be insured --

27

Proceedings

1           MR. HAYES:  Yeah.

2           THE COURT:  -- separately.

3           MR. HAYES:  There's no insurance at issue in

4    this case.  There's no HUD insurance at issue in this

5    case.  Not one of the nearly 160,000 loans securitized by

6    UBS in the forty deals at issue in this case is an FHA

7    insured mortgage.

8           There's an entire huge government program

9    called the "Direct Endorsement Program."  It's a HUD

10   program.  It has myriad regulations and handbooks

11   associated with it.  It is, in fact, is fascinating that

12   UBS cites a single audit of ten loans from one branch of

13   Countrywide in 2007.  When one thinks about the millions

14   at Countrywide -- and this is -- the Court can take

15   judicial notice of this.  The millions of loans that

16   Countrywide originated, they're pointing to a document

17   that concerns ten loans, in connection with a program

18   that is completely unrelated to anything in this case at

19   all.

20          And to make it even clearer, the government has

21   recovered approximately $2 billion in false claims act

22   recoveries from Countrywide and Bank of America in

23   connection with fraud committed by those entities on the

24   government.

25          None of that should be at issue in this case

Proceedings

1  but if it were, the government would say that Countrywide

2  was a bad originator, and the difference here, your

3  Honor, is not so much what -- whether Countrywide was a

4  bad originator of loans, but what UBS said to its

5  investors about Countrywide.  Those are two very

6  different things, your Honor.

7         THE COURT:  Okay.  So can we get back to the

8  issue in this case 00 in this proceeding, which --

9         MR. HAYES:  And I apologize, your Honor, but

10 that goes to the relevancy which is a fundamental

11 question regardless of what the scope of the government

12 is, and whether they can get --

13        THE COURT:  Yes.

14        MR. HAYES:  Right.

15        THE COURT:  Okay.

16        MR. HAYES:  But the Deane case is about --

17        THE COURT:  Yes, I understand that.

18        MR. HAYES:  Yes.

19        THE COURT:  So let me pose the same question

20 that I posed to Mr. Giuffra a moment ago.  Are there

21 cases that you can cite -- civil cases, not criminal

22 cases, post AT&T, that go the other way?

23        MR. HAYES:  We cited whatever cases we could

24 find, your Honor.

25        THE COURT:  Okay.  So for some reason, there's

Proceedings

1    a paucity of written decisions in this area.

2              MR. HAYES:  Yes, your Honor, there's a paucity

3    because courts understand that when the United States

4    brings a case, when it's not bringing the case as a

5    victim but on behalf of others, which can be done civilly

6    as well as criminally, it's really not a question.

7              THE COURT:  Well, are you -- so maybe I should

8    ask you since you've brought up that distinction, are the

9    United States Attorney's Offices bringing this on behalf

10   of agencies, the --

11             MR. HAYES:  No, your Honor.

12             THE COURT:  They're bringing it on their own,

13   as a --

14             MR. HAYES:  Yes, your Honor.

15             THE COURT:  -- freestanding enforcement action.

16             MR. HAYES:  And if we can.  And I recognize,

17   your Honor, I apologize for this that some of this will

18   be representations to the Court which depending upon the

19   Court's need, we can paper those things -- these

20   representations up, but this is not a case brought on

21   behalf of HUD.  There are no HUD loans.  This is not a

22   case brought on behalf of Treasury.

23             Mr. Giuffra referenced -- suggested that there

24   was a press release or maybe more than one press release

25   in which the government, presumably I guess he was

30

Proceedings

1  referring to this case, perhaps he wasn't but in any

2  event --

3         THE COURT:  Well, there is a press release

4  attached.

5         MR. HAYES:  -- there's no press release

6  referring to HUD concerning this case.

7         THE COURT:  Okay.

8         MR. HAYES:  There's no press release concerning

9  this case concerning HUD.

10        THE COURT:  But I think Treasury was part of

11  this.

12        MR. HAYES:  It was not, your Honor.

13        THE COURT:  No?

14        MR. HAYES:  There's a reference to the

15  Inspector General for the FHFA.  The FHFA is a quasi-

16  independent agency that brought its own lawsuit against

17  UBS, which UBS settled and FHFA brought that suit, and it

18  wasn't the FHFA OIG that brought that suit, FHFA brought

19  that suit through private counsel.

