UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

UNITED STATES OF AMERICA,

                 Plaintiff,

        v.

UBS SECURITIES LLC, UBS AG, MORTGAGE
ASSET SECURITIZATION TRANSACTIONS,
INC., and UBS REAL ESTATE SECURITIES,
INC.,

               Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CV-6369 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff the United States of America commenced the above-captioned action on

November 8, 2018 against Defendants UBS Securities LLC ("UBS Securities"), UBS AG,

Mortgage Asset Securitization Transactions, Inc. ("MASTR"), and UBS Real Estate Securities,

Inc. ("UBS RESI").  (Compl., Docket Entry No. 1.)  Plaintiff alleges that between January 1,

2005 and December 31, 2007, Defendants knowingly made false and misleading statements to

buyers of residential mortgage-backed securities ("RMBS") about the characteristics of the loans

underlying the RMBS in violation of the Financial Institutions Reform, Recovery, and

Enforcement Act of 1989, 12 U.S.C. § 1833a ("FIRREA").  (*Id.* at ¶ 1.)

       Plaintiff brings claims under the FIRREA for (1) mail fraud affecting federally-insured

financial institutions ("FIFIs"), 18 U.S.C. § 1341; (2) wire fraud affecting FIFIs, 18 U.S.C.

§ 1343; (3) bank fraud, 18 U.S.C. § 1344; (4) fraudulent benefit from a transaction with a

covered financial institution ("FI"), 18 U.S.C. § 1005; and (5) false statements made to influence

the actions of a covered FI, 18 U.S.C. § 1014,  (*id.* ¶ 32), and seeks the maximum civil penalties

available.  (Compl. ¶¶ 31–32.)

Currently before the Court is Defendants' motion to dismiss the Complaint pursuant to Rules 12(b)(6), 12(b)(2), and 9(b) of the Federal Rules of Civil Procedure.  (Defs. Mot. to Dismiss ("Defs. Mot."), Docket Entry No. 56; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 57.)  Plaintiff opposes the motion.  (Pl. Mem. in Opp'n to Defs. Mot. ("Pl. Opp'n"), Docket Entry No. 60.)  For the reasons set forth below, the Court denies Defendants' motion.

## I.   Background

Plaintiff alleges that between January 1, 2005 and December 31, 2007 (the "Relevant Period"), Defendants misrepresented in their offering documents (1) that the loans backing forty of their RMBS (the "Subject Deals")[1] met underwriting guidelines or otherwise had documented compensating factors justifying an exception and complied with all applicable laws and regulations, and (2) "key loan characteristics" of the loans backing the Subject Deals.  (Compl. ¶¶ 6, 26.)  In addition, Plaintiff alleges that Defendants made false or misleading representations in presentations to investors and rating agencies about their due diligence and other quality control processes.  (Id. ¶ 139.)

Plaintiff alleges that, based on the credit, compliance, and valuation due diligence that

---

[1]  The Subject Deals are: AHMA 2006-2, AHMIT 2006-2, CWALT 2006-12CB, CWALT 2006-23CB, CWALT 2006-43CB, CWALT 2006-OA3, CWALT 2006-OA7, CWALT 2006-OA8, CWALT 2006-OA10, CWALT 2007-24, CWALT 2007-OA2, CWHL 2006-OA5, FHLT 2006-B, INABS 2006-D, INABS 2007-A, MABS 2006-FRE1, MABS 2006-FRE2, MABS 2006-HE1, MABS 2006-HE2, MABS 2006-HE4, MABS 2006-HE5, MABS 2006-NC1, MABS 2006-NC2, MABS 2006-NC3, MABS 2006-WMC1, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-WMC4, MABS 2007-HE1, MABS 2007-WMC1, MARM 2006-OA1, MARM 2006-OA2, MARM 2007-1, MARM 2007-2, MARM 2007-3, MARM 2007-HF1, MARM 2007-HF2, RALI 2006-QO7, RALI 2006-QS15, TBW 2006-6.  (Table 1, annexed to Compl. as Ex. 2, Docket Entry No. 1-2.)

2

Defendants conducted on the loans backing the Subject Deals, Defendants were aware that their representations were false. (*Id.* ¶ 8.) However, "in order to maintain . . . relationships" with the loan originators — Defendants' "most important clients," (*id.* ¶ 19) — Defendants (1) manipulated their credit and compliance due diligence results, (2) "loosened th[eir] policies as needed to close the deal," and (3) "turned a blind eye to poor due diligence results or fabricated baseless excuses for them," (*id.* ¶ 15).

Plaintiff alleges that as a result of Defendants' actions, and "[a]s anticipated by the risk profiles of the loans, which UBS concealed," those who invested in the Subject Deals lost billions of dollars when the loans backing the Subject Deals defaulted at "exceptionally high rates." (*Id.* ¶ 3.) Plaintiff also alleges that one or more FIFIs purchased certificates in each of the Subject Deals, including, *inter alia*, the Bank of New York Mellon and the Federal Home Loan Bank of San Francisco. (*Id.* ¶¶ 295–96.)

### a. The Defendants

UBS Securities is a Delaware limited liability company with its headquarters and principal place of business in New York. (*Id.* ¶ 34.) It served as the lead or managing co-lead underwriter for each Subject Deal, and is wholly-owned by UBS Americas Holding, LLC, a wholly-owned subsidiary of UBS AG. (*Id.*)

UBS AG is a Switzerland-based company with a United States headquarters in New York. (*Id.* ¶ 35.) It served as "Swap Provider, Cap Provider, Corridor Contract Counterparty or Yield Maintenance Agreement Provider" in "many of the Subject Deals," and, through the trade name UBS Home Finance ("Home Finance"), originated loans securitized in two of the Subject Deals, MARM 2007-HF1 and MARM 2007 HF2. (*Id.* ¶¶ 35, 183 (internal quotation marks omitted).)

3

MASTR is a Delaware corporation with its principal place of business in New York.  (*Id.* ¶ 36.)  It is a wholly-owned subsidiary of UBS Americas, Inc., and acted as the depositor and registrant for twenty-two of the Subject Deals (those beginning with "MARM" and "MABS"), and was responsible for registering certificates and filing documents related to the Subject Deals with the Securities Exchange Commission ("SEC").  (*Id.*)

UBS RESI is a Delaware corporation with its principal place of business in New York.  (*Id.* ¶ 37.)  It is a wholly-owned subsidiary of UBS Americas, Inc., and, as sponsor, was responsible for acquiring, holding, and transferring the loans securitized in the Subject Deals.  (*Id.*)

### b.   Loan origination and securitization

RMBS are securities backed by residential mortgage loans.  (*Id.* ¶ 42.)  A residential mortgage loan is a loan made by a lender, also known as an "originator," to the owner of property secured by the value of that property.  (*Id.* ¶¶ 42–43.)  In exchange for the loan, the borrower promises to repay the principal loan amount, plus interest.  (*Id.* ¶ 43.)

To determine whether a borrower will repay the loan and whether the borrower's property supports the loan amount, originators perform a process called "loan underwriting."  (*Id.* ¶ 44.)  This typically includes consideration of, *inter alia*: (1) the borrower's overall debt level, annual income, debt-to-income ("DTI") ratio, and credit or "FICO" score, and (2) the loan-to-value ("LTV") ratio and the combined loan-to-value ("CLTV") ratio.[2]  (*Id.* ¶ 45.)  If consideration of these factors reveals that the prospective loan does not strictly comply with underwriting guidelines, the lender considers whether there are sufficient "compensating

---

[2]  An LTV ratio is the ratio of the loan amount to the property value.  (*Id.* ¶ 45.)  A CLTV ratio is the ratio of the loan amount, plus other liens on the property, to the property value.  (*Id.*)

factors"[3] that offset the deviations from the guidelines.  (*Id.* ¶ 46.)  In addition, originators assess

whether the loan complies with all applicable laws and regulations, (*id.* ¶ 49), and determine the

value of the collateral securing the loan to evaluate whether, if the lender defaults on the loan,

the originator will be able to recover a sufficient amount from the property, (*id.* ¶ 47).

      During the Relevant Period, Defendants purchased large pools of residential mortgage

loans and structured them into RMBS in either "principal" or "third-party" transactions.[4]  (*Id.*

¶¶ 52, 64.)

      In principal transactions, Defendants bought loan pools from originators, used a number

of affiliates to securitize the loans, registered the securitized loans as RMBS with the SEC, and

sold RMBS certificates.  (*Id.* ¶ 65.)  UBS RESI acted as the "sponsor" and aggregated, acquired,

held, and transferred the mortgage loans to be securitized.  (*Id.* ¶ 66 & n.7.)  MASTR acted as the

"depositor" and purchased the loans from UBS RESI "to deposit [them] into a special purpose

entity."  (*Id.* ¶¶ 66, 68 & n.8.)  UBS Securities acted as the "underwriter," responsible for

"coordinating and supervising all the transaction team members, structuring the deal, conducting

the requisite due diligence, preparing or coordinating the preparing of" the SEC filings and

marketing materials, and ensuring that each filing "truthfully disclosed to investors all material

information, and marketing and selling the RMBS certificates to investors."  (*Id.* ¶ 69.)  In

addition, as the depositor in the principal transactions, MASTR (1) filed a base prospectus with

---

[3]  "Compensating factors" are features of the loan that "relate to, and materially offset the particular deviations from the underwriting guidelines that apply to the loan."  (*Id.* ¶ 46.)  For example, "if a borrower has a slightly higher than acceptable [debt to income ratio], a compensating factor may exist if the borrower has significant cash reserves to make up for the smaller income."  (*Id.*)

[4]  Twenty-two of the Subject Deals (those beginning with "MARM" and "MABS") were principal transactions; the remaining eighteen Subject Deals were third-party transactions.

the SEC describing "future [RMBS] offerings," (*id.* ¶ 71), (2) filed a prospectus supplement with the SEC providing "granular detail on the purported characteristics of the loans in particular RMBS," (*id.* ¶¶ 70, 72), and (3) filed and disseminated to investors certain marketing materials regarding the RMBS, (*id.* ¶¶ 70, 73).

In third-party transactions, Defendants did not purchase or securitize the underlying loan pools, but UBS Securities acted as an underwriter, with the same responsibilities it had in principal transactions.  (*Id.* ¶¶ 90–91.)

