```
----------------------------------------------------------------------  X
                                                                        :
UNITED STATES OF AMERICA,                                               :
                                                                        :
                                                                        :
                          Plaintiffs,                                   :
                                                                        :          ORDER
              -against-                                                 :     1:18-CV-6369 (RPK)(PK)
                                                                        :
UBS SECURITIES LLC, UBS AG, MORTGAGE                                    :
ASSET SECURITIZATION TRANSACTIONS, INC.,                                :
and UBS REAL ESTATE SECURITIES, INC.,                                   :
                                                                        :
                          Defendants.                                   :
                                                                        :
----------------------------------------------------------------------  X
```

**Peggy Kuo, United States Magistrate Judge:**

In this civil action, Plaintiff the United States of America alleges that Defendants UBS Securities LLC, UBS AG, Mortgage Asset Securitization Transactions, Inc., and UBS Real Estate Securities, Inc. (collectively, "UBS" or "Defendants") violated the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1833a ("FIRREA"). (Compl., Dkt. 1.) Defendants have moved to compel the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Treasury ("Treasury") to preserve and produce certain categories of relevant documents as parties to this lawsuit pursuant to Federal Rule of Civil Procedure 34. ("Motion," Dkt. 45.) Plaintiff maintains that the Motion should be denied because (1) HUD and Treasury are not subject to party discovery in this action, and (2) the documents sought are not relevant.

For the reasons set forth below, the Court denies the motion to compel production.

## PROCEDURAL HISTORY

Plaintiff brought this action, alleging that "[b]etween January 1, 2005, and December 31, 2007 . . . , [Defendants] sold tens of billions of dollars of residential mortgage-backed securities ('RMBS'), in which [they] knowingly and repeatedly made false and fraudulent statements to investors about the

1

characteristics of the loans backing" forty RMBS trusts, which Defendants "sponsored, issued, underwrote, managed, or offered" (the "Subject Deals"). (Compl. ¶ 1.) Plaintiff asserts five causes of action against Defendants seeking FIRREA civil penalties predicated on: mail fraud (*id.* ¶¶ 792-802); wire fraud (*id.* ¶¶ 803-13); bank fraud (*id.* ¶¶ 814-20); fraudulent benefit from a transaction with a covered financial institution (*id.* ¶¶ 821-25); and false statements made to influence the actions of a covered financial institution (*id.* ¶¶ 826-30).

In lieu of filing an answer, Defendants sought to dismiss the case.[1] Before the motion to dismiss was fully briefed, Defendants filed the Motion "request[ing] that the Court order Plaintiff to preserve potentially relevant documents, and to search for and to produce documents responsive to [Defendants'] Rule 34 document requests, from HUD and Treasury." (Motion at 3; *see also* Dkt. 53 at 3.) Plaintiff opposed the Motion. (Dkt. 52.)

A conference on the Motion was held on July 9, 2019 at the end of which the Court directed the parties to file supplemental briefing on the issues of (1) whether HUD and Treasury are obligated to respond to document requests served on Plaintiff pursuant to Rule 34 (Dkt. 66 at 47:5-14), and (2) the specific types of documents sought by Defendants and the relevance of those documents (*id.* at 47:15-19). Because no answer had been filed, the Court also invited Defendants to state their defenses in order to support their arguments regarding the relevance of the requested documents. (*Id.* at 49:20-50:10.)

Defendants filed their Supplemental Memorandum of Law in Support of their Motion to Compel the Preservation and Production of HUD and Treasury Documents ("Suppl. Memo.," Dkt. 67), and Plaintiff filed its Memorandum of Law in Opposition to Defendants' Motion to Compel Party Discovery from HUD and Treasury. ("Opp.," Dkt. 69.) In addition, Defendants filed a Reply

---

[1] Defendants' motion to dismiss the complaint was denied on December 10, 2019, but no answer has yet been filed because of a pending decision regarding the scope of the Court's jurisdiction in this matter. (Dkt. 76 at 45-46, 45 n.16.)