20        With respect to -- look, there's been a

21  reference to some suggestion -- there's been some

22  suggestion, and if I can take 30 seconds to address this

23  that the government has waived or misled UBS in

24  communications.

25        The first thing, and Mr. Giuffra wasn't on this

31

Proceedings

1   conference call, Mr. DeCamp was, the first thing we said

2   with respect to the scope of executive branch discovery,

3   which is incredibly broad -- if one looks at the

4   definition of executive branch or government in this

5   case, it's everything.

6           And the first thing we said, and perhaps I was

7   a little bit impolite, I said make a motion.  That's the

8   very first thing we said.

9           Now that said, we reconsidered because we're

10  supposed to try to work these things out, and that will

11  continue to be the government's approach to things.

12          But that said, we went to HUD, and we went to

13  Treasury.  And by the way, UBS went directly to HUD and

14  Treasury.  There's an April 22nd letter that is addressed

15  to my office but is also specifically copied to Treasury

16  and to HUD.

17          And UBS served a subpoena on HUD.  So the

18  record here is a little bit more complicated with respect

19  to how UBS viewed the government, at least procedurally.

20  We think this kind of procedure doesn't matter a whole

21  lot.  The question is what's the law?  And the government

22  certainly hasn't waived.

23          The fact that we've tried to revisit our

24  initial flat-out denial that they're entitled to broad

25  government discovery here doesn't mean that we have

32

Proceedings

1   ultimately waived our position, that there isn't just one

2   government that the Department of Agriculture or

3   whomever, because no matter what has been said here

4   today, the request, and the document request, and the

5   letters that have been submitted to the government make

6   it clear that the proposed discovery, and the proposed

7   litigation hold, is not limited to just HUD and Treasury.

8          The government is supposed to figure out, the

9   Northern District of Georgia, and the Eastern District of

10  New York is supposed to figure out, we're supposed to

11  divine what it is that UBS wants from the government.

12  And we did speak to HUD and Treasury.  We did do that as

13  we would speak to any agency that had received

14  hypothetically a subpoena, in this case, a direct letter

15  overture.

16         And we asked well, can this be done?  Can you

17  figure out from what UBS has provided to us, and we've

18  provided all of UBS's letters to these agencies -- to

19  these two departments, can you figure out what is it

20  they're looking for?  And the answer is no, we can't

21  figure out what we're looking for.

22         And by the way, we had nothing to do with the

23  forty securities at issue or any of the loan, the nearly

24  160,000 loans at issue.  Your Honor has already had

25  expressed the Court's views concerning the relevance to

33

Proceedings

1   this discovery, this one audit, or indeed any audit that

2   could have been performed by HUD or frankly Treasury or

3   any other government agency.

4          This case is about the representations made to

5   investors.  If the government hypothetically knows that

6   there's a bad actor out there, which it eventually came

7   to learn, and settled with Countrywide in 2012, and 2014,

8   but if the government has come to learn that there's a

9   bad actor out there, that doesn't mean that UBS isn't a

10  bad actor too.

11         And again, the HUD program at issue, any

12  Treasury program has nothing to do with this case, and

13  one can only imagine what a burden it would be for the

14  district court if we were to have evidence concerning the

15  HUD direct endorsement program whereby first-time

16  homeowners, and those who have been foreclosed

17  traditionally through discrimination, for example, from

18  entering the housing market, have received insured

19  mortgage loans, how that would have anything to do with

20  this case, and do anything but obfuscate what's at issue

21  in this case.

22         Frankly, the government will make whatever

23  motion in limine at trial it needs to make.  But in the

24  meantime, the discovery that is being proposed here, well

25  your Honor is aware that UBS has suggested that there

Proceedings

1   could be a 100 or 200 -- I forget the exact number of

2   depositions, but this is the reason why, because they're

3   proposing to take discovery from HUD, proposing to take

4   discovery from Treasury, proposing to take discovery from

5   whatever agency touched housing policy, touched mortgage

6   policy, touched any of these originators, when none of

7   that has anything to do with the representations that UBS

8   made to its investors.

9           If HUD knew, Treasury knew, Agriculture knew,

10  NASA knew, that Countrywide was a bad originator, well

11  then the question is not so much whether the government

12  knew, but what did you UBS knew, and what did UBS tell

13  investors.  And that's what this case is about, with all

14  due respect.

15          There's been some discussion here about this

16  application being limited to a hold.  We have not

17  understood that.  We've understood this is a motion to

18  compel documents.