UBS RESI, MASTR, and UBS Securities were "each staffed by essentially the same group of UBS employees," who "carried out the securitization steps on behalf of these entities," made "no distinction in their roles for each entity," and held themselves out as employees of "UBS."  (*Id.* ¶ 75.)

### c.  Due diligence

In both principal and third-party transactions, Defendants hired vendors to conduct credit and compliance due diligence on samples of loan pools, (*id.* ¶¶ 84, 96), and in principal transactions, also hired vendors to conduct valuation due diligence, (*id.* ¶¶ 85, 97).  Defendants agreed with originators to examine between 10% and 25% of the loans in principal transactions, (*id.* ¶ 81), and 5% of the loans in third-party transactions, (*id.* ¶ 96).

Plaintiff alleges that Defendants' credit and compliance due diligence on loan samples in the Subject Deals revealed that "significant percentages" either did not comply with underwriting guidelines, had no documented compensating factors, or did not comply with applicable laws and regulations.  (*Id.* ¶ 12.)  In addition, valuation due diligence revealed that the value of the properties backing thousands of loans in the Subject Deals were "out of tolerance," i.e., "there was a high probability that the loans had materially inflated property valuations."  (*Id.* ¶¶ 16–17.)

Rather than "excis[ing] loans from the unreviewed portions of the loan pool" or "chang[ing] its representations to accurately reflect the loan characteristics" of the loans in the Subject Deals, (*id.* ¶ 18), Plaintiff alleges that Defendants manipulated due diligence results or standards, (*id.* ¶ 15).

### i.   Credit and compliance due diligence

During the Relevant Period, Defendants also hired third-party vendors to review loan files to assess (1) the creditworthiness of the loans in the Subject Deals, including whether they were originated in accordance with underwriting guidelines or with compensating factors, and (2) whether the loans were originated in compliance with applicable laws and regulations. (*Id.* ¶ 152.) To conduct this review, Defendants selected a sample of loans from each of the Subject Deals using a "two-pronged method." (*Id.* ¶ 155.) Under the first prong, Defendants selected a sample using "adverse selection," whereby they selected loans with "adverse credit characteristics that could signal heightened risk," and under the second prong, Defendants "selected loans randomly for review," i.e., "randomly selected a subset of loans with no up-front criteria serving as a basis for that selection." (*Id.*) Due diligence vendors then assigned each loan in the sample one of three ratings: (1) "event level 1" ("EV1"), which indicated that the loan was originated in accordance with underwriting guidelines and complied with all applicable laws and regulations; (2) "event level 2" ("EV2"), which indicated that the loan was not originated "strictly according to underwriting guidelines but the originator had approved the loan pursuant to documented relevant compensating factors"; and (3) "event level 3" ("EV3"), which indicated that the loan was not originated in accordance with underwriting guidelines, did not have documented compensating factors, did not comply with all applicable laws and regulations, or lacked key documents. (*Id.* ¶¶ 159–61.)

After reviewing samples of loans in the Subject Deals, the vendors assigned an EV3 grade to "large numbers of loans." (*Id.* ¶ 164.) Because Defendants' policies characterized their samples as representative of the entire loan pool in each deal, (*id.* ¶ 156), these results suggested that the unreviewed loans in the Subject Deals also contained a high number of defective loans, (*id.* ¶ 166). Although Defendants' policies instructed that "[r]esults that are unfavorable will require additional review so as to ensure the diligence sample adequately captures the risk of the pool," (*id.* ¶ 167), Defendants did not conduct additional due diligence on the loans in the Subject Deals, and instead (1) "waived" EV3-graded loans and securitized them or (2) replaced the vendors' EV3 grades with EV2 or EV1 grades, without reviewing the underlying loan file, (*id.* ¶ 171). For example, in a sample of 1450 loans drawn from MABS 2006-NC2, one of the Subject Deals, the due diligence vendor assigned 377 loans an EV3 grade (approximately 26% of the sample). (*Id.* ¶ 319.) Although there is "no evidence that [Defendants] identified any compensating factors . . . that warranted . . . overrides," Defendants directed the vendor to change the grade of "at least 91" of these loans from EV3 to EV2. (*Id.* ¶ 320.) Similarly, in a sample of 4360 loans drawn from MABS 2006-NC3, one of the Subject Deals, the due diligence vendor assigned 1017 loans an EV3 grade. (*Id.* ¶ 328.) Although there is "no evidence that [Defendants] identified any compensating factors," Defendants directed the vendor to change the grade of at least 345 of these loans from EV3 to EV2. (*Id.* ¶ 329.)

In addition, Plaintiff alleges that Defendants "artificially lower[ed] the reject rate" of specific loan samples to "justify the purchase of the pool without conducting additional review," (*id.* ¶ 174), by excluding loans whose files were missing from the EV3-grade count, (*id.* ¶ 173), and randomly categorizing other EV3-graded loans as "soft" rejects and excluding them from the reject rate, (*id.* ¶ 174). Plaintiff alleges that when Defendants "could not manipulate the reject

rate low enough," they "posited excuses to justify large [reject loan] percentages." (*Id.* ¶ 176.) For example, in CWALT 2006-23CB, one of the Subject Deals, Defendants approved a 17.5% reject rate from a diligence sample of less than 5% of the loans in the loan pool. (*Id.* ¶ 177.) Defendants approved the deal even though the reject rate was "outside of what [they] normally see" and "over what [their] highest deal has been in the past," explaining that "the majority of these issues [will] clear as the files [are] made more complete." (*Id.*) Plaintiff alleges that there is no evidence that the underwriter subsequently attempted to "clear any outstanding issues in this deal." (*Id.*)

### ii.   Valuation due diligence

In addition to conducting credit and compliance due diligence, Defendants hired third-party vendors to conduct valuation due diligence, i.e., to "assess whether the value placed on the . . . property [backing each loan] by the originator was reasonable." (*Id.* ¶ 219.) Vendors "used various tools to compare the property valuations determined through due diligence" to the value provided by the originator. (*Id.*) If the difference between these values fell within an acceptable "tolerance level," generally between a 10% and 20% variance, Defendants securitized the loan without further review. (*Id.*) If the difference fell outside the accepted tolerance level, the loan continued through additional stages of diligence until Defendants decided whether to securitize the loan or "kick it out" of the loan pool. (*Id.*)

Plaintiff alleges that Defendants (1) securitized loans that exceeded an acceptable tolerance level, and (2) sometimes changed their tolerance level to accommodate noncompliant loans. (*Id.* ¶¶ 243, 251.) Valuation due diligence revealed that, at various stages of the diligence process, the value of the properties backing thousands of loans in the Subject Deals were "out of tolerance." (*Id.* ¶¶ 16–17, 242.) However, Defendants did not "mov[e] [the identified loans] to

the next stage of diligence" or remove them from the deal.  (*Id.* ¶¶ 18, 242.)  For example, in

MARM 2007-1, one of the Subject Deals, the vendor recommended that 935 loans be sent for

further due diligence based on valuation modeling, but Defendants "ordered additional valuation

due diligence for only 213 of the 935 loans."  (*Id.* ¶¶ 247–48.)  Of the 722 loans that were not

subjected to further due diligence, Defendants securitized 516.  (*Id.* ¶ 248.)  Two hundred and

fifty-one of these loans had a variance greater than 25%, sixty-seven had a variance greater than

50%, and eleven had a variance greater than 75%.  (*Id.* ¶ 248.)  In addition, in INABS 2006-D,

one of the Subject Deals, "without providing any explanation," Defendants "decided to increase

its negative variance tolerance levels to 25% seemingly for the sole purpose of accepting more

loans."  (*Id.* ¶ 251.)

### d.   The Home Finance Deals

In addition to primary and third-party transactions, Defendants securitized loans

originated by UBS AG, under the trade name Home Finance, in two of the Subject Deals,

MARM 2007-HF1 and MARM 2007-HF2 (the "Home Finance Deals").  (*Id.* ¶ 183.)  Plaintiff

alleges that Defendants knew that a "significant number" of loans in the Home Finance Deals

violated Defendants' representation to investors that its loans complied with underwriting

guidelines.  (*Id.* ¶ 185.)  For example, 13.69% of the loans in MARM 2007-HF1 were graded

"critical" exceptions by Defendants' due diligence vendor, meaning that the loans "did not

comply with Home Finance underwriting guidelines and did not have approved exceptions to the

guidelines, or were not originated in compliance with all applicable laws and regulations."  (*Id.*

¶ 187.)

As evidence of Home Finance's knowledge that their loans did not comply with

underwriting guidelines, Plaintiff cites an October of 2006 presentation to LenderLive, Home

Finance's due diligence vendor, during which Defendants "informed LenderLive that [its] process for ensuring underwriting quality was 'ineffective,'" and noted that LenderLive's diligence "failed the sniff test." (*Id.* ¶ 188.) Defendants nevertheless "continued using LenderLive as its underwriting vendor to originate loans [during] the Relevant Period." (*Id.*)

### e.   Defendants' alleged misrepresentations

Plaintiff alleges that, "[i]n securitizing loan pools and selling RMBS certificates to investors," Defendants made misrepresentations about the loans underlying the Subject Deals in (1) offering documents and (2) presentations to investors and rating agencies. (*Id.* ¶ 115.)

### i.   Misrepresentations in offering documents

Plaintiff alleges that Defendants made misrepresentations and misleading disclosures in offering documents by (1) stating that each loan in the Subject Deals was originated in accordance with the loan originator's guidelines or had sufficient "compensating factors," (*id.* ¶ 117), and that each loan was made in compliance with all laws and regulations, (*id.* ¶ 128), and (2) misrepresenting certain characteristics of the loans included in the Subject Deals, (*id.* ¶ 131).

Plaintiff alleges that Defendants made the following misrepresentations about the loans in the Subject Deals' compliance with originator guidelines:

- The prospectus supplement for MABS 2006-NC3, one of the Subject Deals, states: "All of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein." (*Id.* ¶ 123.)

- The prospectus supplement for MARM 2006-OA2, one of the Subject Deals, states: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer." (*Id.*)

- The prospectus supplement for MARM 2007-HF2, one of the Subject Deals, states: "The transferor will represent that as of the

closing date, each loan is in compliance with applicable federal
and state laws and regulations." (Table 2a 48, annexed to Compl.,
Docket Entry No. 1-3.)