2

Memorandum of Law in Further Support of Their Motion to Compel the Preservation and Production of HUD and Treasury Documents ("Reply," Dkt. 70), and Plaintiff filed a Sur-Reply Memorandum of Law in Opposition to Defendants' Motion to Compel Party Discovery from HUD and Treasury ("Sur-Reply," Dkt. 72).[2]

As part of the Motion, Defendants ask the Court to find that HUD and Treasury are subject to party discovery pursuant to Rule 34 "because [these agencies] are non-independent Executive Branch departments 'answerable to instructions from the President.'" (Suppl. Mem. at 2 (quoting *United States v. AT&T Co.*, 461 F. Supp. 1314, 1336 (D.D.C. 1978).) Such a finding is requested here, not only for the purpose of document production, but also, as Defendants state: "Discovery from HUD and Treasury is critical here, where the United States is Plaintiff, because their statements will be admissible under Federal Rule of Evidence 801(d)(2) as statements of the opposing party …." (Mot. at 1.)

In addition, they request that the Court order Plaintiff, including HUD and Treasury, to preserve and produce documents that fall into six categories: (1) HUD's review and approval of originators; (2) HUD's audits of originators; (3) HUD's analyses of housing policies; (4) HUD's analyses of mortgage underwriting guidelines; (5) Treasury's analyses of the causes of the housing bubble and the 2008 financial crises; and (6) Treasury's analyses of RMBS purchased in Treasury's Public-Private Investment Program. ("Suppl. Mem. App. A," Dkt. 67-1 at 1-4.)

Plaintiff maintains that "government 'possession, custody, or control' of documents extends only to materials in the possession of the prosecutors in a particular case or governmental agencies jointly involved in the case and not the 'government' as a whole." (Opp. at 6-7.) The government's "investigation [of Defendants] was conducted by the United States Attorneys' Offices for the Eastern

---

[2] Plaintiff filed a Notice of Supplemental Authority on July 9, 2020 (Dkt. 85), to which Defendants replied on July 12, 2020 (Dkt. 86).

3

District of New York and the Northern District of Georgia, with assistance from the Federal Housing Finance Agency, Office of Inspector General.  Neither HUD nor Treasury had any role in investigating this case." (*Id.* at 4.)  Plaintiff also argues that the documents sought by Defendants "are patently not relevant to any claim or articulated defense at issue in this case, much less proportional to the needs of the case or important to the issues at stake." (*Id.* at 14.)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 34(a)(1)(A) permits a party to a civil action to "serve on any other party a request within the scope of Rule 26(b) to produce . . . any designated document or electronically stored information." Under Rule 26(b)(1),

> the scope of discovery is . . . any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Rule 26(b) "is liberally construed and is necessarily broad in scope." *New Falls Corp. v. Soni*, No. 16-CV-6805 (ADS)(AKT), 2020 WL 2836787, at *1 (E.D.N.Y. May 29, 2020) (quotation and citation omitted).  "Information is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.  Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." *Id.* at *2 (quotation and citation omitted).  The Court considers Rule 26's proportionality requirement, "which focuses on the marginal utility of the discovery sought," in connection with the relevance of the information sought. *Id.* at *2 (quotation and citation omitted).  "[T]he greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.* (quotation and citation omitted).

"The party seeking discovery must make a *prima facie* showing that the discovery sought is

4

more than merely a fishing expedition." *Mamakos v. United Airlines, Inc.*, No. 14-CV-7294 (JFB)(AKT), 2018 WL 4861392, at *2 (E.D.N.Y. Sept. 28, 2018) (quotation, citation, and alteration omitted). Once this showing has been made, the burden shifts to the responding party "to justify curtailing discovery." *Soni*, 2020 WL 2836787, at *2 (quotation and citation omitted). "A district court has broad latitude to determine the scope of discovery and to manage the discovery process." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012).

Non-party discovery is governed by Federal Rule of Civil Procedure 45. *See Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 90 (D. Conn. 2012). Rule 45 permits parties to serve subpoenas on non-parties requiring the non-party "to permit inspection, copying, testing, or sampling" of "documents, electronically stored information, or tangible things." Fed. R. Civ. P. 45(a)(1)(D). Although the procedures for obtaining documents under Rule 45 are different from those in Rule 34, "[t]he scope of discovery under the two rules is coextensive, [ ] at least with respect to document discovery." *Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 n.4 (S.D.N.Y. 2000); *see also Cross v. Connolly*, No. 17-CV-906V (SR), 2020 WL 553573, at *2 (W.D.N.Y. Feb. 4, 2020) ("The reach of a subpoena issued pursuant to Fed. R. Civ. P. 45 is subject to the general relevancy standard applicable to discovery under Fed. R. Civ. P. 26(b)(1)." (quotation and citation omitted)).