19          And the -- and there's also, your Honor, if I

20  can just shift gears for a second because frankly we're

21  disappointed that UBS is bringing up a matter that has

22  not been subject to final meet and confer, but that's not

23  the first time that has happened.  The last time it

24  happened concerns loans that are at issue in this case,

25  that are in UBS' possession, and the government is now

35

Proceedings

1   going to the sources of those loans, the originators of

2   those loans, to get those loans, even though UBS has

3   that.

4           That was brought up to your Honor in the last

5   conference without a meet and confer.  Today, without a

6   final meet and confer, UBS has brought up what can

7   certainly be correctly characterized as a planet-sized

8   issue.  And that is, the 106 terabytes of documents

9   obtained by many United States Attorney's Offices in

10  investing -- in investigating UBS' competitors.  106

11  terabytes is approximately two-thirds of the entire

12  volume of all material in the Library of Congress.

13          A quick Google search shows that that is 50,000

14  trees worth of documents.  All right?  We investigated

15  and settled the case for billions of dollars against

16  Citibank.  We investigated and settled a case against

17  Deutsche Bank for billions of dollars.  We investigated

18  case against Credit Suisse and settled it for billions of

19  dollars.  We can go on.

20          Every single -- any bank issuing RMBS has been

21  investigated by -- of any significance, has been

22  investigated by the United States.  And they've all

23  settled by the way but what is the relevance of those

24  documents to these case -- this case.

25          Now that is not before your Honor.  The only

36

Proceedings

1   reason why the government has brought that up is because

2   Mr. Giuffra chose to bring that up today.  Now we can

3   perhaps have that meet and confer before your Honor or we

4   can do what we're supposed to do, which is to finish that

5   meet and confer between the parties, and then bring any

6   dispute to the Court.

7          There are a few other issues, your Honor.

8          THE COURT:  Well, I want to stay focused on

9   what's before me today.  So there are a couple of ways I

10  can go about this.  My -- I guess the first thing is an

11  observation which is one of the things I said earlier on,

12  which is I am disappointed that the communication between

13  the parties is not better.  That the defendant would take

14  some silence to be a concession or a waiver, does not

15  seem, as I said earlier, the way to litigate a case.

16         The fact that Mr. Hayes, you feel the meet and

17  confers did not take place or were not complete, is also

18  disappointing to hear because I think the parties should

19  be trying to work these things out.

20         I don't think the parties, or at least one

21  side, and you won't know which one, will be disappointed

22  if you make me make the decisions for you.  You know your

23  case better -- your respective cases better than I, and

24  so whatever decision I make, even if I think I am right

25  based on what I know, and what I am hearing, and seeing,

37

Proceedings

1    is going to disappoint one or the other of you.

2            So you really don't want me to have to make

3    those decisions.  So to the extent you can work things

4    out, that is a better course for you going forward.

5            MR. GIUFFRA:  We agree 100 percent, your Honor,

6    and we've been trying to do that.

7            THE COURT:  Okay.  So well, for whatever

8    reason, you both don't seem to be meeting.  So maybe I

9    should just adjourn this conference and let you stay in

10   this courtroom, and work things out, and talk some more,

11   and I'll come back in an hour, and you can tell me what

12   you've been able to thrash out.  Is that how I should

13   proceed?  I don't understand why there's a disagreement

14   about the degree of communication that's happening

15   between the parties.

16           MR. GIUFFRA:  Your Honor, I think the main

17   issue we have today is whether the government should have

18   to preserve certain documents that HUD and Treasury have.

19   That's the issue that we are here about.  And --

20           THE COURT:  So as far as the meet and confers,

21   what -- so Mr. Hayes, what is it that you have been able

22   to thrash out before today that is necessary for today's

23   hearing.

24           MR. HAYES:  Actually, your Honor, and I

25   apologized if I suggested that the issue of executive

                        Proceedings

1   branch discovery has not been conferred about because we

2   think it has.

3            THE COURT:  Okay.

4            MR. HAYES:  The --

5            THE COURT:  So for this issue, you've already

6   met and conferred.

7            MR. HAYES:  We believe so.

8            THE COURT:  So then let's proceed with today's

9   hearing, and then after this, I would urge the parties to

10  stay and talk about any other issues you may have.

11           MR. HAYES:  And if I -- just thirty seconds,

12  your Honor, the only thing that the government would ask

13  is that -- and your Honor indicated and perhaps we

14  misheard, that your Honor had looked at, and read, I

15  think it's the June 7th unauthorized reply.