Plaintiff alleges that Defendants knew that these statements were false at the time they were

made because due diligence results revealed that a "significant percentage" of the loans in the

Subject Deals did not comply with underwriting guidelines or otherwise have adequate

compensating factors or did not comply with applicable laws and regulations. (Compl. ¶ 8.)

In addition, Plaintiff alleges that in offering documents, Defendants misrepresented the

characteristics of the loans in the Subject Deals. (*Id.* ¶ 131.) For example, Plaintiff alleges that

the stated LTV and CLTV ratios for the Subject Deals were misleading because Defendants

"knew from what [they] learned through valuation due diligence that the LTV and CLTV ratios

were highly likely to have been significantly higher . . . and that many of the mortgages were not

supported by the values of the underlying properties." (*Id.* ¶ 244.)

### ii. Misrepresentations in presentations to investors and rating agencies

Plaintiff alleges that in presentations to investors and rating agencies, Defendants made

misrepresentations about their due diligence and other quality control processes. (*Id.* ¶ 139.) For

example:

- In a July of 2006 Credit and Compliance Overview presentation to
  Freddie Mac, Defendants stated: "For prime, 100% of the loans are
  subject to value due diligence." (Table 2b 4, annexed to Compl.,
  Docket Entry No. 1-4.)

- In a March 27, 2007 presentation to Moody's, Defendants stated:
  "By utilizing past pool performance and historical data, UBS
  identifies loans with the highest potential risk and targets them
  within the due diligence process. Based upon due diligence results
  and market trends, adverse selection criteria of due diligence
  samples is continuously reviewed and adjusted. . . . As a result of
  initial Due Diligence review, pool samples often will be increased
  in order for UBS to gain a comfort level with pool portions that are
  not reviewed for due diligence." (*Id.* at 17.)

Plaintiff alleges that these statements were misleading because Defendants did not review 100%

of the loans in any of the Subject Deals.  (*Id.* ¶ 258.)  For example, in MARM 2006-OA1, one of

the Subject Deals, after valuation due diligence began, 1022 loans were added to the deal.  (*Id.*

¶ 260.)  "Because of pressure to complete the securitization on time," Defendants did not

perform any diligence on the added loans.  (*Id.*)

In addition, Plaintiff alleges that Defendants did not use "past performance" or "historical

data" to select samples for due diligence, but instead their "use of adverse criteria to select a

sample for a particular deal was *ad hoc* with each due diligence manager deciding which adverse

criteria to use on a case-by-case basis."  (*Id.* ¶ 144.)  Defendants also did not "often" increase

samples, and, when they did so, the process did not yield results that would increase Defendants'

"comfort level" with the unreviewed loans but instead "confirmed that the unreviewed portions

of the loan pools also contained significant percentages of loans that did not meet [Defendants'

representations]."  (*Id.* ¶ 145.)

### f.    Additional allegations of fraudulent intent

As additional evidence of fraudulent intent, Plaintiff alleges that Defendants were (1)

aware that, during the Relevant Period, origination practices were "severely deteriorating," (*id.*

¶ 4), and (2) pressured by originators to issue noncompliant loans, (*id.* ¶ 20).

### i.    Deteriorating underwriting standards

Plaintiff alleges that during the Relevant Period, Defendants were aware that origination

practices and standards of the lenders issuing home mortgages, including Countrywide Home

Loans, Inc. ("Countrywide"), American Home Mortgage Corp. ("American Home"), IndyMac

Bank, F.S.B. ("IndyMac"), and Fremont Investment & Loan ("Fremont"), were "severely

deteriorating" but nevertheless continued to issue RMBS backed by home loans.  (*Id.* ¶ 4.)

For example, in 2004, a due diligence manager emailed her colleague "the top five reasons" to avoid purchasing loans originated by Countrywide.  (*Id.* ¶ 203.)  These reasons included the fact that: (1) Countrywide's due diligence "reject rates" were "worse than average," (2) Countrywide "rarely" provided loan files on time for due diligence review, which "compromis[ed] the integrity of the process," and (3) Countrywide often provided loan files with "missing data including DTI ratios."  (*Id.* ¶ 203.)  Another UBS employee stated that "[w]hen you do business with [Countrywide], you dance with the devil and sell your soul," (*id.*), and in an email dated March 22, 2007, the "head of mortgage trading" described a pool of Countrywide loans as "a bag of sh*t," (*id.* ¶ 5).  In 2006 and 2007, Defendants securitized loans originated by Countrywide in thirteen of the Subject Deals.  (*See* Table 1.)

In September of 2005, the "head of due diligence for Mortgage Finance" stated that American Home, another originator with which Defendants did business, had "extremely weak past performance from a diligence perspective," and that he "would only be comfortable at 40% due diligence."  (*Id.* ¶ 205.)  In addition, "a trader on the ARMs Desk" stated that American Home is "the worst with due diligence," and its "files are really sloppy and often incomplete." (*Id.*)  In 2006 and 2007, Defendants securitized loans originated by American Home in four of the Subject Deals.  (*See* Table 1.)

In 2004, "a trader on the ARMs desk" stated that he had "made [his] reservations about [IndyMac] quite clear" and was "clearly against buying [its] paper," but "would do whatever is best for the biz," (Compl. ¶ 210), and in September of 2006, a trader on the asset-backed securities trading desk stated that the collateral of Fremont was "crap," (*id.* ¶ 209).   In 2006 and 2007, Defendants securitized loans originated by IndyMac and Fremont in nine of the Subject Deals.  (*See* Table 1.)

14

### ii.  Pressure from originators

Plaintiff alleges that Defendants securitized loans in the Subject Deals that "it knew violated or were highly likely to have violated representations to investors" in order to "maintain its relationships with originators."  (Compl. ¶ 198.)  If an investment bank rejected a loan during due diligence, the originator would have to sell the rejected loan to another purchaser at a "steep discount" and potentially have to disclose that the loan was previously rejected.  (*Id.* ¶¶ 21, 59.) Originators consequently pressured Defendants to "accept poor diligence results and defective loans under the threat of ending their business relationship," (*id.* ¶ 21), and "gave more business and better terms to investment banks with less stringent due diligence requirements," (*id.* ¶ 60).

As one trader stated in describing an originator with which Defendants did business, "[i]f they're really that unhappy, they just won't sell us the loans tomorrow; and . . . I really don't want to get to the point where they hate us."  (*Id.* ¶ 199.)  Similarly, the "head of Asset Backed Securities" stated that if Defendants "pushed for more stringent diligence," they would "run the risk of alienating everyone that sells loans to [them]."  (*Id.* ¶ 199.)

In addition, in the course of "creating" AHMIT 2006-2, one of the Subject Deals, Defendants' lawyer informed Defendants and American Home (which originated loans in the deal) that "disclosures were needed to warn investors of the extremely poor due diligence results."  (*Id.* ¶ 22.)  However, after American Home told Defendants "this language is not going to happen," Defendants "signed off on the transaction."  (*Id.*)  Similarly, despite Defendants' "concern[]" about the "reject numbers" of loans reviewed in CWALT 2007-OA5, one of the Subject Deals, and the "bigger picture issues in the mortgage market (which ain't so good)," under pressure from the originator, Defendants did not cancel the deal or insist on more due diligence.  (*Id.* ¶¶ 478, 484, 488.)

## II. Discussion

### a. Standards of review

#### i. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the

complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*,

884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d

Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v.

N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan

v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all

allegations contained in the complaint are assumed true, this principle is "inapplicable to legal

conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Iqbal*, 556 U.S. at 678.

#### ii. Rule 9(b)

"Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.'"[5] *United States ex rel. Ladas v.*

---

[5] Each of the criminal statutes pursuant to which Plaintiff brings the FIRREA claim
involves fraudulent conduct and therefore, to state a claim, the Complaint must meet the pleading

*Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (alteration in original) (quoting Fed. R. Civ. P. 9(b)).

To satisfy this Rule, a complaint alleging fraud must "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent." *United States ex rel. Chorches for*

*Bankruptcy Estate of Fabula v. Am. Med. Resp., Inc.*, 865 F.3d 71, 80 (2d Cir. 2017) (quoting

*Ladas*, 824 F.3d at 25)).   In other words, Rule 9(b) "requires that a plaintiff set forth the who,

what, when, where and how of the alleged fraud." *HDtracks.com, LLC v. 7digital Grp. PLC*,

No. 18-CV-5823, 2019 WL 6170838, at *10 (S.D.N.Y. Nov. 19, 2019) (quoting *Minnie Rose*

*LLC v. Yu*, 169 F. Supp. 3d 504, 511 (S.D.N.Y. 2016)).   As the Second Circuit has explained:

> The purpose of Rule 9(b) is threefold — it is designed to provide a
> defendant with fair notice of a plaintiff's claim, to safeguard a
> defendant's reputation from improvident charges of wrongdoing,
> and to protect a defendant against the institution of a strike suit.

*Wood ex rel. United States v. Applied Research Assoc., Inc.*, 328 F. App'x 744, 747 (2d Cir.

2009) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally," Fed. R. Civ. Pro. 9(b), a plaintiff must "plead circumstances that provide at

least a minimal factual basis for their conclusory allegations of scienter," *In re Express Scripts*

*Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) (quoting *San Leandro Emergency*

---

standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. Pro.
9(b) (setting forth the pleading standard for complaints "alleging fraud or mistake"); 18 USC
§ 1005 (prohibiting certain conduct committed "with intent to defraud"); 18 U.S.C. § 1014
(prohibiting "knowingly making any false statement"); *7 W. 57th Street Realty Co., LLC v.*
*Citigroup, Inc.*, 771 F. App'x 498, 501 (2d Cir. 2019) (explaining that to plead "violations of
mail fraud, wire fraud, and bank fraud statutes, a complaint must satisfy the heightened pleading
standards of Federal Rule of Civil Procedure 9(b) (citing *Lundy v. Catholic Health Sys. of Long*
*Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013))); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp.
2d 595, 632 (S.D.N.Y. 2005) (finding that the plaintiffs "failed to allege with particularity that
[the defendant] violated" 18 U.S.C. § 1005).

*Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)).  *See also*

*Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 286 (E.D.N.Y. 2017)

("[A]lthough a plaintiff may 'allege fraudulent intent generally' under Rule 9(b), he still 'must

provide some minimal factual basis for conclusory allegations of scienter that give rise to a

strong inference of fraudulent intent.'" (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184

(2d Cir. 1995))).  Such circumstances may be pled by "(1) alleging facts to show that defendants

had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  *Gabriele v. Am. Home

Mortg. Servicing, Inc.*, 503 F. App'x 89, 97 (2d Cir. 2012) (quoting *S.Q.K.F.C., Inc. v. Bell Atl.

TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)); *see also United States v. Wells Fargo

Bank, N.A.*, 972 F. Supp. 2d 593, 620 (S.D.N.Y. 2013) (explaining in a FIRREA case that Rule

9(b) can be satisfied by "(a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness" (citation omitted)).

### iii.  Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the

Federal Rules of Civil Procedure, "[a] plaintiff bears the burden of demonstrating personal

jurisdiction over a person or entity against whom it seeks to bring suit."  *Troma Entm't, Inc. v.

Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v.

Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)); *see also Thackurdeen v. Duke Univ.*, 660 F. App'x

43, 44–45 (2d Cir. 2016) ("In opposing a motion to dismiss for lack of personal jurisdiction,

plaintiffs bear the burden of establishing that the court has jurisdiction over defendants."

(alterations, citations, and internal quotation marks omitted)).  If a defendant challenges personal

jurisdiction by filing a Rule 12(b)(2) motion, "the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." *Id.* at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.3d 194, 197 (2d Cir. 1990)); *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) (same). Prior to discovery, a plaintiff need only plead "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball*, 902 F.3d at 197); *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) ("A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998))).

The court must "construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *Grundstein v. Eide*, 598 F. App'x 45, 46 (2d Cir. 2015) (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)). However, the court need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013), *cert. denied sub nom. O'Neill v. Al Rajhi Bank*, 573 U.S. 954 (2014) (quoting *Jazini*, 148 F.3d at 185).

### b. FIRREA claims

Defendants argue that the Court should dismiss the Complaint because it fails to plead (1) that Defendants acted with fraudulent intent, (2) the predicate offenses of bank fraud, fraudulent bank transactions, and false statements to banks, and (3) personal jurisdiction over UBS AG. (*See* Defs. Mem. 28–63.)

"Congress passed FIRREA in the wake of the savings and loan crisis, [to] . . . put the Federal deposit insurance funds on a sound financial footing, provide funds to deal expeditiously with failed depository institutions, and strengthen the enforcement powers of Federal regulators of depository institutions." *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 148 (2d Cir. 2014) (alterations, citations, and internal quotation marks omitted). The statute "imposes civil penalties for the violation of certain specified criminal statutes." *Wells Fargo*, 972 F. Supp. 2d at 626. It provides: "[w]hoever violates any provision of law to which this section is made applicable . . . shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a).

Subsection (c)(1) of FIRREA specifies that the statute applies to, *inter alia*, (1) fraudulent bank transactions, 18 U.S.C. § 1005, (2) false statements to banks, 18 U.S.C. § 1014, and (3) bank fraud, 18 U.S.C. § 1344. 12 U.S.C. § 1833a(c)(1). Subsection (c)(2) specifies that the statute applies to, *inter alia*, mail fraud and wire fraud, if such violations "affect[] a federally insured financial institution." 12 U.S.C. § 1833a(c)(2) (citing 18 U.S.C. §§ 1341, 1343); *see also United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 654 (2d Cir. 2016) (explaining that FIRREA "imposes civil penalties for violations of the federal mail and wire fraud statutes that affect a federally insured financial institution" (alteration, citation, and internal quotation marks omitted)).

### i.   The Complaint adequately pleads fraudulent intent

Defendants argue that the Court should dismiss the Complaint because it fails to allege facts sufficient to show motive and opportunity or deliberately illegal behavior. (Defs. Mem. 29.) In addition, Defendants argue that the Complaint fails to state facts from which the Court could "infer corporate scienter, such as the fraudulent intent of an employee that can be imputed

to any of Defendants."  (*Id.*)

Plaintiff argues that the Complaint adequately pleads facts showing motive and opportunity to defraud and conscious misbehavior or recklessness, and that Defendants' argument as to corporate scienter is premised on the wrong pleading standard.  (Pl. Mem. 16, 17, 23.)

### 1.   The Complaint adequately describes the circumstances constituting fraud

The Complaint satisfies the pleading standard set forth in Rule 9(b) by (1) specifying the statements Plaintiff contends were fraudulent, (2) identifying the speaker of those statements, (3) stating where and when the statements were made, and (4) explaining why the statements were fraudulent.  *See United States ex rel. Ladas*, 824 F.3d at 25.

Plaintiff alleges that in their offering documents, Defendants (1) misrepresented that the loans underlying the Subject Deals met underwriting guidelines or otherwise had documented compensating factors and were originated in accordance with all applicable laws and regulations, and (2) misrepresented or omitted "key loan characteristics" of the loans in the Subject Deals. (*Id.* ¶¶ 6, 26.)  In addition, Plaintiff alleges that Defendants made false or misleading representations about their due diligence and other quality control processes in presentations to investors and rating agencies.  (*Id.* ¶ 139.)  Plaintiff's allegations concerning these misrepresentations are sufficiently specific.  In addition to providing specific examples of misrepresentations in the Complaint and identifying the source of the misrepresentation, Plaintiff attaches to the Complaint two tables listing each allegedly false or misleading statement.  (*See* Table 2a; Table 2b.)  The table pertaining to the offering documents lists each statement, the source of the statement, and the Subject Deal to which the statement applies, (Table 2a); the table pertaining to the presentations to investors and rating agencies lists the statement, the name of

the presentation during which the statement was made, and when and to whom the presentation was made, (Table 2b).  Plaintiff has therefore identified the statements it contends were fraudulent, the speaker of those statements, and where and when the statements were made.  *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (finding that the complaint satisfied Rule 9(b) where it "contain[ed] a chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these mailings and cross-references to the paragraphs of the complaint in which the mailings are further discussed").

In addition, the Complaint contains an adequate explanation as to why each of the identified statements was fraudulent.  Plaintiff alleges that Defendants were aware that their representations were false based on the credit, compliance, and valuation due diligence that they conducted on the loans backing the Subject Deals.  (Compl. ¶ 8.)  Plaintiff provides a detailed description of the due diligence results for each of the Subject Deals and how these results suggested that the unreviewed loans in the Subject Deals also contained a high number of defective loans.  For example, the due diligence vendor assigned an EV3 grade to 377 loans in a sample of loans from MABS 2006-NC2.  (*Id.* ¶ 319.)  Although there is "no evidence that [Defendants] identified any compensating factors," Defendants directed the vendor to change ninety-one of these loans' grade to EV2.  (*Id.* ¶ 320.)  As to valuation due diligence, in MARM 2007-1, one of the Subject Deals, the vendor recommended that 935 loans be sent for further due diligence based on valuation modeling, but Defendants "ordered additional valuation due diligence for only 213 of the 935 loans," (*id.* ¶¶ 247–48), and securitized 516 of the 722 loans that were not subjected to further due diligence, (*id.* ¶ 248).  The Complaint therefore adequately alleges that Defendants' statements were fraudulent and provides illustrative examples.  *See Wells Fargo*, 972 F. Supp. 2d at 615–16 (finding that the FIRREA complaint satisfied Rule 9(b)

based on (1) allegations that defendant "engaged in [a] scheme[] involving . . . reckless underwriting and certification of loans" and (2) several examples illustrative of the scheme); *see also United States v. Americus Mortg. Corp.*, No. 12-CV-2676, 2013 WL 4829269, at *8 (S.D. Tex. Sept. 10, 2013) (finding that the FIRREA complaint satisfied Rule 9(b) where it "outline[d] the fraudulent scheme, identifie[d] the time periods, . . . and identifie[d] the falsified [document]"); *United States v. McGraw-Hill Cos., Inc.*, No. 13-CV-779, 2013 WL 3762259, at *9 (C.D. Cal. July 16, 2013) (finding that the FIRREA complaint satisfied Rule 9(b) where it "identifie[d] and describe[d] in detail examples of the [financial product] for which [the defendant rating agency was] alleged to have issued or confirmed ratings that did not accurately reflect their true credit risks").

### 2. The Complaint adequately alleges strong circumstantial evidence of conscious misbehavior or recklessness

Plaintiff has adequately alleged strong circumstantial evidence of conscious misbehavior or recklessness based on Defendants' (1) communications showing knowledge of deteriorating underwriting standards and (2) manipulation of their due diligence process and results.[6]

During the Relevant Period, Defendants securitized loans originated by, *inter alia*, Countrywide, American Home, IndyMac, and Fremont, despite Defendants' internal communications acknowledging that these originators' underwriting standards were "severely deteriorating." (Compl. ¶ 4). For example, in 2004, a due diligence manager emailed her colleague "the top five reasons" to avoid purchasing loans originated by Countrywide, including

---

[6] Because the Court finds that the Complaint adequately alleges strong circumstantial evidence of conscious misbehavior or recklessness, it declines to consider whether Plaintiff has adequately alleged motive and opportunity. *See Gabriele*, 503 F. App'x at 97 (explaining that a complaint satisfies Rule 9(b) by alleging *either* motive and opportunity *or* facts constituting strong circumstantial evidence of misbehavior or recklessness).

that (1) its due diligence "reject rates" were "worse than average," (2) it "rarely" provided loan

files on time for due diligence review, which "compromis[ed] the integrity of the process," and

(3) it often provided loan files with "missing data including DTI ratios." (*Id.* ¶ 203.) Another

UBS employee stated that "[w]hen you do business with [Countrywide], you dance with the

devil and sell your soul," (*id.*), and in an email dated March 22, 2007, the "head of mortgage

trading" described a pool of Countrywide loans as "a bag of sh*t," (*id.* ¶ 5). Nevertheless, in

2006 and 2007, Defendants securitized loans originated by Countrywide in thirteen of the

Subject Deals. (*See* Table 1.) In addition, in 2004, "a trader on the ARMS desk" stated that he

had "made [his] reservations about [IndyMac] quite clear" and was "clearly against buying

[their] paper," but "would do whatever is best for the biz," (*id.* ¶ 210), and in September of 2006,

"a trader on the ABS Trading Desk" stated that the collateral of Fremont was "crap," (*id.* ¶ 209).