In addition to the procedural differences between Rule 34 and Rule 45, the scope of the "party" to a lawsuit is relevant to other forms of discovery as "non-part[ies] may not be served with interrogatories . . . or requests for admission." *Brown v. Semple*, No. 16-CV-1144 (SRU), 2017 WL 1190365, at *7 (D. Conn. Mar. 30, 2017); *see also Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.*, No. 14-CV-982 (ADS)(AKT), 2018 WL 4853049, at *2 (E.D.N.Y. Sept. 28, 2018) ("As indicated by the text of Rules 33 and 34, the discovery devices available under those rules are reserved for party to party production" (quotation and citation omitted)).

5

**DISCUSSION**

**I.       Whether HUD and Treasury are Parties to This Action**

Defendants argue that when the United States is a party to a civil action, party discovery includes federal agencies other than the U.S. Department of Justice ("DOJ"). They rely on *United States v. American Telephone & Telegraph*, 461 F. Supp. 1314 (D.D.C. 1978), an antitrust action in which the court rejected the United States' arguments that only the DOJ is a party and that "discovery from other government agencies and departments must proceed under the more restrictive provisions of Rule 45" as non-parties. *Id.* at 1330. The court there found that "[t]he theory of the government's case and the relief requested [were] national in scope and they [were] likely to involve the documents and the activities of a great number of government departments." *Id.* at 1334. Given that the United States sought to "vindicat[e ] broad economic policy" through the pursuit of its case against the defendants, the court concluded that "it simply [made] no sense to hold that the Department of Justice, which essentially is a law office, alone comprises the United States." *Id.* at 1333.

Plaintiff urges a narrow application of *AT&T,* claiming that "courts [have] recognized that *AT&T* [i]s an extraordinary order for an extraordinary litigation" (Opp. at 8) and that "its core reasoning has been overwhelmingly rejected" (Dkt. 52 at 2).

The court in *AT&T* sought to limit the reach of its own decision, characterizing the case as "relatively unique." *AT&T*, 461 F. Supp. at 1334. The court stated:

> Plaintiff has expressed fear that a precedent against its position here might encourage other litigants in other cases to rummage through the files of the entire government, and so paralyze both the work of numerous agencies and that of the courts. The short answer is that in the various respects described above, the instant case is relatively unique. The Court today holds only that on these peculiar facts, which involve massive and wide-ranging allegations, and in this peculiar action, which involves many departments and their evidence, the United States, having filed the action, cannot claim to be merely the Department of Justice.

*Id.* (footnote omitted). However, it turns out that while uncommon, the situation in *AT&T* was not unique, and subsequent courts have found that the "United States" as a party encompasses not just

6

the DOJ, but agencies which are "engaged in a joint effort" with the DOJ, or "when the other agency is so closely aligned with the Justice Department as to be part of the prosecuting team or has contributed significantly to the investigation or prosecution of the case." *Deane v. Dynasplint Sys., Inc.*, No. 10-CV-2085, 2015 WL 1638022, at *4 (E.D. La. Apr. 13, 2015) (citations omitted). In *Deane*, the court found that "you" for the purpose of responding to discovery requests should include the prosecutors who had "responsibility for th[e] action or the investigation leading thereto, and those components of the United States Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) that have or had responsibility for the administration or oversight of the Medicare program that is the subject of the United States' complaint." *Id.* at *5 (quotation and citation omitted)). Similarly, in *United States v. Atrium Village Associates*, No. 87-CV-6527, 1988 WL 2778 (N.D. Ill. Jan. 12, 1988), the court found that the U.S. Civil Rights Commission was "not properly viewed as part of the executive branch" because it is an independent commission, but that the Department of Education and Veterans Administration were required to respond to defendants' discovery requests as they were considered part of the plaintiff, the United States. *Id.* at *1.