16           And if arguments made in writing, and the cases

17  cited there would be outcome determinative of this issue

18  today, the government would ask if it could in writing,

19  brief that.

20           THE COURT:  Okay.  So this is what I am going

21  to do today.

22           MR. GIUFFRA:  Your Honor, can I respond to the

23  arguments he made because he misstated a number of

24  things.

25           THE COURT:  Are they important to know --

Proceedings

1      MR. GIUFFRA:  I think so.

2      THE COURT:  -- for today's proceeding?

3      MR. GIUFFRA:  I think so.

4      THE COURT:  All right.

5      MR. GIUFFRA:  First, you know, again, we would

6  agree to limit the hold, just so we're clear about it, to

7  the HUD -- to HUD and Treasury, and the documents we

8  identified in the May 7th letter, which are highly, you

9  know, particularized and identified.

10      Number two, he's suggested that the money that

11  they're trying to seek is going to some nebulous party.

12  It's going to the United States Treasury as a penalty.

13  It's not going to investors in these RMBS, which were

14  highly sophisticated entities.  He mentioned the FHFA

15  case. That was not a fraud case.  That was a strict

16  liability case.

17      He mentioned service of a subpoena on HUD and

18  Treasury.  That was done inadvertently, and we called

19  them up as we were doing the 300 subpoenas that we sent

20  out, it was to preserve documents.  It was inadvertently

21  included in that.

22      But I think the bigger point, your Honor, and

23  if you would like, I could give the Court, this goes

24  through the documents and actually goes through the

25  relevant allegations that they make and shows why the

40

Proceedings

1    documents are relevant.

2            THE COURT:  The documents of what?

3            MR. GIUFFRA:  The documents that we would like

4    to have preserved that are at HUD, and Treasury.

5            THE COURT:  Okay.  So I --

6            MR. GIUFFRA:  And so the --

7            THE COURT:  What is that?

8            MR. HAYES:  Your Honor, we don't know what this

9    is.

10           THE COURT:  Yeah, I don't either.

11           MR. GIUFFRA:  I'm going to give both of you it.

12   It's --

13           THE COURT:  Well, tell me what it is for the

14   record.

15           MR. GIUFFRA:  It's examples of HUD and Treasury

16   documents that we --

17           THE COURT:  On the public record.

18           MR. GIUFFRA:  -- on the public record, and it

19   excerpts on the center of the document, and what the

20   document is.  And on the right-hand side, it quotes the

21   allegations of the complaint that we think it's relevant

22   to.

23           THE COURT:  Okay.  So I will just consider

24   this --

25           MR. HAYES:  Your Honor, we have never seen

41

Proceedings

1   this.

2            THE COURT:  Yeah, I know.

3            MR. DECAMP:  Your Honor, if I may?

4            THE COURT:  And I am not going to consider this

5   document.  I am just receiving it.

6            MR. DECAMP:  If I may just explain, your Honor,

7   what that is.  The letters that we included --

8            THE COURT:  So Mr. Giuffra didn't explain it

9   adequately?

10           MR. DECAMP:  I mean the letters --

11           THE COURT:  It is what it is.

12           MR. DECAMP:  The letters that we attached to

13  the Court, we didn't want to burden the Court, they were

14  exhibits to the letters that we had given to Mr. Hayes.

15  So Mr. Hayes has seen these documents.  He can't profess

16  not to have seen them before.

17           THE COURT:  I don't think he's professing not

18  to have seen the documents.  He didn't know what the

19  documents were he was being handed.

20           MR. DECAMP:  What we have done is we've -- this

21  is a compilation of exhibits to the meet and confer

22  letters.  We didn't attach all of the exhibits, the

23  materials that we gave to the Court.  So therefore it

24  needs to be -- this is a way for the Court to basically

25  look at everything.

42

Proceedings

1          So for example, if you look on Countrywide,

2    okay, which is --

3          THE COURT:  So this document does not have a

4    cover page.  It just has "Examples of HUD and Treasury

5    Documents", that is the title.

6          MR. DECAMP:  Correct.

7          THE COURT:  K.

8          MR. DECAMP:  And --

9          THE COURT:  So I am just going to have it

10   marked as an exhibit for today's purposes, Defendants'

11   Exhibit 1.

12   (Defendants' Exhibit marked for identification.)