Nevertheless, in 2006 and 2007, Defendants securitized loans originated by IndyMac and

Fremont in nine of the Subject Deals. (*See* Table 1.)

The factual allegations in the Complaint also support the inference that Defendants

manipulated their due diligence process and results, and securitized loans that they knew did not

comply with underwriting guidelines or their representations to investors. For example, the

Complaint states that, after Defendants' due diligence vendors assigned an EV3 grade to certain

loans in the Subject Deals, indicating that the loans "had not been originated according to

underwriting guidelines and did not have documented compensating factors, . . . or . . . did not

comply with all applicable laws and regulations, (Compl. ¶ 161), and without a legitimate reason

for doing so, Defendants (1) "waived" EV3-rated loans and securitized them or (2) replaced the

vendors' EV3 grades with EV2 or EV1 grades, without reviewing the underlying loan file, (*id.* ¶

171). Specifically, in a sample of 4360 loans drawn from MABS 2006-NC3— one of the

Subject Deals — the due diligence vendor assigned 1017 loans an EV3 grade.  (*Id.* ¶ 328.)
Although there is "no evidence that [Defendants] identified any compensating factors,"
Defendants directed the vendor to change the grades of at least 345 of these loans from EV3 to
EV2.  (*Id.* ¶ 329.)

Because Defendants' policies characterized their samples as representative of the entire
loan pool in a deal, (*id.* ¶ 156), this and the other examples in the Complaint demonstrate that
Defendants were aware that the unreviewed loans that were securitized in the Subject Deals also
contained a significant number of defective loans, (*id.* ¶ 166), and thus violated their
representations to investors.

The Complaint therefore supports a strong inference of conscious misbehavior or
recklessness as required by Rule 9(b).  *See S.E.C. v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y.
2014) ("Where the complaint alleges that defendants knew facts or had access to non-public
information contradicting their public statements, recklessness is adequately pled for defendants
who knew or should have known they were misrepresenting material facts with respect to the
corporate business." (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001));
*Wells Fargo*, 972 F. Supp. 2d at 616–17 (finding that the FIRREA complaint satisfied Rule 9(b)
where the Government alleged "the practices by which [the defendant] sought to increase its loan
originations without regard to whether [they] . . . complied with . . . regulations" and defendant's
"decision to continue its loan origination practices, despite knowledge of these violations"); *see
also United States v. Americus Mortg. Corp.*, No. 12-CV-2676, 2014 WL 4274279, at *14 (S.D.
Tex. Aug. 29, 2013) (finding that the FIRREA complaint satisfied Rule 9(b) where it alleged
"facts which, if true, show that [defendant] . . . committed various due diligence abuses in its
underwriting, and falsely certified its compliance"); *McGraw-Hill*, 2013 WL 3762259, at *9

(finding that the FIRREA complaint satisfied Rule 9(b) where the complaint "identifie[d] and describe[d] in detail examples of the [financial instrument] for which [defendant was] alleged to have issued or confirmed ratings that did not accurately reflect their true credit risk"); *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 456 (S.D.N.Y. 2007) (finding conscious misbehavior or recklessness where the plaintiffs pleaded that "at least two statements made to them during due diligence were consciously false").

Relying on *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008), Defendants argue that the Complaint does not satisfy Rule 9(b) because it does not identify any individual employee who acted with the requisite state of mind and whose intent could be imputed to Defendants.  (Defs. Mem. 28–34.)  Defendants argue that instead of identifying any employee who "received and reviewed the due diligence reports for the loans backing the [Subject Deals]," or any employee who was "responsible for making the purported misrepresentations and whether [that employee] was aware of the information in the due diligence reports," Plaintiff "alleges in the broadest possible terms that 'UBS' defrauded investors."  (*Id.* at 29, 30.)

Defendants' reliance on *Dynex* is misplaced because in *Dynex*, the Second Circuit interpreted the Private Securities Litigation Reform Act, not Rule 9(b) or the FIRREA.  In *Dynex*, the Second Circuit held that "[t]o survive a Rule 12(b)(6) motion under the PSLRA, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  531 F.3d at 195.  The court explained, "[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, . . . the PSLRA, which governs scienter pleading in securities fraud actions, establishes a more stringent rule for inferences involving scienter."  *Id.* at 194.  The *Dynex* decision does not

26

cite to Rule 9(b), and post-*Dynex* decisions interpreting Rule 9(b) in the context of the FIRREA

have not required compliance with *Dynex*.  For example, in *Wells Fargo*, the court rejected the

defendant's argument that the plaintiff was required to "identify the particular employee

responsible for submitting or certifying each [allegedly fraudulent] loan."  972 F. Supp. 2d at

618.  The court explained that "[w]here a plaintiff has alleged that a corporation has committed

fraudulent acts, it is the identity of the corporation . . . that the plaintiff must necessarily plead

with particularity."  *Id.* (alteration and citation omitted); *see also United States v. Bank of N.Y.*

*Mellon*, 941 F. Supp. 2d 438, 470 (S.D.N.Y. 2013) (holding that the Government in a FIRREA

case satisfied Rule 9(b) because "the allegations . . . hardly involve[d] piecing together scraps of

innocent knowledge held by various corporate officials" and instead showed "a pattern of

misrepresentation by [b]ank employees who, the [complaint] plausibly allege[d], knew that their

representations were false"); *Americus Mortg. Corp.*, 2014 WL 4274279, at *14 ("Contrary to

[the defendant's] arguments, the Government does not need to provide facts on the specific

underwriters who approved loan applications, nor does it need to allege specific facts on each of

the over 1,800 loans.").

Accordingly, the Court concludes that Plaintiff is not required to satisfy the *Dynex*

standard.  It is sufficient that the Complaint identifies (1) the poor due diligence results for each

Subject Deal and Defendants' manipulation of those results, (*see, e.g.*, Compl. ¶¶ 319–20), (2)

several employees who communicated their concerns about the originators, e.g., that the

originators whose loans were included in the Subject Deals had "extremely weak past

performance from a diligence perspective" and "the worst . . . due diligence," (*id.* ¶ 205), (3)

pressure by originators, Defendants' "most important clients," to securitize loans despite "poor

diligence results and defective loans," (*id.* ¶¶ 21, 199), and (4) employees who were aware of the

"bigger picture issues in the mortgage market," (*id.* ¶ 484). *See Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015) ("Plaintiffs pleaded scienter by asserting that [the corporate defendant] was aware of a high probability that [its representations were false]. The basis for that alleged knowledge is not vague; it is [the corporate defendant's] status as a major participant in the MBS market, a participant who was, consequently, aware of a broad drop in value in the [securities which were the subject of the fraud].").

In addition, the Court rejects Defendants' argument that the Complaint impermissibly groups together the Defendants, referring to them collectively as "UBS." (Defs. Mem. 29–30.) The Second Circuit considered and rejected a similar argument in *Lorely Fin. (Jersey) No. 3 Ltd.*, 797 F.3d 160. In *Lorely*, the defendants argued that the complaint failed to satisfy Rule 9(b) because it attributed fraudulent statements "to a cluster of subsidiaries collectively referred to as 'Wachovia' rather than to any specific Wachovia entity." *Id.* at 171. The Second Circuit found that because the complaint "identifie[d] three Wachovia entities who acted to structure and offer the securities in question," it satisfied Rule 9(b)'s requirement that the complaint "inform each defendant of the nature of its alleged participation in the fraud." *Id.* at 172 (alteration and citation omitted). The court acknowledged that the complaint "state[d] at the outset that it [would] refer to these entities collectively as 'Wachovia,'" and was "hard-pressed to see how [p]laintiffs could have done otherwise in the context of the . . . litigation, or why they ought to have done otherwise based on [the Second Circuit's] cases." *Id.*

The Complaint similarly identifies the role of each Defendant in the purported fraudulent scheme and therefore satisfies Rule 9(b). Plaintiff alleges that UBS Securities served as the lead or managing co-lead underwriter for each Subject Deal, (Compl. ¶ 35), responsible for "coordinating and supervising all the transaction team members, structuring the deal, conducting

the requisite due diligence, preparing or coordinating the preparing of [SEC filings and

marketing materials,] ensuring that [these documents] . . . truthfully disclosed to investors all

material information, and marketing and selling the RMBS certificates to investors," (*id.* ¶ 69).

UBS AG served as "Swap Provider, Cap Provider, Corridor Contract Counterparty or Yield

Maintenance Agreement Provider" in "many of the Subject Deals," and, through the trade name

Home Finance, originated loans securitized in two of the Subject Deals, MARM 2007-HF1 and

MARM 2007 HF2.  (*Id.* ¶¶ 35, 183 (internal quotation marks omitted).)  MASTR acted as the

depositor and registrant for twenty-two of the Subject Deals, (*id.* ¶ 35), filed a prospectus

supplement for each of the Subject Deals with the SEC providing "granular detail on the

purported characteristics of the loans in particular RMBS," (*id.* ¶¶ 70, 72), and filed and

disseminated to investors certain marketing materials regarding the RMBS, (*id.* ¶¶ 70, 73).

Finally, UBS RESI was responsible for acquiring, holding, and transferring the loans securitized

in the Subject Deals.  (*Id.*)  These descriptions are sufficient to apprise each Defendant of the

allegations against it.  *United States ex rel. Piacentile*, 336 F. Supp. 3d at 131 (explaining that the

purpose of Rule 9(b) is to "provide a defendant with fair notice of the plaintiff's claim").  At this

stage, and in the context of this case, Plaintiff is not required to do more.  *Lorely*, 797 F.3d at 172

(finding in securities fraud case that complaint satisfied Rule 9(b) where it described each

defendant's role in the fraud and referred to the defendants collectively throughout the

complaint); *see also id.* at 173 ("Even under the heightened pleading standard of Rule 9(B),

[p]laintiffs are not obligated to disaggregate these affiliates to pursue their fraud claim. . . .