In an analogous case where the President of the United States was a named defendant, the court granted the plaintiff's motion to compel the State Department and Treasury to answer interrogatories served on the President, explaining that the President could respond to interrogatories based on information held in those executive departments because the President "has as much or even a greater degree of control over [those] departments than a corporation has over its subsidiaries." *Trane Co. v. Klutznick*, 87 F.R.D. 473, 476-77 (W.D. Wis. 1980). The court found that the President "benefited from information provided by the State and Treasury Departments" in setting policies, rules, and regulations under the laws that were at issue in the suit. *Id.* at 477. Although the issue in *Trane Company* was the scope of the "President" when he is sued in his official capacity, the analysis is

7

applicable to the scope of the executive branch when the United States is a party.

In Defendants' First Set of Document Requests ("Requests"), which were directed to "plaintiff the United States of America," the terms "You" and "Your" were defined to include the United States and "all of the departments, agencies, bureaus, and other sub-divisions of the Executive Branch." (Ex. 1 to Mot., Dkt. 45-1 at 4.) At the hearing, however, Defendants stated that they were only seeking documents from HUD and Treasury. (*See* Dkt. 66 at 10:4-6 ("[W]e're not seeking documents from the entire U.S. government. We're seeking documents from HUD and Treasury… .").) Defendants' arguments in their Supplemental Memorandum and Reply are similarly limited to HUD and Treasury. Because Defendants are no longer requesting that the entire federal government be responsible for responding to their discovery requests, only that HUD and Treasury be included in their definition of "party," the Court limits its analysis to these two departments.

Plaintiff maintains that "HUD and Treasury had nothing whatsoever to do with [the Subject Deals] or the representations made in connection therewith." (Opp. at 3.) According to Plaintiff, HUD did not insure any of the loans backing the Subject Deals, and neither HUD nor Treasury purchased any of the Deals' certificates. (*Id.*) As for the investigation, Plaintiff acknowledges that HUD and Treasury were part of the "RMBS Working Group" (*see id.* at 4), which, according to a DOJ press release, was formed "to investigate those responsible for misconduct contributing to the [2008] financial crisis through the pooling and sale of residential mortgage-backed securities." (Ex. 24 to the Decl. of Justin J. DeCamp in Supp. of Defs.' Mot. to Compel the Preservation and Produc. of HUD and Treasury Docs. ("DeCamp Decl."), Dkt. 68 at 1.) However, according to Plaintiff, "[n]either HUD nor Treasury had any role in investigating this case. Neither agency provided any documents in connection with this investigation. Neither agency was involved in fact-gathering or charging decisions in any way."[3] (Opp. at 4.)

---

[3] The Court rejects Plaintiff's attempt to conflate civil discovery and criminal discovery. (*See* Opp. at 9 (arguing

For purposes of party discovery, the "United States" includes agencies that engage in joint investigations. However, the definition of "United States" also includes agencies that inform the policies, rules, and regulations that the executive branch sets. *See Deane*, 2015 WL 1638022, at *5; *Trane Co.*, 87 F.R.D. at 476-77. That is the case here with HUD and Treasury.

It is undisputed that this case stems from the work of the Financial Fraud Enforcement Task Force ("Task Force"), led by the DOJ and "consisting of senior-level officials" from over 23 "departments, agencies, and offices," including HUD and Treasury. Exec. Order 13519, 3 C.F.R. 13519 (Nov. 17, 2009).[4] Its purpose was "to investigate and prosecute significant financial crimes and other violations relating to the [2008] financial crisis and economic recovery efforts, recover the proceeds of such crimes and violations, and ensure just and effective punishment of those who perpetrated financial crimes and violations." *Id.* Specifically, the Task Force was charged with, *inter*