13          MR. HAYES:  And your Honor, we don't have

14   these --

15          THE COURT:  I know that.  You have --

16          MR. HAYES:  -- this work product description,

17   your Honor.

18          MR. GIUFFRA:  That's true, they don't.  They

19   don't have that.

20          THE COURT:  You have a copy of it now.  I am

21   not going to make any decisions based on it today because

22   I have not seen it either.

23          MR. HAYES:  Thank you, your Honor.

24          THE COURT:  So Mr. Giuffra, what did you want

25   to say about this?

43

                         Proceedings

1           MR. GIUFFRA:  The point I am making, if your

2    Honor would just cite one example, which is the

3    Countrywide example, which I think Is an important one.

4           THE COURT:  What page are we talking about?

5           MR. GIUFFRA:  This is on page 2.

6           THE COURT:  Tab 2 or Page 2?

7           MR. GIUFFRA:  Page 2.

8           THE COURT:  All right.

9           MR. GIUFFRA:  It's just a summary.

10          THE COURT:  There are items 4, 5, 6, and 7.

11          MR. GIUFFRA:  Yeah, so item 5.

12          THE COURT:  Okay.

13          MR. GIUFFRA:  The allegation in the complaint

14   at paragraph 201 to 203, and obviously a defendant is

15   entitled to seek discovery in order to meet the

16   allegations of a complaint.

17          The allegations of the complaint are that we

18   "contradicted its representation -- UBS contradicted its

19   representations" when it "purchased and underwrote -- or

20   underwrote thousands of loans from" originators such as

21   Countrywide, and "represented" that UBS "only dealt with

22   reputable established originators."

23          Now there's no question if you look further in

24   the complaint that for thirteen of the forty are UBS, UBS

25   dealt with Countrywide.  Well, the reason why we need the

44

Proceedings

1  additional documents reflecting HUD's interactions with

2  Countrywide is because HUD approved Countrywide for FHFA

3  insurance.  They did their own, as it says here, they

4  were annually recertified.  They're subject to onsite

5  evaluations, subject to reviews of individual loans, and

6  if you just look at the next allegation in the complaint,

7  they claim that we somehow did something wrong in taking

8  into account adverse selection in identifying loans in

9  the course of our -- in UBS's due diligence.

10           And then FHA when it did its analysis, also

11  looked at perceived risks of loans in deciding which ones

12  to review.

13           Then, you know, HUD relied on third parties.

14  So did UBS in doing its due diligence.  So --

15           THE COURT:  Okay.  So let me just try to

16  understand what you're saying.  The first column is the

17  document, the public you've identified.

18           MR. GIUFFRA:  Correct.

19           THE COURT:  The second column are excerpts from

20  that document.  The third column are the allegations in

21  the complaint, which you think those excerpts speak to.

22           MR. GIUFFRA:  Correct.

23           THE COURT:  Okay.

24           MR. GIUFFRA:  And --

25           THE COURT:  But this document -- this chart

45

Proceedings

1   anyway, does not indicate what further you're seeking

2   that is relevant.

3           MR. GIUFFRA:  No, and what we're seeking, your

4   Honor, and just -- I want to try to simplify this as much

5   as possibly can.  We've gone through the public record in

6   the letter which I do believe is attached to your

7   materials, which is the May 7th letter, we identify

8   specific categories of documents, and specific human

9   beings who we think have documents that we think are

10  relevant --

11          THE COURT:  Okay.

12          MR. GIUFFRA:  -- allowing us to --

13          THE COURT:  And did you meet and confer with

14  the government about those particular requests?

15          MR. GIUFFRA:  Yes, we did.

16          MR. HAYES:  Yes, we know that they want

17  documents from Timothy Geithner, your Honor.

18          THE COURT:  Okay.

19          MR. HAYES:  And, your Honor, again what this

20  seems to be is laying a foundation for trial.  And

21  there's no answer in this case.  There's no articulated

22  defense.  You've heard suggestions about causation.

23  There's no cases.

24          But in any event, this seems to be a question

25  of the government knew that Countrywide or who knows how

46

Proceedings

1  many other originators, was a bad originator, or believed

2  that it was a good originator.

3          This is something that UBS doesn't know one way

4  or the other about, and it sounds like it's an estoppel

5  argument ultimately.  The government can't bring this

6  case and seek penalties that would go to the Treasury,

7  your Honor -- fair enough, that's like a criminal file.