[Defendant's] own lack of transparency in identifying which entity was communicating to

prospective investors only bolsters our conclusion in this regard.").[7]

### ii. The Complaint adequately pleads the predicate offenses of bank fraud, fraudulent bank transactions, and making false statements to banks

Defendants argue that the Complaint fails to plead the predicate offenses of (1) bank fraud, (2) fraudulent bank transactions, and (3) false statements to banks. (Defs. Mem. 53–60.)[8]

### 1. Bank fraud

Defendants argue that Plaintiff fails to state a claim for bank fraud because it has not shown that the "goal" of the purported scheme was "to defraud a bank or obtain bank property

---

[7] Defendants also argue that the facts alleged in the Complaint contradict Plaintiff's theory of the case because they show, *inter alia*, that Defendants undertook significant expense and burden in conducting due diligence on the loans in the Subject Deals and rejected a significant amount of loans, (Def. Mem. 38–40), and that Plaintiff "improperly inflated the EV3 rates," (*id.* at 43). These arguments identify disputes of fact inappropriate for resolution at this stage. *See McGraw-Hill Cos., Inc.*, 2013 WL 3762259, at *9 (finding in FIRREA case that the Government satisfied Rule 9(b) and that the defendant's argument about the appropriateness of the defendant-rating agency's credit ratings were "disputes of fact that are not appropriately decided at the motion to dismiss stage").

[8] In addition, Defendants argue that the Complaint fails to allege a "contemplated or intended harm" as required for three of the predicate offenses, mail and wire fraud and fraudulent bank transactions. (Defs. Mem. 51–52.) Defendants argue that because the Subject Deals included certain "credit enhancements" to absorb investors' initial losses, the Complaint does not adequately allege that Defendants were aware that the "defective" loans could have "harmed" investors. (*Id.* at 52; Compl. ¶ 105.) However, to adequately allege that "defendants contemplated some actual harm or injury to their victims," a plaintiff need only demonstrate that the defendant's "misrepresentations pertained to the quality, adequacy or price of the goods themselves." *United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015); *see also id.* at 578 ("Where the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." (citation omitted)). As explained more fully *supra*, the Complaint adequately alleges contemplated harm by alleging that Defendants made misrepresentations about the quality of the loans in the Subject Deals. *See Wells Fargo*, 972 F. Supp. 2d at 630 (finding in FIRREA case that the Government adequately alleged contemplated harm by alleging that defendant's "fraudulent underwriting practices led to the [defendant] issuing loans that materially violated HUD regulations" and thus "had a higher risk of default").

specifically." (Defs. Mem. 54 (alteration and internal quotation marks omitted).)  In addition, Defendants argue that "[e]ven if Plaintiff had a coherent legal theory," the allegations in the Complaint are conclusory and do not satisfy Rule 9(b). (*Id.* at 55–56.)

Plaintiff argues that it is not required to show that the "goal" of the fraudulent scheme was to harm a bank; it "need only show knowledge that the fraudulent scheme would deprive a financial institution of its property interest." (Pl. Opp'n 53.)  In addition, Plaintiff argues that "Defendants cannot seriously argue that the Complaint fails to plausibly allege that Defendants intended to defraud FIs when they executed their scheme to defraud all investors in the Subject Deals" and knew that FIs "were among the entities investing in every Subject Deal." (*Id.* at 54.)

The bank fraud statute "criminalizes schemes to defraud, or schemes to obtain the money of, a financial institution."[9] *United States v. Bouchard*, 828 F.3d 116, 123 (2d Cir. 2016) (internal quotation marks omitted); *see also Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019) ("As the text of the bank fraud statute makes clear, the conduct it proscribes is knowingly executing a scheme to (1) defraud a financial institution or (2) fraudulently obtain assets owned by or under the custody of a financial institution.").  "The well established elements of the crime of bank fraud are that the defendant (1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *United States v.*

---

[9]  The bank fraud statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice — (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

*Norris*, 513 F. App'x 57, 59 (2d Cir. 2013) (quoting *United States v. Barrett*, 178 F.3d 643, 647–

48 (2d Cir. 1999)).  The first prong requires a showing that "the defendant engaged in a

deceptive course of conduct by making material misrepresentations."  *United States v. Wider*,

184 F. Supp. 3d 10, 16 (E.D.N.Y. 2016) (quoting *United States v. Rigas*, 490 F.3d 208, 231 (2d

Cir. 2007)).  Although the second prong requires a showing that the defendant "possessed an

intent to victimize the institution," *Norris*, 513 F. App'x at 59, the Supreme Court has explained

that the statute "demands neither a showing of ultimate financial loss nor a showing of intent to

cause financial loss" and does not require proof of "more than [the defendant's] simple

knowledge that he would likely harm [a] bank's property interest."  *Shaw v. United States*, 580

U.S. ---,---, 137 S. Ct. 462, 467–68 (Dec. 12, 2016).

   The Complaint adequately states a claim for bank fraud.  Plaintiff alleges that

Defendants made material misrepresentations to investors, including FIFIs and FIs.  For

example, in July of 2006, Defendants represented to Freddie Mac, a government-sponsored

financial institution, (Compl. ¶ 30), that "[f]or prime, 100% of the loans are subject to value due

diligence," (Table 2b 4).  Plaintiff alleges that this statement was misleading because Defendants

did not review 100% of the loans in any of the Subject Deals.  For example, in MARM 2006-

OA1, after valuation due diligence began, 1022 loans were added to the deal and Defendants

never performed any due diligence on these added loans.  (Compl. ¶ 260.)  In addition, Plaintiff

alleges that one or more FIFIs purchased certificates in each of the Subject Deals, including,

*inter alia*, the Bank of New York Mellon and the Federal Home Loan Bank of San Francisco.

(*Id.* ¶¶ 295–96.)  These and the other factual allegations in the Complaint, as discussed *supra*, are

sufficient to show that Defendants (1) "engaged in a deceptive course of conduct by making

material misrepresentations," *Wider*, 184 F. Supp. 3d at 16, and (2) were aware that their course

of conduct would "likely harm" a FIFI or FI, *Shaw*, 580 U.S. at ---, 137 S. Ct. at 467–68

(explaining that the bank fraud statute does not require proof of "more than [the defendant's]

simple knowledge that he would likely harm [a] bank's property interest").  Plaintiff has

therefore adequately pled a claim for bank fraud.  *See United States v. Lebedev*, 932 F.3d 40, 51

(2d Cir. 2019) (upholding bank fraud conviction where the evidence showed that the defendant

"caused false information to be sent to financial institutions . . . with the intent to obtain funds

under those institutions' custody and control"); *United States v. Reese*, 603 F. App'x 63, 64 (2d

Cir. 2015) (upholding bank fraud conviction where "[t]he exposure of the banks was not unclear,

remote, or non-existent" (citation and internal quotation marks omitted)).

     Defendants' argument that the Complaint fails to state a claim for bank fraud because it

does not allege facts showing that the "goal" of the purported scheme was to "defraud a bank or

obtain bank property specifically," (Defs. Mem. 54), has been explicitly rejected by the Supreme

Court in *Shaw*, 580 U.S. ---, 137 S. Ct. 462.  In *Shaw*, the defendant argued that "the bank fraud

statute requires the Government to prove more than his simple knowledge that he would likely

harm the bank's property interest; in his view, the Government must prove that such was his

*purpose*." *Shaw*, 580 U.S. at ---, 137 S. Ct. at 468.  The Supreme Court rejected this argument,

explaining that the statute criminalizes the "*knowing* execution of a scheme to defraud," and to

require a different state of mind would subvert congressional intent.[10]  *Id.* (alterations omitted).

----

     [10]  In *Shaw*, the defendant obtained a victim's bank account number and used it to
transfer funds from the victim's account to other accounts.  580 U.S. at ---, 137 S. Ct. at 466.  On
appeal to the Supreme Court, the defendant argued that his conviction for bank fraud should be
overturned because, *inter alia*, the statute "requires the Government to prove more than his
simple *knowledge* that he would likely harm the bank's property interest" in the individual's
account, and instead required it to "prove that such was his purpose." *Id.* at 468.  In rejecting the
argument, the Supreme Court found that the statute criminalizes the "knowing execution of a
scheme to defraud," and "[t]o hold that something other than knowledge is required would

Accordingly, contrary to Defendants' argument, Plaintiff is not required to prove that the "goal" of the purported scheme was to "defraud a bank or obtain bank property specifically." (Defs. Mem. 54.)

### 2.   Fraudulent bank transactions

Defendants argue that Plaintiff fails to state a claim for fraudulent bank transactions under 18 U.S.C. § 1005(4) because the statute only creates liability for officers, directors, agents, or employees of the covered institutions, i.e., "bank insiders." (*Id.* at 56.)

Plaintiff argues that Defendants' argument is "contrary to the plain language of the statute, and to the weight of the authority interpreting it." (Pl. Opp'n 55.)

Section 1005 provides in pertinent part:

> Whoever, being an officer, director, agent or employee of any [covered institution], without authority from the directors of such [institution], issues or puts in circulation any notes of such bank, branch, agency, or organization or company; or

> Whoever, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

> Whoever makes any false entry in any book, report, or statement of such [institution] with intent to injure or defraud such [institution], or to deceive any [covered institution]; or

> Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution —

> Shall be fined not more than $1,000,000 or imprisoned not more

---

assume that Congress intended to distinguish, in respect to states of mind, between (1) the fraudulent scheme, and (2) its fraudulent elements," a view unsupported by any "relevant authority in the area of mail fraud, wire fraud, financial frauds, or the like." *Id.* (alterations omitted).

than 30 years, or both.

18 U.S.C. § 1005.

Prior to 1948, the conduct proscribed by the first three paragraphs of section 1005 were "contained . . . in a single paragraph that began with language limiting the provision expressly" to bank insiders.  *United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 798 F. Supp. 2d 517, 525 (S.D.N.Y. 2011).  In 1948, Congress recodified the statute and "divided the single paragraph into three separate paragraphs, after which the limiting language appeared in Paragraph One only." *Id.*  In light of this legislative history, some courts have found that the bank insider limitation in the first paragraph also applies to the second and third paragraphs of section 1005.  *See United States v. Barel*, 939 F.2d 26, 39–41 (3d Cir. 1991) (holding that paragraph three does not apply to non-insiders); *see also United States v. Devillier*, No. 16-CR-12, 2016 WL 2621968, at *2–3 (M.D. La. May 5, 2016) ("Some courts . . . have held that 18 U.S.C. § 1005's legislative history justifies an interpretation that bars anybody who is not a bank insider from being prosecuted under paragraphs one, two, and three."); *United States v. Ortiz*, 906 F. Supp. 140, 145 (E.D.N.Y. 1995) (finding that paragraph three of section 1005 only applied to bank insiders because of the legislative history).  These courts have reasoned that "this is one of those rare cases where the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling."  *Barel*, 939 F.2d at 39 (alteration and internal quotation marks omitted).