---

that "what is in the 'possession, custody, or control' of the government for Civil Rule 34 should be interpreted the same way as what is in the 'possession, custody, or control' of the government under Criminal Rule 16").) Criminal discovery is more limited than civil discovery. *See Sec. & Exch. Comm'n v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (per curiam) (holding that "[t]he government had a discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter"); *see also Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 10 (D. Conn. 2002) (granting the United States' motion to intervene in a civil suit and stay discovery because, if the civil suit went forward, the defendant would receive information through discovery that he "would not otherwise be entitled to receive" in a related criminal action). The limitations on criminal discovery exist to "guard against specific concerns" that are not present in civil litigation. *Sec. & Exch. Comm'n v. Cioffi*, No. 8-CV-2457 (FB)(VVP), 2008 WL 4693320, at *2 (E.D.N.Y. Oct. 23, 2008); *see also Horne v. Perlman*, 433 F. Supp. 2d 292, 295 (W.D.N.Y. 2006) (denying "discovery under Rule 16 of the Federal Rules of Criminal Procedure" because, *inter alia*, these Rules "are not applicable" to civil matters); *Castro v. City of New York*, Nos. 94-CV-5114 (JFK), 94-CV-6767 (JFK), 1995 WL 699730, at *1 (S.D.N.Y. Nov. 28, 1995) (explaining that the importation of criminal procedure into civil cases "is plainly at odds with general case law on discovery standards" because discovery in civil cases "is supposed to be particularly liberal"). Therefore, the Federal Rules of Criminal Procedure, and the case law interpreting those rules, do not govern this Court's consideration of the Motion. The Court likewise rejects Plaintiff's argument that "this FIRREA action is like a criminal action in that the United States is not involved as party to any controversy but, like in the criminal context, the United States 'is the representative not of an ordinary party to a controversy, but of a sovereignty.'" (Opp. at 10 (quoting *Berger v. United States*, 295 U.S. 78, 88-89 (1935) (alteration omitted)); *see also* Sur-Reply at 5.)

[4] The U.S. Navy introduced the term "task force" to describe the organization of the vessels in its fleets by mission. *See* Colin D. Robinson, *The U.S. Navy's Task Forces: 1-199*, 36 Defense & Security Analysis 109, 109-10 (2020). The Navy's reorganization of the Atlantic Fleet into ten task forces in March 1941 "appear[s] to be the first ever formally established" task forces. *Id.* at 110. The origin of the term informs the concept of a task force as bringing together disparate units to achieve a common goal. *See id.* at 109-10.

*alia*, "provid[ing] advice to the Attorney General for the investigation and prosecution of cases of bank, mortgage, loan, and lending fraud." *Id.* According to a memorandum issued by the Attorney General to the Task Force, it was designed "to enhance the government's effectiveness to prevent and combat financial fraud by sharing information and fostering cooperation among members." (DeCamp Decl. Ex. 25 at 1.)

Moreover, in that same memorandum, the Attorney General described HUD and various bureaus within Treasury as "active participa[nts]" in the RMBS Working Group formed under the Task Force's auspices. (*Id.* at 2.) The memorandum stated that the Working Group was specifically charged with investigating matters such as "misrepresentations by originators, sponsors, underwriters, and other market participants concerning the quality of mortgages backing the RMBS." (*Id.* at 1.)

Thus, it is clear that HUD and Treasury joined with the DOJ (which includes the U.S. Attorneys' Offices for the Eastern District of New York and Northern District of Georgia) in the Task Force and the RMBS Working Group to solve a common problem and achieve a common goal through information sharing and other coordinated efforts. *See also* Fin. Stability Oversight Council, Nov. 23, 2010 Meeting Mins., Fed. Bank. L. Rep. P97-473 (Michael Barr, Assistant Sec'y for Fin. Insts., Dep't of Treasury, stating that the "purpose" of "an interagency taskforce on mortgage servicing and foreclosure issues" with the DOJ is "to provide a coordinated and comprehensive process for examining mortgage servicers in order to assess the problems, develop solutions, and hold, as appropriate, servicers and others accountable"). As part of their work, members of the Task Force were charged with "sharing information and fostering cooperation." (DeCamp Decl. Ex. 25 at 1.) Such a close working relationship between these two departments and DOJ in addressing the financial fraud at issue in this case is a sufficient basis for finding that HUD and Treasury should be considered part of the United States for discovery purposes.

As in *AT&T*, the instant dispute also involves "wide-ranging" facts. Plaintiff alleges that

Defendants "securitized over $41 billion of mortgage loans in the Subject Deals," about which they "knowingly and repeatedly made false and fraudulent statements to investors about the characteristics of the loans backing those trusts." (Compl. ¶¶ 1-2.) As a result of these misstatements, investors "lost many billions of dollars, with substantially more in losses projected during the remaining life of the deals." (*Id.* ¶ 2.) The investors in the Subject Deals included a wide range of other companies and nonprofits organizations, such as other "financial institutions (many of which were federally-insured), government-sponsored entities (such as Fannie Mae and Freddie Mac), federal home loan banks, credit unions, pension plans, and university endowments." (*Id.* ¶ 30.) Defendants' "fraudulent conduct and securitization machine . . . contribut[ed] to a housing bubble that, when it burst, led to one of the most severe financial crises in this nation's history, as well as the bankruptcy or distress of many of the [federally insured financial institutions] that originated the loans." (*Id.* ¶ 293.) This alleged misconduct "yield[ed] handsome profits" for Defendants. (*Id.* ¶ 27.)