8  But the government can't bring a case against UBS because

9  some component thought that Countrywide was okay.  And I

10 might add, well if that's okay, then let's bring out the

11 2012 national mortgage settlement in which the government

12 obtained $1 billion in damages under the False Claims Act

13 and Consumer Relief, and the August 2014 global

14 settlement of claims against Bank of America which

15 included Countrywide, and which the government obtained

16 well over another billion dollars in damages against

17 Countrywide.

18          So the government was a victim, and brought

19 cases or resolved prospective cases concerning that.  And

20 none of that has anything to do with UBS at all, and the

21 representations that it made -- that it made to investors

22 about these loans in the forty deals at issue in this

23 case.

24          MR. GIUFFRA:  Your Honor, I think it's

25 directly --

47

Proceedings

1          THE COURT:  Well, I --

2          MR. HAYES:  Timothy Geithner knows nothing

3   about any of this.

4          MR. HAYES:  Your Honor, if that's --

5          THE COURT:  Okay, so let me -- before going

6   forward, so I don't think I have enough information today

7   to make a decision, and there are two things at issue

8   here.  So I am going to ask for further briefing, okay?

9   So the first question is this executive branch discovery

10  issue which as I've noted, I haven't found any case law,

11  the parties haven't given -- haven't found much case law

12  in this area, if you want me to make a decision on that,

13  then you should tell me more and giving me arguments and

14  citations on that issue.

15          The second point are the specifics of what's

16  being requested here.  So if the defendant is asking for

17  specific -- defendants rather, are asking for specific

18  types of documents, then I want to know what those are,

19  and what the relevance is, all right?

20          MR. GIUFFRA:  We will do that.

21          THE COURT:  And I would urge the parties to

22  meet and confer specifically on those things, so that

23  there's no question about whether these are examples or

24  the actual requests.  So the fact that the parties came

25  in here today, not even sure about that point, is

Proceedings

1    troubling to me, okay?

2              So that means that you haven't really

3    adequately met and conferred if it's still ambiguous,

4    whether you're citing examples or you're saying that

5    these are, in fact, the requests.  So this is an example

6    from my mind, of why the parties aren't communicating

7    well.  Okay?

8              So I want you to meet and be clear about what

9    exactly you're looking for, and then I will allow you to

10   make your relevance argument, and then there can be a

11   proportionality argument because one of the defenses to

12   the subpoena is that there's an undue burden, and so that

13   may be one of the reasons in addition to what Mr. Giuffra

14   mentioned at the outset for why you would prefer to have

15   a Rule 34 discovery, as opposed to a subpoena.

16             On the other hand, the Federal Rules of Civil

17   Procedure were recently amended to require a

18   proportionality analysis by the Court.  And so I will

19   permit or I would request that the parties give me enough

20   information as to the need for that information, versus

21   the burden, okay?

22             I don't know how long this is going to be

23   because there's going to be a lot of particular -- it

24   seems from the outset like there are a lot of documents,

25   and so I may regret this but I am not going to put a page

Proceedings

1   limit on it, but I am going to say that it doesn't do the

2   parties any good to go on, and on, and repeat.

3          So if you've got specific requests, and I don't

4   want you to remove margins from pages, and so I will just

5   let you use your good judgment in terms of how much you

6   need to make your argument, get in and get out.  All

7   right?

8          Because if you go on and on, you're likely to

9   talk me out of ruling in your favor, all right?  But I

10  will allow you to go on -- to use more than the normal

11  number of pages because there may be many requests that

12  you need to make, all right?  And if there are similar

13  arguments, you can just say same argument as before, but

14  I do want to point out that because there has been no

15  answer in this case, it is going to be a little bit

16  difficult for me to really argue -- to see the relevance,

17  and so it may be we're putting the cart before the horse,

18  and we may end up making -- having these discussions

19  about whether estoppel would be a valid answer.

20         So if there had been answer already filed,

21  there could have been a motion to strike affirmative

22  defenses, and things like that and so we may end up

23  getting into those discussions as part of whether it's

24  relevant, right?  Because if a particular defense is not

25  permitted, and it would be stricken in the normal course,

50

Proceedings

1   then by virtue of that, whatever is needed for that

2   defense would be irrelevant.

3          So I fear that all of this is getting a little

4   bit mushy but I just put it out there to let you know of

5   some of the difficulties that I may encounter in

6   assessing what you present to me.