In 1989, almost fifty years after the recodification of section 1005, Congress added the fourth paragraph to section 1005 as part of the FIRREA.  *See Rubin/Chambers, Dunhill Ins. Serv.*, 798 F. Supp. 2d at 526.  FIRREA was enacted in the wake of the savings and loan crisis to "put the Federal deposit insurance funds on a sound financial footing, provide funds to deal expeditiously with failed depository institutions, and strengthen the enforcement powers of

Federal regulators of depository institutions." *Nat'l Credit Union Admin. Bd.*, 775 F.3d at 148

(alterations, citations, and internal quotation marks omitted). The legislative history of the

FIRREA notes the addition of paragraph four to section 1005, but does not indicate that the

provision was intended to be limited to bank insiders. *See* H.R. Rep. No. 101–54(I), at 399–400,

472–73, reprinted in 1989 U.S.C.C.A.N. 86, 195–96 ("Section 961(d) amends 18 U.S.C. 1005,

[and] . . . adds a new provision making it an offense for a person to participate, share, or receive

directly or indirectly any money, profit, property, or benefits through a financial transaction with

intent to defraud the United States."); *see also Wells Fargo*, 972 F. Supp. 2d at 627 ("In adding

paragraph four to the Section, Congress gave no indication that the word 'whoever 'should be

limited to bank insiders."); *Van Brocklin*, 115 F.3d at 597 ("Given Congress' concerns in

enacting FIRREA, we decline to read into paragraph four of § 1005 a class restriction that

Congress did not itself mention."); *United States v. Johnson*, No. 11-CR-501, 2015 WL

8967525, at *3 (D. Utah Dec. 15, 2015) ("Congress had not limited the term 'whoever' to bank

insiders when adding paragraph four to Section 1005, as part of FIRREA, as it did . . . elsewhere

in FIRREA.").

The Complaint adequately states a claim for fraudulent bank transactions under the fourth

paragraph of section 1005. Although Defendants argue that the insider limitation of the first

clause of the first paragraph, limiting liability to "an officer, director, agent, or employee of any

[covered institution]," applies to the fourth paragraph, pursuant to which Plaintiff brings its

claim, the plain language of the statute undermines Defendants' argument. *See* 18 U.S.C. §

1005. The fourth paragraph contains no insider limiting language and provides for liability for

"[w]hoever," i.e., anyone who engages in certain conduct, while the first paragraph limits

liability to "an officer, director, agent, or employee of any [covered institution]," i.e., an insider.

18 U.S.C. § 1005.  There is no indication on the face of the statute that Congress intended this

limitation to apply to paragraph four.  *See Johnson*, 2015 WL 8967525, at *4 ("The plain

language of paragraph four of the statute does not contain any language limiting its application to

bank insiders."); *Wells Fargo*, 972 F. Supp. 2d at 629 (holding that "the text of the statute"

indicates that "the fourth paragraph of Section 1005 is not limited to bank insiders").

Defendants argue[11] that based on the legislative history of section 1005, "Congress

clearly envisioned that the insider limitation would carry through to all paragraphs" of the

statute.[12]  (Defs. Mem. 56.)  Contrary to Defendants' argument, the legislative history of the first

three paragraphs differs from that of the fourth paragraph.  *See United States v. Van Brocklin*,

115 F.3d 587, 597 (8th Cir. 1997) ("[P]aragraph four has a much different history than the rest of

§ 1005."); *Devillier*, 2016 WL 2621968, at *2–3 ("T]he legislative history of 18 U.S.C. § 1005's

fourth paragraph is quite different" than that of the first three); *Johnson*, 2015 WL 8967525, at

*4 ("Based on the vastly different legislative history of paragraph four, and its addition to

Section 1005 under FIRREA almost fifty years after the first three paragraphs, there is no reason

to import the bank insiders restriction into paragraph four.").

---

[11]  Other than their argument that the statute only applies to insiders, Defendants do not otherwise challenge the sufficiency of the pleadings as to section 1005.

[12]  Defendants argue that "[a]ll but one of the courts that have considered the question . . . have held that the second and third paragraphs of Section 1005 are limited to bank insiders." (Defs. Mem. 56–57 (citing *United States v. Barel*, 939 F.2d 26 (3d Cir. 1991), *United States v. Ortiz*, 906 F. Supp. 140 (E.D.N.Y. 1995), and *United States v. Edwards*, 566 F. Supp. 1219 (D. Conn. 1983)).)  However, whether the insider limitation applies to paragraphs two and three is not before the Court.  Defendants cite only one case, *United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 798 F. Supp. 2d 517, for the proposition that the fourth paragraph is limited to bank insiders, (Defs. Mem. 58), but the Court is not persuaded by the reasoning in *Rubin/Chambers*. As noted by the court in *Wells Fargo*, because of the ambiguity of the legislative history, "there is no basis to deviate from the plain language of paragraph four by limiting it in a similar manner" to the limitation in the first paragraph.  972 F. Supp. 2d at 629.

Based on the language of the statue and the difference in legislative history, the Court declines to read the bank insider limitation into the fourth paragraph of the statute.[13]  *See Wells Fargo*, 972 F. Supp. 2d at 627 ("Whatever the merits of limiting paragraphs two and three of Section 1005 to bank insiders . . . , there is no basis to deviate from the plain language of paragraph four by limiting it in a similar manner."); *Devillier*, 2016 WL 2621968, at *3 (joining "every other court to have addressed th[e] issue" and holding "that [the] fourth paragraph is not by its terms restricted to bank insiders"); *Johnson*, 2015 WL 8967525, at *4.  Accordingly, the Court finds that paragraph four of section 1005 is not limited to bank insiders and applies to Defendants' alleged fraudulent conduct.

### 3.   False statements to banks

Defendants argue that Plaintiff fails to state a claim for false statements to banks under 18 U.S.C. § 1014 because the statute does not "cover situations where the only involvement of a covered financial institution is as one of dozens of investors in a public securities offering." (Defs. Mem. 59.)

Plaintiff argues that Defendants' argument fails because the Supreme Court has instructed that section 1014 is unambiguous and should be interpreted according to its plain terms and that Defendants' interpretation of the statute would "render large swaths of the statutory language superfluous."  (Pl. Opp'n 57–60.)

Section 1014 provides in pertinent part:

> Whoever knowingly makes any false statement or report, or willfully overvalues any land, property, or security, for the purpose of influencing in any way [a covered institution], upon any application, advance, discount, purchase, purchase agreement,

---

[13]  Moreover, as the court noted in *Wells Fargo*, "Congress made clear elsewhere in FIRREA that it knew how to limit liability to bank insiders when it wanted to do so."  972 F. Supp. 2d at 628 (citing 18 U.S.C. § 1510).

> repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014.

To establish a claim under section 1014, there must be proof that (1) the institution's deposits were federally insured, (2) the defendant made false statements to the institution, (3) the defendant knew the statements made were false, and (4) the statements were made for the purpose of influencing the institution to make one of the specified transactions.  *United States v. Chacko*, 169 F.3d 140, 147 (2d Cir. 1999); *United States v. Kelly*, No. 11-CR-192, 2014 WL 3565957 (D. Conn. July 18, 2014); *Banco de Chile v. Lavanchy*, No. 05-CV-4658, 2008 WL 10716345 (S.D.N.Y. Nov. 6, 2008).  The breadth of the statute has been recognized by several courts.  *See Elliot v. United States*, 332 F.3d 753, 763 (4th Cir. 2003) (finding that section 1014 is a "broad statutory provision"); *United States v. Bank of Am. Corp.*, No. 13-CV-446, 2014 WL 2777397, at *7 (W.D.N.C. June 19, 2014) ("[I]it would appear that Section 1014 does in fact reach . . . fraud in inducing a bank to purchase of securities."); *United States v. Zahavi*, No. 12-CR-288, 2012 WL 5288743, at *2 (S.D.N.Y. Oct. 26, 2012) (acknowledging the "breadth of the statutory language" in section 1014).

The Court finds that section 1014 applies to Defendants' alleged misrepresentations to covered institutions to induce them to "advance" funds in exchange for RMBS Certificates or "purchase" RMBS Certificates in the Subject Deals.  (*See, e.g.*, Compl. ¶ 115.)

Defendants do not argue that the plain language of the statute compels a different conclusion, but argue instead that the statute does not apply to this case because it only covers statements made in connection with lending transactions.  (Defs. Mem. 59–60.)  In support of their argument, Defendants cite to *Williams v. United States*, 458 U.S. 279 (1982), and *United States v. Krown*, 675 F.2d 46 (2d Cir. 1982), both of which are distinguishable.

In *Williams*, the Supreme Court overturned the defendant's conviction under section 1014, finding that, by making bad checks, he did not "make[] any false statement or report, or willfully overvalue[] any land, property, or security," as required by the statute.  458 U.S. at 284 & n.9 (alteration omitted).  In rejecting the government's argument that the statute should be read more broadly — such that a bad check would be considered a "false statement" — the Supreme Court explained that the legislative history reflects that the statute should not be "applicable to anything other than representations made in connection with conventional loan or related transactions."  *Id.* at 288–89.