Accordingly, the Court finds that the party United States is not limited to the U.S. Attorneys' Offices for the Eastern District of New York and Northern District of Georgia, but also includes HUD and Treasury.

**II.     Whether the Requested Documents Should be Preserved and Produced**

Defendants sent Plaintiff the sixteen Requests on January 22, 2019. (Dkt. 45-1.) In the Motion, Defendants identified four "categories of relevant HUD and Treasury documents" which they were seeking: (1) documents concerning HUD's audits of mortgage lenders, including lenders whose loans backed the RMBS at issue here; (2) documents concerning HUD's participation in the housing market; (3) HUD's and Treasury's analyses of mortgage underwriting standards; and (4) Treasury's analyses of the causes of the financial crisis and RMBS. (Mot. at 2-3.) Defendants characterized these as relating to three areas—"(i) the allegations of the Complaint; (ii) the U.S. Government's programs to relax mortgage underwriting guidelines and increase home ownership; and

11

(iii) the causes of the financial crisis"—covered by Requests 1, 2, 3, 5, and 15.[5]  (*Id.* at 2.)

At the July 9, 2019 conference, the Court directed Defendants to provide supplemental briefing setting forth the "specific types of documents" being sought and clarifying their relevance. (Dkt. 66 at 47:17-19.)  In their Supplemental Memorandum, Defendants regrouped the documents into the following six categories:  (1) HUD's review and approval of originators; (2) HUD's audits of originators; (3) HUD's analyses of housing policies; (4) HUD's analyses of mortgage underwriting guidelines; (5) Treasury's analyses of the causes of the housing bubble and the 2008 financial crises; and (6) Treasury's analyses of RMBS purchased in Treasury's Public-Private Investment Program.

---

[5] Those Requests are as follows:

> **Request No. 1**
> All documents concerning, referenced, identified, relied on, consulted in preparing, or otherwise used in formulating the allegations in the Complaint.
> **Request No. 2**
> All documents concerning any alleged misstatements or omissions by, or any allegedly culpable intent on the part of, UBS in connection with any of the 40 RMBS.
> **Request No. 3**
> All documents, including documents corroborating the allegation in paragraph 2 of the Complaint that "[i]nvestors . . . lost many billions of dollars," concerning any losses allegedly incurred by any person in connection with any of the 40 RMBS.
> **Request No. 5**
> All documents concerning communications between You and any witness or other person that is a source of information (whether or not identified in the Complaint), including any department, bureau, agency, or other sub-division of the federal or any state or local government and plaintiffs' counsel in other actions against UBS, concerning any matter alleged in the Complaint.
> **Request No. 15**
> Non-privileged memoranda prepared by DOJ, and communications among DOJ; the United States Department of Housing and Urban Development, and all of its departments, agencies, bureaus, and other sub-divisions (including the Federal Housing Administration); the Federal National Mortgage Association; the Federal Home Loan Mortgage Corporation; the Federal Housing Finance Agency; and Congress, concerning the following topics:
> (a) The scope of FIRREA;
> (b) The purpose of FIRREA;
> (c) The causes of the 2007–2008 financial crisis;
> (d) Your programs or policies to increase homeownership; and
> (e) Your programs or policies to relax or add flexibility to mortgage loan underwriting guidelines.

(Dkt. 45-1 at 6, 10-11.)

(Suppl. Mem. App. A at 1-4.)

Defendants do not explain how these six categories fit into the sixteen Requests or even Requests 1, 2, 3, 5 and 15, which were identified originally in the Motion as being the corresponding requests.[6] (*See id.*; *see also* Suppl. Mem. at 15-23.) Instead, Defendants argue generally that the documents they seek "directly bear on at least three key issues in this case: scienter, materiality, and loss causation." (*Id.* at 16.)