7          So, Mr. Giuffra, if you want to show your hand

8   a little bit, and state what some of those affirmative

9   defenses are as you say why something is relevant, that

10  may be helpful, as well.  All right?

11         MR. GIUFFRA:  We can easily do that, your

12  Honor.

13         THE COURT:  Okay.  So --

14         MR. GIUFFRA:  And what we will do, as we

15  endeavor to do in the document I handed up, we will

16  literally cite paragraphs of the complaint, and show why

17  we think specific documents are relevant.  We'll try to

18  do -- we think this should be done in two weeks because

19  we're actually concerned about the spoliation issue

20  because we've been going back and forth on this for a

21  number of months.

22         THE COURT:  All right.  So I will put some

23  deadlines on this.

24         MR. HAYES:  And your Honor -- and as your Honor

25  looks for a date, the government asks whether this -- we

51

Proceedings

1  presume that this is the case but whether this would

2  follow the usual course as outlined in the Court's rule

3  where UBS would submit something.  The government would

4  respond.  And then that would be it.

5        THE COURT:  I think since we have thrashed out

6  this issue that may be all that's necessary here, and

7  like I said, I'm not putting page limits on it, so make

8  your best arguments, get in and get out.

9        MR. HAYES:  And no reply, your Honor.

10        MR. GIUFFRA:  Well, the only thing I am

11  concerned about, your Honor --

12        THE COURT:  Well --

13        MR. GIUFFRA:  -- is in terms of the -- you

14  raised two issues; one is the relevance issue, which is

15  we'll give you a document which will explain the

16  relevance.  I presume we do it in a chart format.

17        THE COURT:  All right.  So then this is what I

18  will do.  I will permit -- again, this will be a little

19  bit out of my normal procedure, I will put a deadline for

20  the motion, which will be the motion to -- fully-briefed

21  motion to compel, which like I said, will have the two

22  parts, the executive branch discovery, and the relevance

23  as to specific requests.

24        I will put down a deadline for a response.  I

25  will allow a reply, and I will allow a surreply.  And

52

Proceedings

1   then that's it.  So everybody gets two chances.

2           MR. HAYES:  Thank you, Judge.

3           THE COURT:  All right.  So that will clear up

4   any ambiguities about who is allowed to file what, when.

5           So Mr. Giuffra, you said you'll file yours in

6   two weeks, which will be July 15th.  Mr. Hayes, how much

7   time do you need?

8           MR. HAYES:  Two weeks, your Honor.

9           THE COURT:  All right.  And that will be July

10  29.  And then after that?

11          MR. GIUFFRA:  One week, your Honor.

12          THE COURT:  July -- oops, now we're getting

13  into August.

14          MR. GIUFFRA:  Unless it's on a Saturday or

15  Sunday?

16          THE COURT:  No, it's one week --

17          MR. GIUFFRA:  It wouldn't be.  We'll be okay.

18          THE COURT:  One week --

19          MR. HAYES:  One week from a weekday.

20          THE COURT:  -- from a weekday is always a

21  weekday.

22          MR. GIUFFRA:  Is always going to be a weekday,

23  so it will fine.

24          THE COURT:  August 5th.

25          MR. GIUFFRA:  And then the 12th.

53

Proceedings

1        THE COURT:  And then August 12th.

2        MR. HAYES:  Thank you, Judge.

3        THE COURT:  All right.  So I urge everybody to

4  be working -- moving expeditiously.  I see that there may

5  be a large volume, but I trust that everybody has already

6  gotten a good sense of what is at issue here, so the time

7  for you to file these papers should not -- this should

8  give everybody enough time, and I also think given that

9  you've all agreed to these dates, that there won't be any

10  vacations or other things that get in the way.

11        So I will have this all fully briefed by August

12  12th, and I will look at it and see how long it takes for

13  me to come up with something.  I will try to move

14  quickly.  I can't guarantee I will send it to you by the

15  end of August, but I will do my best, and if not, then

16  certainly, I will get it to you by September, okay?

17        MR. HAYES:  Thank you, your Honor.  And, your

18  Honor, the government has one additional thought.

19        THE COURT:  Okay.

20        MR. HAYES:  There was another case in this

21  district, the case United States v. Barclays before Judge

22  Matsumoto, and before Magistrate Judge Orenstein.  There

23  was discovery in that case, and one of the things that

24  the magistrate judge felt would be appropriate and help

25  set the table and provide structure for the discovery,

54

Proceedings

1    was to require Barclays to file an answer statement.  The

2    government refers your Honor to the docket in that case

3    for possible consideration in this case.