In *Krown*, the Second Circuit held that there was no basis to find that the defendant, who paid for certain items from a supplier with checks issued by a fake bank, intended to influence the supplier's bank in making an "advance, loan, or commitment."  *Id.*  Instead, the defendant intended "to have the bank accept the certified checks for deposit and carry out collection procedures" so that he would "gain time for further fraudulent dealings" with the supplier.  *Id.* at 50–51.  In so holding, the Second Circuit explained that section 1014 "is not designed to have general application to the passing of worthless checks, and that the language of the statute, limiting it to the specified credit transactions, must be given effect."  *Id.*

Neither *Williams* nor *Krown* supports a conclusion contrary to the result reached by the Court.  In *Williams*, the Supreme Court interpreted the second element of the statute, which requires the making of a false statement.  *See Williams*, 458 U.S. at 284–285.  "The Court [did] not question" whether the other elements of the statute had been met, i.e., that the defendant presented bad checks "for the purpose of influencing the bank to extend him credit in the form of a loan or advance," *Id.* at 300 (Marshall, J., dissenting), and therefore had no opportunity to consider the fourth element of the statute at issue in this case — that the statements were made

for the purpose of influencing the institution to make one of the specified transactions. Similarly, in *Krown*, while the Second Circuit interpreted the same element of the statute at issue in this case, it acknowledged that "[i]t would also appear that a worthless check could, under certain circumstances, constitute overvalued security for an advance, loan, or commitment," but held that the defendant in *Krown* did not have the requisite intent, i.e., there was no evidence that the defendant intended to influence the supplier's bank. *Krown*, 675 F.2d at 50. The court's holding therefore has no bearing on whether a securities offering can be considered an "advance" or "purchase" under section 1014.

Courts interpreting both *Williams* and *Krown* have likewise acknowledged their narrow holdings. *See Elliot*, 332 F.3d at 762 ("*Williams* does not govern a situation in which some information on the check, such as a false signature . . . is itself a false statement." (quoting *United States v. Hord*, 6 F.3d 276, 285 (5th Cir. 1993)); *Hord*, 6 F.3d at 287 n.18 (distinguishing *Krown* based on the fact that in *Krown*, "the purpose of this scheme was not to induce the bank to make an advance, loan, commitment, etc., but to give the defendant more time to buy goods on credit from the payee of the checks"); *United States v. Falcone*, 934 F.2d 1528, 1541 (11th Cir. 1991) ("Most courts . . . have declined to read *Williams* broadly to require the reversal of convictions in situations other than those involving insufficient-funds checks."), *reh'g granted & opinion vacated on other grounds*, 939 F.2d 1455 (11th Cir. 1991), *opinion reinstated on reh'g*, 960 F.2d 988 (11th Cir. 1992); *United States v. Greene*, 670 F. Supp. 337, 339 (M.D. Fla. 1987) (explaining that in *Williams*, the court considered "a very narrow issue").[14]

---

[14] Several courts have also concluded that although both *Williams* and *Krown* note that the legislative history of section 1014 suggests that the statute is applicable only to "representations made in connection with conventional loan or related transactions," *Williams*, 458 U.S. at 288–89, the legislative history of the statute is actually broader. *See Bank of Am.*

Accordingly, the Court finds that section 1014 applies to Defendants' alleged scheme. *See United States v. Boren*, 278 F.3d 911, 916 (9th Cir. 2002) (holding that section 1014 "is not limited to lending transactions"); *United States v. $37,564,565.25 in Account Number XXXXXXXXXXX at Morgan Stanley, in Name of Anicorn, LLC*, 2019 WL 5269073 (D.D.C. Oct. 17, 2019) ("Persuasive appellate authority favors the Government's position that § 1014 liability extends beyond lending.").

### c.   Personal jurisdiction

Defendants argue that the Court should dismiss Plaintiff's claims against UBS AG because it is not subject to specific jurisdiction[15] in New York.  (Defs. Mem. 61.)  In support, Defendants argue that (1) although UBS AG originated loans under the trade name Home Finance, this entity is based in Florida, not New York, and (2) although UBS AG was a "counterparty to various side agreements" involving some of the Subject Deals, these agreements did not give rise to the "episode-in-suit."  (*Id.* at 61–63.)

Plaintiff argues that UBS AG is subject to specific jurisdiction in New York because it originated loans in the Subject Deals through Home Finance and made misrepresentations

---

*Corp.*, 2014 WL 2777397, at *8 ("It is readily apparent to the court that the law is intended to protect federally insured financial institutions — as well as the government which insures those institutions — not just from those who would cause harm to a financial institution by making false statements in furtherance of a loan, but those who would make false statements that influence in *any way* a covered institution's decision as to *any purchase*."); *Zahavi*, 2012 WL 5288743, at *2 (explaining that the legislative history of section 1014 includes maintaining "the vitality" of the Federal Deposit Insurance Corporation ("FDIC") and covering "all undertakings which might subject the FDIC insured bank to risk of loss" (citation omitted)); *see also United States v. Krilich*, 159 F.3d 1020, 1028–29 (7th Cir. 1998) (explaining that section 1014 criminalizes misstatements to a number of institutions that do not "makes loans," and therefore holding that "[i]f their inclusion in the statute is to have meaning, then § 1014 must cover statements that are not designed to influence an extension of credit").

[15]  Plaintiff concedes that UBS AG is not subject to general jurisdiction in New York. (Pl. Opp'n 61.)

regarding these loans.  (Pl. Opp'n 61.)  In addition, Plaintiff argues that UBS AG is subject to personal jurisdiction because it (1) was the ultimate parent and sole owner of every other Defendant, (2) was "directly involved in the marketing of RMBS and misrepresenting RMBS to investors," as evidenced by the fact that every presentation identified in the Complaint contains a statement that it was "prepared by UBS AG, or an affiliate thereof," and (3) was "Cap Provider or Swap Provider," in each of the Subject Deals.  (*Id.* at 64.)

"There are two types of personal jurisdiction: specific and general."  *Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 225 (2d Cir. 2014), *cert. denied*, 573 U.S. 948 (2014).  Specific jurisdiction requires a connection between the forum exercising jurisdiction over the defendant and the underlying controversy that gave rise to the claim.  *Id.* ("Specific or conduct-linked jurisdiction . . . 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" (alteration omitted) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))).  Under New York law, courts exercise specific jurisdiction pursuant to New York Civil Practice Law and Rules ("CPLR") section 302.  This provision has two prongs: (1) "[t]he defendant must have transacted business within the state," either itself or through an agent, and (2) "the claim asserted must arise from that business activity."  *Licci ex rel. Licci v.*, 732 F.3d at 168 (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).

Plaintiff has made a prima facie showing that UBS AG is subject to personal jurisdiction in New York based on its origination of loans under the trade name Home Finance that were securitized in two of the subject deals, MARM 2007-HF1 and MARM 2007-HF2.  Plaintiff alleges that Home Finance made misrepresentations in the marketing and sale of its loans in New

York, (Compl. ¶¶ 41, 563–89), including by representing that its loans were originated in accordance with underwriting standards or otherwise had compensating factors and were originated in accordance with applicable laws, (*id.* ¶ 184). Plaintiff alleges that Home Finance knew that its representations were false based on the due diligence it conducted, which revealed that between 40% and 80% of its loans were graded "critical," i.e., "did not comply with Home Finance underwriting guidelines and did not have approved exceptions to the guidelines, or were not originated in compliance with all applicable laws and regulations." (*Id.* ¶¶ 187–89.)

Plaintiff has therefore established a direct relationship between the alleged fraudulent scheme and UBS AG's in-state conduct through Home Finance. *Solé Resort*, 450 F.3d at 103 (explaining that personal jurisdiction exists where "there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted"); *Kings County, Wash. v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 316 (S.D.N.Y. 2011) (explaining that specific jurisdiction requires "a direct relation between the cause of action and [the defendant's] in-state conduct" (citation omitted)).

Although the prospectus supplements for the Home Finance Deals state that Home Finance was a trade name for "UBS AG, Tampa Branch, which is based in Florida," (Defs. Mem. 62), a June of 2007 presentation to investors states that "corporate management and capital markets trading for the correspondent, wholesale, and retail channels" of Home Finance were based in New York, New York. (Investor Presentation 6, annexed to Decl. of Bonni J. Perlin in Supp. of Pl. Opp'n as Ex. 3, Docket Entry No. 61-3.) In view of the fact that "all factual disputes are resolved in the plaintiff's favor," *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommandigesellschaft v. Navimpex Cetrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)

(citation omitted), the Court concludes that Plaintiff has made a prima facie showing of personal jurisdiction.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 630 (S.D.N.Y. 2017) (explaining that, in determining whether the plaintiff has established a prima facie case of personal jurisdiction, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party").[16]

### III. Conclusion

For the reasons set forth above, the Court denies Defendants' motion to dismiss the Complaint.  The Court directs the parties to submit letter briefs on the issue of whether the Court

---

[16]  Plaintiff contends that UBS AG is subject to personal jurisdiction in New York over all transactions based on its role as swap provider, cap provider, corridor contract counterparty, or yield maintenance agreement provider and its status as the ultimate parent and sole owner of every other Defendant.  (Pl. Opp'n 63–64.)  These allegations are insufficient to show personal jurisdiction because (1) Plaintiff does not define these terms or explain what UBS AG did in these roles or whether its conduct in these roles had anything to do with the alleged fraud, *see Licci ex rel. Licci*, 732 F.3d at 168 (explaining that specific jurisdiction requires that "[t]he defendant . . . transacted business within the state," and  "the claim asserted . . . [arose] from that business activity." (citation omitted)), and (2) Plaintiff does not allege any facts from which the Court could conclude that any of the Defendants were acting "for the benefit of, with the knowledge and consent of, and under some control by" UBS AG, *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (explaining that under New York's long arm statute, "there is jurisdiction over a principal based on the acts of an agent where the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresidential principal" (citation and internal quotation marks omitted)).

Plaintiff also argues, without any legal support, that the scope of UBS AG's "involvement in the remaining [S]ubject Deals is irrelevant" because UBS AG is subject to personal jurisdiction for every cause of action based on the Home Finance Deals.  (Pl. Opp'n 63 & n.49.)  Because Plaintiff did not brief this issue and Defendants do not specifically respond to it in their reply, the Court declines to decide whether it has personal jurisdiction over UBS AG for the non-Home Finance Deals based on the Court's personal jurisdiction over UBS AG for the Home Finance Deals.  The Court directs the parties to submit letter briefs on this issue within fourteen days of the date of this Memorandum and Order.

has personal jurisdiction over the non-Home Finance Deals within fourteen days of the date of

this Memorandum and Order.

Dated: December 10, 2019
       Brooklyn, New York

                                  SO ORDERED:


                                  _____s/ MKB_____
                                  MARGO K. BRODIE
                                  United States District Judge