With regard to scienter and materiality, Defendants argue that whether a defendant complied with industry standards is relevant in determining scienter in fraud cases. (Supp. Mem. at 16-17 (citing *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 230, 248 (S.D.N.Y. 2014); *Beede v. Stiefel Labs., Inc.*, No. 13-CV-120 (MAD)(DJS), 2016 WL 916418 (N.D.N.Y. Mar. 7, 2016).) Defendants contend that "HUD possesses documents that are relevant to these allegations, because HUD—the principal regulator of and largest participant in the mortgage market—was doing essentially the same thing UBS was doing." (*Id.* at 18.) The processes HUD used to review and approve originators "were remarkably similar to UBS's due diligence process. That is no coincidence—HUD and UBS both were using industry standard due diligence processes during the same time period, which strongly suggests that UBS was not acting with fraudulent intent." (*Id.* at 19.)

Defendants request documents related to HUD's review and approval of originators, as well as their subsequent audits of those originators, for participation in a Federal Housing Administration program which insured against mortgage losses for single-family homes. (Suppl. Mem. App. A. at 1.) In support of their argument that HUD's process was "remarkably similar" to Defendants' due diligence process, Defendants point out that HUD insured loans made by originators that "Plaintiff

---

[6] Indeed, Request No. 15 by its own terms is directed only at documents "prepared by DOJ, and communications among DOJ; [HUD], and all of its departments, agencies, bureaus, and other sub-divisions (including the Federal Housing Administration);the Federal National Mortgage Association; the Federal Home Loan Mortgage Corporation; the Federal Housing Finance Agency; and Congress." (Dkt. 41-1 at 9.) It does not include any other component of the federal government, including Treasury.

13

now calls 'shoddy'" (Suppl. Mem. at 18 (quoting Compl. ¶ 4)), hired third-party vendors to review samples of loans in evaluating the originators' underwriting practices (*id.* (citing DeCamp Decl. Ex. 12 at 18-20, Fig. 7)), "frequently changed the grades" that these vendors assigned to the loans (*id.* at 19 (citing DeCamp Decl. Ex. 12 at 21-22, Fig. 9)), and concluded that originators "'generally complied' with HUD" requirements despite "'significant deficiencies'" in their files. (*id.* (quoting DeCamp Decl. Ex. 13 at 2)).

Defendants fail to show how HUD's review, approval and audit process was "remarkably similar" to UBS's due diligence process involving the loans that were part of the Subject Deals. For example, HUD's application process included specific documentation: "In addition to an application form and fee, lenders are required to submit supporting documentation, including the resumes of senior corporate officers; certified financial statements; and photographs and floor plans of the lender's main office." (DeCamp Decl. Ex. 10 at 10.) Defendants do not state whether their own due diligence process entailed review of these types of documentation. The exhibits submitted by Defendants fail to shed any light on any purported similarities.[7] (*See* Dkts. 68-10, 68-11, 68-12, 68-13, 68-14.) Without such information, the Court cannot conclude that Defendants' process was, in fact, similar to that of HUD's. *See Soni*, 2020 WL 2836787, at *7 (holding that "the conclusory assertion that" the requested documents "'will likely contain relevant information'" is not sufficient to show "how the requested [documents] are in fact relevant to this action").

Defendants also do not explain how the process engaged in by a government entity to determine inclusion in its insurance program constituted "industry standard" for the due diligence

---

[7] For example, Exhibit 10 to the DeCamp Declaration is a report from the Government Accounting Office, dated April 2000, to the Subcommittee on Housing and Community Opportunity of the Committee on Banking and Financial Services in the House of Representatives and the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs in the Senate, entitled "Single-Family Housing: Stronger Oversight of FHA Lenders Could Reduce HUD's Insurance Risk." (Dkt. 68-10 at 3.)

process required of private parties such as Defendants when securitizing loans. Defendants admit that they were, in fact, unaware of the due diligence procedures used by HUD, stating, "[t]o be clear, Defendants do not argue that HUD's due diligence is relevant because UBS was aware of the specifics of HUD's process." (Suppl. Mem. at 19.) Defendants do not explain how procedures they were unaware of bear on their scienter at the time the Subject Deals were securitized.