4              THE COURT:  Okay, thank you.  It is sort of

5    what I alluded to in my statement to Mr. Giuffra, that in

6    making your arguments as to relevance, you may have to

7    tip your hand and say what your answers will be.

8              MR. GIUFFRA:  Fine, your Honor.

9              THE COURT:  Would you prefer to make a

10   statement of your answer?

11             MR. GIUFFRA:  No, I think we would like to wait

12   because we have a fully briefed motion to dismiss.  I'm

13   happy to give the Court a copy of everyone's briefs.

14             THE COURT:  I can get it on the docket.

15             MR. GIUFFRA:  Yeah.  And I think it's --

16             THE COURT:  Although if you have a copy, maybe

17   a courtesy copy would be useful.

18             MR. GIUFFRA:  Do we have a copy?

19             MR. DECAMP:  Yes.

20             MR. HAYES:  There was a motion to dismiss

21   pending in the Barclay's case at the time that Magistrate

22   Judge Orenstein made his ruling in that case, your Honor.

23             THE COURT:  Okay, that's fine.  All right.  But

24   having a courtesy copy is useful.

25             MR. GIUFFRA:  Well, your Honor, there's a

55

Proceedings

1   difference that in the Barclay's case as I recall, there

2   were individuals named as defendants.  There's no

3   individual named here.

4           THE COURT:  All right.  So I will have -- I

5   have access to the docket.

6           MR. GIUFFRA:  And that's among other things --

7           THE COURT:  So I will look it up, and it is

8   useful to me.  Our judicial system functions well on

9   precedent.  So having guidance, even if it's not binding,

10  having guidance from great minds who have considered this

11  issue before me would be helpful as I move forward.

12          All right.  So I will look for those filings,

13  and reserve my decision until that point.  If there's any

14  ambiguity, I will ask to have a brief conference to clear

15  things up with the parties but otherwise, I think what

16  you've provided me today, and what you will provide to me

17  in the papers should be sufficient.

18          MR. HAYES:  And your Honor just because we're

19  here, procedurally we just want to let the Court know

20  that we've been complying as of course we must with the

21  Court's procedural orders.  The parties have exchanged

22  interrogatories, the government has responded, UBS will

23  be responding to the government's interrogatories

24  shortly, and the parties have exchanged settlement

25  position letters.

56

Proceedings

1           THE COURT:  Okay.  Great.  And so you should

2    keep moving forward, and be mindful of whatever deadlines

3    may be looming.  If you need extensions, I m very

4    reasonable but you need to make the request in advance

5    and give me a good reason, all right?

6           Speaking of settlement, you should let me know

7    if at any point you think having a settlement conference

8    would be useful, but otherwise, does the government -- is

9    the government open to mediation in this case or --

10          THE COURT:  We would be -- sometimes government

11   entities are not.

12          MR. HAYES:  The United States is always willing

13   to engage in settlement negotiations, and certainly any

14   negotiations that would be assisted by the Court would be

15   welcome.

16          THE COURT:  All right.  So the parties should

17   confer and if you agree, because settlements are only

18   effective if there's agreement, if you agree, then I am

19   open to scheduling a settlement conference or making a

20   referral to the Court annexed mediation.

21          Is there anything else, Mr. Harris?

22          MR. HAYES:  Nothing from the government, your

23   Honor.

24          THE COURT:  Mr. Giuffra?

25          MR. GIUFFRA:  Nothing from UBS, your Honor.

57

Proceedings

1          THE COURT:  All right.

2          MR. GIUFFRA:  Thank you so much.

3          THE COURT:  Thank you, everybody.

4          MR. HAYES:  Good afternoon, your Honor.

5              (Matter concluded)

6                   -o0o-

58

1                    **I N D E X**

2

3                **E X H I B I T S**

4

5  <u>**Defendants' Exhibits Marked for Identification:**</u>

6  <u>Number</u>   <u>Description</u>                        <u>Page</u>

7  1        Examples of HUD and Treasury documents    42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

# C E R T I F I C A T E

        I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

        I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

        IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **July**, 2019.

                        *Linda Ferrara*
                        Linda Ferrara

                        AAERT CET**D 656
                        Transcriptions Plus II, Inc.