Moreover, because Defendants have not filed an answer to the Complaint or stated their affirmative defenses—despite their assurance to the Court that they would (*see* Dkt. 66 at 49:12-50:21)—the Court is unable to determine how documents related to HUD's oversight of originators for purposes of its insurance program is relevant to any of Defendants' defenses in this matter.[8] Thus, Defendants have not demonstrated how documents related to "HUD's review and approval of originators" or "HUD's audits of originators" are relevant to the issues of scienter or materiality. *See Tottenham v. Trans World Gaming Corp.*, No. 00-CV-7697 (WK), 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) ("Discovery requests cannot be based on pure speculation or conjecture." (citation omitted)).

With respect to loss causation, Defendants state that they "intend to argue, *inter alia*, that investor losses in the [Subject Deals] were the result of the dramatic and unprecedent decline in home values during 2007 and 2008—not some allegedly undisclosed underwriting defects in loans included in the [Subject Deals]—and that the housing bubble and financial crises were caused, in no small part, by Plaintiff's own policies—implemented by HUD—to promote homeownership." (Suppl. Mem. at 20-21.) Defendants allege that "[t]hese policies, among others, are far more likely explanations of the housing bubble and financial crises than UBS's alleged conduct." (*Id.* at 21 (footnote omitted).)

---

[8] In response to the Court's request at the July 9, 2019 conference that Defendants "show your hand a little bit, and state what some of those affirmative defenses are" so that the Court could better evaluate the relevance of Defendants' document requests, Defendants stated they could "easily do that." (Dkt. 66 at 50:7-12.)

15

Defendants fail to explain how the requested documents are relevant to loss causation. The Complaint does not allege that Defendants are the sole cause of the housing bubble and financial crisis. Historians and economists will no doubt continue to explore and debate the social, political, monetary, economic, and behavioral forces behind those historic events. For purposes of the case before the Court, those causes and the role governmental entities such as HUD may have played in them are not relevant to what Defendants are alleged to have done. Defendants have not presented any defenses which require delving into what others may have done to contribute to the housing bubble and financial crisis. None of the exhibits submitted by Defendants in support of their relevance argument discuss the losses experienced by the Subject Deals.[9] (*See* Dkts. 68-15, 68-16, 68-18, 68-19, 68-20.) *See Neogenix Oncology, Inc. v. Gordon*, No. 14-CV-4427 (JFB)(AKT), 2017 WL 1207558, at *10 (E.D.N.Y. Mar. 31, 2017) ("The problem with Defendant's proffer is that it fails to cite any evidence or concrete facts which would provide even elementary support for the assertions it makes and the broad swath of discovery it seeks to obtain via the Subpoena.").

Moreover, to the extent the information in the requested documents may be relevant, Defendants have not shown why the publicly available information is insufficient. *See Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-CV-6608 (PKC)(JCF), 2013 WL 6283511, at *6 (S.D.N.Y. Dec. 4, 2013) (denying a motion to compel as to certain documents that were "publicly available on the Internet").

Accordingly, Defendants' request to compel disclosure of the various analyses by HUD and Treasury of housing policies, mortgage underwriting guidelines, causes of the housing bubble and

---

[9] Exhibit 15 is an excerpt from a May 1995 HUD report entitled, "The National Homeownership Strategy: Partners in the American Dream." (Dkt. 68-15.) Exhibit 16 is a copy of the Housing and Community Development Act of 1992. (Dkt. 68-16.) Exhibit 18 is a September 2013 report by Treasury entitled, "The Financial Crisis Five Years Later: Response, Reform, and Progress." (Dkt. 68-18.) Exhibit 19 is written testimony given by Secretary Timothy F. Geithner to the House Committee on Financial Services, dated March 23, 2010. (Dkt. 68-19.) Exhibit 20 is a "Fact Sheet" on the "Public-Private Investment Program," dated March 23, 2009. (Dkt. 68-20.)

financial crisis, and RMBS purchased in Treasury's Public-Private Investment Program is denied.

## CONCLUSION

Based on the foregoing analysis, Defendants' motion to compel production of the six categories of documents described in their Supplemental Memorandum of Law in Support of their Motion to Compel the Preservation and Production of HUD and Treasury Documents (Dkt. 67) is denied.

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated: Brooklyn, New York
November 30, 2020